# EXHIBIT 4

**Page 1**

BEFORE THE MISSISSIPPI STATE UNIVERSITY
PROMOTION AND TENURE COMMITTEE

RE: LI ZHANG

_____

TRANSCRIPT OF HEARING TESTIMONY OF
JULIE JORDAN

_____

Had on June 5, 2025
at Mississippi State University

Transcribed by: Cathy White

**Page 2**

APPEARANCES

COMMITTEE MEMBERS:

    DR. ROBERT GRALA, CHAIR
    MS. KELLI ANTHONY
    DR. MELODY DALE
    DR. DIPANGKAR DUTTA
    DR. SANTANU KUNDU
    DR. SHIEL LU
    DR. ROBERT MOORE

MISSISSIPPI STATE UNIVERSITY REPRESENTATIVE:
    DR. TABOR MULLEN

LEGAL ADVISORS FOR MISSISSIPPI STATE UNIVERSITY:

    CHARLIE WINFIELD, ESQUIRE
    ASHLYN MATTHEWS, ESQUIRE

LEGAL ADVISOR FOR DR. LI ZHANG:

    GRAFTON BRAGG, ESQUIRE

**Page 3**

INDEX

Style . . . . . . . . . . . . . . . . . . . . .  1

Appearances . . . . . . . . . . . . . . . . . .  2

Index . . . . . . . . . . . . . . . . . . . . .  3

Julie Jordan

    BY DR. MULLEN . . . . . . . . . . . . . . .  4

    BY DR. ZHANG . . . . . . . . . . . . . . .  21

    FURTHER BY DR. MULLEN . . . . . . . . . . .  39

    BY THE COMMITTEE . . . . . . . . . . . . .  40

Certificate of Transcription . . . . . . . . .  54

**Page 4**

EXAMINATION

BY DR. MULLEN:

Q. Dr. Jordan, would you introduce yourself to the --

A. Sure.

Q. -- promotion and Tenure Committee?

A. I'm Julie Jordan, serve as the vice president for research and economic development here at Mississippi State.

Q. And at a very brief level, can you tell us what that actually does?

A. So my office is responsible for all the compliance, all the grants and contracts, whether that's a live animal compliance or it's radiation safety or bio safety, or it's compliance with terms and conditions in all of our grants and contracts. We're also responsible for, you know, trying to secure additional funding from managing sponsor relationships, managing -- supporting and managing our federal relationships, our state relationships that provide and seek to bring in more external funding to the institution, responsible for trying to set sort of broad, high-level strategy and supporting faculty and their research enterprise.

Q. And you do that pretty well. You're a top --

A. I don't -- well, Mississippi State University

Cathy M. White, CCR

cathywhitecsr@gmail.com

601.405.3762

5

does research really well.

Q. Sure.

A. We have great faculty. We're in a top 100 research institution. We have solid contracts and grants management. We turn things around. You know, faculty come to Mississippi State and they talk about how they get better support from our sponsored projects and we sponsored programs accounting here than other places. So we've got good procedures. We've got good processes that work. As far as compliance, we pass AAALAC, we pass our a accreditations. So we're really, you know, we're solid and we punch above our weight, so to speak. Dr. Keenum always talks about the fact that our production per faculty member is really high, and that comes with planning and support that this institution provides.

Q. Top 100 institution, top 70 public.

A. Yeah.

Q. What about our congressional support?

A. Congressional support is super. We punch above our weight congressionally and always have, and it's because of the strategies and the approaches we take to managing our priorities with our congressional delegation. It's a lot to do, honestly, with Marty Fuller and years of experience and reputation of, number one, doing what we

6

say we're going to do --

Q. Who is Marty Fuller?

A. Oh, so Marty Fuller is our federal liaison. He works for a -- he's a former Mississippi State employee, faculty member, professor. Several years ago, he retired from the University and went to work as a federal liaison, our lobbyist for a group in D.C., and he works for us through that group.

Q. He's about as connected in D.C. as it gets.

A. As it gets, yeah. He knows his way around and people know him, and he knows how to help us secure funding that supports and undergirds our research enterprise.

Q. And y'all talk quite a bit?

A. Oh, yeah.

Q. Okay. I want to get an issue you just hit on.

A. Okay.

Q. Okay? How often do you get phone calls from congressional offices or from Dr. Fuller alerting you to problematic solicitations?

A. Rarely, if at all.

Q. Okay. And just to make sure --

A. I don't know that I've had one in a couple of years.

Q. -- news like this doesn't come to you in an

7

email. It's typically a phone call of, hey --

A. It's a text that message says -- or a phone call that says, hey, what's going on with this, this showed up and I didn't know anything about it.

Q. Okay. And that's problematic because of the procedures that we have?

A. That's right.

Q. Okay.

A. And it's just us -- we have such a great relationship and we manage the relationships with our congressional offices so well that, when something shows up that we don't know about -- and if Marty doesn't know about it, I didn't know about it.

Q. Right.

A. So that's really unusual for something to show up in that office that we didn't know or we didn't expect.

Q. So could you work us through, in your own memory, what you remember, and we have exhibits --

A. Sure.

Q. -- for both sides of how that conversation ended up in Dr. Zhang's reprimand.

A. So there had been --

Q. And go back as far as you need to.

A. Yeah. So there had been some correspondence not with me personally, but with my office with Dr. Gammill

8

to -- during the process of submitting that Department of Transportation grant that said, you know, we don't generally seek congressional support for competitive proposals. This was a highly competitive project. We don't normally do that. From time to time, we may make them aware that something's formed, but that's completely different than seeking congressional support, is to let them know that we are applying for something different from support. Because getting involved with that competitive process, we keep -- we use our chip, so to speak, for the other work and not the competitive projects, as it goes. And so -- and that's whether it's on the engineering side of things or it's the ag side of things, that's just kind of the way we do it. So that -- so the communication had gone on during the proposal preparation process that we weren't going to do that, that's just not how we did it.

