# EXHIBIT 6

# Dr. Li Zhang

## Li Zhang
## vs.
## Mississippi State University

## January 15, 2026



338 Indian Gate Circle
Ridgeland, MS 39157
601-573-0961

amanda@awreporting.com
www.awreporting.com

IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

LI ZHANG                                    PLAINTIFF

v.                          CAUSE NO. 23-441

MISSISSIPPI STATE UNIVERSITY and
MISSISSIPPI BOARD OF TRUSTEES OF
STATE INSTITUTIONS OF HIGHER LEARNING   DEFENDANTS

VIDEOCONFERENCE DEPOSITION OF DR. LI ZHANG

Taken at the instance of the Defendants viz Zoom Videoconference on Thursday, January 15, 2026, beginning at 9:04 a.m.

* * * * * * * * * * * * * *
REPORTED STENOGRAPHICALLY BY:
LORI W. BUSICK, CVR-S #7510, CCR #1677

---

APPEARANCES:

GRAFTON E. BRAGG, ESQ. (VIA ZOOM)
BraggLaw, PLLC
965 Madison Avenue
Madison, Mississippi 39110
(601) 624-1153
grafton@graftonbragglaw.com
COUNSEL FOR PLAINTIFF

ASHLYN B. MATTHEWS, ESQ. (VIA ZOOM)
The Winfield Law Firm, P.A.
224 East Main Street
Post Office Box 80281
Starkville, Mississippi 39759
Telephone: (662) 323-3984
Facsimile: (662) 323-3920
amatthews@winfieldlawfirm.com
COUNSEL FOR DEFENDANT

---

INDEX

Style and Appearances............................1
Certificate of Deponent........................172
Certificate of Court Reporter..................173

EXAMINATIONS

Examination by Ms. Matthews......................4
Examination by Mr. Bragg......................166
Redirect by Ms. Matthews......................168

EXHIBITS

EXHIBIT 1  Email from Lux Luxion -  ............95
                March 1, 2022
EXHIBIT 2  Email from Jason Keith -  .........111
                January 19, 2022
EXHIBIT 3  Email from Jason Keith -  .........119
                April 28, 2022
EXHIBIT 4  Email from Jason Keith -  .........166
                December 8, 2021

---

Dr. Li Zhang, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MS. MATTHEWS:

Q. Good morning, Dr. Zhang.

Will you please state your full name for the record?

A. Okay. My name is Li Zhang.

Q. And I know we're doing this over zoom, so if technology fails us at some point and I cut out -- I don't think we've had issues with the depositions so far. But if something happens, let me know, we'll fix it. We'll stop until we get it figured out. And if you can't hear me also, we want to make sure we figure that out and make sure my volume is good enough for me.

Can you hear me good right now?

A. Yes. Let me make this just a little bit -- okay. That's fine. I think I can move the computer a little bit closer and close the door. Okay.

Q. Is that better? Can you hear me good?

A. Yes, I'm good.

Q. Great. Okay.

5

So I know that you've sat in on a few of these, so you probably know the drill by now, but I'll tell you the same thing. Make sure that when you're answering the question you answer it out loud so Ms. Lori over there can get it down on the record.

And if you don't understand anything I ask, which will probably happen because I'll probably ask a really dumb question at some point, just let me know and I'll fix it. I want to make sure that you understand what I'm asking and we're on the same page.

Does that sound good?

A. Yes, that's why I'd like to write down and answer it so I won't get lost. Thank you.

Q. Perfect.

If at any point you need a break, just let me know. I'll tell you the same thing though, that if I've already asked a question just please try to answer the question before we take a break. But I'm happy to take as many breaks as we need to.

Does that sound good?

A. Yes.

Q. I'm going to try not to drag this out too long. I don't want to waste everybody's time on

6

being too tedious. But if you need a break, of course, we're happy to do it.

Okay. So, Dr. Zhang, how old are you?

A. 63 by this April. So I'm 62.

Q. When were you born? What was your date of birth?

A. April 24, 1963.

Q. And where do you live right now?

A. Brandon, Mississippi.

Q. And that's in Rankin County, right?

A. Rankin County, that's right.

Q. How long have you lived there?

A. More than seven years.

Q. More than seven years?

A. Uh-huh (affirmative response).

Q. Before that you lived in Starkville?

A. Uh-huh (affirmative response). Yes.

Q. Tell me about your move from Starkville to Brandon.

A. There, you know, my kid Ch[redacted] he is 10 years and he has a severe autism. And the reason for that is he have a very rare genetical mutation and his doctor prescribe with ABA therapy. And we cannot get not get ABA therapy anywhere close to Starkville. The closest one we have contact is

7

Tupelo and that's put us to a waiting list. That's the primary reason.

And the other reason we tried to enroll C[redacted] MSU kindergarten. And the MSU kindergarten just does not -- did not allow him to be in enrolled because he's -- you know, he needed special care and special attention. So they trying to accommodate the faculty -- you know, faculty's kids as much as possible, but not for Ch[redacted] And I have a email documentation about asking MSU to investigate why C[redacted] won't not be allowed to enrolled.

Q. So was that -- and you can correct me --

A. That's not a part of the lawsuit. We didn't address the issue to the lawsuit as far as I can remember. I might be wrong.

Q. So MSU has -- did they have a regular daycare?

A. Yes.

Q. And they also have some sort of a -- I don't know if it's childcare clinic or what it is, I'm just thinking off of the top of my head now. And you can correct me on this, I'm sure you know. But they have a daycare that's geared special needs children; is that right?

A. Not at the time when C[redacted] was there.

8

They have some kind of ABA clinic offered one hour per week and Ch[redacted] doctor prescribed 40 hours per week.

Q. So the one that you applied to, was that the regular daycare clinic that is not geared towards special needs?

A. Yes. The regular clinic, but they -- they should not exclude the special needs kid as far as their policy, but MSU didn't reply me.

Q. Was he placed on a waiting list or what happened?

A. We placed on the waiting list and then -- then we just didn't got admitted.

Q. So eventually you're saying you decided to move to Brandon because of the childcare issues and your son's needs?

A. My primary, the medical issues.

And actually we contact -- we are lucky in that sense, you know. We applied and the Canopy is expanding. So before our application -- so we got lucky that year and it's just trying to accommodate as many kids, up to 20 something number of the kids. It's usually just a very small number of the kids. So I'm very fortunate we got enrolled.

We also contacted Baton Rouge, Louisiana.

9

As parents we wanted to do whatever that we wanted to do for our kids.

Q. Sure.

A. So we are lucky to choose Jackson. Their clinic in Louisiana, Baton Rouge and they give us the information, they have the opening so we can enroll at any time. And that was our backup. Because in Mississippi, we didn't got immediate answer that we can be admitted.

So when they said okay now we got a opening for Ch█████ Then we have no hesitation, we just bought a house in probably half month or something like that and then we just we stayed in some -- one of our friend's house for like one week so that he can be there the first day when they say ██████ get in the clinic. We have no any hesitation at that time in Mississippi getting ABA therapy is very, very hard. Very, very hard.

And we explored, like I said, Baton Rouge. Our second move is Baton Rouge, slightly closer to Louisiana and we also contact Louisiana to trying to move to Louisiana.

Q. So when you decided to move to Brandon roughly -- you said that was seven years ago?

A. Yes.

10

Q. I'm not a mathematician, so --

A. Right. And that's like 2017. Because my daughter was born 2016, January -- well, 2016, January. And when she was just a few months old then we moved to Brandon.

Q. Okay. And when you --

A. 2016.

Q. 2016. Okay.

So at that time, we're kind of jumping ahead here, so I'll have back up in a minute. But who was your department head at that point?

A. Dr. Dennis Truax.

Q. And so when you decided to move, I assume there was some discussion about how you would be able to continue working for MSU and living --

A. Right.

Q. -- in Brandon?

A. Yes.

Q. How did that go?

A. The are many as far as I know faculty living in Jackson and they work in Starkville. I'm not the first person and I'm not going to be the last person. So probably HR can get you a list for the faculty who live in Jackson and work in Starkville.

11

Q. So I guess what I'm asking is, was it a problem for MSU?

A. No. Dr. Truax, you heard his testimony, he has never raised any problem with me by working at MSU and live in Brandon. It's just two-hours drive. I have my house was not being able to sold for like over one year. I still stayed in same house and rent an apartment. If I cannot get back I can stay in my apartment. And I have a very good neighbor, actually two neighbors offered me any time I needed to stay in their house, they have extra rooms, extra beds. So in one year I did take that advantage and lived in my neighbor's house.

Q. Okay. So how long had you lived in Starkville before you moved to Brandon?

A. I -- from 2025 (sic) until 2016, that's 11 years.

Q. So 2005 to 2016?

A. Uh-huh (affirmative response). Eleven and a half years.

Q. So before Starkville, where did you live?

A. I live in Virginia. I work at a Federal Highways Research Lab as a contractor. Our company is running federal lab, so I was a lead systems engineer, lead a group to support Federal Highways

12

Traffic Operations.

Q. Where did you grow up?

A. I grow up in China. If you know a little bit of world history, at one point Japan occupy most part of China. So I was born and grow up in the World War II capital of China, upstream of the Yangtze River, which the city itself is called the Chongqing. If you want me to spell that out I can do that. C-H-O-N-G-Q-I-N-G.

Q. Thank you.

Okay. So when did you come to the US?

A. 1994.

Q. Was that for school?

A. 1994.

Q. Did you come for school?

A. Yes. I was admitted by Virginia Tech.

Q. And what -- I think we know this, but I just wanted to make sure that we're on the same page here. What do you consider your race to be?

A. Asian.

Q. And you would consider your national origin, your country of origin to be China; is that right?

A. China, yes.

Q. So are you married?

13

A. Yes.

Q. What's your wife's name?

A. Ying, Y-I-N-G.

Q. And her last name is Zhang, too?

A. Yes.

Q. When did you guys get married?

A. That was -- ████ is 10 years. Around 10 years.

Q. Ten years ago?

A. Uh-huh (affirmative response). Ten years ago.

Q. So is she from -- did you guys meet in Mississippi?

A. Yes.

Q. And you had mentioned your son Ch████ right? That's his name?

A. Uh-huh (affirmative response). Yes.

Q. And you have another child; is that right?

A. Yes. I have a daughter, Be████ She is eight years by January 1st.

Q. So your son you said is 10 and your daughter B███ is eight years old?

A. Uh-huh (affirmative response). C████ is almost 10. He's going to be 10 in April.

Q. Do they attend school anywhere there in

14

Brandon or Jackson?

A. Yes. They attend Northwest Rankin Elementary.

Q. Both of them do?

A. Both of them. One is in second grade and C████ is in fourth grade.

Q. Are you involved in any clubs or organizations there in the Brandon or Jackson area?

A. None at this point.

Q. Okay.

A. I used to be something.

MR. BRAGG: Is church a club or organization?

THE WITNESS: Oh, okay.

Q. (By Ms. Matthews) Yes, I was going to ask, church?

A. Okay.

Q. What church do you attend?

MR. BRAGG: Sorry to jump in.

MS. MATTHEWS: That's fine.

THE WITNESS: Grafton, the church on the --

MR. BRAGG: Pinelake?

THE WITNESS: Pinelake. Sorry. Pinelake. My wife went to church every week, I went with her

15

not every week, so sorry.

Q. (By Ms. Matthews) That's fine. That's understandable.

A. Pinelake.

Q. Do you guys participate in any small groups through the church?

A. No. We just go to -- that's to me to the church like that's like make church to me.

Q. You don't do rotary club, a county club, anything like that?

A. No. I don't play golf at all.

Q. Okay. I don't either.

A. I have -- the golf course is just like a few yards from my house.

MR. BRAGG: What a waste.

THE WITNESS: Yes.

MS. MATTHEWS: It is.

THE WITNESS: We can switch our house.

Q. (By Ms. Matthews) Are you guys in involved in PTA or anything through the school?

A. No.

Q. All right.

A. I'm afraid to meet anybody here of my -- that's not relevant to the case. Go ahead, please.

Q. So let's talk a little bit about your

16

education background. Where did you attend college?

A. I got my bachelor's degree and master's degree in Shanghai Institute of Railroad Technology. So I got a railroad engineering bachelor and a master's degree. And that university is no longer existed because that university was merged into Tongji University. But my résumé still write the exact name at the time to get me the degree.

Q. What year did you get your degree from there?

A. 1979. I'm sorry, that's a long time. 1979 I got into the college, I got my first degree in 1983, bachelor's degree. I got my master's in 1986.

Q. And where was the master's degree from?

A. I got two master's degree. One master's degree is from the same institute in 1986. I got another master's degree in Virginia Tech in computer science. It's probably in 1999 or 2000. Should be 1999. I have to look at my résumé. But you probably have that.

I have my PhD in 2000 from Virginia Tech as well. That's transportation engineering from civil and the environmental engineering department.

Q. Any other degrees beyond the PhD in 2000?

17

A. No. That's enough. Although, Grafton and I was talking about I going into law school after this case end.

Q. No desire?

A. I try -- I think I wanted to, you know, to go to law school, but I'm afraid I cannot do that. Once this end I probably can get you attending, too.

MR. BRAGG: The administrative experience might have stifled that desire to go to law school.

MS. MATTHEWS: That's understandable.

(Laughter.)

Q. (By Ms. Matthews) Okay. So after you got your PhD in 2000, that was at, you said, Virginia Tech?

A. Uh-huh (affirmative response).

Q. Did you stay in Virginia for a while after that?

A. Yes. I got my -- actually before I got my PhD I already got my job in ITT industries, one of the big defense companies. They have a contract with the federal government. So I was in their transportation group. And a very small group was in that defense company and we were federal in McLean, Virginia next to CIA.

Q. How long did you work there?

18

A. More than five years.

Q. And after that, where did you go?

A. Mississippi State.

Q. Okay. So it was that transportation defense company and then MSU?

A. Defense company, they have small transportation group.

Q. Oh, got it.

So where are you employed currently?

A. Currently I don't know my status, to be honest with you. You know, the other day Joanne told me that I was still employed by Mississippi State, but I don't have any access. I even afraid to tell -- I even dear to somebody I -- any association with Mississippi State, just in case somebody accuse me, you're fired already, why are you still claiming that you work for MSU or something like that.

So I really -- it's a dilemma to me. I'm kind got a pain from Mississippi State University. I don't have my email address if somebody wanted me to confirm that you -- how do you -- how I confirm you work for Mississippi State University? Then I figure out ways that I probably refer them to ask HR and HR can say yes or no.

19

Q. And we can -- we'll talk more about it later I'm sure.

A. Yes.

Q. But I guess just at this point, we know that you got a notice of intent to terminate your employment, right?

A. Yes, I got that one.

Q. And we went through the whole process, which we will talk about later.

A. Right.

Q. But since you've gotten that notice and been through everything, have you missed any salary payments or are you still getting paid your salary?

A. I got pay. I don't miss any thanks for that court order. I got all -- I don't miss any paycheck from Mississippi State on my base pay. I don't have any summer salary since I got that notice.

Q. What about benefits that you get through MSU? Are you still getting those benefits?

A. Yeah, I still got all benefits. Except I don't know if MSU still match summer pay 401 too. Because I choose 401 and Mississippi State match 50 percent of our 401K. So every dollar received on the 401. I'm not one hundred percent sure. If some

20

summary, we can get benefit about that 401K.

Q. Do you have any employment outside of MSU?

A. I did find outside consulting form to Grafton. I'm not sure if Grafton sent you or Charlie and they --

MR. BRAGG: Hang on one second. What was the question, Ashlyn?

MS. MATTHEWS: If he has any outside employment with -- or employment outside of MSU right now?

MR. BRAGG: Okay. You can answer. I just wanted to make sure --

THE WITNESS: I did file the outside consulting from with MSU. So I don't know if that can be considered to be outside employee. Yes, that is -- every faculty, according to the policy can work for the outside company for a certain number of the year -- a number of the hours. And it wasn't entire summers, holidays, vacation time, whatever is offered by MSU policy.

Q. (By Ms. Matthews) And was that outside consulting, you said you submitted a form to do outside consulting?

A. Right.

Q. Was that the New Global Systems for

21

Intelligent Transportation Management?

A. Yes.

Q. It's that company?

A. Yes.

Q. Is this -- is that your business? Do you own that business?

A. I don't own, my wife own.

Q. Your wife owns it?

A. Uh-huh (affirmative response).

Q. Do you -- does it have any employees?

A. Yes.

Q. Who -- how many employees does it have?

A. Me, my wife and another programmer.

Q. Another what?

A. Another programmer.

Q. Another programmer, okay.

A. And it also have a consultant, too. A few consultant.

Q. Where is the other programmer located?

A. In Kentucky.

Q. And what about, you said you used to employee other consultants, but you don't anymore?

A. She's still employed.

Q. Still employed?

A. Uh-huh (affirmative response).

22

Q. Where is that consultant, where does she live?

A. Oh, consultant, he live in Texas. He, I'm sorry. The permanent employee is a female.

Q. And what's her name?

A. Hum?

Q. And what's the permanent employee's name?

A. That's not for me to disclose. I think I am just the employee by my wife. So if you -- I think probably you can work with Grafton or work with the court to have the other two --

MR. BRAGG: Dr. Zhang, if you know the employee's name, you should answer.

