# EXHIBIT 8

BEFORE THE MISSISSIPPI STATE UNIVERSITY
PROMOTION AND TENURE COMMITTEE

RE: LI ZHANG

_____

TRANSCRIPT OF HEARING TESTIMONY OF

DAVID SHAW

_____

Had on June 5, 2025

at Mississippi State University

Transcribed by: Cathy White

---

APPEARANCES

COMMITTEE MEMBERS:

DR. ROBERT GRALA, CHAIR
MS. KELLI ANTHONY
DR. MELODY DALE
DR. DIPANGKAR DUTTA
DR. SANTANU KUNDU
DR. SHIEL LU
DR. ROBERT MOORE

MISSISSIPPI STATE UNIVERSITY REPRESENTATIVE:
DR. TABOR MULLEN

LEGAL ADVISORS FOR MISSISSIPPI STATE UNIVERSITY:

CHARLIE WINFIELD, ESQUIRE
ASHLYN MATTHEWS, ESQUIRE

LEGAL ADVISOR FOR DR. LI ZHANG:

GRAFTON BRAGG, ESQUIRE

---

INDEX

Style . . . . . . . . . . . . . . . . . . . . . 1

Appearances . . . . . . . . . . . . . . . . . 2

Index . . . . . . . . . . . . . . . . . . . . . 3

David Shaw

  BY DR. MULLEN . . . . . . . . . . . . . . . 4

  BY DR. ZHANG . . . . . . . . . . . . . . . 28

  BY THE COMMITTEE . . . . . . . . . . . . . 57

Certificate of Transcription . . . . . . . . . 73

---

DR. GRALA: It's time to get started. Dr. Mullen?

DR. MULLEN: Thank you.

DAVID SHAW

EXAMINATION

BY DR. MULLEN:

Q. Dr. Shaw, I have an hour. If you would, would you briefly introduce yourself to the Promotion and Tenure Committee?

A. I'd be very happy to. And I apologize, I just got back from an overseas trip last night, and I contracted a cold while I was over there. And so if I'm not as clear, please don't hesitate to ask, and I'll try to enunciate a little bit more clearly. That's the nasally sound in my voice.

I'm David Shaw, and I serve as the provost and the executive vice president here at Mississippi State University. I have been in that capacity for six years now and, prior to that time, I spent about 10 years as the vice president for research and economic development.

I came to Mississippi State in 1985. I actually got my 40-year pin two weeks ago. I joined the faculty in the College of Agriculture and Life Sciences, and specifically in the plant and soil

Cathy M. White, CCR

cathywhitecsr@gmail.com                    601.405.3762

sciences department; served in that -- in the associate -- assistant to the associate and full professor in that department. Then in 1998, we created a new research center that ultimately became what we now know as the Geosystems Research Institute; and then also, while I was in that capacity, was the lead investigator for the creation of the Northern Gulf Institute, so served as the center director for about 12 years before I became the research VP.

So that's a bit of my history here at the institution and so...

Q. So, Dr. Shaw, you're not only provost, so not first among equals, you are the executive vice president?

A. I am. I am serving as the executive vice president.

Q. And, therefore, it's safe to say the president delegates the day-to-day business of the institution?

A. That is correct. In fact, I often talk about having two jobs. One is the provost and one is whatever Dr. Keenum asks me to do at any given moment in time.

Q. I understand. You are familiar with handbook, termination of employment, IHL, trustees, policies and bylaws, and so I would take your attention to University Exhibit Number 4. In those

three policies, there has to be a decision-maker. Is that you?

A. Yes, that is. In our operating policy, that responsibility does fall with me.

Q. Yes, sir. Can you tell me how we got to this letter?

A. So I know you've heard from a number of individuals and I will not try to do a recap of all of that, but I'd be certainly happy to answer and clarify anything.

A number of events in research and in the academic side led up to the point of this letter in 2024. As indicated in the letter, there were a number of issues that has arisen in teaching since 2021, several things that had created problems on the research side that I learned Dr. Jordan has already spoke to you about, and then the ongoing conflict that the activities with the dean and the department head, as well as the vice president for research, all led to a decision to issue this letter.

Q. It's funny you kind of alluded to since 2021. Dr. Truax was here just a minute ago. And just to kind of summarize a few things that he said, I've never had an issue go to the college or higher, and, of course, I was remiss to call out Exhibit Number 20, which he asked for

help from the dean, but people forget, and that he would have just handled this. But, Dr. Shaw, he left at least an impression on me that he left in a very sour way.

A. I think that would be a very fair assessment. Dr. Truax -- Dr. Truax did not have a great relationship with the dean.

Q. Okay.

A. And Dr. Truax also was not at all pleased with the direction that the University took in creation of a new Rula building.

Q. Okay.

A. And basically said I'm washing my hands of that, and turned it over to -- through the dean, turned it over to Isaac Howard in the development of that facility ultimately. And so there was a number of things that he was actually very sour about by the time that he left.

Q. Why would a department head be sour about the creation of a multimillion dollar school and top notch facility?

A. I think he had a different vision fundamentally --

Q. Okay.

A. -- with the type of facility that was needed and the design.

Q. Yeah. Okay. And he just washed his hands and,

ultimately, Dr. Howard was chosen by Dr. -- excuse me -- Dean Keith, as the department head?

A. That's correct.

Q. Okay. Well, did Dennis want to be dean?

A. He did.

Q. Okay. So yet another growing piece of throwing it to the wind to Jason Keith?

A. Yeah.

Q. Well, that explains a lot to me about what goes on. I want to take you -- do you have a timeline in front of you?

A. I do not.

Q. You became provost when again?

A. In July, July 1 of 2019.

Q. 2019. The start of the pandemic.

A. Yeah.

Q. Got it.

A. Not a great time.

Q. Not a great time.

Let's move to -- I would like to move to fall of '21. Okay?

A. Okay.

Q. And there is discussions between Zhang and Howard about reassignments of classes. But it really, to me, would not seem that the provost would get involved until

9

the 20 -- excuse me -- November 29th. Is that safe to say, or had you been involved with complaints of Dr. Zhang previously?

A. Sir, I had been involved. Dr. Keith, I think, certainly was wanting to be sure that he did not go in a different direction than the University senior administration would want to. So he and I had been touching base on a regular basis about some of the issues that had occurred.

Q. And what were those issues; defiance, not pulling your weight?

A. Well, there were a number of concerns that had come up over time about the relationship between Dr. Zhang and Dr. Howard.

Q. Sure.

A. You know, and again, I know that some of these have been presented as evidence. But there was an ongoing series of issues in the conflict that had been occurring that had Dr. Keith very sensitive to the level of -- and the tenor of the discussions that were occurring.

Q. So unlike Dr. Truax, who hid everything in his department, Dr. Howard decided to elevate issues to the dean for help?

A. Yes. And I think, you know, certainly a part of that was that Dr. Howard, as interim --

10

Q. Uh-huh.

A. -- recognized the limited nature of the decision-making authority that he should have as the interim. And so I think he was spending more time than a department head might normally with Dr. Keith because of that interim stature.

Q. But Dr. Keith didn't raise the -- just appoint Dr. Howard as department head. We had a national search, did we not?

A. We did.

Q. And, ultimately, that national search led to Dr. Howard.

A. That's correct.

Q. Okay. He becomes department head. I'm going to go through some exhibits, but we'll talk about it. Effectively, Dr. Zhang goes AWOL with response to the dean, and I'm going to pull that exhibit --

A. Okay.

Q. -- in just a second. But do you remember that mindset of Jason of what to do to finish up the classes?

A. I do.

Q. Could you tell us, kind of from your perspective, what that was?

A. Well, you know, it was one of those circumstances where, from my vantage point, a small amount of

11

communications could have eased a lot of the issues. You know, the issues with medical issues or caretaking issues do require the responsibility of the faculty member to take care of things in a time where an absence may be needed.

