# EXHIBIT 9

BEFORE THE MISSISSIPPI STATE UNIVERSITY
PROMOTION AND TENURE COMMITTEE

RE: LI ZHANG

_____

TRANSCRIPT OF HEARING TESTIMONY OF

DENNIS TRUAX

_____

Had on June 6, 2025

at Mississippi State University

Transcribed by: Cathy White

---

APPEARANCES

COMMITTEE MEMBERS:

DR. ROBERT GRALA, CHAIR
MS. KELLI ANTHONY
DR. MELODY DALE
DR. DIPANGKAR DUTTA
DR. SANTANU KUNDU
DR. SHIEL LU
DR. ROBERT MOORE

MISSISSIPPI STATE UNIVERSITY REPRESENTATIVE:
DR. TABOR MULLEN

LEGAL ADVISORS FOR MISSISSIPPI STATE UNIVERSITY:

CHARLIE WINFIELD, ESQUIRE
ASHLYN MATTHEWS, ESQUIRE

LEGAL ADVISOR FOR DR. LI ZHANG:

GRAFTON BRAGG, ESQUIRE

---

INDEX

Style . . . . . . . . . . . . . . . . . . . . .  1

Appearances . . . . . . . . . . . . . . . . .  2

Index . . . . . . . . . . . . . . . . . . . . .  3

Dennis Truax

BY DR. ZHANG . . . . . . . . . . . . . . .  4

BY DR. MULLEN . . . . . . . . . . . . . . .  38

BY THE COMMITTEE . . . . . . . . . . . . .  39

Certificate of Transcription . . . . . . . . . .  65

---

DR. ZHANG: One thing I think about Dr. Truax and I is, we can probably talk the entire day, several days about me (indiscernible), but I understand this is a very limited time. I'm just trying to ask as few question as possible, leave for all the time for the Committee to ask.

DENNIS TRUAX

EXAMINATION

BY DR. ZHANG:

Q. So, Dr. Truax, do you mind some open-end introduction about our relationship, you know, how we know each other, how we (indiscernible) each other?

A. Sure. As I presume everybody in the room knows, I was -- I've been on the faculty at Mississippi State 1980, was elevated to what was then department head of what was then the civil and environmental engineering department at Mississippi State. At that time, Li was on the faculty, a very young faculty member. And so the next 15 years that I served as what ultimately became director of the Rula School of Civil and Environmental Engineering, we collaborated together on research projects. I sat on graduate student committees with Dr. Zhang. I represented the Mississippi Department of Transportation as director of the Mississippi Research

Cathy M. White, CCR

cathywhitecsr@gmail.com                    601.405.3762

and -- Mississippi Transportation Research and Development Center. I had to take a run at that one. Sorry. Albeit, I was an environmental engineer.

But that office is set up to work collaboratively with SPA and the VP's office to facilitate research throughout the state at the various universities; did research through them, but most of the work I did, because of environmental engineering, was with Dr. Zhang or in support of Dr. Zhang's effort to bring research to Mississippi State through the research center, several, numerous research projects.

He also worked with and I collaborated on several volunteer projects for the University. He volunteered his time and that of his graduate students to develop emergency evacuation plans for the University, transportation plans, transportation management plans for the University, with no compensation other than the modest recognition during annual review.

My first engagement at a real personal level with Li was in a situation where we had a problem with some students in his class. I was asked to come in and mediate it and, during the process, I realized the students had actually broken several University rules,

and that Dr. Zhang, being as considerate and courteous to them as -- but at the same time, demonstrated a high level of professionalism as defined by the engineering profession.

We're both licensed professional engineers and take that obligation to the state and the citizens of the state quite significantly, quite seriously.

Over the 15 years, it might have been more like 14 after that one occurrence, we had numerous instances to engage on a variety of situations.

During the latter few years, Li had a child born and O███████ had a challenge, he's classified as autistic, and he worked and I tried to support him the best I could in my administrative position to find support for him in the Starkville, Mississippi State community. Inasmuch as there really wasn't any and we weren't getting support from anybody, Li ultimately took it on himself, came to me and said, I'm going to have to find something for my child, and this is either moving to D.C. or moving to Jackson. And I said, what do you mean to D.C., there's no way we can keep your position. If you move to Jackson, I'll work with you and see what we can do. That was the choice he made for the sake of continuing to support the University and the department.

And then from that time, he's had a number of

challenges which I recognized and worked with him to the extent that I could to make sure that he continued to be a productive member of the faculty.

And with that said, I don't want you to think it's all roses. We have had some knock-down drag-outs, and I mean, we have stood there and argued right and left. We have disagreed about things. But at no time did Dr. Zhang ever cross what I would consider a line that would have breached any of the contingencies within his contract.

The one I always pointed to internally, this isn't something I share with people, except for you for the reasons, I guess, that are obvious to give you a background. But the situation that I always evaluated Li's performance are the standards defined by the college in terms of his productivity and then I looked at the contract stipulations, which largely embrace that, and then you end up with the issue of collegiality. And I never felt -- albeit Li and I, as well as many of the other faculty and I, disagreed. At the end of the day, I never felt like he breached the collegiality. He never did anything to hurt me, never did anything to hurt faculty, he never did anything to hurt the students or the staff. And in that regard -- to my knowledge, with the extent that I can't (audio distortion) as such. Even

though we had disagreements, I never felt that they were being done in a spirit of manipulation, but rather it was a spirit of trying to ensure success of him, his students, and his program.

Q. Thank you.

A. Does that help?

Q. Yes. So by following that about the one of the -- you know, disagreement, is it in your judgment, am I qualified to be the UTC PI, UTC director?

A. Sure.

Q. Would you mind to comment and say a sentence?

A. Well, for those that don't know, UTC is University Transportation Center. Okay? And, actually, we wrote a proposal together to get a UTC and, because of some back-channel manipulations that were outside of our control, in fact, outside of our knowledge, that project wasn't awarded. We did work through the UTC and co-collaborate on the UTC that we did get funded in the last iteration before that proposal, and Li was quite successful. At that time, he co-directed, along with Tom White and I guess John was involved, John Usher was involved with it. And let me think a second. It's been a while since I've seen John. He's now dean at Southern, Southern Alabama, Southern Mississippi.

Anyway, projects worked fine. The center worked

Cathy M. White, CCR

cathywhitecsr@gmail.com                               601.405.3762

9

fine. USDOT was more than happy with the work that was put out by the center, even to the point where they extended the contract. As I say, the only reason the effort to get a new UTC didn't -- wasn't successful was not a lack of trying on our part, but rather just because of some things that went on behind our back that we weren't aware of at the time of writing the proposal. All these were bias that had developed unrelated to anything that we had done.

Q. Thank you.

A. Sure.

Q. Are you worked for MDOT for many years.

A. Decades.

Q. And also, we have many alumni, my students, your students, work at MDOT?

A. Uh-huh.

Q. How do you think MDOT view me? Do I have a good reputation or a bad reputation? Or how -- basically, how MDOT got my research or got my personal -- my collaborations with it?

