# EXHIBIT 28

1 (Pages 1-4)

**Page 1**

BEFORE THE MISSISSIPPI STATE UNIVERSITY
PROMOTION AND TENURE COMMITTEE

RE: LI ZHANG

_____

TRANSCRIPT OF HEARING TESTIMONY OF

ISAAC HOWARD

_____

Had on June 4, 2025
at Mississippi State University

Transcribed by: Cathy White

**Page 2**

APPEARANCES

COMMITTEE MEMBERS:
   DR. ROBERT GRALA, CHAIR
   MS. KELLI ANTHONY
   DR. MELODY DALE
   DR. DIPANGKAR DUTTA
   DR. SANTANU KUNDU
   DR. SHIEL LU
   DR. ROBERT MOORE

MISSISSIPPI STATE UNIVERSITY REPRESENTATIVE:
   DR. TABOR MULLEN

LEGAL ADVISORS FOR MISSISSIPPI STATE UNIVERSITY:
   CHARLIE WINFIELD, ESQUIRE
   ASHLYN MATTHEWS, ESQUIRE

LEGAL ADVISOR FOR DR. LI ZHANG:
   GRAFTON BRAGG, ESQUIRE

**Page 3**

INDEX

Style . . . . . . . . . . . . . . . . . . . . . 1

Appearances . . . . . . . . . . . . . . . . . 2

Index . . . . . . . . . . . . . . . . . . . . . 3

Isaac Howard

   BY DR. MULLEN . . . . . . . . . . . . . . . 4

   BY DR. ZHANG . . . . . . . . . . . . . . . 41

   BY DR. GRALA . . . . . . . . . . . . . . . 56

Certificate of Transcription . . . . . . . . . . 116

**Page 4**

ISAAC HOWARD
EXAMINATION
BY DR. MULLEN:

Q. Dr. Howard, would you introduce yourself to the Committee?

A. Sure. My name is Isaac Howard. I've been at Mississippi State since 2006 in civil engineering; became interim director in 2021, permanent director in 2022; originally from Arkansas; and glad to see all of you this morning. If you have any other specific questions, I'll be happy to answer them, but I guess that's me in a nutshell.

Q. Good. Well, Dr. Howard, I am going to ask you a few set of questions and I do ask a few things of you. One, I want to hear the facts as they were at the time that you made these decisions. Okay?

A. Okay.

Q. So I am not really interested in revisionist history, or conspiracy theory, nor anything that you think I want to hear, because you have a board of your peers here today to hear the information from '21, '22, et cetera. Okay?

A. Okay.

Q. And one of the things that I have enjoyed and gotten to see from our P & T Committee is they

Cathy M. White, CCR
cathywhitecsr@gmail.com                    601.405.3762

5

appreciate the facts and, to some extent, brevity. Okay?

A. Okay.

Q. So I want to go back to the summer of '21, and you become interim director.

A. Correct.

Q. Okay. And at that point, you are -- I assume one of the most important jobs of a department head is setting the schedule?

A. Yes. The teaching schedule is one of the important tasks that you have to do. Correct.

Q. Absolutely. And arguably, the department head is the toughest job at the institution academically?

A. (Indiscernible, two speakers.)

Q. You don't have to answer that. Okay? That's just something we've always been told.

A. There's a lot of difficult jobs at the --

Q. Okay.

A. -- University.

Q. Okay.

A. I don't know that I can make a case one way or the other. There's a lot of responsibilities on a lot of different people.

Q. But in June, you're setting the schedule for the fall.

6

A. Well, sort of. The schedule for the fall is normally going to be set well before that.

Q. Okay.

A. I was adjusting the schedule in June, once I became interim director, to make sure that all the classes that we had had sufficient enrollment and that the ones that we were going to offer had instructors.

Q. Perfect.

A. So I wasn't really creating a new schedule as much as I was starting with the one that Dr. Truax --

Q. Okay.

A. -- who recently retired had created and, you know, making adjustments as needed.

DR. MULLEN: And for the purposes of what I'm going to talk about, we're talking about Exhibit Number 9 in our packet.

BY DR. MULLEN:

Q. So tell me about what's a low enrollment?

A. Low enrollment?

Q. Right.

A. Typically, when you're in the shape the University is, is the University to consider a non -- low enrollment course is 10 undergraduate equivalents.

Q. Okay.

A. Graduate students typically count as two. So you

7

can say a course with 10 undergraduates, a course with five graduate students, or some combination that adds up to 10 equivalent would be a course that is not considered underenrolled.

Q. And in this case, you asked Dr. Zhang to consider adjusting his teaching schedule?

A. Yes, I did.

Q. And he went from a low enrollment class?

A. Yes. There was one course that had, I think was, four students enrolled.

Q. Four students? And in this particular case, he moves to a class of -- well, it ends up being around 78 students. Is that correct?

A. I think it ended up being closer to 70 once the course was actually taught.

Q. Okay.

A. (Indiscernible, two speakers).

Q. And is that unusual for a full professor to teach an undergraduate class of 70 people?

A. No.

Q. Okay. Is that pretty consistent in your department?

A. Well, in that particular semester, I looked at three or four other cases and they were all teaching two courses, and their combined enrollments between the two

8

courses would have been anywhere from a little bit lower than that so to a little bit higher than that. So it was in the range of what other tenured faculty were doing that semester in two classes, where one of them is considerably larger than the other one.

Q. And as a nonacademic, that's a pretty normal process. Does the faculty member have to acquiesce to that?

A. You mean to teach two courses in a semester?

Q. No. Just to be switched. Whose prerogative is that?

A. Well, the prerogative, I mean, the teaching schedule is set by the department head or the director. And as far as acquiescing to a course, I mean, for a tenured professor who's taught these courses before, adjusting course schedule is typically not going to be that challenging --

Q. Okay.

A. -- because you've already taught these courses before, or you're just a seated professor that, even if it is a new course, you're experienced in the field and you can adjust.

Q. And so that seems to a normal proceeding?

A. I don't have any, I guess, statistics on how normal it would be, but it would certainly not be out of

Cathy M. White, CCR

cathywhitecsr@gmail.com                                     601.405.3762

9

the range of --

Q. It definitely wasn't bias.

A. No, it was not biased, and there's no -- you know, certainly not abnormal --

Q. Okay.

A. -- to have one class that you have underenrolled and then switch to another one.

Q. Now, a lot's been said about research responsibility and teaching responsibility. Okay? And loads and releases and not supporting faculty, et cetera. Okay? Do you remember how that kind of flowed through in the summer and fall of '21?

A. Do you mean the adjusting of the courses?

Q. Uh-huh. And how that affects a faculty's load.

A. Well, the faculty, in terms of workload, the typical expectation for a tenured faculty is going to be to teach two course a semester unless there's some sort of predetermined arrangement that you make based on (indiscernible) of research or I guess other things conceivably, but I the main one would be (indiscernible) research. But those arrangements are made ahead of time.

Q. Uh-huh.

A. And, you know, Dr. Zhang came to me. We talked sometime in the month of June, and one of the things he suggested was for me to get an adjunct to teach the

10

course, which I asked him what he was planning to release from research from a salary perspective, and we had conversations off and on in June. I'd eventually put a deadline, I believe it was July 12th, but it was sometime in the middle part of July, to let me know what salary is going to be released. I never got an answer for that question. And then I proceeded to, in early August -- I don't remember the date, but it would have been well after the deadline that was set. I fixed the teaching schedule to be two courses.

Q. Okay.

A. And so those were probably the main elements that I would, keeping it brief or most relevant, that, you know, for a person to release salary to get out of a class, that arrangement has to be made ahead of time, and eventually, you get to the point where a decision has to made.

And then the other thing that we were continuing with during that timeframe is we were literally moving buildings from point A to point B. And so the summer of 2021 would have probably been the busiest period, certainly of my academic career, moving facilities while simultaneously dealing with these other things. And eventually, you get to a point where you have to make some decisions.

11

Q. Uh-huh.

A. And we were at least a couple of weeks behind when I had set the deadline. And so, at that point, I fixed the teaching schedule and we moved on into the fall.

Q. Classes start, he's ready, he's prepared?

A. Well --

Q. Let me --

A. (Indiscernible, two speakers).

Q. I take that -- I take that back. Classes go forward. Did he release his research?

A. There was a salary release --

Q. Okay.

A. -- after the deadline. I think it was 30 percent or 35 percent, somewhere in there.

Q. Okay.

A. The salary was eventually released, but it was well after the deadline that had been set for the teaching schedule.

Q. And for that salary to be released, that would have paid for the adjunct that you were willing to give him earlier in the semester?

A. Well, salary release is -- it does not necessarily have to come with the faculty member getting anything. I mean, I have -- there have been multiple faculty in our unit to release salary to the unit, because

12

you have 100 percent of your time that needs to be allocated in any given semester.

Q. Correct.

A. And one course is 25 percent of your time. And so you can release 10 percent of your salary and nothing change because you're doing -- 10 percent of your time is on funded research.

Q. Okay.

A. So there's no direct one-to-one in terms of what you release and what happens. It's not like there's a formula that is followed. But for salary release to affect your teaching schedule, it has to be done on a time scale that the teaching decisions can be made. And, in this case, it was not.

Q. Okay. I want to move ahead to November now, November of '21, and Dr. Zhang has to have surgery. Okay. And it is the responsibility of the instructor of record to teach the class at the standard that we expect at the institution.

A. That's correct.

Q. And to complete the semester.

A. That's correct.

Q. Okay. And if he can't complete the semester, then you have to make allowances for him. Somebody has to complete the semester.

13

A. That's correct.

Q. Okay. How did y'all, in November 23rd, is what I'm seeing that he had a spinal surgery scheduled for December 1st. Okay? How did y'all go about completing the class? Like, did somebody stand in? Did somebody give the finals? How does it get graded?

A. Well, in this particular case, once we became informed that Dr. Zhang had to have the surgery, the first thing we did -- and I don't remember the exact timeline, but within, you know, a relatively short period of time of finding that out, we started asking the questions, what provisions do you need, what plans do you have in place, what -- basically tell us what is needed to make this end with a successful outcome for the students and also, you know, to allow everyone, if they need to do surgeries and other, and that information was not provided. And I asked. I know Dr. Keith, who was a dean at the time, asked, and eventually, it became so dire from a time perspective that the University -- it was Kari Reeves, I believe, ended up actually taking the responsibility of being instructor of record, accessing grades, and trying to assign the most equitable grades possible in this --

Q. Okay. But when we talk about assigning grades, Dr. Reeves is a full professor in industrial engineering?

A. She was at the time.

14

Q. She was at the time. You're right. She has a distinguished career and is now at the University of Tennessee.

A. She is now at the University of Tennessee.

Q. Okay. She didn't grade anything.

A. She did not.

Q. She did not. We simply -- we, the University, went into Canvas, assessed what was done, because a professor had not responded to you --

A. Correct.

Q. -- and assigned grades based on a syllabus -- the syllabus in that some of the -- because we -- do you remember asking for the final and the key so that we could grade, or was that the dean?

A. There were a lot of discussions about the keys, the final. Whether I asked or the dean asked --

Q. Okay.

A. -- it was asked.

Q. And the dean assigned what he believed to be the most objective person to rectify the grades in this particular class?

A. That would -- I don't want to speak for the dean, but that's my impression of what happened, yes.

Q. Yeah.

A. That Kari Reeves was someone who was able to do

15

this and would be very objective in the perspective and, for that reason, was the one who ultimately kind of took on that role.

Q. Okay.

A. Now, there were others -- you know, Robert Green was involved in the --

Q. Sure.

A. There were other people involved in the process, but it was a -- it was a -- I mean, for me personally, it was unprecedented to have to be involved in something like this. I mean, there's really no way to prepare yourself, or a manual, or anything like that.

Q. Extraordinary?

A. Yes. And then once -- even when the system was accessed, looking at the grades that were actually available, it was very difficult to look at the syllabus and look at the grades that were available in the system and see that this is assigned to this, and so it became quite complicated, and Kari Reeves would have been the one who was most involved in that particular step.

Q. Okay. And I believe that is Exhibit Number 10. Grades get posted. And were you aware that Dr. Zhang, after the deadline or on the day of the deadline to submit finals, emailed his students directly, the darkest day? There's a little later on, but

16

previously, he had -- and I believe this is in Exhibit 10, as well -- tells students he graded their finals, graded while on pain medicine, did not finish all the grading, so grades may change?

A. I'm aware of the email. The exact -- the day or the (indiscernible) --

Q. Yeah.

A. It was in the same timeframe, within a few days, yes.

Q. Uh-huh.

A. Yes, I am aware of that.

Q. And you're also aware of this darkest day email?

A. Yes.

Q. Okay. And that, obviously, the Committee has seen quite a bit and heard testimony on. All right. So not the greatest fall of '21. Okay? But life happens, you know, surgery. So we put Dr. Zhang back in the classroom?

