# EXHIBIT 41

# Teresa Gammill

# Li Zhang vs. Mississippi State University

# January 7, 2026



338 Indian Gate Circle
Ridgeland, MS 39157
601-573-0961

amanda@awreporting.com
www.awreporting.com

IN THE CIRCUIT COURT FOR THE FIRST JUDICIAL DISTRICT
OF HINDS COUNTY, MISSISSIPPI

LI ZHANG                                    PLAINTIFF

VERSUS                      NO. 25CII:23-CV-441-AHW

MISSISSIPPI STATE UNIVERSITY, AND
MISSISSIPPI BOARD OF TRUSTEES OF STATE
INSTITUTIONS OF HIGHER LEARNING             DEFENDANTS


**************************************************

DEPOSITION OF TERESA GAMMILL

**************************************************


APPEARANCES NOTED HEREIN


TAKEN VIA ZOOM
ON JANUARY 7, 2026
AT APPROXIMATELY 11:30 a.m.


REPORTED BY:  AMANDA M. WOOTTON, CSR, RPR
Court Reporter & Notary Public
Amanda Wootton Reporting,  LLC
eMail: amanda@awreporting.net
338 Indian Gate Circle
Ridgeland, Mississippi 39157
601.573.0961

APPEARANCES:

Grafton E. Bragg, Esquire
BraggLaw, PLLC
1060 East County Line Road, Suite 3A-120
Ridgeland, Mississippi
grafton@graftonbragglaw.com

Ashlyn Brown Matthews, Esquire
The Winfield Law Firm, PA
224 E Main Street
Starkville, Mississippi 39759
amatthews@windfieldlawfirm.com


Also Present: Dr. Li Zhang

* * * * * *

TABLE OF CONTENTS

Appearances                               2
Examination by Mr. Bragg                  5
Conclusion of Deposition                  86
Certificate of Reporter                   87
Certificate of Deponent                   88
Correction Sheet                          89

E X H I B I T S

| | | |
|---|---|---|
| Exhibit No. 21: | E-mail exchange dated January 26, 2022 | 30 |
| Exhibit No. 22: | E-mails dated January 26, 2022 | 31 |
| Exhibit No. 23: | E-mails dated January 27, 2022 | 36 |
| Exhibit No. 24: | E-mails dated June 6, 2022 | 39 |
| Exhibit No. 25: | E-mails dated Mary 31, 2011 | 50 |
| Exhibit No. 26: | E-mails dated September 14, 2022 | 54 |
| Exhibit No. 27: | E-mails dated September 14, 2022 | 60 |
| Exhibit No. 28: | E-mails dated September 14, 2022 | 62 |
| Exhibit No. 29: | October 21, 2022 Letter from Julie Jordan to Dr. Li Zhang | 63 |
| Exhibit No. 30: | Text messages | 69 |
| Exhibit No. 31: | E-mails dated October 25, 2022 | 69 |

5

* * * * * *

TERESA GAMMILL, after having first been duly sworn, was examined and testified under oath as follows, to-wit:

E-X-A-M-I-N-A-T-I-O-N

EXAMINATION BY MR. BRAGG:

Q Please state your full name for the record.

A Teresa Andie Gammill.

Q Okay. And I can call you Dr. Gammill?

A Sure. Teresa.

Q Or Teresa. So my name is Grafton Bragg. I represent Dr. Li Zhang in the matter that has been filed against Mississippi State and others.

You're familiar with the matter?

A Yes.

Q Have you ever given deposition testimony before?

A I have not.

Q Okay. I'll go over a few of the basic ground rules, things that your counsel may have covered with you but just to make sure we're on the same page.

One of the things that is important is that when we respond -- when you respond to a question, you

6

don't just do nods and shakes, but you actually give verbal responses, yeses and nos.

Does that work?

A Yes.

Q Okay. Another thing is that in normal conversation a lot of times we will jump in before someone finishes their question or their answer when we understand what they're essentially saying.

In the deposition context it's -- it is informal in that we're all in offices; we're on Zoom. It's kind of like a meeting. But it is a little more formal because there is a court reporter, and it is under oath.

So it is important that you wait and let me finish my question before you jump in with your answer and, vice versa, I'll do my best to let you finish your answer before I jump in with my next question.

Does that work?

A Yes.

Q And if you're in the middle of an answer and I thought you were finished and you weren't, feel free to let me know so that you can finish your question. I'm never going to try to cut you off from answering a question.

7

Q Okay. If you -- let me know If you need a break. I'm happy to accommodate that. The only thing I would ask is that you go ahead and answer a question that has already been on the table before asking for that break.

Does that work?

A Yes.

Q Okay. And then I've got several exhibits today that we're going to review, and I'll ask you questions about them. I'm just going to put them up on the screen, share my screen, and you can look at them.

Most of these, I think, will be new exhibits that we haven't covered yet as part of the other depositions. And so I will send them to Ms. Matthews. I'll send them to Amanda Wootton, the court reporter here, so that everybody will confirm that, yes, that's what we all looked at, and those were the exhibits to your deposition.

Does that work?

A Yes.

Q Okay. What did you do to prepare for the deposition here today?

A I looked back at previous e-mails from when I was in ORED, the office of research and economic

8

development.

Q Okay. I saw some text messages that were recently produced where in anticipation for the administrative hearing you had reviewed around 200 e-mails.

Is that -- did you kind of go through that process again in preparation for this testimony?

A Not that many, but, yes, I reviewed e-mails, but not anywhere near 200.

Q So at this point, we're six to seven months from the administrative hearing. Back at the administrative hearing we would have been three years from probably the last time you looked at some of this stuff.

So I guess you didn't have to jog your memory quite as much this time since you had looked at it back in June.

Is that kind of the idea?

A That's correct.

Q Okay. Okay. So you looked at e-mails. I don't want to -- I don't want to know what you talked about. But did you have a conversation with Mr. Winfield or Ms. Matthews?

A With Ms. Matthews.

Q Okay. And then did you look at any

9

documents other than e-mails?

A   The exhibits that were given to me back in the fall.

Q   Okay.  And were those the exhibits that were submitted along with Mississippi State's position statement?

A   Yeah.

Q   Okay.  So they were like numbered 1 through whatever?

A   Right.  Correct.

Q   I think it was in the 30s.

Okay.  Other than the exhibits, other than the e-mails, did you review any other documentation?

A   No.

Q   Have you seen the decision from the promotion and the tenure committee -- or the recommendations from the promotions and tenure committee?

A   Clarify.  Are you talking about since the fall?

Q   Yes.  So in -- there was this administrative hearing that you were listed as a witness, but you didn't end up having to testify.

A   That's right.

Q   Okay.  And after that hearing -- and that

10

hearing was before the University promotion and tenure committee, sometimes called the P&T committee; is that right?

A   Correct.

Q   And after that hearing, the P&T committee issued a seven-page recommendation.

Are you aware of that?

A   No.

Q   Okay.  So you have not seen that document?

A   I have not.

Q   Okay.  Do you know ultimately what has happened with Dr. Zhang's employment?

A   Other than what I was presented in the exhibits and the information before the administrative hearings in the fall, I do not.

Q   So you have no new information since the administrative hearing?

A   No.

Q   All right.  I want to go through and -- some attorneys will spend 45 minutes on this, but I just want to go through your background.  I'm not going to spend nearly that long, but just to get to know you a little bit and about kind of how you ended up where you are.

Where are you from originally?

11

A   Starkville.

Q   Have you lived in Starkville your entire life?

A   Not my entire life.  I grew up in a small town about 45 minutes north of here.

Q   Okay.  What town?

A   Let's just say Houston.

Q   Okay.

A   A lot of people don't know the town of Woodland.

Q   You said adjacent.

A   Yeah.

Q   Okay.  And then -- but you've lived, I guess, in Starkville.  Where did you graduate from high school?

A   Woodland.

Q   From Woodland.  Okay.

And then did you go to Mississippi State for undergrad?

A   I did.

Q   All right.  And when did you graduate from Mississippi State?

A   Gosh, 1992, maybe, '93.  Somewhere in there.

Q   Okay.  So early -- early 1990s?

A   Yeah.  When I graduated from high school, I

12

went two years to community college at Wood Junior.  And then I worked in the workforce for probably six, seven years.  And then I went back to school and came to Mississippi State and finished my undergraduate degree.  So that's the reason for the span in time.

Q   Okay.  So what was your job when you were working in the workforce?

A   I worked at a newspaper in Houston.  And then when I moved to Starkville to continue my education, I worked with a newspaper here before going to work for Mississippi State full time.

Q   Got it.

And so did you work for the newspaper in Starkville during your -- the entire time you were attending Mississippi State?

A   No.

Q   Okay.

A   During that time I applied for a job here at MSU and was employed here at MSU.

Q   So you had a student job while you were at Mississippi State?

A   I had a full-time job and went to school full time.

Q   Okay.  And so what was that job?

13

A    I worked in continuing education here at Mississippi State.

Q    Have you been employed from -- by Mississippi State ever since that time?

A    No.  I left Mississippi State to take a job in Kennesaw, Georgia as associate Dean at Kennesaw State University.  And then when I returned to Mississippi, I took a position at the Mississippi School for Math and Science.  And then when I left MSMS, I came back to MSU in the position in the office of research and economic development.

