# EXHIBIT 65

LI ZHANG, Ph.D., P.E., F., ASCE. F. ITE
Professor
May 22, 2025

Mississippi State University
Promotion and Tenure Committee
C/O Joan Lucas, general counsel
jlucas@legal.msstate.edu                                    *Via Email*

Craig Aarhus, College of Education
C/O Joan Lucas, general counsel
jlucas@legal.msstate.edu                                    *Via Email*

Jenna Altomante, College of Architecture, Art & Design
C/O Joan Lucas, general counsel
jlucas@legal.msstate.edu                                    *Via Email*

Kelli Anthony, Instructor Representative
C/O Joan Lucas, general counsel
jlucas@legal.msstate.edu                                    *Via Email*

Todd Archer, College of Veterinary Medicine
C/O Joan Lucas, general counsel
jlucas@legal.msstate.edu                                    *Via Email*

Melody Dale, Library
C/O Joan Lucas, general counsel
jlucas@legal.msstate.edu                                    *Via Email*

Dipangkar Dutta, College of Arts & Sciences
C/O Joan Lucas, general counsel
jlucas@legal.msstate.edu                                    *Via Email*

Robert Grala, College of Forest Resources
C/O Joan Lucas, general counsel
jlucas@legal.msstate.edu                                    *Via Email*

Santanu Kundu, Bagley College of Engineering

**MSU259838**

C/O Joan Lucas, general counsel
jlucas@legal.msstate.edu                                    ***Via Email***

Shien Lu, College of Agriculture & Life Sciences
C/O Joan Lucas, general counsel
jlucas@legal.msstate.edu                                    ***Via Email***

Robert Moore, College of Business
C/O Joan Lucas, general counsel
jlucas@legal.msstate.edu                                    ***Via Email***

Athena Nagel, Teaching Professor Representative
C/O Joan Lucas, general counsel
jlucas@legal.msstate.edu                                    ***Via Email***

Mary Love Tagert, Clinical/Extension/Research Professor Representative
C/O Joan Lucas, general counsel
jlucas@legal.msstate.edu                                    ***Via Email***

Charlie Winfield
Ashlyn Matthews
The Winfield Law Firm, P.A.
224 East Main Street
Starkville, MS 39759
cwinfield@winfieldlawfirm.com
amatthews@winfieldlawfirm.com                               ***Via Email***

RE: *Li Zhang, Response to Notice of Intent to Terminate and Supplemental Notice of Intent*

Dear Promotion and Tenure Committee,

Please accept this formal response to the (1) "Notice of Intent to Terminate" issued by Mississippi State University ("the University") through Provost David Shaw on February 14, 2024 and (2) the unsigned "Supplemental Notice of Intent to Terminate" provided to this committee on January 22, 2025. (Exhibit Z-1,

2

**MSU259839**

Notice of Intent to Terminate); (Exhibit Z-2, Supplemental Notice of Intent to Terminate).

Through counsel, Dr. Zhang is sharing Exhibits Z-1 to Z-42 through a secured google drive link. This link will be shared with the University's general and outside counsel, and Dr. Zhang specifically requests that the materials be made available to all members of the Committee. Dr. Zhang and his counsel are also happy to add others to the google drive folder for direct access or take any other logistical steps that the Committee deems appropriate.

## Introduction

Dr. Zhang has diligently and faithfully served this University and its students since 2005, and he was fully promoted in Spring 2021. Dr. Zhang was assigned a a full course load by then Department Head, Dr. Dennis Truax, plus a 32% research distribution. In Summer 2021, the interim School Director (changed from Department to School in Summer) altered his course workload without accounting for Dr. Zhang's research load. Later in the year, Dr. Zhang needed scheduling accommodations so he could have a spine surgery that he desperately needed and so that he could provide care for his disabled son. The University, through Dr. Isaac Howard, Dean Jason Keith, and Provost David Shaw, was wholly inflexible and refused to accommodate him.

