**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION**

**LI ZHANG**                                                                        **PLAINTIFF**

**v.**                                                      **CAUSE NO. 1:23CV71-GHD-DAS**

**MISSISSIPPI STATE UNIVERSITY, et al.**                              **DEFENDANTS**

**DEFENDANTS' MEMORANDUM IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Mississippi State University ("MSU"), Mississippi Board of Trustees of State

Institutions of Higher Learning ("IHL"), Mark Keenum ("Keenum"), and Alfred Rankins, Jr.

("Rankins") (collectively "Defendants"), subject to their pending motions to dismiss, file their

Memorandum in Support of their Motion for Summary Judgment as follows:

## I. INTRODUCTION

Plaintiff Li Zhang ("Zhang"), a tenured professor at MSU, asserts claims against MSU and

IHL for (1) deprivation of leave and retaliation under the Family and Medical Leave Act ("FMLA")

[Counts 1 and 4] and (2) disability discrimination and retaliation under the Rehabilitation Act

[Counts 2 and 4]; against MSU for race, ethnicity, and national origin discrimination and retaliation

under Title VII [Counts 3 and 4][1]; and against Keenum and Rankins based on MSU's and IHL's

alleged violations of (1) the due process clause of the Fourteenth Amendment, (2) the FMLA,

(3) the Americans with Disabilities Act, (4) the Rehabilitation Act, (5) the Age Discrimination in

Employment Act, and (6) Title VII [Count 5].

Zhang's claims fail because he cannot make a prima facie case for any cause of action and

cannot establish a genuine issue of material fact on essential elements of his claims. Moreover, MSU

---

[1] Count 4 alleges that IHL violated Title VII; however, Zhang has since conceded, consistent with a prior agreed order, that this claim against IHL should be dismissed. *See* Zhang's Mem. in Opp. to Mot. to Dismiss, pp. 2, 4 [dkt. #135]; Aug. 2023 Agreed Order ¶ 3 [dkt. #18].

1

and IHL have legitimate, non-discriminatory and non-retaliatory reasons for each action complained of, and Zhang cannot show any proffered reason to be pretext.

## II. BACKGROUND

### A. THE PARTIES

#### 1. MSU

MSU is an institution of higher learning that offers areas of study in eight different academic colleges, including the College of Engineering (the "College"). The College is comprised of eight academic departments, including the School of Civil and Environmental Engineering ("CEE"). Dr. Isaac Howard has served as the CEE Director / Department Head since approximately 2021, following the retirement of longtime director, Dr. Dennis Truax. Dr. Jason Keith served as Dean of the College from approximately March 2014 until July 31, 2024. Dr. Kari Babski-Reeves served as the College's Associate Dean for Research and Graduate Studies from approximately August 2015 until September 2024. Dr. Robert Green served as an Assistant Dean of the College from approximately July 2019 until August 2024, then as interim Dean following Dr. Keith's departure in 2024, and now as the College's Associate Dean for Academics as of April 2025. Ex. 1, Corey Dec. ¶ 2; Ex. 2, Howard Dec. ¶ 1; Ex. 3, Reeves Dep. pp. 14-15.

MSU's Office of Research and Economic Development ("ORED") oversees research strategies and provides support to faculty in their pursuit of research initiatives. ORED's work includes managing compliance issues, sponsor / governmental relationships, and funding efforts. Dr. Julie Jordan served as the Vice President for Research and Economic Development from approximately July 2019 until October 31, 2025. Ex. 1, Corey Dec. ¶¶ 4-5; Ex. 4, Jordan Trans. p. 4.

Dr. Mark Keenum has served as MSU's President since 2009, and Dr. David Shaw has served as MSU's Provost and Executive Vice President since July 2019. Ex. 1, Corey Dec. ¶ 5.

2.      IHL

IHL is a constitutionally-created subdivision of the state of Mississippi. Its authority is implemented through statute, and its responsibilities involve overseeing the state's public universities, including MSU. IHL and the universities it oversees are separate legal entities. Miss. Const. Art. 8 at § 213-A; *Jagnandan v. Giles*, 538 F.2d 1166, 1175 (5th Cir. 1976); Miss. Code Ann. § 37-101-1. Dr. Alfred Rankins, Jr. has served as IHL Commissioner since 2018.

3.      Zhang

Zhang is a Chinese American male currently employed by MSU as a tenured Professor within CEE. Sec. Am. Compl. ¶¶ 1, 8 [dkt. #92]. MSU first hired Zhang as an Assistant Professor in 2005, promoted him to Associate Professor and awarded him tenure in 2011, and promoted him to Professor in 2021. Ex. 5, Offer Letter; Ex. 6, Zhang Dep. pp. 39-40, 45-46.

In 2016, Zhang moved with his family to Brandon, Mississippi, to better accommodate his son's special needs. Ex. 6, Zhang Dep. pp. 9-10. Zhang then would commute approximately two hours between Brandon and Starkville when he needed to be on campus.[2] Ex. 6, Zhang Dep. p. 11.

Zhang claims he began experiencing problems with his employment after Dr. Howard assumed the role of CEE Director. From the beginning, Zhang was unhappy with Dr. Howard's appointment to Director, as they did not share a good relationship. Ex. 8, Shaw Trans. p. 67. Dr. Howard also brought a new leadership style. For example, where Dr. Truax may have buried problems with Zhang at the department level, Dr. Howard brought them to the attention of administration in an effort to manage them. *See* Ex. 9, Truax Trans. pp. 31, 39[3]; Ex. 59, Oct. 2021 Email Regarding Zhang.

---

[2] Before beginning sabbatical leave in 2022, Zhang would spend the week in Starkville and return home on the weekends. Ex. 7, Ying Zhang Dep. pp. 45-46.

[3] In his testimony in support of Zhang, Dr. Truax indicated his own disdain for his replacement, Dr. Howard, and confessed that he had a bias against him. *See* Ex. 9, Truax Trans. pp. 40:14, 41:22-42:4.

Zhang remains employed by MSU as of the date of this filing. With the administrative termination process now complete, however, MSU is likely to terminate Zhang before early March 2026. Ex. 1, Corey Dec. ¶ 6.

**B.      ZHANG'S COMPLAINTS AND LEGAL ACTIONS**

In February 2022, Zhang's attorney communicated with MSU regarding Zhang's purported concerns, and, in March 2022, Zhang filed his first EEOC Charge against MSU. Sec. Am. Compl. ¶ 32. Zhang initiated this action against MSU and IHL on May 4, 2023.[4] After an agreed partial dismissal, he then initiated a parallel action in the Circuit Court of Hinds County, Mississippi, reasserting and repackaging claims dismissed here as breach of contract claims.

Zhang's pleading is excessively broad and asserts an array of grievances, including issues with the processing of his leave requests, his workload, his involvement with research projects, his superiors' actions in connection with his classes and student complaints, and the decision to terminate his employment. Each purported adverse action is discussed individually below.

### III. ARGUMENT

**A.      THE ALLEGED ADVERSE ACTIONS ARE EITHER UNSUPPORTED BY THE RECORD OR WERE FOR LEGITIMATE, NON-DISCRIMINATORY AND NON-RETALIATORY REASONS**

Zhang bases his claims largely upon the same 33 alleged "adverse employment actions." Sec. Am. Compl. at ¶¶ 43(a)-(gg), 46(a)-(gg), 49(a)-(gg). He vaguely attributes "some or all" of the alleged actions to his claims for retaliation and claims for discrimination under Title VII and the Rehabilitation Act. *Id.* Defendants will address each category of these alleged actions at the outset.