Then sometime later, I think in the September time frame, I was looped into an email from -- that was circulating that Dr. Zhang had sent to his team around actively asking his team to seek congressional support for this project. And, you know, at that time, I looked -- you know, I looked at it and go, hey, you know, we asked you not to do that. So I just sent an email that said please stand down, please don't do this, this is not how

9

we do this.  That email is, I'm sure, somewhere in this.

And after -- it was after that that he get the phone call or the notice of, hey, what's going on, somebody from another state is down in the office, you know, looking for support for this project, because we had not worked it through because we made the decision that was not what we do with competitive projects.  And so that's what set that in motion to go, you know, you know, we just can't do this, and it was just that whole -- that project had been very tech- -- just lots of things had not -- procedures had not been followed, processes not been followed, deadlines had not been followed and so forth.  And so that's what ended up with the letter.

Q.  Okay.  For a vice president of research, do you have a lot of letters of reprimand?

A.  No, not many at all.

Q.  Okay.  So --

A.  Very few -- I mean, you know, particularly for faculty, you know, presenting -- we don't get involved with, you know, the -- what they -- what that proposal is, what the content, the technical content, of that proposal is.  We're trying to make sure it's complaint.  So we have process responsibility, but we don't have that other responsibility of whether this is -- makes sense to submit or not.  We're not doing that.  So the only leverage we

10

have is trying to make sure that the processes are working.

For example, we have something called the three-day waiver.  We want proposals to show up in our office so we can review them and have a reasonable amount of time, three days, to submit.  Many universities have five days.  We have three.  And then if it doesn't show up, which this one didn't, and they don't always, there are reasons sometimes, we have a waiver and it can still get submitted.  There have been very -- there's still very few things that ever don't get submitted.  We try to do our darnedest, but we try to also try to get people to be reasonable about deadlines.

Q.  We're going to go back to those reasonable deadlines and boundaries in just a little while.

Was this the first time that Dr. Zhang had kind of -- I assume most faculty members really don't interact with the vice president --

A.  No.

Q.  -- very much.

A.  (Indiscernible) sponsored projects and others.

Q.  But if there are troubling issues that would bubble up --

A.  Yeah.  If they're persistent -- if they're persistent, if certain -- if faculty are persistently just

11

disregarding procedures and policies and how things operate, I get looped in just to be made aware in case the dean says something to me or department head or I bump into people, I get a heads-up.  Rarely from a heads-up do I take some action unless it's, you know, something extraordinary --

Q.  Okay.

A.  -- at that time, yeah.

Q.  Like, in February of '22, with the ASSURE grant?

A.  Right.  I mean, yeah.  I mean, that came up and it had been talked about, I'm pretty sure, with other people, before it ever showed up.  You know, it was just awareness to me that we need to pull -- we need to pull him off this project, the sponsor would -- you know, doesn't want him on the project anymore.

Q.  And that was for what particular -- what was conveyed to you for why we needed to pull --

A.  Because he was communicating proprietary information to the -- in open settings that the sponsor did not want communicated.

Q.  Okay.  And I have no doubt that Dr. Zhang disputes that, but that's what was communicated --

A.  That's what was communicated.

Q.  -- to you.  Got it.

A.  And the sponsor --

12

Q.  And thus, Mississippi --

A.  And the sponsor is very important to us, and so --

Q.  (indiscernible) is pretty important?

A.  Yeah.

Q.  Sure.

A.  And so it's -- you know, it doesn't happen very often that we pull somebody off, but if a sponsor doesn't want somebody working on their project, we're not going to -- we're likely not to jeopardize the entire project for leaving that individual if somebody else could do that work or that work's not wanted -- I think in this case, I'm not sure if they wanted that particular work anymore done, either.

Q.  And if I'm -- could you turn in my book, which is the other one, to 31?  And is that kind of the email chain back and forth?  And you're not always on everything, but I believe that that is ultimately the removal by J.C. Key (indiscernible).  We go to 06.  Tom had a question, Dr. Zhang in CEE is asking why he's removed from the ASSURE led to a reduction in his '22 -- I'm paraphrasing -- do you have any other further background.  This would have ultimately -- in 7105, is that a decent explanation?  But if we go to the third paragraph, ma'am, this is a very condensed summary of what is a pretty

13

complex matter, and we kind of talked about it earlier. The worst news is never delivered in an email?

A. Oh, no. Yeah. We're not going to put our sponsors in particular -- we're not going to put words in our sponsors' mouth in an email. But if they call us and they say something that's not going right or a person who hasn't done something right, we're going to manage it as best we can internally. We're not going to ever -- we're not going to put words in our sponsor's name that they're not willing to -- that they don't want.

Q. Okay. Let's skip ahead. Well, let's skip backwards even a little bit to the MDOT project.

A. Okay.

Q. Okay? So it began in '18. When did end; do you remember?

A. I don't think it finally ended until 2023. It got on my radar sometime in 2022, I think.

Q. Okay. And again, why did it bubble up to the vice president's office?

A. Because it was -- an extension was being requested, I think, for the third or fourth, maybe third time, and that's really unusual, and it had gone on that long. And so that's when sponsored projects probably called me and said, hey, you know, do you want to -- we're going to -- we've got this renewal now for a third time,

14

it's really unusual. So that's how it got on my radar. And so then I started, you know, asking questions about what was going on.

Q. A research project like this in '18 typically would take how long?

A. I think it was a two-year project.

Q. Okay. And you're kind of alluding to five?

A. I didn't even know it was asking -- it was asking for another extension that was going to get it over into five years.

Q. Okay. And the research that one does in '18, is this valid? It's still good data? Can you even --

A. That would be up to the sponsor, but the Department of Transportation, something that they were trying to learn about in 2018, by the time we get to 2025, may or may not be useful.