Ashlyn, can we agree that I can have 15 days from the transcript to designate any material subject to the confidentiality order and that you'll treat anything under that confidentiality order until you either get my designation or the 15 days elapses?

MS. MATTHEWS: Yes, that's fine.

MR. BRAGG: Okay. All right. So --

MS. MATTHEWS: I might need that written down somewhere so I don't forget.

MR. BRAGG: That's fine. That's fine.

That should -- so that should help your

23

confidentiality concerns, Dr. Zhang.

THE WITNESS: Right. Yes.

MR. BRAGG: You can answer the question if you know.

THE WITNESS: Grafton, here's my take. I am not an owner. I just work with her. So I, you know, I should not disclose some information I'm not authorized to disclose.

MR. BRAGG: Ashlyn, can we just take a two to three-minute break and confer on this?

MS. MATTHEWS: Yes, that's fine.

MR. BRAGG: Thank you.

(Off the record.)

MR. BRAGG: Back on the record.

THE WITNESS: Can you ask the question again?

Q. (By Ms. Matthews) Yes.

I was just asking the name of the other full-time employee for the New Global Systems business?

A. Okay. Okay. All right. So another full-time employee, her name is Sherrie and I cannot remember -- that's her short version of her first name. I cannot remember her last name and the full first name.

24

Q. Okay. Is your wife also an engineer?

A. She is a content majors, she is not an engineer.

Q. So what kind of consulting does this business do?

A. We reported on the -- I think we filed a report to MSU and we have it said exactly what we got. We got a small business research project from federal government.

Q. Is that all that -- let me back up.

How do you -- how should we refer to this business in short form? Do you use acronyms? Do you say NGSIM or New Global --

A. You can use that NGSIM or we have that very long name. But if you wanted to know the long name, I can spell that out. And we have that information with Mississippi State University, my outside consulting form.

Q. So you said that there's NGSIM it has some sort of a grant to do a project?

A. Uh-huh (affirmative response).

Q. And that's what the form was about?

A. Right.

Q. So were you performing on that project now?

25

A. Yes. That project is going to -- actually, that project -- one project is going to end in February, another one is going to end in June I think.

Q. How many -- so you have two --

A. Uh-huh (affirmative response). Another one is from the Commonwealth of Kentucky.

Q. And do you receive pay for working on both of those?

A. Yes.

Q. How long have you been working on both of those projects?

A. One year. I think the federal grant starting from 2024, if I remember the correctly. Might be 2025. The other one, Commonwealth one starting from 2025.

Q. And roughly how much do you get paid on each of those? If you had to put it --

A. Probably 40K every year, starting from 2024, 2025, roughly about 40K. 2025 I didn't get my W-2 yet, so that's just as close as I can get, 40K each year.

Q. And is that per project or is that both of them together each year?

A. Both of them, entire W-2.

26

Q. How long have you been doing work for NGSIM?

A. Fifteen years or something. When I was at MSU, I got a really good grant from federal government in addition for me to work for MSU. I believe I briefed Carisa Carmile about that, but she didn't recall. She said that she have never met me. I might be wrong. That's just my memory when I got a federal grant.

And I -- oh, you was not in the meeting. We had a meeting with Joanne and Charlie sometime and I reminded Joanne I met a Joanne with Dr. Truax so -- to talk about my grant. And Joanne give us really good directions, how to navigate, you know, small business side to do federal research while work with MSU.

Q. So any pay that you get through projects that you do for New Global Systems, that is separate from any pay that you would get from MSU; is that right?

A. Correct.

Q. Okay. On average how many projects do you have going -- I guess, let me break it down like this.

In 2023, since that was before these two

27

that you're working on now, in 2023 how many projects did you have through NGSIM?

A. Zero.

Q. What about in 2022?

A. Zero.

Q. What about 2021?

A. Zero.

Q. In 2020?

A. 2020? I'm not sure when was my last project ends. It probably end around the 2020. So if you talk about 2020, I'm not sure. I need to go back to my record.

And also, MSU have my record. If I have the consulting going on, I should file the -- should file the consulting form.

Q. So when you say that you didn't have any projects going during those years, did the company have projects but you just weren't working on them or were there no projects?

A. No the company does not have any project, too.

Q. Okay. So what do you think changed? So, I guess what I'm trying to ask is why in 2024 you think that you started doing projects again through this company?

28

A. Because we have the project.

Q. Did you have to do a proposal for the project?

A. Yes.

Q. Did the company pay you for developing the proposal?

A. No.

Q. So is there a separate office for this company or is it operated out of your home?

A. In Mississippi we operate it out of our home. And in some year we do have -- when we was in Starkville we do have the office in Research Park.

Q. Was that the whole time that you were living in Starkville?

A. Not the whole time. At the time when we have the project.

Q. Okay. All right. I'm going to skip -- bear with me just one second.

So when you started working for MSU in 2005, were you recruited to come to MSU or did you see an opportunity and apply?

A. I think one of MSU professor forward me they had the opening. So I sent my résumé and got an interview and I got hired.

Q. Do you remember who the professor was that

29

forwarded you the information?

A. Yes.

Q. What was that professor's name?

A. Yunlong Zhang. And he is -- work at Texas A&M now.

Q. Can you spell?

A. Z-H-A-N-G, that is his last name. And his first name is Yunlong, Y-U-N-L-O-N-G.

Q. Got it.

How long did he stay at MSU after you came?

A. He worked for A&M since 2024 -- 2004, and he still work for A&M now.

Q. So he -- you said he went to A&M in 2004 or 2024?

A. 2004.

Q. Okay.

A. Moved to A&M in 2004.

Q. So he was on his way out when he sent you the information?

A. Right.

Q. Okay. Did you have to go through an interview process?

A. Yes, all the vetting process as far as I can recall.

30

Q. Can you describe the process to me of getting this job -- your first job at MSU?

A. Okay. You sent your résumé and they -- I guess they have the committee, I'm not sure how that -- that was just my understanding for how MSU hired the professor. Because I was a few committee chairs to search for the new faculty.

When you apply you actually don't know what the other side does. Right? So that was just based on my knowledge that I hired some other faculty.

So basically we got a résumé. We have the internal discussion. And we look at who might be the best candidate. Usually we interview like five candidates and we ranked them. And then we send the rank to department head.

Q. Okay. So I guess if I could back you up a little bit. I more so want to know right now what you remember from your process of getting the job.

A. Right.

Q. Not necessarily what was going on --

A. Right.

Q. What do you remember about the process?

A. I send a résumé. And after a few months I think one day, I don't know exactly I got a call or

31

got email that said you have days that you can choose to come to Starkville for an interview. And I did choose one of the days. And I work with a secretary of the civil engineering at that time, which is -- I forget her name. I think she still work for Mississippi State. I can dig out her name from -- by looking at other departments. She probably is still working one of the schools.

Q. That's okay. I don't need the name.

A. Right. I worked with her to get my travel documents, like MSU bought a ticket and they made the reservation at the Hampton Inn. And I had one-day interview. And also that was the department head, Dr. Tom White. He was arranged the next day before I leave, make sure I tour the city to get a sense about how much is the cost of the house in Starkville. And I was very happy because in my northern Virginia house is very expensive. The house here is very affordable.

So then I fly back to northern Virginia. And then after a few -- probably around one-month's time then I got a job offer.

I remember at the time you got a job offer and the time you're going to have the class is very short, probably one or two months. But that's to

32

give me 30 days to inform my employer I have to change my career from engineer to MSU. And everybody in my office wasn't very happy about that. And I can -- even the federal managers said it's better for my future career.

Then I fly back. MSU pay my relocation costs. And I lived in the faculty housing for like two or three years before they say, no, you have to move out to get your own house. Then I bought my house in Older (phonetic) Oak. I don't know if you know, at the end of South Montgomery there are some houses over there.

Q. Oh, yeah.

Okay. So do you only remember the one interview?

A. Yes.

Q. Okay.

A. Well, you have the telephone interview first.

Q. The what interview first?

A. Telephone interview. At that time we don't have the zoom meeting, we don't have the team meeting, just telephone interview.

Q. So who is that phone interview with?

A. Dr. Tom. I think Truax might be in the

33

panel.

Q. Say that last part again.

A. Truax might be in the panel. The previous department head might be Truax, I'm not one hundred percent sure. But there are three persons.

Q. Three people on the call?

A. Uh-huh (affirmative response).

Q. So you had the department head, Tom White, Dennis Truax and do you remember who the other person was?

A. Maybe the Structure professor, Chris. He moved to Michigan. Chris? I can probably think about what is his last name.

Q. What was his position at the time?

A. Chris position?

Q. Yes.

A. I think assistant professor.

Q. And Dr. Truax was not department head yet? Was he professor at that point?

A. I think he was a professor at that time already.

Q. And what's the race of Tom White? Do you know his race?

A. He's white.

Q. Do you know his country of origin?

34

A. America. He's, you know, very gentleman. He was a faculty at Purdue University for many, many, years then moved back south because he was born in Mississippi. He was fascinated by a professor next door to him and Darce Bullock (sic). And Darce Bullock and I know each other, you know, he was a consultant to Federal Highway. So Tom knows what I'm doing internal for bank (sic).

Q. Okay.

A. And internal for bank (sic) is the federal NAP that we operated.

Q. Dr. Truax's race is white; is that right?

A. Yes.

Q. And he's, I believe, American; is that correct?

A. Yes.

Q. Do you know about the third person, what his race would have been?

A. White.

Q. Was he also American?

A. Yes.

Q. And so that was the phone interview. And then you said you had an interview on campus and that was with Tom White?

A. Uh-huh (affirmative response).

35

Q. Was there a bigger panel involved that you know of?

A. I did make a presentation to the entire department and there maybe a couple of professors from industrial engineers as well, about my work in northern Virginia.

Q. Was Isaac Howard at MSU when you were hired?

A. He was hired after me.

Q. What about Jason Keith?

A. Jason Keith is nowhere -- he is no -- I don't know where was him. He was, you know, come from nowhere.

Q. So you don't remember him being there?

A. Yes. He just at MSU very short period of time.

Q. Okay. What about --

A. Was my years, I mean.

Q. So what about Kari Reeves, was she there when you started?

A. No. She was again I might bump up with her at Virginia Tech, but we never speak with each other, because she and I work in the same transportation group. There are 40 something transportation researchers, so we don't know each

36

other at all.

Q. What about David Shaw, was he at MSU when you started?

A. According my conversation with him, he has been at MSU for more than 30 something years. So he should be here, but he was in a different department. I don't know what his position and what he was doing at that time.

Q. So your understanding is that he didn't have any involvement in your hiring?

A. No. Just he made the pivotal decision.

Q. So when you were first hired you brought on as an assistant professor; is that correct?

A. Yes.

Q. Tenure track, right?

A. Yes.

Q. And that you were brought into the Department of Civil Engineering, correct?

A. Yes.

Q. When did -- it changed its name at some point, right, the department did?

A. Yes.

Q. Now we might refer to it as the School of Civil Engineering?

A. Yeah, there are several changes.

37

Q. Okay.

A. At the time when I was hired it's called Civil Engineering Department. Somehow when Dr. Truax was -- when Dr. Truax was the department head then Dr. Truax changed it to Department of Civil and Environment Engineering. We was joking that Dr. Truax just wanted to drop the civil become the entire department to the Department of Environment Engineering. Because he was an environment professor.

Q. Oh, I see.

A. So we were joking, if I were going to be the department head then I'm going to probably change to Department of Civil and Transportation Engineering, but I wasn't.

Q. Okay. So this was in the College of Engineering, right?

A. Right, the College of Engineering.

Then at that year when we got a big building, Dr. Truax worked really hard to get that building established. And then somehow Dr. Truax work with University with some kind of deal to change to the school, but unfortunately just before that school started, he was fired of the department -- he was a professor. His professor was not fired

38

but his department head was fired.

Q. So who was the Dean of the College of Engineering when you started working for MSU?

A. I think it's Kirk Shields.

Q. Can you spell that?

A. K-I-R-K, Shields.

You probably need to Google that, because he retired from Washington State University just one year ago, I think, less than one year ago. But he was the best.

Q. What was his race?

A. He was white and born in America as far as I know.

Q. Okay. And you've been in the same department, despite the name changes, you've been in the same department your whole time --

A. Yeah, I survived all of the department until this year probably.

Q. Okay. I know you have a specialty of transportation engineering. Do you have any other specialties that you would say?

A. I got a really good training in computer science. So I was also listed as adjunct professor in computer science. And I was also a graduate advisor in computer engineering. So I don't know if

39

computer science still list my name. You probably can -- I can check it after the meeting.

Q. Okay. All right. So you came in 2005 and then you were promoted to associate professor at some point. Do you remember the year that that happened?

A. That's 2010, I think.

Q. Maybe 2010, 2011, that timeframe?

A. Right, yeah, that time. Maybe the paperwork was done on 2010 and then the actual salary and appointment come from 2011.

Q. Okay. And Dr. Truax would have been your department head then; is that right?

A. Yes.

Q. Did you have the same Dean of the College of Engineering?

A. No. That was Dean Sarah Ragahi.

Q. And you're saying Sarah?

A. Yes, Sarah.

Q. How do you spell her last name?

A. R-A-G-A-H-I -- it's not exact. It might spell wrong, but I can check that for you.

Q. That's okay. I'm sure we can track it down.

Do you remember Sarah's race?

40

A. She was white. She was born in America.

Q. Okay. And did you get -- you were awarded tenure at the same time; is that right?

A. Yes.

Q. And that is a huge process is my understanding; is that correct?

A. Yes.

Q. Okay.

A. Yes.

Q. Can you give just sort of an overview of what the process for getting tenured is?

A. Again, you just collect all the information, all the projects, research paper -- actually, MSU have a form. So you fill out that form first. And then once you filled out that form, then you send me that form, attach a bunch of the appendix, I think, and you make a binder. It's probably similar to the way that you guys get some kind of -- I don't know if a lawyer is anything like that. You probably, if you wanted to apply for the federal job, it may be similar.

So you collect everything that you have done in those five years. You can also include some of the achievements before you join MSU, I guess. But those things is just for reference. The mainly

41

I need to look at what you have done for MSU in those years. And you send me the binder to the committee. And the department committee -- department committee write a letter to approve or not approve, to recommend or not recommend.

Then you get -- then the department committee send the binder to the department head. The department head write a letter recommend or not recommend.

Then you send the binder and the letters to the Dean's committee. And the Dean's committee have to recommend or not recommend. Then you send that letter to the Dean. And the Dean either recommend or not recommend.

Then send it to the Provost's office. I'm not sure if the Provost's office have a committee or not. But the Provost recommend or not recommend.

Then send to the President. And the President send it to IHL. And eventually IHL have the final say, are you going to be promoted or not promoted, are you going to be tenured or not tenured.

Q. Okay. So it sounds like you have the decision being made or recommendations being made on a lot of different levels; is that fair to say?

42

A. Right.

Q. And one of those is a department committee?

A. Right. Yes.

Q. Do you remember who was on the committee, on the department committee for your tenure application?

A. James -- James, I forget about his -- he might be the committee chair for many, many, years, but he passed away a few years ago. There are two more professor, I think a Chris may be one of them. The professor I referred, he might be my, you know, committee member for hire me. I don't recall the third person.

Q. Okay.

A. But I know you questioned is Isaac is on the committee. Isaac is nowhere close, because he was hired before me -- after me.

Q. After -- so because he was hired after you --

A. Right.

Q. Well, I'm not going to ask you that. Okay. So James you said was on the committee. Do you remember his race?

A. White.

43

Q. American?

A. Uh-huh (affirmative response).

Q. What about Chris?

A. He's white and American. There might be a professor, he was -- he was probably -- he was from Lebanon, might be considered to be white as well, but he was from Lebanon.

Q. Lebanon you said?

A. Uh-huh (affirmative response).

Q. That was Chris or maybe the third person?

A. The third person.

Q. Okay.

A. Since this happened many, many, years ago, I'm not one hundred percent sure whether the information is accurate.

Q. That's fine.

A. You probably can find out the accurate information from HR or some -- you know, from my document from the lawsuit.

Q. That's fine.

A. Okay.

Q. I'm just asking. You know, obviously if you don't remember, that's fine.

A. Okay. Yeah.

44

Q. And we said your department head at the time was Dr. Truax?

A. Uh-huh (affirmative response).

Q. And then how many people --

A. That's for sure.

Q. How many people were on the Dean's committee?

A. Dean's committee, actually, I don't know.

Q. Do you think it was more than three?

A. Yes.

Q. Do you think it was less than 10?

A. Yes.

Q. Do you remember the names of anybody who would have been on that committee?

A. No, I don't remember any name on that committee. That committee may not be disclosed to me, too.

Q. So you weren't made aware of who was on the committee?

A. I might be made aware, I may not be made aware. I just don't recall.

Q. And then the Dean was Sarah --

A. Ragahi or whatever, yeah.

Q. Who was the Provost at the time?

A. Jerry Gilbert.

45

Q.   Jerry Gilbert?

A.   Uh-huh (affirmative response).  He's a great gentleman.

Q.   And he is white, correct?

A.   Yes.

Q.   Is he also American?

A.   Yes.

Q.   And I believe Dr. Keenum was there at that time; is that right?

A.   Probably not.

Q.   You don't think he was President --

A.   I'm not sure.  I think there are several Presidents before Dr. Keenum was on board.

Q.   Okay.  All right.  So you said Isaac Howard was not involved in your getting tenured at all?

A.   Yes.

Q.   Yes, he was not involved?

A.   He is not.  I'm one hundred percent sure because he was hired after me.

Q.   Okay.  All right.  So then in 2021 you were promoted to full professor; is that right?

A.   Yes.

Q.   Is this the highest level that you can attain at a professor at MSU?

46

A.   Yes.

Q.   Who was your direct supervisor when you were promoted to full professor?

A.   Dr. Truax.

Q.   Dr. Truax, okay.  He was still the department head?

A.   Yes.

Q.   I seem to remember some -- the timing is -- it falls right there -- I don't remember when you got the letter, so you could correct me on that.