Q. Okay.

A. And so that -- I think that was the frustration that Dr. Keith was expressing to me on more than one occasion, was the lack of communication and the lack of planning and essentially being told that, well, that's not my responsibility, that's someone else's responsibility.

Q. And they made, as y'all have heard, good faith efforts to try to solve or rectify the way that class ended. But at some point, the dean has to have a contingency plan.

A. That's correct.

Q. Okay. And you're right. Things may could have been handled better. But it is, at this point, the way it was handled. Did you have to authorize --

A. I did.

Q. Okay. And Dr. Keith, Dr. Babski-Reeves, and Dr. Green made the best decision they could at the time they had with all the information that they had at that time?

A. Yes, absolutely.

12

Q. Okay. There are very few perfect decisions in the universe.

A. Well, you can always second-guess anything, but I think with what they and what I knew at the moment in time, I firmly believe that the right decision was made on behalf of our students.

Q. Okay. We'll come back, but let's move on to -- for teaching purposes, let's move on to spring '22. I'm not going to rehash the darkest day, telling our students that he was on pain medicine while grading. That's all been established. Let's go to spring of '22.

How often do you meet with just faculty members and the faculty senate president and human resources over disputes?

A. That has only happened once in my six-year tenure.

Q. Okay. And you were reticent of last semester. And by "last semester," I mean fall of '21. That was odd, at best?

A. Again, unique.

Q. Unique?

A. From the time that I had been (indiscernible).

Q. Okay. And now, February 23rd, students start complaining again. And is it safe to say that Isaac and Jason felt like they were back in the same treacherous

**13**

boat again --

A. Yes.

Q. -- or what?

A. No. That's a very fair assessment. We had multiple conversations about hoping that all '21 was a one-off experience, and it seemed like we were really reopening all of those situations again.

Q. So this incident, for lack of a better word, starts in February and it ends up getting resolved in May. And we'll talk about that.

But, you know, Dr. Shaw, I've seen your schedule and I've had glimpses into other vice presidents'. Getting on your calendar is difficult. Okay? So I just want y'all to know, there's a sequence of events here. It is -- even important events take time. You allowed the administrative command, the administrative chain of command, to vet this situation?

A. I did.

Q. Do deans serve at your pleasure?

A. They do.

Q. Department heads serve at the dean's pleasure?

A. That's correct.

Q. Okay. So these are highly competent people that we would believe to make judgments?

A. Yes, sir.

**14**

Q. Okay. And ultimately, late in that semester, they determined at the time that there was an inappropriate addition to a class?

A. Yeah.

Q. Okay. That the dean's office believed put students in danger. Do you think they put students in danger?

A. Yes, I do.

Q. Okay.

A. We had several students -- and this is, you know, I think, to be sure that everyone is calibrated, this is a senior level course, and so we had several students that were looking to graduate in May and, if they were not -- if they either received a failing grade or did not receive their grade until after the fact, they would not be able to graduate. We're looking at students that have employment lined up already. We're looking at students that have plans for graduate school. And so the ability to go ahead and receive the -- a fair and final grade on time is incredibly important for seniors, above any other level.

Q. You know, Truax said a little while ago that he would have just given everybody incompletes.

A. Well, if that had surfaced to the provost level, that would not have been approved because an incomplete

**15**

does not allow graduation.

Q. He also said a few semesters ago, they'd just go do a grade appeal and that will solve your problem.

A. Well, that's an after-the-fact thing.

Q. Sure.

A. And so again, if graduation is tied to that, then --

Q. And you've got to have a final grade.

A. Right.

Q. Okay. So you ultimately, through your chain of command, authorized that he be removed from that class?

A. I did.

Q. Okay. Any qualms with that?

A. No.

Q. And Dr. Reeves was the most -- seemingly, I believe, the most objective person to go into that gradebook and what was left, and determine grades?

A. Yes.

Q. Okay. Did she do that to subvert the academic standards of Mississippi State?

A. Absolutely not. It was one of those that I think we've got to be sure, we always have to be sure that we are looking out for the best interest of our students. That does not mean relaxing standards, but it's making sure that we're fair to each and every student.

**16**

Q. So all of this grace and compassion that we extended in COVID, and it did change students, didn't change the academic stature of our institution or our ability to uphold academic integrity?

A. In no way.

Q. Okay. This is not some arbitrary assigning of grades. This is the institution's (indiscernible) of crisis.

A. That's correct. And I go back to something that I said earlier. I've been in this position six years. I'd been very close to the previous provost for the prior 10 years to that. So in 16 years, this is the only time I've ever seen this happen. And so it is not something that's willy-nilly and it's not something that is taken lightly by the provost or by the dean, to go in and do something like this. I -- I would be appalled if we were having to do this on a regular basis, and I think we would have to be stepping back and really taking a look at institutional policies if this was something that occurred on a regular basis.

Q. I agree.

Do you mind going back to being provost, but yet kind of thinking about it in some ways as the vice president of research?

A. Okay.

Q. Would you move to Exhibit 31? Dr. Shaw, do you know what the ASSURE project is?

A. Certainly do.

Q. Do you? How do you know what the ASSURE project is?

A. So this was one while I was the vice president for research and economic development. I led the effort to put the team together and ultimately write the proposal that won ASSURE.

Q. Okay.

A. And so worked for four years to get federal legislation put in place to authorize the ASSURE program.

Q. Okay.

A. And then worked two more years to get appropriation language put in to fund the ASSURE program.

Q. So it's important to the University. This is a big deal to the institution.

A. This is one of the largest wins in the history of the institution.

Q. Okay. And it makes it all that worse that one of our faculty members was asked to be removed from it?

A. It does. Again, that is a very rare occurrence in the FAA program at large, not just with MSU.

Q. Do you know how that happened?

A. So I do. The -- I think the -- there were two sets of issues. You know, there were -- I think the typical way that the FAA program takes someone off, if you would, is to redirect funds, and it's noted in some of the documentation that you have. Some of those funds were redirected. And that can happen for a variety of reasons.

Q. Uh-huh.

A. It can happen for changes in priorities.

Q. Uh-huh.

A. It can also happen because of perception of poor performance.

Q. Okay.

A. I think the bigger issue that arose in this instance was the divulging of proprietary information of FAA in some inappropriate ways.

Q. Right. And we know that because they didn't send some large memo. They simply told us.

A. Right.

Q. And is that, in your opinion, how it happens?

A. It is.

Q. And a lot of that is to save our institution from embarrassment.

A. It is. That's correct.

Q. The MDOT grant, everything that went on with that, is that something that you can speak to?

A. Dr. Jordan and I had a number of conversations and, because of my time, especially at this point in time, with me having just served as the research VP and having a number of friends and contacts at MDOT, you know, I know there was a great deal of frustration about the length of time that the project took, the lack of a final report, and the lack of a positive relationship. You know, MDOT had been -- had a long and very proud history of working with MSU, and there was some frustrations that had been expressed verbally multiple times.

Q. I would assume that much of MDOT holds an undergraduate degree from Mississippi State.

A. Yes, absolutely.

Q. So for us to not deliver to our alums as well as an important agency is difficult to hear.

A. It is. And that -- that relationship is so important not only for the research, but what we do with them in economic development, what we do with them in, frankly, infrastructure around our campus, as well as they're an invaluable source for match funds for projects that we go after, not only in research, but also, for example, with Jeremiah Dumas and the transportation network that we have.

Q. Absolutely. I actually forgot about that.

Every faculty member, I assume, negotiates sabbatical differently.

A. Yes.

Q. From go to recharge and take their research in a different direction. I've always thought of it as that plateau --

A. Uh-huh.

Q. -- in moving forward, some are R&R, some do a lot of things. When a faculty member goes on sabbatical, are they required to continue to work on University projects?

A. They are not required.

Q. Okay. I assume that they make some type of work-around -- work-around is not a good word -- some type of plan with their department head or dean about what they're going to do.