A. Let me take a half step back and frame it for the individuals in the room that, at the end of the day, there really are only two research-quality -- well, we had three for a brief period of time. So every time we get a -- we had one to two transportation engineers. Ole Miss had

10

kind of one, great guy. Hugh Dean is just a wonderful guy to be around, didn't want to do a lot of research. He's kind of at the end of his career. Li was mid-career and pushing hard, and MDOT's response to the product that he put out in terms of research was exceedingly pleased.

The -- we tried to expand the transportation program in the department a couple of times. In all candor, we didn't get a lot of support from the University. We had spousal issues where we were trying to get people hired and, for reasons I won't bother to go into, we were never successful in getting the spouses hired on campus and, therefore, creating in an instability that led to the faculty leaving after a short period of time.

So Li carried the water -- my term, environmental, admittedly. Li carried the water in transportation for the department almost solo without any support, other than graduate students and mine to a very minor degree and any other collaborations that he felt needed. He did collaborate with some people over in industrial engineering and was successful with that.

But to answer the question in succinct fashion, given I've now gone part of the short answer, they constantly renewed his work. The short answer is, if you don't like the work a person's doing, you don't award them

11

a contract again. They awarded him a contract routinely, year in and year out. The completion of the work was always done in a satisfactory manner, if not exceedingly acceptable manner, and MDOT had no issues with Dr. Zhang at all that were ever expressed to me in any way, shape, or form. And the executive director for MDOT is a former student of mine, was at the time, Melinda McGrath -- Melinda's since left.

Q. Uh-huh.

A. So there was an open door in the leadership at MDOT between my office and that agency. So I would have heard very quickly if we had any problems.

I also had a good relationship because of the transportation research center with the head of research at MDOT, both -- all three of them starting with Randy all the way down to Cindy.

Q. Would you mind to say a few words about my relationship with the Federal Highway Administration, the USDOT, which is really, really the background of how I strongly champion the University for the UTC?

A. Yeah. And then -- and if -- what's the lab? I keep forgetting.

Q. The Traffic and Research --

A. Yeah.

Q. -- Institute.

12

A. Thank you.

Q. They changed it to that.

A. Yes. That's the reason I keep forgetting. They changed it, they changed the name.

Anyway, the bottom line is, they offered Li a job on more than one occasion and he chose to stay at Mississippi State. He brought research to the University or supported graduate students as a result of research they asked him to do. In one case, they refused to let the research come to Mississippi State, and he developed a back-door way to bring as much of it to Mississippi State as he could by creating, with my knowledge and approval, a corporation outside of the University in another state so he could then literally funnel the money down here to work with or otherwise our graduate students.

So he devised techniques to bring research to Mississippi State from USDOT when the USDOT did not want Mississippi State doing research and was quite successful with the work that he did. As I said, I'd like to reiterate, they would love to have hired him during my tenure as department head and made him offers on more than one occasion.

Q. Thank you. Also, my three students.

A. Turner Fairbanks.

Q. Right. I work with Turner Fairbanks for Federal

Page 13

Highway.  Right?

A.  Yeah.

Q.  And he would ask his future to brought him to their and Case --

A.  (Indiscernible, two speakers.)

Q.  -- somehow he does not want me for research in Virginia (indiscernible)?

A.  Well, Case didn't want to leave Louisville, which is where he lives today.  He loves what he does.  He works for a state consulting firm.  He's been recognized as just being an outstanding transportation engineer, and this is a result of the education and research exposure that he had working with Dr. Zhang.

I'm thinking of -- and I can't remember his name right now.  Again, it's been four years since I was department head.  The individual that you took up to USDOT.

Q.  Shi Tong [phonetic].

A.  Shi Tong.  Thank you.  And he has reached out to me on more than one occasion and talked about how successful he is in his position in Washington, D.C., and has reached out to me on previous occasions about helping find other students, finding other opportunities, announcing opportunities to students.  But he's exceedingly pleased with the position he had and, by his

Page 14

report, I've not talked to anybody in his chain of command, but as far as I know, they're exceedingly pleased with the work that he's doing.

Q.  Thank you.

A.  Sure.

Q.  I think I'll move to teaching and summer 2021, just before you left --

A.  I retired in '21.

Q.  Right.  Yes.

A.  So could be June of '21.

Q.  You assigned me two courses.  Probably you are not -- you may not remember, but I can remind you.  You assigned me graduate courses, traffic flow theory, other project was traffic -- geometric design on the street, and we -- because we communicating, you know, I have a heavy workload.  Do you think that that's a fair assignment or that just --  you just made me (indiscernible)?

A.  Well, the assignment of workload in the department was based on the two-plus-two process.

Q.  Uh-huh.

A.  Four classes a semester, but because we were or are a research unit of the University, we did two hours -- excuse me -- half time research, half time teaching.  And then if he -- if a faculty member can buy time out, then the workload reduces.  And Dr. Zhang oftentimes did buy

Page 15

time out where he only taught three during the semester.

The problem there is, one, of course, faculty are only paid for nine months, and so the summers are open either to do research or to try and supplement the salary by doing coursework.  The other is that, because we were coming out of the pandemic, and because we were short-staffed, and because we had an issue with faculty capacity and capabilities in teaching classes -- the other transportation engineer we had at the time was a planning person and wasn't able to teach geometric design, didn't have the qualifications to teach geometric design.  So as a result, I did ask you to carry a heavier than normal load, in part with the idea that we had transitioned into the flexibility of you being able to teach virtually rather than 100 percent in the classroom, in part because we had a number -- both of those classes had a distance component.

Q.  Right.

A.  And as such, could and would be offered to our off-campus students as part of the distance education program, and allow them to move along.

And then the third aspect was you had talked about going on sabbatical and, as a result, had rearranged your research schedule.  And I think I'm correct in saying that that summer, because of that research rearrangement,

Page 16

that summer, you weren't completely covered.  So I was trying to get enough classes on your schedule so that you could supplement your salary at a level comparable to or commensurate with what your regular schedule would have been.

Q.  Okay.

A.  Or salary would have been.  Excuse me.

Q.  Yeah.  Would you assign me geometric design and (indiscernible,) introduction of transportation which is eight students had enrollment.  And you also -- you know also I have really heavy research load.  To be exact, it's 32 percent of the time release and the -- would you do that two undergraduate course to me where you know I have to complete more than half my hours research for FAA by October 1st?

A.  Sure.  Well, first off, you had to have it finished in a month-and-a-half after the semester started.  Secondly, I needed the classes taught.  The rotation of the other classes we had at the undergraduate level that was fairly rigid.  Otherwise, we'd end up with -- because we had so few faculty in the department, we had to hold a rigid undergraduate teaching cycle or we would end up causing students to have to stay an extra semester or two.  So I ended up relying -- now, what we ended up doing for part of that, if I recall correctly, is we moved Ali Reza

Cathy M. White, CCR

cathywhitecsr@gmail.com                                    601.405.3762

Page 17

[phonetic] over to help with part of that load for a while and then shifted back around so it -- it wasn't 100 percent, but it was a substantial load, and you still carried your responsibility for management of classes and the awards.