A. Yes. There was a meeting that occurred in between semesters. I believe it occurred in early January. Either way, it was between semesters where, I believe, a member of the faculty senate was present, myself, Dr. Keith, Dr. (indiscernible, two speakers) --

Q. Uh-huh.

A. -- and there may have been -- Dr. Zhang was there

**17**

and there may have been a couple of other people there. I can't remember at the time. But there was a discussion to try to avoid another example of these types of behaviors occurring in the spring. And then, yes, Dr. Zhang went back in the classroom --

Q. Okay.

A. -- to teach one class in the spring of 2022.

Q. While we're on that subject, Dr. Zhang was on approved medical leave for his surgery.

A. During -- you're talking about in December of '21?

Q. Yeah. I'm going back a little bit.

A. I understand. The medical leave, you know, Dr. Zhang informed us that he had a spinal surgery to have to do, and I've heard the December, the dates, you know, I don't think they're relevant, but early December, and there were a lot of, we'll just say, challenges with his leave paperwork. And there were several instances, I don't have a number of how many, where his paperwork would have been returned and those instances would have been at the direction of human resources.

Q. Okay.

A. They were not to say don't have surgery, or don't rehabilitate yourself, or anything of that nature. This was simply matters of course that the leave forms need to

**18**

be filled out correctly. And I always was of the perspective that that was not being understood, even though it was being clearly conveyed, is that no one is trying to prevent you from having the medical care you need, but at the same time, these forms need to be filled out correctly for processing.

But in many cases, those forms are not filled out until the process is over. I mean, if someone gets the flu and starts to -- this may be a little too much information, but if someone wakes up with the flu and is throwing up, they don't have to come to campus and sit in their office until I approve their medical forms. You know, they go get the care that they need and, once they have recovered, they then come back and fill out the paperwork in accordance with the University policies. And so, from my perspective, there was a lot of misunderstanding in communication about the forms themselves and the timing in which they needed to occur.

Q. Right.

A. And that became -- there were a lot of challenges in that area.

Q. And this process is handled by an archaic, burdensome process -- burdensome is a tough word. Troubled process in eForms?

A. EForms are -- I guess everyone's got their own

**19**

opinions --

Q. Yeah.

A. -- about eForms. They can be complicated on occasion, but at the same time, you know, paperwork has (indiscernible, two speakers) --

Q. Sure.

A. I don't think that eForms themselves -- I mean, I know a lot of people on campus complain about eForms.

Q. Okay.

A. I'm not going to deny that. But I don't -- I don't have a better answer, either. I mean, you know, paperwork sometimes can be complicated.

Q. Yeah.

A. And so I'm not going to be the person that's criticizing the thing with no solution for improvement. And so that can be kind of tedious. But I will also say, when it comes to medical forms, our human resources group does a very good job of walking you through what needs to be done.

Q. (Indiscernible, two speakers).

A. (Indiscernible, two speakers) Anyone.

Q. Okay.

A. And so in some of these situations, if I had a question, I would just call human resources. And so there were multiple eForms, we'll say, returned or denied or

**20**

rejected --

Q. Uh-huh.

A. -- whatever word you want to use there, and in a lot of those cases, I was literally on the phone with human resources saying, what does this form need to have in it to be in proper accordance of what's actually happening, and they would say, send it back to the user with this note --

Q. Uh-huh.

A. -- which I would do, and that doesn't -- that's not to say that you're saying you can't have the surgery. That's saying that policies need to be followed in such a way that the procedures you're having match the paperwork that is being submitted.

Q. Right.

A. And that -- I really feel like that became something far different than it really was. It was a paperwork process, not a, you know, we're telling you not to get --

Q. Right.

A. That's between you and your physician, not between you and I.

Q. I have employees that have to send eForms back, too, and there's no "nice" button to send it back. There is a "disapproved" and put a reason --

21

A. Yeah. It's just kick it back and -- or send it back.

Q. But any time you disapprove anything, you have to put an explanation that the end user has to affirm.

A. I don't know that that's required in all cases. That certainly is the normal process.

Q. Okay.

A. I wouldn't --

Q. Okay.

A. I'm not --

Q. That's fine.

A. -- (indiscernible, two speakers) to say you must do that, but that is the normal procedure.

Q. But to be clear, you never denied anybody medical leave?

A. I don't have the powers. No.

Q. That's enough said.

A. How can I possibly do that?

Q. So we had a meeting in January where senior administrators, Dr. Zhang, and the faculty senate, among others, and we start the semester. How far do we get into this particular semester -- and I'm talking about the spring of '22 -- where problems arise?

A. It would be difficult for me to give you an exact time because I know, in some situations, you know, the

22

problem -- you know, sometimes you have to get a little bit past the problem to realize the problem started a week ago or --

Q. Right.

A. -- something of that nature. So I can't answer exactly when the problems would have started. But well before the end of the semester, students started to complain not only to myself, but to other administrators, about some aspects of the course. And so I don't have a date for you, but it would have been well before the end of the semester.

Q. Would late February --

A. That could -- that's very --

Q. Okay.

A. -- reasonable as a possible date.

DR. MULLEN: Well, I would point the Committee now to Exhibit 14.

BY DR. MULLEN:

Q. You run a pretty robust department and you have -- and I don't want --

A. We have a lot going on. I don't know that --

Q. Well, I think that's saying it mildly. But you also run a department that has some of the top achieving academic students at the institution. And that's not to knock any other college, but that is the truth.

23

A. We are very proud of our students --

Q. Okay.

A. -- in civil engineering, and I think university-wide, you know, we also -- we have a great group of students on this campus as a whole, and certainly civil engineering encompasses that.

Q. And by the time of February, your students, undergraduate, by and large, are figuring out what their next step is from a job perspective.

A. In a senior level course, like would have been taught by Dr. Zhang, a significant number of those students will be graduating in May or, if not May, August, certainly sometime that calendar year. Most of those students would be receiving their degrees. A lot of them would have been looking to graduating. I don't have numbers on how many, but in a typical semester, you're looking at very soon to be engineers in training in construction companies, design firms, agencies.

Q. And unlike -- you know, I was a history major as a BA, and, you know, I was just trying to get to graduation. Okay? And I'm not going to knock any particular major. But when you're an engineer in civil, the idea of learning -- and I think Dr. Zhang even said this yesterday very well -- is that we're learning because we're building bridges, we're building roads.

24

A. Uh-huh.

Q. No one died -- would have died if I had not completed my history thesis. Okay? I could have mucked through it. But you're training people to become PEs.

A. That's correct.

Q. And build roads that we have to drive over.

A. That is correct.

Q. So integrity is a little more important.

A. Well, integrity is important everywhere, but I would -- I think, from an engineering standpoint, we take civil engineering very seriously at Mississippi State.

Q. Yeah.

A. Civil engineering in the southeast, Mississippi State is one of the first places to really become strong in that area.

Q. Uh-huh.

A. And we take that reputation extremely seriously. When you join the civil engineering and environmental at Mississippi State --

Q. Right.

A. -- you're joining something that matters.

Q. We heard about how important accreditation was yesterday.

A. Okay.

Q. And I may want to come back to that.

Cathy M. White, CCR

cathywhitecsr@gmail.com                                                601.405.3762

25

A. But I think, from the perspective of the students, these are -- the students that would have been in this class would be future leaders in the profession. They will be treating the water you drink and the roads you drive on, the bridges, the buildings. I mean, these are, by and large, a very serious, for this age group of people, who, for large numbers of them to have a serious problem with a class is highly unusual.

Q. Okay.

A. We frequently have a student complaining about anything. I mean --

Q. Yeah.

A. -- I don't think that's possible to avoid. But to have a large number, I mean, maybe half the class -- that number is not a literal number, but a very significant percentage of the students complaining about something, the odds that there's nothing there is extremely low.

Q. Have you --

A. Many students already have jobs. What purpose would they have to complain and to go out of their way to say certain things if they've got a three-point-something GPA, they've already got a job? Most -- if there's no problem, you're not going to hear from that many students, in my opinion.

26

Q. And, Dr. Howard, you know, I'm also going to have another witness who's going to talk about this, but you and Dr. Green vetted these initial complaints?

A. Yes, we did.

Q. Okay. Regarding the traffic count. Or we'll call it the traffic project.

A. There were more than just the traffic project, but students that -- it came to our knowledge that there were some complaints. I believe students sent an email that they had listed a bunch of other people that also had similar complaints. And so Dr. Green and I had a meeting where we basically told them we're going to be -- I'm pretty sure it was in my office, and whoever wants to come, come.

Q. Okay.

A. But they only sent a few the first time, maybe -- I don't remember the number, three or four. That number is approximate.

Q. Uh-huh.

A. But, you know, a relatively small number. And they started to describe a lot of complaints.

Q. Uh-huh.

A. The traffic project being one of them.

Q. Okay. So is it safe to say that they felt unprepared and unsafe in this lab component to an lecture

27

class?

A. I would say "unprepared" was the more common phrase of some of the students than "unsafe."

Q. Okay.

A. I think the concerns for safety were there maybe on occasion with the students, but concerns for safety were there more from our perspective.

Q. Good point.

A. That, you know, you're 21, 22, sometimes you're not afraid of as much as you should be. And so they -- there wasn't really, from my memory, a lot of safety --

Q. Uh-huh.

A. -- concerns from the students, although there were a couple. I'm not saying that it was not there.

Q. Sure.

A. But it was not the main thing. It was the, we don't really know what we're doing, why do we have to, you know, be at a required place for a required time for a lecture class.

Q. Uh-huh.

A. Why are we having to do all these things where we don't really understand what we're supposed to be doing. There were a lot of concerns that students said they were being threatened with honor code violations. There seemed to be a lot -- a disproportionately large number of people

28

concerned about being turned in to the honor code. That was a big thing. So the project was definitely an unpopular thing with the students, but I wouldn't say safety was their biggest concern. It was certainly one of mine.

Q. Well, you did kind of set the scenario that you have high-achieving students who want to graduate.

A. The idea that these students -- that's true, but the idea of a lot of these students, they wouldn't graduate, was unfathomable to them. I mean, they're high-GPA students making good grades in all of their classes. You know, the fact that they would be in a situation where they just --

Q. So (indiscernible) --

A. -- (indiscernible) course at that level could cause these problems.

Q. So a 21-, 22-year-old with a grade that they've got to have to graduate being held over their head probably is not as concerned about safety as the adults.

A. That would be -- that's -- and, again, I'm not --

Q. Is that the sentiment you felt?

A. Yes, it is.

Q. Okay.

A. I didn't feel that there was -- you know, they didn't come to us feeling -- the biggest -- I think the

29

initial biggest issue with them was how are we going to get all this done, we don't understand what we're supposed to be doing, we're having to go to a place that's outside of the class time, and then also, we keep hearing honor code, honor code, honor code, honor code.

Q. Yeah.

A. That those were probably the initial, I guess -- again, it's debatable, too.

Q. Okay.

A. I mean, it was basically just a very -- I don't want to say "scared" is the right word, but very animated, very frustrated, very confused group of students.

Q. Uh-huh.

A. And, again, it was a lot of them. It wasn't a student or two students. It was a lot of students.

Q. And, Dr. Howard, like I started this, I appreciate your telling it the way you remember it in the time.

A. Sure. I mean, it's been a long time. I mean, there's always the possibility that --

Q. It's fine.

A. Time has a way of making use of memory, I (indiscernible).

Q. So you, who is effectively the head of undergraduate affairs in the Bagley College of

30

Engineering, Robert Green, who is assistant dean at that particular time --

A. That's correct.

Q. -- vet this information and take it to the dean?

A. Well, Robert -- I don't know that I ever talked specifically to Dr. Keith.

Q. I'll let Robert speak to --

A. Either way, it was taken to the dean.

Q. Okay. And the dean ends up telling Zhang he cannot have the students do the traffic project.

A. He was told the traffic project is not something he needs to do by more than just Dr. Keith.

Q. Okay. And what does then -- and I'm going to point to Exhibit 18 at this particular point.

And then, effectively, you get feedback that the dean has told Zhang don't do it, and then students start saying, hey, somebody must have talked to him. They felt like they had been retaliated against.

A. The students themselves --

Q. So a dean --

A. -- I don't know that that happened exactly that way. There was concern from the students that they would be retaliated against, but I don't know that there was ever one day where that feeling started. There was definitely a concern from the students of retaliation from

31

Dr. Zhang.