Q    Okay.

A    And then I retired from ORED in December, at the end of December of 2022, and returned to MSU as a retired rehiree after my 90 days that PERS requires that we sit out.

Q    Okay.  There is a lot to follow up on there. I'm not going to follow up on all of it.

But what was your degree from Mississippi State?

A    My Doctorate?

Q    Okay.  Did you obtain a Bachelor?

A    All three of my degrees are from Mississippi State.

Q    Tell me your degrees.

14

A    My undergraduate is general liberal arts. My Master's is educational leadership with emphasis in higher education.  And my doctorate is in Ag extension and education.

Q    When did you obtain your doctorate?

A    '85, I think.

Q    1985?

A    No, that's not right.  I'm going to have to think on that.

Q    Okay.

A    Let me run through the years.  I'm going to have to think on that.  I should know, but that's a long time.

Q    Let's see.  Do you know when you came back to Mississippi State?

A    I came back to Mississippi State in 2007.

Q    Okay.  And at that time you had your Doctorate?

A    I did.

Q    Okay.

A    Obviously, it would be before '85.

Q    Right.  And -- okay.  So you came back in 2007. All right.  So that was interesting.  You actually retired from ORED, which is -- what does that stand for?

15

A    The office of research and economic development.

Q    Okay.  So you obtained your full PERS retirement from -- we'll call it ORED for short and then were able to be rehired sort of like a second career, another career, but while you're still obtaining your retirement, similar to how under PERS you could go work for a different public institution, you can do with the same institution?

A    At MSU if you return as a retired or rehiree, you can work 1,040 hours per year, per fiscal year.

Q    I did not realize that.  That's neat.

This question is -- I preface it with I realize it is sensitive, and I'm not asking it for just an irrelevant reason.  It's just there are certain allegations in the case, and that's the reason I'm asking it.

What would you describe as your race or ethnicity?

A    White.

Q    Okay.  White or Caucasian?

A    Caucasian.

Q    Yes.  Okay.  Okay.  I know that you were in ORED.  But what is your current role again?

16

A    Currently I am a retired rehiree, and I serve as the associate director in Mississippi State extension service.

Q    Okay.  Did you ever work with Dr. Robert Grala as part of your role in the extension service?

A    I haven't worked with him.  I know who Dr. Grala is.

Q    Is it Grala?  You said Grala.

A    Uh-huh. (Affirmative response.)

Q    I think I mispronounced it the entire day yesterday, and he never corrected me.

Okay.  Did you previously work under Dr. David Shaw?

A    I did.

Q    What was the date range that you were working for Dr. Shaw?

A    I need to have my resume in front of me.  I came to ORED in 2007.  And I think maybe around the time of 2009, 2010 he became our VPR.

Q    And VPR stands for?

A    Vice President for research and economic development.

Q    Is VPR, is that the job that Dr. Julie Jordan currently holds?

A    That's correct.  Well, she doesn't

17

currently, but, yes, she did.

Q    Who's currently the VPR?

A    There is currently an interim VPR, and that is Dr. Scott Willard.

Q    When did Dr. Jordan roll off?

A    She left ORED at the end of October of 2025.

Q    Do you know why?

A    She took another position across campus as the AI -- AI adviser to the President.  I'm not real sure what her title is, but she is an AI adviser --

Q    Okay.

A    -- to the President.

Q    I'm looking at the press release now, and it doesn't seem that there is a title at the press release.

Okay.  But she's assisting with the University's AI efforts?

A    Correct.

Q    AI being artificial intelligence?

A    Correct.

Q    Okay.  So when did Dr. Shaw -- did Dr. Shaw go straight from the VPR within ORED to the Provost position?

A    Correct.

Q    When was that, as best you recall?

18

A    2015, 2014, something like that.

Q    Okay.

A    No, that's not right.  It's going to be somewhere around -- no.  It would have been 2019, maybe, or 2020.  Somewhere in there.

Q    Okay.  And I see a press release on Mississippi State's website from 2019.  So does that sound accurate?

A    Yes, sir.

Q    Okay.  So it sounds like you worked -- did you work with Dr. Shaw as your direct supervisor for more than a decade -- for about a decade?

A    Not my direct supervisor, no.

Q    Okay.  Was your position in ORED always the same, or did it change over the years?

A    No.  When I came to ORED in 2007, I worked on the national science foundation score project.  And so my boss was the AVP, who's the PI of that project, Dr. Sandra Harpo.

Dr. Harpo retired, and I assumed some of her responsibilities while they were filling that position.  And at the point in time that they did fill that position, then I moved to assistant VP.  Well, I came out of that role into assistant VP position.  And then over the years I moved to associate VP.

19

Q    Okay.  And so assistant -- when did you become assistant VP?

A    That would have been -- what year did you say Dr. Shaw was VPR?

Q    I think you testified around -- maybe around 2009, 2010.

A    What was your question?  Ask me again.

Q    When did you become the assistant VP?

A    2012, 2013, somewhere.  And I've got to be honest.  Don't hold a gun to my head.  I'm not sure.

Q    I just want to get a reasonable approximation.

A    Yeah.

Q    If the specific dates are different, that's okay.  I just want to get kind of an idea -- really what I'm -- what I'm working down into is about how long you worked with Dr. Shaw as your direct supervisor.

And so 20 -- when you were the assistant VP, who was your direct supervisor?

A    Dr. Shaw.

Q    Okay.  And then you said at some point you became the associate VP.  When was that, approximately?

A    Probably 2019, 2020, maybe.  That was under

20

Dr. Jordan.

Q    What is the difference between an associate VP and an assistant VP?

A    The role.  Just some of the roles and responsibilities.  There are more responsibilities associated with associate.  For example, I had departments who reported to me.  I had centers who reported to me, university centers that reported to me.  As assistant you have some of that but nowhere near the load of responsibility.

Q    When you became the associate VP under Dr. -- did you say Jordan?

A    Jordan.

Q    Do you know if she is related to the judge down here, Dan Jordan?

A    I did not know that.

Q    I was asking if you knew if she was.

A    No.

Q    I don't know a lot of names that are pronounced that way that are spelled that way, but that's fine.

So when you started -- when you became associate VP, did the assistant VP position go away, or did someone else fill that role?

A    That's one of those where you -- you just

21

kind of assume. And so I kind of -- it was a double whammy. I kept the role and responsibilities I had, and I assumed additional responsibilities.

Q   So your job -- your job enlarged --

A   Yeah.

Q   -- when you became associate VP?

Okay. All right. So from the time you became assistant VP approximately 2012, 2013 until around 2019 when Dr. Shaw became Provost, he would have been your direct supervisor? That was a "correct"?

A   Correct.

Q   Okay. How would you describe your working relationship with Dr. Shaw during that time specifically?

A   What was the last part?

Q   Yeah. How would you describe your working relationship with Dr. Shaw during that time?

A   Yeah. It was a positive relationship. Dr. Shaw traveled a lot, and so he was -- he was not by any means a micromanager. He trusted his administrative team and his staff. And so, yeah, we had a really good working relationship.

Q   Did -- so I guess as the Provost Dr. Shaw sits over all things academic, whether that be

22

research or teaching or anything else that fits under that, correct?

A   Somewhat, yeah.

Q   And I know that may be kind of a crude lay person understanding of it. But that's kind of my understanding. Okay.

So -- but Dr. Shaw came out of the research world. Would you say that he continued to maintain really strong relationships with ORED based on his previous time there?

A   Yes.

Q   Okay. Once he became Provost?

A   Yes.

Q   Did you continue to have a good working relationship with Dr. Shaw once he became Provost?

A   I did.

Q   Do you have any understanding of the process that led to Dr. Jordan being appointed to the new VPR of ORED?

A   Other than Dr. Shaw taking a position and there needed to be an interim VPR.

Q   Okay. So she became interim at first?

A   Correct. I think she served in that position for maybe two to three years before she was actually named for -- they did a search.

23

Q   Did you submit an application?

A   I did not. I did not.

Q   Okay. Just curious.

All right. Even after Dr. Shaw was appointed to become Provost or named Provost -- let me back up. That was a bad question.

To this day, as the Provost, Dr. Shaw is ultimately an authority over ORED; is that accurate? Is ORED like independent of Dr. Shaw, or is ORED --

A   ORED is independent of David Shaw in that the VPR makes those decisions -- makes decisions in respect to ORED.

Q   Okay. Does the VPR of ORED report directly to the President?

A   Well, that's where it gets kind of tricky.

Q   Explain that to me.

A   Yes and no. Really it's the Provost, and then you have the various VPs. But at the end of the day they all kind of go up under Dr. Shaw, but they all report to Dr. Keenum, so ever how you want to figure that out.

Q   So ORED makes its own decisions about research. It is entrusted with the expertise of --

A   Correct.

Q   In theory Dr. Shaw could overrule -- could

24

probably overrule ORED on something, but in practice ORED handles the research issues. Is that about right?

A   That's correct.

Q   Do you recall when you first met Dr. Li Zhang?

A   When you say met, I don't -- and, honestly, I don't recall that I've ever met him face to face. If we have, I apologize. I don't remember that. We have had a lot of conversations, and that would have gone back to the probably 2021 or 2022 when the UTC was starting to be discussed.