When Dr. Zhang expressed frustration about this, they turned against him on a dime. Provost Shaw's written words say it best: faced with a legitimate request for medical leave in November 2021, Provost Shaw claimed Dr. Zhang was "working the system to his advantage" and Provost Shaw wanted to "aggressively do everything we can to rectify this situation." The University has since been file building against Dr. Zhang so it could put a good face on its hostile and unlawful retaliation. Dr. Shaw's desire to "aggressively do everything we can" has now culminated in these termination proceedings.

Provost Shaw asks this Committee to bless his retaliatory vision and recommend Dr. Zhang's termination. This Committee should investigate all facts and claims made in the supplemental letter of intent (unsigned by anyone at the University) and reject Dr. Zhang's termination. Tenure—and any

3

MSU259840

chance at real academic freedom—will be meaningless if they can be stripped away at the whim of administrators' personal feelings and animosities.

Dr. Zhang hopes the committee will see this case for what it is: an attempt to "aggressively do everything" it can to terminate Dr. Zhang, even if it requires false and misleading statements and violations of the University and IHL policies, federal and state law, and even the United States constitution. Dr. Zhang urges the Committee members, both faculty and staff, to stand up against any attacks on higher education, respect and enforce important policies and procedures, and fully investigate assertions and allegations made by anyone, from Dr. Zhang to the highest-ranking administrators at the University. Everyone deserves equal treatment under the law and at this University.

**INFIRMITIES IN THE HEARING PROCEDURES**

The original notice of termination was issued on February 14, 2024. (Ex. Z-1). Although the notice mentioned Dr. Zhang's right to invoke the administrative hearing process, the language was clear. Dr. Zhang "will be terminated for cause on February 29, 2024" and "you are relieved of all work duties." (Ex. Z-1). Meanwhile, Dean Jason Keith and a human resources representative instructed Dr. Zhang to move out of his office by February 29, 2024, told him that salary and benefits would discontinue on that date, and directed him to establish COBRA health insurance on March 1, 2024, just before Dr. Zhang's family would take his disabled son Channing to medical appointments in Baltimore that were more than a year in the making. Dr. Zhang was asked to continue his medical insurance through COBRA on March 1 before his son's medical trip to Baltimore . (Exhibit Z-3, Email Exchange with Julia Morrison). The University's termination letter and its contemporaneous conduct make clear that, hearing rights aside, it has already made the termination decision.

The hearing was originally scheduled for early February 2025. Yet just before the hearing, Dr. Zhang received the "Supplemental Notice of Intent" that was 10 times longer than the first one, drastically expanded the scope of the allegations against Dr. Zhang, and included numerous exhibits. Around that time, Dr. Zhang also learned that the full Promotions and Tenure Committee

MSU259841

was not being convened for the hearing. Dr. Zhang's counsel requested an extension of the hearing so that (1) the full panel could be convened and (2) he could prepare to defend the laundry list of allegations against him. (Exhibit Z-4, Email Requesting Extension).

Surprisingly, Dr. Zhang has learned that even after the extension, the full Promotions and Tenure Committee is still not being convened for this hearing. This is so, even though in April 2025, Dr. Zhang's counsel formally requested that "the full Promotion and Tenure Committee attend and participate at the hearing" pursuant to HRM 60.113V(D) (Exhibit Z-5, Letter on Hearing Procedures); (Exhibit Z-6, HRM 60.113V(D)). Dr. Zhang is gravely concerned that, without the full committee, his right to an unbiased hearing may be severely impaired. This is especially true, given  given the evidence shown below of faithful execution by more than 10 administrators of a plan to get rid of Dr. Zhang by "aggressively do[ing] everything we can . . . ."

Dr. Zhang has also repeatedly requested access to Banner, OneDrive, and his email account—at least 21 days before the hearing—to adequately retrieve documents and prepare for the hearing. Most recently, Dr. Zhang made this request through his formal counsel letter in April 2025. (Ex. Z-5).To this day, Dr. Zhang has not received the access that he requested.