1.      Leave and Accommodations [(a), (b), (f), (r), (s)]

a.      *Making Up Missed Classes*

Zhang complains about having to make alternative arrangements for his classes when he was

---

[4] Grounds for dismissal based on Zhang's EEOC Charges are set forth in the pending motions for partial dismissal. Defendants do not restate those arguments here, but they are incorporated by reference.

to be absent. *See, e.g.*, Ex. 10, Interrog. Ans., No. 25; Ex. 11, Leave Docs. at LI 001586, 1603-1606. Under MSU policy, course instructors are to arrange equivalent and / or alternative instruction when unable to meet a scheduled class. Ex. 12, AOP 13.03 at MSU255898. Instructors have options to ensure students receive the necessary contact hours, but there are times that makeup classes would need to be scheduled. Ex. 2, Howard Dec. ¶ 4; Ex. 13, Fall 2023 Emails at MSU217074; Ex. 14, Oct. 2021 Emails at MSU047817. Zhang was informed of this expectation and his options multiple times before any alleged act of discrimination or retaliation. Ex. 15, Emails Regarding Class Arrangements; Ex. 11, Leave Docs. at LI 001586-1588, 1602-1606; Ex. 8, Shaw Trans. pp. 11, 47-48, as examples.

        b.      *Leave Requests for Son*

Zhang makes complaints regarding the need for leave to attend to his son's needs. For example, on Thursday, August 19, 2021, Zhang informed Dr. Howard about a dentist appointment for his son on Monday, August 23 that conflicted with a class Zhang was scheduled to teach. Zhang complains that he "was required to make up the classes." Ex. 10, Interrog. Ans., No. 25 (p. 25, ¶ 1). Zhang did not apply for or take leave for this appointment. *See* Ex. 16, Leave Summary at MSU00263413. He also was not "required to make up the classes," although that would have aligned with normal MSU policy and applicable law. Rather, he was told to make his own arrangements rather than unilaterally requiring his supervisor to do so. Ex. 11, Leave Docs. at LI 001584. The appointment was said to be at 2:30, and Zhang's class was to meet from 12:40-1:30; the conflict, therefore, would have been due to his need to be in Starkville for the class with insufficient time to return home for the appointment. *Id.* Zhang taught the class remotely through WebEx, thereby negating the conflict. Ex. 17, Aug. 2021 Leave Docs. at MSU043257, 43318.

On September 14, 2021, Zhang requested leave due to his son's exposure to COVID-19. He claims approval was delayed and he was "effectively forced . . . to teach the class." Ex. 10, Interrog. Ans., No. 25 (p. 25, ¶ 2); Ex. 11, Leave Docs. at LI 001594-1595. Zhang, however, was granted leave

5

to care for his son during the requested time. Despite being told multiple times that he was responsible for making alternative arrangements for his classes when possible, Zhang again requested Dr. Howard to "arrange the replacement teachers." He stated that he would conduct one of the classes through online instruction, but instead of making arrangements himself for the others, Zhang waited for action from Dr. Howard, who ultimately asked another professor to help with the classes. Ex. 11, Leave Docs. at LI 001595.

On September 26, 2023, Zhang notified Dr. Howard that he would need to take leave to care for his son in October, and he began the form submission process a week later. Zhang claims approval was delayed and that, as a result, he brought his son with him to his office. He claims leave was effectively denied. Ex. 10, Interrog. Ans., No. 25 (p. 26, ¶ 6); Ex. 11, Leave Docs. at LI 001621-1626. Zhang's requested leave was not "effectively denied." He waited to submit the required form, and its processing was held up by a question that went unanswered by the designated human resources representative who was on leave with a sick child. When Zhang inquired about the status on the Sunday prior to the first day for which leave was requested, this was explained, and he was assured that the leave was approved. Ex. 11, Leave Docs. at LI 001621-26. Zhang made the unnecessary decision to take his son to work the next day despite also having a remote work agreement in place that allowed him flexibility to work from home in the event that approval was not given. Ex. 18, Oct. 2023 Leave Comms. at MSU012626.

In early December 2023, Zhang submitted a leave request for January 2-5, 2024. He claims he was asked to withdraw the request "because classes [were] not in session so no leave would be granted." Ex. 10, Interrog. Ans., No. 25 (p. 26, ¶ 7). Zhang's leave request was unnecessary. He is a nine-month faculty member, and classes would not even be in session during the requested dates. Ex. 11, Leave Docs. at LI 001629.

c. *Other Leave Requests*

Zhang makes additional leave claims unrelated to family-care leave. Because his FMLA interference claim applies only to family-care leave, and because his other alleged leave issues had no impact on his employment, Defendants do not address each one in detail. In any event, those remaining allegations are similarly unfounded and provide no basis for relief. *See* Ex. 11, Leave Docs.; Ex. 16, Leave Summary; Ex. 17, Aug. 2021 Leave Docs; Ex. 22, HRM 60-201[5]; Ex. 23, Fall 2023 Leave Corr. Defendants will, however, address one additional instance, i.e., Zhang's claim MSU denied his request for major medical leave until he was "medically cleared."[6] Ex. 10, Interrog. Ans., No. 25 (p. 25, ¶ 3).

On November 23, 2021, Zhang told the CEE Director and Dean he was having surgery on December 1; the courses he was teaching that semester had final exams scheduled December 3 and December 6. Ex. 19, Fall 2021 Grading / Planning Docs. at MSU250205. He told them:

> By looking at the attached instruction, looks like I may not be able to proctor December 3 and December 6's finals. It might affect my grading all homework, projects, final for 4133 and grading final for 3113. There are a few days for me to know for sure after the surgery
>
> * * *
>
> If you think I can have options to, that should be really helpful to avoid the complications after the surgery
> 1. Extend my final grade submission time
> 2. Add resources to help me grading so the grade can submit on time
> 3. Approve undergraduate grader to help me grade final
> 4. Or any other things you think the department and the college could help.

Ex. 19, Fall 2021 Grading / Planning Docs. at MSU250205.

Some students were degree candidates and needed final grades by the deadline; thus, an extension was not possible. Zhang was asked to provide materials to allow someone to help with grading if it became necessary. Dr. Howard also requested that Zhang make a detailed plan for final grade entry and provide a specific list of what he needed to ensure grades were submitted on time.

---

[5] The version of the policy in effect at the relevant time was superseded by a new version in 2025.

[6] Zhang dates this instance December 2022, but the context of his allegation indicates that he is referring to what took place December 2021-January 2022.

After nearly a week, and with just one more working day before his December 1 surgery, Zhang had not provided the information. Ex. 19, Fall 2021 Grading / Planning Docs. at MSU 250202-05.

In the early morning hours the day of his surgery[7], Zhang emailed confirmation that he would need someone to proctor his exams but continued to express uncertainty about grading. Ex. 19, Fall 2021 Grading / Planning Docs. at MSU 250201. MSU arranged proctors and again asked Zhang for his grading plan. Two days later, Zhang told Dr. Howard and Dr. Keith that he would grade the exams and asked that they be placed in his office.[8] Ex. 21, Dec. 2021 Grading Comms. at MSU051631-32. MSU complied with his request, and Zhang thereafter graded the exams. Ex. 21, Dec. 2021 Grading Comms. at MSU051630; Ex. 20, Dec. 2021 Leave Docs.