Q. So not a great deliverable to --

A. Not getting a deliverable to a sponsor that's important to the state, a relationship that's important to the --

Q. MDOT concerned about its --

A. They just wanted the project to end. They were ready to get it off their books --

Q. Okay.

A. -- and wanted the project to go away, get what

15

they needed to be able to justify paying it and -- which was the final report at that time, and get it off their books.

Q. Off their books. That's a -- I assume that the Department of Transportation for the State of Mississippi is another important relationship?

A. Absolutely. Absolutely.

Q. Particularly for the college of engineering?

A. And it had been important to Dr. Zhang's career earlier --

Q. Okay.

A. -- as well. And he did a lot -- he did work for the Department of Transportation. I assume that you'd want to do a good job and get them, like you said, you were going to get them so you can get the next work.

Q. So we've gone over three different incidents, as I look at it, that have caused you concern.

A. Absolutely.

Q. Okay. And so you did put some boundaries on Dr. Zhang at that point?

A. That's right. I just wanted to know what he was doing so that our teams could be aware that -- to be expecting it.

Q. Did he do -- do you have to do that a lot?

A. No.

16

Q. Is this extraordinary?

A. Extraordinary because it was extraordinary work on our team or -- to support.

Q. Could you talk about that a little bit?

A. So, you know, there's just piles and piles of, you know, email strings where we're asking for -- somebody's asking for a budget and to be done a certain way, and then it didn't get a response or didn't get responded appropriately, it has to be redone and, you know, all kinds of support provided either by the dean's office, Dr. Reeves, Dr. Keith at the time, my office, Dr. Gammill. Sponsored projects is always in that. So all this work was going into this effort and it was just all -- it was just persistently disjointed in how the processes were followed, basically not following processes. And so it was just creating extra work. It didn't mean that we weren't trying to help. We were constantly trying to help to get the projects out the door and we did get the projects out the door. But it was always -- it was always a lot of extra work.

Q. And, in fact, at some point, he has to have approval from you and he continues to submit proposals?

A. Yes.

Q. And you'd approve them the same day?

A. Right. I mean, the fact that somebody needs to

**17**

email me it was going to take -- in the thinking or processing of submitting, wanting to submit a proposal, taking two minutes to shoot me an email that says, hey, Dr. Jordan, thinking about submitting this one, is it okay, you good with that, and I turn around and say, yes, I mean, that's two minutes of somebody's time in the processes of any proposal to ask that. And it simply gives our office heads-up this is coming, let's be prepared, let's try to get ahead and see what we need to do.

Q. And did anything ever improve?

A. I'm not sure he -- I don't recall if he submitted anything after that period of time.

Q. Okay.

A. I mean, I did approve some, but I don't know that --

Q. That's fine.

A. I don't recall if I ever received any.

Q. Look, I would rather you say, and I think the Committee would, you don't recall --

A. Yeah.

Q. -- than make something --

A. I don't think I did.

Q. Okay. My impression, and I -- even at the end, there was just a continuation of an unacceptable effort in

**18**

research. Is that fair?

A. I think that that's not really my office's --

Q. Okay.

A. -- job --

Q. Okay.

A. -- to decide if somebody's effort in research is acceptable or not.

Q. Okay.

A. It falls into the realm of --

Q. I agree. I agree. Let me rephrase.

A. Okay.

Q. Let me restate what I'm saying. This is a termination hearing, and that makes it difficult for everyone involved. But what I don't hear you say is that his research was so important for us to have not terminated him.

A. He wasn't producing research. The volume of research, from a production perspective, was not -- was not being full to the amount of research --

Q. Got it.

A. -- at this institution.

Q. All right. And did your staff go out of their way to hurt his research?

A. No. To hurt it or herd it?

Q. Hurt, hurt.

**19**

A. Oh, no. Yeah, no, we weren't hurting --

Q. To stymie it.

A. Oh, no, we did not go out --

Q. To let him fail.

A. No. We were trying at every corner. I mean, fall (indiscernible, two speakers) --

Q. There's going to be an email I'll talk to you in just a little bit about Teresa Gammill talking about this is going to make you look back to IGO.

A. No.

Q. Okay? Did she set him up?

A. No. He had pushed on this project before I got in this role before, and so he was determined to lead this effort. And so it was, okay, I think there was nothing -- there was -- I wouldn't say there's nothing. There was little evidence from past work --

Q. Uh-huh.

A. -- that indicated to me, so it would be my own opinion, but that indicated to me that he would be overly competitive or successful at a large multi -- a large project like this.

Q. Okay.

A. I mean, large projects are large projects for a reason. They're complex for a reason. And certain PIs are better suited at large projects as opposed to

**20**

individual PI work, such as maybe that done at the Department of Transportation.

Q. Okay.

A. There's no evidence that that -- that he had -- he could -- he could do that.

Q. And that is your vice presidential professional opinion?

A. That's right.

Q. That the best indicator of future success is the past?

A. Yes.

Q. It's easy to say that -- we talk a lot about operational policies at the institution. You've talked about those. I just want to kind of leave it. Did your staff ever bend any policies to acquiesce or to help Dr. Zhang along?

A. Yeah. When we didn't -- he didn't hit any of the deadlines and, you know, we still did it. And even though we tried, so -- so policy -- so let me talk about --

Q. Yeah.

A. I'll be carful, though, because policies are one thing.

Q. Sure.

A. And then there are procedures.

Q. Thank you for --

21

A. And so an awful lot -- an awful lot of what our office deals with is procedures that --

Q. Good --

A. -- we've established and not policy. So I think we don't -- we don't bend policy. We can -- we can adapt and adjust procedures depending upon any given situation to try to help people.

Q. I appreciate that. So did your staff --

A. Yes.

Q. -- spend --

A. Procedurally --

Q. -- (indiscernible, two speakers) procedure?

A. -- we did everything we could.

Q. Gotcha. To help him or hurt him?

A. To help him, I think.

DR. MULLEN: Dr. Grala, no more.