Did you get the letter about your promotion in the spring or was it in the summer?

A.   I think I got a department letter before -- around December.

Q.   Okay.  Of 2020?

A.   Right.  And I got a letter in spring of 2021.

Q.   Okay.

A.   The Dean's letter and the Provost's letter and the President's letter in spring.

Q.   Okay.  And I believe the transition from Dr. Truax to Isaac Howard as department head, that was in the summer of 2021?

A.   Yes.

Q.   So did that happen after you were promoted

47

essentially?

A.   Yes.

Q.   I mean, you may have been waiting for it take effect, but the decision had been made; is that right?

A.   Right.  Yes.  So once IHL approved, you know, before -- before Howard was appointed interim department head.  He was not appointed of the department, he was interim department head.

Q.   Right.  So was there a committee involved in the promotion to full professor?

A.   Yes.

Q.   How many people are on that committee?

A.   Three.

Q.   Do you remember who they were?

A.   One is Howard.

Q.   Isaac Howard?

A.   Uh-huh (affirmative response).  And the one -- another professor from other departments, I probably cannot recall their name at this point.

Q.   How many people was it, did we already say?

A.   Three.

Q.   Three, okay.

All right.  And so I don't know if we've

48

established this yet, but Isaac Howard is white and American; is that correct?

A.   Right.  Yes.

Q.   Do you know about the other two, what their races were?

A.   I think I know who are they, I just cannot remember their name.  And they should be able -- when I go onto the website, should be able to get their name for you.  I think another one is white and there might be one Chinese American, I think Asian American.

Q.   And you said those two were from different departments within the College of Engineering?

A.   Right.

Q.   So was Dr. Howard, he was the only one from CEE?

A.   Yes.

Q.   Okay.  And then the department head of course was involved?

A.   Right.  Yes.

Q.   And then the Dean had to sign off on it?

A.   Yes.

Q.   And who was the Dean at that point?

A.   Jason Keith.

Q.   And he is white and American; is that

49

right?

A. Yes.

Q. Did the Provost have to sign off on it?

A. Yes.

Q. And who was the Provost then?

A. David Shaw.

Q. Also white and American?

A. Uh-huh (affirmative response).

Q. Forgive me for doing these again, I'm forgetting who we talked about. I'll stop asking at some point, I promise.

Did it go through anyone else, the President maybe?

A. President and the interim.

MR. BRAGG: One thing I was going to say for Lori's benefit. The way that Dr. Zhang pronounces Jason Keith kind of sounds like Case, Jason Case.

THE WITNESS: Oh, yes.

THE REPORTER: Thank you.

THE WITNESS: Thank you for catching me on that one.

MR. BRAGG: He's much better at pronouncing all the words in his second language than I am in my second language, which is zero.

50

THE WITNESS: Not only second language, the problem is specific providence, the location I was raised up. That make my speak -- I cannot just pronounce some words as good as should be. Just like some people joking a southern accent, people are joking at me about those pronunciation, too.

Q. (By Ms. Matthews) Okay. So have you ever applied for the position of department head?

A. No.

Q. And same would go for the CEE director? I know they changed the title.

A. Yeah, same as that one. I know what you mean.

Q. And you never applied for that, correct?

A. Yeah.

Q. Okay. So if we can, I'd like to go through starting in 2021 if you can remember.

A. Okay.

Q. I'd like to see if we can get a running list of who the full professors were --

A. Right.

Q. -- with tenure in your department.

A. Right.

Q. So in 2021 after you got promoted, who were the other full professors with tenure in your

51

department?

A. I think there might be geotech professor. I think he was promoted in same year as I did.

Q. You said a geotech professor?

A. Uh-huh (affirmative response).

Q. And that's in the civil engineering department?

A. Yes.

Q. Okay. And you don't remember his name?

A. Yes, I don't remember his name now.

Q. Do you know his race?

A. Hid race may be white. He was from Iraq.

Q. So from Iraq.

A. From Iraq.

Q. Anybody else?

A. Just three of us, four professor. Isaac, me and Vahid. V-A-H-I-D.

Q. Okay. I think Vahidafar or something --

A. Farshid, you are right.

Q. I think it might be spelled F-A-R-S-H-I-D is his first name.

A. Right. Perfect.

Q. And I'm not going to try to spell his last name, but it starts with a V, I know that. Vahidafar is how I would pronounce it, but I'm sure

52

that that's wrong.

A. Right.

Q. So he was a full professor with tenure?

A. Right.

Q. You think he got tenure the same time as you?

A. Right.

Q. He's from Iraq.

And then you have Isaac Howard?

A. Uh-huh (affirmative response).

Q. Did -- so 2022, was it the same group of people or anybody else get added or taken away from the list?

A. Vahid was -- Howard was a department head, Fashid just moved to another University.

Q. So Fashid moved at that point?

A. Uh-huh (affirmative response).

Q. Okay. So then it was just you and Dr. Howard in 2022 who were the full professors?

A. Oh, 2022, we promoted another one.

Q. Oh, okay. Who was that?

A. He was from India. He was environment professor. I will remember it after a few -- after we speak a few other questions. I will mention once I recall that.

53

Q. Okay. In 2023, was it the three of you again?

A. No, he left MSU.

Q. The man who was from India left?

A. Right.

Q. So he was just there in 2022, left in 2023?

A. Right.

Q. So then we just have you and Isaac Howard or was there someone else added?

A. No.

Q. So just you and Isaac Howard as the full professors with tenure in 2023?

A. Right.

Q. Do you know about in 2024?

A. No, because I was prohibited to enter the campus since 2024.

Q. So you don't know --

A. In that letter, if you still remember that letter?

Q. Yes.

So you don't have any knowledge of who the other full professors with tenure are at MSU from 2024 forward?

A. That's right.

54

Q. Okay. All right. Can you tell me about endowed chairs?

A. Yes. That has talk me a few times to have me as endowed chair. There is probably no any documents for vote me to an endowed chair. And somehow that didn't happen. So I have a few conversation with him about that and somehow just didn't happen.

Q. Who were those conversations with?

A. Dennis Truax.

Q. So when somebody is given an endowed chair, is that a promotion or is it just sort of an addition to their --

A. It's kind of honor and addition to their -- there's just the honor name with a monetary how much you're going to get extra.

And I remember that when Dr. White is no longer the department head, then Dr. Truax asked him to, you know, to create his endowed chair so that the other people can have the opportunity.

So at some point you get a endowed chair for some reason after a few years you may not be the endowed chair for different reasons. That was my understanding. I may not be accurate in the -- because I had never got the endowed chair.

55

Q. So when somebody has an endowed chair essentially is it a stipend they get, like an additional monetary stipend?

A. Stipend and the title of endowed chair.

Q. Okay.

A. But nothing is permanent. That's not permanent. For instance, funding run out for that endowment, then you just don't get the pay and you don't have that title. That was my understanding. Again, I don't get endow chairship, so I don't know the whole rules.

Q. Okay. That's fair.

Are there any other faculty at any level of the civil engineering department who are from China?

A. At the time when I was hired, no, most of the time. There was one in recent years, maybe starting from 2021, 2020, Jun Wang. You probably know her name already.

Q. Okay. And it's J-U-N, is it W-O-N-G or W-A-N-G?

A. W-A-N-G.

Q. Okay. And you think she's from China?

A. Uh-huh (affirmative response).

Q. Is there anyone in the department who you

56

understand to also be Asian?

A. Yes, Ben. As far as I know his salary even -- even not as good as my salary.

Q. You said Ben?

A. Yeah. I think that was from the release of the EEOC complaint. And the EEOC have list of all the salary of the department. If you go back to that document, the EEOC.

Q. I was trying to find Ben's last name. I think it start with an M?

A. Magbanua.

Q. Okay. I think I found it. M-A-G-B-A-N-U-A.

A. Uh-huh (affirmative response). Yes.

Q. And he's Asian?

A. Yes, he's from Philippines, I believe that's Asian.

Q. Okay. Is he the only other Asian person that you know of in the department other than Jun?

A. No, not as I can think about.

Q. Is there anybody in the department that you know to have disabilities?

A. I know Phil, he got a surgery, he got a heart surgery. After surgery, I'm not sure if he got an issue or not. But usually disability is a

57

kind of personal and confidential information, so I don't -- I'm not department head, so I don't have the access who is a disabled, who got disability and whose kids was, you know --

Q. That's fair.

A. -- had some issue.

Right.

Q. And you're anticipating my next question, too. And I'm just asking what you might know about. So I understand if you don't know the details of everybody's disabilities, their personal lives, things like that.

A. Right.

Q. But you think Phil, is his last name Gullett?

A. Gullett, yes.

Q. And you think he may have been considered to have a disability at some point because of a heart surgery?

A. Yes. I know he got a heart surgery for sure. If he got a disability, I'm not sure. I don't know that status.

Q. Do you know around what year that would have been?

A. Probably 2020. I'm sure Dr. Truax was

58

department head. I'm sure about that part. Because Dr. Truax give us the updates about his surgery. And Dr. Truax is a very caring person, if I got sick he's going to come ask me bunch of the questions and update to the other professors, too.

Q. So is it fair to say that you -- do you not have any issues with Dr. Truax?

A. Oh, we have disagreement. Sometimes it can be intense. So we work well with each other.

Q. Okay. Do you have any issues with him as far as discrimination or retaliation is concerned?

A. You mean now with Dr. Truax?

Q. At any point with Dr Truax?

A. I may raise some issues about my salary or I don't have the -- okay. About the title, I mean we have a few discussions about the title. And I told Dr. Truax, you know, I might be discriminated and Dr. Truax said he not discriminate me. It was a system discriminate.

Q. Do you know what is meant by that, the system discriminated?

A. About my case. When I have the kids, then I have some issue and like my kids cannot get in MSU's kindergarten, for me to get title of professor or something like that.

59

Q. Okay.

A. And at one point I apply the, you know, if you're going to get promoted usually MSU is going to allow you to get into leadership academy. I'm not sure of the exact word. I think I applied once or twice and Dr. Shaw rejected my application.

Q. For a leadership academy?

A. Uh-huh (affirmative response).

Q. Sort of thing?

A. To attend the leadership academy.

Q. When was that?

A. 2021, even prior 2020.

Q. So do you believe that Dr. Truax ever discriminated against you?

A. If he discriminated me I would be very frank to talk to Dr. Truax, you discriminate me on this or that. I don't recall I have a discussion on that one except for my title professor.

Q. Okay.

A. But Dr. Truax explained to him it's not discriminating me, it's the system discriminated.

Q. Did you believe him?

A. I believe him.

Q. All right. So since you've been at MSU, have you always been on a nine-month contract?

60

A. Yes.

Q. Okay.

A. Nine-month salary, yeah. Maybe nine-month contract we can call that, yeah.

Q. So have each of your contracts -- I guess have each of your contracts been from a term from August to May of whatever year the contract is for?

A. Right.

Q. Okay. And this is opposed to a 12-month contract, right?

A. Right.

Q. Some people get 12-month contracts?

A. Yeah.

Q. So what's your understanding of the difference between a nine-month contract and a 12-month contract?

A. Right. Well, for nine-month contract, I think it's a -- the best thing about a nine-month contract is that you can do the consulting in summer months or you can teach. If you don't have the consulting, if you don't have the research, you can get extra summer pay by just teaching.

And civil engineering will have a bunch of opportunity. There is -- every year Dennis is begging us to teach during the summer because

61

students need to have the course to graduate and usually sometimes we do, sometimes we don't.

Q. So in a nine-month contract, it doesn't provide for work in the summer, but you might be able to get that extra work; is that what you're saying?

A. Yes. I can still remember there were words, something like that my job offer -- you are offered a nine-month salary and the nine months of the duty to work and the summer research and the summer teaching are usually available.

Q. Okay.

A. Something like that. We can look at my job offer letter.

Q. So is it fair to say that you only -- or professors with nine-month contracts only get paid in the summer months if they pick up --

A. Extra pay, summer months.

Q. Extra pay in the summer months in addition to what's in the contract?

A. Right.

Q. And they only get that if they pick up classes to teach in the summer or if there's a grant that they're working on that pays them during the summer; is that right?

62

A. Right. Yeah. For teaching it works slightly differently. Usually if you tell Dr. Truax, I told him, Dr. Truax, I wanted to teach a course in summer, usually he's going to arrange for that.

Q. So who decides if there will be a summer course taught? Who decides if you to teach, the department head?

A. Uh-huh (affirmative response).

Q. In the summer they decide that?

A. Uh-huh (affirmative response). Right.

Q. So I kind of want to get into this breakdown that I understand exists with I guess any professor position and it's how you apportion your effort between -- or among teaching, research and service. Can you explain that to me?

A. So usually you got two courses to teach, a maximum two course to teach in every semester. And usually those two courses include a undergraduate course and a graduate course.

So as a full professor you got four courses in one semester. And usually if you got a 25 percent of the research buyout, then you just got a one course reduction. You teach three courses.

If you got 50 percent of the research

63

workload then you just reduce two courses. So that's just a -- I think there's a written policy at the College of Engineering how to redact the course.

Q. So --

A. For the assistant professor you got three courses, I think.

Q. So with each promotion, is it fair to say that there's an expectation that you'll teach more classes?

A. Yes.

Q. Or have a heavier teaching load; is that fair to say?

A. Yes. Well, up to four courses.

Q. After four courses?

A. Up to.

Q. Oh sorry, up to four courses. Got it.

A. Yeah.

Q. Okay. So in your job as a professor, anyone's job as a professor probably, you decide for any -- is it any given semester how you're going to divide up your time or is it per year?

A. It's usually we just look at our research load and then you talk to your department head. For example, Dr. Truax, look I have so many projects can you reduce one course for me, please? Then usually

64

you have a discussion then you got, he's happy, I'm happy, then that's it.

I have not got a situation with Dr. Truax that I'm happy, he's not happy. I don't recall the situation we discuss I am not happy. So it's kind of, you know, friendly -- it doesn't have to be -- it can be a casual conversation. It doesn't have to be very formal, have to be in his office, have to have a discussion that has to be recorded. It's just very casual.

Q. But it's a bit of a negotiation it sounds like?

A. Yeah.

Q. Okay.

A. It might be in the hallway that both of us go to the coffee machine, you know. It's very casual.

Q. Is there a typical, throughout your time at MSU, did you have sort of a typical apportionment of your time? Like did you -- I'm just going to give an example. And I have no idea if this is how you did it. But if you always did 33 percent research, 33 percent teaching, 33 percent service? Did you have something like that that was typical for you, a breakdown?

**65**

A. It not so scientific. So usually I look at my research commitment. If I have less research then I have more teaching and service. If I'm more research, just talk to Dr. Truax to reduce my teaching load and to reduce my service sometimes. So it's not -- I would like to say it can be vary from semester to semester.

Q. And it's a decision that you usually reach in conversations with your department head?

A. Right. Right.

Q. So what about -- let's talk about the classes that you have taught at MSU. Have you -- did you ever teach or have you ever taught general engineering classes for like freshmen or have you stuck to transportation specialty type stuff?

A. No, I didn't talk about general courses. I just taught transportation engineering courses. Although, I maybe have one conversation with Dennis to taught the final course, which we call -- which is a comprehensive course which is the last course every senior have to take. I have never expressed to wish to teach any other courses except maybe one or two occasions raised that issue.

Q. So you've pretty much always been focused on the upper classmen or graduate students?

**66**

A. Right.

Q. Are there any classes that you would pretty much always teach in any given semester? Like you can always count on during a fall semester I'm probably going to be teaching this class or in the spring semester --

A. Right. Yes.

Q. What would you typically teach in a fall semester?

A. I typically geometric design of highway and street in fall semester. I typically teach traffic engineering in spring semester. And before I was promoted to tenure, I also teach transportation engineering in the spring.

So after I promoted transportation engineer Dr. Truax has managed to hire more transportation professors so that junior professor usually work with me and he teach the transportation engineering introduction course and I teach those high level, which offer to -- most of the students are the graduate -- is going to graduate at that semester or the next -- the senior class, let me call that.

Q. Who is the other transportation engineer professor or is there more than one?

**67**

A. Unfortunately we have hired two transportation professor when I was there. Both of them has moved to other University because they feel MSU, you know, is not the best place to work. One professor is at Wisconsin Madison now. One professor is at University of Texas Arlington.

Q. Do you remember their names?

A. Yes. The professor at Madison is Shiaopent Li. His last name is my first name. His first name is S-H-I-A-O-P-E-N-T.

And another professor is -- has the same last name, Li, L-I. His first name is Pentfei, which spelled P-E-N-T-F-E-I, I think. Might be slightly different.