A. Yes.

Q. Okay. And there's be some discussion about extensions to the MDOT program and that they got them, but then they went on sabbatical, they shouldn't work, shouldn't work, should, should not. But let's look at -- let's look at Exhibit 33 then. And I'll remind you that Dr. Zhang is on sabbatical at this point. But it looks to me -- and I'm, you know, I'm a novice -- that he is indicated to be paid for moving to a building and then subsequently submitting time cards for the UTC exhibit.

A. Right.

Q. So, but faculty on sabbaticals have negotiated

21

their pay.

A.  They certainly should have.

Q.  Certainly should have.  I mean, Dr. Shaw, do we have any faculty who don't get paid during sabbatical?

A.  I don't know of -- I don't know of a single instance where that has happened.

Q.  Okay.

A.  Occurred.

Q.  Okay.  And this goes on into Exhibit 33 to where human resources has to tell him he doesn't get paid for it.  So it just seems like you give a guy an inch and he takes a mile, and he just continues to not want to the hear direction.

And that rolls into the fall with -- and I know Dr. Zhang disputes this and there are emails.  And the Committee has wisely requested more emails associated with Dr. Jordan.  But when you set up protocols and you build the robust level of research that we have, protocols have to be followed to the best of our ability, and that relationship with Marty Fuller and our congressional district -- excuse me -- our congressional -- are effectively some of the most important.  Can you speak to that?

A.  I certainly can.  As a little bit of history, when I first stepped in in 2010 into the vice president

22

for research role, we had several instances where there were multiple sets of folks that were providing very competing levels of priorities about specific projects.  And one of the things we did was all things had to come through the office of research to be able to go to the congressional delegation, because we wanted to be very clear.  And I think the institution has benefited tremendously.  It's obvious that we did not want to necessarily stop those contacts from happening, but we wanted to be able to be sure that we were controlling the message so that the institution was speaking with one voice rather than a whole series of voices.

And so, over the time that I was in that position, we made a very concerted effort that any contact with the Mississippi congressional delegation would go through the office of research and through Dr. Marty Fuller rather than having faculty members or department heads or deans go to the delegation on their own.

Q.  Thank you.  And you know, I'm running into my time limit, and so I would just --

DR. GRALA:  You have 30 minutes.

DR. MULLEN:  Oh, can I?

MS. ANTHONY:  Thirty more minutes.

DR. MULLEN:  Thirty more minutes.  Fine.  I don't think we'll need to take all the time.

23

BY DR. MULLEN:

Q.  You've explained, at a very eye level, frankly, with a good bit of detail.  I want to go back to our exhibit that I asked you about at first, Exhibit Number 4.  And since I have time, I'll ask a few little questions.  Nothing I have sensed from you so far has indicated that you wanted to write this letter.

A.  No.

Q.  So, Dr. Shaw, why did you have to write this letter?  And take your time explaining it to the Committee.

A.  So this letter is really the culmination of what you've been hearing over the last two days, and a number of verbal conversations, as well as all written documentation that you have seen.  And this was -- this has never been taken lightly.  And in the six years that I've been provost and in the 10 years that I was vice president for research, I know of only maybe one or two other instances that were -- where something like this happened.  And in every case, a law had been violated in all of the others.  So to my knowledge, this is the only time in those 16 years where something like this has happened.

So the institution takes a very careful, careful look, and so this is in consultation with our legal

24

counsel and in consultation with the president.

Q.  Uh-huh.

A.  This is a decision that was made by everyone that was involved rather than -- certainly than by just me, and it was with the overwhelming amount of information that was used to be able to ultimately reach the decision that we did.

Q.  Is this a witch hunt by Isaac Howard?

A.  No.  This was -- I'm sorry.  Absolutely not.  You know, there was -- obviously, the day-to-day interactions were with Dr. Howard, but at the same time, when the department head, the dean, HR, legal counsel, the provost, and the president are all on the same page, no way could this be called a witch hunt by one individual.

Q.  I don't think he could pull it off if he wanted to.

A.  No.  In fact, I would say, you know, you made the point earlier, any time that we have dealt with situations in the past where there was a witch hunt or where there were problems --

Q.  Uh-huh.

A.  -- between faculty members and department heads, I can tell you that there's been more than one occasion, in the six years that I've been in this position, where we have asked department heads to go back to faculty --

**Page 25**

Q. Uh-huh.

A. -- rather than serve in the administrative position that they're in, because we expect a higher level of standard in terms of fairness and relationship-building with our department heads.

Q. And because it did come up on Tuesday, academic appointments are at will, at the pleasure of the dean and provost?

A. Administratively.

Q. Excuse me. Academic administrative appointments.

A. Yes.

Q. That's correct. Thank you.

Is this an affront to academic freedom?

A. Absolutely not, no. And in fact, I think you've seen we have processes to be able to be sure that academic freedom is honored and this institution is very highly ranked in terms of its recognition of academic freedom nationally. It's something that President Keenum and I are very proud of. And so I think you've got to be sure that we separate misconduct from academic freedom.

Q. Okay. Are you trying to get rid of tenure at the University?

A. Absolutely not. I'm tenured myself and in no way --

Q. I actually think I'm the only person that doesn't

**Page 26**

have. (Audio distortion,) Kelli and I, that works at the University.

A. Let me go back to the unique nature of this. Now, obviously, when the laws are violated, that changes all of the rules. And so, yes, we have removed faculty members from their positions because of violation of law. But tenure is something that the president and I hold in very high regard and continually defend, frankly, in Jackson. As we know, tenure is under assault nationally, but it's something that President Keenum and I strongly, strongly believe in. So -- and I think that's one of the reasons why the circumstances that we're here to talk about today are so unique, because we do not go through a termination process for tenured faculty members on a regular basis at this institution.

Q. But having tenure does not absolve you of your responsibilities to the institution.

A. And I think that's -- that's the unfortunate mischaracterization that we have nationally and in Jackson with our legislature, is a misunderstanding and, frankly, it's probably sometimes a misuse and a lack of upholding the standards by the institutions themselves. We have to own that. We have to own the fact that having tenure does not mean that I just get to quit doing my job.

Q. Okay.

**Page 27**

A. And so I think part of what we have to do is we have to be sure that we demonstrate on a continual basis to our students, to our stakeholders, to our legislature, to the general public, that tenure does not give a free pass to be able to do whatever I want. Tenure is protection of academic freedom.

Q. Correct. So when we have failure to teach in accordance with the University standards, unsatisfactory performance in research, really what ties those together is a level of collegiality to meet. But, sir, when we start to erode in the way that Dr. Zhang did in the eyes of his administration, you had to step in for our students and our faculty, did you not?

A. And I -- that's very well said. As I said before, we've got to be sure that we are treating our students with respect and that we are upholding high standards, but at the same time, that we are being fair to our students. And then we've got to be sure that we are creating an environment both for our students and for our faculty, and staff, and departments so that everyone has the opportunity to be able to be successful. And when we have both of those that are falling apart, something has to be done.

DR. MULLEN: Thank you. We'll talk to Charlie real quick.

**Page 28**

That's it.

DR. GRALA: Thank you very much.

Dr. Zhang, your time to ask questions.

EXAMINATION

BY DR. ZHANG:

Q. Dr. Shaw, thank you so much and thank you and Dr. Keenum defend the tenureship in legislature. We all understand academic freedom and the tenureship is under attack from enough where I (indiscernible.) I personally don't know the extent of that nature completely, but we might be able to (indiscernible.)

But having said that, back to the research that we just talking about. So do you -- so there is, you know, people talk about it in the last three days. Why isn't Dr. Julie Jordan testified just a few minutes ago that I got an informal reprimand because -- why not our team University, why not team professors? He contact Mississippi congress, senator's office, and they -- Dr. Julie Jordan, that's a case by that she know I send an email out to him, ask everybody in the team to stand down. So Dr. Jordan testified that the reason for that letter of reprimand was because one of my team members at University of Denver, somehow there's a history how that was connected to the office of our senator. But that's a (indiscernible) matter.