But that sometimes -- and to that end, as much as we may argue about it -- and I don't recall us arguing about that case. Dr. Zhang routinely would complain in the sense of -- I won't even say objecting. He'd make a note that, hey, I got all this work to do, you're asking me to teach the classes, and I'm going, yeah, but this is the situation we're in, to which he would say, okay, I'll do what I -- I'll do my best, and we would go on with the job. But then again, in all honesty, that's the same thing I'd had to ask of all the faculty. I mean --

Q. Thank you.

A. -- basically, we didn't have the human resource capacity to do the job without imposing some type --

Q. Yeah.

A. Myself included.

Q. Right. For the last situation, if I come to you, Dr. Truax, note, I'm really, really proud, my family, that semester, and for seeing (indiscernible) course, can we ask Keith to teach that course.

A. Yeah.

Page 18

Q. I was, you know, 30-some percentage of the cost research release, that's far more enough to cover Case, would you approve my request?

A. Sure. In fact, I think we did for Case once.

Q. Uh-huh.

A. And (indiscernible) his instructor, which we had the policy. Case was basically an all-but-dissertation graduate student. He completed his coursework for the Ph.D., but just kind of got tired, just found he didn't like doing research --

Q. Uh-huh.

A. -- like you said earlier. It was our policy that, if you had a Ph.D. student, as they finished the coursework and got near completion --

Q. Right.

A. -- we would put them in the classroom and in the hope that it would entice them to move into an academic career, or at least prepare them for the rigors of an academic --

Q. Right.

A. If that's what they chose to do.

Q. Yeah.

A. So in Case's case, we actually did --

Q. Right.

A. -- do that once.

Page 19

Q. Yeah. So that one, if somehow is or (indiscernible) me, you still have to teach the courses. Do you -- will you offer me help with a graduate teaching assistant for two undergraduate courses?

A. Sure.

Q. Do you think how many undergraduate courses you might offer me in two undergraduate courses with really heavy enrollment?

A. Well, "heavy enrollment" is a relative term. Let's put it --

Q. (Indiscernible, multiple speakers.)

A. I understand. Let's put it in the context that I taught a class that had 185 students in it and had no help.

Q. Yeah.

A. So maybe I'm a little biased in the minute, management.

Q. Yeah.

A. But nevertheless, what we would do is look at -- and I would rely on your judgment --

Q. Uh-huh.

A. -- as to the level of help you would need. If you came --

Q. Right.

A. -- and said I need help with this class --

Page 20

Q. Right.

A. -- and we put the priority on the class with the most students.

Q. Right.

A. We'd make sure we understood what that help was going to do --

Q. Yeah.

A. -- as far as their responsibilities --

Q. Uh-huh.

A. -- and the level of work. And that might be a full assistantship --

Q. Right.

A. -- for that individual. Or it might be --

Q. Uh-huh.

A. -- that the individual's got research. So my approach was always to negotiate with faculty --

Q. Right.

A. -- yourself included --

Q. Yes.

A. -- to define workload need, and then I would match what I could to help. At the same time, where are you getting graduate students --

Q. Yeah.

A. -- because they're all tied up in your research, so that always got to be an issue.

**21**

Q. Yeah.

A. We did not want to use and never did use --

Q. Uh-huh.

A. -- while I was administrator, undergraduates in an academic position.

Q. Yes. Thank you so much for your support.

A. Sure.

Q. In that case, I think your last semester, because I have to finish FAA, so all my graduate students are committed to the project already.

A. Right.

Q. If my students were not available, will you agree or (indiscernible) that most likely, for example, structure graduate students, they can do this 3013?

A. And if you could have --

Q. Yeah.

A. And if you could have done --

Q. Or you offer me to get one, you are confident you can get one?

A. Well, I'm not confident I can get anybody. But the idea is that, if I need somebody that has the capacity -- initially what we look for --

Q. Uh-huh.

A. -- if it was an undergraduate class, is we'd look for somebody that had had the class.

**22**

Q. Right.

A. And was now working on a graduate degree, again, not wanting to put an undergraduate or even a senior back into that environment. So if we could find somebody, yes.

Q. Okay. Thank you.

A. Uh-huh.

Q. So here is a --

A. And let me augment that by saying, we're not going -- not beyond going outside of the department.

Q. Right.

A. So industrial engineering, for example --

Q. Uh-huh.

A. -- had a component that was transportation, if they could do it.

Q. Right.

A. But again, likelihood is they had not had your class and that made them a less acceptable candidate.

Q. Right. They change the curriculum, so -- and that's how industrial engineering students also take seats from every class.

A. That's right. Some did. Some didn't.

Q. Yeah, yeah.

A. That's no different than what I did for Dr. Howard.

Q. Uh-huh.

**23**

A. He had people outside of the department working on his research project.

Q. Right.

A. And that's because he needed the help --

Q. Right.

A. -- and couldn't find it inside.

Q. Right. Thank you.

By following on the teaching, so in that fall, I was tasked to teach two courses.

A. This is fall 2021?

Q. '21. After you --

A. After I'm gone?

Q. After you're gone.

A. Okay.

Q. So Dr. Howard --

A. Can't blame me. I'm gone.

Q. -- change -- dropped my traffic engineering, traffic flow class, and added it to our 3103 --

MR. BRAGG: Clarify what 3103 is.

DR. ZHANG: Okay. I'm sorry.

BY DR. ZHANG:

Q. Transportation engineering, which that's in the fall, and the geometric design of highways and street, 4143, in the second semester. So why is that somehow in December 1st -- you know my back surgery, back pain.

**24**

A. Actually, I didn't. I knew you had had back issues.

Q. Uh-huh.

A. But I didn't know that you were ever scheduled for surgery.

Q. Right.

A. This, again, was after I had left.

Q. Yeah, after you had left. So I schedule surgery December 1st, and they -- my doctor initially said I have to stay two weeks after surgery doing nothing, and then he continued to require me to stay until sometime in the middle of January. In that scenario, what do you think you can support me 3103, because 70 students. I don't have TA. The grader, I was allowed one grader after my grader talked to -- Dr. Howard asked my grader, talked to her. Was that (audio distortion) that grader even does not sit and (indiscernible.) So in that situation, what you might be able to tell me, you know, Amid can help me, you know, Tom can help me, you know, Case can help me.

A. I understand what you're saying and those would be the things we would -- okay. The way I would approach this, if I was director of the program at that time, is we'd have a conversation, what are your needs and what are our opportunities to meet those needs. Now, what I'm hearing is, you would have suggested -- I'm assuming you

25

would have suggested could we reach out to Case --

Q. Uh-huh.

A. -- again, living in Louisville, to see if he could pick up the class and finish it out. And in that case, I would reach out to Case and say, hey -- or reach out to his employer or both, and say, hey Case, are you interested, will you let him do it. So I'd talk to both his employer and him to make sure that we didn't get crossed up somewhere, and that would be one. Tom White you mentioned, I'm not sure if Tom --

Q. The instructor, the associate teaching professor.

A. Oh, Tom Lynn?

Q. Tom Lynn.

A. I'd have to have a long conversation with Tom. Tom's a water resources engineer. So -- and was probably -- I would imagine, I don't know, but I imagine, if it was me, I'd have had him loaded up. He'd have been teaching four classes because he had no research expectation and had -- probably would have -- well, I would imagine he'd have picked up ASCE student chapter by that time. But his qualifications would be my concern. I don't want to put somebody in a classroom that isn't qualified to teach it and just because you have civil engineering degree doesn't mean you're qualified.