Q. I'll just let you read 18.

A. Again, that (indiscernible) one of those situations where there was one event, but --

Q. So if Dean --

A. -- I remember it being an issue) but not one specific --

Q. Perfect.

A. (Indiscernible, two speakers.)

Q. Perfect. So, effectively, Zhang tells the dean that (audio drop).

A. That is effectively what happened, yeah. That he was going to continue with this traffic project despite a direct statement from the dean.

Q. And, ultimately, he has to be removed, Number 16. And that's how that happened.

All right. Did we have to call Kari back in?

A. I don't understand.

Q. Well, grades have to be assigned.

A. Oh, you're saying did Kari Reeves --

Q. I'm asking how the grades got placed.

A. In that particular case, the dean's office largely handled the grades --

Q. Okay.

A. -- the same as --

32

Q. Okay.

A. Yeah.

Q. Same as the previous time?

A. Yes.

There was another situation that was -- it was just so flabbergasting to be in that situation again. It was a very -- very unfortunate to be in that situation again.

Q. Just to sweep the corners on these two semesters -- okay? How many full professors do you have in your department?

A. Right now, or at the time?

Q. At the time.

A. At the time, if you count myself --

Q. Were you teaching?

A. Yes, I was.

Q. Okay.

A. You would have had -- Farshi Vahedafar (phonetic) would have been a full -- he went up, I believe. And I didn't prepare for this one. I believe Farshi became full professor in the fall of 2021.

Q. Okay.

A. I believe he submitted his package in 2020. Dr. Zhang, I'm fairly certain, became a full professor in the fall of 2021, as well. And I think those would have

33

been the only three at the time, because Dr. Martin had retired. No, no. Dr. Goude (phonetic) would have been there, as well. We had a lot of people on the associate to full, so the exact year of promotion sometimes --

Q. Understood.

A. But three or four, approximately.

Q. I'll rephrase it. How about we do this? Of all the tenured professors --

A. Okay.

Q. -- how many did you have to remove from their teaching responsibilities that semester?

A. No one.

Q. No one?

A. I've never been involved with a situation like this, before or since, with anyone.

Q. Okay.

A. Tenured or untenured. This is --

Q. So this isn't a regular occurrence?

A. I've never been a part of it. Honestly, until this happened, I'd never even really heard of it. It's one of those scenarios that I just would have never thought to prepare myself for.

Q. On --

A. I've been at Mississippi State, I guess, 19 years now and --

34

Q. Okay.

A. -- in civil engineering, it's just -- I mean, this is very unprecedented.

Q. Unprecedented.

A. I can't speak to the rest of the campus, but in civil engineering, this has not happened.

Q. But you haven't have had to appear before the P & T Committee to do this before?

A. No.

Q. Okay.

A. No, I have not.

Q. Okay. Just to show you what students thought about that particular class, I would like for you to look at Exhibit Number 17.

Dr. Zhang goes on sabbatical soon after that.

A. I believe Dr. Zhang went on a sabbatical in the fall of 2022.

Q. Let me get to my stuff.

A. Summer to fall of 2022.

Q. Yeah.

Oh, summer, he doesn't teach a class and then, on the fall of '22, he goes on sabbatical?

A. Yeah. I believe it started in the fall, but somewhere in the summer, fall.

Q. Okay. You mentioned earlier accreditation and

35

how important that is.

A. In engineering, accreditation is essential because accreditation is required to become professionally licensed.

Q. Okay.

A. Without a professional license, you're -- it is very (audio distortion) for lot of engineers to practice in the way that they would like to.

Q. Got it. And your accrediting group is called?

A. ABET.

Q. Okay. When they come accredit (audio distortion), briefly tell me kind of what a schedule of ABET looks like. And do you set it or does the accreditation group set what they want to see?

A. Typically what happens with ABET, we'll say best case scenario, it's the one that we're typically accustomed to here, you have a six-year accreditation cycle. So if your program is strong and they don't have concerns, you get evaluated once every six years. So what that will mean is, the year before that, you produce what's referred as a self-study report. A self-study report would be in, say, year five, if you will, of the accreditation cycle. You would submit that to them. You would be assigned what's referred to as a program evaluator or a PEV. This will be a faculty member at

36

another university in your area, so it would be a civil engineering professor.

In our case, it was someone from California, Dr. Gupta, Dr. Grupa. And in his particular case, what you do is, once that program evaluator is assigned, there are certain elements that are going to be there, like, for example, he is going to brief the president at the end, he is going to meet one on one with the director, and there's a couple of elements that are going to be in any visit. But otherwise, the PEV largely tells you what they want you to do. They will tell you, I want to meet with all the tenured faculty one time, or I want to meet the tenured faculty one at a time, or, you know.

Q. Yeah.

A. So for the most part -- and, again, I'm not that versed on how that happens nationwide, but in the cases I've seen, the program evaluator dictates the schedule more than everyone else combined because, ultimately, they are the one who recommends whether you maintain your accreditation or not. And so, needless to say, they are in a position of significance to your unit --

Q. Uh-huh.

A. -- when they are there.

Q. And in this particular case, did our accreditor ask to speak with faculty collectively or individually?

37

A. Collectively.

Q. Okay. You know, we're all in higher ed and understand the gravity of not doing anything to hurt accreditation. How long has civil engineering, environmental engineering been accredited?

A. Oh, for years. I mean, as long as modern memory.

Q. Okay.

A. I mean, I couldn't give you a -- we became -- I mean, the college of engineering was formed in 1902. Civil engineering broke off in 1924. And if there were accreditations at that time, I'm sure they had them.

Q. Uh-huh.

A. I can't speak to that specifically, but we've been accredited continuously in the modern era.

Q. Did anything go wrong in our accreditation?

A. We ultimately were accredited. Dr. Zhang met with the program -- requested to meet with the program evaluator individually after being told by the dean do not do that. Dr. Zhang requested to meet with the program evaluator individually before his arrival. He was very clearly instructed by the dean that is not part of this visit. He then proceeded to schedule, while the program evaluator was there, to meet with him one on one, which was --

Q. Problematic?

38

A. -- unfortunate.

Q. Okay. I am running down on time, so I want to go through a few items really quickly.

Why did Dr. Zhang's '21 and '22 annual reviews -- they're really close in timeline. Can you explain that?

A. What happened with the annual reviews for both 2021 and 2022, you know, unit-wide, all faculty, all staff -- 2021 was probably the hardest year in the history of the civil engineering school. We had COVID, we had a 40-something-year long director retire, and we were moving into a new facility. So we were simultaneously dealing with all of those matters.

And I was in an interim role. By the time we got to -- into the building and established, I just ultimately elected to do the 2021 and the 2022 reviews together. The 2021 was going to be late no matter what at that point, and there was a search for a director, and there was a point where, you know, they were interviewing other candidates beside myself, and so there was a distinct possibility I was not going to be the director, and the first two interviews that occurred were not me. And so in that perspective, I elected to just wait and see who the director became. It ultimately became me. And then after that, just elected to do the two years together. I mean, it's definitely not an ideal scenario to do two years of

39

annual reviews together, but I'm pretty certain Dennis, my predecessor, Dr. Truax, my predecessor, I'm pretty sure we did two years back to back one time a few years ago. I'd have to look back at the detail. But, you know, it was not -- they were done together for everyone. It was late, but it was done for everyone.

DR. GRALA: Dr. Zhang, you'll have your time to cross --

DR. ZHANG: I mean, just to (indiscernible) know, each time, no matter how long -- you like to ask Dr. Howard, I can be (indiscernible).

DR. MULLEN: Sir, I so appreciate that, but I really want to stay and do our (indiscernible) time.

BY DR. MULLEN:

Q. I feel like we've swept a lot of the corners of things that have come up, that you have handled your position in a consistently fair manner. Do you have a personal vendetta against any of your faculty?

A. I do not.

Q. Are you even capable of creating this large conspiracy that would result in this hearing?

A. I'm nowhere that powerful, no. No.

Q. Just not -- it doesn't seem to be in your mindset, anyway.

A. I wouldn't do it even if I could.

40

DR. MULLEN: Yeah, yeah. I think you're a very good department head. Puppet master, I'm not so sure about.

But I'm going to confer with Ashlyn just really quickly, if there's anything I need to...

And at this point, sir, we rest.

DR. GRALA: Thank you very much.

Dr. Zhang, now it's your half an hour to cross-examine the witness.

DR. ZHANG: Can I take a couple minutes?

DR. GRALA: Yeah. Let's take a five-minutes break for bathroom or any other --

DR. ZHANG: Okay.

(Recess.)

DR. GRALA: I'll give you half an hour time to cross-examine Dr. Howard.

DR. ZHANG: Can I make a request to get a textbook from my office? I'm just trying to show you, the traffic counts is just one of the homework in the textbook. Because I was locked out of office. I was not allowed on the campus. Is that possible? I can show you that is one of the homework question in the textbook.

DR. GRALA: Okay. We'll come back to that after we've completed cross-examination. We'll also look into your syllabus just to see. You sent a description of

41

that.

DR. ZHANG: By the way, I probably will have to obtain everything from you guys because I don't have any access in my OneDrive. I try to search if I store somewhere else. I can find out yesterday that the best way is to added to package from my wife or Dr. Howard, if he can get the syllabus for that course for me.

DR. MULLEN: I have the syllabus for you.

(Indiscernible, multiple speakers).

DR. GRALA: As far as the OneDrive and other aspects, we'll have to consult with Ms. Lucas, see what is the process for that.

DR. MULLEN: I'm remiss that, when the Board -- excuse me -- the Committee requested documents, I cc'ed your chair on everything, and it's all been sent to you. I do forget about counsel, and so that has all made its way to the appropriate groups now. I'll note --

MR. BRAGG: It's a reflex in our field.

DR. MULLEN: Yes, yes. In my field, it is service to the Committee, you know. That was not an intentional move.

DR. GRALA: Dr. Zhang, let's start.

DR. ZHANG: Okay.

EXAMINATION

BY DR. ZHANG:

42

Q. First question, Dr. Howard. Is that true you accept personal accountability for the truthfulness and the completeness of your testimony here today? In other words, you're sure that your statement will be uphold in the integrity and the personal ethic expected of MSU, abide by HRA?

A. Yes.

Q. Thank you. Followed by the question that you have said of your (audio distortion,) you have mentioned that there are the, you know, first one that belonged to the (indiscernible,) that three, four students come to see you. Are you comfortable to release those students' name?

A. That will be up to legal counsel whether or not they want to release the students' names. That is not -- that's not -- that's a legal counsel question, not a question for me.

Q. Okay. Do you know about those students complain to me -- complain about me, how many students was in the four (indiscernible) in January class?

A. I do not know.

Q. Is it true, you don't have any documentation indicating my research was unsatisfactory that has been vetted through the grievance process or by any other any other University committee?

A. Are you asking if your unsatisfactory annual

43

review in research in 2022 was vetted by a committee?

Q. By another committee or by the grievance committee or process, appeal process.

A. If you're -- you appealed the annual reviews that were made, and the only appeal that I ever saw was Dr. Keith's, and Dr. Keith upheld the original reviews. And so beyond that, I made the recommendations and the appeals process doesn't involve me, obviously, because it would be appealing me.

Q. Do you mind to have a "yes" or a "no" answer?

A. Say it again.

Q. Do you mind if I have a "yes" or a "no" answer?

A. A "yes" or a "no" answer --

Q. Uh-huh, for that question.

A. Can you repeat the question again?

Q. Okay. You don't have any documentation indicate my research was unsatisfactory that has been vetted through the grievance process or by other University committee?

A. The way you've asked the question kind of leads me to the answer of no.

Q. That's up to you. You can say "yes" and (indiscernible) you have to say "no."

A. The process itself, the reason -- one of the reasons that you got an unsatisfactory rating in research

44

in 2022 is you got a formal reprimand from the vice president for research and economic development. As far as what happens beyond that, I made the recommendation and University process handles the recommendation the way they choose. It doesn't involve me from there because it's a grievance against -- or it's --

Q. Okay.

A. -- a complaint against me.

Q. Okay. Is that a "yes" or "no" answer?

A. The answer to your question is that the University has a process for grievances, and you would have to speak to the University on the specifics of that. I'm not here to speak on behalf of the University.

Q. Okay. Thank you.

A. You're welcome.

Q. Is it true that you don't have any documentation indicating my undergraduate teaching was unsatisfactory that has been (indiscernible) with the tools of the grievance process or by any other University committee?