Q   Okay. Were you involved with Dr. Zhang during the first UTC proposal when Dr. Truax -- that he worked on that was led by Dr. Truax?

A   I wasn't involved in that. I was aware, but I wasn't involved.

Q   Okay. So the first you recall any personal interactions, e-mail or otherwise, with Dr. Zhang would have been during the UTC proposal on which he was the lead PI?

A   Correct.

Q   What does PI mean?

A   Principal investigator.

Q   And that is -- I've learned a lot in this

25

case that I didn't know before.

But Dr. Zhang was personally the PI, but then Mississippi State was also considered a PI?

A No. Dr. Zhang is the PI. He is the principal investigator and responsible for the project and all of the responsibilities that go along with it.

Q Okay. So I've seen in places institutions being referred to as PI institutions or code PI institutions. Is that --

A What you have is you have -- in this case with UTC, with this UTC, when you have outside institutions that are partners or sub recipients, you have a lead institution. For this particular proposal MSU was the lead institution.

Q Okay.

A But as far as a PI, that will always be a faculty member or whoever it is that signs the dotted line that says, "I'm taking full responsibility for the project and the goals that go along with it."

Q Okay. Were you -- was there ever a time leading up to or at the beginning of the UTC proposal process where you perceived in any way that the University administration was devoting more attention to Dr. Zhang than an ordinary faculty member?

A In what regards?

26

Q In regard to disciplinary issues, in regard to oversight, any more attention than a typical faculty member would receive.

A The only thing I can say pertaining to your question on this is that I told you that I was aware of some of the things that went on with the previous UTC with -- where Dr. Truax was the PI. I was aware of some of the issues with that. Outside of that, as far as disciplinary or anything else, I don't know.

Q Okay. What did -- what were some of the issues that you were made aware of? Well, first of all, how did you become aware of the issues with the earlier UTC proposal?

A When the new RFP hit for the new UTC, there was discussion as to who would be lead PI for the new project. And so that generated a discussion as to the previous UTC.

Q Okay. And who was involved in that discussion?

A That would have been Dr. Keith, the -- who was the Dean of engineering; Dr. Reeves, who was the associate -- associate director for research; Dr. Shaw; myself; Dennis; Dr. Truax. That's all I can think of right now.

Q Was Truax still at the -- at the University

27

at that time?

A I believe so. But if he departed, it was very soon around that time if he was still there.

Q Are you -- are you sure that Dr. Truax was in the meeting, or is it possible that he was not in that meeting?

A Those weren't meetings. Those were e-mails. Those were e-mail discussions. We -- I've never had a meeting with those people in the same room where we had a discussion. Those discussions were via e-mail.

Q Okay. Were there any -- did you become aware of any issues with the earlier UTC proposal through any method other than e-mail?

A I don't believe so.

Q Okay. So that should all be documented in e-mail somewhere. Whatever your awareness of that situation was would be documented in an e-mail?

A It should be. Just to clarify on that question, I'm speaking for me and my involvement. I am not speaking for if there were a meeting with the other people that I named off. I'm speaking as far as myself.

Q I completely understand. Yeah, that's what I want to know, is what your understanding of the earlier UTC was based on, the issues with the earlier

28

UTC.

So what was your understanding that the problem was in the earlier UTC?

A There had -- well, there was a lot of discussion I think in the beginning, trying to decide who should be the lead, who should be co PIs, trying to get the team together, trying to get the proposal together, trying to get a budget together, just a lot of factors that played into it.

And I think there were some trust issues among some of the people. Just a combination.

Q Yeah. Were there any concern -- concerns about Dr. Zhang's performance in the earlier UTC proposal that you were aware of?

A The one that I am aware of the most is that there was -- there was a lot of negativity on Dr. Zhang's part when Dr. Truax was made the PI, and there were remarks made as to his credibility to lead a UTC. I'll stop there.

Q Was there anything else, any other issues other than Dr. Zhang's belief that -- let me back up. Did Dr. Zhang believe he should have led the earlier PI, as far as you know? I mean, earlier UTC proposal --

A My opinion, I think so. Yeah.

AW Reporting
601-573-0961

29

Q    Okay.  And your understanding was that when he didn't get that, he --

A    He was not happy.

Q    He was not happy.

And he communicated negative things about Dr. Truax's ability to lead?

A    Correct.

Q    Okay.  Outside of that, was there anything else that Dr. Zhang did or didn't do during the first UTC proposal that you became aware of?

A    Not that I'm aware of.  And, in all honesty, I haven't -- I did not go back and review the old UTC, any of that information.  So I may be missing something, but I'm trying to remember just from years ago.

Q    And at the time, did you go review any correspondence or anything in connection with the previous UTC proposal, or was your understanding based on contemporaneous communications from others?

A    The information that I just gave you came from e-mails because those e-mails came about, though, as the discussion was being had as far as who the UPI would be for the new UTC.

Q    Okay.

A    It wasn't like we went back, and we dug up

30

things.  It was like we looked back at that because that played -- that could have played, or maybe it did play a role, and it would be new PI.

Q    Understood.  Okay.  I'm going to share a document with you that has been marked -- that will be marked as Exhibit 21.

(DOCUMENT MARKED AS EXHIBIT NO. 21 AND ATTACHED.)

MR. BRAGG:  We've already been through Exhibits 1 through 20 in other depositions.  That's why this one is 21.

MR. BRAGG:  (Continuing.)

Q    And can you see my screen here?

A    I can.

Q    I'm just going to go down to the bottom and then go up to the top.  It's not a long e-mail.

Okay.  Do you recognize this e-mail exchange?

A    I do.

Q    And this was an e-mail ultimately that was forwarded to you on January 26th, 2022 by Julie Jordan?

A    Correct.

Q    And it looks like Dr. Shaw had forwarded it to Dr. Jordan before Dr. Jordan forwarded it to you,

31

correct?

A    (Witness nods head affirmatively.)

Q    And this is where Dr. Zhang was emphasizing the time frame around the need to make a decision about who was going to -- who was going to lead the UTC proposal; is that correct?

A    Correct.

Q    All right.  I'm going to pull up what will be marked as Exhibit 22.

(DOCUMENT MARKED AS EXHIBIT NO. 22 AND ATTACHED.)

MR. BRAGG:  (Continuing.)

Q    This is another e-mail exchange from Dr. Keith to Dr. Zhang and then sort of exchange back and forth with them.

And then Dr. Shaw forwarded that, because he was involved in the original communications, to you and to Dr. Jordan, and there was some back and forth among the three of you.

Is that accurate representation of this?

A    Yes.

Q    Okay.  And you recognize this as a true and accurate copy of those e-mails that you were a part of?

A    I agree.

32

Q    Okay.

A    Yeah.

Q    All right.  So let's go back down.  So it looks like on January 26th, 2022 Dean Jason Keith gave Dr. Zhang the go-ahead to submit the proposal.

A    Correct.

Q    He said move forward, correct?  I said correct.  Sorry to be a stickler.

A    Correct.

Q    All right.  And then Dr. Zhang said that this was a fresh start, and he seemed to express some optimism about the project.

Do you agree with that?

A    Yes.

Q    And then Dr. Shaw e-mailed just you and Dr. Jordan; did not include Dr. Zhang or Dr. Howard or Kari Reeves, at that time Kari Reeves, or Dean Keith and asked if we had anybody else who would be planning to submit a proposal; is that accurate?

A    Correct.

Q    And then Dr. Shaw was concerned that Li might not be the best choice for PI?

A    Yes.

Q    Okay.  I think you responded -- looks like you responded and said that you were not aware of

33

anyone else, but you remember the history on this.

So we have a challenge here with Li, correct?

A    Correct.

Q    Okay.  And so when you said you remember the history, you were recalling the history that you learned from others through e-mail, not personal understanding of the history at the time that it happened; is that right?

A    That's fair.

Q    Okay.  And then you said, "Li won't be happy any way we go unless he is the PI," correct?

A    Correct.

Q    And, again, that wasn't based on anything other than information you had received from others through e-mail, correct?

A    I had seen e-mails that he had provided to people when he would be very -- e-mails that were very derogatory.

Q    Okay.  And then Dr. Shaw responded to you and to Dr. Jordan and asked if there was someone else legitimate that wants to be the PI and suggested Isaac Howard as someone who would be exceptional, correct?

A    Correct.

Q    Do you know whether Dr. Shaw -- well, let me

34

ask you this.

Do you know about Isaac Howard?  Excuse me.  Do you know Isaac Howard personally?

A    I do not know him personally other than his position at Mississippi State and when we've been involved with projects.  But as far as personally and in-depth, I do not.

Q    Okay.  Do you know if he has any qualifications within the field of transportation?

A    I do not know Isaac's background.  I know he is in that department, the CE department.  But as far as his background, I do not know.

Q    Dr. Zhang is a traffic engineer.  He's a transportation engineer, correct?

A    That's my understanding.

Q    And then your remark was that Li is going to fight against anyone and everyone.

Was that, again, something based on your e-mails?

A    That's right.

Q    You didn't review --

A    That's correct.