Dr. Zhang also disputes certain annual reviews submitted along with the University's supplemental notice of intent. In his original notice of intent, Dr. Shaw's primary reasons for the decision to terminate Dr. Zhang are "unsatisfactory ratings" for "teaching and research" since 2021.  (Ex. 1). Neither the Committee nor Dr. Zhang has been provided with a signed copy of the 2021 and 2022 annual evaluations. (University Exhibit 23, Invalid 2021 evaluation); (University Exhibit 22, Invalid 2022 annual review). Nor has Dr. Zhang received any annual reviews for 2023 and 2024. A signed and valid copy of the last annual review for 2020 (signed by Dean Keith ironically) and the second-to-last valid annual review of 2019 are more than just "satisfactory." (Exhibit Z-7, 2019 Annual Review); (Exhibit Z-8, 2020 Annual Review). Dr. Shaw's false statements in the initial termination letter allow this Committee to infer that many of the allegations against Dr. Zhang are false, misleading, and unfounded.

MSU259842

In addition to the invalid 2021 and 2022 annual reviews, the outcomes of those two invalid reviews were predetermined by Provost Shaw, Dean Keith, and Dr. Howard before the process. The due process afforded to the faculty to dispute the annual reviews in a grievance hearing was deliberately delayed and canceled due to the termination letters, which cited the two invalid reviews. This is a textbook example of a procedural catch-22, also referred to as a circular denial of due process, in which annual reviews are used to justify termination, while the pending termination serves as a basis to deny a challenge to the very same reviews. The invalid annual reviews for 2021 and 2022 were conducted 19 months and 7 months later than MSU policies required, and they bear no signatures (even as of today) by any University administrators. Further, not all faculty in CEE even received 2021 and 2022 reviews. For these reasons, Dr. Zhang urges the Chair and Committee to exclude the 2021 and 2022 Annual Reviews at the upcoming hearing.

**SUMMARY OF FACTS**

Dr. Zhang is a Chinese American tenured full professor at Mississippi State University ("the University") within the School of Civil and Environmental Engineering (the "School"). Dr. Zhang began working for the University as a transportation engineering assistant professor in January 2005. He received a tenure promotion in 2011. And in Spring 2021, Dr. Zhang was promoted to full professor on the strength of a glowing recommendation from his dean Jason Keith. (Exhibit Z-9, Keith Recommendation).

During his time at the University, Dr. Zhang has made significant research contributions within the field of civil engineering. Dr. Zhang has brought various honors, including an international best paper award, and around $14 million in research funding to the University. (Exhibit Z-10, Excerpts from 2019 Dossier). In 2020 and 2021, Dr. Zhang's research workload and contributions to the school were approximately 4.9 times that of an average tenure-track and tenured faculty member within the School, and 2 times that of the other two full professors within the School. (Exhibit Z-11, 5.10.21 Email from Traux); (Exhibit Z-12, 5.1.22 Faculty Email from Howard).

6

MSU259843

As Dr. Zhang has labored in the classroom and through research, he has faced personal challenges. His son was diagnosed with autism spectrum disorder and global developmental delay,[1] and Dr. Zhang has undertaken significant caretaking responsibilities. (Exhibit Z-13, Records from UMMC – July 2024). Dr. Zhang has also suffered from debilitating back pain, which ultimately required him to undergo spine surgery in December 2021. (Exhibit Z-14, Emails with Spine Surgery Restrictions).

In the Summer 2021, Dennis Traux, then-department head was terminated for unexplained reasons. Shortly after this, Dr. Zhang's interim (and eventually permanent) replacement, Dr. Isaac Howard, altered and overloaded Dr. Zhang with additional teaching responsibilities stemming from Dr. Truax's absence, (although Dr. Truax had already assigned him a full teaching load). Dr. Howard and Dean Keith were aware of Dr. Zhang's already-heavy research workload. Dr. Howard had publicly threatened Dr. Zhang in a department meeting when it was revealed that Dr. Howard had (in secret) been selected to replace Dr. Traux. (Exhibit Z-15, May 2021 Email Exchange with Jason Keith). At the meeting, Dr. Zhang explained his heavy research load, suggested keeping his current (and full) load of two courses because of his heavy research load, and recommended that Case William Fulcher teach the extra courses. Dr. Howard, Dean Keith, and Fulcher's employer agreed to this proposal. (Exhibit Z-16, Emails Re: Fall 2021 Scheduling, at 11).