Zhang's complaints about supposed delays in handling his leave request are without merit. Zhang's superiors diligently worked with him to provide the help he needed, but he did not begin the request and approval process until the day of his surgery. Ex. 19, Grading / Planning Docs. at MSU250201 (noting he had "submitted the leave"); Ex. 20, Dec. 2021 Leave Docs. at MSU009555, 172389. His submission did not provide the necessary information to be processed, and he had to resubmit the form a number of times. Ex. 20, Dec. 2021 Leave Docs. at MSU009555, 172389. Zhang's inconsistencies also complicated the process. *See, e.g.*, Ex. 20, Dec. 2021 Leave Docs. at MSU001475 (requesting leave until Dec. 8, 2021, stating need to "take at least one week from work [but] may be more days or less days," and noting "totally unable to return to work" until evaluation on Jan. 17, 2022), MSU009553 (initial form submission showing leave from Dec. 2, 2021 to Dec. 6, 2021), MSU009903-05 (requesting approval to travel Jan. 5-13); Ex. 21, Dec. 2021 Grading Comms. at MSU051631 (indicating inability to work until Jan. 16); Ex. 19, Fall 2021 Grading / Planning

---

[7] This was also the day that Zhang first submitted his leave request form that required multiple corrections and resubmissions. Ex. 20, Dec. 2021 Leave Docs.

[8] This communication from Zhang, like many others, contains a multitude of baseless accusations, misstatements of policy, and misconstrued statements attributed to his superiors.

Docs. at MSU000582, 250192 (stating doctor advised not to work until Jan. 17).

Zhang also complains of an email from the College of Engineering Dean, who, confronted with Zhang's near abandonment of his classes during a crucial time in the semester, turned to the Provost and HRM Director for guidance. Seeking "to minimize impact to the students," Dr. Keith asked if it was possible to deny or defer Zhang's request for medical leave. Less than five minutes later, he was informed that an employee's medical leave request could not be denied. Ex. 20, Dec. 2021 Leave Docs. at MSU005976-77. Zhang's leave request was not denied, and one administrator's inquiry amid a difficult situation is not improper. Zhang also complains of an email from the Provost, Dr. Shaw, that notes the "long history of issues" and the "need to aggressively do everything we can to rectify this situation," wherein Zhang had "been repeatedly working the system to his advantage." Ex. 20, Dec. 2021 Leave Docs. at MSU005975. This comment, which Zhang characterizes as an affront to his right to take leave, was a direct response to a question posed to Dr. Shaw in a prior email complaining about the effects of Zhang's poor communication and organization on students and faculty. He was asked: "David do you have any advice from an academic affairs standpoint? This is really pushing the limits and going past those allowed within AOP 13.03 in my opinion." *Id.* at MSU005976; Ex. 12, AOP 13.03 (regarding instructor responsibilities). Dr. Keith's concerns were well-founded. *See* Ex. 8, Shaw Trans. p. 46.

       d.     *Accommodation Request*

Zhang requested a raising desktop, which MSU promptly provided. Months later, near the end of the semester and just as he was set to begin a year-long sabbatical leave, Zhang informed Dr. Howard he needed a *motorized* raising desk. Following up with HRM regarding the request, Zhang acknowledged that there was "no hurry." He quickly changed course, however, and began lodging baseless complaints about the accommodations provided. When Zhang returned to campus after sabbatical leave, he was provided with the motorized raising desk. Ex. 24, Raising Desk Emails.

9

2.      Classroom Issues [(c), (e), (g), (k), (m), (n)]

Zhang's primary complaints are based on events that occurred in the fall 2021 and spring 2022 semesters. Defendants address each his claims in turn, but, importantly, Zhang had exhibited serious issues with his classes long before these events took place. *See* Ex. 25, Apr. 2021 Reeves Email at MSU225795; Ex. 26, Apr. 2020 Emails Regarding Distance Teaching at MSU002957-58.

a.      *Fall 2021 Course Issues*

In the fall 2021 semester, Zhang taught two courses. Zhang was unhappy with one course assignment because it was a large class and required his presence on campus each workday. Zhang claims the assignment, in itself, reflects disparate treatment, but it was not; rather, the department was in a challenging season as it was short on faculty going into a semester where the class schedule was already set.[9] All CEE faculty were asked to be flexible, but particularly those who, like Zhang, were tenured and fully promoted. Like other faculty, Zhang was asked to adjust his teaching load and teach a course after the original instructor similarly had to change his schedule. Zhang asked MSU to hire an adjunct in his place, but MSU told him he would need to release part of his salary by a certain date to allow this. He did not do so. Ex. 27, Fall 2021 Scheduling Emails; Ex. 28, Howard Trans. pp. 6-12, 58, 107-108.

Shortly before final exams, Zhang told Dr. Howard and Dr. Keith he was having surgery in the days before the exams. Yet again, Zhang failed to sufficiently prepare or communicate his needs. Then, as he submitted final grade calculations, complaints from students revealed additional issues from the semester, including a flawed grading methodology and grades missing from calculations. Ex. 19, Fall 2021 Grading / Planning Docs.; Ex. 28, Howard Trans. p. 13. Administrators worked to correct the grading issues, aiming to uphold academic integrity while protecting the best interests of

---

[9] The department was also transitioning under a new director and managing a move to a new building on campus, all while trying to return to some sense of normalcy on the heels of COVID-19.

the students. Ex. 28, Howard Trans. pp. 14-15; Ex. 29, Green Trans. pp. 5-10; Ex. 8, Shaw Trans. pp.14-16, 27.

After these grading corrections, Zhang sent an email to his students complaining about his department and dean, suggesting the grading system had been hacked, and claiming "[t]oday is the darkest day in my almost 17 years of transportation teaching career." Ex. 30, Darkest Day Email. This conduct (blaming students and administrators for his own errors while suggesting criminal activity and directing students to contact him via personal email) was inappropriate and insubordinate. MSU instructed Zhang to cease student communication and to meet with leadership to discuss what led to the need to adjust grades. Ex. 31, Meeting Emails; Ex. 8, Shaw Trans. pp. 39-41, 58-60. MSU hoped the intervention would cause Zhang to correct his conduct; it did not.

### b. Spring 2022 Course Issues

Zhang taught one course in spring 2022, CE 4143 / 6143 Traffic Engineering. During the semester, Zhang's students contacted College administration with numerous complaints, including, but not limited to, poor communication about assignments, unfair and unreasonable classroom practices, threats of honor code reporting, and last-minute assignments. MSU administrators met with students to hear their concerns. Aiming to gain a complete understanding of the students' experiences, the Dean also sent an email to the enrolled students and invited them to share their experiences, both positive and negative. The response was overwhelmingly negative. Ex. 32, Spring 2022 Complaints; Ex. 28, Howard Trans. pp. 22-29; Ex. 29, Green Trans. pp. 13-22, 40.

Although this class was meant to be a traditional lecture course, Zhang included a lab component, couched as a traffic study project, which required students to collect data on roads. Not only did Zhang's poor management of the assignment contribute to a negative student experience, his "project" also created liability, safety, and accreditation issues. Zhang was instructed to modify the "project" so that it was not, in practice, an unauthorized lab being conducted in a lecture course.

Zhang refused. Ex. 33, Project Emails; Ex. 8, Shaw Trans. p. 54; Ex. 28, Howard Trans. pp. 30-31, 92-94; Ex. 29, Green Trans. p. 53.