(Discussion had off the record.)

(Recess.)

DR. GRALA: Dr. Zhang, it's now your time to ask questions.

DR. ZHANG: Okay.

EXAMINATION

BY DR. ZHANG:

Q. Thank you so much, Dr. Jordan. Would you mind if you turn to the Exhibit Z-31? 30. I'm sorry, Z-30, the

22

first page.

A. Yes, sir.

Q. Right. That is from Dr. Gammill's email. And the second paragraph of his email, would you mind to read that?

A. Second paragraph of Dr. Gammill's email?

Q. Uh-huh.

A. This one?

Q. Uh-huh, yeah, the second paragraph.

A. That's the reason I gave him the green light to let him fail and then they'll be done with having to deal with his tirades every year when their RFP drops.

Q. Would you mind to explain to the Committee?

A. Well, I think it is saying that -- I mean, the gist of the letter, the email, is that giving the green light to submit for this and that, hopefully, it will keep the arguing, I would say tirades or arguments, down every year when this RFP drops. So it was a green light to go ahead and submit, sir.

Q. Okay. Thank you so much for you read that email.

You have mentioned a lot about procedures, everything is so important to your office. Is that -- should you have shared those procedures with me and with the Committee?

A. Share the procedures?

23

Q. Uh-huh.

A. Well, there's a lot of procedures and documents on the Office of Sponsored Projects website. So there are procedures around what we need as far as when proposals are submitted, what types of documents. All of those depends upon whatever the sponsor is, so --

Q. Okay.

A. -- those are highly dependent upon what the sponsor needs, and so that's why there's -- the first process, the first step is to generally a similar ticket is submitted in (indiscernible) for a PI that wants to submit a proposal. Then our specialist, for whatever agency that is, can begin to work with the PI --

Q. Okay.

A. -- to let them know. USDA needs something different from (indiscernible, two speakers) --

Q. Right.

A. -- needs something from this one.

Q. And for -- my point is that if I violate any procedures, would you and MSU will put those procedures in a binder and -- because those binders are supposed to support what MSU's point is. So whatever procedure I violated, those procedures should be in this binder. Right? If you don't mind to find those procedures in the binder.

24

A. I've not read these binders, sir, so I can't -- I don't --

Q. Okay.

A. I've not read these binders.

Q. Okay.

A. I don't know what procedures are in here and what procedures aren't in here.

DR. MULLEN: The comprehensiveness of Mississippi State University's policies and procedures and those that you're alluding to are published, and we have supplied what we thought supported our particular claims.

DR. ZHANG: Okay.

Would you mind to -- okay. Okay.

DR. MULLEN: We outlined that in a letter and an amendment to that letter.

DR. ZHANG: Okay.

BY DR. ZHANG:

Q. So, Doctor, you cannot identify any procedures at this particular point of time specifically.

A. The procedure of the -- I mean, you missed the three-day waiver approval, I'm pretty sure, for that particular one. So the three-day waiver rule is published and broadly known across the institution for a number of years. So that procedure. There were -- I think it was actually submitted, if I remember reading some of the

**25**

notes, I think it was actually submitted without a financial conflict of interest form that was required, but we submitted without it anyway. So, you know, there were several things that were required that we -- that's the part of us bending over backwards to try to help you get this through and over the hump, because certain things weren't followed that would have certainly made it more competitive and would have made it easier for everybody.

Q. Right.

A. It's what the procedures are for.

Q. (Indiscernible, two speakers).

A. Trying to make things flow well and things be more (indiscernible, two speakers).

Q. Right. I was fired by associated with somebody who contact our congressional office, about that contact, you know, congressional office, one of those procedures --

A. There was an email, sir, that I sent to you that said, please stand down and not contact (audio distortion).

Q. Okay. So that's not procedure. It's just an email I should stand down?

A. Yes.

Q. Okay. Okay. Thank you for clarifying. It's not violate any procedure --

A. It is our --

**26**

Q. (Indiscernible, two speakers.)

A. -- internal -- it speaks to -- it's our procedure. That's how we handle things.

Q. Okay.

A. And, clearly, I put it in writing and Dr. Gammill and others had told you that that's not what we were going to do. So it was more than once that you were said that's not what we do.

Q. Okay.

A. You were asked more than once.

Q. Okay. Can you turn to Z-31? When MSU soft touch [phonetic] UTC proposal and the -- page 4, which is the number the MSU 249329. Would you mind to read that?

DR. GRALA: Could you repeat the (indiscernible)?

BY DR. ZHANG:

Q. Tab Z-31.

A. Which one do you want me to read?

DR. MULLEN: He want you to read --

A. 21? 249329, from Dr. Gammill to Dr. Reeves?

BY DR. ZHANG:

Q. Uh-huh.

A. Agree with all of the above. Zhang will be furious that we pulled it, but even worse that we have made him look bad with the partnering IHLs.

Q. Okay. Would you mind interpret "make him look

**27**

bad"?

A. I'm assuming that you -- that would be mean that -- I mean, Dr. Gammill wrote that, so I don't know that I really want to put too many words in, but I'm assuming that it would mean that your colleagues that have put the work in would be disappointed that the project didn't go in.

Q. So is that true, you and your office deliberately to make me look bad and deliberately to let me fail?

A. No.

Q. Well, quote, let me fail, let him fail from Dr. -- letter quote from Dr. Gammill. It's not one email. The second email --

A. There's --

Q. Let me quote, feel -- let me finish.

Let me quote from Dr. Gammill. Start at the quote, "make him look bad," end of quote. It's not just one email to -- you know, to trying to back patch that quotes. So let me move from something else.

If you don't mind that you go to Z -- let me read my document.

MR. BRAGG: Z-42.