Q. What years were they at MSU?

A. That's not --

Q. Do you think it was before 2021 or after?

A. Definitely before 2021.

Q. Okay.

A. They move before Howard was the department head.

Q. Okay.

A. I can get you the approximation if you want that information.

Q. I think that's good enough for me. What

**68**

you've given me is fine.

A. Okay.

Q. So how often would you teach a course in the summer?

A. I never teach a course in the summer until just recently I, you know, if something happen to my research, I ask Isaac to assign me the summer course.

Q. What year was that, do you remember?

A. I might ask Isaac to give me a summer course in 2022 and in 2023.

Q. And you did not end up teaching those summer courses?

A. No. After 2022 I was stripped out of the teaching.

Q. Yes. We're going to talk about those courses, too.

But typically in the summer it sounds like you would have a grant to work on?

A. Yes.

Q. Would you say that that was every summer throughout your time MSU except for those that you asked --

A. Very, very rare before 2021, I don't have any summer. Might be on the fall funding, but I do

69

have a funding every summer. I mean, I may not be able to provide one hundred percent of my salary, but of my memory I never recall even the first summer when I got to MSU I still have the research funding to support my summer salary.

Q. Okay. So in your fall courses that you would typically teach, and I think you named one course but it was -- you would do sort of an undergraduate and a graduate level?

A. Yes, I'm sorry.

Q. So how many students would typically be in those fall courses that you would teach?

A. For undergraduate courses it vary probably around 10 to 40. For spring classes it's probably vary from 10 to 50 at one point, I think, five, zero.

Q. For the undergrad courses?

A. Uh-huh (affirmative response). For undergrad. I'm sorry, for all the courses we have talk about so far is undergrad course. And I do have graduate courses. That's what I mean we have two courses to teach every semester and usually you have one undergraduate and one graduate course.

Q. Okay.

A. So we are talking about the undergraduate

70

course so far.

Q. And I assume the enrollment for graduate courses was much lower usually than that for undergrad?

A. Yes.

Q. Okay. What is your understanding of how it's decided who will teach what class in a semester?

A. Again, department head, talk to department head if I needed to teach this course for graduate student to graduate then I add that course, so.

Q. So faculty might ask a department head to teach something and the department head will decide whether they can? Is that how it works?

A. Yes. And the faculty talk to the department head if the workload is too heavy.

Q. Okay. Did you -- did Isaac Howard handle course assignments any differently than Dennis Truax did in your experience?

A. Yes, of course.

Q. Tell me how.

A. Dr. Howard does not like to talk to faculty. As far as I know he just assign the faculty courses and they -- what you see is what you get.

71

Dr. Howard actually does not talk to faculty at all. Maybe just my experience. Maybe he talk to other faculty every day, every hour, so I don't know about that. But that was my experience with him.

Q. That was going to be my question is if you knew if he was that way with everybody? If all the faculty --

A. I don't know to be honest with you.

Q. Did all the faculty feel the same way --

A. Because I don't monitor his activity every day.

Q. Sure.

Do you ever talk to the other faculty about how they feel about Isaac Howard?

A. Yes.

Q. What were their feelings?

A. Generally negative.

Q. Did they express that they wished he talked to them more, that sort of thing?

A. I don't want to pass some faculty's feeling about him. But I will ask you question maybe correct or maybe not correct, but can you ask your question again.

Q. Yeah.

72

When you would talk to faculty -- when you and other faculty would talk about Isaac Howard, what did you understand their complaints about him to be? That's probably a better way to ask it.

A. Okay. Probably his qualification and his styles about -- the style of his leadership I would like to say and what's the direction the department is going to go.

Q. Okay.

A. So those are probably the main concerns.

Q. So what -- can you expand on the style concern, about his style? What do you mean by that?

A. His style? Maybe communication might be a one of the -- one of the things we talk about. It seems he compared with Dr. Truax, he does not talk to faculty as much as Dr. Truax does or Dr. Truax did. His style is more like he decide that you do it, not too much feedback, no back and forth, that type of thing.

Q. Okay.

A. That was the things that we talk about.

Q. Okay.

A. You can see how many faculty has been lost once he was appointed as department head. And you can see how many faculty was lost when Dr. Truax was

73

the department head.

Q. Okay. I don't know if this is -- you might be guessing at this, so feel free to tell me to buzz off with this question, I guess. But how many faculty do you think have left since Isaac Howard has been department head because of his -- the way he leads?

A. Okay. Two professors first. Four professors and one assistant professor. There might be one, I'm not one hundred percent sure. Also I was fired. So as far as I know at the time when I got the intent to fire notice, all the four professors are either go to other university or in my case, I was fired. And Dr. Truax he was a full professor and he was humiliated and he left.

So four professor either was forced to retire or was fired or go to other universities. I think four full professors and one assistant professor.

Q. Do you know the races of any of those people?

A. There are two Irani professors from Iran. I think they call them, they are white, right?

Q. From Iran?

A. Uh-huh (affirmative response). Two from

74

Iran, one is India, which is Asian American, I think and Dr. Truax is white.

Q. Okay.

A. But Dr. Truax choose to retire because he was stripped of the department head.

Q. So part of your employment at MSU involved working on research grants; is that right?

A. Yes.

Q. How many grants -- and I'm not going to hold you to this number. But if you had to estimate how many grants you've been principal investigator on, how many --

A. Thirty. Probably 30.

Q. 30?

A. Uh-huh (affirmative response).

Q. I think I know the answer to this, but except for the two that you're working on for the NGSIM company, are you working on any other grants or proposals?

A. I've had work on a few grants in my sabbatical leave, but I was not awarded. And I did have a few awards at the time when I talk to Joanne Lucas. I think it's over three times for the same things that I'm doing, because I have phase 1, phase 2, phase 2b. That was for Federal Highway.

75

Q. Right now are you working on any others?

A. Yeah, we have talk about I have SBR (sic) grant, I got a small Kentucky grant.

Q. Can you explain to me what a principal investigator does, what their responsibilities are?

A. It's usually write a proposal and then your proposal awarded, then you are the principal investigator.

Q. Okay. Are they kind of the boss for the grant or for the proposal or the grant?

A. I would not say that boss part. Basically you're responsible for the grant.

Q. Okay.

A. You do, for example, at MSU I'm the PI. I can ask help from other professors, but I'm not the boss of the other professors. We are cowork and it's more closely. It's not, kind of, well, I can fire him. No, I cannot fire any other professor who is working with me on the same grant although I'm PI.

Q. Sure.

Do you -- as a PI, does a PI kind of direct the work of people working on the grant?

A. You take the leadership roles and you are to make sure at the beginning to make sure the

76

expectation to other co-PI or the co-work and of course you need to monitor the progress, make sure everything is done by what you proposed to.

Q. Okay. So I understand one of your claims is that MSU has caused you to miss out on research opportunities. Is that right? That's one of your allegations in the case?

A. I don't I remember the exact words. Do you mind to show me my complaint to that part exactly?

Q. Well, let me just ask it this way. Do you know of any research opportunities that MSU has caused you to miss out on?

A. Yes.

Q. Okay. So what are those?

A. The UTC proposal we have -- I think we have complained that in the court document.

Q. And that was in -- you worked on the proposal summer 2022?

A. Right.

Q. And then it kind of went into the fall of 2022, the issues with that; is that right?

A. We submitted a few weeks into the fall -- I think in August, in the later part of August, in beginning of the September. That was the submission

77

deadline. So we did spend a few weeks into the fall to submit the proposal.

Q. Are there any others that you would say MSU has caused you to miss out on?

A. I think there might be MDOT proposals. We're still investigating MDOT's email, I think. We just got it. So probably after a few days or few months we probably can get you a little bit more detail answers. And some of the things are settled (sic), you know. So I think there are a few things that we can still explore. As we speaking, we have not got a whole picture yet.

Q. Okay. So in your answers to request for admissions, and I can show you this if you want to see exactly what your answer was.

A. Right.

Q. You said in response to one that you've identified a grant sponsor or funding agency that did not consider a proposal because of MSU?

A. Right.

Q. So let me show you that. Because I'm going to -- I just want to --

A. Yeah, that is reference to the UTC.

Q. So that's the UTC?

A. Yes.

78

Q. Okay. Well, we can move on then, because that's -- I thought maybe there was another one that you were referring to there.

A. Okay.

Q. Okay.

A. And there might be more. We said at least one, so we're still investigating.

MS. MATTHEWS: Okay. Do y'all want to take maybe a short break? I know we've been going for a while. We can go off the record.

(Off the record.)

Q. (By Ms. Matthews) So when would you say that you first began experiencing issues that you would describe as discrimination?

A. The issue is some kind of -- not really that many I can recall with Dr. Truax. There are two issues I have raised with him. One is a -- one is a title professor. I was not being able to get that one. The second one is my kid, for that one Dr. Truax helped me as much as he could. I understand that he does not have any say to the admission of my kid to the daycare.

Q. So which one of those came first? Was it the daycare or you're saying the title of professor?

A. The endowment professor or sometime I also

79

call it title professor.

Q. Okay. So what you're saying is that you believe it was discriminatory to not have been given an endowment chair?

A. Uh-huh (affirmative response).

Q. Do you remember -- so which one of those came first? The daycare --

A. Probably at the same time.

Q. Okay. So --

A. It's approximately within one year or something like that.

Q. Was that like 2019?

A. Yeah, something like 2019. Yeah, sounds about right.

Q. Okay. And that would have been -- the endowment chair issue, is that something Dr. Truax would have decided or who all would have decided --

A. Jason Keith.

Q. Jason Keith?

A. Uh-huh (affirmative response).

Q. And it's not a formal application process, correct?

A. No.

Q. Just informal conversations, I think that's what you said?

80

A. Uh-huh (affirmative response).

Q. How far did those conversations go? Do you know if you were in the finalists for a chair?

A. I'm not sure about that, because I'm not on the other side of the decision process.

Q. But for that you would say that the discrimination came from Jason Keith; is that what you're saying?

A. Dr. Truax didn't say that way. He said the system. I didn't ask him specifically who is in the system, but I -- because that does not affect me too much, so I did not raise this issue to complain to the EEOC, for example. I don't think I raised the issue to that. Also, I don't have any evidence about how the system is working.

Q. Okay. So let's turn to your claims in these lawsuits that we're here about today.

A. Right.

Q. My understanding is that you're claiming discrimination based on race, ethnicity, national origin, disability and your role as a caregiver for your son?

A. Right.

Q. Am I missing anything?

A. As far as I can remember those are the

81

completeness.

Q. Okay. Great. Just wanted to make sure we're on the same page about what all of is it.

A. Right.

Q. In any of your conversations with David Shaw, have you ever heard him use a racial slur?

A. I had probably 30-minute conversation with David Shaw, at that time we talk with each other, we got a very pleasant conversation. That's probably at the time when Ben was department head.

Q. Did you hear Dr. Shaw use a racial slur?

A. No that as far as I can recall. We talk about the UTC primary, I think.

Q. Have you ever heard him use a racial slur?

A. Not to me directly.

Q. Have you heard about it indirectly?

A. We saw some documents from him, you know, it's not that pleasant to read.

Q. What do you remember the slur to have been?

A. For the slur I cannot remember any slur. I do recall he said to do everything we can to get him -- I forgot about the next part. He said do everything possible to get this guy -- to get rid of this guy. It's implied for that. It's not exactly

82

the same words as I said to get this guy out. You probably can find the email. Everything is in his email.

Q. Yeah, I think I know what email you're talking about it.

A. Right.

Q. I don't have it in front of me unfortunately, so it might take a little work to find it?

A. That's fine. I know what that email is and you know that email, I think we're on the same page.

Q. Is your memory of that email -- do you remember any sort of racial slur being in that email?

A. I don't remember he made any comments about my identity, anything, just the action items.

Q. Okay. What about, have you ever heard him make an unkind remark about your disability or your son's disability?

A. So far as I can remember of the document we can get and some of the document I have not seen, I don't recall there's something like that.

Q. Okay. And I'm going to ask the same questions about Jason Keith. Have you ever, in any

83

of your conversations with him, have you ever heard him make a racial slur?

A. There are a few things I think I raised in my (unintelligible). The first thing happened in the COVID-19. I think it's in the email to the entire MSU. And somebody at the engineering college student made a threat to a Chinese professor.

So I think I emailed Dr. Keith to say, you know, is there anything that I can do, you know, to talk with other Chinese professors so that we -- we are a little bit scared, at the same time we're a little bit feel unsettling about those threatening email from students.

As far as I know Dr. Keith did nothing to investigate who this student is. So basically he didn't just do anything about it as far as I know. He might did something in the background that you probably might be able to dig that up. But that is the first thing that I think I can remember.

And he even used some unpleasant word and like called me Zi, Z-I. And he did call me a meat.

Q. A what? I'm sorry.

A. Meat, M-E-A-T. Like he is like the predator and I am a piece of the meat, so he can eat me at any time.

84

So he imply -- he called me the meat. That is a very offensive -- very bad words to describe somebody to be the meat for somebody else to eat in my culture.

And then I think he probably knows some Chinese culture. I think his PhD advisor is Taiwanese American, which we shared a very close cultural things. I'm not one hundred percent sure about that part.

Q. Was the meat comment, was that in person or over email?

A. Over email.

Q. Do you remember about when that was, like year?

A. That was -- that was -- they solicited the students come. And when the students come to his email box, then he's, oh, I got you. Now you are the piece of meat. It's not exact words. But when I read the email I feel like that way.

Q. Okay. So other than that and your being unsure if he did anything about the student email, any racial slurs that you can think of from Dr. Keith?

A. I don't remember anything about that student email. At this point if you don't mind to

85

show me the student email, I will be more than happy to --

Q. That's okay. I was just trying to get -- make sure we had covered all of the potential --

A. Right.

Q. -- slurs that you remembered?

A. I don't remember anything come from that student email. Any slurs from that email and anything about that email at this point.

Q. Okay. So when --

A. When I talk about that, my brain just went blank.

Q. Okay. What about any unkind remarks about your disability or your son's disability, have you ever heard anything like that from Jason Keith?

A. Not I can recall at this point.

Q. Okay. So what about Kari Reeves have you ever heard her use a racial slur?

A. He once called me international faculty although I have got my citizenship for many years --

Q. Okay.

A. She called me. I'm sorry.

Q. Okay. That's fine.

Do you consider that to be offensive?

A. Yes.

86

Q. Okay.

A. It's no matter what I have done for MSU and she implied that you are -- you know, you are outside. At some point you should go if I call you international faculty.

Q. You think that was her implication?

A. That's my interpretation. She might -- may not have that, you know, intention, but to me that's means that.

Q. Okay. Have you ever heard her make an unkind remark about your disability or your son's?

A. I cannot recall at this point.

Q. What about Isaac Howard?

A. I cannot recall at this point.

Q. Okay.

A. I might remember it later on. I will let you know.

Q. And that's for either racial or ethnic slur or disability comments. So if you think of anything, you can --

A. I think I almost have no conversation with him.

Q. Okay. Do you remember a meeting with him and Julia Morrison for your annual reviews?

A. We did have a meeting on that.

87

Q. Okay. Did you refer to him as a Nazi in that meeting?

A. Well, he called me engineer, and when I feel it kind of pain and uncomfortable, angry about it, he called me engineer. Then he is nothing. He's making fun out of my pain. He is trying to say my suffering was his pleasure. I might call something unpleasant. Look, look what he has done.

So if you -- you probably know, so now MSU is implementing his engineer by offering me going back because engineer work on this special project at this point. So look at his action, look at what he has done so far to me and look at MSU has trying to implement what he has done in one year. 2023, right? Three years ago what he envisioned for my future.

So I just don't enjoy with what he did that to me. I might call something like that, but look at all those things, sequence of the events. I don't know what the other people will call him about this.

Q. Okay. So those are the reasons that you say that you referred to him as a Nazi in the meeting?

MR. BRAGG: Objection. You can answer.

88

A. I might -- I might say that. Like I said, which might not be the best description, as I look back. But at that point, that was just the -- like I said, sometimes I jump out some of the words. Probably not the best description about the situation. But look at what action he has done, MSU has done, I think everybody might have their own interpretation about those actions.

Q. In that meeting, did he say anything about your race or use an offensive term about race?

A. We are talking about my performance. I don't recall we talk about anything about the personality or description about me or describing about him.

Q. So other than what we've already talked about --

A. Uh-huh (affirmative response).

Q. -- has anybody in your department at MSU ever used a racial or ethic slur with you?

A. No, for other faculties I think we did have very polite conversation. I don't recall anything else.

Q. What about any remarks about your disability or your son's disability?

A. I don't recall anything except those

89

emails that we have discovered.

Q. Okay. Do you remember any emails where other people in your department have used -- have made unkind remarks about disabilities?

A. We don't have any email from my department. The emails that we have are the administrators that have come in from -- the comments from Jason Keith, comments from David Shaw, HR directors. So I would like to see -- I didn't see any email from my department.

Q. Okay. So there is an issue with an ASSURE grant -- a research project with ASSURE.

A. Uh-huh (affirmative response).

MS. MATTHEWS: And for Lori, that all caps A-S-S-U-R-E.

THE WITNESS: Right.

Q. (By Ms. Matthews) Can you give a brief description for the record of what ASSURE is? If it can't be brief, that's fine.

A. Okay.

MR. BRAGG: I'm ready to hear this because I don't know that I fully understand to this day.

MS. MATTHEWS: Okay.