29

My point that, if I ask him to stand down, as Dr. Julie Jordan testified, she knows about that because I was punished because of what somebody else contact our congressional office, and I did tell him not to, you know. He just testified, again, asked him to -- Dr. Jordan here to say that I -- she know I ask professor at University of Denver to stand down. Do you think, I got the letter of reprimand, that that's fair?

A. If it was as the way that you described it --

Q. Uh-huh.

A. -- then I certainly am going to defer to Dr. Jordan, who knew -- who had all of the conversations --

Q. Okay.

A. -- with Dr. Fuller --

Q. Right.

A. -- who had talked directly with the congressional delegation.

Q. Right.

A. I think that's the missing piece --

Q. Uh-huh.

A. -- that may need to be considered here, is --

Q. Right.

A. -- the conversations with the congressional delegations --

30

Q. Right.

A. -- themselves.

Q. Yeah. So as the VP for research, your were VP for research, would you do that, (indiscernible) letter of reprimand, if that was true?

But anyway the -- you know, it was in the recorded, so we can go back to see her transcript.

A. You know, certainly, I cannot speak to all of the details without knowing everything that Dr. Jordan did.

Q. Right.

A. I know she and Dr. Fuller had a number of conversations --

Q. Uh-huh.

A. -- about the frustrations that came up --

Q. Right.

A. -- that I was not a part of.

Q. Okay. So if, you know, somehow we get a transcript that everything that -- okay. Okay.

Let's go to the next questions. So before November '21, the issue you know about from Dr. Keith about me. Correct? That was from your testimony a few minutes ago.

A. Yes. Dr. Keith had -- and I have regular monthly meetings with him, face-to-face, verbal meetings, and Dr. Keith had been bringing me up to speed in those

31

regular monthly meetings with the interactions --

Q. Okay.

A. -- that you -- that Dr. Howard did make him aware of.

Q. Okay. Okay. So that was initiated by Dr. Howard?

A. It was initiated by Dr. Keith.

Q. Dr. Keith. But Dr. Howard told Dr. Keith that Dr. Howard might have something to do with me or the issue with me?

A. Possibly.

Q. Okay. Okay. Do you know why Dr. Keith -- he is probably the key person that, you know, make most of the decisions. Do you know why Dr. Keith would not make him available for this hearing?

A. Not make himself available?

Q. Uh-huh.

A. He's in a provost position at Iowa State University.

Q. Uh-huh.

A. And so that's -- it would be purely speculation on my part.

Q. Right.

A. But provost position is a very busy position and --

32

Q. Right.

A. -- so I'm not sure that he felt necessarily that he could add anything. I've not had any conversations with him, so I don't know.

Q. Okay.

A. I don't want to speak on his behalf.

Q. Right. In terms about the, you know, the serious of the matter, you know, just many years (indiscernible,) do you think, you know, Dr. Jason Keith is a responsible person which -- will he make himself available to this meeting would be --

A. I don't --

Q. -- the best --

A. I don't want to speak on his behalf.

Q. Okay. That was probably research piece.

If you -- if you don't mind, can we go back to the Exhibit 1 in my folder? In (indiscernible) from making letter.

DR. MULLEN: (Indiscernible, multiple speakers).

BY DR. ZHANG:

Q. That one, yeah. So there are three reasons for my termination, and the first one I wanted to recycle what we have talk about before. So first question is that, have you personally verified this statement is accurate and -- there in that letter of termination?

Cathy M. White, CCR

cathywhitecsr@gmail.com                                    601.405.3762

33

A. Yes, I have.

Q. Will you take the responsibility for every word you said in that letter?

A. I do. My signature is there.

Q. Okay. How about the supplemental? We have, you know, how many pages (indiscernible) pages after that?

MR. BRAGG: Z-2, so it would be in the other binder.

BY DR. ZHANG:

Q. Will you be responsible for supplemental --

DR. MULLEN: (Indiscernible).

BY DR. ZHANG:

Q. The supplemental, because that supplemental, there's no signature attached to your signature. If you feel you responsible for every word in that supplemental?

A. I did not put this together.

Q. Okay. Do you know who in the University is claim to be responsible for the accuracy for every word speak on that supplemental?

A. I'm going to defer to Charlie and Tabor on that.

DR. MULLEN: The exhibit? I'll stand by it.

DR. ZHANG: You'll stand by that?

DR. MULLEN: Sure will.

DR. ZHANG: Will you take personal responsibilities if there is any false statement,

34

misleading statement to be --

MR. WINFIELD: He's not giving testimony now. Your questions are for Dr. Shaw.

DR. ZHANG: Okay.

BY DR. ZHANG:

Q. Dr. Shaw, if you want to take the responsibility for (indiscernible), that is the responsible for that one, do you think he will take the responsibility to make sure all the words is accurate, not misleading? Do you think he -- will he be responsible for that?

MR. WINFIELD: I want to ask a couple of questions because I think there's several traps potentially in what you're asking there. The first -- the term "personal," --

DR. ZHANG: Uh-huh.

MR. WINFIELD: He is not serving a personal in a personal capacity. He is serving in the capacity as an institutional representative. And so if he takes responsibility, it is from a responsibility as an institutional person rather than from a personal liability standpoint, if that's what you're getting at.

DR. ZHANG: That's right.

MR. WINFIELD: I think the other part of it is, obviously, you know, he has indicated in the question that you asked that he believes that it is accurate, but at the

35

same time, certainly, there can be your view necessary to verify that accuracy. But I have no reason to not believe that it is an accurate reflection.

BY DR. ZHANG:

Q. Okay. So you and Dr. Mullen both stand by the accuracy of that document, whether personally, officially, that's fine.

Do you think it would -- there is a significant material or the statements are incorrect, misleading, or you or -- Mr. -- Dr. Mullen being sanctioned by HR and (indiscernible)?

A. Sir, I'm expecting any sanctioning by HR.

MR. WINFIELD: So I just want to clarify to make sure what we're talking about. This is a submission to the panel that was made that represents Mississippi State's position to which you offered a response and a rebuttal. It is not a termination document. It is, as it was asked yesterday, --

DR. ZHANG: Okay.

MR. WINFIELD: -- it's an expansion upon (audio distortion) my office did.

DR. ZHANG: Okay. So my understanding is nobody is going to take responsibility for what's (indiscernible) in the letter. Okay. I got that. Okay.

BY DR. ZHANG:

36

Q. Let's move on to the next question. Again, would you mind to go back to your termination letter? The first one is for the teaching. Have you personally verified my teaching is unsatisfactory in 2021, 2022, 2023, and 2024? That's for since 2021.

A. So since you did not teach in '23 and '24, then I think the statement is correct as it was written, that the teaching that you did since 2021 was unsatisfactory.

Q. Okay. So there is no misleading, it's very accurate, you stand by that?

A. I do.

Q. Okay. Thank you.

So when we talk about the teaching, what is the metrics about teaching? For example, undergraduate teaching, graduate teaching, and what's about the advisor is part of the teaching, too.

A. It is.

Q. So is that teaching is a combination that three or just of one thing?

A. It's -- very often, it is a case-by-case basis. We have some faculty that do only undergraduate teaching, some that only do graduate teaching, and some that have no advisors -- advisees at all.

Q. Okay.

A. So it varies dramatically --

37

Q. Okay.

A. -- between individual faculty members.

Q. Okay. Have you personally verified my teaching include which part then you consider those three parts? If I have three parts, then you've got a conclusion that my overall teaching is unsatisfactory. Have you personally verified?

A. I've personally verified it through the performance evaluations that Dr. Howard and Dr. Keith provided.

Q. Okay. So that unsatisfactory across all the board. Right?

A. That was their assessment.

Q. Their assessment is across all the board, undergraduate, graduate, and advisor?

A. It was not spelled out specifically in those areas. It was an overall assessment.

Q. Okay. Would you mind to turn to Z-41?

A. Z-41?

Q. Uh-huh.

DR. MULLEN: (Indiscernible).