Q. Okay. Thank you.

26

A. Yeah.

Q. So --

A. Case would have been an excellent suggestions.

Q. Okay. Let's move to the spring 2022. You know, I used to teach traffic engineering class, traffic engineering.

A. Spring '22. That's right. Okay.

Q. So one of the reasons I was fired, because I asked students to do the traffic counts.

A. You were fired?

DR. GRALA: Dr. Zhang, you were not fired. You were --

DR. ZHANG: Okay.

DR. GRALA: -- notice --

DR. ZHANG: Okay.

DR. GRALA: -- of intent (indiscernible, multiple speakers.)

A. You've got to remember, I'm pretty sure, when I left the University, we didn't maintain contact.

BY DR. ZHANG:

Q. Right.

A. I don't know about the surgery. I don't know what happened at the University after that --

Q. Yeah.

A. -- after June 2021.

27

Q. Right. Yeah. So you know so well about the traffic counts, asked student to come and count the cars on the street.

A. Sure (indiscernible, two speakers).

Q. Had different ways to do that.

A. Yeah.

Q. In your more than 10 years or maybe --

A. (Indiscernible, two speakers) though the years.

Q. Don't worry about years. And have you ever had any concern about student safety to be jeopardized, had any concern about the UUUC compliance, any complaint about the accreditations because I did the traffic counts, asked students?

A. No. In part because, though there wasn't a formal lab class associated the class, there could have been. That was a machination the department did 25 years ago when we were asked to go to 130 hours. The labs got hidden and blended and all the rest.

Q. Uh-huh.

A. But the point is that, when you came after all that occurred, we talked at one point and you assured me that you were talking -- you briefed the students. I know the specific conversation we had wasn't about standing at the corner taking a traffic count, but it was about the placement of the counters that, at times, got placed

28

around campus.

Q. Uh-huh.

A. And it was my impression, confirmed to a small degree in talking with people like Case, that people were apprised of the fact that there's obviously a human risk and that they needed to be safe. You don't stand in locations where you're putting yourself in risk and that life comes before data.

Q. Right. Yeah. Thank you.

A. Sure.

Q. Let's move on to other thing about the students' complaint. So if three, four students come to your office to complain of my class and the -- would you do a follow-up, I don't know, from the three, four, how that three, four student complain, come up with 22 or 3 students to be someone in the classroom and you and Robert Green stand up there, ask the students about -- ask 23 students, and one Committee member pointed out, Dr. Green, have you make sure all those 23 students are in my class, and also consider --

DR. MOORE: (Indiscernible) want to sit in that room without being in your class.

DR. ZHANG: Right.

BY DR. ZHANG:

Q. So what's one of the (indiscernible) is Jason

29

Keith and Kari Reeves change the 3113 traffic -- transportation engineering class. Most of the students take my transportation engineering class. They're moved to the traffic engineering class.

A. Yeah.

Q. Okay. So those students take the advantage of the administration change the grades without even inform me and they send me the (indiscernible) of the students. Only one student failed and they are -- if you -- basically, I want you to comment or you organized 23 students to connect --

A. Whoa, whoa, whoa, whoa. Let's bring it all the way back to the beginning.

Q. Okay.

A. Because the real question was, if I had two or three students come through my door --

Q. Uh-huh.

A. -- complaining about you --

Q. Uh-huh.

A. -- what would I do. Well, first off, it never happened. I never had any student at any time ever come through my door or meet me in the hall to ever complain about you about anything. Okay? Graduate student or undergraduate. You never got a complaint.

If, on the other hand, because I had students

30

come through my door and complain about other faculty, which I won't get into detail on, my process on this was to hear -- would be to hear the student out individually, not collectively, and then compare the stories of each of the students to see what the, I'll say, complaint is, is this -- is the story really similar or is there enough deviation I feel it's positive.

Step two, if I feel there's valid -- validity here, I will step aside, off the side, and in an unofficial way, talk with the student that's in the class to validate what they saw.

Third step, if I have enough validation that I don't have somebody that's just upset, then I go to the faculty member, said, okay, I've got somebody, without name, that has said something, and if it's three, I'd still talk as if it was one, and I have been told this happened. Did it, if so, why, if not, why is that being said.

Then the step would be that we would get together. In fact, we mentioned, our first real intense meeting --

Q. Uh-huh.

A. -- was an attempt to resolve that. So it's bringing the students together --

Q. Right.

31

A. -- bringing the faculty member together --

Q. Okay.

A. -- and having the conversation about it --

Q. Right.

A. -- with me being the mediator --

Q. Uh-huh.

A. -- as to how to resolve this issue --

Q. Right.

A. -- and to see if it can be resolved.

Q. Yes.

A. If it can't be resolved --

Q. Uh-huh.

A. -- footnote, I never ended up in a situation where it couldn't be resolved.

Q. Okay.

A. But if it couldn't be resolved, then we'd talk about taking it to the next level.

Q. Uh-huh.

A. And at that point then, we would move into an academic --

Q. Uh-huh.

A. -- mode. Truthfully, I'd have to call and ask what to do next because, as I said, I've never had to deal with that.

Q. Right. Yeah.

32

A. We've always been able to resolve it at the department level.

Q. Thank you.

A. Whatever the charge was.

Q. Thank you for that.

A. Sure.

Q. So will you in my (indiscernible) ask those 23 students without me any, you know, no knowledge about you are going to meet students, talk to students, you will not share any student's detail complinat about me if there is 23 students.

A. No question. That's ludicrous. The only time that occurred -- the only time a situation like that occurred was --

Q. Uh-huh.

A. -- I think it was the first accreditation visit.

Q. Uh-huh.

A. In fact, I know it was.

Q. Okay.

A. Because Thompson, last name, first name, Bill Thompson --

Q. Bill Thompson.

A. -- NC State, sat down with me and we had a conversation in the office, and something he said put us in jeopardy of being -- having an issue a shortcomings --

Cathy M. White, CCR

**33**

Q. Right.

A. -- we call it at ABET, which I also do ABET visits. He was basically saying your students in the class we interviewed, you know --

Q. Uh-huh.

A. -- said yada, yada, yada.

Q. Uh-huh.

A. And I said, whoa, okay. So I need to find out what it was.

Q. Okay.

A. And it wasn't anything derogatory.

Q. Uh-huh.

A. Basically, for clarity and for meaningless information, they told him they thought they were getting a degree in civil and environmental engineering, and that's not the case. They were getting a degree in civil engineering. And, to ABET, that's a fatal flaw or near fatal flaw. Anyway, I found out, I knew what class he'd interviewed, I went in, just -- I said, hey, folks, just got a question, what you are you getting the degree in --

Q. Okay.

A. -- is the way I put it, and the answer (indiscernible.) Anyway, bottom line is, the only time I've ever had a situation, it was because it involved the entire class. I went to their entire class and I asked

**34**

the question in a way where they didn't know what I was trying to find out. By the way, the answer came back bachelor's of science in civil engineering. And so when the report came from ABET, I wrote back, well, I surveyed the same class and I asked the question this way. Here's the response, 100 percent.