A. My answer would be exactly the same as it was on the previous question.

Q. Okay. Is it true that you predetermined in the email to provost, Dr. David Shaw, and then the dean, Jason Kate, that my 2022 and the 2021 annual review was, quote, about the March (indiscernible) from 2020 as through could

Cathy M. White, CCR

cathywhitecsr@gmail.com                                     601.405.3762

Page 45

justify, end of quote, and your (indiscernible) quote, very often to lowly reaching, if that makes sense to the group. Is that also true you to define MSU policy which the annual review from the (indiscernible) from outcome in our conversation first instead of predetermined that was the administrators first?

A. Your annual review result was definitely not predetermined. I put together your annual review, and there were a lot of -- by the time your annual reviews happened, there were a lot of discussions that were occurring relative to any number of things. You had been removed from two classes. You had a formal reprimand from the vice president for research. And during that process, there were a lot of people trying to understand what all has been happening relative to your overall reviews. And so was your review predetermined? No, it was not.

Q. Can you verify as -- can you see Exhibit 41?

A. Exhibit 41?

Q. Uh-huh, Z-41. Last sheet from the bottom.

A. Okay.

Q. Can you confirm the quote I just say?

A. Can I confirm what?

Q. The quote, quote you in email.

A. Yes. You are taking excerpts from an email, according to Exhibit Z-41, that I sent on August 30th,

Page 46

2023, at 6:25 p.m.

Q. That's "yes." Right?

A. Yes. You are reading from that email, that is correct.

Q. It's -- okay. Thank you.

A. You're welcome.

Q. Can you confirm you didn't sign the annual review for 2021 and 2022?

A. I signed your annual review form in 2021 and 2022.

Q. You signed it?

A. Yes, I did.

Q. Okay. And can you go to MSU's -- MSU's annual -- 23. MSU's Exhibit 23.

(Indiscernible, multiple speakers).

A. Exhibit 23?

BY DR. ZHANG:

Q. Okay.

A. I'm at Exhibit 23.

Q. Can you show me your signature?

A. I don't know if my signature is in this or not. (Indiscernible) signing something in Exhibit 23.

Q. Can you show me Exhibit 24, signature for the 2022?

A. It's going to be the same answer. I can't speak

Page 47

to whether or not --

Q. Okay.

A. -- what's in the --

Q. (Indiscernible, two speakers) the annual review without your signature is invalid?

A. Annual review without my signature, you're asking is it invalid?

Q. Uh-huh.

A. That would be a question for legal counsel. I do not know.

Q. Okay. Thank you. (Indiscernible) that a college policy about the course assignment was 25 percent research.

A. Right.

Q. And you got one deduction of the course.

A. I am not familiar with the specific policy.

Q. Okay.

A. I would even go as far as to say that Dr. Keith actually tried to put such a policy through the faculty senate recently relative to actually defining departments for faculty and releases, and that was protected by the faculty senate.

Q. Okay.

A. So I am not aware of such a provision.

Q. Okay. We can show him -- was confirm that 25

Page 48

percent redistribution gives faculty a course load, one-course load in the -- in the review, in the accreditation ABET review documents?

A. Could you ask that question again, please?

Q. Yeah. Can you confirm that 25 percent research will reduce a course reduction in the ABET report?

A. I would -- a 25 percent reduction, if it occurs on a timely basis, certainly can result in a teaching reduction, but it does not have to.

Q. Okay. Did you make the full disclosure to ABET about your point?

A. ABET never asked that question, so, no, I didn't go out of my way to make that point when it wasn't asked.

Q. Your point is that -- well, you know, you say that ABET, you told ABET 25 percent is a -- you know, we reduce the faculty course.

A. No, I did not say that.

Q. Okay.

A. I said that --

Q. Okay.

A. -- 25 percent reduction can, if done in a timely manner. I never said anything about ABET one way or the other.

Q. Okay. Okay. Thank you.

A. You're welcome.

49

Q. And is that true, you don't have any documents complain about me that has been vetted through -- in the same grievance process or by any University committee?

A. Dr. Zhang, in the interest of your time here, any time you're asking me about vetting out the grievance process, my answer will be the same, that you can speak to the grievance process, that is, to them and not me.

Q. Okay. You don't want to give a "yes" or "no" answer to that?

A. It's not my answer to give. It's the grievance policy's answer to give.

Q. Is that true, you don't have any documented complaint about me that has been discussed to with me in details, line by line with me, and the (indiscernible) solution we sitting together to get -- about those complaints? Is that true?

A. If I understand the question, it says, do I have a list of student complaints that I have walked through you, line by line, to work toward a resolution? Is that your question?

Q. Uh-huh.

A. That I've done that? No, I have not done that.

Q. Okay. Thank you.

Is that true, when you support Dr. Jason Keith's decision to remove me from (indiscernible) for a

50

(indiscernible) class in spring 2022 after the master class session ends? Exact date that I was removed on May 3rd of 2022. Neither you or nor Dr. Keith stated any policy that would justify remove of the instructor.

A. Is your question that there's no policy to justify your removal?

Q. If you remove me from instructor later and you supported, you know, Dr. Keith's decision -- right? -- in the email, and that you also does not mention any policy to justify that and Dr. Keith does not use any policy to justify that. Is that true?

A. Well, the University has policies relative to insubordination and defiance. I mean, your behavior had escalated beyond insubordination to just complete defiance. When it came to things like this last project, you were requiring students to do something outside of normal classtime, which is not something that we do. And then you were also not taking instructions from not only your director, your dean, legal counsel, you were repeatedly told that this project where you were requiring students, without proper personal protective equipment, training, or other types of traffic control, outside of classtime, to do a required project for a lecture course, not a lab course, you were told repeatedly that was something that you needed to stop doing. And that level

51

of defiance is --

Q. I'm asking one email.

A. Oh, I don't know about any one email, but I'm talking about the overall sequence of events. You were defiant across the board to any instruction from anyone.

Q. Okay. Okay. I sense that you don't want to answer that question. That's fine.

Is that true, in the summer of -- you set up a dateline app for me to submit a percentage of the research submission, and that I am the only person that you asked to submit the percentage of the distribution data, not require all other faculty to submit their research submission requirements?

A. They weren't asking to be out of the class. There was -- you're the only one asking to be out of the class. You're the only one I was talking to about being out of the class.

Q. Does that -- Would you mind to have a "yes" or "no" answer, if you can?

A. The timeline of when people were asked to release their salary would have been during the summer. The only person I was interacting with specifically on your class and your release was you. If another faculty would have said, I want to be out of my class, I would have been asking them the same questions I was asking you, but they

52

weren't, so I didn't.

Q. Is that true that there was a promotion chair just a few months before you were appointed as interim with your actual at the time when you asked me about the distribution and, also, as the interim director, you already aware that I have a heavy research load? Are you aware of that?

A. I'm not sure how you define a "heavy research load," so --

Q. Means just the highest in the department.

A. How would you define that? What is your definition of the highest research load in the department?

Q. That was from your email, I have the highest percentage of the research release.

A. Are you referring to --

Q. (indiscernible, two speakers.)

A. Are you referring to those overhead distributions?

Q. Uh-huh. Uh-huh.

A. The overhead distribution sheets that you're talking about are not the way we measure research productivity. So for example --

Q. Let's talk about the time release.

A. If a faculty member has --

Q. Time release.

Page 53

A. I understand what you're talking about. I'm trying to answer your question, sir. The fees that you were provided that are overhead release, if a faculty member has a large grant at a research center, almost all of that grant isn't even counted in that because most of that overhead is going to the research center. So they're taking departmental-level overhead sheet, and to equate that to research productivity is not something that would be substantiated throughout campus.

If you really want to look at research productivity, you go to the office of sponsored projects, get the internal approval sheets, take the percentage credit that is given on those internal approval sheets, and use that as a metric, not the internal unofficial overhead generation that we use. It does not -- you know, that's only money coming into the department through overhead. Different research centers have different overhead return policies and then there are a number of other things that make that one potentially highly skewed metric, it could be a metric, but it is, by far, not the only one. I mean, there are many metrics to document research productivity, not just an overhead --

Q. So what you're saying is that my research contribution or the time release is -- using that one is -- I just want to you to confirm I am not the highest,

Page 54

one of the highest, that is, contributor to the research time release.

A. You have to document what you mean by "research productivity" because it's --

Q. Well, time release.

A. On release?

Q. Uh-huh.

A. Which semester are we referring to? Because --

Q. Well, this fall 2021.

A. For the one semester, in the fall of 2021, you were one of the higher releases in that semester, that is correct.

Q. Right. So you don't need me to fit a number exact. You (indiscernible) interim school until after, and as evaluator to my annual review, you are aware of that, are you?

A. Yes, I am.

Q. Okay.

A. And that was in 2021.

Q. Right.

A. When you were received a satisfactory research evaluation.

Q. Okay. Thank you.

A. You're welcome.

Q. Is it true, when (indiscernible) a merit request

Page 55

for research distribution and the reply heard the next day about my percentage release, that is still (indiscernible) before the class start. If my memory is correct, it's around 10 days before the class start, or maybe one week, at least. Can you acknowledge about that? And you say that I have 32 percent of release. Is that a true way to make any change, and one was a reason for -- well, is that a true way to make adjustment of the cost?

A. At that point, I'd already made the final decision on a teaching schedule, and I told you I was going to be doing that already. So at that point, with all the other things that are going on, moving buildings -- you know, the unit has more going on than your teaching schedule. I think you're aware of that. But in this particular context, that decision had been made and other matters were being tended to at that time.

And as far as that particular email that you're referring to, in that email, if you read the whole email, one of the things you said is that you -- you effectively said you're agreeable to teaching that class, you just want a teaching assistant's support, to which I granted.

Q. Did you grant the TA when I asked for one of my students to be my TA then? Did you approve that student to be my TA?

A. I gave you a couple of options in the email that

Page 56

were -- that met the requirements that you had put. I gave you -- you said you had a couple of different scenarios, and I gave you one of them. I think I even let you pick.

Q. Is it true that, due to my sabbatical in fall 2022 and you email MDOT about I don't want to finish the project (indiscernible), and you have never talked with me before, and then you just spread there was an email around to MDOT and if it (indiscernible)?

A. I'm not sure what you're referring to with an email to MDOT on (indiscernible).

Q. If you don't mind to turn to Z...

DR. ZHANG: Do I have time?

DR. GRALA: Yes, yes.

DR. ZHANG: Okay. We'll follow with the paperwork. Thank you so much.

Thank you, Dr. Howard. Nice to see you.

DR. HOWARD: Great to see you.

DR. GRALA: Thank you very much. The Committee would like to take maybe 10 minutes' recess and we go can over the questions that we'll ask.

(Recess.)

EXAMINATION

BY DR. GRALA:

Q. Dr. Howard, thank you very much for being

57

here. We understand this is an uncomfortable situation for both parties. We have several questions that we would like to ask. And we also understand that there might be some questions that you might not be able to answer.

A. Okay.

Q. Just perhaps you were not involved in the decision-making.

A. Okay.

Q. The first we would like to ask, so, originally Dr. Zhang had two courses assigned and, if you could remind me, which year was it?

A. (Audio distortion.)

Q. We had CE 8133, which is a graduate course. We had four students enrolled there. And then he had a CE 4113, 6113, where he had 14 undergraduate students enrolled, and the schedule was Tuesdays and Thursdays. Later, his schedule was changed to -- well, he kept we where we had the 4,000, 6,000 course. Graduate course, 8133 with graduates students was removed and, instead, he was given CE 3113, where he had 71 undergraduate students. And that changed his scheduled to -- I mean, the course load was basically the same, but his schedule changed from Tuesday-Thursday to Monday-Friday, every day. Did, at that point, Dr. Zhang requested or communicated any accommodation because of his family situation and he has

58

son with special needs.

A. You're asking did he?

Q. Yeah.

A. Yes. He wanted his courses moved to where they were all on either, like, Tuesday and Thursday or Monday, Wednesday, and Friday, but that's just not possible to move 70 students at that point. They're in quarantine. But, yes, he did communicate the desire to have the courses all on one day or --

Q. So was it impossible because simply there was no time slots that would be available, or was it conflicting with other required courses that those students would have to take, or --

A. It would conflict with everything. You have students that you would have to move that would conflict with other courses, find a classroom that's just sitting the there open with 70 students. As you all know, classrooms are a big problem on campus. We have to almost compete for them as you go through the process of scheduling courses. And so between the student conflicts and the classroom availability, there's just no way to move a class of that size.

Q. Okay. If there was the space and time, would that accommodation be made to Dr. Zhang?

A. If it was possible, yes, I would think so, but --

59

Q. And I understand we just --

A. Yeah. That's a hypothetical, but I would -- I mean, we're always as accommodating as we can be. It's just, when you get to August and -- you just can't do that. But if we were in an environment -- I mean, like, for example, we've had faculty, I mean, Jun Wang is the transportation -- not transportation, construction professor. She recently asked, in this most recent round of courses and maybe the one before, could she get classes taught where she didn't have a certain schedule. I don't remember what the schedule was. We looked into it, we were able to do it, we did it. Because we would, if we could. It's just, in a lot of cases, it's not feasible.