Q    Did you have any follow-up conversations, not over e-mail but over the phone or in person, with Dr. Shaw or Dr. Jordan or Dean Keith or Isaac Howard

35

following this e-mail?

A    No.  Because at the end of this e-mail, it was -- Jason gave him the green light to go forward.

Q    Okay.  So Jason -- by the time you guys were having this conversation, Dean Keith had already given the green light, correct?

A    Yes.

Q    Okay.  But it does look like there is a follow-up conversation where you guys are considering whether you may be able to pivot, and you even asked who the best person would be to approach Dr. Isaac Howard, correct?

A    Correct.

Q    Okay.  So it was still open ended about whether someone else might be able to lead instead of Dr. Zhang following this e-mail.

Would you agree with that?

A    Not necessarily.

Q    Okay.  So did anyone approach Dr. Howard, that you know of, after this e-mail?

A    Not that I'm aware of.  Not that I'm aware of.  That could have happened, but I don't know.

Q    Okay.

A    In my mind -- I will go ahead and say in my mind when Jason gave him the green light, it was

36

pretty much a green light.

Q    Okay.  Unless something -- unless something changed, that was the course that had been set?

A    Yes.  And that would not have been a decision I would have made.  That would have been made at a higher level.

Q    Okay.  And so that e-mail exchange, which was Exhibit 22, was January 26th.  And so let's move to January 27th.

And, just to confirm, this is another situation where you weren't on the original e-mail, but you did receive the e-mail exchange, correct?

A    Okay.

MR. BRAGG:  We'll make this Exhibit 23 to the depositions.

(DOCUMENT MARKED AS EXHIBIT NO. 23 AND ATTACHED.)

MR. BRAGG: (Continuing.)

Q    It looks like the first e-mail is -- did you say Kari Reeves?

A    Kari.

Q    And is it now Kari Babski Reeves or Kari Reeves Babski; is that right?

A    Kari Babski Reeves.

Q    Kari Babski Reeves.  Okay.  So at this time

37

it would have been Babski Reeves. It just says Reeves on the e-mail.

Okay. So her e-mail that was forwarded to you suggests that she feels like the team and the total package can be a strong one on the UTC proposal even with Dr. Zhang being the PI?

A Correct.

Q And her last sentence says, "I think we can make this work."

A Correct.

Q Thank you.

All right. And then Dr. Howard chimed in, and after that Dr. Shaw forwarded this to you and to Dr. Jordan, correct?

A Correct.

Q And do you know why he forwarded it to you?

A We needed to be in the loop because any time that there is a big proposal -- well, any time there is a proposal, but especially one that large, is that, given my role in research and Dr. Jordan as VPR, we should be aware.

Q Okay. So it was a big project?

A It was.

Q It was going to involve a lot of time, a lot of resources, not just of Dr. Zhang at MSU but other

38

partnering institutions as well?

A Correct.

Q Did you ever have -- I may have already asked this. But I may have not completely asked it, so I just want to be sure.

Did you ever speak verbally with anybody about why Dr. Zhang would be awarded the PI?

A Possibly. Possibly. I can't remember. I'm going to be honest.

Q Okay. Did you know why he was given the PI role?

A I think Dr. Li needed the opportunity to be the PI because it's sometimes easy to think you want to be a PI on a large project such as this, and then it looks very different when you actually are the PI.

Q Did -- did you expect that if Dr. Zhang was the PI, the proposal would not succeed?

A Somewhat, yes. In all honesty, yes.

Q Okay. Did you voice that concern to anyone?

A I did.

Q Who did you voice that to?

A It was in an e-mail where I think I said, "We gave him the green --" something to the effect "We gave him the green light to let him fail."

But that -- with that comes the frustration

39

of knowing that it's going to be an uphill battle because he -- Dr. Zhang did not like to follow process and procedures. And so it wasn't that we -- let me say this.

Out of frustration -- I'm speaking for myself. Out of frustration, I did not believe that he could pull it off -- I'll be honest about it -- just because of the history and because of him not being -- he is not willing to work with people.

Did I want him to fail, no. There is a big difference. Let him fail and make him fail are two different things. The intent is always to help our faculty members be successful because when they're successful, the University is successful. So while I said, "Let him fail," that is very different from making him fail.

Q Okay. Let's go back because I'm aware of the e-mail. And so this is going to be Exhibit 24 to the deposition.

(DOCUMENT MARKED AS EXHIBIT NO. 24 AND ATTACHED.)

MR. BRAGG: (Continuing.)

Q Is this the e-mail exchange you're referring to where it has the phrase, "Let him fail"?

A Correct.

40

Q And I'll just scroll down to make sure it is the full e-mail exchange, correct?

A Correct.

Q Okay. Now, this e-mail was sent in June of 2022. But my question was really more about at the beginning of the decision to allow Dr. Zhang to be PI.

Did you have -- at the beginning of that time, did you have concerns that Dr. Zhang would not be able to successfully lead the UTC proposal?

A I don't know that it is so much about success leading the proposal as it is submitting a proposal.

Q Okay.

A They're two very different things. My concern was more about the submission versus the leading. Because before you can lead, you have to get it funded. And in order to get funding, you have to write a quality proposal.

My concern was more on the submission, the writing of the proposal, more than his leading the proposal should it be funded.

Q Okay. So -- and that's, I guess -- that may be where my understanding of the jargon just leaves me a little deficient.

But the -- when I'm talking about the

41

proposal, I'm thinking about the -- you know, the writing of, the submission, the thing that is being proposed, not once it is ultimately funded and becomes an actual funded UTC. In my mind that would be after the fact, right?

A I agree.

Q It would not be a proposal at that point. It would have come to fruition, correct?

A I agree.

Q And successful proposal is -- could you have a successful proposal that doesn't get funded?

A You could. You could. Would you like me to explain that?

Q Yeah. Go ahead.

A I've been on proposals. I have helped write proposals. And we submitted what we felt like were quality proposals. We got reviews back that looked very, very good. Our scores were very high. And we had a great team. We wrote a solid proposal. But competition is competition, and we just didn't get funded.

So sometimes you do have a great team and a quality proposal that doesn't get funded that you can consider it was a success. We got it done. We did it as a team. And for whatever reason the funding agency

42

didn't fund it. So, I mean, that's the way the world of research works.

Q Right. So when -- I guess when we are talking about successful proposals, we are not talking about ones that get funded. We're talking about ones that are a good work product submitted and having the opportunity to be funded?

A Correct.

Q Okay. So in January -- so let's go back to this e-mail, Exhibit 23.

At that time, in January of 2022, did you have concerns that Dr. Zhang would not be able to lead a successful proposal as PI?

A I had concerns, but I did not believe that it could not be done.

Q Okay. And at that time did you voice those concerns to anyone?

A I honestly don't remember.

Q Okay. So you don't have any recollection of voicing any concerns about Dr. Zhang's ability to succeed in January of 2022, correct?

A Correct. Because that's when we started. There were -- again, there were concerns, but there was no reason to believe that he could not submit a successful proposal.

43

Q Okay. And this was -- and in January is when he was given the green light --

A Correct.

Q -- agreed?

A Correct.

Q So let's look at Exhibit 24. And I want to walk through a couple of things here. So this is a -- hang on one second.

Okay. So this e-mail exchange begins with an e-mail from the United States Department of Transportation, kind of a blast e-mail, I guess, about this new funding -- federal funds available for 35 university transportation centers. And it's forwarded by Kendall Moore with Cindy Hyde-Smith's office to Marty Fuller, correct? Did you say, "Correct"?

A Correct.

Q Who is Marty Fuller?

A He is our congressional liaison for Mississippi State in DC.

Q So he has relationships with people like Cindy Hyde-Smith?

A Correct.

Q And he has relationships with Mississippi State?

A Correct.

44

Q Which is probably why Kendall Moore was asking about whether something would be -- like this would be a good fit at Mississippi State?

A Correct.

Q And then Marty did what Marty does, and he forwarded that to Dr. Jordan?

A Correct.

Q Okay. And then Dr. Jordan sent an e-mail to you asking here in June of 2022, so five months or so after the green light had been given to Dr. Zhang, whether Mississippi State could mandate a different PI; is that right?

A Correct.

Q Okay. And she says, "CAVS," C-A-V-S, "perhaps." What does that mean?

A CAVS is the Center for Advanced Vehicular System here at Mississippi State.

Q Okay. And what department is CAVS under?

A CAVS belongs to engineering, College of Engineering. It's a center that reports to the College of Engineering.

Q Okay. But it would be distinct from -- okay. So it's a center that reports to the College of Engineering.

But it would not be under the jurisdiction

45

of Isaac Howard like Dr. Zhang was, correct?

A    No.  It reports to the Dean of Engineering.

Q    Okay.  Which at that time was Jason Keith?

A    Correct.

Q    So why would -- why would Dr. Jordan have wanted to mandate a different PI at that time in response to this request from Cindy Hyde-Smith's office?

MS. MATTHEWS:  Objection.

You can answer to the extent you know what Dr. Jordan wanted, I guess.

A    I don't know.  If I had to answer, I would say it was probably from a conversation she and Dr. Fuller may have had.  But I don't know that.

MR. BRAGG: (Continuing.)