After a few days, however, Dr. Howard changed his mind and asked for Dr. Zhang's salary release for the Fall Semester. (Ex. Z-16, at 11). On June 28, 2021, Dr. Howard insisted that Dr. Zhang release his salary. Rather than seek input from and balancing the schedules of all faculty, Dr. Howard decided that Dr. Zhang would not just be overloaded, but that his schedule would change to Monday through Friday from Tuesday/Thursday classes only. Dr. Howard made this decision despite Dr. Zhang's commute from Brandon, Mississippi, his caregiver responsibilities for his disabled son, his chronic back pain, and his 32% salary release. (Ex. Z-17, Emails regarding Salary Release). This created additional hardship because of Dr. Zhang's known disability and his son's disability. Dr. Howard adamantly refused to accommodate Dr. Zhang. (Ex. Z-16).

---

[1] Doctors later confirmed that Dr. Zhang's son suffers from a rare genetic disorder SCN2A.

7

MSU259844

Things came to a boiling point in December 2021. For some time, Dr. Zhang had experienced chronic and debilitating back pain that interfered with his teaching, his caretaker responsibilities, and other activities of his daily life. Dr. Zhang had made the University aware of this fact through his supervisors, who knew about Dr. Zhang's back problems.

After receiving a recommendation from his physician at the MSU student health clinic, Dr. Zhang informed Dr. Howard and Dean Keith on the morning of November 19 that he would discuss spinal surgery on November 22 with a surgeon. Dr. Zhang suggested that the final exam would need to be taken care of by assigning a proctor. *See* Ex. 14. Dr. Zhang received no objection to the surgery. In fact, Dean Keith replied the same day, "I hope all goes well with your medical appointments next week!" (Ex. Z-14, at 4). The surgeon advised Dr. Zhang to appear for surgery the following week. The day after Dr. Zhang learned that the surgeon had an opening for December 1, 2021, Dr. Zhang informed Dean Keith and Dr. Howard about it. (Ex. Z-14, at 2). The email included an attachment from NewSouth NeuroSpine prohibiting work for "2 weeks following surgery or as discussed with your doctor"—that is, until December 14, 2021.  (Ex. Z-14, at 3). Two days after the surgery, after a post-operative examination, Dr. Zhang's surgeon extended his medical leave until January 17. On that day, Dr. Zhang emailed the revised leave request to Dean Keith Dr. Howard. (Exhibit Z-18, Leave Form and Email).

The University took no action on Dr. Zhang's medical leave request, instead holding approval as leverage to force Dr. Zhang to work and then blame him for any irregularities in the grading. The University did not approve Dr. Zhang's leave until January 27, 2022—more than 50 days after he submitted the eform and 20 days after Dr. Zhang had recovered from his surgery and was cleared to return to work! (Exhibit Z-19 – 1.27.22 Leave Approval). The decision to "deny" or "defer" Dr. Zhang's leave request was made over an unequivocal objection by the HR director, who wrote: "Unfortunately, we cannot deny medical leave for an employee." (Exhibit Z-20, November 2021 Emails, at 2). But Provost David Shaw believed that Dr. Zhang had been "working the system to his advantage" and wanted to "aggressively do everything we can to rectify this situation." (Exhibit Z-20, at 1).

MSU259845

With Dr. Zhang being forced to work during surgery recovery, he did his best to complete the exams and final Fall 2021 grades for his students. Without any support for two undergraduate courses with total of 93 students (MSU Exhibit 9, at 7), Dr. Zhang submitted the exam to the administration, took steps to ensure that a proctor would be available to administer the exams, and then actually graded the exams and calculated the final grade. For a few students, Dr. Zhang was not able to finalize exam grades due to physical constraints relating to his back surgery. He planned to do so and adjust final grades if necessary, and Dr. Zhang communicated this fact to the affected students, Dean Keith, Associate Dean Kari Reeves, and Dr. Howard. *E.g.*, (Exhibit Z-21, Emails Regarding Follow Up Grade).  Associate Dean Reeves even agreed that Dr. Zhang would "be able to submit eforms to change all of his missing grades." (Exhibit Z-22, Emails Regarding Fall 2021 Grades).