After significant discussion, and after learning that Zhang had inappropriately confronted his students with hostile and threatening behavior, MSU removed Zhang as the instructor of record for the course. Ex. 34, Spring 2022 Course Removal Email; Ex. 35, Zhang Reaction; Ex. 8, Shaw Trans. pp. 13-16; Ex. 28, Howard Trans. pp. 31-34; Ex. 29, Green Trans. pp. 18-20, 22-25, 71. Again, Zhang's own actions led to MSU's legitimate and necessary reaction.

        c.       *Subsequent Course Assignments*

Zhang states that MSU "rejected" his request to teach a class in summer 2023. Zhang's employment contracts have never included summers; he has been employed through nine-month contracts with terms from mid-August of one year to mid-May the next. Ex. 36, Contracts. While summer appointments for additional pay are sometimes available, they are not guaranteed. Ex. 2, Howard Dec. ¶ 2; Ex. 5, Offer Letter. Zhang "never [taught] a course in the summer," and his "request" to teach a course in summer 2023 was performative, at best. Ex. 6, Zhang Dep. pp. 68. In January 2023, CEE's Academic Coordinator emailed all CEE faculty to inquire about interest in teaching a summer class. Zhang's response, copied to all faculty, stated, "I would teach any, or all transportation courses in summer provided the department head, the dean, and the provost all signing on the protection of academic freedom and no administrative interference in teaching." Ex. 37, Summer 2023 Emails. This request would have been entirely imprudent to sign, considering the issues MSU had faced in Zhang's most recent classes and documented classroom issues.

Zhang also complains that he was not allowed to teach any courses in fall 2024. Zhang has been on administrative leave with pay since February 2024. Ex. 1, Corey Dec. at ¶ 6. To be clear, however, Zhang has not been assigned any courses to teach since spring 2022. He went on sabbatical leave for the subsequent year, and it was determined that he would not be assigned any

courses to teach upon his return, as to do so would not be in the best interests of MSU's students or CEE. Ex. 28, Howard Trans. pp. 94-95, 112-113; Ex. 38, Email Regarding Fall 2023 Courses. In 2023, MSU hired Dr. Osman Okuyucu, who is of Turkish descent, and in 2024, it hired Dr. Fei Wang, who is Chinese. Both Dr. Wang and Dr. Okuyucu have taught courses previously taught by Zhang; Case Fulcher, who Zhang sought to have cover at least one of his classes, has also taught courses previously taught by Zhang. Ex. 2, Howard Dec. ¶ 6.

#### d. *Graduate Student Admissions*

For admission as a CEE graduate student, an applicant must meet minimum qualifications, have faculty willing to serve as their major professor, and go through the formal submission process. Ex. 2, Howard Dec. ¶ 3; Ex. 39, Grad. Stud. Adm. Corr. at MSU220738, 235214. In fall 2022, Zhang expressed a desire to have seven new graduate students admitted to CEE for which he would serve as major professor. This large number of admissions would have created a substantial commitment of time and resources. Ex. 39, Grad. Stud. Adm. Corr. at MSU235216. MSU administration was concerned about Zhang's ability to support the students, and CEE was lacking in resources and capabilities. *Id.* at MSU235215. Two of the students were not admitted. *Id.* at MSU205834, 235215.

#### 3. Research Projects [(d), (o), (p), (q), (u), (v)]

#### a. *Removal from ASSURE Project*

Some of Zhang's past research efforts involved supporting projects through the ASSURE FAA Center of Excellence ("ASSURE"). In February 2022, Zhang was removed from an ASSURE project in part because he repeatedly violated express directions not to discuss FAA proprietary research in meetings on other projects. He was removed from the project for failing to follow clear instructions and because his work no longer fell within the scope of the project; it was the FAA's decision to end Zhang's effort. Ex. 40, ASSURE Proj. Corr.; Ex. 8, Shaw Trans. at 17-18.

b.      *The University Transportation Center Proposal*

In 2022, MSU gave Zhang the opportunity to lead a proposal for a grant from the United States Department of Transportation ("USDOT") for a University Transportation Center ("UTC"). Even after he delayed beginning his proposal efforts , College administration made significant efforts to help Zhang assemble a team and prepare a budget. Zhang's delays, along with his disorganized approach, placed a significant burden on everyone working to support him. Ex. 4, Jordan Trans. pp. 18-21, 24-25; Ex. 41, Gammill Dep. pp. 74-80.

As a general practice, MSU does not allow faculty to reach out directly for Congressional support in connection with research proposals. The protocol is, instead, to utilize the university liaison for such matters. Ex. 8, Shaw Trans. pp. 21-22; Ex. 41, Gammill Dep. pp. 49-50, 53-54, 57-58. Following the UTC proposal submission, Dr. Jordan learned that Zhang's collaborators had acted in violation of specific directives against seeking support from the Congressional delegation. Ex. 42, Term. Docs. at MSU260535; Ex. 4, Jordan Trans. pp. 7-9; Ex. 41, Gammill Dep. pp. 53-58. As a result of his team's failure to follow this requirement, Zhang received a written reprimand from Dr. Jordan in October 2022.[10] Zhang's actions were found to be "clear insubordination and a violation of MSU Policy HRM 60.401." Ex. 43, Oct. 2022 Ltr. of Reprimand.

c.      *MDOT WiFi Project*

Zhang complains about MSU's communications with the Mississippi Department of Transportation ("MDOT") concerning his work on a research project. Zhang began working on the MDOT project in 2018. Zhang repeatedly delayed the project by seeking multiple extensions, even after his work was supposedly complete. In December 2022, after discussions with MDOT, Dr. Jordan issued Zhang a deadline of January 31, 2023 to deliver his final report. Even after he

---

[10] Zhang disputes the appropriateness of the demand since he did not individually engage with anyone to seek Congressional support. However, as the PI for the effort, he is accountable for the actions of his team.

14

submitted the report, it took Zhang two months to apply MDOT's requested edits and provide the final version of the report. Ex. 44, MDOT Project Corr. Zhang's delayed efforts do not align with the quality of work MSU expects of researchers, and MSU feared MDOT would hesitate to work with Zhang in the future. Ex. 45, Aug. 2023 MDOT Proposal Corr.; Ex. 8, Shaw Trans. pp. 18-21.

### d. *Increased Oversight*

Because of Zhang's mishandling of the UTC and other projects, MSU instructed him that any future efforts to secure external funding would have to be approved by ORED. Zhang still failed to meet critical deadlines to advance research efforts. Ex. 43, Oct. 2022 Ltr. of Reprimand; Ex. 46, 2023 FHWA Proposal Corr.; Ex. 45, Aug. 2023 MDOT Proposal Corr.

### 4. Alleged Pay and Other Monetary Issues [(h), (i), (l)]

### a. *Zhang's Pay*

During his 2021-2022 contract period, Zhang was more highly paid than all but three of eleven faculty in his department. The three faculty with higher compensation were the School Director and Professor, Dr. Isaac Howard, Professor Dr. Farshid Vahedifard, and Associate Professor Dr. Veera Gude. Ex. 36, Contracts at LI 000193; Ex. 47, Pay Docs. at MSU001321, 2140-42. Dr. Howard is white and American, Dr. Vahedifard is of Iranian descent, and Dr. Gude is from India; all hold endowed positions, which are established by donors to provide additional funding to exceptionally productive faculty. Ex. 2, Howard Dec. ¶¶ 7-8; Ex. 47, Pay Docs. at MSU002140-41; Ex. 6, Zhang Dep. pp. 54-55. The positions come with additional stipends reflected in total compensation. Ex. 47, Pay Docs. at MSU1623; Ex. 6, Zhang Dep. p. 125. Dr. Howard is further differentiated by his twelve-month contract position as CEE Director. Ex. 2, Howard Dec. ¶ 1.

For the 2022-2023 contract period, the only faculty with higher compensation than Zhang were Dr. Howard, Dr. Vahedifard, and Dr. Gude. Ex. 47, Pay Docs. at MSU002146-48. For the 2023-2024 period the only faculty with higher compensation were Dr. Howard and Dr. Vahedifard.