BY DR. ZHANG:

Q. Z-42. If you look at page 6.

MR. BRAGG: It's pages 6 and 7. They're not

**28**

numbered, 6 and 7. I think on the bottom of page 6 is the email of September 15th at 9:12 a.m.

Do you see it?

DR. JORDAN: Uh-huh.

DR. MULLEN: That's from Cindy Smith. She worked for the Department of Transportation.

DR. JORDAN: Yeah, she worked for the department.

BY DR. ZHANG:

Q. Okay. There is an email in that email chain that -- there is email chain, MDOT informed MSU they already approve my extension and the -- because Cindy Smith knows I'm going to be on sabbatical leave on 4/22. Do you remember that email?

A. The one on this page?

Q. I'm trying to find out which.

MR. BRAGG: Page 4.

DR. ZHANG: Page 4? I'm sorry. Right. Yeah. I request -- I request --

MR. BRAGG: Dr. Zhang's email begins on page 5 and then your responses are going to go on page 4.

DR. ZHANG: Right.

BY DR. ZHANG:

Q. So my request on page 5 docs, and then the approve letter, approve email from Cindy Smith is on page 4. If you'll look at the middle, Cindy Smith said, yes,

29

we have already talked, says, he's on sabbatical. We are extending it to a year. So that is October 20th. So MDOT already approve that and, at the same time, you're trying to hunt me for additional something at the same time as Dr. Gammill said let him fail, let him fail and then make him look bad. So this is a consistent effort to make me look bad. So in your office and you orchestrate with MDOT, you can see, later on, after you talk with Cindy, and then Cindy let me -- I talk -- if you look at the email --

MR. BRAGG: Page 3.

BY DR. ZHANG:

Q. -- page 3, I talk with -- okay. You read the first line of that email.

A. I talked with Julie Jordan of OSP at MSU last Tuesday.

Q. Please continue.

A. I get that he will not need an extension.

Q. So did you contact me? I already work with them that covered extension were ready. Then you talked to him that -- you talked to her that I don't need extension. Have you contact me before you talked to Cindy Smith I don't need an extension? How do you know I don't need an extension?

A. I don't think you needed an extension because the

30

only thing that was left was the final report, and I don't believe -- if I recall, there was no -- there was no funding left. Everything had been spent on that project.

Q. Are you aware I was on sabbatical that semester?

A. I was aware you were on sabbatical at the time, yes.

Q. Right. So is that reasonable for me to deliver a report I come back from sabbatical?

A. I don't know if it's reasonable or not, but the sponsor had been waiting --

Q. Well --

A. -- for a long time.

Q. Well, sponsor already approved my extension and you said no, no, no, no extension.

A. That's right. I also have to approve extensions. I --

Q. (indiscernible, two speakers).

A. I also have to approve extensions.

Q. Okay.

A. I also have to approve requests for extensions.

Q. Okay. Is that true Isaac Howard required the extension that year or he started project the same year with me and he requested extension in almost the same time? Did you approve his extension or you just ask him in the (indiscernible) --

31

A. I'm not what you're -- I'm not sure who "him" is because there's --

Q. Isaac Howard.

A. -- (Indiscernible, two speakers) and there's John, and there's not -- there's not a "him" in this.

Q. Well, another project, I started almost the same year his fourth request, the third extension, too, so --

A. I don't know anything about that.

Q. Okay. You don't know anything about that. Okay. That's okay. Thank you so much. You don't know anything about that.

So why you pay attention to my project --

A. Because --

Q. -- instead of to Dr. Isaac's project?

A. Because -- I said that earlier. It was the third no-cost extension that was requested and was granting a project out to overpass five years. That was really unusual. So the Office of Sponsored Projects brought it to my attention.

Q. Is that true that MSU had decided to punish me for something before you --

A. It had nothing to do with punishing anybody. It was trying to wrap up a project, get it off our books, get it off their books, and there was no more money left. All the money had been spent. The project needed to come to

32

an end.

Q. Is that true you know my EEOC complaint and the federal complaint about MSU before those events, before the UTC project (indiscernible) events?

A. I'm not sure that -- I'm not sure of the question. Did I know what?

Q. Do you my EEOC complaint and the federal and state court complaint about MSU?

A. Court complained? What court complained about MSU?

Q. About fired, firing. You know my EEOC complaints?

DR. JORDAN: I'm not sure what he's asking.

DR. MULLEN: Were you aware or are you aware that Dr. Zhang has filed an EEOC complaint with the University?

DR. JORDAN: Yes.

BY DR. ZHANG:

Q. When did you know?

A. I don't remember. Six, nine months ago? I don't know. I don't recall when I found out.

Q. Six months from today or --

A. Yeah. Six or nine months ago from now. I don't remember when I -- I don't remember when I was asked or when I was made aware that there was a complaint.

Q. Okay. Thank you for that question.

Cathy M. White, CCR

**33**

On submission for research, do you understand that each of the university have their own right to contact their congressional office for sponsorship for whatever the project?

A. Rephrase that, please.

Q. Do you understand any university have their own right to contact their congressional office to get a sponsor (indiscernible) or whatever support?

A. Do I understand that any university --

Q. Right.

A. -- has the right to contact their --

Q. Congressional office. Congressional office.

A. I guess I find that -- I guess I find that the fact that the universities contacting not making much sense to me. Are you talking about does an individual, does a person, does a -- I don't know what --

Q. I'm talking about other university.

A. Do other universities --

Q. Uh-huh.

A. -- contact their congressional offices for support?

Q. Right.

A. I'm assuming that other universities contact their congressional offices for support.

Q. It is their right. Right?

**34**

A. I don't know about it being a right. I don't know whether I'd called it a civil right or a human right for --

Q. Right. There is no --

A. -- somebody to contact their --

Q. It's normal business. Right?

A. Is it normal business for universities to have conversations with their congressional offices?

Q. Right.

A. Yes.

Q. Yes.

A. We have regular, normal conversations with our congressional offices.

Q. Right. Yes. So do you mind that you indicate in that MSU document where are the evidence I did not stand down? And also, can you explain that what "stand down" means?