Q. Let's hear it.

A. It's like FAA UTC.

90

Q. That's helpful.

A. Yes.

Q. MSU is the lead institution for ASSURE; is that right?

A. Yes.

Q. And they run various research projects through the ASSURE organization, correct?

A. Right.

Q. And what is Raspet? How does that fit in?

A. Raspet is one of the major awardee of the ASSURE projects.

Q. So that's separate from ASSURE, but it does projects on behalf of ASSURE?

A. Right.

Also Raspet was -- get other projects from other organizations. It doesn't have to get all the projects from ASSURE.

Q. Okay. So there's one main project that's kind of at issue in your complaints.

A. Right.

Q. And that would be Urban Air Mobility Project?

A. Yes.

Q. Is that the best way to describe it?

A. Yes.

91

Q. Who is the lead institution on that project?

A. I think North Dakota University or North Dakota State University.

Q. I have Embry-Riddle?

A. Embry-Riddle was a task leader on the task I worked on, if my memory is still correct. I can look at the contract.

Q. So you can -- you might have a project where you have an institution leading the project but it can be broken down into smaller tasks --

A. Right. Yes.

Q. -- where different institutions lead those tasks?

A. Right. Yes.

Q. So for what your were tasked on --

A. Right.

Q. -- was that Embry-Riddle?

A. Yes. We work with Embry-Riddle.

Q. Can you explain what you were doing on that project?

A. Okay. So I don't know if this is related or not related. So at one point MSU fired Raspet director without any explanation. So I work closely with Raspet director, Dennis Brook and he was a

92

strong leader at MSU. I worked with him and he's navigating all the external communications. He is highly regarded by other institutions as well.

So he and I wrote the proposal -- actually, wrote the task proposal. Because we're the sub, right. North Dakota is the lead, Embry-Riddle was task leader, then here's MSU.

Once we wrote the proposal, wrote scope of the work and the FAA approved it and give us the funding to do the research.

Q. Who did you report to on that project?

A. There are two MSU manager, Dos Brock (phonetic) was gone. So Dos Brock (phonetic) supposed to be the manager at MSU that I report to. And when he was gone, then there are two more manager, one is Brian. I forget his last name. Another one is a graduate, just graduate from the aerospace, I forget her name as well. So they are the project manager supposedly.

Q. Do you know the races of those people?

A. White.

Q. All of them?

A. Uh-huh (affirmative response).

Q. And all American?

A. The lady who just graduated, I think she

93

might from east Europe, one of the county.

Q. Okay.

A. I don't know specifically -- I don't know her that well. We probably just have a few conversations. It's probably the time spent with her in conversation is less than the conversation I talk with you.

Q. So did you do any research through ASSURE or I guess I should say did you do any research for the FAA before this project?

A. Yes.

Q. How often or how many projects did you work on before this?

A. Two or three. At that time I've completed one -- completed two already.

Q. Were you made aware of any confidentiality requirements in connection with the projects?

A. As far as I know, there may be verbal requirement. I don't recall specifically I sign any confidentiality documents. You might be able to get that from ASSURE if I sign it. I don't recall it.

Q. Okay. Did anyone ever, to your memory, tell you that you couldn't share information between the projects that you had been working on?

A. We told if we needed to discuss or if we

94

needed to use some other information we need to let FAA aware. It's not saying that you cannot use that information, you have to let FAA aware. And maybe FAA might be able to say no. And we did wrote out our proposal, said in this proposal we want to use some of the outcome from the previous proposal, which is following the protocol to every -- we made you aware we're going to use some of the outcomes. And the FAA does approve that proposal, I would like FAA just give us green light to use outcome from the previous proposal.

Q. Did they tell you that you should share the information from that proposal to the new one?

A. No. We didn't get any written documents that any new proposal that you cannot use the other ones. And actually, I have asked MSU give us and ASSURE give us those type of the instructions before. I don't believe I have get any written documents that we cannot use that information from the previous proposal. And I don't recall we sign any confidentiality. And those proposal is not classified, nonclassified.

Q. Tell me about when you were removed from the project. Was there a discussion with somebody when that happened?

95

A. Just a few days -- when MSU is aware I might file EEOC complaint, then I was called and then I was told the work that I have done is not admitted. You can see my memo. I wrote a memo about the meeting notes and I think that was one of the documents you have.

Q. Okay. So I will share my screen really quick.

A. Okay.

Q. So we can look at something. If I can figure out how to do this. Okay.

Are you able to see the document, Dr. Zhang?

A. I probably will have to switch glass. Can you make it bigger?

Q. Whoa, too big.

A. Yeah, yeah. Good.

Q. I'm going to give you a chance to --

A. Oh, yeah, Brian. Yeah.

Q. -- read over it.

A. Yeah. And I was told -- yeah, you can see that.

MS. MATTHEWS: Lori, I'm going to mark this as Exhibit 1.

(Exhibit 1 marked for identification.)

96

Q. Dr. Zhang, is this an email that you received Lux Luxion?

A. Uh-huh (affirmative response.) Yes.

Q. And really I guess I just want to see what parts of this you disagree with if any or if you agree that this is an accurate --

A. Right. Yes, I think, my understanding, like I said I worked on -- I worked with federal government before I joined MSU.

So here's my understand. If the proposal was approved by a federal agency and if the proposal is got awarded, and if for something is not needed then the award agency will have a change of the scope of the work to MSU and the ASSURE. This is ASSURE project, but it's awarded by FAA.

So FAA -- so I disagree. This is not admitted because I have never showed FAA scope of the change document says that the scope has been changed. Then this part of the scope is not admitted. So I don't agree with this email. It's not admitted. I never showed any document from FAA even until today that the scope of the work is admitted.

Q. So I've highlighted a portion here that says, it's the first part of that second paragraph.

97

The data you needed from working package one were not available to complete your original scope of work and so on.

That's what you're referring to right now?

A. The previous one -- the previous -- the sentence above that.

Q. Okay.

A. The work you have been doing for ASSURE is no long needed.

Q. So you disagree with that statement?

A. Yes.

Q. What about --

A. I just didn't got a confirmation about that is not needed. Maybe there is FAA internal communication with ASSURE and MSU just didn't wanted to share with me. It just didn't show that part of the scope of the work from FAA say that's no longer needed. That's my understanding. I might be wrong.

Q. Okay. So what about the part that I highlighted where in that paragraph he kind of gives the -- he says there's two reasons and I don't want to mischaracterize anything, so correct me if I'm wrong. Looks like he's saying there were two reasons for your removal. And the one that I highlighted is about the data not being -- the data

98

you needed from working package one not being available to complete your original scope of work.

And you made modification recommendations and it sounds like the FAA decided they didn't -- it didn't fill their need for the project.

Is that a fair reading of what's there?

A. No.

Q. Go ahead.

MR. BRAGG: Go ahead.

Q. (By Ms. Matthews) Go ahead. You can correct me.

A. First of all, we have made a change to make sure that we have the data available.

The second one is, like I said, I never got FAAs document says the exact the same thing or similar things or the things is not needed.

Q. So are you saying that because you haven't seen documentation from the FAA you just don't know enough to know whether this is true?

A. Yes.

Q. Okay.

A. And another part is the data. And I think we have the data needed for this work package. Even sometimes when the data is not admitted and you can change to other data that might be available if you

99

send this one to me or they give two days (sic) asking me to find other data source. I mean, I just don't have the -- I don't recall I have the opportunity trying to work on the data part.

Q. Okay. So I'm going to highlight this second part of his explanation.

A. Right.

Q. And I'll let you read that.

A. Yes.

Q. Okay. What is the -- is the FAA IDIQ contract a previous one that you had worked on for the FAA?

A. Yes. Now I have explained that part. I don't agree with that part as well.

First, the FAA IDIQ contract is tax dollar funded project, which is not classified. There's no confidential agreement that I can recall that I have signed in. The only thing that we have told in the past when Dos Brock (phonetic) was on board was once FAA is okay then you're okay to the use data from that.

Like I said, it's tax dollar funded project. No classified, no confidentiality signed. I just don't know that's is going to be the issue and we -- that's the first thing.

100

Second thing is we proposed this one to FAA and the FAA funded the project. So supposedly if FAA -- supposedly if FAA said you are going to use the data or use something from that project, then we should be okay. That's my interpretation. I don't -- if MSU until today have not showed the documents to me that otherwise.

Q. Okay.

A. So that is two part of the comments that I like to say.

Q. What about the part where it says you were notified on multiple occasions that the work completed were not to be discussed after the project ended? And I don't -- I'm not asking about whether you agree with that, whether it should have been discussed. But did they tell you not to discuss it?

A. I would like to have to look at a environment and the other circumstances those -- those not to be discussed is mentioned. If I got that environment, then they can say probably at some point we say that. But I have to bring that environment out to make the judgment that that's how that impact the specific part of the work I'm doing.

So if you wanted to say, have that -- has ever been discussed? Yes, that has been discussed.

101

Q. Okay.

A. There are environment and other conditions under which that is discussed.

Also, I am questions not to be discussed, that words. My impression if FAA is okay, then we can use any results. It's not like a -- it's not like it's classified then you can never discuss it. It's kind of discretionary.

Q. So is my understanding right that it was more of an issue of you had a disagreement about what could be discussed?

A. Uh-huh (affirmative response).

Q. When they told you not to discuss something, you just disagreed with what could and could not be discussed?

MR. BRAGG: Object to the form. You can answer.

A. Like I said, I have to get a environment out and now up so many years I needed to go back probably read my email see what and where or get a recording that we have requested and then I can get you a complete and accurate answer.

Q. (By Ms. Matthews) Okay.

A. But it has been discussed, I agree with that. If your question is have ever been discussed?

102

Yes, it has been discussed. And those discussion is under some condition and environment, if I have to going back a little bit backwards.

Q. How long was this project supposed to last?

A. So supposed to be end by this summer.

Q. The summer of that year of 2022?

A. Yeah, 2022.

Q. Okay.

A. So part of my summer salary should be paid by that project.

And ironically once I was forced out of that project, FAA and ASSURE extended that project until next year or the end of that year. Because I'm still on the meeting email list.

Q. Okay. So do you believe you were removed from that project because of your race?

A. I'm not one hundred sure I can say that part, but that was just too odd. MSU just been informed I'm going to file EEOC complaint, then another few days I was removed from the project.

Q. So is it your belief that you were removed in retaliation for that or did it have anything to do with your age, national origin, or was it just what you're saying the retaliation?

103

A. The EEOC is about my race origin and age, you know, bunch of the things that you have mentioned before. So if we have to tie everything together, I think there are some elements within it.

Q. Okay. So there's some allegations about a traffic data collection project --

A. Uh-huh (affirmative response).

Q. -- for the traffic engineering class?

A. Right.

Q. What class was this for? Let me see, was this --

A. That is traffic engineering class C4143.

Q. Was this a lecture course? What kind of course is traffic -- or sorry -- transportation engineering?

A. Traffic engineering.

Q. Traffic engineering, I'm sorry.

A. Yeah. This -- at that time MSU has been completely come out of the COVID online class, so it's a lecture class.

Q. Okay.

A. Through the COVID it's online class.

Q. So what is the difference between a lecture class like this one and then a class with -- that has a lab component. What's your understanding

104

of the difference between those?

A. Once -- I don't know, I needed -- because we don't have the NAP components, that does not mean we cannot ask a student to do the traffic accounts. With the traffic accounts, you're counting the number of cars is counted as a lab or counted as a homework assignment. And I think Dr. Howard have a misunderstand about that part. I have showed everybody in the room that is a regular homework assignment. If that's -- okay. Worldwide not only in the U.S. as far as I know assign students to counting the number of the cars at a corner of intersection is a regular homework assignment. If you have to say that is a lab components, I totally disagree with that. That's just regular homework.

Q. Okay. So where were the students doing this work?

A. They just -- some of them standing at the corner of intersection, some of them sitting in their cars in the parking lots. So just counting the number of the cars. You can do any where. If students wanted to stand in the middle of the roadway to manually count the number of the cars, I've never seen some students do that.

Q. So did they have some kind of instrument

105

they were using to count?

A. Not in this particular class.

Q. Okay.

A. And I say Howard and David Shaw have no problem for students using a instrument just before this class.

Q. So in this class --

A. So I file the EEOC complaint, then this becomes the issue.

Q. So in this case the students were basically, they had a pen and a paper and they were out there saying car number one, two, three, four?

A. Uh-huh (affirmative response). We have a math that show them how -- you know, how to do that. And then they also have equipment you can stand in the corner of intersections. You don't have to put anything in the roadway.

Q. So what other classes had you done this project in before?

A. I have done this class in my graduate class. And I have done this in the previous 4143 class. And I have made this one to be the optional class in that course that the grade has been changed secretively without my knowledge in the previous semester 3113 class.

106

Q. So what were the -- I know the safety precautions has been a big topic of discussion. So what were the safety precautions that were given to the students?

A. Well, the students are asked to call the police department. So they have the police direct the traffic. I think we have a email in the faculty hearing, I think I have challenged MSU to contact the police department and to say, you know -- the campus assist student doing something in the middle of the roadway. They probably can get arrest. Right?

So whenever we have that type of traffic count activity we call the police department. They come here to direct the traffic, protect the students. And sometimes even the police department chief asks us to do something for them because they wanted to know the game-day traffic. We have a really good relationship with the police department. And they didn't have any students complain their safety was compromised for them to standing at intersection corner to count the number of the cars or even to do the traffic counts with police protection. I am never aware, Dr. Truax have never aware of any safety concerns.

107

Q. At some point though administration, and I can't remember who all was involved, I know Jason Keith was one, probably Isaac Howard and you can add more names if there are more. But somebody approached you with some concerns about the project; is that right? During this spring 2022 semester.

A. Right. Jason Keith and Isaac Howard asked me, there are some concerns, so I changed the -- I -- personally I don't think there is a problem for the police protection to do the traffic counts. But I did make the change to accommodate Dr. Howard and Dr. Jason Keith's concern. So I changed the automatic counting for the equipment on the roadway to the manual counting, so students stand at safe intersection corner or sit in their car in the parking lot to count the traffic. So I did make the change to accommodate.

So saying that I am, you know, just don't follow their instruction, that's not completely true.

Q. So there was -- are you saying there was some sort of instrument being used and then they --

A. In the past.

Q. Okay. And then after they raised concerns you changed it to the pen and paper method

108

basically?

A. Yes. Which is a standard homework assignment format.

Q. So you're saying that changed it so it was more like standard homework; is that what you're saying?

A. Yes.

Q. When did the police get brought in to help?

A. Whenever we have the students work on the roadway to put down the detectors.

Q. So every year you had done it they were helping?

A. If that is the -- we never missed one opportunity not ask police to do something, not call police department. And that was basic requirement for students.

Q. So after they raised these concerns you're saying you made this change so they could be wherever they wanted to be writing it down, writing down the traffic counts.

A. Right.

Q. Did you relay that to the administration who were concerned? Did you tell them about that change?

109

A. Yes.

Q. And what was their response?

A. I don't recall about that response.

I did ask for a meeting to discuss that further with Dr. Shaw and Dr. Jason Keith, they probably didn't respond me, so I did ask the meeting. I think we have maybe that meeting email available to everybody in that faculty meeting. And I never got a response from them. They just, you know, they just wanted to set up this as a kind of a trap.

Q. I'm going share --

A. So ask me what my option would be? Here I have something in the syllabus. And if I don't do that, if I did it, either way I'm going to get caught. If I don't something that, like the traffic counts, and I have that in the syllabus, I can still get in trouble by not following the syllabus. So it's something called catch 21.

Q. So in the past, I know you said that Dr. Truax knew about this project; is that right?

A. Right.

Q. So do you know if it had ever been --

MR. BRAGG: Hey, Bill. This will be the zoom link. Dr. Zhang is having his deposition right

110

now, which I guess you can attend if you want to as an expert, but...

MS. MATTHEWS: Guess he decided not to.

THE WITNESS: I'm sorry, Ashlyn, I know too much is not good for me.

MS. MATTHEWS: No, you're fine. You're fine.

Q. (By Ms. Matthews) I have lost my train of thought. Oh, Dr. Truax, he knew about it and you said that he didn't have an issue with it? Is that your understanding?

A. The police chief does not have issue with it. The campus traffic director does not have a issue with it. Sometimes we do these things for him as well. Jeremy, transportation director.

Q. Do you know if it was raised with Jason Keith before this spring '22 semester?

A. No. Jason Keith has no issue with this as well. Dr. Shaw have no issue with this as well. I don't know if he knows about it or not.

Q. You don't know if they knew about it before spring 2022?

A. Right. But at least police chief does not have any issue. At least transportation director does not have any issue with what we are doing.

111

Q. Okay. I'm sharing my screen I think. Yes. Tell me if you can see an email from Jason Keith dated January 19, 2022?

A. Uh-huh (affirmative response).

Q. Is this date before or after you made the changes to how the students were doing the project?

A. Before I made the change as student do their project.

Q. Okay.

A. And I didn't see this email -- you see I'm not on the list of this email.

Q. Right.

A. So I don't know this email until probably I see your -- I see this email after we file the EEOC complaint and the court complaint, then we got this document.

MS. MATTHEWS: Okay. I'll mark this as Exhibit 2.

(Exhibit 2 marked for identification.)

MS. MATTHEWS: I'm going to stop sharing.