A. Yeah.

BY DR. ZHANG:

Q. So if you would look at the table on top of that, since you personally -- since you personally verify, job

38

verification somehow is not consistent in this table. We can look at 2021, the overall.

A. Okay.

Q. All right. So you did notice the inconsistencies. Right?

A. I see the point that you're making.

Q. Uh-huh.

A. In the letter that I wrote, it was a summation of the composite.

Q. Okay. That the summation is different from what Dr. Howard's table here?

A. Uh-huh.

Q. Okay. Thank you.

Again, for the research, we don't have what -- you know, we have already talked about enough. So I am going to go to the third one about the come to the (indiscernible), candor, and malfeasance.

DR. MULLEN: He's back here.

DR. ZHANG: I'm sorry. I'm sorry. I don't (indiscernible).

BY DR. ZHANG:

Q. Okay. So basically, we talk about that policy, misconduct, it's very serious. I agree with you, if somebody did that, if I did it, I got fired. However to be qualified for that, according to your general

39

principles or according to the definition, the regulations, whatever that is, there needed to have several components. One is time. Second one is substantial. The third one is documented. The fourth one is due process. Have any of MSU's accusation about my serious misconduct have all four elements of those, especially the due process?

A. I think the due process certainly was followed and, at multiple steps of the way, myself, Dr. -- in fact, at times, even with your presence, there were meetings with HR and/or with legal to be able to be sure that you had been notified of concerns --

Q. Uh-huh.

A. -- so that you had the opportunity to address those. And so, in fact, I do believe that all four of those were followed.

Q. Okay. If my memory is correct, these are the meeting and we have six, seven other administrators all talk about how bad this person is, and I don't recall you have specifically asked me to explain, you know, how your medical conditions affect everything you did. I don't recall you gave me any chance to speak out for myself. If that is still due process, I'm okay with that. I'd just like to say, you know, that's one example of the due process you talk about. Are the due process same as the

40

one I have talk about what -- I'm not remembering it being --

A. Well, probably the most significant due process step was the meeting that we had in my conference room down the hall with you, HR, legal, and your administrative chain of command --

Q. Yeah.

A. -- all in that meeting.

Q. Yeah.

A. And that was nearly a two-hour meeting --

Q. Okay.

A. -- to talk about the serious concerns that we had and the need for you to address those.

Q. Okay. I'll ask you, how many -- if you're remember remembering the two hours, do you remember how long I got a chance to speak?

A. You spoke most of the time.

Q. Most of the time?

A. You did.

Q. Okay. Okay. Thank you.

That's why (indiscernible) that example that due process was followed?

A. Well, certainly, and you and the committee have seen a lot of the documentation of either requests or, in some cases, reprimands that were put in writing in

Cathy M. White, CCR

**41**

addition to that face-to-face meeting that we had. And so I think there's a large evidence of due process that was followed at many steps throughout the two-year process.

Q. Okay. Let's talk about specific. Do you recall I have emailed you twice, ask, you know, can we talk about something? One thing is the traffic counts. The second one is my summer assignment.

A. Uh-huh.

Q. And you said, no, we don't need to. Do you recall that?

A. I do.

Q. Okay. So is that a good way to say -- is that a best practice of due process?

A. Well, certainly, when there is a number of issues that have been raised over time, trying to have the two of us speak without, in some cases, your department head and/or your dean involved in the conversation, I felt like it was a much better idea to be able to bring all of us together --

Q. Yes.

A. -- as opposed to individual meetings in which things that we talk about wind up being different than what Dr. Howard or Dr. Keith might say.

Q. Okay. That's not Dr. Jason Keith's practice. He is, you know, (indiscernible) individual faculty comments

**42**

on all the faculty against Dr. Howard's appointment. But anyway, if you think that's (indiscernible), that's fine.

My point is, we don't have to speak one on one. We can brought everybody together just make best time. That's still a good way, I think you mentioned, to -- we probably cannot call that a due process. That's still a good way to get a question resolved. Right?

Do you remember, is there any particular reason you don't want to speak to me in those two occasions?

A. Well, the level of conflict that was going on, certainly, I was wanting to be very careful that all of us were listening to each other rather than having separate sets of one-off conversations.

Q. Yeah. Yeah. I mentioned, I don't mind you to have everybody in the same room to, you know, to speak, just like now, but I do like you to get my side of the story to you. That was just my intention. You (indiscernible) my voice need to be there, I'm going to speak the same thing about my concerns about everything. And in those two occasions, are you, you know, (indiscernible), but in those two occasions, you still think it's not a -- is there any particular reason you don't want me or everybody else to be there to speak with each other?

A. You know, I'd have to go back and take a look. I

**43**

don't know if it was a set of calendar issues or --

Q. Uh-huh.

A. -- if there were other issues that were going on.

Q. Okay. Okay. Thank you.

You have mentioned just a few minutes ago, you do had a one-on-one meeting with Jason Keith?

A. Uh-huh.

Q. And that meeting is talking something about me. You think it might be a fair chance, because of he speak to you one-on-one, if I can have that chance to speak one-on-one, you are going to be more balanced to the opinion about me?

A. I certainly would not disagree with that. You know, again, I'm not certain of exactly the circumstances that were going on at that time to be able to know exactly how to address that question.

Q. Okay. Let's move on. For the due process questions, you know, Dr. Jordan, she just testified a few minutes ago, she wrote me a letter of reprimand and to my personal file, without the due process first. Do you think that's a good practice?

A. Well, you know, I can't speak for Dr. Jordan.

Q. Right. Right.

A. And, you know, I know we -- that's a separate division.

**44**

Q. Uh-huh.

A. And so, obviously, there are overlaps in responsibilities.

Q. Right.

A. But at the same time, I know that she probably believed that --

Q. Uh-huh.

A. -- and had consulted with legal counsel to be sure that what was being done was --

Q. Okay.

A. -- the appropriate process.

Q. Will you do that if you was (indiscernible) for research?

A. Again, there's some circumstances there that I'm not -- that I'm not fully aware of. So I don't want to speak about what I would or would not do.

Q. Okay. Thank you.

So back to that letter of termination. Do you mind to let everybody in here know when that decision to terminate me was made?

A. Immediately before the letter was issued.

Q. How immediate; one week, two week, one month?

A. I don't know.

Q. You have said that there's only, like, many years, just one letter. Can you try to think about how

45

long that decision has been --

A. Probably within a week of when the letter was issued.

Q. Okay. Thank you.

Okay. Would you go to Z-20, which -- okay. Okay. Would you mind to read the first sentence, first?

A. Okay.

Q. The contents of the email, would you mind to read the first sentence?

A. Out loud?

Q. Yeah.

A. There's a long history of issues here leading to --

Q. Okay. "Long history," do you mind to elaborate on that, "long history"?

A. Well, I think, you know, this is --

Q. Okay.

A. -- noted here in December. And as I had indicated earlier, there had been an ongoing set of issues that Dr. Keith had informed me of.

Q. Okay. So that long history is from Dr. Keith?

A. Yeah.

Q. Okay. Thank you. And would you mind to continue to the second sentence?

A. Leslie, I'd like for you to work with Jason and

46

Isaac to develop a matching plan to stop this behavior.

Q. Oh, I'm sorry. On the, there is a long history, can you just --

A. Oh. He's been repeatedly working the system to his advantage.

Q. And we -- I'm sorry.

MS. ANTHONY: First sentence.

BY DR. ZHANG:

Q. Under the first sentence, second --

A. We need to aggressively do everything we can to rectify this situation.

Q. Okay. Do you mind to explain what are the aggressive to rectify the situation?

A. Well, I think, if you look back through the other emails, what you'll see is, is that there are a number of issues related to problems with the class this time that either -- for example, class is cancelled or you told Dr. Howard or Dr. Keith that they would just need to figure out what to do, and that there had been an ongoing set of issues that led up to this point, and we need to be sure that we, as I indicated in my second and third sentence, that we need to do everything that we can to rectify the situation so that we are not all leaving our students in a lurch or not being taught effectively.