Q. Okay. We'll move on.

A. Sorry. Just...

Q. We'll move on that --

A. (Indiscernible, two speakers).

Q. Right. If you -- you said to me, I agree to move other class instructor because you didn't listen to me until the traffic counts. Also, there are 23 students complain. Will you remove me from the instructor? I don't listen to you, don't do the traffic counts, and I --

A. Well --

Q. -- have 23 students complain which I didn't share with you?

A. Well, we're getting into real hypotheticals.

Q. Uh-huh.

A. But my responsibility as an administrator is to my faculty, and my staff, and my students. And if I felt that any one of those groups was put in jeopardy, I would address that situation to ensure that that jeopardy was resolved. So if I felt that I had an instructor who

**35**

was putting the safety of the students of the University, of the department, of the college, putting them in jeopardy --

Q. Right.

A. -- then, yes, I would intercede, even to the point --

Q. Right.

A. -- of removing the instructor because of their hack of responsiveness or their inability to recognize the harm that they have the potential to cause.

Q. Yeah.

A. Human life is first and foremost. That's -- as you know, a professional engineer, that's our obligation, not just our credo, not just some words.

Q. Uh-huh.

A. And as such, that's the way I would attack that.

Q. Thanks.

A. Sure.

Q. I probably ask a bunch more --

A. There is one more question, statement you made, Li. Let me jump on it just briefly. We had actually talked about it and, for the Committee, the comment he made a little while ago was changing grades. Absolutely never allowed by anybody except with the approval and foreknowledge of the instructor, ever. This is the

**36**

responsibility of the instructor, to award grades, and the only time I ever changed a grade, it was with the foreknowledge of the instructor and it was the result of a mistake, either a coding mistake, or a student came back and corrected a deficiency, or as a result of some documentable error.

Q. Right.

A. We never changed a grade, in the 15 years I was running the shop, without first collaborating with the instructor and making sure they understood that this is what's going to happen and, with the exception of one case, it actually occurred -- actually, even then, that occurred at the initiation of the faculty member. The one I wasn't thinking about was a distance faculty member who had a student call and he couldn't put the grades in, so I had staff put them into the system. He could have, but he said he couldn't. Anyway, she put the grades in. She coded them wrong. The student called about the grade and he actually did -- I was thinking it was a student called us, but it wasn't.

Q. Yeah. Can you explain this a little bit? You know, Mississippi, our traffic --

A. The state or the university?

Q. The state.

A. Okay.

Cathy M. White, CCR

cathywhitecsr@gmail.com                                                    601.405.3762

**37**

Q. The traffic fatality and accident rate is at an -- I would say (indiscernible) we have highest fatality rate, we have highest accident rate, and if we don't have a qualified engineer, transportation engineer, to design their road, design bridge, what is societal damage and what the -- you know, those students should not get a pass grade and they give them the pass grade, why that can damage our engineering reputation?

A. Well, again, it goes back to the people who are preparing to move into the profession, whether they get licensed or not, are expected to work to the betterment of society nonetheless and, as a result, the obligation is that they work effectively. Now, everybody makes mistakes, but we don't want to be the reason for that mistake. So the goal is to provide the best quality education we can with the resources available to ensure that those individuals that move into the workplace are competent, capable of becoming licensed professional engineers, and are -- and that's part of what we do with what we do with the degree, it's part of why the degree contains what it has, to ensure that level of success, because at the end of the day, that's what the state needs, whether it be by the consultants, or whether it be by the federal or state agencies, or whether it be by the individual working in other capacities.

**38**

Q. Thank you.

A. That's the reason we exist.

Q. One more question. So move to the ABET. You are ABET evaluator and you have come through two departmental ABET reviews. In those two reviews --

A. Oh, I've been going through ABET visits since 1980.

Q. Right. Yeah. I was there with you --

A. We've been through two together, yes.

Q. Yeah, yeah. Two before, Isaac for the third one. So is that just a regular practice ABET evaluator talk to individual?

A. Yes.

Q. Instead of group talk?

A. Yes.

Q. Okay. Thank you. That's all my questions.

A. I'm sorry to, you know --

Q. Have to (indiscernible), again --

A. Okay.

DR. ZHANG: My time probably through.

(Discussion had off the record.)

DR. GRALA: It's your turn.

EXAMINATION

BY DR. MULLEN:

Q. Dr. Truax, I really appreciate your fatherly --

**39**

I've got two daughters. Why not? -- that you presented today and I don't know if I can find it amazing or telling that you never had an issue creep up from the department to the college that you mentioned a little bit ago, but --

A. It's how you manage the unit. The dean's got --

Q. The fact of the matter --

A. The dean's got enough to without pushing it up there.

Q. But the fact of the matter is, you have not been affiliated with Mississippi State since 2021?

A. Basically, four years.

DR. MULLEN: Thank you, sir.

DR. GRALA: Any other questions?

DR. MULLEN: That's it.

DR. GRALA: The Committee will take about 10, 15 minutes' recess to develop our own questions.

(Recess.)

EXAMINATION

BY DR. GRALA:

Q. (Indiscernible.) Dr. Truax --

A. Yeah, it does a nice job of that. I use it a lot myself.

Q. -- we have some more questions for you.

A. Sure.

Q. And we'll try to not -- we'll have to go quickly

**40**

over that because we have the next witness at 1. Otherwise, we'll lose that witness. So we should have plenty of time.

A. In other words, keep the answers short and don't elaborate. I got it.

Q. I will ask you --

A. Don't worry about it.

Q. (Indiscernible, two speakers).

A. That's fine.

Q. Would you give us your opinion on the professional relationship and collegiality between Dr. Zhang and Dr. Howard? Will (indiscernible) that?

A. That's the bomb that I was hoping would never come. Okay. I'll keep my bias off to the side. I'll frame it this way. When I left the department, there was not one faculty member in the department that wanted to work with Dr. Howard to the point that, after I left, in short order, four faculty resigned when the dean appointed him over their objection to be the department head or director.

I have no personal knowledge of Dr. Zhang or Dr. Howard collaborating or having any kind of an interaction, albeit Dr. Zhang's office, for a period of time, was just across the hall from Dr. Howard's. Dr. Zhang moved down the hall when the vacancy became

Cathy M. White, CCR

cathywhitecsr@gmail.com                    601.405.3762

41

available so that he'd be closer to his graduate students and (indiscernible).

So I have no personal knowledge of animosity other than a general departmental feeling that -- and I think to go back to the search for my replacement, you'll find documentation where the faculty actually wrote letters and said we don't want Dr. Howard to be the department head.