Q. So that was a fall class that would start in August. Is that correct?

A. Yeah, in August.

Q. And Dr. Zhang asked for those accommodations, as well?

A. I don't know for sure. I want to say he asked for those accommodations in August, but I do not --

Q. Okay. That's fine. We just needed a ball park.

A. It was very soon before the semester.

Q. And were there any other -- so you mentioned one case. But were there any other cases where faculty requested to change the schedule and, if so, were they

60

granted, and what was the balance time that those faculty would ask for those accommodations prior to when the semester starts?

A. I should actually probably clarify what I just said. The example I gave was not to change the schedule.

Q. Okay.

A. It was while the schedule was being prepared.

Q. Okay.

A. So if I misled you there, I'm sorry about that. I can't think of any cases that have been involving me where we tried to change the schedule once it was set because that is extremely complicated. So, yes, I'm sorry if I misled you on that first one. It was -- that was during the schedule development process.

Q. So were there other cases during the schedule development process that the faculty would come and ask for --

A. During schedule development?

Q. Yeah.

A. Oh, it's common. I mean, we -- one of the things that we try to do as a school now is we'll have meetings where, like, for example, at our fall retreat in August, we'll sit down and we'll try to get people's preferences in August for the next nine months, what are you looking at, what are you thinking about, what -- you know, what

Cathy M. White, CCR

cathywhitecsr@gmail.com                                                    601.405.3762

**Page 61**

kind of needs do you have. We can't accommodate all these needs, but we at least --

Q. Understood.

A. -- attempt to. But, again, that's during the -- we're talking in August about what we're going to be doing months from now, not days from now.

Q. So Dr. Zhang didn't ask for any accommodations during that schedule development process?

A. I do not know because that would have been with someone else.

Q. Okay.

A. I became interim director in June.

Q. So it was before you?

A. The schedule would have been built before me, that is correct.

Q. Okay.

A. So I would not -- I have no idea.

Q. That's fair.

Let's talk now a little bit about grade change. So there are circumstances where the grades were changed, one, after Dr. Zhang had his surgery. And our understanding -- and perhaps later it will help us to have a timeline on that. And I understand it is that the Dr. Zhang had his surgery, that he committed that he will grade the final exam, and the grades were changed -- he

**Page 62**

was entering the grades, but the grades were changed somewhere between -- when he entered the final examination, he realized that those grades were changed. Could you explain -- and I'm not sure if you were involved in that -- why they were changed at that point, given that the final exam grades were entered and most likely there was a likelihood that the final grades will be submitted by the due date of December 13th?

A. Most of those activities is going to be better for others to speak -- I can speak to it a little bit. I was not that active in that process largely for the reason of just trying to get more objective people involved in the situation, because it was just so unprecedented. It's not like any one person felt like they had the expertise or background to deal with this, and so we really wanted to involve all the administrators in such a way to try be as fair as possible.

And the things that I do know, there was no grading done. In other words, we were not grading. We were taking information -- by "we," mostly Dr. Reeves and Dr. Green, were taking information that was already graded and trying to use the syllabus to assign a grade based on the best information possible where, in cases of discrepancy, they were leaning toward the student. So if it was, you know, if it was a question, if it was

**Page 63**

somewhere between 87 and 91, they're going to give the student a 91, just as a hypothetical, based on the information. Because from what they explained to me -- and I saw some of it myself. The information that was uploaded and entered was extremely disorganized. It wasn't, you know, column A is assignment 1 worth 10 percent of your grade, and column B is assignment 2 worth 12 percent of your grade. It was a very disorganized process. And beyond that, probably Dr. Green -- I don't think Dr. Reeves is a part of this or not, but they would be better to speak to that than I would. And I know they weren't grading. They were taking information they had.

Q. Okay. So basically, any question as to related the grades change in both cases, we should direct to the --

A. Dr. Green would be a lot better to speak to that than myself. And then Dr. Reeves would be even better than that.

MS. ANTHONY: I have one follow-up for it.

DR. GRALA: Go ahead.

BY MS. ANTHONY:

Q. Just to be clear, do you know or can you, for sure, tell us whether Dr. Zhang posted final grades?

A. Whether he posted final --

Q. Did he post final grades for that semester class

**Page 64**

and then the grades were changed, or do you know that information, or were they posting grades for him?

A. I think it's they posted grades for him.

Q. So he did not post final grades? I'm asking.

A. I do not remember.

Q. Okay. So that's something that Dr. Green --

A. Yeah, I really think -- the sequence of events at that level, I don't know.

Q. Okay. Thank you.

A. Someone else would be better to speak to that than me.

BY DR. GRALA:

Q. We are asking this question because that particular case where there was a surgery, there was a final exam administered and the final exam --

A. Yes, there was a final exam administered.

Q. And it was on the syllabus, so, consequently, should be included in the final grade.

You mentioned that there was a couple of students, or maybe more than a couple, who complained about the course, Dr. Zhang's course. Were those students who complained about the course actually enrolled in that course?

A. Oh, yes.

Q. All of them?

65

A. There were a couple dozen students, so at least almost all of them. I didn't check one at a time, but, yes. I mean, certainly, the ones that came in the first meeting were enrolled in the course.

Q. Okay.

BY DR. MOORE:

Q. How many were there again?

A. It was over probably 20 or more.

Q. Okay.

A. It became a very large number. There was a meeting that was held -- I didn't organize the meeting, so I can't speak to the particulars of how the meeting was organized, but there was a meeting for any student in his class who wanted to come and express complaints. I'm pretty sure Dr. Green organized this meeting. There were -- again, I don't want to say at least 20 because there may have been 19, but it was a staggeringly large number of people in this meeting expressing complaints of the course. So the first group was representing a much larger group, and they were all in it.

BY DR. KUNDU:

Q. So you're saying that (indiscernible) students, all of them are not all from that particular class, or do you mean some of them are not in that class?

A. No. I'm saying I didn't check one -- I did not

66

take attendance in the meeting and cross-reference their attendance, but I -- certainly, almost all of them. There may have been one student in there that wasn't. I don't know. But 95 percent -- or I probably shouldn't even confuse the situation. I just didn't check the attendance roster and cross-link it to the class. These were students in the class.

BY DR. GRALA:

Q. That's fair.

Dr. Howard, you mentioned that those complaints were vetted. How were they vetted?

A. The complaints were vetted?

Q. From students about the course.

A. The student complaints being vetted was just to ask the students themselves.

Q. Were those complaints cross-referenced and did anyone ask for Dr. Zhang's opinion on those complaints so he could respond to those?

A. I think the complaints were provided to Dr. Zhang in a generic format where it didn't say anything about the students. Again, Dr. Green was handling that particular issue, so he would be the best person to speak to. I was in the meeting when the students were talking. Robert organized the meeting and Robert was the one taking notes and summarizing it. So the communication mechanism with

67

Dr. Zhang probably would be best spoken to by him.

Q. Is there any formal or informal policy in your department or that school for how those student complaints about the course should be handled?

A. No. We have no formal policy within the school of how to handle student complaints.

Q. Is there any reason -- I understand there was a large number of students complaining about the course, but there is also a policy for how students can appeal the grade if they --

A. Yes.

Q. -- feel that they were misgraded. Was there any discussion where students were advised that they should actually follow that policy after the final grades would be posted?

A. Yes. Any students -- there were students that had questions. We always pointed them, there is a grade appeal policy.

Q. Okay.

A. And there was also a discussion within the unit that, even if we didn't -- "we" being the University, did not the relieve Dr. Zhang of his duties, that these students would likely easily win grade appeals because of all the things that were occurring and --

Q. Those appeals were not submitted by students?

68

A. I don't think anyone actually submitted an appeal.

Q. And if they did, the first appeal would start with Dr. Zhang, where he would have a chance to resolve that with the student. Then that would go to you next level?

A. True.

Q. And then, if that wasn't resolved by the time, it would end up on the desk in the provost's office. Right?

A. Yeah. I believe -- I want to say either four days, five days, or something like that.

Q. Yeah, there is a --

A. Then it goes to Dr. Zhang, then it comes to me, and then goes to the provost's office for a final assessment.

Q. So Dr. Zhang was removed from teaching a course after the last day of classes. Right?

MS. ANTHONY: In spring of 2022.

A. Yes. That's correct.

BY DR. GRALA:

Q. Before the final exam.

What was the point of removing him at that point?

A. The point of removing him at that point as opposed to?

Q. Because I can -- some of the complaints started

69

in the middle of the semester.

A. Correct.

Q. But he wasn't removed as an instructor until that semester was basically over. So the only one item that was left was to administer and grade the final exam.

A. As far as why it didn't occur earlier, I can't speak for all the -- because, ultimately, the decision to remove him from the course is the provost's to make, not mine.

Q. Okay.

A. But from my view and my view only, in the early stages, maybe February, March, I was hoping we could come to a resolution. I mean, the last thing I could possibly dream that I wanted to ever happen is to do this again. And so I was hoping we could come to a satisfactory resolution. As far as why the decision was made on May -- you said the 3rd? That would be a question for the provost's office because, ultimately, they make that decision, not me. In both cases, I did not make the decision. I supported it. I just did not make it.

Q. Again, not trying to suggest that. We're just asking questions to get a better picture of what happened --

A. Right.

Q. -- and who made the decisions and so on and what

70

was the process.

A. Again, I don't want to speak for anyone else. I know for me, I was hoping we could come to a satisfactory resolution to the decision, you know, without having to go that route.

Q. Is there any official AOPE for removing instructor from a course that would have outlined the steps, or is it just a decision of the provost?

A. I'm not aware of an AOPE. My -- my understanding is that, especially that it's happened twice, is so unprecedented that you can't have a contingency plan for everything and so --

BY MS. ANTHONY:

Q. You said "in both cases." Was he removed from the course the first time?

A. Well, I'm not sure if he was officially removed or -- I guess he would -- it depends -- Kari Reeves, Dr. Reeves, would have been assigned his course for the grade entry. Whether or not that constitutes being removed or not, I don't know where that line is drawn. But, you know, Dr. Reeves was given administrative access to his grades at the permission of the provost's office. So I'm not sure exactly how that's defined, but that --

BY DR. GRALA:

Q. So removing Dr. Zhang as instructor

71

(indiscernible) implication to accreditation process of your program?

A. I would -- I would think it certainly potentially could, just from the perspective of, anytime there's an unfortunate situation going on, everyone, the accreditation body of the unit, everyone would prefer it not to be going on. But I feel like we were in a situation where it would have been far more risky not to do something.

Q. Okay.

A. Because from my view, Dr. Zhang had became defiant. I mean, it was beyond insubordination. And when you're dealing with a level of defiance at that level, you know, doing nothing is a decision. And so we felt or, you know, it would be from the perspective that, in the best interest of the students, you can't allow them to continue to be in this environment where they are being honor code, you know, questioned, that they're being -- these assignments and things. And so I think, from an accreditation body standpoint, the fact that it was an unfortunate situation would be viewed as less than ideal from them, but I feel like the fact that we made clear efforts to try to remedy it and show that there was disciplinary action for egregious situations would be more favorably viewed than just doing nothing.

72

Q. So in the second instance where Dr. Zhang was removed officially from the course and Dr. Babski-Reeves replaced him, there's a question, Dr. Reeves is in the college of engineering, but that course wasn't her -- she didn't do the grading, but that course is really not her area of expertise. Does this create some problems for accreditation?

A. If she would have been grading exams or something of that nature, I think that could have been potentially a concern. You know, for example, if she would have started to teach the lectures and graded tests and made assignments and things, I think that could have potentially been a cause for concern. But this was, more than anything else, trying to take the information available, or at least as I understand it, I was not that involved in that particular part, but taking the syllabus that was already generated, the grades that were available, and using that information to assign grades.

Q. Okay.

A. More from an administrator standpoint than a technical competence standpoint.

Q. We also have another question. What happened between spring of 2021 and fall of 2022? There's obviously a really big change in how Dr. Zhang performance was evaluated both in terms of teaching and research, and

73

previously there were no -- or we haven't been provided with any evidence that there were complaints from students or anything like that, and that has dramatically changed during that time.

A. Well, there were, I believe -- at least I have read through some of these documents, there were some complaints about his teaching in the spring of 2021, which would have been prior to my appointment as an interim director. Beyond that, I don't know that there's anything in the documents. As far as how Dr. Truax evaluated him, all I can say is, if he's available, you can ask him.