Q    Okay.  So having been in the, you know, realm of research for a long time at Mississippi State, do you understand what Dr. Fuller was forwarding to be a form of -- you know, to basically be -- represent congressional interest on the part of Cindy Hyde-Smith in supporting something like this at Mississippi State?

A    What are you asking me?

Q    Yeah.  So to me it looks like Kendall Moore was forwarding this on behalf of Cindy Hyde-Smith's

46

office.

A    That's nothing out of the ordinary.  That's their job as staffers in those offices to send us information like that.  So that's nothing out of the ordinary that they would normally send to Marty or to others at MSU.  Normally to Marty, though, because Marty filters it down to the VPs or Deans.

Go ahead.  I'm sorry.  I just wanted to get that --

Q    No.  That makes sense.

So this indicates that there is some level of congressional interest in this UTC transportation center funding that had become available under President Biden?

A    That's right.  Because Kendall would have been aware that we have transportation experts here at MSU.

Q    Okay.  And then in response to that e-mail from Dr. Fuller, Dr. Jordan's -- Dr. Jordan didn't say, "We're already working on it."  She said to you -- she asked you whether we could have a different PI, correct?

A    Correct.

Q    Okay.  And your response was that, "Kari Reeves and Jason --" being Jason Keith?

47

A    Correct.

Q    "-- have given Li Zhang the green light on this."  And that was back in January of 2022, correct?

A    Correct.

Q    "It would be a major undertaking to tell Zhang he can't be the PI if funded," correct?

A    Correct.

Q    "However, at the rate they're going, they aren't going to submit a proposal," correct?

A    Correct.

Q    Okay.  And then your comment here was, "That's the reason they gave him the green light, to let him fail, and they'll be done having to deal with his tirades every year when this RFP drops," correct?

A    Correct.

Q    So, first of all, the RFP, this isn't something that drops every year.  It is every five years, or something like that, correct?

A    Correct.

Q    And I'm curious -- well, how do you know -- how did you know when you sent this e-mail that Kari and Jason -- let me back up.  Let me ask that question again.

When you sent this e-mail on June 6th of 2022, how did you know that in January of 2022 Kari

48

and Jason gave Dr. Zhang the green light for the purpose of letting him fail?

A    Because of previous -- his previous actions on the previous UTC and other instances that I'm not aware of.

Q    What I haven't seen is any e-mails from Kari or Jason where they told you, "We would like to give this to Li so that he can fail."  So I'm curious how you knew their reasons.

A    Well, there would have been discussions about the -- about who was going to be the PI.

Q    Okay.  I was thinking -- were all of the discussions not via e-mail?  Were there some verbal discussions?

A    There were some -- probably some verbal discussions.  But as far as you asked me about -- you asked me about meetings.  There were no meetings.  There may have been individual conversations between Kari and myself or Jason and Dr. Shaw.

But as far as there being a meeting to say, "This is what we're going to do, and this is what it is going to look like, and this is why we're going to let him be the PI," that meeting -- there was never a meeting to that degree.

Q    Okay.  So suffice it to say you didn't just

49

make this up out of thin air the reasons that Kari and Jason gave Dr. Zhang the green light?

A    No.  I'll stand behind that.

Q    Okay.  That was based on information you received from Kari and Jason in some way?

A    Correct.

Q    Could -- just looking at the e-mail exchange on the whole, my impression is that this is the type of proposal that with the right PI the University could have sought congressional support; is that accurate?

A    Possibly.

Q    And that would be something that would need to be decided based on all of the factors and circumstances at that time based on whatever the situation was at that time, correct?

A    Correct.

Q    There's no hard and fast rule that we can't seek congressional support for a project like this UTC proposal, correct?

A    There is no hard rule that says we can't, no.  We -- we leave those decisions -- when a faculty member is asking for congressional support, the process and protocol here at MSU is that we work -- normally it's the Dean and the PI.  We work through

50

our congressional liaison, which would have been Dr. Fuller.  And Dr. Fuller would have determined whether we needed to make that ask or not.  That is protocol and process.

Same thing for, if we're working with state agencies, it would be Lee Weiskopf who we would work with.  He is the equivalent to Marty Fuller for a state agency.  And that -- that's for anyone across the University.  It's not just for this particular one.  It is for anything that we do when we're asking for congressional support.

Q    Okay.  Let's look at what will be Exhibit 25 to the deposition.

(DOCUMENT MARKED AS EXHIBIT NO. 25 AND ATTACHED)

MR. BRAGG: (Continuing.)

Q    And is this an e-mail exchange involving you, Dr. Zhang, and others?

A    Okay.

Q    Okay.  And this is from May -- looks like end of May -- the end of May of 2022?

A    Correct.

Q    All right.  So on the morning of May 31st, 2022 Dr. Zhang sent you an e-mail asking about whether someone in your office could work with congressional

51

delegates indirectly or directly.

So that's -- that's a way of asking about the possibility for congressional support; is that right?

A    That's right.

Q    Okay.  And he also mentions which University we're encouraged to collaborate.

So we needed to have some collaborating universities on this project, correct?

A    You would -- yes.

Q    Okay.  All right.  Your response from a couple of hours later -- first of all, did you have a conversation with Dr. Zhang about this, or was it just an e-mail response?

A    E-mail.

Q    All right.  Your response was -- first of all, you were copying Dr. Reeves.  Second, he would need to identify other universities that he would like to collaborate with that fit within the research things that had been identified for the UTC, correct?

A    Correct.

Q    And then the next -- in the next sentence you said that, "Since the UTC is a funded program, we will not seek additional congressional support for this effort," correct?

52

A    Correct.

Q    Okay.  And then you offered to help with identifying potential contacts at other universities once he gave you the names of those institutions, correct?

A    Correct.

Q    So the UTC is a funded program.  It is a federally funded program, correct?

A    Correct.

Q    And so is there ever a time when the University would seek congressional support for a federally funded program?

A    Not in the way of -- not fiscal money, no.  Not fiscal.

Q    But like a letter of -- like a letter of support?

A    Maybe.

Q    Okay.

A    I can't -- that's a decision -- that's a decision at the Marty Fuller level.

Q    And that's whether or not Mississippi State would reach out to a congressional office for some sort of support, monetary or otherwise, correct?

A    Correct.  Because Marty would have been the person -- that person.

53

Q   Okay.  And so the fact that the UTC is a funded program does not mean as a hard and fast rule that the University could not seek a letter of congressional support?

A   That is correct.  But you have to understand that at a large research institution, that we have to prioritize as to which and how many times that we will ask for that congressional support.  And those priorities have to be put in place, and those are put in place at the President and Marty Fuller level.

Q   Right.  You've got sort of -- you've got a certain amount of political capital, and you don't want to necessarily spend it all at one time?

A   Correct.

Q   And so if there had been perhaps a different PI, such as CAVS, someone within CAVS, leading the UTC proposal, then the University might have considered seeking congressional support?

A   That is not true.

Q   So no matter who had led this UTC proposal, the University is not going to seek any form of congressional support for the UTC proposal; is that true?

A   That was my understanding.  Because it's not about who the PI is.  It's about the funding and

54

getting the funding and the support.  So in this particular case it had nothing to do with PI.  Again, it goes back to we have to prioritize, ask MDC.

Q   Okay.  And then Dr. Zhang responded thank you for letting him know about the congressional support issue.  And then he identified three collaborating institutions that had already responded, correct?

A   Correct.

Q   Let me go back now.  On this sentence right here that starts, "Since the UTC is a funded program," it says, "We will not seek additional congressional support."

What did you mean by "we"?

A   MSU.

Q   Okay.

A   Again, that ask -- talking about an ask for congressional support, when we make an ask, it's not on the PI's behalf.  It is on MSU's behalf.

Q   Understood.  So at some point -- bear with me one second.

All right.  This is going to be Exhibit 26.

(DOCUMENT MARKED AS EXHIBIT NO. 26 AND ATTACHED.)

MR. BRAGG: (Continuing.)

55

Q   And this is an e-mail exchange that you were on I think the entire time, starting with Dr. Zhang setting up a meeting with other individuals on September 14th of 2022 and then forwarded.  In the very last e-mail in this exchange was Jason Keith sending an e-mail to Dr. Shaw and copying you and others, correct?

A   I'm not sure I'm familiar with this e-mail.

Q   Okay.

A   I know I'm on there, but I'm not recalling it.

Q   Okay.  Let's look at the very first one.  This is an e-mail from Dr. Zhang to several individuals, including you, copied on September 14th, 2022.  Just take a minute to look at the e-mail and see if you recognize it.

A   That was after the proposal was submitted.  This was after the UTC was submitted in August.

Q   Okay.  So I guess the proposal could be submitted, and then there could be a request for congressional -- a Congress person could submit a letter in support of it after the proposal was submitted?

A   They could.  But that's not -- that's not usually the norm.

56

Q   Do you not recall this e-mail at all?

A   I do now.

Q   Okay.

A   But --

Q   All right.  So Dr. Zhang had said that he had talked to several folks, including yourself, in hopes that MSU would reach out to congressional delegation.

But then he was reaching out to you, I assume being the three people in the title there, to see if we may be able to have a short call to see if Ole Miss, JSU, and USM might be able to move to this direction; is that accurate?

A   Correct.