Meanwhile, without alerting Dr. Zhang, University administrators were making a behind-the-scenes "contingency" plan that involved assigning students different grades than they earned. (Exhibit Z-23, Emails Regarding Contingency Plan, at 13-14). Then after Dr. Zhang submitted grades, the University (in response to alleged student complaints), unilaterally and secretly changed the course grades that Dr. Zhang had worked diligently to assign, even as he recovered from surgery. (Exhibit Z-24, Emails Confirming Grade Changes). As a result, students who had performed poorly or who had even been cited for honor code violations were given a free pass by the administrators who handed out the grades (and who were not qualified to do so). (Ex. Z-23).

The University's concerns were overblown, and its response was disproportionate. Dean Keith admitted that "a relatively small number of students" were "doing poorly in this class." (Ez. Z-23, at 2). For one of these, Associate Dean Reeves admitted: "for the father that has called and emailed ISE, the student did not turn in  4 of 6 HWs, did not take exam 3, and made a 2 on exam 2. He's also missed 18 classes. This appears to be less a function of Li and more a result of the student's engagement in the class." (Ex. Z-23, at 4). Crudely, Assistant Dean Robert Green joked that the student would argue "that since 'Dr. Zhang spoke no English' there was no use in going to class." (Ex. Z-23, at 4).  Kari Reeves believed that grades were fair: "With grades this good, should

9

we hold off for a couple of days and see what he does before entering the grades." (Ex. Z-23, at 4).

Ultimately though, MSU committed an unthinkable act against all faculty: large-scale grade fabrication. Even some students complained. One student put it well:

> I would like to find out why that is that some students grades are getting changed higher and others aren't[.] Thats not really an even playing field academically and if some students are getting passed and others aren't for such a trouble some class. I am just wondering if I needed to speak with someone here in the department or if I needed to go through elsewhere to get my grade corrected." "if I needed to go through elsewhere at the university to get my grade corrected."

(Ex. Z-22, at 2).

Dr. Zhang responded to the grade manipulations by sending a class-wide email to alert his students. (Exhibit Z-25, Email Reporting Grade Manipulations to Students). The University felt this email was an affront. But Dr. Zhang's tone matched the gravity of what his supervisors had done. As this Committee well knows, a professor's right to assign grades is sacrosanct. Dr. Zhang would not have expected something like this to happen even in China—but it did happen here in the United States.

After these events, Dr. Zhang began advocating under federal employment statutes. In February 2022, Dr. Zhang asserted violations of the equal employment opportunity statutes. (Exhibit Z-26, Counsel Email to University's General Counsel); (Exhibit Z-27, EEOC Charges). Once he began advocating, the University went on a retaliatory warpath against Dr. Zhang. Paragraph 32 of an amended complaint in federal court contains an updated and more

**MSU259847**

complete list of the University's many actions against Dr. Zhang. (Exhibit Z-28, First Amended Complaint).[2] Among some of the bigger actions, the University:

- Removed Dr. Zhang from an ASSURE research project, thereby reducing his summer salary for 2022;
- Mandated that Dr. Zhang give students full credit on a portion of a traffic-data collection project for a traffic engineering class and then, when Dr. Zhang would not, stripped him of his teaching responsibilities near the end of the Spring 2022 semester;
- Removed Dr. Zhang from his traffic engineering class by inviting students to criticize his teaching style and then citing those invited criticisms as the basis for his removal, with Associate Dean Reeves posing as a course instructor and assigning students fabricated grades for a second time in a second course! (Exhibit Z-29 is an email exchange showing how administrators manipulated grades for the second time.)
- Refusing to pay Dr. Zhang for the sort of research work that other faculty had been paid for in the past;
- Rejecting Dr. Zhang's request to teach traffic engineering in Summer 2023.
- Refusing to allow Dr. Zhang to teach in Fall 2023 and Spring 2024;
- Taking affirmative steps to effectively prevent Dr. Zhang from admitting any new distance or on-campus graduate students;
- Appointing Dr. Zhang as PI for the USDOT's University Transportation Centers ("UTC") proposal with the admitted goal of having Dr. Zhang "fail," just to remove Dr. Zhang for a false reason and gloating about how "furious" Dr. Zhang would be that the University "made him look bad with partnering IHLs." (Exhibit Z-30, June 2022 Emails); (Exhibit Z-31, October 2022 Emails);