Ex. 47, Pay Docs. at MSU002152-53. He has been on administrative leave since February 2024.

MSU does not award annual pay raises as a matter of course. Other than when in connection with a promotion or competing job offer, raises are generally awarded only when funds are made available from the state. When there are sufficient funds, the department allocates raises based upon determinations of merit. Ex. 2, Howard Dec. ¶ 9; Ex. 6, Zhang Dep. p. 123. Decisions regarding the distribution of merit raise funds awarded in the 2022 fiscal year (July 1, 2021-June 30, 2022) were made in the summer of 2021, before any claimed advocacy occurred. Ex. 47, Pay Docs. at MSU002079. Raises for the 2023 fiscal year (July 1, 2022-June 30, 2023) were determined in the summer of 2022, and raises for the 2024 fiscal year (July 1, 2023-June 30, 2024) were determined in the summer of 2023. Ex. 2, Howard Dec. ¶ 10; Ex. 47, Pay Docs. at MSU002080-81. Raise decisions made in summer 2022 for the 2023 fiscal year were affected by Zhang's removal from a spring 2022 course and the extraordinary issues that led to grade adjustments in his fall 2021 course. *See* Ex. 28, Howard Trans. p. 15. When decisions for the 2024 fiscal year were made, Zhang had been on sabbatical leave through the fall 2022 and spring 2023 semesters, and Zhang's deficient research performance would have justified no raise at all. His disorganized UTC proposal efforts, missed deadlines, written reprimand, and attempt to secure yet another extension on an MDOT project pending since 2018, requiring administrative intervention to ensure completing, reasonably supported limiting or denying a raise entirely. *See* Ex. 2, Howard Dec. at ¶ 11.

b. *Pay for Research Work*

In summer 2022, Zhang began submitting hourly timecards for his work on the previously referenced UTC proposal, despite there being no agreement to provide him with summer pay. Ex. 47, Pay Docs. at MSU244334-35. Zhang is a salaried employee, but he is not entitled to a summer salary under the terms of his nine-month contracts. He asked to lead the UTC proposal effort and was allowed to do so. It is common for nine-month faculty to spend summers working on research

16

grant proposals without additional pay, and Zhang was informed that this would be the case for him. Ex. 47, Pay Docs. at MSU187606. When he demanded pay for the effort he volunteered to lead, he was reminded that there was no agreement or arrangement for CEE to pay him for that work. He was cautioned that, if he expected additional compensation to prepare the proposal, he should stop working immediately, but he did not. Ex. 47, Pay Docs. at MSU238624.

Zhang claims two former employees had been paid to develop a UTC proposal in past summers. Those employees, however, were employed under twelve-month contracts, so they received summer pay under the regular terms of their employment. Ex. 6, Zhang Dep. pp. 126-127.

        c.     *Use of Discretionary Account*

Faculty sometimes have funds allocated to a discretionary account used to support their professional activities. The accounts are institutional in nature; the funds are not for faculty's personal use, and they are not solely controlled by the faculty member to whom the account is attributed. *See* Ex. 2, Howard Dec. ¶ 12; Ex. 6, Zhang Dep. pp. 130-131. Requests that have been made that Zhang use his discretionary account for certain expenditures, as opposed to other institutional funds, have been within MSU's authority. Ex. 2, Howard Dec. ¶ 12.

        5.     Service Opportunities [(j)]

Zhang complains that someone else served in the unpaid role of faculty advisor for MSU's student chapter of the Institute of Transportation Engineers. Ex. 6, Zhang Dep. p. 129. In September 2022, students in the club requested that Aaron Cagle, a white male who teaches engineering courses at MSU, serve as advisor. Zhang was not their advisor before Aaron Cagle, and he was on sabbatical leave when the need for a new advisor arose. Ex. 6, Zhang Dep. pp. 128-129. Zhang has no memory of asking to assume the role upon his return. Ex. 6, Zhang Dep. p. 129.

        6.     Annual Reviews [(t), (w), (x)]

Zhang complains about the annual review process for 2021 and 2022, and that there was no

17

annual review conducted for 2023. Zhang did not receive an annual review for 2023 because reviews were completed after he received notice of the intent to terminate his employment and was placed on administrative leave. Ex. 2, Howard Dec. ¶ 13.

Due to difficulties caused by COVID-19, the School's move to a new building, and CEE's transition to a new Director, Dr. Howard was delayed in completing annual reviews for 2021; reviews for both 2021 and 2022 were completed in 2023. Ex. 48, Annual Review Docs. at MSU208797, 216404. Zhang was not the only faculty whose reviews were delayed. *Id.* Unhappy with his 2021 and 2022 annual reviews, Zhang sought and received additional review from the Dr. Keith. Ex. 49, Annual Review Appeal. Ultimately, Zhang was allowed to provide his own lengthy rebuttal as part of the reviews. Ex. 60, 2021 Annual Review; Ex. 61, 2022 Annual Review.

He also complains about the manner in which Dr. Howard prepared the 2021 and 2022 annual reviews, including his discussions with higher administration in the process. These reviews were among Dr. Howard's first to conduct as School Director, and he justifiably sought guidance. He observed that he was generally providing lower ratings than his predecessor, not only for Zhang, but for others in CEE as well. Ex. 28, Howard Trans. pp.101-102. As for Zhang, Dr. Howard knew that the well-documented performance issues in 2021 and 2022 would warrant unfavorable remarks, so he sought guidance from administrators as a good faith effort to provide Zhang with a fair and honest review. Ex. 28, Howard Trans. p.100. While true that Zhang had filed this lawsuit by the time his 2021 and 2022 annual reviews were complete, his legal activity does not insulate him from truthful and accurate performance reviews. Zhang had long been outspoken about his issues with Dr. Howard; Dr. Howard's understandable desire to have his superiors affirm the fairness of his evaluations only further reflects MSU's consistent efforts to thoughtfully address Zhang's concerns. Ex. 2, Howard Dec. at ¶ 13.

7.     Termination [(y), (z), (aa), (bb), (cc), (dd), (ee), (ff), (gg)]

      *a.*     *The Termination Process*

On February 14, 2024, Zhang received notice of MSU's intent to terminate his employment, citing the cause for his termination to be (1) his failure to teach in accordance with MSU standards, (2) unsatisfactory research performance, and (3) contumacious conduct and malfeasance. Ex. 42, Term. Docs. at MSU260132. The next day, Zhang requested a hearing in accordance with MSU policy. After an agreed postponement, a hearing took place June 3-5, 2025 before a faculty panel assembled under the Provost's inherent authority. Ex. 42, Term. Docs. at MSU260125; Ex. 50, HRM 60.113 at MSU255903. The panel issued its findings on June 19, 2025, agreeing that cause existed to terminate Zhang due to his conduct. Ex. 42, Term. Docs. at MSU260814-20. MSU's Provost thereafter recommended termination to the President, who accepted the recommendation. Ex. 42, Term. Docs. at MSU260831. Zhang appealed the decision to IHL, and in September 2025, IHL affirmed MSU's termination decision. Ex. 42, Term. Docs. at MSU260833.

Zhang has not yet been terminated, although he is likely to be terminated at the end of February 2026. In complaining about his forthcoming termination, Zhang makes various claims of unfairness and urges that he was not afforded sufficient due process. Zhang may not like the result of the hearing before his peers, but he was not denied a hearing, and he cannot show that the hearing he received was insufficient. Moreover, Zhang possesses no evidence that IHL or MSU failed to adhere to their procedures following the termination recommendation. Ex. 51, IHL Policies and Bylaws (2023-2024) at MSU256189-91; Ex. 52, IHL Policies and Bylaws (2024-2025) at MSU256393-95; Ex. 50, HRM 60.113; Ex. 53, Faculty Handbook at MSU002211-2212; Ex. 42, Term. Docs. at MSU260132-35, 260800-33; Ex. 54, Morrison Trans. pp. 10-15, 20-22.