A. "Stand down" means stop, don't do something.

Q. Okay. So can you find out anything I specifically did is not stopping, continue to --

A. Yes. You did --

Q. -- solicit or ever --

A. Yes, we were --

Q. (Indiscernible, multiple speakers).

A. (Indiscernible, multiple speakers) explained to

**35**

you by Dr. Gammill and I think Dr. Reeves, perhaps, back in -- earlier in that year that we weren't going to do that and --

Q. Please find that.

A. I don't know where it is in the documents, sir. I'm telling you what my recollection is.

Q. Okay.

A. There was an email -- I mean, there was conversations between Dr. Gammill and Dr. Reeves that we weren't going to seek congressional support because it's a competitive proposal.

Q. Okay. We'll happen to hear Patrick's.

A. And that was -- and then you sent an email to your colleagues specifically asking for that. And then that's when I said please stand down and don't do that. You'd already been told not to do it, and I was reinforcing the fact that you'd already been told not to do that.

Q. Did I send to -- are you aware I sent an email ask everybody to stand down after you sent me the email to ask for stand down?

DR. MULLEN: Did you copy her on it?

DR. ZHANG: Yes.

DR. MULLEN: Did you produce that?

MR. BRAGG: He's asking.

**36**

DR. MULLEN: Excuse me.

BY DR. ZHANG:

Q. Are you aware or not aware?

A. I honestly don't -- I mean, there were a lot of emails, sir. So, yeah, there could have been an email where you copied me on where you told them not to do that.

Q. So you didn't verify --

A. I can go look.

Q. Okay. So you didn't verify I send an email to everybody to ask them to stand down.

A. If you sent an email, then it did not work.

Q. So if I send an email to other university, if that does not follow what I suggest them to do, I still should be punished for what they're doing?

A. So I would say that I held you accountable for not --

Q. Okay.

A. -- following directions.

Q. What specific directions?

A. For there not to be communication with the congressional offices.

Q. I asked other universities to stand down, pass your email to them, and they didn't stand down, so I was held accountable. Is that right?

A. That's right.

Cathy M. White, CCR

cathywhitecsr@gmail.com                                              601.405.3762

37

Q. Okay. Okay. That's all I wanted to know.

Is that true, you and your office also orchestrated another UTC proposal without informing me in the same year, same time frame?

A. Were we working on another UTC proposal?

Q. Uh-huh. Are you aware?

A. No.

Q. You're not aware. Okay. That's fine.

Is that true, if there was any UTC proposal, you should be aware about that?

A. If there is any --

Q. Other -- if MSU is not the PI, even --

A. If Mississippi State was not the lead on something, I might not know it.

Q. Okay.

A. If Mississippi State was not the lead on a UTC proposal, if we had a PI working with another institution, I might not would know that and the Office of Sponsored Projects would not know that until such time as the subaward would be processed. And a routine practice, there wouldn't be any reason for me to be aware of that even when a subaward was processed.

Q. Is it true, when use letter of reprimand and ask to put in my personnel file, and you did not give me a chance to explain that before you put the letter of

38

reprimand to my personnel file?

A. So I -- I wrote the letter. It's not the one that went in our personnel file, but it's -- but I wrote the letter and just simply added that restriction. So it's -- I don't know about -- where it ends up and how it gets used is -- I'm not in that chain.

Q. Okay. Are you sure you didn't ask to put in my personnel file?

DR. MULLEN: If you would, turn to 27 in our book.

DR. JORDAN: In your book?

DR. MULLEN: Yes, the University's.

A. Okay. You're right. It does say HR in personnel file.

BY DR. ZHANG:

Q. Right. Yeah. So you didn't recall that, saying that's to put my personnel file, affect my rest of my life. You and I (indiscernible) other universities and feel affect on my personnel file.

A. I know that --

Q. How do you --

A. I'm not sure that personnel files are released.

DR. MULLEN: You can't speak to that.

DR. JORDAN: Yeah. I don't know that the personnel files are released.

39

BY DR. ZHANG:

Q. Okay. I'm going to ask one more question.

Okay. Have you consult with other university, other eight university, before you decided soft touch the project to withdraw from USDOT?

A. No.

DR. ZHANG: Okay. Thank you very much. That's all the questions.

FURTHER EXAMINATION

BY DR. MULLEN:

Q. Are you the vice president for research at Mississippi State University?

A. That's right.

Q. Or any other university?

A. No, no other university.

DR. ZHANG: That's fine.

DR. GRALA: Although it's not your time to ask that question.

MR. BRAGG: He asked (indiscernible.)

DR. GRALA: Just try to keep it civil, because on (indiscernible.) Any more questions?

DR. ZHANG: No.

DR. GRALA: Dr. Jordan, we would ask for about 10 minutes' recess so we can combine our questions.

(Recess.)

40

EXAMINATION

BY DR. GRALA:

Q. Dr. Jordan, we previously have discussed (indiscernible) and you have answered a lot of questions. I would like to put out there, this is a difficult situation. We will be asking some questions that might feel insensitive, but we are not implying anything. We are just trying to establish the timeline, and we are not trying to be disrespectful or implying anything.

A. Okay.

Q. But just based on what was said.

The first one, the first question is, are you aware or do you have perhaps any evidence of Dr. Zhang sending an email to co-PIs at other institutions and asking them to solicit support from congressional delegations?

A. Yes. There was an email where he did that.

Q. Would it be possible for us to receive a copy of that email? Perhaps it might be in the, you know, in the binders.

DR. MULLEN: Sure. I really wish Ashlyn was here, but, yes, we'll --

DR. GRALA: It doesn't have to be now.

DR. MULLEN: Okay.