Q. (By Ms. Matthews) Dr. Zhang, did any students complain to you about the project?

A. About the project or the traffic accounts?

Q. The traffic counting project?

A. Inside of this project, right?

112

Q. Did they complain to you about the project in this spring 2022 semester?

A. No. The first time when I announced the project in the class, I ask students comments and they said it's good.

I didn't recall this specifically come to me saying, Dr. Zhang, this project is not good. There might be some students say there are too much work, but not the way the project is laid out, not the way they ask to do this.

Q. Okay. Who -- you mentioned that you would be in trouble if you had changed the syllabus mid semester. Who would have -- who would you have been in trouble with if that happened?

A. Still the same people. If I don't do the traffic accounts supposedly, and they got in the syllabus, I can still be fired. Because now I ask student did the traffic accounts and I got a fired for that. Why they will not fire me for not doing something, I -- you know, I don't know how much you understand that syllabus. Syllabus is like the law. It's like the contract between students and us. If I don't do something, which is said on the syllabus or if I don't do something ahead of the time said something in the syllabus, I still can get in

113

trouble to get fired.

Q. Had you ever deviated from your syllabus before?

A. Not I can recall.

Q. Okay. Did you ask Jason Keith or any of these people who were telling you to make changes, did you ask them if you were allowed to deviate from the syllabus in order to make the changes?

A. I probably did ask them to make the change on the syllabus.

Q. You think you probably did?

A. Probably did not.

Let me say what happened in those months, it's not matter what I do, they have one way or other way. Just like Isaac Howard testified in the impact hearing, you know, according to the policy that I am supposed to get a one-course reduction. And he testified in that one, he does not have to give me that course reduction. So then that's how the things happen in those months, the years, that anything I did which is going to be problem.

Q. So I just want to make sure I'm understanding what the allegations are, I guess.

Is it that these things were happening because -- for a retaliation purpose or were any of

114

them specific specifically tied to race, age, disability, caregiver status?

A. Okay. Like I said, I talk too much. Let's go back to that traffic things --

Q. Well, I would like to know -- and I know that was not -- that wasn't a very well-worded question, so I could probably ask it better.

But I'm trying to figure out, you know, I'm sure you've seen your complaint. It's got a lot of allegations in there.

A. Right.

Q. And I'm trying to figure out which of the things that you're unhappy with that happened. Which of those things you say were because of your age, race or ethnicity, national origin or disability as opposed to maybe what was you think happened because of retaliation. And I know you said earlier you see it as all being tied up together.

So I'm trying to figure out, I guess, if most of this fits in that box of, you think it's -- you see it as all being related to your age and these other things because it was raised in the first complaint?

A. Yes.

115

Q. Okay.

A. Yes.

Q. Do you have any reason to think that there were issues with this project -- I guess I shouldn't say it that way.

Do you think that there were issues with this project directly because of your race?

MR. BRAGG: I'll object to the legal implications of the question. But Li, you can answer the question.

A. Okay. Yes, I still insist my view, which we filed everything, all sorts of the allegations against MSU because of race, age, bunch of the other things. And then once I filed those complaints then there enormous retaliation. And those strong allegation. I am sure MSU have one EEOC complaint. I am sure MSU have one court case against MSU and because my race, age and caregiver status. So MSU have much stronger retaliations, probably retaliation to the faculty in MSU's history. You and the -- you know, your attorney has defended MSU for many years, ███████ will probably have the same feeling. This is the strongest retaliation -- let me -- this is retaliation. Anyway strong reaction, that's probably better word. So that still have

116

something to do with race and racial. If for some other factor MSU might have less strong reaction.

Q. Are you aware of any other faculty in civil engineering who were -- who had their students doing a project similar to this?

A. Yes, I do.

Q. Tell me about those.

A. There's white professors ask student to do a survey, which is student stand in the roadway or the edge of the roadway. And in the same year probably I believe they do other semester, other year. I don't think that white professor have this so strong, have never got any issue.

Q. Okay.

A. With Isaac.

Q. Are you --

A. Thank you for reminding me about that question.

Q. Do you know any details about what safety precautions that professor took for the students?

A. No. I myself learned the survey class before. So what I -- what I can tell from my survey experience in China is that you just watch yourself. And maybe you have students are the protector for you and they asked me to go when he or she see a

117

danger on the roadway.

And sometimes the professional surveyor, they will put the signs around the roadway saying that a surveyor ahead asking cars to slow down or something like that. I never see MSU professor did those type of thing to student.

Q. Okay. Do you know, was that a traditional lecture course as well?

A. That is a -- that have survey lab components. Whether have a lab or lecture course, safety is still the same. The requirement to students is the same whether you have lab class or you have the lecture class.

Q. Okay.

A. If there's no reason for the lab class then you got a relaxation under the student safety.

Q. So eventually you were removed as instructor record from this course; is that right?

A. Not the -- that statement is different than what I understand.

Q. Okay. What's your understanding?

A. Okay. I taught the class until the last day. After the last day of the lecture end, which is end of April, after the class end then I was removed from the lecture class. There's only --

118

there were other courses you remove me, what impact to students? Zero to me. That is just trying to retaliation. There's no point you remove the instructor after the class end. Right?

Q. So did you get paid the same that semester?

A. Yes.

Q. Okay.

A. Student got instruction. There's no one get zero hours, zero minutes instruction to students except me. After the class end, I was removed.

Q. Okay.

A. You see there's email in January, why don't they remove me in January? They allowed me to teach the course until the end of the semester then they remove me.

Q. Was this the semester where there were student complaints, your understanding?

A. Yes.

Q. Is it your understanding now -- I don't -- I think that there was some conversation about when you became aware. But now is it your understanding that those were happening throughout the semester or what's your understanding now of what that situation was?

119

A. My understand was, once I filed the complaint with EEOC, then they asked students secretly to complain about me without feedback to me about their complain. And they then, just in case, said, I got you, you are my meat now. I can do anything about you, even to eat you.

Q. Is that a direct quote from Jason Keith?

A. No.

Q. Okay.

A. It's something like that. He said I'm -- there's a meat word used. Everything else is just my understand about that email.

Q. Okay. So I'm going to share my screen with you again. Let me know if you're seeing an email here?

A. Yes. That's April 28.

Q. Yes. Okay.

MS. MATTHEWS: I'm going to mark this as an exhibit. Is this three or four.

THE REPORTER: Three.

(Exhibit 3 marked for identification.)

Q. (By Ms. Matthews) I'll give you a chance to read over this email, Dr. Zhang.

A. Yes.

Q. The one at the bottom of the first page

120

where Jason Keith is emailing.

A. Uh-huh (affirmative response). Right.

Q. Okay.

A. Yes. So your question?

Q. Is this the -- is this what you're referring to when you say that MSU invited criticism from students or is there anything else?

A. This is the second invitation.

Q. This is the second one?

A. Uh-huh (affirmative response). I think they think -- they probably think the first invitation was not good enough for them to fire me or to do something about it to me.

Q. Is that something that somebody told you or is that your impression of the situation?

A. Impression about the situation.

Q. Okay. So you say --

A. Usually -- I'm not a student in loop. Usually I should be in the loop. This is just un-American, something that sort information secretive from your back.

Q. So I know that you have some allegations about your pay raises; is that right?

A. Can you show me the email?

Q. Well, this isn't an email. I'm referring

121

back to claims that you're making in this lawsuit.

A. Yes.

Q. You've complained about your annual pay raise.

A. Right.

Q. So what's your understanding of how raises are awarded at MSU? What goes into those decisions to your knowledge?

A. It's not my understanding. It's EEOC complain, once we file EEOC complaint, Brett, the MSU civil right director.

MR. BRAGG: Are you talking about Brett Harvey, for the record?

THE WITNESS: Right. Yes.

He was saying how MSU salary was determined. It determined mainly by your rank and year of service. I'm not sure if you want MSU to correct what he has said so that we can --

Q. (By Ms. Matthews) Well, I'm asking you what your understanding is of how it works?

A. Yeah, that's the same thing, too. My understanding is it depend on your rank and the years that you served MSU as well.

Q. Okay. So do I have it right that raises don't happen automatically every year?

122

A. Right.

Q. Some things that might result in a raise would be a promotion?

A. Yes.

Q. Or if somebody gets a competing job offer, that might get them a raise; is that right?

A. That does not show up on -- there might be some factor on that, somebody got competing offer. And in that case MSU can argue about that and give me -- give us the accurate -- we just got MSU's information about the salary. So if somebody got a competing offer, that way I can eliminate the calculation from that. I use those calculation to compare the salary.

Q. Well, I'm more so asking now just generally how it works. I want to make sure we're on the same page of how --

A. That's a very small percentage, they are outliers.

Q. From time to time people will get competing job offers and they can use that to get a raise?

A. Yes. So far as -- if you ask my impression or understand, that is a very small number of the people.

123

Q. Have you ever gotten a competing job offer that you used to --

A. No.

Q. -- raise?

Did you get a raise with each promotion that you received?

A. Yes.

Q. Okay. Other than those kinds of raises, it's my understanding, and you can correct me on this if yours is different, otherwise raises depend on the legislature making funds available for raises to be given across the board?

A. Yes, I understand.

Q. When that happens, each department is given a certain number -- a certain amount of funds to allocate raises; is that correct?

A. Yes.

Q. Okay. So who determines the distribution to your knowledge?

A. The department head.

Q. The department head. Okay.

And it's based on his determination of merit; is that right?

A. Yes. It's kind of related to perform.

Q. And I think sometimes they might say, I'm

124

not even going to look at performance, I'm just going to give everybody the same percentage. I think that happens sometimes?

A. Yeah, that's happened, too. Yes.

Q. So when it comes to your raises, are you talking about -- when you're complaining about the raises that you got, I just want to make sure we're zeroing in on the same date range here, that we're look at the same thing.

Are you talking about raises that you got after you filed your EEOC charge or anything before that?

A. Because I don't have any other people's -- you know, in the past everybody's salary is on the website. But for some year MSU just block that information.

So my understand is that my performance as civil engineering is better than the average professor. And we can ask Dr. Truax to confirm that. So my salary should not be less than the average professor in the college of engineering.

Q. Okay.

A. In the same years of service, same rank.

Q. Are you comparing yourself only to people in civil engineering or in the whole college of

125

engineering?

A. In civil engineering, like I said, all the professor has been removed by -- or let go or leave MSU already. I don't have any people to compare.

Q. I think, and I guess we could go back to the list we made earlier. I'm not sure if I made good enough notes to rely on them.

But I guess in 2022, the full professors in civil engineering would have been you, Isaac Howard and then I think you said there was one other person who had since left; is that right?

A. Yes.

Q. And Isaac Howard, he at that point was also department head?

A. Yes.

Q. Does that come with a higher salary in general? Does he get an additional salary bump for that title?

A. Yes. I removed the other factors and did the calculation and that was in the EEOC complaint. Just in case says, oh, it's not much difference.

So he feel comfortable that I got most salary was highest year of service. But his comment is that he admitted there, but he said the difference is not that much. I don't recall the

126

exact email. You probably can find that out. He said, it's not an issue because, you know, I just got a -- although, I got the lowest one, which is not too much lower.

MS. MATTHEWS: Okay. I'm going to switch gears a little bit. Does anybody need a break before we --

THE WITNESS: I'm good. I'm trying to restrict myself from talk too much. I'm sorry.

(Off the record discussion.)

Q. (By Ms. Matthews) So you also mention in your complaint that you were not paid for the sort of research work that other faculty had been paid for in the past. I think I understand this to be referring to your work on the UTC proposal?

A. Yes.

Q. Summer 2022?

A. Right.

Q. Is that right?

A. Yes.

Q. Okay. So what other faculty had been paid for developing the UTC proposal?

A. Dr. Truax.

Q. During the summer?

A. Uh-huh (affirmative response).

127

Q. Was he a nine-month employee -- did he have a nine-month contract at that point or a 12?

A. It's 12.

Q. Okay.

A. And another professor, the previous UTC one, Dr. John Asher (phonetic), he was 12 months though.

Q. Okay. Do you know if they -- did they receive an additional stipend in addition to their normal contract for work on the proposal?

A. Not I know of.

Q. Did you request extra pay for working on the proposal before the summer?

A. I don't recall when I request.

Q. Okay. Do you -- is there any other projects you can remember that people were paid for working on proposals for?

A. I'm not aware.

Q. Okay.

A. There are probably -- Oran (phonetic) might be the best source to answer that question.

Q. So another allegation you make is about a white non-faculty member serving as a faculty advisor for a student organization.

A. Uh-huh (affirmative response).

128

Q. And this was the institute -- The Student Chapter of the Institute of Transportation Engineers; is that correct?

A. Right.

Q. Are you talking about Aaron Cagle?

A. Yes.

Q. He occasionally teaches engineering courses at MSU, right?

A. I'm not aware. Maybe. I'm not department head.

Q. Do you know when he served as the advisor for that student group or for how long he did it?

A. My understanding was one of the transportation professor is gone, then Isaac Howard assign him the student chapter advisor. Although, I have been student chapter advisor for more than 10 years.

Q. Okay. Were you on sabbatical leave during all of this?

A. I'm not sure about the timing.

Q. Were you on sabbatical during fall 2022 and spring 2023?

A. Yes. Right. But when I come back from sabbatical leave he didn't assign me back.

Q. So you're saying that you had been the

129

faculty advisor before sabbatical?

A. Not before the sabbatical, before the new transportation professor was fired.

Q. So when did you stop being the faculty advisor for that --

A. When the new professor was hired, because we want him to get more service.

Q. Do you remember what year that was?

A. Like I said, we have several professor on and off, on and off. So whenever somebody is gone then I just take the responsibility. When we have the new person, then we just shifted my -- that part of the responsibility to him.

Q. Did you ask to take over the position again once you came back from sabbatical?

A. I don't recall.

Q. Does it come with any additional pay?

A. No.

Q. Okay.

A. Just volunteer service.

Q. Okay. All right. So the next thing I want to ask you about is discretionary accounts. And I don't think this is going to be --

A. Okay.

Q. -- a big topic, but I just want to

130

understand a little bit.

How is a -- what is discretionary account? What kind of money goes into a discretionary account?

A. There are two type of the money goes to the discretionary account. One is -- one is research funding. If you got research funding and some percentage goes to discretionary account.

Another one is graduate teaching. And once you got a distant student teaching, then you got proportion of the money goes to the discretionary fund.

And usually department head showed us how much you got from research, how much you got from teaching. So that percentage, you can calculate it back how much research funding that you got.

Q. Okay. Is it -- does it at any point become your personal funds?

A. Not really personal funds. You can use it for travel, for example, international conference, conference somewhere in the world. Probably now it's not allowed that you use that funds to travel to China, but it is allowed for you to use in Europe international conference.

Q. In general it has to be tied to work stuff

131

though; is that right?

A. Yes, work related.

Q. So how is a decision made or who makes the decision, I guess, to use discretionary funds as opposed to money that's in a department budget?

A. Usually the professor who have the research and that account is separate -- there's account number have your name on it, so you can only -- you are the only person can use it. But department head probably can use it because Isaac charged my, although I disagree, he still charge it to my account.

Q. I guess, you know, that's what I'm trying to get at.

A. Right.

Q. That situation where a laptop and I think a lost van key was charged to your discretionary account?

A. Right.

Q. Is that -- in your experience, has a department head made decisions about what to charge to discretionary accounts versus a department budget?

A. Dr. Truax would not do that, to charge student's, pay from my discretionary account.

132

Here's what happened to me specifically. I bought a van for the department. Isaac Howard and his students used the van without saying one word of thank you. And my students lost one of the department van key, he asked me to pay for my student's action. Like the same thing as I was accused on other things. I am responsible for the action of somebody who associated with me, not the direct action I have done. This is un-American, too.

If they wanted to charge a student, charge a student, charge his personal account, whatever he can do to that student. Student lost the key, then charge me. It's un-American.

Q. So in your opinion --

A. I --

Q. -- the student should have had to pay for the key?

A. If the students killed somebody, for example, am I going to be responsible for that as well? If a student did some criminal things --

MR. BRAGG: I'm sorry.

THE WITNESS: I'm sorry.

MR. BRAGG: She gets to ask the questions.

THE WITNESS: I'm sorry.

133

MR. BRAGG: I know they were rhetorical, but...

Q. (By Ms. Matthews) What -- so let's try to talk about this UTC proposal.

A. Okay.

Q. I'm going to try not to go too detailed because --

A. Okay. We can talk about days.

Q. And we may have already covered a lot of this. But this was summer 2022, right?

A. Right.

Q. When you worked on the proposal?

A. Yes.

Q. And I think we established that it was submitted kind of early fall 2022, right?

A. Yes.

Q. Okay. Tell me how you believe MSU undermined your efforts on that project?

A. Well, at first I got that MSU does not want to support me too much. But with all the emails was available to us through the court request, then we found out MSU has made a decision early on to make sure this proposal is not going to be successful. Dr. Shaw say to do everything possible to make -- he said to make everything

134

possible to make me, you know, something.

And, you know, a bunch of the people in MSU just trying to implement his plan. And this is one example that made everything possible I'm not going to get award of the UTC proposal. That was my general impression at this point.

Q. Did anybody tell you that MSU was trying to sabotage the proposal? And, you know, not in so many words, but I'm wondering if anybody told you?

A. Right. Teresa Gamble, those words from her email I think best describe this situation. Give him the green light then make him look bad at a other institute. Give him a green light then make him fail.