Q. Do you have kind of a note why that has happened?

47

Is there any alternative to what you said, especially where there is medical issues, the disability kids issues? I need (indiscernible) those issues that Dr. Howard informed you. If somebody have a family medical leave, if somebody have caregiver issues, if he has to get approved medical leave, what is your -- what is your --

A. Faculty members --

Q. -- (indiscernible, two speakers) to that?

A. Faculty members are responsible to teach the classes to which they are assigned and, if they have disability issues or if they have medical issues that occur, then it's still their responsibility to be able to figure out how to take care of those. Sometimes that can be videoing a lecture in advance. Sometimes that can be arranging for a substitute teacher. It can be a class assignment that they do out of class. So there's a number of options the faculty have --

Q. Uh-huh.

A. -- to be able to do that. But it always falls back to the faculty of record to be able to find ways to take care of situations in which they are not going to be able to be in class.

Q. Okay. Thank you for clarify that.

So University position is that, when University or the administration have no responsibility or zero

48

responsibility to help their faculty to, you know, to take care of their medical conditions, to take care of their kids' conditions?

A. We certainly provide a great deal of flexibility in the ability -- in providing the option to be able to take care of themselves and with family members, but that does not absolve them of their responsibility. You know, you would certainly not expect me to be able to step in and effectively teach a class when I'm not a civil engineer.

Q. Of course.

A. And so the responsibility of the faculty member always falls back to -- unless it's a situation where the faculty member is going to be permanently out, and then the department head may have a substitute come in to take the rest of the semester or something like that. But an ongoing basis is the full expectation of the administration across the entire campus that the faculty member is the one that is teaching that class and, therefore, needs to take the responsibility to be sure effective teaching is occurring.

Q. Okay. Thank you for clarify that.

And it's not a matter of how serious their medical condition, it's not matter how serious about the condition he was you have he have to be hospitalized, but

49

(indiscernible.)  Thank you for clarify that.

If we move on to page -- to the Z-20, the same book.

MR. WINFIELD:  Page 3.

BY DR. ZHANG:

Q.  Okay.  Okay.  Could you read the highlighted -- well, underlined text by Dr. Jason Keith?  Would you mind to read this underlined text?

A.  I would like to see if we can deny his request for surgery and ask him to administer the final and submit grades.

Q.  Once you comment, and is there anything that you have done to either upgrade or correct or any action plan from your side?

A.  I think a part of this that I would -- I'm certainly certainly not going to speak on behalf of Dr. Keith --

Q.  Uh-huh.

A.  -- (indiscernible, two speakers) on that.

Q.  And you know this.  I was emailed, sent the email to you.

A.  But, you know, from my standpoint, a lot of it depends on the nature of the surgery, whether that surgery can be scheduled at a time that would be more appropriate.  There's a lot of details here that I certainly cannot

50

speak effectively to that specific statement since Dr. Keith made it.

Q.  Uh-huh.  Would you agree that Dr. Keith can't deny my request?

A.  Depending on the circumstances, yes.

Q.  Okay.  Thank you.

Would you mind to move to Z-41, the same exhibit that you had before?  Uh-huh.  So to your background, so this was an email chain between Dr. Howard, Dr. Jason Keith, talk about my annual evaluation.  Would you mind to read the email on the last -- on the last page, on the last paragraph, just before your signature --

MR. WINFIELD:  It's on page 2 of the document.

BY DR. ZHANG:

Q.  Page 2.

MR. WINFIELD:  The bottom email.

A.  Okay.  I think Jason's points are all relevant.  I would question that he has performed satisfactorily in research and how has he been able to be satisfactory in service.

BY DR. ZHANG:

Q.  Do you mind explain the information or you have personally talked to me, you have -- what materials that you have reviewed before you read this email?

A.  The annual performance review that Dr. Keith had

51

provided to me.

Q.  Okay.  So it says that you think Dr. Keith's and Dr. Howard's evaluation is not in line or is your understand about that (indiscernible.)

A.  So this --

Q.  So they have done their evaluation by Dr. Keith, Dr. Jason.

A.  Uh-huh.

Q.  It turned out to me you use -- you have a difference.

A.  I simply raised a question, and then Dr. Keith responded to me above that.

Q.  Okay.  Thank you.

When did you informed about my EEOC complaint about MSU?

A.  Ask that again.

Q.  When did you be aware of EEOC complaint I filed against Mississippi State University?

A.  I don't know.

Q.  Any chance you might be able to think about it a little bit to the refresh your memory?

A.  I'd have to go back and look at the timeline.

Q.  I think the EEOC complaint is against the -- it's complaint about Mississippi State University.  So generally, if that kind of complaint is filed, are you

52

going to be the first line to be informed about (audio distortion?)

A.  I will be.

Q.  You will be?

A.  Uh-huh.

Q.  Okay. So we've -- it's probably just a lot of information passed to MSU, that MSU informed you.  Right?

A.  That's correct.

Q.  Okay.  That's good.

So, does the federal court file because your name is on that, so probably you are the first line of the people to be informed --

A.  Correct.

Q.  -- as well.

And the state complaint, same?  Okay.

A.  Uh-huh.

Q.  If you don't know the exact date, that's fine.  I'd just like to confirm, you did -- are the first line of the recipient --

A.  Yes.

Q.  -- about those documents.

A.  Uh-huh.

Q.  Thank you.

Have your office and are you aware about any discussion about this termination hearing, discover

53

termination hearing -- do your office which are -- or you have this termination hearing, have you decided stand by what the outcome of this termination hearing, I mean recommend fire (indiscernible)?

A. No. I certainly respect our process and certainly have a valuable -- an invaluable representation here of our faculty. So I will very strongly listen to any recommendations that come forth.

DR. ZHANG: Okay. Thank you so much.

DR. GRALA: Is that all?

DR. ZHANG: If time has expired, then that's all.

DR. GRALA: If you have other questions, you still have time.

BY DR. ZHANG:

Q. In follow-up, I have one. If you decided to -- you know, if the Committee decided not recommended fire me and if you decided not to recommend the termination (indiscernible) for my position, if Dr. Howard does not like me, he say, Dr. Shaw, I don't want Li to be in my department, so what -- what's your suggestions of where should I go?

A. Well, my full expectations is, if you're not terminated, then you would still be in the civil and environmental engineering department.

Q. Okay.

54

A. That's where your tenure lies.

Q. Okay. Thank you so much.

Back to traffic counts. If that was one of the reason that I was removed from the, you know, instruction, that (indiscernible) the one that students complain, the second one is the traffic counts in spring 2022, traffic engineering class. So were you aware of the safety concerns about the traffic counts?

A. I was aware of those.

Q. Okay. Once you understand how that affect the student safety, what is exact safety concern? I have not be informed by either you, or Dr. Howard, or Dr. Jason.

A. So the issue is that was raised to me was twofold. One, that it was not a laboratory class, it was a lecture only class and, therefore, having an outside assignment in which traffic count data would be collected was not appropriate for the type of class that it was.

Q. Okay.

A. The second part was the safety issue --

Q. Right. What --

A. -- mostly because the students, at least to my knowledge and to the knowledge of Dr. Keith, had not been trained in safety practices regarding traffic counts.

Q. I was a transportation professor for 20 years, was a transportation engineer for 30 years. I am not

55

aware students have to be trained to sit on the street corner to count the number of the cars. So I -- so that's why I emphasize meeting with between you and the, you know, everybody to hear my side of story is important. But however, that's not happened. My point is that I'm not aware about any training, need to train student to sit on the corner of the street, which is running the road -- middle of the roadway.