Q. Thank you. And could you also elaborate on professional relationship and collegiality between Dr. Zhang and Dr. Keith?

A. I have no personal knowledge of any interaction between those two gentlemen.

Q. When you were department head, there were no complaints about Dr. Zhang's performance. There were also no complaints from students about his teaching performance. However, when there was a change in the department head, that have changed traumatically. Do you have any personal opinion for -- or finding a reason for that or why? I know that's speculation, but we would like to know what you think about that.

A. I don't like impugning people. I've already gone about as far as I want to speak to Dr. Howard and his personality.

Q. And that's fine if you want to say I have no

42

opinion.

A. Yeah. Well, I actually have an opinion, but I'd rather not share it because -- would be the better way to put it.

Q. Okay. When you were the department head, was a traffic count component part of the CDE 40103 course?

A. Traffic engineering, yes, sir.

Q. Traffic engineering.

A. It was always a component.

Q. Always a component?

A. Yes.

Q. Do you remember if it was a component when this course was approved by the UCCC?

A. Yes.

Q. Okay.

A. That would have been under Dr. Epps.

Q. Okay. And in your professional opinion, if that component was to be implemented by students, what would be the safety precautions or standards that would need to be implemented for that to take place?

A. Well, the standards that I understood that were in place were the fact that the students were cautioned about being safe, that -- traffic counting is a process where an individual stands there, generally sits there, and watches vehicles go by recording whether they turn, go

43

straight, or whatever. So it's just as simple as it sounds. And so, therefore, there's no reason for a student to ever be in the flow of traffic. And that was expressed, to the best of my knowledge, it was tradition, it was policy, it was expectation that that would be expressed to all the students attending the class.

As I mentioned earlier, there was one modification and that was occasionally Dr. Zhang used the equipment that came from his research experiment, which was an automated traffic count, which basically gets put in the roadway, and then the movement of a metal vehicle, whatever, certainly not a (indiscernible) over it, it would count that. And so there were -- he took protocols to take vehicles to block the road, a sign, and make sure that the students that were placing a camera in the road will protect it.

BY DR. MOORE:

Q. Would that be the pneumatic tubes?

A. No. These are electronic.

Q. Electronic, so it's --

A. Yeah.

Q. -- (Indiscernible) load into the box?

A. No. It's self-contained. It's a little self-contained box that sits there and gets glued to the surface. You drive across that and they --

44

Q. (Indiscernible, multiple speakers).

A. A couple days later, pry it off and take it home.

Q. It would be anchored in there?

A. It has to be attached. It's not a permanent (indiscernible) --

Q. Right.

A. -- but it is an attachment.

DR. MOORE: Thank you very much.

BY DR. KUNDU:

Q. So if that's the case, would what would be the safety precaution for putting those things on the road?

A. What Dr. Zhang did, and I know this first- and secondhand, is he would take the department pickup, move it and basically block the road so it's impassable. The student would work in the position where the truck protected them. Then there were other students acting as flag people directing traffic around the obstruction so that they remained safe. In other words, so that a vehicle wanting to go through the lane of traffic now had to move into the oncoming lane of traffic and there would be individuals signaling it's safe or it is not so that we didn't have anybody -- whether it be traffic or the students or Dr. Zhang who -- I can't say with certainty that he attended all of those placements, but I would say he probably attended the vast majority of them to make

Cathy M. White, CCR

cathywhitecsr@gmail.com                                        601.405.3762

**45**

sure that the students were kept safe.

BY DR. GRALA:

Q. So I think we have to at least hear what Dr. Zhang did to make sure there was safety.

A. Uh-huh.

Q. My thought would be to understand that (indiscernible) any were hit.

A. Exactly what he did.

Q. So what about vests, elements --

A. I mean, in this case, flagmen are effectively it. And I would think that, again, I'm -- in one case that I ran across here over on Hail State, the students actually did have vests on.

Q. Would there be police needed?

A. No.

Q. If there was a student --

A. Doesn't mean you couldn't call police, but --

Q. Yeah.

A. -- you said needed.

Q. Yeah. Or required.

A. No.

Q. If a student was doing a manual count by standing on the side, would they have to wear any vest?

A. No.

Q. Anything like that?

**46**

A. No.

Q. Okay.

BY DR. DUTTA:

Q. I'd like to follow up on that.

A. Yes, sir.

Q. Are you aware of these procedures in the fall and spring of 2022, when you --

A. Again, as I said, the University -- when I stepped away from the University, the University severed all ties with me and, as a result, I don't know of any changes and I didn't -- and because of my departure and the way I departed, it was obvious that I didn't need to be coming back and trying to find out what was going on. And I was busy. Actually, I had become president of the American Society of Civil Engineers and was traveling extensively around the world. And so there really wasn't a lot of opportunity or motivation for me to come back on campus.

BY DR. KUNDU:

Q. Doctor?

A. Yes.

Q. So you said that you are the president of the American --

A. American Society of Civil Engineers.

Q. So you know that these practices done, that this

**47**

component is also being done at other universities, like the traffic count things?

A. Sure.

Q. And --

A. Well, it's not from AFCE. It's from my ABET experience. See, I have been a team chair and an ABET visitor since 2006, 2007. I'd have to go back and look on my record. And I have done one or two, as many as three, ABET visits at U.S. universities and did a previsit at one international university and a visit at one international university.

And so, of course, those programs that have traffic engineering do -- I've got a good friend at University of Washington who runs the traffic research center there. He's got students in the field doing traffic counts all the time.

BY DR. GRALA:

Q. Do you know if the traffic count as it was developed by Dr. Zhang is the background for a class that has a lecture component?

A. Has an extra --

Q. Has a lecture component. Because this --

A. It is consistent with what we did. Again, as I said, when the University, in -- 25 years ago, when the University -- give or take -- when the University asked

**48**

the department to cut out five hours from 135-hour proposal to go to 130 on the premise that another university in the state was doing 130, even though they didn't have the rigor of content ours did, the department faculty, with the leadership of another department head, decided that what we would do is we'd stop giving credit for certain labs.

Q. But, technically, you would include no credit for that in --

A. Same difference. That's effectively what we did. That was not an option back then. It is today.

Q. If a faculty member disobeyed your direct instructions (indiscernible,) what would be your course of action?

A. Well, if a faculty member disobeyed.

Q. Yes.

A. I guess it really would come down to in what way did they disobey and what the ramifications of the disobedience would be. Obviously, if the disobedience would be the result of putting somebody in harm, we'd have a substantial issue. What I'd probably do at this point is to explain to them we're going to have to take this -- they're going to have to be removed -- have to be removed from whatever situation that is allowing them or causing them to do that. In order to do that, then again, I'd

49

have to seek out the help of HR or HRN, and the college administration to make sure that we did it in a way that was appropriate.

This is what we went through when we wanted to remove the dean in the college. We checked with HR, we checked the VP's office here, and so we lined up a strategy, choreographed the process, which started and was completed over a two-month period.

Q. If an interim dean of a program ask instructor to remove, in this case, (audio distortion) course and faculty refused to do that, what is the course of action in this case?