Q. Okay.

A. I can't speak to that. But what I do know from my view is that, you know, you look at, like, overall research productivity. When someone's averaging a journal paper a year over a decade, in my assessment, that's not excellent research productivity, just as -- I mean, that's not the only metric. There's a lot of different metrics. I don't want to point to any one, but I'm just using that as an example. So from my view, Dr. Zhang's research in the first year was satisfactory. But from a teaching standpoint, the events that transpired in the fall of 2021, I just could not see how those would be given a satisfactory review from a teaching standpoint.

As far as why the shift occurred, all I can do is

74

tell you why I assessed the situation the way that I did. I do not know why Dr. Truax did what he did.

And then in 2022, from the perspective of the annual review, you know, it's hard for me to see both from the fact and the research perspective, when you get a reprimand from the vice president from research, you know, that's not something that you're looking to get. And so that's not a satisfactory outcome. And then also and, again, there's other things to point to, but that's one of the big ones, in the interest of time.

But then also from the teaching standpoint, his teaching -- Dr. Zhang's teaching evaluations in the spring of 2022 were extremely unfavorable from the students. I mean, there were very large percentages of strong disagrees. Many, many, many students say nothing worked well in the course. And that combination of things is what led me to put the annual reviews together that I did. It's just difficult for me to talk about the difference because I have to speak for someone else.

Q. Okay. So, basically, for the years that you were responsible, you evaluated Dr. Zhang based on how you interpreted the guidelines for assessing his performance?

A. That is correct, yes.

Q. Okay. In terms of those unfavorable student evaluations, after the course was completed, were there

75

any official appeals submitted regarding the final grades?

A. Not to my knowledge, no.

Q. Okay.

A. There were no appeals that made it to me to resolve.

Q. Okay. So they could have started with Dr. Zhang. He said he did not have any. The next level would be you. You didn't have any. And, technically, they should have really started with a higher level?

A. Yes. To my knowledge, there weren't any (indiscernible).

Q. Did Dr. Zhang's productivity over time, before you took that position and after you were in that position, change?

A. I'm not sure I understand the question.

Q. Did his productivity over time change?

A. In the first year, his productivity, to me, was less than ideal for the reasons we've already described. He then proceeded to go on sabbatical for a year, which, obviously, is very difficult to evaluate productivity during a timeframe where someone's on sabbatical. And soon after that, he was placed on administrative leave by the University. So as far as, like, a multiyear period to really establish a pattern, I really didn't have one.

Q. Okay.

76

A. But his productivity from the, say, beginning or, say, the middle of 2021 to the end of 2022, there was somewhat of a decline in the research numbers.

Q. Okay. In terms of your assessment of Dr. Zhang's research productivity and find that part of that was based on a reprimand that he had received through VP --

A. Uh-huh.

Q. -- for research, that grant was eventually submitted. Right?

A. That grant?

MS. ANTHONY: UTC.

BY DR. GRALA:

Q. UTC. So that reprimand was related to UTC grant where Dr. Zhang was reprimanded --

A. Oh, I --

Q. -- because one of his co-PIs contacted Mississippi congressional delegation in Washington.

A. You're asking was that grant submitted?

Q. We know it was submitted. I mean, it wasn't selected like --

A. It was submitted, but not selected.

Q. Yes.

A. That's correct.

Q. But that also indicates some level of productivity, and that reprimand wasn't really about his

77

research productivity, but conduct. Right? So where would you factor in that reprimand in your evaluation of his performance?

A. Well, the reprimand would definitely be a factor. But in my view, at the -- if you're going to be ranked as a full professor, successful proposals are much more of a metric than submitted proposals.

Q. Right.

A. If you're a first year assistant professor, submitted proposals are definitely more of a metric. But when you're rising toward a full rank or certainly at a full rank, you know, it's the papers that you've published, not the papers you've started. It's the grants that you receive, not the grants that you're formulating. And just from the numbers that I had, I didn't see a productivity level that was high enough to warrant certainly "excellent" in research. But then when you have a reprimand involved and all these other things, you know, my assessment of unsatisfactory was just -- was the way that I viewed the process.

Q. In that year where Dr. Zhang submitted that UTC grant proposal, that was a (indiscernible) milliion grant proposal, were there any proposals that he submitted in that year?

A. You're asking were there additional proposals?

78

Q. Was that only one or --

A. There may have been other proposals. I'd have to look. But this was certainly the main one.

Q. Okay. And when the information that this grant wasn't funded was related to you, would that information be included in the annual review or the decision came from the agency after the annual review was completed?

A. The decisions on proposals being funded, if a proposal is not funded, in a lot of cases, as an administrator, you're not notified.

Q. Okay. I was just wondering if you knew perhaps.

A. I had heard -- you know, I was aware that it was not funded, but that's a long -- usually, especially the UTCs, it takes a long time for that answer to come. It would have -- you know, it's a long process to get a UTC.

Q. Okay. Is there -- Dr. Zhang provided in his packet two annual reviews that were sent by him but no one else. Is there any annual review -- and those two annual reviews, I believe, were on file, and are they signed by you and then by him?

A. I have the originals that I signed back from -- I can provide those. As far as the dean's signature, I'd have to look. Again, you know, we fill them out in the unit. We send them to the college and then, from there, obviously, our control on it is gone, but I can check and

79

see what happened. I have versions that I signed.

Q. Okay. So --

A. And human resources was actually in the meeting with Dr. Zhang when his annual review occurred.

Q. So Dr. Zhang submits an annual evaluation, he signs that, you review that, you have a meeting with Dr. Zhang regarding his performance, an annual review for that here. You provided an assessment. I do see one of those. Dr. Zhang provided rebuttal. He didn't agree. So that would have been to resolved at the college level. Was there any meeting following your assessment and his disagreement, again, of your annual evaluation?

A. There was a -- he disputed or rebutted the annual review. That rebuttal would go to the dean, Dr. Keith at the time.

Q. Yeah.

A. Dr. Keith evaluated the process. He met with me, discussed the review and the rationale for the review, and then I was just informed at some point later that I -- that the process agreed that my review was reasonable.

Q. Okay. Was that communicated to Dr. Zhang?

A. Not by me.

Q. What is the process in your unit once the review is completed, annual reviews? Are they returned -- signed by all parties at all levels. Are they returned to the

80

faculty?

A. The signed documents, if they're returned to the unit, I provide whatever's returned to the unit to everyone.

Q. Okay. When did you have your annual review meeting with Dr. Zhang?

A. My guess, maybe October.

BY MS. ANTHONY:

Q. And that would be October of?

A. '23.

MS. ANTHONY: Okay.

BY DR. GRALA:

Q. There is a communication, email communication, and that's Z-41, where you discuss annual evaluation scores with several other faculty -- not the faculty, administrators.

A. Uh-huh.

Q. That includes Dr. Shaw and --

DR. GRALA: Committee members, help me out here. Who was the other --

MS. ANTHONY: Dr. Keith and Ms. Lucas.

DR. GRALA: And Ms. Lucas?

BY DR. GRALA:

Q. So the first question would be, why those scores are even -- or even the level of those scores were

**81**

discussed with those other people (indiscernible)?

A. The reason they were being discussed -- I made the interviews on my own.

Q. Yeah.

A. The reason they were being discussed was probably a couple of reasons. One is this is such an unprecedented situation to have two semesters back to back to have trouble at this level. And then also from the same individual, in a separate area of research, have a reprimand from the vice president for research, you know, that that -- the level of unprecedence that provides led me to just want to know what does everyone think about these reviews, do you think these are reasonable. Because from my perspective, you know, this thing, it got so complicated with Dr. Zhang, I didn't feel like anyone really knew everything that was going on because there were so many activities, so many things going on. And my main motivation for sending that email was, am I missing something here, is there something here that I'm not seeing that I need to be considering in this review.

Q. So once have done your annual evaluation on own --

A. Uh-huh.

Q. -- have those scores ever been changed?

A. No.

**82**

Q. No?

A. Eventually, everyone said we agree with your assessment. I think there was some questioning back and forth about -- I think from a lot of -- maybe some other people's perspective maybe I could have scored even a little bit lower, but especially in the first year, in 2021 -- and I'm not trying to ask for any sympathy from anyone, but 2021 for civil engineering was hard, COVID, moving buildings, you know, we were down a faculty member, so we were trying to scramble for teaching. And so I was generally lenient across the board when I was looking at evaluations.

You know, it was -- so that's why I'm saying, like, as far as -- I think there's a statement in this email that seems to get a lot of attention that this is as low as I could justify. My motivation with making that statement is I was factoring in the context of how difficult everybody's environment was in 2021. I believe -- I'd have to look at the annual reviews, but I believe I wrote that note in just about everyone's evaluation, that this was an extremely difficult year. And so that was kind of my motivation for that particular part of that.

Q. Is Dr. Shaw involved in annual evaluations of any of the faculty in your school?

**83**

A. No.

Q. Is Ms. Lucas involved in reviewing your annual evaluation of any other faculty in your school?

A. No.

BY DR. DUTTA:

Q. Can I have a follow-up on that? 2021 annual review, in your comments, you say, table one shows scholarly output, graduate student advisement, neither of which changed a great deal relative to 2020. All were outstanding output. So that's your comment. And you graded his research output as satisfactory. But the previous year, which is -- you're saying has not changed, there is (indiscernible) change from 2020, he was graded as superior in research activities. So that is a big change from superior to satisfactory, while you're claiming in your report that scholarly output, graduate student achievement, neither of which changed a great deal relative to 2020. Can you comment on that?

A. Can I -- you said I said that his output was outstanding?

Q. Yeah. No, no, no. Previous, 2020, was outstanding.

A. I was calling out the 2020. Okay. Got it. I understand.

Q. But you also said it was outstanding output.

**84**

DR. GRALA: Let's make the (indiscernible.)

DR. DUTTA: Yeah, yeah, yeah. So that --

DR. MULLEN: (Indiscernible, two speakers) in front of you. It's the next page.

DR. DUTTA: Page 7 of --

DR. KUNDU: This is the blue (indiscernible.)

BY DR. DUTTA:

Q. 23, MSU 219771.

A. 23? Okay.

Q. 219771, page 7, annual review.

A. Okay.

Q. So if you look table one, the second paragraph from the bottom.

A. Okay.

Q. Table one, it says, scholarly output, graduate student advisement, neither of which changed a great deal relative to 2020 or were outstanding outputs.

A. I'm saying, "or were outstanding outputs." What I'm saying is, they were not outstanding. I'm saying neither changed a great deal and neither was an outstanding output. It says, "neither of which changed a great deal relative to 2020 or were outstanding." I'm saying, in my opinion, neither 2020 or 2021 was outstanding, that "or were outstanding."

Q. Oh, okay. So it is a little confusing. It seems

85

to be saying --

A. It says table one -- because I was confused when you said I'd said it was outstanding, so I thought I don't think I did. So table one shows scholarly output and graduate student advisement.

Q. Uh-huh.

A. Neither of which changed a great deal relative to 2020.

Q. Uh-huh.

A. And then the second point is, in my assessment, neither were outstanding.

Q. Okay.

A. So I was almost saying I politely disagreed with my predecessor's 2020 assessment.

Q. Okay. Now I'm back with you.

BY DR. KUNDU:

Q. So (audio distortion) superior assessment?

A. Correct. What I was saying is that, even though it has not changed, I did not think it was -- it's not my business to change the 2020 review, obviously, but I can have a different opinion than my predecessor, and my opinion was different than his.

BY DR. DUTTA:

Q. Okay. Otherwise, you're saying it was outstanding.

86

A. Oh, no. I was saying it is not outstanding, in my opinion.

BY DR. MOORE:

Q. Would that continue across all faculty, that type -- not that particular case, but your assessment of them?

A. My assessments, on average, would have been lower than my predecessor.

Q. Okay. Okay.

A. If you looked at -- I say that. I probably shouldn't say that without actually checking the data completely. But as a general rule, once I did start to check -- because in the beginning, I didn't until this particular case came up, and I did, in a couple of cases, just wonder, well, you know, because I wasn't giving excellents and superiors across the -- you know, to a lot of different people. Because the University is pretty clear that excellent and superior are reserved for pretty specific types of output and, in my opinion, this particular case didn't rise to that level.

BY DR. GRALA:

Q. So then I guess a very standard question, from a faculty perspective, when you get guidance from one department head who says you're doing great and so on --

A. Right.

87

Q. -- and then you of have that transition, you perhaps -- you know, you may need time just to be able to adjust to those expectations. Otherwise, you know, the standards are the same.

A. Right.

Q. But you may have slightly different interpretation between different administrators where those conducts are met and at what levels.