Q   Do you recall what your response was when you saw that e-mail come across?

A   No.  Please remind me.

Q   Okay.  All right.  So I guess the first thing you did was forward it to Dr. Jordan?

A   Correct.

Q   And then Dr. Jordan sent an e-mail informing Dr. Zhang that the request was out of line and ordering him to stand down on the effort immediately, correct?

A   Correct.

57

Q Okay. So that's -- there are two different chains here combined.

But was it your understanding that Dr. Zhang's e-mail -- I mean, as we sit here today, do you think that Dr. Zhang's e-mail asking for Ole Miss, JSU, or USM to consider seeking congressional support in their own right was a violation of your earlier instruction that Mississippi State would not seek congressional support, or do you view that as a bit of a different thing?

A I think that is a back door to getting what he wanted.

Q And I understand your position on that.

But, I mean, isn't that sort of consistent with the reality that, okay, Mississippi State only has so much political capital? It only wants to make congressional support asks in certain situations. If a collaborating institution made that request, that would -- that could be a different thing.

Do you see how he could -- he could come to that conclusion?

A I do understand what you're saying. But let me -- let me explain to you that, when we work with other institutions in our state, they all have congressional liaisons. They all have a Marty Fuller.

58

And normally when it is a big project like this and we are going to -- all of us are going in together and ask for congressional support, it is those congressional liaisons that work together and determine if it would be Ole Miss to ask or it would be USM to ask, which one is going to use a bullet, per se, to ask for that congressional support.

Does that make sense what I'm saying?

Q Yeah.

A It may not have been MSU asking for congressional support. Someone is going to ask in the State of Mississippi for congressional support. But that conversation should have been had at a different level as to him asking those people or requesting those people to ask for congressional support. There's a process --

Q Yeah. Do you know -- I mean, did you personally explain that to Dr. Zhang?

A Not pertaining to that e-mail, no.

Q Do you know whether anyone else explained that to Dr. Zhang?

A I don't -- I don't know.

Q All right. We'll go -- I hate to be looking at documents the whole time and not being able to see each other. But we'll go back to the document here

59

that's Exhibit 26.

It starts on -- starting on page 2 of Exhibit 26, we again have the same -- an e-mail from Dr. Zhang. And then Dr. Keith sent an e-mail asking if you wanted to discuss this e-mail and that you could call Kari or him.

Do you see that?

A I do.

Q You responded that you thought they needed to talk, that y'all did need to talk. And then it looks like following that there was a Webex with Marty Fuller that Kari and Jason Keith were on.

A Correct.

Q So I guess it was you, Kari, Jason Keith were on it and then possibly -- do you know if Julie Jordan was on it as well?

A I'm not sure. I don't remember.

Q Okay. But Julie Jordan was going to send some correspondence about the meeting, correct?

A Correct.

Q What did you guys talk about in that meeting?

A If I had to try and remember -- and it's not clear; I'm going to be honest -- we would have talked about just what I explained to you a while ago as to

60

why we would or why we would not make a congressional ask and, if so, who would it come from.

In all honesty, it should have come from MSU if there were going to be an ask because our PI was from MSU.

Q The PI on the project?

A Correct.

Q Do you agree that if there had been a letter of congressional support, it would have increased the likelihood that the project was funded?

A There is no way to know that.

Q Okay.

A It depends on the agency. It depends on the reviewers. It depends on a lot of factors. There's no guarantee.

Q Okay. But those things are done for a reason, so the conventional wisdom is that congressional support can't hurt, and it could help?

A Absolutely. It doesn't hurt. But you don't always know that it is going to be the factor that pushes it over the line.

(DOCUMENT MARKED AS EXHIBIT NO. 27 AND ATTACHED.)

MR. BRAGG: (Continuing.)

Q I'm going to pull up what would be

61

Exhibit 27. Hang on. All right. Now I'm going to pull up what will be Exhibit 27.

Okay. And it looks like there continue to be -- so do you recognize this e-mail chain as one that you were on regarding the UTC proposal in this meeting for congressional support?

A I do.

Q And so it looks like people started talking about jumping on the meeting to have this conversation?

A Correct.

Q Okay. And then on Wednesday, September 14th at 1:44 p.m., you responded, "Lord, help us see the load. Surely he will not go through with the call," correct?

A That's correct. He had been told by Dr. Jordan to stand down.

Q Okay.

A He went forward anyway. He disregarded the directive.

Q So we were looking at Exhibit 25. Hang on. So he had been told to stand down. In response to his e-mail where he had copied Dr. Jordan, correct? Excuse me. Where he had copied you, and you had forwarded it Dr. Jordan? That was a "Correct"?

62

A Correct.

Q Okay. And so there is some communication about about whether the call would be canceled. It looks like they were looking at a four o'clock start time; is that right?

A Correct.

Q Okay. And it is your testimony that he did the call anyway?

A He did the call. No. No. Dr. Zhang did not do the call.

Q That's right.

(DOCUMENT MARKED AS EXHIBIT NO. 28 AND ATTACHED.)

MR. BRAGG: (Continuing.)

Q So if we look at Exhibit -- what's now Exhibit 28, and you're also on this e-mail, correct?

A Yeah.

Q Okay. At 2:12 p.m. he said that he had been asked to shut down the call, and there would be no phone call regarding this topic?

A Correct.

Q And he apologized for initiating the call, correct?

A I don't see that. Oh, sorry. Yeah.

Q Okay. All right. At some point -- and I'll

63

see if I can short circuit some of this.

At some point Dr. Zhang -- at some point Dr. Jordan got wind, and you got wind that congressional support had been solicited by this UTC team, correct?

A Correct.

Q Okay. Did you ever get any -- did you ever have any information that Dr. Zhang is the one that solicited congressional support?

A I did not. They -- that information went to Dr. Jordan.

Q Okay. Did you ever have any information that Dr. Zhang disobeyed the order and went forward with the call or otherwise asked anyone else to go seek congressional support notwithstanding Dr. Jordan's order?

A Not that I'm aware.

MR. BRAGG: Okay. I'm going to mark this Exhibit 29.

(DOCUMENT MARKED AS EXHIBIT NO. 29 AND ATTACHED.)

MR. BRAGG: (Continuing.)

Q Have you seen this letter?

A I have.

Q And you were not copied on the letter. So

64

was it sent to you by someone else?

A Yeah.

Q Who sent it to you? Dr. Jordan?

A Right.

Q Okay. And this was a reprimand to Dr. Zhang for refusing to -- quote, "refusing to follow a direct order to not engage with anyone outside of MSU leadership in seeking congressional support"?

A Correct.

Q And she announced that she had authorized the office of sponsored projects to contact the sponsor and withdraw the pending UTC proposal?

A Correct.

Q So that's a proposal that had already been submitted by that time but was pending with the US DOT?

A Correct.

Q And then there was also restrictions placed on his ability to seek external funding or other research support?

A Correct.

Q He basically had to get approval from ORED to do any of that kind of research activity?

A Correct.

Q Did you agree with the reprimand?

65

A   I did.

Q   Did you know whether he disobeyed a direct ORED?

A   From the information I had, I think he did.

Q   Okay.  The information you had that leads you to that belief is what?

A   I'm sorry.  Say that again.

Q   So we know he canceled the phone call after receiving that September 14th e-mail from Dr. Jordan, correct?

A   Correct.

Q   Okay.  What other information do you have that leaves you to believe that he disobeyed that direct order on September 14th?

A   There was an e-mail that I saw that Dr. Jordan -- pertaining to information she had gotten from Dr. Fuller that contacts had been made to congressional people after we had asked him to -- he did not make the contact, but people on the project had made contact.

Q   Okay.  And so the assumption was that Dr. Zhang had continued to ask them to make the contacts?

A   Correct.

Q   Okay.  But did you have any evidence that

66

Dr. Zhang had made that ask and that those individuals had not acted of their own accord?

A   I did not.

Q   So you really don't know whether Dr. Zhang violated the September 14th order or not?

A   I don't.

Q   All right.  This is going to be marked Exhibit 29.

Okay.  And is this a text message exchange between you and Dr. Jordan?

A   Correct.

Q   And this is the complete text message exchange during the administrative hearing?

A   Correct.

Q   All right.  So there is a message from Dr. Jordan right here on June 5th at 10:58 a.m. where she asks you to call her when you can.

Did you call her in response to that?

A   I did.

Q   What did you guys talk about?

A   She wanted to know if the -- if we actually did the proposal.

Q   Okay.  And then what did you say?

A   I said that we did.  And I went back, and those are screenshots from the office of sponsored

67

program's portal, submission portal.

Q   Okay.  The document --

A   I'm sorry?

Q   This is on page 6 of the document.  I'm just -- for purposes of the record.

It is the last page of the text messages, correct?

A   Correct.

Q   So these screenshots, tell me about them.

A   Those screenshots, when you submit a proposal, it has to go through the office of sponsored projects here at MSU.  There is a portal that all of the information goes in throughout the life of the proposal submission.

And so any time that you want to go back and look and see any of the documents or anything that's been submitted or any conversations between the PI and those who are helping with counting or OSP, that information is logged in the portal so we have a track record of the process of the proposal.  And that is the -- that is the OSP portal screenshots.