---

[2] Dr. Zhang has been forced to file two lawsuits against the University and IHL. He filed the federal action first. Because the University and IHL would not waive their federal-court immunity, Dr. Zhang had to bring some of his claims in state court. The state case is pending in Hinds County Circuit Court as case number 25CI1:23-cv-441-AHW. The federal case is pending in the Northern District of Mississippi as case number 1:23-cv-71-GHD-DAS.

MSU259848

- Effectively blocking Dr. Zhang's research efforts by imposing a unique proposal that he obtain pre-approval for all research activities through the Office of Research and Economic Development;
- Issuing biased and inaccurate annual reviews for 2021 and 2022 without following the process, just to cite those reviews as a basis for his proposed termination;
- Terminating Dr. Zhang when he sought HR and his department head's guidance about reporting MSU administrators' misconduct, especially grade manipulations and potential violations of federal and state laws. (Dr. Zhang was instructed by his department head to contact the University's general counsel, and he received notice of his termination 6 days after doing so). (Exhibit Z-32, Emails Regarding Reporting Process); (Exhibit Z-33, Emails Reporting to General Counsel); (Ex. Z-1).
- Contractually interfering with an MDOT project and damaging his reputation with widespread false information to MDOT and FHWA. (Exhibit Z-42, , at 2, 3, 7, and 16,).

**LEGAL PROTECTIONS AGAINST RETALIATION BY THE UNIVERSITY**

Consistent with the First Amendment to the United States Constitution, the IHL policies recognize the academic freedom that University professors should have. The IHL affirmatively "endorses" the AAUP statement on academic freedom. (Z-34, Excerpts from IHL Policies, at 66-67, § 403.0101). That statement ensures "[t]eachers are entitled to freedom in the classroom in discussing their subject" and that, when teachers speak or write as citizens, "they should be free from institutional censorship or discipline . . . ." (Exhibit Z-35, AAUP Statement). And "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). These First Amendment protections extend to public employment. *Tompkins v. Vickers*, 26 F.3d 603, 606 (5th Cir. 1994).

Likewise, under the equal employment opportunity laws to which the University purportedly adheres, the University cannot retaliate against an employee for making claims of unfair treatment. 29 USC § 2615 (a) (prohibiting FMLA

12

**MSU259849**

retaliation); 42 USC § 12203 (prohibiting retaliation for disability-discrimination complaints); 42 USC § 2000e-3(a).

And finally, the IHL policies prohibit discrimination against Dr. Zhang because of his race, age, national origin, or disabled status. (Ex. Z-34, at 148). These IHL protections necessarily prohibit retaliation for Dr. Zhang's complaints about unlawful discrimination. *See, e.g.*, *Cohen v. Univ. of Tex. Health Sci. Ctr.*, 557 F. App'x 273, 277 (5th Cir. 2014) (Rehabilitation Act prevents retaliation against those "who have opposed discriminatory employment practices or made charges of discrimination"); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 176 (2005) ("[A] general prohibition on racial discrimination" also includes a prohibition "on retaliation against those" who advocate against racial discrimination).

## RETALIATION BY THE UNIVERSITY

Notwithstanding these myriad protections against retaliation, retaliation is what the University has done and is doing through these termination proceedings. The University has been out to get Dr. Zhang ever since he began seeking disability and FMLA accommodations, alerting students about the wrongful grade changes, and advocating against unlawful discrimination.

Several excerpts from University official emails demonstrate their bad faith animus toward Dr. Zhang:

- *Dean Jason Keith wrote*: "**Maybe 'Zi' is the one who can't speak English**." *(Exhibit Z-36, "Zi" Email – Dean Jason Keith). Associate Dean Robert Green wrote*: "**Dr. Zhang spoke no English."** *(Ex. Z-23, at 4)*

- *After being advised by HR that "**unfortunately, we cannot deny medical leave for an employee**," Provost David Shaw wrote*: "**There's a long history of issues here, and we need to aggressively do everything we can to rectify the**

13

MSU259850

> *situation. He's been repeatedly been working the system to his advantage."* (Ex. Z-20, at 3).