Zhang's employment contracts permit termination for cause. Ex. 36, Contracts at LI 000195. He was given notice of the intent to terminate his employment for cause and, after he requested a

hearing on the proposed termination, he was afforded a hearing in accordance with MSU and IHL policies. Ahead of the hearing, Zhang was provided with a supplement to the notice of intent to terminate his employment, setting out in detail the reasons for the action. Ex. 55, MSU Term. Suppl.[11] Zhang provided his own written response and was given ample opportunity to defend against the claims. At every step, MSU followed the applicable policies and, in fact, went beyond what is required to ensure Zhang had sufficient information and opportunities to defend himself. Indeed, he had even more information about his employment than the typical tenured professor facing termination, as, during the course of discovery, he had received thousands of documents concerning the matters at issue in his termination hearing.[12]

> b. *Reasons for Termination*

Defendants have already described multiple problems with Zhang's teaching and research, so they will not repeated them here. His conduct, however, was also in near-constant violation of MSU policies, and he consistently willfully disregarded his superiors' directives; this manifested in Zhang's teaching and research performance, as shown. *See* Ex. 56, HRM 60.401[13]; Ex. 12, AOP 13.03[14]. Indeed, the faculty hearing panel found that Zhang's conduct alone justified termination.

It is impossible to catalogue every instance of Zhang's insubordination here, but a few examples are illustrative. Throughout his employment, Zhang has refused to take responsibility for

---

[11] Due to their voluminous nature, and because they are largely duplicative of other exhibits to this motion, MSU is not including the exhibits to the termination supplement that were provided to Zhang and the panel in connection with his termination hearing.

[12] This includes, but is not limited to, ESI reaching as far back as 2020 from several administrators' university email accounts. Zhang had also been provided with ESI from his own university email account that also reached back to 2020.

[13] This policy provides a non-exhaustive list of examples of inappropriate conduct, including failure to follow instructions, failure to maintain established standards of work, unsatisfactory performance, workplace bullying, insubordination, and behavior or communication perceived to adversely affect MSU.

[14] This policy outlines an instructor's responsibilities when he must miss class and provides that instructors are obligated to demonstrate respect for the student and treat the faculty-student relationship professionally.

classes he needed to miss, and in his disdain for having to do so, flatly told the former CEE Director, "I don't have to help you." When he did undertake the task on his own, he created unnecessary and avoidable issues for those involved. Ex. 15, Class Arrangement Emails. Zhang also has a history of making unfounded accusatory and threatening remarks to his colleagues. Most recently, in a 2023 annual review meeting, Zhang called Dr. Howard a "nazi." Ex. 28, Howard Trans. p. 111; Ex. 54, Morrison Trans. p. 40; Ex. 6, Zhang Dep. pp. 87-88; Ex. 57, Zhang Interactions.

In other instances, Zhang has flatly refused to follow the directions of his superiors. He refused to make changes to a class project as instructed, when there was concern about safety, liability, and accreditation.[15] Ex. 33, Project Emails. In October 2023, Zhang disregarded specific instructions not to approach an ABET evaluator outside of the scheduled meeting time while he was visiting CEE for accreditation purposes, and he thereafter misrepresented the circumstances that led to his individual meeting. Ex. 58, ABET Meeting Corr.

Zhang's performance in teaching and research, insubordination and lack of respect for MSU procedures, his students, or his colleagues merit the termination he now faces.

**B.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ZHANG'S FMLA CLAIMS**

Under the FMLA, employers are prohibited "from interfering with, restraining, or denying the exercise or attempted exercise of the employee's right to take FMLA leave." *Park v. Direct Energy GP, LLC*, 832 Fed. App'x 288, 293 (5th Cir. 2020) (internal citations and quotations omitted); *Lanier v. Univ. of Tex. Sw. Med. Ctr.*, 527 Fed. App'x 312, 316 (5th Cir. 2013); 29 U.S.C.A. § 2615(a)(1). Claims for violations of the FMLA's prescriptive provisions are "interference" claims. *Park*, 832 Fed. App'x at 293. The FMLA's proscriptive provisions "protect employees from discrimination or

---

[15] Zhang explained that the "safety" precautions for students involved having one student stand lookout and "shout run, run, run" so the other student could retreat from oncoming traffic. Ex. 6, Shaw Trans. at 56:9-14.

retaliation for exercising or trying to exercise their FMLA rights," and employers are prohibited from retaliating against an employee for opposing unlawful FMLA practices. *Park*, 832 Fed. App'x at 293; *Lanier*, 527 Fed. App'x at 316; 29 U.S.C.A. § 2615(a)(2). Claims for violations of the FMLA's proscriptive provisions are "retaliation" claims. *Park*, 832 Fed. App'x at 293.

FMLA claims are further categorized as: (1) claims related to leave taken for a family member, known as "family-care" leave; and (2) claims related to leave taken to address one's own health condition, known as "self-care" leave. *Bryant v. Tex. Dept. of Aging and Disability Services*, 781 F.3d 764, 768 (5th Cir. 2015); 29 U.S.C.A. § 2612(a)(1)(C), (D). Zhang asserts interference claims only with respect to the FMLA's family-care provisions, but he asserts retaliation claims with respect to both family-care and self-care provisions.[16]

### 1.      Zhang Cannot Demonstrate Any Actionable FMLA Interference

Because Zhang's interference claim is limited to the FMLA's family-care provisions, his only relevant leave allegations are those concerning leave taken or requested to care for his child. To make a prima facie case of interference, Zhang must show (1) his employer was subject to the FMLA, (2) he was eligible for FMLA leave, (3) he was entitled to FMLA leave, (4) he notified his employer of his intent to take FMLA leave, (5) his employer interfered with his exercise of FMLA rights, and (6) he was prejudiced as a result. *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 526 (5th Cir. 2021); *Park*, 832 Fed. App'x at 293. Temporary administrative delays, requests for clarification, or disputes about the manner in which leave is taken do not constitute actionable interference absent proof of prejudice. *See Park*, 832 Fed. App'x at 293.

Zhang cannot show that MSU asked him to work during periods of family-care leave, but

---

[16] Zhang's asserts claims against MSU and IHL under the FMLA family-care provisions for deprivation of leave (i.e., interference) and retaliation. Sec. Am. Compl. ¶¶ 40-42 (as to deprivation of leave) and ¶ 50 (as to retaliation). The Court previously dismissed Zhang's self-care leave claims on immunity grounds. Aug. 2023 Agreed Order at ¶ 1 [dkt. #18]. He now reasserts those claims, in addition to his family-care claims, through a claim for reinstatement against Keenum and Rankins. Sec. Am. Compl. at ¶ 52(b).

even if he could, it would not necessarily constitute interference. "Giving employees the option to work while on leave does not constitute interference with FMLA rights so long as working while on leave is not a condition of continued employment." *Park*, 832 Fed. App'x at 294 (quoting *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 210 (5th Cir. 2018)). Zhang has never been required to work during any period of leave as a condition of continued employment, and he cannot show otherwise.

Moreover, mere coverage by the FMLA does not insulate Zhang from MSU policies or responsibility for any possible work-related obligations. Employees have the burden to "make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer." 29 U.S.C.A. § 2612(e)(2)(A). MSU is entitled to take steps to ensure that it is able to carry out normal operations in Zhang's absence. *See Acker v. Gen. Motors, LLC*, 853 F.3d 784, 789 (5th Cir. 2017). Where, as here, Zhang's absences from his assigned classes directly impact MSU's students, it is reasonable to ask Zhang to make alternative arrangements that account for his absence, and to do so is in alignment with internal policy. Ex. 12, AOP 13.03 at MSU255898.