BY DR. GRALA:

Page 41

Q. And then there was a discussion about another email that Dr. Zhang mentioned that he sent an email to his co-PIs to stand down at some point.

A. We can -- they can find that.

Q. Okay. But you are aware of that, right, or have you seen that?

A. Yeah. When he reminded me, I did remember.

Q. Okay. And there was also a discussion of an email that you have sent to Dr. Zhang asking not to seek support from Mississippi congressional --

A. It's in that same string.

Q. Okay. So can we have a copy of that?

DR. MOORE: That would be the original one.

DR. GRALA: The original.

DR. MOORE: (indiscernible) in the process, not --

DR. JORDAN: Oh, the one where Dr. Gammill and Dr. Reeves had communicated with (indiscernible, multiple speakers).

DR. MOORE: Yes.

DR. JORDAN: Okay.

BY DR. GRALA:

Q. The email where Dr. Zhang was informed for the first time that --

A. Yeah, that would be --

Page 42

Q. -- (indiscernible, two speakers) seek congressional support for this particular --

A. Right.

Q. -- proposal because it was a competitive proposal?

A. Right.

DR. MULLEN: No problem.

DR. JORDAN: Yeah, we can find it.

DR. DALE: It sounds like, based on the timeline, that may have been May 31st.

DR. JORDAN: I think it was in May that they did, that that happened.

DR. MULLEN: In the effort of time, no problem.

DR. DALE: Thank you.

BY DR. GRALA:

Q. And then there was another email where you follow up on that and sent an email Dr. Zhang asking him to stand down and stop his --

A. Yes.

Q. -- solicitation of congressional support. Could we have a timeline of Dr. Zhang's activities that violated or were disobedient to your direct instructions?

A. So (audio distortion) because what you just described --

Q. That may --

Page 43

A. -- is the timeline. Those emails would layout that time.

Q. So there's nothing beyond that?

A. No. Where he disobeyed a direct -- no.

MS. ANTHONY: Even with the proprietary information? I mean, outside of that?

DR. JORDAN: Yeah, I didn't have -- no, I was not involved and there was no direct order from me related to the --

(Indiscernible, multiple speakers).

MS. ANTHONY: Got it.

DR. JORDAN: There was no direct order.

BY DR. GRALA:

Q. There's also an email from you to Dr. Zhang where he's being informed that he's prevented?

A. Right.

Q. Because of that, and because of that, that his proposal would be withdrawn?

A. Right.

Q. What was the motivation to withdraw the proposal that was already submitted and was in the system?

A. The motivation was to -- at that point, to protect our reputation as an institution, and I think, in my opinion, to some degree, protect his reputation, as well, for a proposal that had a lot of -- was just

Page 44

challenging to submit, was a lot of it done the last minute, and was not going to be overly competitive.

Q. From our -- so let's clarify that. So this proposal was in our system and it wasn't in the sponsoring agency's system where you would go and say to grant (indiscernible) and submit it there, and that waits for a day of review or -- so was it in the system internally or was it already submitted to the agency?

A. I need to clarify that.

Q. Okay.

A. I need to go back through the OSP tickets and clarify that. So can I do that?

Q. Yes.

A. Okay.

Q. Now, obviously there is a trade-off here where you prepared -- the University prepared to, but at the same time, there was nine collaborating (indiscernible).

A. Right.

Q. That's something that could also affect MSU, our reputation, collaborators that perhaps don't seem to be (indiscernible), being willing to work with us again. How do you weigh those trade-offs to arrive at the decision to -- that actually withdrawing that, that would be a better option?

A. In my opinion, the difficulty that all of those

45

PIs had, and as I read through those email trail of all the questioning and back and forth and back and forth, I think it would have been an extraordinarily difficult project to manager and go forward to. I think it was -- I don't envision that it would have -- that not winning that would have been of major concern for their careers or major issue in their careers.

Q. It is your opinion that it was not -- that this project was not only managed properly here in terms of the submission, it was not also properly managed how Dr. Zhang was communicating with his fellow PIs?

A. That's right.

Q. Eventually, the proposal was submitted. Right?

A. That's the piece I need to go and determine if we -- because "submitted" means we actually sent it. So it need to go double-check that.

Q. We also would like to know, if it was submitted, whether Dr. Zhang was still a PI on that one.

A. Was he the PI?

Q. Yeah.

A. He was the PI --

Q. Okay.

A. -- of record.

Q. So there was no submission in replacement of the --

46

A. No, no, no. There was no replacement pending of PI. I think he even -- I think the IES originally had him 100 percent, and we asked did he not want to give other of his colleagues some credit. And so I think it was, you know, no, he was...

Q. And that information regarding question that we have -- and you may not have that information readily available. Were there any other faculty who had similar circumstances as Dr. Zhang and asked for a deferred or more extensions on the project?

A. Have any other faculty asked for extensions on -- are you talking about the Department of -- a no-cost extension or extension on three-day waiver to --

Q. The no-cost extension.

A. Have other faculty asked for no-cost extensions? All the time.

Q. More than three times?

A. More than three times, not that I'm aware of.

Q. Had the extension been granted, that project would be completed three years after. Right?

A. And that -- it would have been completed more than five years after this started.

Q. Okay.

A. And it was out of money. There was no more money.

47

Q. Okay.

A. There was no -- somebody was working on Mississippi State time at that point, I guess.

Q. If that happens, help us answer the next question. So does the communication end up -- was already respond he's not going to get an extension, but you had decided at that had point that you weren't going to grant an extension and that was your --

A. Yeah, that was my understanding.

Q. Could you explain why you made that decision?

A. So at that point in time, there was no -- there were no funds left on it. There had already been two extensions. There was a sabbatical. The only piece that the sponsor was waiting on was the final report. There was no more work to be done on that. And so to give -- in my opinion, to give another year, get that sponsor to wait another year, keep that award open on their books, them trying to trail it, us trying to trail it, but just to get a final report done, it felt like to me we could get the final report done, get that off of everybody's books and move on. It did not seem to be of any -- in the sponsor's best interest or Mississippi State's best interest to let that lag another year.