Q. I'm going to find that email really quick I think. Is that your memory of the --

A. Yes, that was my memory. May not be the exact word.

MR. BRAGG: You want me to pull it up?

MS. MATTHEWS: Sure.

MR. BRAGG: I don't have to. It's up to you.

MS. MATTHEWS: Yeah, let's pull it up if you don't mind, if you have it handy.

MR. BRAGG: Yeah, I've got it because I

135

had numbered the exhibits sequentially. So hang on. I think you and I had the opposite situation happened last week where it ended up proving to be harder. I would have to go back through. I'm happy to do it. It will just take a minute.

MS. MATTHEWS: I'm looking real quick. We can just move on. That's fine.

MR. BRAGG: Okay. But for the record I do think the phrase was let him fail, to the extent that helps.

MS. MATTHEWS: I think we're talking about the same email though.

Q. (By Ms. Matthews) I just wanted to make sure that there was no other email, Dr. Zhang, was there? There's the one from Teresa Gamble where she says something about a green light to let him fail. Is that the one you're talking about

A. Yes. That's exactly what happened.

Q. And I may have misstated it, too, since I don't have it in front of me. So don't hold me to that wording.

A. Yeah, that's fine. Yeah.

MR. BRAGG: We all are well aware of the email.

MS. MATTHEWS: I figured we were.

136

Q. (By Ms. Matthews) Okay. So how -- was any -- you mentioned your future income related to this UTC project.

A. Summer income.

Q. Summer income.

A. Right.

Q. Was that --

A. If I leave MSU I might be able to bring that project to some other university, too.

Q. I see. Okay.

Was that dependent on the project being funded?

A. Uh-huh (affirmative response). Yes, of course.

Q. Okay. How many UTC proposals have you worked on besides this one?

A. In the past you mean?

Q. Yes.

A. In the past I have worked on three maybe.

Q. And were those successful?

A. One is successful fortunately.

Q. So it was funded?

A. Uh-huh (affirmative response).

Q. Do you remember about what year that was?

A. That was 2017, 2015, I have to check my

137

résumé.

Q. Okay. Who was the lead institution on that one?

A. MSU.

Q. Who was the PI on that one?

A. Brock Usensky (phonetic) -- I can send you the name of that or I can get from my résumé.

Q. So I assume there was a UTC center opened after it was funded?

A. Right.

Q. Did you work at that center afterwards?

A. Yes.

By the way, for the record, I was -- he was a PI and I did most of the proposal part. Well, he did the proposal writing, but I write the core components about the transportation. He was industrial engineering professor.

Q. I see.

So when did that end? When did that grant end so the center went away from MSU?

A. That was -- that UTC is only like two or three years. It's probably 2018, 2019.

Q. Okay. Have you worked on any UTC proposals since this one?

A. Yes.

138

Q. How many?

A. Two more at least. One is doctor -- Dr. Joe Usher, I forget is one or two. Another one is Dr. Truax.

Q. Was that after this summer 2022?

A. Before.

Q. Okay. And those were not funded, correct?

A. Not funded. Dr. Truax even not submit it. I was very upset about him and made some not so nice words about him. But we, you know, we reconciled. Whenever we have a not-so-nice conversation with each other then we catch up later on.

Q. Okay. What about after this summer 2022 proposal, have you worked on any after that?

A. I was proposed to have one, but I was -- basically I was not, you know, I was not provide anything to do that. There was one call, which is harder than the previous one. It's only like two to three UTC, the one that applied nationwide is 3040 UTC. In other words, a call for three UTC or two UTC, you can see how hard that will be.

Q. Okay.

A. But I was not allowed -- I think I was not either allowed or not provided a matching fund to do that.

139

Q. Okay. So when it came to the issue of seeking congressional support for this summer 2022 proposal, did you approach MSU about trying to get support before it was submitted?

A. Yes.

Q. And what was the response?

A. MSU -- MSU said -- MSU said something that I'm not going to do this for this particular proposal, something like that. I need to look at my email to correct my answer.

Q. Okay. And then did you approach them again after it was submitted?

A. Yes.

Q. Okay.

A. I approached them again because when we -- after we submit it -- before we submit it we don't know what our proposal will look like. After we submit it, we feel strong that our proposal was a good one. And even Teresa Gamble testified that our proposal was a good one. So I was hoping MSU might change their mind.

Q. So the response then though, they still didn't want to pursue it; is that right?

A. Yes. They said MSU does not -- the wording is like, MSU does not, you know -- one of

140

the email wording like this, MSU does not want to go ahead and to do that and you can work with other university. May not be exactly the work at other university to get the congressional support. But each of the university can do their own things. They can do for their own interest to get congressional support.

Q. So at some point after that you reached out to your collaborators at different universities, right, and --

A. No, I didn't not reach them. They reached me first. Asked me to ask MSU again. So I asked MSU again. Because I, you know, you are the lead university.

Q. Okay. At some point Dr. Julie Jordan sent you an email that said essentially, stand down from this effort to seek congressional support; is that fair?

A. Yes.

Q. Okay. After you got that email, what steps did you take to prevent your collaborators from continuing the effort?

A. I think I sent all the collaborators, forward her email and we said that we stand down. Maybe not the exact stand down, but I forward her

141

email and said we're not going to do this.

Q. Anything else besides forwarding the email?

A. I add a few words.

Q. Okay. All right. So the complaint talks about -- I guess both complaints talk about your son's medical treatment. And so we're switching gears, kind of, here?

A. Okay. Sure.

Q. And so I want to ask you some questions about your son.

A. Okay.

Q. And your caregiving responsibilities. I don't want to pry more than is necessary but --

A. Okay. Go ahead.

Q. -- I just want to understand background relevant to your leave requests.

A. Okay.

Q. So your son's name is Ch_____ right?

A. Yes.

Q. And I think you said he's about to turn 10?

A. Uh-huh (affirmative response).

Q. My understanding from this case is that he has autism; is that right?

142

A. It's more than autism. Like I said, the road course is genetical mutation which is called SCN2A, which I was explained his -- in his genetic there is one extra gene block the communications between all the other genes, so he's nonverbal. Need to take care in his lifetime, until somebody can do the gene editing to each of the gene in his body.

So far we took him -- by the way, MSU deliberately fired me -- stopped my insurance just a few weeks before we took him to -- took him to Baltimore to do a comprehensive exam. So from that exam we understand we have to provide him the life support.

Q. I think you mentioned in there that MSU denied you insurance. Have you lost insurance at any point?

A. No. Thanks to the court order. But MSU has asked me to do -- to buy your own insurance, once I got letter of intent.

Q. Are you referring to --

A. They intended to disconnected my medical insurance, and thanks for the court order MSU was not being able to do so.

Q. Okay. I think I understand.

143

I think -- are you referring to, I guess it was an explanation maybe from Julia Morrison about Cobra; is that --

A. Yes.

Q. Okay. So what is your son's official diagnosis, if you don't mind sharing it?

A. Autism, ADHD, SCN2A genetical disorder or something like that.

Q. Okay.

A. I think that we probably provide you the official diagnostic. If there's any difference or any addition, probably that is the best one to look at.

Q. That's fair. That sounds complex diagnosis to keep on the tip of your tongue, too.

MR. BRAGG: And I think that acronym is in the more recent amended complaints in the footnote.

MS. MATTHEWS: Okay.

MR. BRAGG: So in case there's difficulty understanding what it is.

MS. MATTHEWS: Got you.

Q. (By Ms. Matthews) Do you remember when he was diagnosed?

A. He was diagnosed with autism a little bit over one year.

144

Q. And has it been sort of a progression of getting the correct diagnosis over the years or did they know immediately?

A. Yes. More and the more symptoms added. For example, the SCN2A was diagnosed by UMC after -- because we wanted to know why? Why he is -- why his behavior -- why he is still like this way? We trying to look at of why was that? So we did the progressive genetical tests. So the doctor start with the most common one and gradually narrow it down to SCN2A genetical mutation was the reason for his diagnostic.

Since then he was diagnosed as ADHD as well. And probably there are little bit more, some kind of small addition. But ADHD, autism with developmental delay. That was diagnosed at only age two, the same time he was diagnosed with autism.

Q. Does C_____ live with you full-time?

A. Yes.

Q. So is it -- essentially it's you and your wife, I assume --

A. Yes.

Q. -- are responsible for his day-to-day care; is that right?

A. Yes.

AW Reporting
601-573-0961

145

Q. Does he go to school?

A. Yes. He goes to the elementary school. Go to a special need class in the morning.

And during the lunchtime my wife or me have to drive him from Northwest Rankin to Jackson. It's less than 10 miles, but consider you pick up him from school, drive him to the clinic and then back. You have to pick up him and bring him back.

During the afternoon, I'm not sure if you drive on the 25, Lakeland Drive during the rush hour, it can be grown to 30 minutes to 40 minutes one-way drive. But usually it's around 20 minutes one-way travel time during the afternoon rush hour.

And we cannot skip for one day. There's no chance that we skip the one day necessary unless both of us are -- even if we are sick, it doesn't matter if you are sick, it doesn't matter rain, snow, we still go. So that's the daily activity you will have every day.

Q. Okay. I know you've mentioned something called Canopy?

A. Yes.

Q. What is Canopy?

A. Canopy is a ABA clinic. It's therapy clinic specially designed for autism.

146

Q. So is that where you're talking him at lunchtime and then in the afternoons?

A. Yes.

Q. And that's every day?

A. Every day, five days a week. Not on the weekends.

Q. Okay.

A. But I assure you, weekends is more challenge.

Q. Sure.

So your complaint mentions a need to visit a specialist in the northeast United States at some point.

A. Right.

Q. Does he require trips like that often or is that sort of a rare thing?

A. That's a few years we wanted to see where he is. That was the first time we planned for almost a year to get a chance to get in that clinic. I know Vanderbilt might have a good, you know, good program for autism, too.

Q. Has there been any time where you were denied leave in connection with needing to care for your son or take him somewhere?

A. Of course. We listed it in the complaint.

147

Q. So I'm trying to figure out if anything was denied so he had -- you couldn't care for him as opposed to it being delayed for whatever reason?

A. I don't recall, but we listed everything to the -- if not in the complaint, then it's -- you asked us a few interrogatory questions, we list in that one. Maybe in the interrogatory questions.

Q. Okay. So sitting here today, you don't have any memory of being denied leave in connection with his care?

A. We listed everything. If there's a deny, then it's in that document.

Q. But you don't remember it right now?

A. Yeah, I don't remember now if there is a deny or if there's just delay. But everything has been listed as far as I can recall.

Q. Okay. Have you or did you ever request an accommodation in connection with your son's needs?

A. Yes, of course.

Q. What kind of response did you get to that request?

A. The first request is that I asked Isaac Howard to schedule the class and like I said he -- everything has been documented in the court documents. So I don't want to -- that is one of the

148

example about how he treat was my request.

Q. Are you referring to -- I think it was fall 2021 --

A. Right.

Q. -- where after Dr. Truax --

A. From the summer I'm trying to negotiate a way, you know, to help my overload research and class. He dramatically increase my workload and extend my class from two-day class to five-day class. Instead of accommodating me, he's trying to expand my workload and expand my days have to be in Starkville.

Q. And this was, I think it was -- there was a request to move when courses met so you wouldn't have to drive Starkville. I don't know if it was every day?

A. Every day. Right.

Q. Was it every day?

A. Yeah.

Q. I think -- I guess we can look at the dates and emails and I don't have them in front of me, so I won't bother asking you.

But what about any official or formal forms that would have been filed with HRM, were there any accommodations requested in that way?

149

A. First of all, I'm not sure if HRM have the form to accommodate the flexible schedule. So like I said, usually this is just between my department head and I work out on the class assignment. We can do that while at a coffee break. And Isaac's testimony said he doesn't have to make any changes. So I don't know if even there is a form there will be any difference that were going to be made.

Q. Okay. And so there were also some issues with leave requests related to your own medical needs; is that right?

A. Yes.

Q. And I'll ask you the same question. Do you have any memory of MSU ever denying you medical leave?

A. MSU tried to deny my medical leave. From Jason Keith's email you can see that. MSU is trying to -- so interrogatory said no we cannot deny his medical leave. Then just in case we just defer his medical leave and that's why my medical leave has not been approved for like 45 days after the surgery is completed.

Q. So --

A. And there was -- Dr. Shaw said we will do anything possible to prevent me getting in the

150

system, something like that. Exact word is in the email in the complaint.

Q. I think you're talking about here fall 2021 --

A. Right.

Q. -- when you scheduled a spine surgery?

A. Yes.

Q. Okay. You did take leave in connection with that surgery, right?

A. Well, you can see that's leave -- I did take the surgery.

Q. Okay.

A. But I was still asked to grade student's work, grade after the surgery while laid on the bed. And I was still (unintelligible) for the student's grade. And that was the reason they used to justify their, you know, I called the grade cheating scheme, might be -- the better description might be the grade manipulation without instructors acknowledge -- without instructor's knowledge.

Q. Okay. So when did you determine that you would be having surgery?

A. I think about two weeks or maybe 10 days before the surgery.

Q. How long after it was set did you inform

151

MSU about it?

A. Once I know about my surgery, I informed Isaac Howard and maybe Jason Keith as well.

Q. So was the surgery something your doctor told you you needed to go ahead and have now or, you know, then, or was it an elective sort of surgery?

A. It's not elective, I promise you. If you cannot walk one hundred feet without break, what else you can do? Consider I cannot ask my wife to do one-hundred-percent care of my kid. The sooner I got recovered, the better for my family, better for MSU as well.

Of course you can say you will not die without the surgery. I think in Jason Keith and Isaac's mind, you will not die without the surgery. Of course I'm not going to die with back pain, but you have no life. You cannot do your work. You cannot care your kids.

Q. Do you remember filling out a form for -- like an official approval for the surgery?

A. I do.

Q. Did you do this as soon as you found out about the surgery or when did you do it? Do you remember?

A. I don't recall the exactly when I did it,

152

but I did it when there was information. Sometimes when you do your surgery, my wife -- I was joking with my wife, I was putting to sleep and I don't know if I'm going to wake up. And there's a chance, doctor told me any surgery once you put to sleep, you have a risk of not being able to wake up.

So that was -- once I know the full picture, I did as soon as possible.

Q. Did you have any memory of having to resubmit the form?

A. Yes.

Q. Multiple times?

A. Yes.

Q. Okay. What was your -- what's your memory of the reason for that?

A. My reason for that is Isaac Howard is just trying to make this to be the issue, trying to cause some small errors or small things in my form. Just trying to make my, you know, submission process not -- as slow as possible, so he have some reason to, you know, to not approve on time. Because he has a history of not approve or delay my approve.

Q. When you took leave for the surgery, were you still paid for the time that you were on leave or was it unpaid leave?

153

A.    It's a paid leave.

Q.    It's paid leave?

A.    Uh-huh (affirmative response).  And I was still asked to work.  Supposedly, I mean, if it's a paid leave, I'm not suppose to assign the work.  I may not be paying you for the whole 45 days after they approve, but probably two to three weeks.

Q.    Was the pay any less than it would have been if you were not on leave?

A.    No, the same pay.

Q.    So I know that you're claiming to have been discriminated against based on disability, right?

A.    Yes.

Q.    And so, my understanding of your disabilities, and I want you to correct me if I'm wrong, but I'm -- this is from your complaint.  So if I'm missing anything I also want you to tell me.

A.    Okay.

Q.    It's your back, vision and knee problems. Is that all or is there anything else?

A.    Back -- my back pain, my knee pain and I have some eye surgery.  If you notice in the hearing I have to switch glasses a few times.  Those probably reported in the video as well.  It's not

154

something I want.  It's just when you get old, the more problem you got.

Q.    I think in your discovery responses you mention memory loss, cognitive difficulties.

A.    Uh-huh (affirmative response).

Q.    And I think it said that they first started in 2020.  Does that sound right?

A.    Probably.

Q.    What kind of memory loss?

A.    Like I said, the faculty names.  We just experienced, you asked me the faculty names.  Under normal circumstances, I should be able to remember them.  And it's happened once we have a few more conversations, oh, all the sudden I have the memory back.  So I did do a test that MSU -- you know, you guys got a free ticket to search all my medical record, you should be able to find that out.

Q.    What kind of diagnosis do you have for your memory loss?  Do you have a diagnosis?

A.    No.  My score is slightly more than the average.  But the doctor assure me for Asian American 95 percent does not have that assessment, you know.  And I do got one begs to question, which is not answered in terms about my age, but she think it's just accidental.  It's not something systematic

155

as far as I can recall.  I'm not a medical expert and once you pull that medical record out, you should be able to find out more.

Q.    So do you have any -- do you know of any diagnoses that you have for any other cognitive issues?

A.    Not I am aware of, not I have been tested before.

Q.    Okay.  Do you have -- what do you -- do you have any diagnosis in relation to your back?

A.    Yes.  Long history.  When you pull up my medical record, you probably don't want to read it. It's just so many, you know, back to probably 10 years ago.

Q.    So long time issues with your back?

A.    Uh-huh (affirmative response).  Yeah.

Q.    But any specific -- is it just pain?  Is it caused by anything in particular or do you think it was triggered by something?