Also, Dr. Robert Green made a false statement about sometimes, if the students have to be on the roadway, we'll have several major, I'll say, protections. The first one is we call the police department. The police department is going to place their police car, so the suppose this is the -- this is supposed to be the highway, and this is one man. You have another man on the campus for that (indiscernible.) So one way you can do it is that you walk in to place a detector, metal detector, drill a hole on the pavement. Students have to be in the roadways. Most likely, the research project for the traffic count study, usually we don't do that. We occasionally still do that. So this is a practice. We place detector here. Student have to drill a hole over there. We have our department and the students, so there's no car will be able to -- this is a traffic (indiscernible) direction. So this is our department car

56

and we also had students directing the traffic. We can get two police chief to testify (indiscernible) in case it's necessary.

Secondly, if student have to be on the road, we have the -- to train student to have the helmet and vest, wear it over there. We have additional students just in case somehow the police directing traffic is not working, and some, you know, people drive here is unexpected. So the students just watch the traffic. The students are taught or trained, if you see anything a dangerous situation, then one is going to shout run, run, run. So the students, when they hear the run, run, it's not matter, don't worry about your tools, nothing. Then you just run to the -- the walkways.

So that's why -- and looking again, say the communication is very important. Some (indiscernible) communications between you and me are broken for some reason. Maybe I don't have the good feeling or whatever reasons that will be. But if the communication has been happened, that's going to be resolved and not issues.

So what Dr. Green false -- made the false statement is that he said that the police was there and the police said -- because he accused the police found our students not safe and the police was there. It's our call to police department and, fortunately, they got call every

57

time. When we have the police chief checked. I talk to the police chief. But, of course, would help them, as well. Police chief, a few times, ask me to do traffic counts for them. We did with other, you know, just like Dr. Howard say, not -- just like Dr. Truax said, we did that with police department, trying to help the traffic counts. We give them our studies for campus. You can ask Jerry Mack to testify if it was submitted.

So my point, Doctor, we, as transportation engineer, we care about campus. We care about students. I don't know how those things passed to your ear was different impression, but that's not the part on me. I would (indiscernible). Thank you.

DR. GRALA: Dr. Zhang, is that all?

DR. ZHANG: Yeah.

DR. GRALA: Thank you.

Dr. Shaw, we're (indiscernible) recess so we can formulate our questions.

(Recess.)

EXAMINATION

BY DR. GRALA:

Q. Dr. Shaw, on behalf of the hearing panel, thank you for being here and taking time out of your busy schedule. We had some questions that we would like to ask. And perhaps maybe some of those questions might be

58

sensitive or might be misguided by our perception, but we would like to ask those just to be sure that we get the timeline right and to get a full picture of that situation. It is a serious situation and may be uncomfortable to every party involved here.

During the discussion when Dr. Zhang asked you questions, you said a meeting that took place in January of '22 between you, Dr. Zhang, and several administrators.

A. Uh-huh.

Q. Could you summarize for us that meeting, what was discussed and what was the outcome of that meeting?

A. Certainly. To my recollection -- and I don't have any notes from that meeting, so I'll do my best to reconstruct it. It included representation from general counsel, and from human resources, and myself, and Dr. Howard, and Dr. Keith. The meeting was to discuss the concerns that had occurred up to that point in time regarding what had happened the previous semester, and it was a meeting that was intended to be sure that that was a -- that was a single occurrence rather than something that was ongoing.

And so the meeting, as I indicated, lasted for quite some time, a lot of discussion about everything from illness and the child with the disability and how to care for that, but also the responsibilities of faculty

59

members, as I mentioned in the comments earlier, to try to be sure that there was a good understanding on all parties' parts, that we did not need to see something like that happen again, and that communication needed to be more effective both directions, and that we needed to be sure that, if -- if and when the missed classes occurred, things like that, the appropriate plans were made in advance to be able to address those.

Q. Did those guide the (indiscernible) improvement plan for bringing (indiscernible,) did Dr. Zhang acknowledge this plan and he agreed to continue and implement those suggestions that were suggested by you and (indiscernible, two speakers)?

A. It was a difficult meeting from the standpoint that Dr. Zhang was defending why he had done what he had done, and I don't know that that would -- I would say there was ever acknowledgement of the plan going forward. There was an expressed belief that it was the responsibility of the department head any time a faculty member needed to miss classes or do things like that to be able to take care of things.

A lot of the conversation also vectored to how final grades were developed and, you know, Dr. Zhang, understandably, was very upset that things had been changed, and so there was a lot of conversation about why

60

that had occurred. I won't say that there was agreement reached between everyone about whether that was the appropriate action or not, but that was the tenor of the discussion.

Q. So perhaps -- and you bring up today an important point. So, obviously, there was a problem with the communication at the time over the grades and Dr. Zhang -- and I'm talking about the time when he taught the course and had surgery. Obviously, every instructor was to enter his final grades, but in a situation like that, and I suspect what happened, there's no policy for that, AOP, what happens if -- someone has to make a decision how to interpret the grades in time for what to do in that situation.

A. Right.

Q. Whose responsibility would be to determine that and how would that be consulted to make sure that that would be an appropriate --

A. I think, ultimately, that responsibility falls to the provost.

Q. Okay.

A. So I'll take full responsibility and did take full responsibility for the final decision. But there was a great deal of input. You know, our legal counsel understands the legal interpretations of all of our AOPs

61

and, therefore, I was relying very heavily on the composite feedback from the people that were represented there, so the department head, the dean, HR, from the legal ramifications from any leave policies, things like that, and then legal counsel to be sure that we -- that my interpretation of the AOPs was correct.

Q. So based on the feedback that you had received from the dean, department head, and others, you rendered the decision. So it wasn't like someone was secretly (indiscernible) and had those grades (indiscernible)?

A. It was very well vetted by everyone that I mentioned there.

Q. Okay. There was also another aspect. Dr. Zhang received a promotion to a full professor, so he became -- effectively, he became a full professor on July 1st of 2021. And then in November of 2021, there is an email from you where you state that there is a long history of issues, and that situation is to be rectified through strong discipline (indiscernible) behavior. Could you elaborate, what do you mean by "long history"?

A. The long history in that particular instance was there had been an ongoing set of issues during that entire semester.

Q. Oh, so it's not like years. It was one semester?

A. Right.

62

Q. Okay. What kind of issues? What kind of behavior?

A. Well, you know, I think -- I think there had been ongoing conflict between the department head and the faculty member. There had been, you know, the issues that had been raised in terms of responsibilities for classes and things like that. And so those were the -- those were the kind of things that Dr. Keith had made me aware of.

Q. So given that there was a conflict between Dr. Howard and Dr. Zhang, how would you assure that the information that was conveyed to you by Dr. Howard was objective?

A. Well, very seldom did it come directly from Dr. Howard. You know, I -- my -- Dr. Howard is not a direct report of mine, so my interactions primarily was with Dean Keith. At times also, we relied on the associate dean for academics, as well. And so I was relying on not just Dr. Howard, but also Dr. Keith and...

Q. Okay. Also we have talked a lot about safety concerns related to the traffic count component that was included in Dr. Zhang's course. During our previous testimony, Dr. Green said the students were on campus, they were unsupervised, and there was a police car. They stopped, they asked what they were doing. Students were not really able to explain what they were doing, and the

63

police made their own decision to decide to stay there for the time that they were doing their study. And Dr. Zhang -- and I know Dr. Zhang was referring in general to that practice or to this one mentioned that once the police car requested by them.

Could we have any verification who requested the police car or if the police car wasn't requested at all? I'm asking maybe more of a question that (indiscernible), but we would like to determine --

A. Yeah. You know, I'll certainly let Tabor and Charlie discuss that, yeah.

Q. Dr. Shaw, are there any other courses on campus that have a lecture format and they have data collection incorporated into that lecture, as opposed to have a lab section where there's a credit-producing lab section or non-credit-producing lab section?

A. I certainly would never say -- maybe I should say, I don't know for 100 percent certainty.

Q. Okay. The course that Dr. Zhang was instructing that included a traffic count component, at some point in the past, was approved by the UCCC?