A. Great question. That's a level of disobedience and, effectively, what I would have to do is ensure the faculty member complied with the administration's requirement and not add that to the class.

Q. And if the faculty --

A. Refused --

Q. (Indiscernible, two speakers.)

A. What we'd have to do, then I'd have to find an alternative instructor for the class.

Q. So, effectively, the faculty would be removed --

A. That's correct.

Q. -- from the (indiscernible, two speakers)?

A. That's correct.

50

Q. Okay. If a faculty is unable to administer a final exam, (indiscernible) enter the final grades, but Dr. Zhang's --

A. Uh-huh.

Q. And in fact, he would have a surgery and the faculty was asked to provide the contingency plan for that situation but hasn't provided that under the surgery, what would be your course of action for you to make sure that the final exam's administered and that the final grades are handed out?

A. Well, what I'd have to do is -- so let me make sure I understand the question. I have a class that's been taught by a faculty number up to a period of time.

Q. Yeah.

A. This -- we've now gotten to a point where this faculty member is going to have to take a medical leave from the University and is not going to be able to complete his assignment.

Q. So (indiscernible,) class started, the class ended, so the --

A. (Indiscernible, two speakers.)

Q. The class is over. The only thing that's left is the final exam, in theory, and -- but the faculty knows that he will have to have a surgery during the final exam, and it wasn't clear how much of a leave that faculty would

51

need because we don't know, you know, how the surgery will go. All right?

A. Well, the outcome of the surgery is second level.

Q. Yeah.

A. The first issue is, what I'd be doing is I'd going to the faculty member who has just taught the 15 weeks and said do you have a final exam prepared.

Q. Yes.

A. Or what will it take to prepare that final exam. At that point, do you have a key for that final exam or somebody that can grade it once we administered it.

Q. Okay.

A. Once I resolve the evaluation piece for the course, then what I do is, we're on autopilot. I have faculty that have staff administer the exam all the time.

Q. Okay.

A. Did. I don't now. And so I'd have a staff member, not a student, administer the exam, collect the exams, and if need be, then use the key to grade the exam. Now, I never got that far. But the administration of the exam by staff was not an uncommon practice at the department.

The next step, though, would be you're looking into the next year. And so what I've now got to do, assuming the faculty member's not teaching during the

52

December period, whatever that's still called, whatever, I've got to rearrange schedules. I've now got a faculty member that's not going to be returning in January to start class and the presumption is, that's work.

Now, what typically occurs in civil is that the first -- the second week of classes is TRE, and as a result, the faculty are gone anyway. So we make adjustments and --

Q. And we don't have to gp through January. But there is one component, the final grades.

A. Sure.

Q. Trying to contact the faculty member, you are not getting any response to do this by December 13th.

A. Yeah.

Q. Students don't have grades.

A. Right.

Q. How do you go about making sure that grades are there?

A. Well, that's a difficult thing to say because of the hypothetical.

Q. Yeah.

A. If -- again, as I said, one of the things I would ask for in getting the final exam would be a key to the final exam --

Q. If that was provided.

Cathy M. White, CCR

cathywhitecsr@gmail.com                    601.405.3762

53

A. -- or a definition of somebody that could grade it. So that if I did not hear from the faculty member, I have a solution to generate a grade and the gradebook, assumingly, to go with it so that we could administer grades or award grades appropriately. If on for (audio distortion) I have allowed the situation to get to the point where the faculty member -- I'm going to use the term disappeared -- and I think that's what happened.

Q. Yeah.

A. If the faculty member disappeared and I could not get the final exam or the final exam administered or the final exam graded, at that point, everybody gets an incomplete.

Q. How does that affect those students who are --

A. Graduating?

Q. And have to have the grades. That's not really your fault, because you have to have a reason for incomplete. Right?

A. And then the reason would be that the course hadn't been completed.

Q. Yeah.

A. I wouldn't have the grades to award, so there's no way for me to give a fair grade based on the performance over the previous 15 weeks. So again, now, how I would resolve that as far as the few students that

54

would be graduating that semester?

Q. Yeah.

A. That, I probably would ask for some advice on. The expectation would be that we -- I would hope we could come up with a work-around where a student might get a pass, allow that to accept on the contingent that the student understood that an actual grade would be awarded and, if they didn't pass, they've got to come back.

Q. How common or uncommon it would be for a class for (indiscernible) have an incomplete?

A. Well, the situation you've hypothetically developed never occurred.

Q. Yeah. Well, actually it did, but --

A. (Indiscernible.) I understand.

Q. Have you ever had a situation in which an entire class would get incomplete?

A. No, because I've never had a faculty member disappear on me or that I was never given the grades, even with the distance program.

Q. What would be your course of action if you had 20 students complaining about a faculty's teaching performance?

A. Well, as I said earlier, when you have a preponderance (indiscernible) of a class -- excuse me -- having been an objection, that raises the bar to a level

55

where one would have to consider pretty substantial. My first course of action would be to bring the instructor in and have a conversation.

Q. So you would talk to the instructor first?

A. First and foremost.

Q. (Indiscernible, two speakers) where this, you know, necessarily without divulging names or anything like that?

A. Of course. You've got to.

Q. You have --

A. Again, I wouldn't even mention it was the whole class or 22 in the class. It would be a matter of I have a complaint.

Q. Yeah.

A. I'd like to get your side of the story. Let's talk about --

Q. Again, (audio distortion) you would make faculty --

A. Yeah.

Q. -- aware of that situation?

A. Yes, absolutely. And in the same regard, I'd also -- with that massive number, I'd still want a little ground truthing, as I would call it. I'd want a little validation. I had a situation, different instructor, where an individual went around and antagonized a group of

56

students. This was pre-COVID, and this would have been -- so this would have been '20, spring '20. Had to be because I left through the summer. They went around and convinced several members, not a substantial number, but I'll say six out of a class of 56, or it could have been 65, that if they did a certain thing, they could strong-arm the faculty into giving them a grade.

And what I did was I went in and started investigating with other members outside of this clique and have conversations. And then ultimately, after about three conversations, the existence of the clique was found, at which time then I brought the individuals in and started -- I'm going to say interrogating. Why not? And discover the ring leader, and the others the effectively relented. And out of the six of them, three of them were trying to graduate and did not because they ended up getting awarded (indiscernible) because of the shenanigans, and the other three, two of the other three went back and took the class again because they weren't ready to graduate, and the instigator wasn't ready to instigate [sic], but never took the class again.

Q. Can you have a look at tab 21 of the black binder?

A. Oh, boy. I'll tell you on the front end, I lost my glasses yesterday, so these are my pilot's glasses.

57

MR. BRAGG: I can also pull it up on the screen and maybe make it bigger.

DR. GRALA: Let's see how it --

MR. BRAGG: Tab 21 is (indiscernible, multiple speakers.)

BY DR. GRALA:

Q. There is an email exchange regarding student complaint about the work that was required after the grades were -- all the grades were due. Could you walk us through that situation?

A. There's a lot of pages here.

(Indiscernible, multiple speakers).