A. Correct.

Q. We would like to talk about the salary release. We understand that rule 25 percent, more or less, would be sufficient to release a faculty from one course. You also mentioned that doesn't have to necessarily (indiscernible) --

A. (Indiscernible, two speakers).

Q. Why would faculty release salary if they didn't have any other relief from their duties?

A. Well, one of the reasons would be just to be a good citizen of the unit. I mean, I can, I guess, speak for myself. I've done that many times over many years. The other reason is they're actually doing funded research during part of that time. So, for example, as a -- your official appointment is for 25 percent bought. So when you teach two courses, that occupies 50 percent of your semester. And if you're doing funded research 20 percent

88

of the semester or 25 or 26, any number like that, you can make a case that you're just reducing your service while doing funded research and still teaching the same. Does that commonly happen? It happens sometimes. It's probably not especially common, but I don't really have any data for that, so I guess I shouldn't even have said it because it's not that relevant to this.

But the other thing is, in this particular situation, you know, had the salary information came when I asked for it multiple times, I might have made a different decision. But at the time, you know, once you get to two or three weeks beyond the date, I had no information, and so at that point, the teaching schedule got set.

Q. The major point of contention here for not changing Dr. Zhang's teaching (indiscernible) was simply he provided that information too late --

A. Correct.

Q. -- to make any changes?

A. Yeah. It's not a wise move to budget on what someone's going to do. I mean, as a, you know, department head, that can get you in a really bad financial situation.

BY DR. DUTTA:

Q. I have a follow-up on that, as well. So the

**89**

change of teaching assignment was made in August. Right? Because of --

A. Yes, it was.

Q. -- of the previous had made the scheduling and changed it because -- but that change only happened in August. So he couldn't have requested release or release from teaching before August, before your changes were made.

A. Oh, no. We met and talked about it in June.

Q. Okay.

A. And he mentioned the idea of releasing salary. I asked him more than once or twice in June, please let me know, please let me know. I heard nothing. I then put a deadline of, I think it was, July 12th, still heard nothing, waited until August 6th or 7th or something like that, and then made the decision. So it was known in June.

BY DR. GRALA:

Q. So let's talk now about medical leave that Dr. Zhang requested for his spine surgery. Was that medical leave kicked back because it wasn't completed properly or --

A. The leave on paper was sent back multiple times because it was not being filled out properly.

Q. Okay.

**90**

A. Directly at the guidance of human resources. Most of the time, they were on the phone while I was typing on the keyboard.

Q. That specific eForm for this specific medical leave for his spine surgery?

A. There were more than one eForm.

Q. From him?

A. Yes. There would have been more than one eForm from all of this. I don't remember how many, but...

Q. Okay.

A. But the overall process, we were, we thought, clearly communicating that these eForms do not prevent you from getting any medical care you need. They are how the medical care gets coded relative to your employment here. Those are two separate matters. His medical care or anyone's medical care is not between me and them. It's between them and their physician, not between them and I.

Q. Did anyone in your unit ask for that medical leave be not approved?

A. To be not -- you mean to just, like, not allow him to do it?

Q. Yes.

A. Oh, no. No.

Q. In eForms you submit, Dr. Zhang makes the request and that has to be approved at the next level?

**91**

A. You mean, like, someone saying you can't take off to do this surgery?

Q. Yes.

A. Absolutely not. No. That's -- no. It was just the paperwork had to be filled out correctly in accordance with human resources.

BY MS. ANTHONY:

Q. I just want to clarify why we're asking that.

A. Yes.

Q. There was an email between Dr. Keith and Leslie in human resources and she says to him, unfortunately, we can't deny medical leave. I would have to go back and find it. But, in essence, he's saying we've got to find a way to stop this behavior in his email, and she says, well, we can't deny medical leave. So that's why that question is being asked.

A. I was -- there was no one that I know of. Now, I can't speak to anything outside of what I saw or witnessed, but no one was trying to actually deny medical leave. The process that I was involved with was trying to get the paperwork filled out properly.

Q. And she suggested that, if there were performance issues, there needed to be a human resources plan moving forward in that circumstance.

BY DR. GRALA:

**92**

Q. We would like to talk about that project that include traffic counts. What (audio distortion) safety standards for implementing project like that if students are involved?

A. Well, if students are involved and it's a course -- first of all, if it's a lecture course, you can't just have students say you must be somewhere at some time that doesn't match the course. But as far as safety standards, typically what you would see for something like that, if it was an allowable project, you would brief them on the safety activities of the process. That probably doesn't take but a few minutes. You would provide them the proper personal protective equipment, like vests or other types of markings, and if the intersection or other location is trafficked to a certain level, you would require support or traffic control to be there while people are actually in the roadway.

Q. Okay.

A. So those -- and again, it depends on different factors, you know, the different level of traffic and things. But again, Dr. Zhang is a transportation expert. He would be very aware that safety vests are required when you are in traffic control situations, just as an example. That is an across-the-board requirement.

Q. Did Dr. Zhang provide any plan of how those

93

safety measures will be implemented for that course or was there any description of what safety measures were implemented?

A. There were no safety measures seen and the students said that they were not provided any safety training or PPE.

Q. Okay. Of course, they're saying -- and that might be a gray area, whether that project could be required for lecture or whether that should be allowed. But even when you have a lecture, you can have homework assignments and students would be completing those outside the classtime. Right?

A. Correct.

Q. They would be submitting those by the specific due date?

A. That's correct.

Q. How does assignment differ from that homework assignment?

A. They were being required to be somewhere at a specific time.

Q. At a specific time, on a specific day?

A. That is what they were telling us, yes.

Q. Okay. Would the situation be different, let's say, in -- assuming that the safety measures were provided and communicated to students, where Dr. Zhang instructed

94

you need to complete those counts within, let's say, (indiscernible) or so on, but the time when you want to do it and where, it's up to you, but you need to provide your report and results by a specific date. Would that be a different situation?

A. That would change the situation somewhat because now it becomes more of a homework assignment. We're not telling you when to do it. We're just telling you to do it.

Q. Okay.

A. And then if -- but then you've also made the caveat that the safety precautions and things were in there, as well.

Q. So you have mentioned that there were numerous instances of insubordination on the part of Dr. Zhang. Was a post-tenure process ever initiated?

A. No. The post-tenure process was discussed, but the post-tenure process, as I understand it, is more of a process to alleviate, for example, if someone is having a problem -- it's not a conduct issue, is maybe a good way to say it. The post-tenure process is not to deal with conduct. It's to deal with actual academic performance, like lack of research performance or bad teaching evaluations. And the significant majority of the issues, or at least a large number of the issues that we're

95

dealing with here, were conduct related. And considering just the defiance that had been felt and the insubordination that had been felt across the board, that's first a conduct issue, but then also there was no real reason to see that this process would be successful because he just -- there was no -- there was just defiance across the board.

And so then the question becomes what's in the best interest of the unit and, in particular, the students, because in a post-tenure evaluation process, you're going to have to put this person back in the classroom even if there are classroom issues, and the idea of having to go through this a third time was just not -- it didn't seem like the probability of success there matched the risk to our students.

Q. Was there any improvement plan developed and communicated to Dr. Zhang for trying to improve or mitigate that behavior?

A. Mitigate the behavior of insubordination?

Q. Yeah.

A. There were plans discussed, but by the time it got to the point where we would move forward with it, the plans were never implemented. He went on sabbatical and they never really came back up after that.

Q. You have also mentioned, that during your

96

accreditation process with ABET, that Dr. Zhang requested a one-on-one with the individual who was designated to conduct that accreditation process on site here.

A. That's correct.

Q. Do you know what was discussed in that meeting?

A. I really don't. I wasn't there, so I...

Q. And that's fine. And --

A. The evaluator never really spoke to me about the matter. To me, the issue would be more of the -- just it's just not something you do. Whether the meeting was good or bad or neutral, just the, again, defiance. When you're directly told by your dean this is not something you do, that's not something you do.

Q. So do you know if Dr. Zhang communicated to anyone that he planned to talk to that individual at some point in time? Well, I guess what I'm trying to determine, why Dr. Zhang was told not to talk to that individual.

A. We would have told anyone.

Q. That was a blank statement to any faculty, not specifically --

A. Well, it wasn't to any faculty because no other faculty asked.

Q. So he did --

A. He did.

Cathy M. White, CCR

cathywhitecsr@gmail.com                                          601.405.3762

97

Q. So he asked?

A. He asked, I would like to have -- and I'm paraphrasing here -- I would like to have a meeting with the PEV.

Q. Okay.

A. And I believe that was in an email, but I can't recall for sure. But he said I want to have one on one time with the PEV, there's only group meetings. And he was told no, that is not what we want to do. The PEV had not requested an individual meeting, and that is the single biggest issue, that he was told ahead of time do not do this.

Q. I understand. Did he ask you or did he ask a dean or any other individual?

A. I believe he asked both, and I believe the dean -- I know the dean is the one that said no.

Q. Okay.

A. Which I concurred with that assessment, but...

Q. And just to make sure that we understand the sequence of events, we would like to ask you for a timeline of different events that took place and that led to the decision to terminate Dr. Zhang. So what we are looking here for key decisions and also those events related to his insubordination or defiance.

A. So you're asking to just walk through --

98

Q. Yeah.

A. -- the three or so year period?

Q. So we know what happened when and why and if there were any other events in between.

And there's one more question that I would like to ask. Were you aware that Dr. Zhang filed official complaints with the state and -- in state and federal courts?

A. Yes.

Q. At what time were you aware of those submissions?

A. It's hard for me to answer. I think it was relatively soon after it happened, and I do not -- I did not prepare to look at the date when those happened, but these would have been Brett Harvey, at the time, Brett Harvey's office. They would have notified me probably just a few days, maybe even less, afterwards. I just don't have the dates in mind of when those claims were filed.

Q. But it was --

A. Yes, I was aware.

Q. Yes. So you were aware how they were -- you were aware of that soon after those complaints were filed?

A. Yes.

Q. Was it before Dr. Zhang was eventually terminated of his position?

99

A. Yes. Those claims were made before he was terminated, yes.

Q. And you were aware of those before the termination?

A. Yes, I was.

Q. And we were not provided anything (indiscernible).

DR. GRALA: Committee members, do you have any more questions?

BY DR. KUNDU:

Q. Dr. Howard, just one (indiscernible) the letter that MSU claimed, 21973 and 21977.

A. Uh-huh.

Q. I think that you said you mentioned that you were (indiscernible) different than the review of previous department head. So that means that you provided the tables of their (audio drop), that this table had been provided. So my question is this: When you do that, you provided this table to all faculty members to show that why you (indiscernible).

A. No, I didn't do that with --

Q. It was just provided to in this (indiscernible)?

A. Maybe. I didn't really look at the annual reviews and say I want to make a table for everyone. That wasn't really the head space, and I didn't necessarily

100

even look at the old annual review on everyone before I made the new one.

Q. But in this case, it was done?

A. In this case, it was done largely because I knew that there were unsatisfactory metrics that I was going to give and I really feel like, as an administrator, when you cross over to unsatisfactory, you need to be very diligent when you do that. You know, whether I give someone satisfactory or excellent has far less implications on their career than if I go satisfactory to unsatisfactory. So I'm going to spend more energy being diligent going down in the ranking than I am going up. And so that was the main motivation for doing that, is to make sure that there's a justifiable reason to do this. Because there's a lot more at stake when you go to unsatisfactory than, again, the difference in, you know, good and excellent.

Q. (Indiscernible) faculty, if my ranking went down last year to this year, how you explain, I'm assuming your department might even be across the board. Did other faculty complain?

A. I wouldn't say complained. And, again, I'm not saying --

Q. I just (indiscernible) I have done to my -- if my -- if my new department head (indiscernible,) at least in my opinion.

Cathy M. White, CCR

101

A. Right.

Q. So then (indiscernible) testify this is --

A. Sure.

Q. -- table and all this. That's my -- like a metric and everything depends on that, so (indiscernible) I ask that. So you said that your ranking went lower than your previous department head. So maybe that happened to other faculty members, also, like it did, and they may have complained that and they can (indiscernible) and you provide. Like, is there any kind of -- are there any kind of (audio distortion) (indiscernible)?

A. No, I don't mind. And part of this is just from memory because, you know, some of it's years old, but -- and I want to clarify, I did not benchmark every person against the previous review and -- but just a couple, three that I probably looked at, I did get the gauge that I probably was rating out to maybe a little lower than what my predecessor was. But there was one case that the faculty member, you know, they -- I think they did drop in one area and they came and asked me about it and I just talked to them and said this is kind of how I see it, and we talked and, realistically, other than their opinion and perspective, they didn't have anything to -- you know, they just liked the other number better, and they didn't really have a good justification for that. So we talked,

102

and they seemed okay with it, and we agreed to disagree, and we moved on.