Q   Okay.

A   I can't make those out.  I think those are screenshots of where Becky Bassett -- thank you. That's -- that's the signatures for finishing the

68

proposal on the 25th of August.

Q   So 25th of August 2022, the proposal was successfully submitted?

A   Correct.

Q   Okay.  And then we have the big situation with congressional support.  And it looks like the top screenshot shows that in October of 2022, the proposal was withdrawn?

A   Correct.  October 25th.

Q   Okay.  Are you the one that did the withdrawal?

A   No.  That directive came from Dr. Jordan and OSP or the people who had to do that.

Q   Okay.  Do you know whether there were any conversations with any of the collaborating institutions about the fact that it would be withdrawn before it was done?

A   I don't know.  That would have come from Dr. Jordan.

Q   During your time as a professional within the ORED at Mississippi State, in a situation like that, would it be appropriate to contact the collaborating institutions to let them know, hey, this proposal that we all worked on is being withdrawn?

A   It would be.

69

Q  Okay. We're going to do Exhibit 30.

(DOCUMENT MARKED AS EXHIBIT NO. 30 AND ATTACHED.)

MR. BRAGG:  And I know we've been going for a while. Ashlyn, I'm trying to go relatively -- I'm trying to finish so that we don't have to move the next one. But if y'all do need a break, let me know. I think we are getting near the end.

(DOCUMENT MARKED AS EXHIBIT NO. 31 AND ATTACHED)

MR. BRAGG: (Continuing.)

Q  So do you recognize these two -- I guess they're e-mails?

A  Right.

Q  Okay. And these are both from you to Kari Reeves?

A  Correct.

Q  It feels like you and Kari Reeves are good friends?

A  We are not good friends. We work closely together because she's the Associate Dean for research, and she was my liaison, and that college was all faculty. Yes, we're friends, but we are not like best friends. We just work a lot together because we did a lot of work with engineering.

70

Q  Understood. You're work friends?

A  Correct.

Q  Understand.

A  And the thing you're seeing -- I want to go ahead and say when you're seeing all of these e-mail forwards and e-mails back and forth is because we try to keep everybody in the loop so no one is blindsided.

So that's the reason that there is forwards, there is to, from, that kind of thing. We're just trying to all stay on the same page.

Q  So this is a -- this first one here is on 8:37 a.m., October 25th, 2022?

A  Correct.

Q  And it's from you to Kari Reeves. It doesn't have a subject line on this.

Does the actual e-mail also not have a subject line?

A  No. What you see is what it is.

Q  So this is not a forward, or anything. This was just a one --

A  That was me telling her heads up.

Q  Yeah.

A  And -- because we knew once Dr. Zhang found out, that there was going to be another tirade.

Q  It was kind of a big deal, this thing that

71

he and other institutions had been working on for months and that had already been submitted for consideration by the US DOT was being pulled.

A  It's a big deal.

Q  So I think a tirade has a negative connotation.

But you expected that he would be upset about that?

A  Correct.

Q  Do you think that would have been an incorrect reaction for him?

A  No. I would have been upset.

Q  Okay. Let's look at the next one, October 25th at 9:13 a.m. And you said, "I agree with all of the above," but I'm not seeing any other e-mail information or anything.

Do you know what you're talking about on "the above"?

A  Not without going back and looking, no.

Q  Okay. Did she send you a e-mail, and you responded to it here?

A  Probably. Probably.

Q  Do you have your e-mail in front of you, by chance?

A  I can.

72

MR. BRAGG:  Ashlyn, I'll be happy to let you look at it first. But I am just curious. I didn't see anything in the production that this was connected to. So if she can --

MS. MATTHEWS:  If you can give me a second too, I can run a quick search in the e-mails.

THE WITNESS:  What date was that? October 25th?

MR. BRAGG:  Let's take two minutes. Take more if you need it.

(Off the record.)

MR. BRAGG: (Continuing.)

Q  So Dr. Gammill, did you find this e-mail at all in your inbox?

A  I did not.

Q  Your sent folder?

A  I did not.

Q  Okay. Regardless, this was an e-mail that you sent, correct?

A  Correct.

Q  And let me make sure I'm pulling it up.

Okay. And then you -- do you recall what you were agreeing with?

A  I don't, unless it was about the letter, unless it was about the reprimand letter.

73

Q    Okay.

A    I'm sure it had to pertain to that.  Not the reprimand letter.  I'm sorry.  The pulling of the proposal.

Q    And you mentioned that Dr. Zhang would be furious that you pulled it?

A    Yes.

Q    But, even worse, that you had made him look bad with partnering IHLs?

A    Correct.

Q    What was the purpose of that comment?

A    In my opinion Dr. Zhang is very self centered and not a team player.  He's not collegial.  And so it's -- he's very self centered.

And so any time that there is anything that is going on with him, it's always about him and him first and foremost.  And, given that reputation, it leads you to know that he will be furious because he will fear that he looks bad at the other institutions.

Q    Okay.  Did you feel that he was in some way getting his comeuppance for his prior actions?

A    I'm sorry.  Say that again.

Q    Did you feel that essentially he was getting something that he deserved because of his prior actions?

74

A    No, not at all.  I mean, I don't -- bad decisions led to some of the things that happened with his proposal and all of these things that happened.  But his actions lead you to believe that he only cares about himself and not the institution and not the college.

Q    And these -- when you say his actions, you're talking about things that you read in e-mail, not personal interactions that you had with Dr. Zhang, correct?

A    Okay.  Let's go back.  Let's -- let me go back to -- let me go back to the start of this.

Normally when there is a large proposal that is going to be written at MSU, there is a team.  There is a PI that is designated.  The PI would then pull together a team that will be on the proposal.  There will be roles and responsibilities assigned.

In this particular case there was cost share associated with it.  Cost share will be determined up front, where would cost share come from, how will it be covered.  There are a lot of factors that go into it.

But when you're the PI of a large proposal, you have a meeting up front first thing so that everyone understands the roles and responsibilities

75

and deadlines.  Deadlines are given also.

This was never done at the beginning of the proposal when he was awarded the green light.  Had that meeting taken place when he pulled all of his team players together and indicated to Kari Reeves, me, Jason Keith, anyone the resources that he needed, then a lot of this could have been avoided because all of that would have been discussed in the initial meeting where all of the players were at the table.

So when you look at this, a lot of his bad decisions brought this on himself.  For him to look bad to others, yes, he's going to believe that he will look back to his partners, to his partners in the institutions.  But that's -- that is because of his actions, not because of what we did.

Q    Okay.  So are you saying that Dr. Zhang did not have meetings after he had given the green light to discuss budgeting and other things with his team?

A    I'm not saying he didn't have meetings.  I'm sure he had meetings.  But at no point were we all brought to the same meeting where we all said, "Okay, let's map this out.  Let's strong man this out so everyone knows --" number one, we needed to know where the cost share was coming from so that would not be an issue to even see if we could cover the cost share.

76

Number two, we needed to know who the sub awards were going to be, the partnering institutions, because that would determine how much cost share we had to come up with.

When we sub award institutions with cost share, they are responsible.  If they get 200,000, they have to cost share whatever percentage or portion of that cost share there is.  We had to know that so they would know.

We would need to know who was going to be on the project so we would know if those faculty members had the time and effort left to be on that project, to know how much time and effort to put on the project that would affect the budget.

There are a multitude of things that could have been hashed out.  We could have talked about congressional support.  We could have talked about support letters.  We could have talked about so many things that could have all been hashed out at the very beginning had we only had that meeting.

And it is the PI's responsibility to call that meeting to determine who their team members are and get everyone around the table to know what resources you have and who was going to do what.

Q    Okay.  So it is -- it is your understanding

77

there was supposed to be a meeting at the very beginning in January or February of 2022?

A    I'm not saying there was supposed to be a meeting.  I'm saying normally when a large proposal is being submitted, the PI will call that meeting, and they will have those people around the table.  If there was a meeting called, I was never involved in that meeting.

Q    Okay.  So it's your testimony that you were not involved in a meeting early in the project to discuss all the things that you just talked about, correct?

A    Correct.  And I don't believe that there was ever such a meeting because, had there been that type of meeting, there would have been a Kari, who would have said, "Gammill needs to be in this meeting," or there would have been a Jason that said, "Gammill needs to be in the meeting."

We would all have said we knew who the players were that needed to be in the meeting for the resources outside of faculty members who could help him make a successful proposal and make it so much easier on him.

Again, we weren't trying to make it hard on him.  He needed to let us know what he needed so we

78

could help him versus waiting until the tenth hour to tell us, "Oh, I still need cost share.  Oh, I still need the budget done.  Oh, I still need this."

And even with all of those things in play, we were very lenient on him.  We let him go past a lot of deadlines that we would not have let any other faculty member because we wanted him to get a proposal submitted.  We wanted him to be successful.

So it frustrates me when it appears that we have done him wrong when in my opinion we tried to do everything we could to help him.

Q    Okay.  So did you or anyone else communicate to Dr. Zhang that there needed to be a meeting that he did not have early in the process?

A    I don't know.  I don't know the conversations that he had with Kari.  I don't know with Jason, as far as me saying -- telling him that, "You need to have this meeting."