- *Theresa Gammill wrote "That's the reason [Jason Keith and Kari Reeves] have him the green light [on the UTC proposal] to let him fail . . . .* (Ex. Z-30, at 1).

- *Theresa Gammill wrote "Zhang will be furious that we pulled [the UTC proposal] but even worse that we have made him look bad with partnering IHLs."* (Ex. Z-31, at 4)

When considered alongside the University's desire to "aggressively do everything we can" to thwart Dr. Zhang, the University's case for termination loses credibility. Rather than engaging in honest and equitable oversight of Dr. Zhang as a full professor faculty member, the University has—for the past several years—been file building to set Dr. Zhang up for termination.

This is shown not only by administrators' rhetoric against Dr. Zhang but also by the mounting number of false or misleading claims in the University's amended notice of termination. A few examples include:

> Claim: "Dr. Zhang's grading plan and assignments to be completed after the final exam [in a Spring 2021 class]. . . put students' eligibility at risk." (Ex. Z-2, at 4).

> Truth: The students' poor performance put their eligibility at risk. Dr. Zhang was considering post-exam bonus work, not regular class assignments, that could have helped students graduate notwithstanding their poor performance.  This is an extraordinary and false allegation, made four years after the event. No student has complained to Dr. Zhang about this. Dr. Zhang's then-department head Dr. Truax, and Dean Keith have never raised this to Dr. Zhang. In any event, the Committee members know MSU has a grade appeal policy. In Dr. Zhang's 20 years of teaching at the

14

MSU259851

University, no student has appealed any grade assigned by Dr. Zhang.

Claim: For the Fall 2021 semester, "Dr. Zhang never followed through with releasing a portion of his salary . . . ." (Ex. Z-2, at p. 5).

Truth: As Dr. Howard admitted in his email, Dr. Zhang released "the equivalent of 32% of [his] fall semester" salary. (Ex. Z-17, at 1).

Claim: Dr. Zhang "failed to provide a detailed plan [for Fall 2021 exams] as requested." (Ex. Z-2, at p. 5).

Truth: Dr. Zhang provided as much information as feasible, given uncertainties about the surgery. Because his leave was not approved, Dr. Zhang ended up working diligently to assign grades, and he did assign them. Dr. Zhang had no idea that, at the same time, the University was making a "contingency" plan to disrespect Dr. Zhang's work (Exhibit Z-23) guaranteed by the US Constitution.

Claim: Dr. Zhang has a "history of recurring problems" in the classroom. (Ex. Z-2, at p. 7).

Truth: According to valid official University documentation, Dr. Zhang was a good professor. (Ex. Z-7); (Ex. Z-8); (Ex. Z-9).

Claim: "Dr. Zhang delayed beginning his effort to develop a team and start on the [UTC] proposal." (Ex. Z-2, at 7-8).

Truth: Dr. Zhang stressed the importance of the UTC proposal and expressed his interest on January 26, 2022. (Exhibit Z-37, Emails Regarding UTC Proposal). Dr. Zhang began working on his team as soon as he received the "green light." It was University officials, including Provost Shaw, who delayed in appointing Dr. Zhang because, as Provost Shaw put it at the time, "I don't know that Li is the best choice for PI." (Ex. Z-37, at 6. For example, on June 6, 2022,

15

**MSU259852**

Dr. Julie Jordan wrote: "Any chance we can mandate a different PI? CAVS perhaps?" (Exhibit Z-30, at 1).

Claim: Dr. Julie Jordan "learned that Dr. Zhang's collaborators had acted in violation of specific requests not to seek support from the Congressional delegation" for the UTC proposal." (Ex. Z-2, at 7, 8).