As already detailed, MSU has not denied Zhang any properly-requested family-care leave to which he has been entitled, and it has not otherwise interfered with, restrained, or denied Zhang's rights under the FMLA. Even if he could show any measure of interference, he cannot demonstrate any prejudice as a result. He has been allowed to take leave to which he was entitled, was paid, and never suffered an adverse action as a result of the leave. Zhang cannot make a prima facie case for interference under the FMLA family-care provisions.

2.      <u>Zhang Cannot Prevail on His Claim of Retaliation</u>

Zhang's retaliation claims implicate both the FMLA's family-care and self-care provisions. Zhang claims he was retaliated against for advocating for his FMLA rights "through counsel and the EEOC's administrative procedures" on February 7, 2022 and March 1, 2023, respectively. Sec. Am. Compl. ¶¶ 40-42, ¶ 52(b).

Where, as here, there is no direct evidence of retaliatory intent, the *McDonnell Douglas* burden-shifting framework applies. *Park*, 832 Fed. App'x at 295. Zhang has the initial burden to make a prima facie case for retaliation, and it is only then that the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for the decision at issue. The burden then shifts back to Zhang to prove the stated reason is pretext for retaliation. *Park*, 832 Fed. App'x at 295. To make a prima facie case of retaliation under the FMLA, Zhang must show (1) he was protected under the FMLA, (2) he suffered a materially adverse employment action, and (3) he was treated less favorably than an employee who had not requested leave under the FMLA or the adverse decision was made because he sought protection under the FMLA. *Campos*, 10 F.4th at 527; *Wheat v. Fla. Parish Juvenile Justice Com'n*, 811 F.3d 702, 705 (5th Cir. 2016). To meet the third element, Zhang must give proof of a causal link. *Campos*, 10 F.4th at 527.

To be an adverse employment action for a retaliation claim, an act must be "a materially adverse action that 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Lindsley v. TRT Holdings, Incorporated*, 984 F.3d 460, 470 (5th Cir. 2021) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "[P]etty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* Even derogatory, threatening, or abusive remarks from a supervisor do not constitute adverse employment actions; nor do extra scrutiny, unfair performance ratings, or even a denial of break times. *Lindsley*, 984 F.3d at 470; *Stancu v. Hyatt Corp. / Hyatt Regency Dallas*, 791 Fed. App'x 446, 451 (5th Cir. 2019); *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 485-86 (5th Cir. 2008).

Most of the alleged adverse actions set forth by Zhang in his Second Amended Complaint do not rise to the level necessary to support a retaliation claim. The only actual adverse employment actions are Zhang's pending termination, and perhaps his lower raises in the 2023 and 2024 fiscal years (although he still received raises for those years despite his deficient performance). However,

24

Zhang cannot identify a similarly situated employee who received more favorable treatment or otherwise establish a causal link between any alleged adverse action and his leave or claimed advocacy. Even if he could demonstrate temporal proximity between each action and a protected activity, only "very close" proximity is enough on its own to establish causation in a prima facie case. *Besser v. Tex. Gen. Land Office*, 834 Fed. App'x 876, 884 (5th Cir. 2020). Moreover, Zhang would still be "required to raise a fact question showing that the protected activity was not 'wholly unrelated' to his discharge." *Amsel v. Tex. Water Devel. Bd.*, 464 Fed. App'x 395, 402 (5th Cir. 2012) (quoting *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)).

As noted above, Zhang's termination and all other alleged adverse actions have been wholly unrelated to any protected activity or alleged discriminatory animus. Zhang cannot establish a causal connection between any protected activity and a materially adverse action, nor can he rebut Defendants' legitimate, non-retaliatory explanations for their actions.

### 3.   Zhang's FMLA Claims Against IHL Fail for an Additional Reason

Zhang does not make any allegations uniquely tying IHL to any alleged FMLA violation; he simply attributes MSU employment actions to it. In addition to all the reasons previously detailed herein, because Zhang cannot establish that IHL is his employer for purposes of the FMLA or that it took the actions of which he complains, IHL is entitled to summary judgment.

**C.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ZHANG'S CLAIMS UNDER TITLE VII, THE REHABILITATION ACT, ADA, AND ADEA**

Zhang claims MSU discriminated against him based on his race, ethnicity, and national origin in violation of Title VII, and he asserts claims for disability discrimination under the Rehabilitation Act against both MSU and IHL. He also asserts claims for retaliation under Title VII against MSU and under the Rehabilitation Act against MSU and IHL. His claims for reinstatement are further based on alleged violations by MSU and IHL of the ADA and ADEA discrimination and retaliation provisions. Because these claims generally involve the same analysis, they are addressed together.

At the outset, Defendants note that certain of Zhang's allegations fail as a matter of law. For instance, because the Rehabilitation Act makes no provision for associational discrimination, Zhang does not have a cognizable claim for discrimination based upon his status as a caregiver for his son. 29 U.S.C.A. § 794(a). Additionally, the ADA does not protect against discrimination on the basis of age, and the ADEA prohibits discrimination on the basis age, not disability. *See* Sec. Am. Compl. at ¶ 52(c), (d); 42 U.S.C.A. § 12112; 29 U.S.C.A. § 623(a).

1. <u>Zhang Cannot Prevail on His Claims of Discrimination</u>

With no direct evidence of discrimination, Zhang's Title VII, Rehabilitation Act, ADA, and ADEA claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Houston v. Tex. Dept. of Ag.*, 17 F.4th 576, 585 (5th Cir. 2021); *McDonnell Douglas Corp.*, 411 U.S. 792, 802 (1973).

To establish a prima facie case of Title VII discrimination, Zhang must show that he (1) is a member of a protected class, (2) was qualified for the position at issue, (3) was subject to an adverse employment action at the hands of his employer and (4) was replaced by someone outside his protected class or treated less favorably than other similarly-situated employees who were not in his protected class. *Harville v. City of Houston, Mississippi*, 945 F.3d 870, 874-875 (5th Cir. 2019). A claim brought under the ADEA is subject to the same analysis, except that, for his ADEA claim, he "must show that he was 'replaced by someone younger' and was 'otherwise discharged because of [his] age.'" *Munoz v. Seton Healthcare, Inc.*, 557 Fed. App'x 314, 320 (5th Cir. 2014).

As for his discrimination claims under the Rehabilitation Act and ADA, Zhang must show that he (1) had a disability or was regarded as such, (2) was qualified for the job at issue, and (3) was subject to an adverse employment decision <u>solely</u> by reason of his disability. *Harmon*, 158 F.4th at 608-609; *Dabbasi v. Motiva Enterprises, LLC*, 107 F.4th 500, 508 (5th Cir. 2024); *January v. City of Huntsville*, 74 F.4th 646, 652-653 (5th Cir. 2023); *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 697 (5th Cir. 2014); *Cohen v. University of Texas Health Science Center*, 557 Fed. App'x 273, 277 (5th Cir. 2014).

26

Zhang must additionally show that his disability was known by MSU and IHL, or that his claimed disability, resulting limitation, and necessary reasonable accommodation was open, obvious, and apparent. [17] *Francois v. Our Lady of the Lake Hosp., Inc.*, 8 F.4th 370, 378 (5th Cir. 2021).