Q. There's also an email from Dr. Gammill that Dr. Zhang referred and that's several in the booklet where

48

she says let him fail, that's what Dr. Zhang questioned, University's (indiscernible) proposal. Was he (indiscernible) this proposal?

A. So I think the University, was it fully behind the proposal? I mean, you can qualify that any way you want to.

Q. Yeah.

A. I don't know that I can qualify that. Did -- there is -- there are hundreds of emails around, and how Dr. Gammill, Dr. Reeves, even Dr. Keith, the dean, was engaging with Dr. Zhang to try to help him, advise, offer support, grants and contracts. So there are just a huge paper trail --

Q. Okay.

A. -- that demonstrates that, in my opinion, my team bent over backwards. His college and dean's office and our offices bent over backwards to try to help him get this through and over the line.

Q. So your office did everything they could to submit that in a timely manner?

A. We did everything we could to try to make sure he would give us the information so that we could get it submitted at that time.

Q. And I'm not questioning --

A. Yeah, yeah, yeah. Absolutely, we did.

49

Q. There's also Exhibit Z-34, where there's some discussions about Dr. Zhang's qualifications meet that. And so if there were doubts that he could successfully execute this project, why he was allowed to proceed as the PI in that?

DR. MULLEN: The first page of Z-30, at the bottom.

A. I think it speaks to what I said earlier. I think there was -- there was just little -- there was little evidence in the work that Dr. Zhang had done in the past that he would be successful in trying to lead a project of this size and scale in scope.

BY DR. GRALA:

Q. Perhaps you could clarify --

A. But I don't know that that shows up in this particular passage, though.

Q. Is this the (indiscernible) project, is this the one where the University all of a sudden had one other project and they had to select internally which project?

A. The federal UTC is a limited submission.

Q. Limited submission. Okay.

A. Yes.

Q. So it's not like he could, you know, have several things. It's only one, and that would be the best interest of the University to have --

50

A. It would be best for us to have a highly competitive team.

Q. (Indiscernible) best one --

A. That's right.

Q. -- to be successful. Okay. Great.

DR. GRALA: That looks all of our questions, unless you have a follow-up.

BY DR. DUTTA:

Q. The follow-up would be, basically, so it looks like you had doubts about --

A. Yes.

Q. -- him being a good fit for this proposal. Why did you allow to go ot --

A. Why did we allow it to go to? I think it speaks to the fact that, where Dr. Gammill said he would be -- just he was so angry and there was so much fuss about the previous cycle of the proposal that it was -- and there was nobody else, I mean, that was particularly interested in going after that project. So it was -- I think, had there been somebody else that felt strongly about that going after that proposal and leading it, but there was nobody else. And so I think it -- I mean, it was no point in having days and hours of email strings of frustration from him to -- on why we didn't let him do it.

BY DR. LU:

51

Q. I have one question, follow-up question. And the document indicates your (indiscernible) Dr. Jarabali [phonetic] to (indiscernible) to sponsor office --

A. Uh-huh.

Q. -- regarding this proposal submission. So would you please recall how many hours Dr. Zhang came to office to review the proposal or just (indiscernible) proposal package or just to one component of package was delayed?

A. I don't have that detail.

Q. Okay.

A. Generally, proposals, the package comes in pieces into OSB. It doesn't all show up at one time. And so they're generally reviewing things as they go, depending upon their workloads and everything. So I don't know which pieces of it were actually last after three days. However, there were pieces of it that were never submitted. The financial conflict of interest was never submitted, which is normally required before we would submit, but we submitted it anyway.

Q. That conflict of interest, that component is critical for a package. If that part is missing, why the proposal was submitted?

A. I'm sorry. Say that again. Was the FCOI --

Q. Yeah, COI component is critical. It's required for that proposal, which this project is missing.

52

A. It wasn't provided.

Q. It wasn't --

A. And the deadline was there.

BY DR. GRALA:

Q. I guess my question would be, was that component required internally or was that required by --

A. I'd have to go see. In some cases, they're -- honestly, there are different rules today than there were in 2022 with what was required, so I'd have to go back.

Q. I'm asking that, for example, because you submitted a proposal to some agency and they have different components that you have to submit.

A. Uh-huh.

Q. If you don't have one, you're just not able to submit that because the system verifies that and that --

A. That's right.

DR. GRALA: Okay. Was there any other?

BY DR. KUNDU:

Q. Dr. Jordan, you may not have the information right now. So on the -- it was said yesterday that Dr. Zhang was a co-PI employee on other UTC proposal. So if he done -- if he had (indiscernible) on that proposal, for any one proposal like that, so -- to get -- I don't think you have the (indiscernible) right, would necessary that he (indiscernible) of the proposals (indiscernible).

53

A. 2011?

Q. 2011, 2016.

A. That would be way before me, so I don't have that information. You know, I think, in the 2022 time frame, I remember looking back five years. I believe I went and had pulled sponsored projects proposal submissions and awards for the previous five years and there weren't any. There wasn't anything. So I didn't go all the way back through his career. I think -- I think -- yeah, I didn't --

Q. That's fair.

A. Yeah.

DR. GRALA: Any more questions?

If not, Dr. Jordan, thank you very much. We appreciate your patience.

DR. JORDAN: I thank y'all.

54

CERTIFICATE OF TRANSCRIPTION

I, Catherine M. White, hereby certify that the foregoing pages contain a transcript of the testimony of said witness transcribed from Microsoft Meetings recordings TO THE BEST OF MY ABILITY.

I further certify that I am not in the employ of or related to any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature this the 12th day of August, 2025.

_____
CATHERINE M. WHITE

Cathy M. White, CCR

cathywhitecsr@gmail.com                601.405.3762