A.    Yeah, the doctor have an explanation and you can probably can read that.  The worst thing is that it radiated to my leg.  So that make me unable to walk for one hundred feet without that surgery. I have to take a few breaks when I walk from the engineering building -- I'm sure you've walked it by

156

this time -- to the dean's office.  From my department to dean's office, I have to take a few breaks.

Q.    So have you submitted any forms to human resources to request accommodations for these issues?

A.    I -- the back pain and unable to walk was in the middle of the semester once I have been put on the extra workload that resulted, the pressure everything, starting from that point.  And then I have the surgery after one month or two.  I'm not sure if I submitted any document.  But I did submit a surgery by a document and that was dated for 45 days.  So I don't know if I submitted any other document.  First of all, I don't know if I submitted any document that would make any difference.

Q.    Okay.  All right.  So I want to turn to your annual reviews issues just briefly.

A.    Okay.

Q.    The 2021, 2022 and 2023 are the annual reviews I understand you to have an issue with; is that fair?

A.    Yes.  Now it's 2026, so now I should have my 2024 and 2025 as well.

Q.    That's a good correction.  Because I think

157

your issue with 2023 is that there was not one, right?

A. For the -- I have the outcome of 2021 and 2022. And I have the -- I have -- I have not seen my 2023 one.

Q. Okay. In your experience when Dr. Truax was in charge of your annual reviews, did he ever complete them late?

A. Maybe late, not that late.

Q. Did he ever just not complete an annual review for any year?

A. As far as I know he has covered all years.

Q. Okay. So --

A. One thing that I wanted to make sure, if he wanted -- if he have some issues, he won't wait until the annual review comes up. He's going to talk to me. Li, I want you to be better on this, I want you to be better on that. So he won't wait until the annual review comes up. He wanted to improve you, make sure that you can work to the standards that he feel comfortable.

MS. MATTHEWS: Okay. Grafton, I think we're getting close here.

MR. BRAGG: Okay.

MS. MATTHEWS: We can go off the record.

158

(Off the record.)

Q. (By Ms. Matthews) Dr. Zhang, before you received the notice of intent to terminate your employment, which was February 2024, right?

A. Right.

Q. Before that, did you ever apply for jobs with different employers besides MSU?

A. I don't recall.

Q. With this company that your wife owns, I assume you didn't have to like put in a formal application or anything?

A. Right.

Q. Okay. Have you ever been recruited by another institution since you started working at MSU?

A. Since I work for MSU, yes.

Q. When were you recruited by another institution, to the best of your memory?

A. I almost jumped the ship back to Federal Highway.

Q. About when was that?

A. That was after I got my tenured, probably one year or two year. I can remember the interview was before the new year and that can get me a timeline to go back to find out exact year if you

159

need.

Q. How far into the process did you get, do you remember? Was there an interview? Did they make an offer?

A. They made an offer of the salary and I don't appreciate their salary, so I just reject it. Dr. Truax knows about it.

Q. That's fair enough.

So in your answers to requests for admission, and if you need to look at it, I can show it to you. But it says that you have, since receiving the notice you have sought and obtained available work.

A. Say that again.

Q. Here, let me just show it to you real quick. I'll share my screen. It might be hard to -- in translation, you know. All right. Let's see, I think it's number four.

It says, Dr. Zhang has sought and obtained available work, but he has not applied for written employment. So I'm really just focusing on this part right here that says you have sought and obtained available work.

What kind of work is this referring to?

A. I don't --

160

MR. BRAGG: I'll make an objection to the extent that it was written by me, signed by me at the bottom.

MS. MATTHEWS: Yeah, that's fine.

MR. BRAGG: On behalf of Dr. Zhang. But certainly if you know what that means, Dr. Zhang.

THE WITNESS: I don't know -- I forget about what that is specifically refer to.

Q. (By Ms. Matthews) I guess I'll just ask you then, have you gotten any employment offers?

A. No.

Q. Okay. And the work that you have done since receiving the notice, is it limited to this work for NGSIM?

A. Yes.

Q. Have you applied anywhere else?

A. Not yet.

Q. Not yet?

A. Uh-huh (affirmative response).

Q. Have you --

A. Let me -- I might have had something about FHW job. Then I saw the DOGE, Elan Musk and the DOGE is trying to reduce the federal work. So I might withdraw it or I might submit it. But I never go back to look at it because I know Federal Highway

161

is going to close all their positions.

Q. Okay. So you remember maybe applying for something with Federal Highway?

A. Uh-huh (affirmative response).

Q. But because of DOGE the funding was not there anymore?

A. Because of DOGE, all the federal governments -- the federal government are frozen and they're cutting the employee. So I may not submit it, I may submit it, but I never go back to the application portal to look at it again.

Q. Okay. Kind of abandoned it because you felt like it was no use?

A. Right. Yeah.

Q. Have you had any informal talks with anyone about different employment opportunities?

A. Might still continue talking with Federal Highway about employee, with people in there.

Q. What kind of job would that be?

A. That's going to be just 14 or 15. And then now with MSU's email to Federal Highway, I am not sure if I wanted to go to Federal Highway route again.

Q. You said because of MSU's email the Federal Highway?

162

A. Isaac's email with MDOT and FHWA Mississippi division was copied.

Q. So you're not sure if you want to go work with them because of Isaac's email to them?

A. Uh-huh (affirmative response).

Q. Why is that?

A. It's a small world.

Q. Have they told you they don't want to work with you?

A. No, they will never tell me. Those things is, you know -- if they don't want to work with me they will never tell me.

Q. Okay.

A. I'm not sure how far this email transmitted inside the FHWA up to their management.

Q. Got you. So I think this might be the last thing. In your complaints you asked to recover any medical expenses in connection with your claim. So I just want to ask, are you claiming that you have incurred medical expenses because of MSU?

A. I have visited the doctor much more frequently in recent years.

Q. Who is that?

A. I have visited the doctor much more

163

frequently than the years when I was at MSU. I don't know -- I'm not sure you have the proof. Everything about my medical have the -- you know it's probably I don't have direct evidence.

Q. So who is Dr. Mochimo (sic) is that right name?

A. When I see my doctor at here, almost a year or two then there's changes. Because I always work with the residents. And then the residents at UMC graduated, they went to somewhere else, they assign me another resident. So probably in the past few years I have worked with three or four residents as my primary doctor.

Q. So is this doctor or his group, his medical group, is this just your primary care doctor?

A. Yes.

Q. So what kind of medical issues do you think you've had because of MSU?

A. The eyesight is the -- I'm not sure for how this related to that. And now I have a much more hard time to read and to write things without switching glasses. And another one is I have been knocked unconscious twice.

Q. Knocked unconscious?

164

A. Fall on the ground was not aware of anything. And I have talked with my doctor. They said it might be have something to do with my blood pressure. And blood pressure have document the problem, it's a lot of research with people like me who have childhood bad experience from government now connect to my bad experience with MSU.

And have time -- from time to time during the evening I'm thinking about the comparison between what I have been treated by MSU compared with my mom was treated by communist China. And some things just cannot get it out of my mind.

And the worst thing is that when you're driving, something just jump out of your brain that might endanger you. But whenever that happen I'm try to pull me out, you know, just try not to think about it. I try to think about my kids. Just think about I have to -- I have to be responsible for their future. So I do have some (unintelligible) of everything that I got from MSU.

MS. MATTHEWS: Grafton, do we have the records from this Dr. Mochimo or his office.

MR. BRAGG: What the provider? Like where is that, Dr. Zhang? Where you do you see Dr. Mochimo?

165

THE WITNESS: I don't recall that doctor's exact name. I think it's probably not Dr. Mochimo. It's my primary doctor in my complaint.

MR. BRAGG: Where do you see that doctor? Like where do you go to see that doctor?

THE WITNESS: UMC.

MR. BRAGG: I think there has been a subpoena, so I don't know if y'all have received the records yet.

MS. MATTHEWS: We haven't gotten anything.

MR. BRAGG: Okay. It's the world we live in with providers and requests for records.

MS. MATTHEWS: Yeah.

THE REPORTER: And just for the record, Ashlyn, when I was taking the testimony, I wrote he was saying doctor much more. I didn't think he said a name, but I could be wrong.

MS. MATTHEWS: Oh, I'm sorry, I was hearing Dr. Mochimo.

Q. (By Ms. Matthews) Dr. Zhang, were you saying you were seeing the doctor much more or were you saying a doctor's name?

A. I didn't say any doctor's name.

Q. That's my mistake. I'm sorry. Thank you.

A. I'm sorry if I said any doctor -- I mean,

166

like I said, in the past few years the doctor has been changing from one to another. The doctor who I remember that her name is -- before this one, he went to Kentucky. So that's why -- he -- I complained to her that I lost conscious. He said it might have something to do control my blood pressure too much. He asked to reduce my blood pressure medicine.

MS. MATTHEWS: Okay. Well, I think that's all I have.

MR. BRAGG: I do have just a couple of things to clean up.

EXAMINATION BY MR. BRAGG:

Q. Dr. Zhang, I'm going to share my screen with you.

Do you see this email?

A. Yes.

MR. BRAGG: And we'll make this Exhibit 4, right, Lori?

THE REPORTER: Yes.

(Exhibit 4 marked for identification.)

Q. (By Mr. Bragg) I think you were asked about certain racial slurs from Jason Keith earlier. Do you recall that line of questioning?

167

Do you recall that line of questioning?

Can you hear me, Dr. Zhang?

A. Yes. Yes.

Q. Do you remember those questions?

A. Right.

Q. I don't know that I heard you identify this email that's Exhibit 4. Do you know whether you mentioned that email?

A. To me, Grafton?

Q. Yes.

A. Yes, I did mean that email.

Q. You meant -- well, let me just ask you this way. Do you consider this email to be a racial slur?

MS. MATTHEWS: Objection to leading.

A. To me it is.

Q. (By Mr. Bragg) Okay. All right. After having -- take a look at Exhibit 4 and let me ask you differently to hopefully avoid the leading objection.

Is there a -- do you recall any written racial slurs from Jason Keith that you may not have identified?

A. I cannot recall at this point.

Q. Okay. So what about this one?

168

A. The meat one was the one that I mentioned.

Q. Okay. What about this document on the screen?

A. Who cannot speak English, Zi. He called me Zi.

Q. Do you consider that to be a racial slur?

A. Yes.

Q. Okay. There were a lot of questions today about your recollection of emails and other documents. Do you remember those?

Do you remember being asked questions about that?

A. Yes.

Q. Okay. If something you said is different than what the emails say, are you going with what you said or with what the emails said?

A. I going with what the email said. Because my memory is not accurate at this point.

MR. BRAGG: Okay. That's all I have.

MS. MATTHEWS: I have a brief, if I may redirect really quick.

MR. BRAGG: You want me to pull that back up?

MS. MATTHEWS: Yeah, if you don't mind.

169

REDIRECT BY MS. MATTHEWS:

Q. We're back on Exhibit 4, I believe.

A. Yes.

Q. Dr. Zhang, I'm just curious, how do you know or why do you think that this is a comment about you?

A. You can see that one, the email after that one, which is talking about the purchase. And that was a purchase the PC5950x.pdf was the one that sent to your case.

Q. Okay. So --

A. And was a response, Merri's response, that detail that is one the conversation between -- before this one.

Q. Okay. So I think I might be missing the connection though between mentioning something about maybe someone can't speak English -- I just don't know that it's -- I'm not trying to argue, I guess. But I want to know if there's another connection that I'm missing that you know that that comment was about you in particular?

A. The order 24479, that order, that detail, that is a order I made. I think the best thing is ask doctor -- maybe just in case, ask if this is a email about me.

170

MS. MATTHEWS: Okay. That's all I have.

MR. BRAGG: Okay.

MS. MATTHEWS: Thank you, Dr. Zhang.

THE WITNESS: Thank you, Ashlyn, for asking me hard questions.

MS. MATTHEWS: Well, I'm sorry I kept you so long.

THE WITNESS: Oh, that's fine. That's fine. If you need, we can come back again.

MR. BRAGG: Oh, I did want to mention something and I did want to put this on the record, make what you will about it.

There were several times that Dr. Zhang said, I'm happy to send that to you if you want it, something like that. I would just ask that -- we're not going to unilaterally do that. But if you want any of those things, please request them and we'll review and produce them.

THE WITNESS: Yes.

MS. MATTHEWS: I will. I'll tell you, I don't anticipate needing to follow-up on any it, but I'll let you know.

THE WITNESS: Thank you so much, Ashlyn, for your time.

MS. MATTHEWS: Bye, Dr. Zhang.

171

THE WITNESS: Thank you, Lori.

THE REPORTER: Thank you.

MR. BRAGG: We'll read and sign and I'll need a copy.

THE REPORTER: Okay.

(End of Deposition.)

SIGNATURE/NOT WAIVED

(Whereupon, the above-entitled deposition was concluded at 1:57 p.m.)

172

CERTIFICATE OF DEPONENT

DEPONENT: Dr. Li Zhang
DATE: January 15, 2026
CASE STYLE: Zhang vs. MSU
ORIGINAL TO: Ashlyn Matthews, Esq.

I, the above-named deponent in the deposition taken in the herein styled and numbered cause, certify that I have examined the deposition taken on the date above as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me.

Subject to those corrections listed below, if any, I find the transcript to be the correct testimony I gave at the aforestated time and place.

| Page | Line | Comments |
|------|------|----------|
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |

This the ____ day of _____, 2026

_____
Dr. Li Zhang

State of Mississippi
County of _____

Subscribed and sworn to before me, this the _____ day of _____, 2026.

My Commission Expires:

_____     _____
                          Notary Public

173

CERTIFICATE OF COURT REPORTER

I, Lori W. Busick, Court Reporter and Notary Public, in and for the State of Mississippi, hereby certify that the foregoing contains a true and correct transcript of the testimony of Dr. Li Zhang, as taken by me in the aforementioned matter at the time and place heretofore stated, as taken by stenotype and later reduced to typewritten form under my supervision by means of computer-aided transcription.

I further certify that under the authority vested in me by the State of Mississippi that the witness was placed under oath by me to truthfully answer all questions in the matter.

I further certify that, to the best of my knowledge, I am not in the employ of or related to any party in this matter and have no interest, monetary or otherwise, in the final outcome of this matter.

Witness my signature and seal this the 25th day of January, 2026.

Lori W. Busick, CVR-S #7510, CCR #1677
My Commission Expires:
August 22, 2026

172

CERTIFICATE OF DEPONENT

DEPONENT:  Dr. Li Zhang
DATE:  January 15, 2026
CASE STYLE:  Zhang vs. MSU
ORIGINAL TO:  Ashlyn Matthews, Esq.

I, the above-named deponent in the deposition taken in the herein styled and numbered cause, certify that I have examined the deposition taken on the date above as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me.

Subject to those corrections listed below, if any, I find the transcript to be the correct testimony I gave at the aforestated time and place.

| Page | Line | Comments |
|---|---|---|
| 34 | 11 | NAP->Lab |
| 104 | 3 | NAP->Lab |
| 115 | 17 | one->more than one |
| | 22 | Chaining->Charlie |
| 116 | 2 | factor>faculty |
| 119 | 4 | just in case->Jason Keith |
| 125 | 21 | just in case->Jason Keith |
| 149 | 19 | just in case->Jason Keith |
| 169 | 24 | just in case->Jason Keith |
| 138 | 19 | 3040->30 to 40 |
| 142 | 2 | road->root |
| 149 | 18 | interrogatory->HR director |
| 156 | 13 | Dated->delay |

This the 5th day of _Feburary_ , 2026

_____
Dr. Li Zhang

State of Mississippi
County of __Hinds__

Subscribed and sworn to before me, this the __5__ day of __Feb__ , 2026.

My Commission Expires:

August 2, 2026.

_____
Notary Public

STATE OF MISSISSIPPI
SHAWN D HORST
NOTARY PUBLIC
Hinds County
My Commission Expires
August 2, 2026
COMMISSION NUMBER 31465

AW Reporting
601-573-0961

172

CERTIFICATE OF DEPONENT

DEPONENT: Dr. Li Zhang
DATE: January 15, 2026
CASE STYLE: Zhang vs. MSU
ORIGINAL TO: Ashlyn Matthews, Esq.

I, the above-named deponent in the deposition taken in the herein styled and numbered cause, certify that I have examined the deposition taken on the date above as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me.

Subject to those corrections listed below, if any, I find the transcript to be the correct testimony I gave at the aforestated time and place.

| Page | Line | Comments |
|------|------|----------|
| 9 | 4 | Their->The |
| 17 | 7 | attending->advice |
| 24 | 2 | content->accountant |
| 51 | 12-14 | Iraq->Iran |
| 62 | 21 | semester->year |
| 68 | 25 | fall->full |
| 87 | 5 | nothing->laughing |
| | 6 | say->see |
| 91 | 25 | Dennis->Dallas |
| 92 | 13 | Dos->Dallas |
| 95 | 4 | admitted->needed |
| 96 | 17/20/21/23 | admitted->needed |
| 98 | 24 | admitted->needed |

This the 5th day of February, 2026

_____
Dr. Li Zhang

State of Mississippi
County of Hinds

Subscribed and sworn to before me, this the 5 day of Feb, 2026.

My Commission Expires:

August 2, 2026          _____
                         Notary Public

STATE OF MISSISSIPPI
SHAWN D HORST
NOTARY PUBLIC
Hinds County
My Commission Expires
August 2, 2026
COMMISSION NUMBER 4655
AW Reporting
PH 601-573-0961