A. That's correct.

Q. And at the time, the course was -- included the traffic count component. Given that it was approved by the UCCC, administration raised safety concern, whose

64

purview it would be to determine that this component has to be removed?

A. Well, that certainly could fall under several that could make that decision.

Q. Okay.

A. That could be the UCCC itself in some circumstances. It can be the dean, it can be the department head, or it could be the faculty member who is responsible for that course.

Q. So I guess here, the bottom line would be that, if the safety concerns were raised by the dean or by you --

A. Right.

Q. -- this doesn't necessarily have to go back to the UCCC for that component to be removed. Right? If you directed that --

A. Ultimately, it will need to go back to UCCC.

Q. At some point?

A. At some point.

Q. Okay.

BY DR. MOORE:

Q. But it would still be valid to remove it.

A. It would be valid to remove it if it went through the appropriate process, even if we just remove it by the department head or the dean at that time for a semester or

Cathy M. White, CCR

65

two.

Q. So we do --

A. We provide one-off opportunities under very limited circumstances, but part of the SACSCOC review process is that we are upholding the standards that are set forward. And so we work very closely with Tracey Baham to be absolutely certain that we are not stepping out of bounds with our accreditation in, if you would, willy-nilly changing courses compared to --

Q. Right.

A. -- what's been approved by University Curriculum Committee.

BY DR. GRALA:

Q. So, Dr. Shaw, you have talked about numerous times (indiscernible,) but (indiscernible,) so just the concept of academic freedom and there's also concept of faculty autonomy. But you also recognize that we work within the institution and their procedures. And so Dr. Zhang claims that you having forced the way he was to teach that is part of his academic freedom and he's an expert in that area, and he should know how to explain that course and what should be included. And then at the same time say, we can say we will cover administration fairly that they may review that component created safely, but potentially that might be liability for remove

66

Dr. Zhang at the University. How do you resolve situation like that to make sure that there's some resolution to the situation?

A. I guess the two things to touch on there is, academic freedom does not -- you know, let me take an extreme case. Academic would not allow me to send somebody to stand out in the middle of a four-lane highway. You know, that's -- there are a number of issues other than just academic freedom that are governed by safety and common sense.

But then above and beyond that, there's also academic freedom does not mean that I can violate the process that this institution and our governing board and our accrediting body has set down as the standards for (indiscernible). The content itself, there's a great deal of academic freedom. The approach that we take in the overall approval process for any particular course that we take is not just the faculty member's purview. It is an institutional set of responsibilities.

Q. In this particular case, you don't contest the fact that faculty has terrific flexibility in terms of what content they develop for the course. It was more often how it was developed and what activities it included?

A. That's right. The two issues that we saw have

67

nothing to do with the content of the course. It was the execution of the course.

Q. And I have -- are you aware about communication, tensions between Dr. Howard and the faculty since the time he was appointed to department head?

A. Yes.

Q. (Indiscernible) Dr. Zhang?

A. Well, you know, what Dr. Keith had shared with me -- I've not had a conversation directly with Dr. Howard about it. You know, what Dr. Keith had shared with me was that, frankly, leading up to the time when Dr. Howard was appointed and during the interview process, that there was -- it was very clear that Dr. Zhang was not supportive of Dr. Howard being in that position and that was a -- that was actually an issue that was a part of the consideration when Dr. Keith made the decision about the department head, was if Dr. Howard -- and I believe they had conversations to be sure that Dr. Howard was aware that, as an administrator, he needed to be sure that he was providing a fair and balanced approach to faculty members, even if there was not a good personal relationship.

Q. Are you aware of any tensions between Dr. Howard and faculty other than Dr. Zhang?

A. I'm not aware of it.

68

Q. We have the testimony previously from HR, and there's a post review, post-tenure review process, and we were explained that this is -- was related to misconduct with the outstanding review wouldn't apply in this case.

A. Right.

Q. But the termination letter includes both this standard and also teaching performance and research performance. Given that there was a (indiscernible) of issue, would that outstanding review have been applicable in this case?

A. In my consultation with our legal counsel, it was very clear that this was one of those that fell outside the bounds of the post-tenure review process. And so what was spelled out in the letter was to provide enough clarity on what some of the issues were regarding the misconduct so that there was some clarity on why. Rather than just making a statement with one bullet point about it being misconduct without any definition, there was two -- the two additional points that were provided, so it was a clear understanding that it was misconduct related to both academics and research.

Q. Understood.

DR. GRALA: Any other questions?

BY DR. GRALA:

Q. We have also one more question and that relates

Cathy M. White, CCR

**69**

to productivity, which was also cited in the notice of termination. I think the issues were outlined also in annual evaluations for the year 2021 and 2022. And we were wondering, if that was the case, why there was no any action at the time instead of that later getting that notice of termination?

A. Well, if I remember correctly, there were written comments in the performance evaluations that did indicate, if you would, a plan or the need to address. And so I don't know that I would agree that there was not things that were spelled out by Dr. Howard and then supported by Dr. Keith in terms of addressing some of those deficiencies.

Q. Typically, when there is a post-tenure review, is there any timing that, for example, we are doing a first post-tenure review after five years or we are doing a post-tenure review because there has -- a productivity issue? Is that a reason for (indiscernible)?

A. Typically, in most instances, a post-tenure review is triggered after three unsatisfactories.

Q. Okay.

A. And so the process in which we normally use is to see multiple years' of documentations of poor productivity, and that will then be used to trigger. Now, we do have allowances for those outside of the three-plus

**70**

years under unique circumstances, but that is it.

DR. GRALA: Other members, do we have any follow-up questions, any additional questions?

DR. DUTTA: I might have a quick follow-up.

BY DR. DUTTA:

Q. So you mentioned that Dr. Howard was not directly talking to you anywhere. You were getting the information through Dr. Keith. So since there is a history between Dr. Howard and Dr. Keith, how do you ensure that you are getting fair picture from Dr. Keith?

A. Well, I did -- it's a good question. Let me think about that for just a moment. You know, what I was relying on was probably as much -- my normal practice is to have a standing monthly meeting with each one of the deans, and so it was -- I certainly understood the situation in which Dr. Howard was in and the issues that we've already talked about, the level of conflicts between the two individuals.

You know, I always work with each one of the deans to be sure that my understanding is that they are working to bring a fair and balanced approach as -- at the dean level, and so I would always ask questions of Dr. Keith to try to be sure that he was taking an unbiased or a fair and balanced approach to that. But I did not ever take it down to the level of trying to -- until we

**71**

had the meeting that we discussed a few moments ago, that we brought all of the parties involved. I was using Dr. Keith as my eyes and ears, if you would, to try to be sure of that.

DR. GRALA: Go ahead.

BY DR. KUNDU:

Q. Dr. Shaw, thank you. I have -- I know you have not wrote the annual review, so but one of the cases (indiscernible) part of the undergraduate, graduate, and service, and I get that advising. So one is unsatisfactory, but other was satisfactory. But at the end, department head wrote that day an unsatisfactory.

A. Right.

Q. So I mean, that's basically the (indiscernible). I don't know how that can be.

A. Well, I think --

Q. (Indiscernible).

A. -- part of it falls to the level of responsibility. Now, if somebody is doing a small amount of advising or little or no graduate-level instruction, then the driver needs to be the undergraduate evaluation. So my understanding was, especially in that circumstance, the weighting, if you would, that the department head was using was heavily towards the undergraduate teaching because that was where the primary set of responsibilities

**72**

fell.

DR. GRALA: Any other questions for Dr. Shaw? If not, then, Doctor, thank you very much.

DR. SHAW: Thank you so much.

73

CERTIFICATE OF TRANSCRIPTION

I, Catherine M. White, hereby certify that the foregoing pages contain a transcript of the testimony of said witness transcribed from Microsoft Meetings recordings TO THE BEST OF MY ABILITY.

I further certify that I am not in the employ of or related to any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature this the 13th day of August, 2025.

_____
CATHERINE M. WHITE