DR. MOORE: Let's run with what you said. So what you're saying is -- it's like the first four pages of that section, Z-20.

MS. ANTHONY: No, University.

(Indiscernible, multiple speakers).

DR. TRUAX: Chronologically, it would be from here moving forward.

BY DR. GRALA:

Q. I think you have to probably read from the back.

A. April 27, 2001. (Witness read document sotto voce.)

Oh, this is -- yeah. This is traffic.

(Witness read document sotto voce.)

58

Yeah. Li was trying to be accommodating to get the work finished that was being asked, and it appears that, because the deadlines were upon him and because we were -- I was pushing him to get this thing resolved, he basically (indiscernible) pulled back their offer allowing them to do make-up work, based on my response.

BY DR. MOORE:

Q. Would that comment -- because if you go to the first page of section 21 --

A. Yeah. This is -- again, this is reverse chronology, so --

Q. Right.

A. Okay.

Q. Dr. Kari notes that, you know, that this raises a serious enough issue that, if something formally needed to be done to address classroom issues, have an email box with nothing but teaching issues.

A. Well, as you can see, I wasn't copied on this.

Q. Yeah, that one you weren't. But she notes that there had been issues. That was 2021. Was that a common occurrence while you were department head?

(Indiscernible, multiple speakers.)

A. Hm. Well, this was never addressed with me.

BY DR. GRALA:

Q. Okay. So we'll have to continue --

59

A. Okay.

Q. -- just to make sure I can --

A. Yeah.

Q. -- talk to the next witness. So then (indiscernible) accreditation board for engineering classification and your department, now school, would have regular accreditations?

A. Every six years.

Q. My understanding is that the department would work with the accreditation body to establish a schedule for their visit?

A. That's done in the college.

Q. Okay. And once that's done, is it typical for an individual faculty to request a one-to-one meeting with the coordinator, visiting coordinator, that wasn't included in the schedule?

A. I have no way of knowing what goes on at other universities and I don't know of anybody, during the two that I was in charge of, or the ones that I participated in prior to those two ever asking -- most of the time, you didn't want to be around. I would say that it should be understood by the administration, not this one, but at the college level, that ABET's not in the grape business, so allowing an individual to come and talk, it's really up to the discretion of the team chair, the program evaluator

60

and the university administration --

Q. Okay.

A. -- as to whether it provided time. Because time is very limited on that Monday when they're visiting.

Q. If the faculty requests that meeting and their request is made to the dean over the faculty head and the dean specifically says not to schedule a one-to-one meeting with the coordinator, how would you --

A. Well, if the dean told me not to do it, then I wouldn't do it.

Q. And --

A. He's my superior.

Q. Okay. And if faculty did that independently, requested that meeting, had that meeting, what would be your course of action?

A. Well, I wonder how the faculty member would set up a meeting one on one with the program evaluator during the visit. That's something that (audio distortion) scheduled. It's extremely tight from the time they on Sunday -- or on campus on Sunday until when they leave on Tuesday.

Q. Regardless how they would do it, if they had that one-to-one meeting with the coordinator and the faculty was specifically asked by the dean not to schedule that, what would be your course of action, situation where you

61

(audio distortion)?

A. Well, I can't undo what's happened, so I would probably express my disappointment with the faculty member about going against what I told them to do. But the ramifications, there's not much I could do at that point. I can't undo the --

Q. Okay.

A. -- the meeting.

Q. Is it typical for an administrator to actually ask faculty not to schedule them --

A. No.

Q. -- (indiscernible, two speakers)?

A. No. Not just the opposite. The ABET visit, again, from my ABET hat, our goal is to find out the reality of the content of the program and its credibility. We're not interested in airing dirty laundry or anything else. We get that. I mean, we do collect that information by sitting there through the meetings, individual or otherwise, but it's not used in any evaluation. It does no harm to the accreditation process.

DR. GRALA: Okay. Committee Members, do you have any follow-up?

BY DR. KUNDU:

Q. I just want to ask one.

A. Sure.

62

Q. Because you said that you were ABET coordinator for a long time --

A. ABET visitor, and I've been a team chair on a number of visits.

Q. Have you ever experienced like that, where anyone reach out to you and you talk to that individual in any other meeting?

A. No. On the other hand, the majority of my visits have been one-on-one conversations anyway. And I schedule -- I generally schedule to meet with individual faculty. The only time I meet in groups is when the size of the faculty is so large that I just don't have the time to meet with everybody. At that point, then I group them based on some form of demographic, assistant, associate, full professor, research faculty, instructor, however I think the demographic beats. I have, as a visitor, evaluator, set (audio distortion) in the program book so I know who's there and, if there's somebody I want to see, I do that. But generally, I try and keep it one on one simply because of, as I mentioned earlier, when I've got a -- if I have a complaint with a student, when I had a complaint with student, I'd always want to separate the group so that I got everybody's independent comment rather than the collective.

Q. So (indiscernible) you said that you

63

(indiscernible) chair. So you go there. You have multiple departments --

A. Uh-huh.

Q. -- happen. Is that --

A. Sometimes it's multiple accreditations. The ABET accredits engineering, engineering technology, computer science, and natural science.

Q. So you can have a schedule, the way it's done for one department, is it going to be that format (for all the other departments? So putting one department individual meeting and that other department have a group meeting?

A. Yes, is the short answer. The departmental -- the program evaluator has the ultimate discretion to set up the program because they're intimately familiar with how many faculty, what are the programs. For example, in civil, we tend to like the -- I don't want to necessarily sit and talk to somebody in transportation if I'm trying to evaluate the transportation component based on the information I've got. So I'll break transportation off or environmental, or whatever.

On the other hand, if I don't have any substantive issues with the curriculum, I'll be more interested in maybe the resourcing, because one of the things we evaluate is does the university support the faculty, does the university support or provide resources

64

for the curriculum in a way that ABET feels (indiscernible). In that case then, what I'll do is I'll break out junior faculty, assistant, if you will, are you being supported, are you reaching tenure, are you being promoted, how are you being evaluated, yada, yada, yada, get the associates now that you've got tenured rank, let's talk about how you're being supported to get to the next level, and that kind of thing. So it depends what I'm wanting to do. But again, I generally prefer to meet individually, but I've got to do all of this in a day-and-a-half, sometimes a day. And so with anything more than about 15 faculty, active participatory faculty in the instructional piece, not possible. That's not possible.

DR. GRALA: In the interest of time, we thank you very much. We're appreciate your time and willing to come and testify on behalf the Committee.

DR. TRUAX: I'm not even testifying on behalf of anybody. I'm just answering questions. I mean, Li was the one that invited me. If you had invited me to come, I would still have come.

DR. GRALA: Sure. Thank you. I appreciate it.

DR. TRUAX: No problem.

65

CERTIFICATE OF TRANSCRIPTION

I, Catherine M. White, hereby certify that the foregoing pages contain a transcript of the testimony of said witness transcribed from Microsoft Meetings recordings TO THE BEST OF MY ABILITY.

I further certify that I am not in the employ of or related to any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature this the 12 day of August, 2025.

_____
CATHERINE M. WHITE