BY DR. GRALA:

Q. Did any other faculty disagree with your annual evaluation in official capacity --

A. No.

Q. -- the way Dr. Zhang --

A. No. No. There was one -- there was a case or two where someone said, hey, you know, what happened here or there, is there something wrong. And I said, no, this is just kind of what my opinion was on it.

Q. But no official --

A. No, no. Just, you know, 5-, 10-minute meeting in your office that you don't even document (audio distortion.)

BY DR. LU:

Q. Quick question, Dr. Howard. To my knowledge, based on your testimony, you indicated the grade change and were made largely by dean office, not your office. Is that correct?

A. Could you say that one more time, please?

Q. Grade change --

A. Uh-huh.

Q. -- made by dean office, but not your office?

A. The dean's office was more involved in the actual

103

administration of that process.

Q. Okay.

A. But the two offices were very much in agreement that something had to be done.

Q. Okay.

A. I wasn't that involved, but I was in agreement that something had to be done.

Q. So to my understanding, so the result of what of corrected grades didn't share with the Dr. Zhang. Is that correct?

A. The corrected grades?

Q. Yes.

A. I do not think they shared them ahead of posting.

Q. Okay. Do you know the reason why; because they remove instructor --

A. Part of it was because the grades were coming up due. I think it was that the submission deadline is coming up due. But Dr. Green would be the best person to talk about that.

DR. LU: Thank you.

BY DR. GRALA:

Q. Are you aware of the fact that there were some grades that were changed, for example, from F to B? That's a very substantial change, even if the student was borderline.

104

A. I was aware of a couple of cases like that, and there was one case that I recall where the student had the hand-graded content that was a zero in the gradebook. So the person got an F and, you know, they said I didn't take the test, and he's handing you his handwritten graded test, and so there --

Q. Which was graded by?

A. Which was graded by Dr. Zhang.

Q. Okay.

A. But there was a zero in the grade. That was one of the cases that really created some serious concerns, like, this student's got his graded stuff, and he's not a student known for having problems, and he walks in and says, here's my stuff. And so there were -- I know there was at least one case like that. I couldn't speak to if there's more. But there were some grade increases, but I can't really speak to them specifically.

Q. So you have mentioned that Dr. Zhang was an expert in the transportation area. Do you think it was appropriate for someone else to really change those grades, even above grading, but there was some discussions about how to curve them, as someone -- would that be appropriate for an individual who doesn't have knowledge in that area to change those grades in any capacity?

A. I feel like, when you get a gradebook and you --

105

you've got five people with engineering background looking in a gradebook and none of them can understand the gradebook, there's some problems. And in those situations, I think you need to favor the students as opposed to anything else. And so is it appropriate? I think it was appropriate to do something because something had to be done. The alternative was, in my view, far worse. And would it have been great if we had another transportation professor that we could have went to and said, you give the final, you do these things? Perhaps. But with the timelines and the overall constraints we had, that just didn't seem to be an option.

Q. Has anyone sent an email to Dr. Zhang saying, hey, we need to post the grades by the due dates, we are seeing you're not entering the grades, we're going to, you know, help you out and enter those grades on your behalf with those columns in Canvas?

A. I think there was some communication to him asking questions about what the status of things were, but I -- it's been almost three years now, so I don't remember the exact details. But there were -- there were attempts to communicate with Dr. Zhang about this process and it just was not successful. Like, for example, heading up to this, the few days ahead, we asked on more -- what do you need, what support do you need, what -- and it was not met

106

with answers in most cases.

Q. I'm just wondering, so, you know, if the claim is made that no one knew what those columns were when those grades were presented and the final grades were calculated.

A. Again, that -- I played almost no role in that part.

DR. GRALA: I understand.

BY DR. MOORE:

Q. You mentioned defiance. And could you -- for that timeframe, could you give us some key what you consider the most, you know, egregious defiant steps?

A. Okay, well --

Q. Besides the talking to the evaluator --

MS. ANTHONY: Or maybe put those in the timeline.

BY DR. MOORE:

Q. Yeah.

A. Okay. So are you ready for this timeline now?

Q. Okay. So if you go --

DR. GRALA: Do we want a timeline now or do we want to have a list that we can later look at when we have our --

MS. ANTHONY: Would you rather it be in writing? Is that what you're asking?

DR. GRALA: I think so. That will be --

107

BY MS. ANTHONY:

Q. Is that something you're willing to put in writing and send to all of us or send it to him?

A. There was a timeline put in the documents that you provided.

Q. You mean prepared.

A. Yeah. The timeline can be provided.

BY DR. GRALA:

Q. Okay. But again, you are willing to maybe provide, like, high-level events right now, that would be helpful, too.

A. So you're asking for a high-level just verbal timeline --

Q. Yeah.

A. -- now, and then written timeline --

Q. More specific later.

A. -- after. Okay. Understood.

So as far as the process, if we just go to back to the summer of 2021, you know, you come into -- I mean, I came into the interim role and, again, in an environment that is not really enviable, COVID, building move, down three classes, and Dr. Zhang was not helpful in that process, even just from the perspective of, like, he tried to talk and have a conversation about changing classes, and it's like no, you need -- almost aggressively telling

108

me, you do this, you do this, you do this, you know, you need to get this person to teach this class. So that's not exactly how that works.

And so then you move on to the next sequences of this. I was trying to be very accommodating to him, say, if you've got salary release time, tell me what you want to release. Well, he initiated the idea of releasing salary to not teach the class, and then I asked him to tell me what you're going to do, and he doesn't do it for a month. Well, that's -- to me, that's an example of what I'm talking about. It's like you initiated this conversation about the process, not me. And if you want to initiate the numbers, then initiate the -- or do that, do that.

Because in the beginning of the conversations, like in June, it was -- the conversation would be more of the tone that would say things to the effect of, oh, we don't have to make this decision right now, let's see what we can release. Well, we wait until the summer's over, until August, and then you start trying to do something. It's like, well, now, why wait until the last minute. Well, we started this two months ago. And so we've already kind of -- I think we've really talked that summer of 2021 into a lot of details.

But you move on into the fall. Then Dr. Zhang

109

would, for example, he would, like, send me an email saying I need you to do this for me or do that for me, and I would explain to him, if you're the instructor of record, you're responsible for your class. You don't -- if you have to miss class, that's okay, but you're responsible for making that up. And so I told him that two or three times. You know, there's no reason to keep coming to me and telling me that you want me to do this or to do that. If you're the instructor of record, you should be managing your own class. And so he just -- and again, you know, you've got -- two or three times, he's still saying those same things. Again, I've already said it. We don't need to have that conversation continually. And so you had things like that that would have occurred throughout the semester.

In terms of specific events in the fall beyond those, I really can't think of anything just all that specific, but then again, you know, when your department head or your director specifically says, please send me a list of the things you need, and then you don't, and then you're upset about the outcome, it's like that's a hard -- that's a hard thing to deal with because you don't know what to do. You're asking for the information, what help do you need.

So then you kind of move into the holiday

110

timeframe. Well, obviously the darkest day email was not really advisable.

Then you move on into the spring of 2022 where the transportation class is being taught, and that's where some of the insubordination got even more extreme because we told him, you cannot do this project this way, and he basically just said, no, I am -- you know, who are you to, effectively, tell me that I can't do that, you know, you're bringing shame on transportation engineering. You know, those would be the kinds of phrases that would be told, is that, you know, this project has been done for many years, or phrases of that nature and, to me, that's classic insubordination, just like we're not -- we're saying this project is not being done in a way that meets University requirements. And we weren't saying that there weren't some alternatives necessarily, but not like this. And so, you know, that would be a classic example.

You move on into the summer with the UTC, and a lot of these weren't necessarily directed at me, but in that UTC process, he wanted to be paid to work on the UTC proposal. That's not normal for someone to request to be paid to work on proposal in the summer. He was told that you're not going to get paid to do that. He went as far as to turn in a time card to me that undergraduate students turn in for hourly wages asking to be paid for

111

his work, and it's like, you know, we keep telling you that that's not part of the process.

Let's see. During his annual review with Julia Morrison, he referred to me as a Nazi a couple of times, which, you know, I didn't think was really all that necessary. And it's just been a variety of events that kind of unfold that...

You know, then you go to the fall of 2023, the ABET evaluator, another classic example of he was specifically told don't do this, did it anyway. And so -- and then once you get much past that, you know, the administrative leave started.

So is that the high-level version you wanted for it?

Q. Dr. Howard, I would like to ask you maybe two questions, and those will be sensitive questions.

There was some communication about Dr. Zhang's spoken English. Was English ever problem in -- for Dr. Zhang to deliver his classes up to the standard, University standard, according to your knowledge?

A. According to -- I mean, a lot of the students have complained about his ability to be understood when he's lecturing, and you can see those in his evaluations, and you also just hear them around the unit, around the hall that Dr. Zhang is difficult to understand. But there

112

are some documented cases in his evaluations.

Q. Now, in terms of your communication with Dr. Zhang, at least in the emails, there was at least one instance where Dr. Zhang called you close-minded and that, you know, would be -- the depart- -- the unit to fail or something along those lines. Was that the only one instance or are there any situations of that type of a communication with Dr. Zhang?

A. I would think it would be pretty easy to find additional ones. I can't -- I can't think of one right off of the top of my head but, no, there are -- those types of phrases are not -- would not be that difficult to find a few of them.

Q. How do you feel about that?

A. I'm not that sensitive to things like that. I don't really -- I don't think it's really all that appropriate, but does it really affect me? Not really.

DR. GRALA: Thank you.

BY MS. ANTHONY:

Q. I have a follow-up question from the timeline. So the courses that had issues were fall '21, spring '22. He was on sabbatical fall '22. Correct?

A. That's correct.

Q. What happened in spring '23? Was he in the classroom?

Cathy M. White, CCR

cathywhitecsr@gmail.com                                           601.405.3762

113

A. Still on sabbatical.

Q. Oh, he was on sabbatical for the whole year?

A. Uh-huh.

Q. Okay. And then fall '23, he was not in the classroom?

A. He was not.

Q. But he was not on leave yet?

A. He was not on leave and he was not in the classroom.

Q. Okay. And that was a decision made by the dean, the department?

A. Everyone agreed, but ultimately, decisions like that are made at the provost level.

Q. And he was just full-time research, or what was his appointment for that semester?

A. Research and service. Mainly research, yes. He had several graduate students and other things he could be doing.

BY DR. GRALA:

Q. Dr. Howard, I know we said several times that that was almost the last question, but --

A. Take your time.

Q. -- there's one more question. So when Dr. Zhang was -- had his surgery and he was on medical leave --

A. Uh-huh.

114

Q. -- and (indiscernible) he will grade those final exams, if a faculty or employee is on medical leave, can they be required to do any work or the unit or --

A. If they're actually on medical leave, I don't think they can -- I think that's the function of the terms of the physician's instructions for why they're on medical leave.

Q. Okay. Were there any contingency plan? Obviously, Dr. Zhang had surgery. At the time, it was unknown what the outcome be and what the post-surgery care would have to be. Was there any contingency plan done in your unit in the case that Dr. Zhang wouldn't be able to do anything for the course?

A. It was definitely a conversation. That's one of the reasons that we started trying to get our collective around what is the status of the current information. So that was -- it was talked about, but it wasn't necessarily talked about all that much that I can recall.

There was a -- there were conversations. The conversations that were the most significant were before the surgery occurred. We were trying to get him to tell us what is the plan here, what do you need. So we were much more involved in it before the surgery trying to get a plan while we still could. And then after that, we just adapted to the best that we could.

115

DR. GRALA: Thank you very much.

Any other questions?

We don't have any comments. We appreciate your time. If we have any additional questions, we will follow up with that.

DR. HOWARD: Thank you all.

So I do have one question for you. So my understanding is you're asking me for a timeline. What -- do you have any -- like, is it supposed to be X length? When do you want it? Just do you have any specific requirements?

DR. MULLEN: I'll work with you.

DR. HOWARD: Okay.

(Indiscernible, multiple speakers).

DR. MULLEN: We'll work together.

DR. HOWARD: Thank you all.

DR. GRALA: Thank you very much. We appreciate your time.

116

CERTIFICATE OF TRANSCRIPTION

I, Catherine M. White, hereby certify that the foregoing pages contain a transcript of the testimony of said witness transcribed from Microsoft Meetings recordings TO THE BEST OF MY ABILITY.

I further certify that I am not in the employ of or related to any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature this the 10th day of August, 2025.

_____

CATHERINE M. WHITE

Cathy M. White, CCR

cathywhitecsr@gmail.com                601.405.3762