But let's be -- let's be truthful here.  This is not his first rodeo.  He's been at Mississippi State.  He's been a PI on other projects.  He knows how the process works.

If he wanted to take on this large responsibility for this proposal, then he should have taken the correct steps to make it easier and to make

79

it where all of us could have been a true partner and help him with the resources that he needs.

Q    It sounds like you were very frustrated by how the process went.

A    I was because there was -- I'm sure you have an e-mail where I reached out to him to say -- for something as simple as a letter of support.  And I'm like, "I'm telling you I will have it.  Tell me what you want the letter to say."

And then, on top of that, instead of him trusting me, he reaches out to MDOT and saying, "Hey, we need the letter, and we need monetary support."

I mean, it is some things that small.  Don't even get me started on deadlines.

Q    Okay.  What I would like to know -- I hear what you're saying, and we may have a dispute about some of that, and we can take that up later.

What I would like to know -- we were looking at this e-mail where you related that Dr. Zhang would be furious, and you mentioned that he was selfish.

And what my question is is did you feel that Dr. Zhang, based on his conduct and attitude, was getting what he deserved?

A    No, not at all.  Again, had we -- had we had

80

that mindset from the start, do you think that we would have gone the extra mile that we did so the proposal could even be submitted?

We went -- we went -- we went around policy so that proposal could be submitted.  Do you think if we were out to sabotage him -- I could have done that by myself on several levels at my position.  We did right opposite.

Q    Okay.  So the proposal was submitted.

Did you feel at that time that it had a reasonable chance of being funded?

A    I think the proposal was good.  Yes, I do.

Q    And why did it get pulled?  Isn't that bad for the University?

A    Again, that was a conversation with him and the VPR as to her interpretation as to if he was insubordinate of her, if there was insubordination as to what she told him to do.

Q    But it was not something that was done because there was a deficiency of the proposal.  It was done as a measure of punishment.

Would you agree with that?

A    No, it's not a measure of punishment.  I mean, you can call it punishment if you like.  But, I mean, your actions determine outcome.

81

Q   But there was no reason to pull the proposal --

A   That was at the discretion of the VPR.

Q   Okay.  Other than the documents we've looked at, do you remember any conversations with Dr. Jordan about Dr. Zhang either before or after the UTC proposal?

A   I know that she told me that she had scheduled -- she had e-mailed him and that she was going to have a face to face meeting with him and that her plan at that point in time, unless he convinced her differently in the face to face, that she would pull the proposal.

Q   Okay.  What about -- so do you know if they ever had that face to face meeting?

A   They did.

Q   Okay.

A   I was not in that meeting.

Q   They had that meeting before the proposal was pulled?

A   Yeah.

Q   And she told you that?  Dr. Jordan told you that?

A   Yeah.

Q   Okay.  Were there any other conversations

82

you had with Dr. Jordan about Dr. Zhang that you recall other than the ones we've talked about?

A   There could have been.  I honestly don't remember.

Q   Okay.  What about -- are there any conversations with Dr. Shaw --

A   No.

Q   -- or Dr. Keith that you had about Dr. Zhang?

A   Are you talking about as far as the reprimand or the pulling of the proposal?

Q   Did you ever have any conversations with Dr. Shaw about Dr. Zhang?

A   Throughout the process?

Q   Yeah.

A   Yeah.

Q   Okay.  Do you recall any of those conversations?

A   Those conversations would have been had early on when we were trying to determine the PI.

Q   Okay.

A   They were way back when we were trying to -- when we were going back and talking about previous -- the previous UTC with Dennis Truax.

83

Q   Okay.  Who did -- did you have any conversations with Dr. Shaw after the -- after that early decision about who would be the PI that were about Dr. Zhang?

A   No.  Dr. Shaw -- once that was determined, we were off to the races at that point.

Q   So tell me what the conversations were like with Dr. Shaw.

A   Dr. Shaw actually had more background than I did about the Dennis Truax because of the research efforts between engineering and ORED.

Dr. Keith and Dr. Shaw would meet.  I think they met monthly.  So he was much more aware of things going on in engineering, and it wasn't necessarily just about UTC.  They talked about different things going on in engineering, whether it be research or academics, at those monthly meetings.  I wasn't privy to that.

But because of those monthly meetings, Dr. Shaw had information that I wasn't privy to.

Q   These are meetings between Dr. Shaw and Dr. Truax?

A   Dr. Keith as the Dean.

Q   So he was having meetings with Dr. Keith, and Dr. Shaw provided you some of that background?

84

A   He provided me the background pertaining to that -- well, like I said, in the e-mails as far as Dr. Zhang's displeasure with previous PIs and the way the proposals were handled.

Q   Okay.  Any other concerns that -- so Dr. Shaw mentioned the previous proposal.

Any other specifics that Dr. Shaw mentioned to you in those conversations?

A   He -- he was familiar with Dr. Zhang.

Q   Did he tell you that Dr. Zhang and Dr. Howard did not get along?

A   Well, that was -- that was obvious in e-mails that they did not get along.  Dr. Zhang made that clear in e-mails.

Q   Any other concerns about Dr. Zhang that Dr. Shaw expressed to you?

A   No.

Q   Okay.  Did you have any conversations directly with Dean Keith about Dr. Zhang?

A   No.  Those were normally -- it was the -- it was the group.  It was the Kari and the Jason and me and sometimes Julie and Dr. Shaw.

Q   Okay.  What do you recall -- and you said and Dr. Shaw?

A   It was just back -- you have the e-mails

85

where we talked about is Dr. Zhang the best one to be the PI. It's those conversations that we were having.

Q Okay.

A Do we go with Dr. Zhang, do we look for someone else. It was those type of discussions.

Q Right. And I guess I'm trying to find out things outside of the e-mails.

Did you have any face to face or a phone call or video conference meeting, a verbal conversation where Dean Keith was in the conversation, and you talked to him or heard him talk about Dr. Zhang?

A No.

Q Okay. And what about Isaac Howard?

A No. I never spoke with Isaac.

Q Okay.

A I only had e-mails -- well, I didn't even have e-mails with Isaac.

Q Okay.

MR. BRAGG: All right. I will -- give me just about two minutes. I'm going to chat off line, and I think we're almost finished.

MS. MATTHEWS: Grafton, we can go off the record for this.

86

(Off the record.)

MR. BRAGG: I don't have any more questions.

(DEPOSITION ENDED AT APPROXIMATELY 1:40 p.m.)

87

CERTIFICATE OF REPORTER

I, AMANDA WOOTTON, Court Reporter and Notary Public for the State of Mississippi, do hereby certify that the above and foregoing pages contain a full, true and correct transcript of the proceedings had in the aforenamed case at the time and place indicated, which proceedings were recorded by me to the best of my skill and ability.

I also certify that I placed the witness under oath to tell the truth and that all answers were given under that oath.

I certify that I have no interest, monetary or otherwise, in the outcome of this case.

This the 22nd day of January 2026.

AMANDA M. WOOTTON

My Commission Expires:
December 15, 2026

88

CERTIFICATE OF DEPONENT

I,_____, do hereby certify that the foregoing testimony is true and accurate to the best of my knowledge and belief, as originally transcribed, or with the changes as noted on the attached Correction Sheet.

Subscribed and sworn to before me this the _____ day of _____, 2026.

_____
Notary Public

My Commission Expires:

89

CORRECTION SHEET

I,_____, do hereby certify that the following corrections and additions are true and accurate to the best of my knowledge and belief.

CORRECTION          PAGE     LINE     REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____

Subscribed and sworn to before me
this the _____ day of _____, 2026.


                          _____
                              Notary Public
My Commission Expires:

88

CERTIFICATE OF DEPONENT

I, _Dr. Teresa Gammill_ Digitally signed by Dr. Teresa Gammill Date: 2026.02.18 06:45:49 -06'00' , do hereby certify that the foregoing testimony is true and accurate to the best of my knowledge and belief, as originally transcribed, or with the changes as noted on the attached Correction Sheet.

Subscribed and sworn to before me this the ___18th___ day of _February_, 2026.

_Vicki S. Vaughn_

Notary Public

My Commission Expires:

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 109466
VICKI S. VAUGHN
Commission Expires
July 7, 2026
CHOCTAW CO.

AW Reporting
601-573-0961

89

CORRECTION SHEET

I, _Dr. Teresa Gammill_ <sub>Digitally signed by Dr. Teresa Gammill Date: 2026.02.18 06:46:19 -06'00'</sub> , do hereby certify that the following corrections and additions are true and accurate to the best of my knowledge and belief.

| CORRECTION | PAGE | LINE | REASON |
| --- | --- | --- | --- |
| "Andie" should be "Dendy" | 6 | 9 | incorrect transcription |
| "score" should be "EPSCoR" | 19 | 17 | incorrect transcription |
| "Harpo" should be "Harpole" | 19 | 19 and 20 | incorrect transcription |
| "Lord, help us see the load" should be "Lord, help us all." | 62 | 13-14 | incorrect transcription |
| "did the proposal" should be "did pull the proposal" | 67 | 22 | missed word |

Subscribed and sworn to before me this the 18th day of February , 2026.

_Vicki S. Vaughn_

Notary Public

My Commission Expires:

AW Reporting
601-573-0961