Truth: The University initially accused Dr. Zhang of personally seeking congressional support. (Exhibit Z-38, UTC Letter of Reprimand). But the request for congressional support was made by a person, a professor at the University of Denver, and against Dr. Zhang's express admonition not to seek congressional support. He wrote a letter of apology (Exhibit Z-39, Emails with Explanation about Congressional Support, at 3). When Dr. Zhang explained this apparent misunderstanding, the University refused to budge from its unreasonable position. (Ex. Z-39). Of course, the plan was never for Dr. Zhang to successfully submit the UTC proposal but to "let him fail." (October 2022 Emails). When Dr. Zhang was not "failing" as the University desired, it simply withdrew the project proposal altogether.

In addition to sabotaging the project by attempting to withdraw without consulting the other universities first, the University attempted to sabotage the project during the proposal. For example, despite Dr. Zhang's objection, Associate Dean Reeves budgeted most of the University's research funding to buy an AV platform. In addition to Dr. Zhang's strenuous objections, three senior Co-PIs from the eight other universities had to write a letter to Dean Keith expressing their "deep concern" about shortfalls in the budget. (Exhibit Z-40, Emails Requesting Budget Change, at 2-7). The team believed that, with hard work, it could receive the award. Although the team knew that the University was never very supportive of the UTC proposal efforts, the team never expected the University to deliberately sabotage it just so that Dr. Zhang could "fail" and be "furious" that the University "made him look bad with partnering IHLs." (Ex. Z-30, at 1); (Ex. Z-31, at 4). That University

16

administrators would interfere with the application for a $20 Million grant and damage the reputation of, not just the University, but eight other partnering institutions, demonstrates their animus toward Dr. Zhang and the any length they would go to see him fail.

The inconvenient truth of UTC is that Dr. Julie Jordan, Teresa Gammill, Dean Keith, and Associate Dean Reeves sabotaged the UTC proposal. It is $20 million of research funding for the four largest Mississippi universities and five other universities. Since the Universities stripped Dr. Zhang of his OneDrive access, he cannot access the U.S. DOT debriefing to present to the Committee. If he could gain access, it would show that deficiencies in the proposal could have been resolved with strong support from the University. Dr. Zhang is confident the grant could have been funded. Because the administrators feared that Dr. Zhang (as PI for the lead institution) would be successful, they withdrew the proposal without consulting the other eight institutions, something the University had no right to do.

Claim: Dr. Zhang had poor annual reviews in 2021 and 2022. (Ex. Z-2, at 7, 9).

Truth: In addition to many policy and procedural violations, these annual reviews given in Fall 2023 were hardly an honest assessment of Dr. Zhang's performance, but part of the University's scheme to terminate Dr. Zhang because he chose to speak up for himself, his family, and academic integrity. Before issuing the reviews, Provost Shaw, Dean Keith, and Dr. Howard emailed about what grades to assign. Dr. Shaw "would question that [Dr. Zhang] has performed satisfactorily in research." (Exhibit Z-41, Emails About Annual Reviews). Dr. Howard admitted the ratings "were about as much of a drop from 2020 as [he] thought [he] could justify given the year itself and what actually happened in the year numbers wise." (Ex. Z-41, at 1). Dr. Howard was "very open to lowering ratings if that makes sense to the group." (Ex. Z-41, at 1). The annual reviews were not signed by any University official.

17

MSU259854

Claim: "Dr. Zhang delayed the MDOT project by seeking multiple extensions even after work was represented to be complete. After being issued a final deadline of January 31, 2023, to deliver the final report, it took Dr. Zhang 2 months to apply MDOT's changes and provide the final version . . . . MDOT has been hesitant to work with Dr. Zhang. " (Ex. Z-2, at 8).

Truth: On September 15, 2022, MDOT's Research Engineer Cindy Smith inquired about the project status, and Dr. Zhang discussed the matter with her. Ms. Smith approved an extension of one year until the end of 2023, confirmed in an October 20, 2022, email. (Exhibit Z-42, MDOT Extension, at 4).

## CONCLUSION

For the above reasons, the Committee should reject the termination proposal.

# Li Zhang
Digitally signed by Li Zhang
Date: 2025.05.22 21:25:41 -05'00'

5/22/2025

_____          _____

LI ZHANG, Ph.D., P.E., F., ASCE. F. ITE          DATED
Professor

18

**MSU259855**