Zhang cannot make a prima facie showing of discrimination. Again, the only actual adverse employment action that Zhang has suffered is his pending termination, and because of the conduct and other issues that led to the termination decision, he cannot show that he was qualified for his position. Zhang also cannot show that he was replaced by someone outside of his protected group or identify a similarly situated comparator who received more favorable treatment. To be "similarly situated," the plaintiff and the employee he seeks to compare himself to must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them. *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). He is unable to make any such comparison in his favor. Moreover, Zhang's previous job duties have been assumed, at least in part, by a more recent hire who is also Asian and Chinese. Ex. 2, Howard Dec. at ¶ 6.

Zhang also cannot show a causal connection or that any action he complains of was taken "solely by reason of" a disability, and his claims further fail because all the alleged adverse actions he complains about were based upon the legitimate, non-discriminatory reasons previously detailed herein. Zhang cannot show that these proffered reasons were pretext. Any such "evidence must be of sufficient 'nature, extent, and quality' to permit a jury to reasonably infer discrimination." *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 826 (5th Cir. 2022) (citing *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000)). This, he cannot do, and all his discrimination claims must be dismissed.

---

[17] Moreover, if Zhang is to recover any compensatory damages based upon his disability discrimination claim, he must demonstrate that any discrimination was intentional. *Francois*, 8 F.4th at 378.

### 2. Zhang Cannot Prevail on His Retaliation Claims

To establish a retaliation claim[18], a plaintiff must prove that (1) he engaged in protected activity, (2) his employer took adverse employment action against him, and (3) there was a causal connection between the protected activity and the adverse action. *Harmon*, 158 F.4th at 608; *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 757 (5th Cir. 2017) (citing *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015)); *see Parker v. La. Dept. of Educ. Special Sch. Dist.*, 323 F.App'x 321, 327 (5th Cir. 2009) (applying *McDonnell Douglas* framework). Ultimately, Zhang would have to prove his retaliation claims under a but-for causation analysis. *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577 (5th Cir. 2020; *Univ. of Tex. Southwest Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). That is, he must show that the unlawful retaliation would not have occurred in the absence of the protected activity.

Without direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework applies. *Thomas v. Johnson*, 788 F.3d 177, 179 (5th Cir. 2015) (internal citation omitted). "Ultimately, in order to survive a motion for summary judgment, a plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the adverse employment action but for the protected activity." *Brown*, 969 F.3d at 577 (quoting *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019) and *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012)) (additional internal quotation marks omitted).

The same analysis set forth above for Zhang's discrimination claims applies equally here; therefore, Defendants will not repeat that analysis in detail. In simplest terms, Zhang cannot show that any actions against him would not have occurred but-for any protected activity or status, and he cannot show any conflict in substantial evidence on Defendants' proffered reasons for their actions

---

[18] The Sixth Circuit Court of Appeals recently held that Section 504 of the Rehabilitation Act does not prohibit retaliation in employment. *See Smith v. Michigan Dep't of Corr.*, 159 F.4th 1067 (6th Cir. Nov. 21, 2025). Although not binding on this Court, its reasoning based on a Spending Clause analysis and statutory interpretation principles warrants consideration.

to indicate they were, instead, a but-for result of same.

        3.        <u>Zhang Cannot Show a Failure to Accommodate</u>

Zhang does not expressly make a failure to accommodate claim in his Second Amended Complaint, but in the litany of claimed adverse actions, he alleges that he was denied a motorized raising desk to accommodate his back pain. Sec. Am. Compl. ¶ 43(f). To be sure, Zhang was not denied this or any other accommodation. The undisputed record demonstrates that the processes for making accommodations for Zhang were appropriate and that Zhang was, in fact, provided reasonable accommodations.

        4.        <u>Zhang's Claims Against IHL Fail for an Additional Reason</u>

Zhang can offer no competent proof that IHL took any challenged employment actions, other than considering Zhang's appeal of MSU's termination decision, or that IHL is his employer under the relevant statutes. For this additional reason, IHL is entitled to summary judgment.

**D.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE DUE PROCESS CLAIM**

To support his claim for reinstatement under *Ex Parte Young*, Zhang alleges violations of the due process clause of the Fourteenth Amendment; specifically, he claims that he was deprived of a protected property interest in continued employment without constitutionally sufficient notice and opportunity to be heard. Sec. Am. Compl. ¶ 52(a).

To terminate a tenured public university faculty member, due process requires that the faculty member receive notice and an opportunity to be heard. *Jones v. La. Bd. of Sup'rs of Univ. of La. Systems*, 809 F.3d 231, 236 (5th Cir. 2015). The specific process due depends on the context of each case, but a tenured professor generally has the right to "(1) be advised of the cause for his termination in sufficient detail so as to enable him to show any error that may exist; (2) be advised of the names and the nature of the testimony of the witnesses against him; (3) a meaningful opportunity to be heard in his own defense within a reasonable time; and (4) a hearing before a

29

tribunal that possesses some academic expertise and an apparent impartiality toward the charge." *Jones*, 809 F.3d at 236; *Levitt v. Univ. of Tex. at El Paso*, 759 F.2d 1224, 1228 (5th Cir. 1985).

As already set forth herein, Zhang received both sufficient notice and an opportunity to be heard. He received the initial notice of the reasons for his termination and then, upon his request for a hearing, he was later provided with a supplemental notice detailing the reasons for his termination with 34 supporting exhibits. Ex. 42, Term. Docs. At MSU260132; Ex. 55, MSU Term. Suppl.. He prepared his own lengthy written defense, and it was shared with the faculty members comprising the hearing panel. A hearing was set based on an agreed timeline, and it took place before a panel of MSU faculty, none of whom can be shown to have had any partiality towards the termination suggestion. In advance of the hearing, Zhang was provided with information about the witnesses against him, and he was ultimately given extensive opportunity to be heard in his own defense. In fact, the faculty panel continued its inquiry beyond the hearing dates and allowed Zhang to add to his defense through email correspondence.

IHL's role in the termination process was a purely discretionary review of the "record made at the lower level." Ex. 52, IHL Policies and Bylaws (2024-2025) at MSU256394-95. IHL exercised its discretion to grant Zhang a review of the proceedings and affirmed MSU's decision to terminate Zhang's employment. Ex. 42, Term. Docs. At MSU260833. Zhang simply cannot show that he did not receive adequate notice of the claims against him or an opportunity to be heard. His due process claims, therefore, should be dismissed.

## IV. CONCLUSION

For all the reasons set forth herein. The Court should grant Defendants' motion for summary judgment and dismiss this action.

Dated: February 19, 2026

Respectfully Submitted,

MISSISSIPPI STATE UNIVERSITY,
MISSISSIPPI BOARD OF TRUSTEES OF
STATE INSTITUTIONS OF HIGHER
LEARNING, MARK KEENUM, in his
official capacity, and ALFRED RANKINS,
JR., in his official capacity

By:   /s/ Ashlyn B. Matthews
      Ashlyn B. Matthews
      Miss. Bar No. 104424
      amatthews@winfieldlawfirm.com
      Charles E. Winfield
      Miss. Bar No. 10588
      cwinfield@winfieldlawfirm.com
      THE WINFIELD LAW FIRM, P.A.
      224 East Main Street
      Post Office Box 80281
      Starkville, Mississippi 39759
      Telephone: (662) 323-3984
      Facsimile: (662) 323-3920

31

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I electronically filed the foregoing with the Clerk of the

Court using the ECF system, which sent notification of such filing to the following:

> Grafton E. Bragg
> BraggLaw, PLLC
> grafton@graftonbragglaw.com

Dated: February 19, 2026

/s/ Ashlyn B. Matthews
Ashlyn B. Matthews