# Robet Grala

## Li Zhang
### vs.
## Mississippi State University, et al.

## January 6, 2026



338 Indian Gate Circle
Ridgeland, MS 39157
601-573-0961

amanda@awreporting.com
www.awreporting.com

**EXHIBIT**

**10**

1

IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT


LI ZHANG                                        PLAINTIFF


V.                          CASE NO. 25CI1:23-cv-441-AHW


MISSISSIPPI STATE UNIVERSITY and
MISSISSIPPI BOARD OF TRUSTEES OF STATE
INSTITUTIONS OF HIGHER LEARNING          DEFENDANTS




*************************************************


VIDEOCONFERENCE DEPOSITION OF ROBERT GRALA


*************************************************




APPEARANCES NOTED WITHIN



DATE:  TUESDAY, JANUARY 6, 2026
PLACE:  VIA ZOOM
DEPONENT APPEARING FROM
STARKVILLE, MISSISSIPPI
TIME:  9:31 A.M.




BETHANY CAMMACK
Certified Shorthand Reporter
Mississippi CSR No. 1526

APPEARANCES


GRAFTON E. BRAGG
BraggLaw
965 Madison Avenue, Suite 2C
Madison, Mississippi  39110
grafton@graftonbragglaw.com
        Counsel for Plaintiff


ASHLYN BROWN MATTHEWS
The Winfield Law Firm
224 East Main Street
Starkville, Mississippi  39759
amatthews@winfieldlawfirm.com
        Counsel for Defendants

TABLE OF CONTENTS

PAGE

Title Page.................................... 1

Appearance Page............................... 2

Table of Contents............................. 3

Exhibit Index................................. 4

EXAMINATION OF ROBERT GRALA

   By Mr. Bragg............................... 6

Reporter's Certificate...................... 121

Deponent's Errata Sheet..................... 122

4

EXHIBIT INDEX

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Mississippi State's Answers to Interrogatories | 13 |
| Exhibit 2 | Recommendation of Committee for Brecken Rush Appeal | 19 |
| Exhibit 3 | Email Exchange, Signature is Needed, MSU 256858-861 | 28 |
| Exhibit 4 | Email Exchange, Status Update MSU 257940-945 | 33 |
| Exhibit 5 | Email Exchange, Regarding Zhang Appeal, MSU 257955-957 | 36 |
| Exhibit 6 | Email, Extension Request Exhibit Z-4 | 46 |
| Exhibit 7 | Letter, Grafton Bragg Exhibit Z-5 | 49 |
| Exhibit 8 | Email Exchange, Participation and Material, MSU 257998-999 | 52 |
| Exhibit 9 | Email Exchange, Committee Members Needed | 53 |
| Exhibit 10 | Email Exchange, Time Sensitive Request | 56 |
| Exhibit 11 | Email with Position Statements, MSU 258013-043 | 58 |
| Exhibit 12 | Email Exchange, Advisor MSU 258053-055 | 68 |
| Exhibit 13 | Email Exchange, Advisor MSU 258065-084 | 73 |
| Exhibit 14 | Email Exchange, Followup on Documents, MSU 258578-579 | 78 |

5

EXHIBIT INDEX CONTINUED

NUMBER              DESCRIPTION                        PAGE

Exhibit 15          Email Exchange, Request of
                    Summary, MSU 258552-554            79

Exhibit 16          Email Exchange, Expected Date      80
                    MSU 258674-677

Exhibit 17          Email Exchange, Meeting
                    Tomorrow, MSU 258655-657           83

Exhibit 18          Recommendation of Committee
                    for Dr. Zhang's Appeal             85

Exhibit 19          Teams Group Document
                    Beginning MSU 258504               88

Exhibit 20          Policy HRM 60.113
                    Termination of Employment          120

ROBERT GRALA,

having been remotely sworn,

was examined and testified as follows:

EXAMINATION

BY MR. BRAGG:

Q. Please state your full name for the record.

A. My name is Robert K. Grala.

Q. I can call you Dr. Grala, correct?

A. That's fine.

Q. You know we've met before. My name is Grafton Bragg. I represent Dr. Li Zhang in a matter that has been filed against Mississippi State and the IHL and a couple of individuals in their official capacities. Have you ever given deposition testimony before?

A. No, I have never given deposition before. This is the first time.

Q. Okay. So I'm sure that counsel for Mississippi State has discussed sort of the basics with you, but I'll go over some of the preliminary things that I like to cover just pretty much in every deposition, just to make sure we're on the same page.

So the first thing that I expect you'll be

good at is, it's important to respond verbally with yes or no answers, rather than nods and shakes. Does that work?

A.   Yes.

Q.   Good job.  In normal conversation a lot of times we sort of jump in after we understand what the person is going to say and it's sufficiently obvious.  It's important in a deposition for you to let me finish my question before you jump in with your answer, and for me to let you finish your answer before I jump with my next question.  I sometimes struggle with that, but I'll do my best if you'll do your best.  Does that work?

A.   I understand, yes.

Q.   And I'm sure that Bethany will let us know if we're violating that rule.  You know, I think we're going to be here for a little while today because you led the proceedings, but I will try to be as efficient as possible.  If you need a break for any reason, just let me know.  Is that okay?

A.   Yes.

Q.   The only thing I would ask is, if I've asked a question, a question is on the table, I would ask that you go ahead and finish the answer to that question before you ask for a break.  Is

8

that fair?

A.   Yes.

Q.   Okay.  If you don't understand a question that I ask, then please just let me know.  Because if you don't let me know, then everyone who reads the transcript, whether it be the attorneys, a judge, or a jury, will assume that you did understand the question.  Is that fair?

A.   Yes, I understand.

Q.   Okay.  Thank you.  Today I've got several exhibits that we're going to go through.  Right now they're marked A through T.  We might not do all of them, but there are quite -- you know, quite a bit of documentation.

So what I intend to do is, I will share my screen.  I'll identify the exhibits where Ashlyn can find them too, if she needs a minute to pull it up, and certainly she can have that.  And then I'll just -- I'll ask you some questions about the document, and we'll make it an exhibit to the deposition.  Is that good?

A.   Yes.

Q.   Okay.  Tell me what you did to prepare for the deposition today.

A.   I have contacted Ms. Ashlyn Matthews just

9

to give me the overall idea how the deposition will go.  Also, the hearing of Dr. Zhang's case was a long time ago, half a year, so I went over my emails -- I'm not sure if I was able to cover all of them -- just to remind myself what the conversation was.

Q.  So you looked at your emails that you had send throughout, I guess, the pendency of the hearing?

A.  Yeah.  So the emails that I have sent or that I have received.  I also went through a Teams portal that we have created to draft a letter regarding Dr. Zhang's case.

Q.  Okay.  And that was -- the final recommendation was generated --

A.  Yes.

Q.  -- through the portal?

A.  Yeah, so that was the final -- that was a live document where every hearing panel member had access to it to provide comments and participate in the final evaluation.  So currently this is the final Word version of that document.  And I also have PDFs where each hearing panel member signed the letter.

Q.  Okay.  Thank you.  Tell me a little bit --

10

I'm not going to spend too long on this, but give me the benefit of your background. Where were you born, Dr. Grala?

A. I work in the Department of Forestry, in the College of Forest Resources at Mississippi State University. I am professor of forest resource economics.

Q. Okay. So I was going to ask that in a minute, but the first question I had was, where were you born?

A. I was born in Poland.

Q. In Poland. How long did you live in Poland?

A. I lived in Poland for about 25, 26 years.

Q. Okay. Did you move to the United States after that?

A. Yes, I did.

Q. Okay. And where did you move to when you moved to the United States?

A. I started my graduate studies, Ph.D. studies, at Iowa State University, and after that I received a position offered here at Mississippi State University, and I have been working at Mississippi State since that time.

Q. Okay. And was that 2004 that you began

11

working at Mississippi State?

A.   That's correct.  So I have been working for Mississippi State University for about 20 years now.

Q.   And then you received a -- were you promoted to full professor in 2021?

A.   Well, that would be sooner than that.  I was promoted to associate professor after five years, so that's a standard period, over which you have to be evaluated, and a decision has to be made whether you are promoted to associate professor and you receive tenure.

And then after another five years, I would be promoted to full professor.  So I would be promoted in 2015, 2016.  So I have been full professor position for about ten years now.

Q.   Okay.  Bear with me one minute.  Okay. I'm going to share my screen.  Can you see this document?  I don't think you would have seen this before, Dr. Grala.  Have you ever seen these answers to Dr. Zhang's third set of interrogatories?

A.   I don't think so.  I don't recall that.

Q.   Okay.  I would not have expected you to. So I'm going to scroll down to Paragraph 6, and

there is some information listed about you.  And I want you just to take a minute to read the information and see if there is anything in it that is not accurate.

A.  So "Robert Grala is the George L. Switzer Professor of Forestry" --

Q.  Just to save you -- to save you and the court reporter, I don't need it out loud.  Just let me know when you're finished.

A.  Okay.  Everything is correct except when I was appointed a full professor, 2021.

Q.  Okay.

A.  So that seems too late.  I can provide -- produce a letter where I have received notification of being promoted to full professor, if that's required.

Q.  Okay.  I don't think it will be.  Your recollection is that it was around 2015?

A.  Yeah.  2015, 2016.  It was a five -- minimum five years required to be able to apply for a position to full professor.

Q.  Okay.  Great.

MR. BRAGG:  Off the record one second, please.

(OFF THE RECORD.)

13

MR. BRAGG: We'll make those interrogatory responses Exhibit 1 to the deposition.

(EXHIBIT 1 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q. Okay. And, Dr. Grala, I thought you did an admirable job at the hearing whenever you had to ask sensitive questions, doing it in a way that was very respectful, so I'm going to try to do my best with this question.

There are some issues in this case -- some allegations involving race and ethnicity. And so I'm just -- I'm going to invariably have to ask every witness how they would describe their race or how they would describe their ethnicity. So you're first. That's the question to you.

A. I would describe myself in any form that requires a reporting of ethnicity as Caucasian.

Q. Okay. Thank you. What is your -- what are your official degrees and certifications and, you know, everything that sort of makes up your CV?

A. So I have a Ph.D. in forest resources with specialization in forest economics. I have a master's in forest resources, and I have a master's in environmental science and policy.

14

Q.   Okay.  So you are within the Department of Forestry.  I understand that correctly?

A.   Yes.

Q.   Okay.  Who do you report to within the department?

A.   I report to my department head, Dr. Donald Grebner.

Q.   Can you say that again?

A.   I report to my department head, Dr. Donald Grebner.

Q.   How do you spell Donald's last name?

A.   G-r-e-b-n-e-r, Grebner.

Q.   Okay.  Thank you.  And does your department head, Dr. Grebner, report to someone above him?

A.   Yes.

Q.   And who is that?

A.   He reports to the dean of the college resources, Wes Burger.  Dr. Wes Burger.

Q.   Okay.  Wes Booker?

A.   Burger, B-u-r-g-e-r.  Burger.

Q.   And then Dr. Burger reports to the provost?

A.   Yes.

Q.   I think I learned that if you were to

15

receive an annual review, and you sort of exhausted the chain of command, and you weren't happy with it, and you went up through the chain of command and appealed that, you would ultimately end up appealing to Dr. Shaw?  Is that correct?

A.  So if there is an annual evaluation, the faculty can provide -- and contest that evaluation, that's going to be evaluated by the dean.  And the dean makes a final decision in that case, in the case of an annual evaluation.  This is my understanding.

Q.  Okay.  So that stops at the dean level typically?

A.  Yes.

Q.  How did you get on the Promotion and Tenure Committee?

A.  I volunteered.  I was interested in serving on a university committee, provide some extra service.  And I was elected by faculty in my college to serve on the University Committee on Promotion and Tenure.

Q.  When someone is -- okay.  So can you say University Promotion and Tenure Committee?

A.  Yes.  So there are several variations how people call it, but official name is the University

16

Committee on Promotion and Tenure.

Q. Okay. I think it's also referred to as the P&T Committee?

A. Yes. With the exception that you may have P&T Committees at several levels. So there's one at the departmental level, there's one at the college level, and there's one at the university level.

Q. Okay. So let's -- maybe we can agree on this. If we talk about the P&T Committee or the Promotion and Tenure Committee today, and we don't specify that it's at the department level, then we're talking about the University P&T Committee of which you are the chair.

A. I understand.

Q. Okay. Great. And so you said you were selected by the faculty. Is the dean of the college or the department head involved in selecting you to be on the P&T Committee?

A. No. So the call comes -- that comes from the faculty senate. There's notification that, you know, a position is vacant or -- well, each department, each college, gets one seat, and then there's a call for nominations from the faculty.

Faculty nominate other faculty for those

17

positions, or they can do self-nominations.  Those nominations are then announced, and the faculty of the college can vote for specific names.  And after the vote window is completed, then the winner is announced.

Q.   Okay.  Understood.  So did you have someone running against you for the position?

A.   I don't recall.  I think there was one individual who was running against from a different department in my college.

Q.   Okay.  Is there a list of criteria or values that a member of the P&T Committee is supposed to have?

A.   There is not, but there is a charter of what a committee does and whom the committee reports to.

Q.   Okay.

A.   Now --

Q.   Yeah, go ahead.

A.   There's one clarification.  That the university committee may deal with different cases of whether there's promotion and tenure.  If that decision is related to, say, an associate professor, then both associate professors and full professors can participate in the discussion and

18

the decision.

However, if that's a higher level, for example, a full professor, then you can have only full professors discussing that case. So basically you have to be at the case -- or at the level, rank level, at which the case have been submitted for your review.

Q. Okay. And is that true for every matter that is considered by the P&T Committee?

A. Yes. So basically on the University P&T Committee, you have faculty Rank 2 and Rank 3 at most.

Q. Okay. How did you receive the appointment as chairperson?

A. So we have received -- I was on the committee, and we have received a case to review. I volunteered to serve as a chair. There was no individual running against me. Members of the committee voted, and they elected me to be the chair of that committee.

Q. Okay. So that arose because there was a committee that had been appointed; there was not a specific chair at that time?

A. At the time, yes.

Q. Okay. And then -- what year was that?

A.    That would be about two and a half years ago.

Q.    And have you continued to be a chair from the time that you first received the appointment?

A.    I have continued to be the chair.  I have been re-elected one year and a half after.  Because you elect chair every academic year, which starts with the fall semester.  And I have continued that through August of last year, which was Dr. Zhang's case.

Q.    Okay.  And so two and a half years ago would have been the middle of 2024 on that case?

A.    Yeah, I can quickly double-check that if you let me.  So I will...

Q.    Would this have been the Brecken Rush matter?

A.    Yeah.  That's exactly that case.

Q.    It looks like it was in the mid of 2023, that case.  And I'll go ahead and we can make it Exhibit 2 to the deposition.  Just to get confirmation.

      (EXHIBIT 2 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q.    And I'll scroll down to let you look at it for just a second and get you to confirm that this

document that will be marked as Exhibit 2 is the P&T Committee's recommendations on the Brecken Rush appeal.

A.   Yes.  That seems correct.

Q.   Okay.  And it looks like the date of that was 2023, correct?

A.   July 31st, 2023.

Q.   And so I think your math was correct, that that's roughly two and a half years ago.  Mine was incorrect.  Okay.  That will be Exhibit 2.

How long were you on the committee before you became chair?  Maybe an easier way to ask that is, when did you join the P&T Committee?

A.   I would have to check that.  I was there -- on the committee probably for a couple of years, but I'm just -- at this point I'm not sure.

Q.   Were you involved in any cases as a member but not as a chair of the committee?

A.   No.

Q.   Okay.  So the first case that you participated in while on the committee was the Brecken Rush appeal?

A.   Yes.

Q.   So where does the P&T Committee fit within the organizational structure of the university?

A.    Could you specify?

Q.    I was hoping that -- sometimes when I Google something I hope that I spell it well enough that Google will understand what I meant.  I was kind of hoping you would understand that question well enough to provide some clarity.

But it's my understanding that the P&T Committee does answer to the provost.  Is that accurate?

A.    Yes.  So the P&T Committee members are being elected by the faculty.  They report to the provost.  And the goal is that if a case like this one, like Dr. Zhang's arise, the committee evaluates the case, and all information provided -- to provide provost with their recommendation of how the committee feels about that case and if the appeal had merit or not.

Q.    Okay.  And the idea is that the P&T Committee, while answering to the provost, is providing sort of an independent analysis.

A.    That's correct.

Q.    And during your time with the P&T Committee, have you always felt like the committee was acting in an independent manner?

A.    Yes.

22

Q.    What types of cases does the committee hear?  You alluded to a couple earlier, but let's get a full list.

A.    So I was involved in three cases.  Two of those involve intent to terminate employment, and one involved denial of promotion from one level to the second -- to the next level.

Q.    Okay.  So let's take them one at a time. The first one was denial of promotion, and that was Brecken Rush, correct?

A.    That's correct.

Q.    The second one was an intent to terminate, and I've seen the name of that person in the documentation, but I don't have it with me --

A.    Ruo Jia.

Q.    How do you spell that?

A.    R-u-o, that's -- and then J-i-a.

Q.    Okay.  And talk to me a little bit about that.  Like how did the notice of intent come about?

A.    The notice of that case related to whether that faculty was authorized to work for Mississippi State University.  A recommendation was provided, and the hearing panel voted the faculty wasn't authorized to work for Mississippi State

University.

Q.    Was that a legal authorization?

A.    Like what do you mean?

Q.    Like why was the finding that -- is that a male or a female?  I'm sorry.

A.    That was a female.

Q.    Okay.  What was the finding that she was not authorized to work for Mississippi State?

A.    The faculty didn't have the appropriate visa to work for Mississippi State University.

Q.    Okay.  Understood.  And when did that hearing take place?

A.    That would be about a year ago.  Early -- the beginning of the academic semester, so August, September.

Q.    Of 2024?

A.    That would be 2024.

Q.    Okay.  And was the recommendation of the P&T Committee followed by the university in that case?

A.    Yes.

Q.    Who signed the notice of intent to terminate in that case?

A.    That would be Dr. Shaw.  Let me just see if I have any documentation on that.

24

MS. MATTHEWS: Grafton, do you have these documents that you're --

THE WITNESS: The notice of termination was signed by Dr. Angi Bourgeois, Dean of the College of Architecture, Art, and Design.

MR. BRAGG: Okay. Ashlyn, I do have a little bit of information on that, but I don't have that document. I really am just more interested in an answer to the question, so it's not -- I don't think it's critical that I have it. Thank you.

MR. BRAGG CONTINUED:

Q. All right. And so Dr. Shaw would have been involved, I guess, in the termination decision of Dr. Jia. Is that correct?

A. Probably.

Q. Okay. And then the final matter you've been involved in is the notice of intent to terminate Dr. Zhang's employment. Is that correct?

A. So we are talking about here two different individuals, Dr. Ruo Jia and Dr. Li Zhang.

Q. Right, right. I'm -- sorry, I was moving -- so you said there were three cases. We've talked about --

A. Yeah, yeah. So the last case that I

25

presided as a chair over, that was Dr. Zhang's case, intent to terminate employment.

Q. Okay. In the first two matters that you participated in, was the entire P&T Committee in attendance?

A. So that's not always possible, so the policy stipulates that the P&T -- the University P&T Committee would select a hearing panel, and the idea is that when we select a hearing panel, that's the majority of the University P&T Committee.

Q. Okay. So I don't think the policy specifically says majority, but that is your --

A. Yeah. That's how -- a practical approach to ensure that we have representative -- opinion that would be representative of the University P&T Committee.

Q. Okay. What about in the case of Brecken Rush? Was the entire committee able to be there?

A. I think we were probably missing maybe two or three faculty. Just, you know, those cases arise where the faculty may have preschedules, sabbaticals, or they may have field trips or other visits, so -- but we had a majority in that case too. I can go over it quickly and tell you how many faculty signed the letter, if that's helpful.

26

Q.   I think it's okay.  What about Dr. Jia?

A.   Dr. Jia, not every faculty was able to participate while -- was on sabbatical, so -- but we still had a majority of the committee serving as a hearing -- on the hearing panel.

Q.   All right.  In past matters has the panel allowed for remote attendance, or has in-person attendance been required?

A.   So we did -- most of the time we did personal attendance.  For some witnesses we did a remote via video.  And I think we had one member -- a hearing panel member who participated remotely.  But I would have to double-check on that.

The stipulation in the policy is that only faculty or hearing panel members who participated in the entire presentation of the case can discuss the case and can vote on the case.  So if someone was to miss a meeting, they wouldn't be able to vote on that case.

Q.   And what policy number is that?

A.   That's Policy 60.113.

Q.   Okay.  Within the HRM policies?

A.   Yes, HRM policy.

Q.   Has there ever been a time where you personally voted against a recommendation by the

27

university?

A.   You mean against --

Q.   Yeah.  In a matter --

A.   Yes.

Q.   Your answer was yes?

A.   Yes.  I voted against the university recommendation before.

Q.   Okay.  And which matters did you vote against the university recommendation?

A.   That was the first case of Ms. Brecken Rush.

Q.   Okay.  Dr. Zhang was on the committee for the Brecken Rush appeal?

A.   Dr. Zhang was on the committee for the second case.  That would be Dr. Ruo Jia, if I remember correctly.

Q.   Okay.  I think he was also -- so we can look at it.

A.   Yeah.  I can look at it quickly.

Q.   Got it.  So I've Exhibit 2 pulled back up, and this was the Brecken Rush appeal decision.

A.   So this is the Brecken Rush, and we can look at the -- Dr. Li Zhang.  Yes.

Q.   So he would have been on that appeal?

A.   Yes.

28

Q.   During your time -- so since you guys worked on the same committee together, did you get a chance to know Dr. Zhang?

A.   No.  Beyond the typical participation in the committee -- on the committee, I didn't have any other interactions with Dr. Zhang.

Q.   What was your experience with Dr. Zhang during the participation on the committee?

COURT REPORTER:  I'm sorry.  Repeat that question.

MR. BRAGG CONTINUED:

Q.   Yeah.  I asked, what was your experience with Dr. Zhang during your joint participation on the committee?

A.   Like with every hearing panel member, so we would have discussions, would provide comments on the case.  And that was the extent of that interaction.

Q.   Did you perceive him to be professional?

A.   I don't really have an opinion on that.

Q.   All right.  I'm going to share another document with you.  And this is an email chain, so I'll start at the bottom.  We'll make this Exhibit 3 to the deposition.

(EXHIBIT 3 WAS MARKED FOR THE RECORD.)

29

MR. BRAGG CONTINUED:

Q. Do you recognize this as an email chain in which you were a party with Dr. Howard, Isaac Howard? And I'll just kind of scroll up. And others. It's got -- I think there's a couple of email chains stuck together, but they're both involving Dr. Howard. Do you see that?

A. Yes.

Q. Okay. And so the first email down here at the very bottom of page 4, which is Bates numbered MSU 256861, it looks like -- if you just want to take a second to read it, it looks like you're having difficulty getting in touch with Dr. Zhang?

A. That's correct.

Q. Okay. And was this about the second matter that you testified about, the --

A. Dr. Ruo Jia case.

Q. -- Dr. Jia matter? Yeah. Okay. And so the second sentence in your email says, "The committee has developed a letter regarding the participation of professional-track faculty in promotion decisions."

A. Yes.

Q. Tell me what that is about.

A. So after we reviewed the case, we need to

30

develop a letter where we provide a recommendation to the provost. So there was a discussion on that. And Dr. Zhang also provided his feedback. And then typically in these situations, I start with a draft letter, which other faculty hearing panel members can review, contribute, and review.

And I think it took some time, but we get to the point where we were ready to sign the letter, that all the faculty members indicated they were able to sign. And when I have sent an email to Dr. Zhang, I haven't received a response. I have called several times. I haven't received a response. I thought perhaps he was on sabbatical or something similar.

And then I contacted Dr. Howard regarding what would be the best way to contact Dr. Zhang, you know, to obtain his signature on that letter. When the hearing panel provides their recommendation to the provost, that letter has to be signed by every hearing panel member that heard the case.

Q. Okay. And so I don't think I've seen the actual -- that actual letter. Can you just give me the -- your understanding of what that letter was conveying?

A.   That letter was conveying that the faculty -- the faculty was offered a position at Mississippi State University conditional on the faculty's ability to secure H-1B visa, which wasn't done.  So faculty wasn't authorized to work under the visa because actually didn't have it.

And then the faculty claimed that they could work for Mississippi State University under their current visa, which was their old visa, but the university didn't believe that that visa was appropriate because it wasn't sponsored by the Mississippi State University.  It was sponsored by another institution.

Q.   Okay.  So this was not -- the way the email reads, it doesn't go into details of the --

A.   No.

Q.   (Indiscernible.)

A.   Yeah.  And on my part there was no reason to notify Dr. Howard what was the case about that letter.  I just needed some contact information for Dr. Zhang, whether he agrees with the final version of the letter and whether he's willing to sign that letter.

Q.   Okay.  That makes sense.  So this was not a letter that was about sort of structural

32

processes --

A. No, no. That was just a letter that I needed to get in touch with Dr. Zhang in order to be able to proceed with the letter and be able to deliver that letter to the provost. And we had a specific, you know, due date by which specific documents had to be provided.

Q. Okay. So then it looks like Dr. Howard made a recommendation that you correspond with others and copied a whole host of people that we became familiar with during the hearing, the administrative hearing, correct?

A. Yes.

Q. And then it looks like Julia Morrison responded to you?

A. Yes.

Q. And that would be on page 3 of this document.

A. Yeah.

Q. And then she just mentioned that Dr. Zhang was on administrative leave and --

A. Yes.

Q. -- could not sign, correct? Okay. Did you have a followup conversation with anyone about this, or was it all done via email?

33

A.    It was done -- I recall it was done via email, and subsequently another faculty member was elected to replace Dr. Zhang on the University P&T Committee.

Q.    And who is that?

A.    That would be Dr. Santanu Kundu.

Q.    Okay.

MR. BRAGG:  And so that document will be Exhibit 3.  Is that correct, Bethany?

COURT REPORTER:  I think so.

MR. BRAGG:  Bear with me a minute. I'm making sure our numbering is right.  It will save us time on the back end.  Okay.  Now I'm sharing a document that has been -- that will be marked as Exhibit 4.

(EXHIBIT 4 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q.    And it's another email chain.

A.    Yes.

Q.    And it starts with you emailing the group of the committee, including Dr. Zhang, about scheduling a meeting.  Do you see that?

A.    Yes.

Q.    And that's an accurate representation of what you emailed, I'm assuming.

34

A.   Let me just read that quickly.

Q.   Okay.

A.   Yes, that's correct.

Q.   And then I'll sort of scroll up here. There's some dialogue back and forth, and then we get to the email at the very top, to the final email in the chain, on page 1.  And you're following up with the P&T Committee on September 9th, 2024.  You see that?

A.   Yes.

Q.   Dr. Zhang is not on that email because at that point you've learned that he's on administrative leave, correct?

A.   Yes.

Q.   Okay.

A.   Let me just -- let me just read the entire email.

Q.   Yes, go ahead.  Take your time.

A.   (Reviewing document.)  Yes, that's correct.

Q.   Okay.  And so I wanted to ask you about one thing you said here.  You said that the composition of the committee would change?

A.   Yes.

Q.   What did you mean by that?

A.   I just mean by that that Dr. Zhang won't

35

be -- won't be on the committee any longer, but I didn't want to disclose necessarily that he was on administrative leave because that was confidential information.

Q. Okay. At the time that you wrote this email, did you understand that Dr. Zhang had received a notice of intent to terminate?

A. No. I was just informed that he was on administrative leave.

Q. Okay. How did you first find out about Dr. Zhang's notice of termination?

A. The letter was sent from Dr. Shaw to the committee indicating there was a -- that Dr. Zhang received a notice of employment termination, and the committee's charged with -- and Dr. Zhang appealed the decision, and the committee's charged with reviewing that case.

Dr. Shaw also indicated that Dr. Zhang served on the committee before and there might be some faculty who might be uncomfortable serving for that review. I followed up with the committee members, and none of them indicated that they were not willing to serve, so -- they didn't have any trouble serving on the committee.

Q. Okay.

36

A.   On the hearing panel.

Q.   And I'll show you a document that we'll

mark as Exhibit 5 to the deposition.

(EXHIBIT 5 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q.   And do you recognize this as an email

chain that you were a part of also?

A.   Let me just read the first one on the top

of the page.

Q.   Yeah, I'll go -- oh, you want me to go --

I'll start at the first chronologically here.  Tell

me when you're ready for me to move to the next.

A.   (Reviewing document.)  Yes, I have read

the entire email.

Q.   Okay.  And then I'm just sort of scrolling

up.  I just want you to confirm these are -- this

is an email chain that you were a part of.

A.   Yes.  Those look -- it looks like those

were emails sent by me or to me.

Q.   Okay.  And so you mentioned that you first

found out when Dr. Shaw notified the P&T Committee,

and we've got an email here at the bottom of

Exhibit 5 that was Saturday, December 7th.

A.   Yes.

Q.   And it looks like that's an email from

37

Dr. Shaw to you referring to the notice of termination to the committee.

A. Yes.

Q. Is that accurate?

A. Yes.

Q. Is this the first that you found out about the notice of termination, this email?

A. I don't recall any other information receiving his notice of termination except getting this letter.

Q. Okay. And then it looks like the very next day, also on a weekend --

A. Yeah.

Q. You forwarded this email to the then current members of the P&T Committee. Is that correct?

A. Yes, yes.

Q. Okay. I want to go through just each of the people in the "To" line here.

A. Yeah.

Q. So the first person here is Craig Aarhus?

A. Correct.

Q. Is that how you pronounce his name?

A. I suspect.

Q. Okay. And so he was a member of the P&T

38

Committee in 2024?

A. Yes.

Q. Was he also a member of the P&T Committee in June of 2025?

A. So he was not on the hearing committee for Dr. Zhang's appeal.

Q. So he was not on the hearing panel, but he was still part of the P&T Committee at large?

A. I would have to check that. It's not like all committee members change at one time, so there might be rotations, and typically we have, you know, several committee members that would rotate each year.

So that list may have been updated after sending that email once we knew the results of the elections.

Q. Okay. So you don't know -- as we sit here today, you're not sure one way or the other?

A. Yeah, I would have to go and double-check. But he did not serve on the hearing panel.

Q. Do you know if he had a conflict that prevented him from being able to serve on the hearing panel?

A. If he was still on the committee, I think he probably was on sabbatical, but at this point

I'm not sure. I would have to go and double-check on that.

Q. Okay. What about Jenna Altomonte? Is that a correct pronunciation?

A. Yes. Jenna Altomonte was on sabbatical.

Q. Okay. I think she -- when did she go on sabbatical? Do you know?

A. I don't know.

Q. I think she indicated in one email that she may have been able to sit had the hearing gone forward in February. Do you recall that?

A. Yes. But eventually she wasn't able to participate in all meetings. And if you not able to participate in all meetings, you cannot vote or deliberate on that case. So eventually she did not participate on the hearing panel.

Q. Okay. I'm not going to go through everybody because a lot of these folks were on the hearing committee. What about Athena -- is that Nagel?

A. Athena Nagel.

Q. Nagel? Okay. Athena Nagel. Was she on the P&T Committee in 2025?

A. Yes.

Q. Was she unable to attend because of a

40

conflict?

A. Yes. I think she had a summer program class, and that was an international class where she would be with students on a trip over there and do some educational stuff. So she wasn't able to attend during that time because of -- for that reason.

Q. Okay.

A. So --

Q. How did you find out about that?

A. She would inform me.

Q. Okay.

A. Or send an email to the general counsel. But any faculty -- any faculty that did not serve on the hearing panel would have some type of a conflict.

Q. Okay. Whether it be a sabbatical --

A. Yeah.

Q. -- or another conflict?

A. Yeah, yeah. So it wouldn't be anything that they refused. They would just have conflict that wouldn't allow them to participate in all hearing days.

Q. Okay. That will be Exhibit 5. Bear with me.

(OFF THE RECORD.)

MR. BRAGG CONTINUED:

Q.   Do you know how the date was selected for the February 2025 hearing when it was first scheduled?

A.   Is that the Dr. Zhang's?

Q.   Dr. Zhang, yes.  So let me back up.  So Dr. Zhang's hearing was first scheduled for February 2025, correct?

A.   Yes.  So Dr. Zhang did appeal the termination decision, intent to terminate, within the ten days, which is the required period of time, and -- but that case wasn't referred to the committee because of ongoing litigation.

Q.   Okay.  And so do you know how the February dates were selected?  Not in terms of they're being delayed, but just who decided, hey, it should be on these February -- one of these February weeks?

A.   So typically that would be the chair who would select the date, but the date would be selected in consultation with both parties.  So basically you have to find a date that works for all parties involved in order to conduct the hearing.

So that wouldn't be an arbitrary date

42

that, you know, chair would select, we are going to meet on this specific date. There would be consultation where that can be done. And that decision has to be -- the hearing has to take place within the 30 days since the case has been referred to the committee.

Q. Okay. And in this situation I think the parties agreed that the hearing could take place outside of the 30 days, correct?

A. That was decided between lawyers or legal advisors of the university and yourself.

Q. Okay. Right. So I guess my next -- so you said typically. So when you're consulting with the parties in a typical situation, are you also consulting with the committee members to see what their availability is?

A. Yes. We would have to do that because you couldn't select a date where no committee member can attend. And they have different assignments. They teach, they travel, they have conferences, they have field tech experiments. So basically you have to coordinate to figure out where most of the committee members could meet, along with both parties.

Q. Okay. And in this situation, are you

43

aware if committee members were consulted about their schedules before the February date was selected?

A.   I just don't recall that because that specific date, I wasn't involved in coordinating that.  So that was general counsel's office that was coordinating a meeting date for that hearing. The meeting dates for that hearing.  So they would also contact the individual hearing panel members regarding when they were available.

Q.   You don't have personal knowledge of that; that's just your understanding?

A.   Yeah.  I mean, there was some discussions. There was a communication that -- you know, I was aware of that, but I just don't specifically remember how it was phrased.  But the message was coming from the general counsel's office regarding scheduling that meeting.

Q.   Before the February dates were selected, were you contacted about your availability?

A.   I don't recall, but I would have to be contacted just to be able to participate.  But the chair of the university committee doesn't necessary have to be the chair of the hearing panel.  So if the chair is not available, another individual can

44

be designated by the chair to serve as the chair of the hearing panel.

Q. Okay.

MR. BRAGG: Can we go off the record for just a minute?

(OFF THE RECORD.)

MR. BRAGG CONTINUED:

Q. Do you know as we sit here today who was planning on attending -- back on the record. Do you know who was planning on attending the hearing when it was scheduled for February?

A. Is that question for me?

Q. That question's for you.

A. Could you elaborate on that?

Q. Yeah. So when we looked at Exhibit 5 and all the different folks that were on the committee at the time, do you have recollection of anyone who had a conflict or anyone who definitively was planning to be there in February of 2025?

A. No, unfortunately I don't. I would have to probably go through my emails to see if there was any conversations regarding that. That hearing was half a year ago, so that would be even longer than that. I just don't remember.

Q. So outside of the emails, which I think

45

have been provided, you wouldn't have any independent recollection?

A.   No.

Q.   Do you know why the hearing was rescheduled?

A.   To the later date?

Q.   Yes.

A.   At some point there was a mention that there was ongoing litigation, and it's going to be later -- it's going to take place later.

Q.   Okay.  Were you aware that -- have you ever been made aware that counsel had requested an extension so that the full P&T Committee could be convened?

A.   I don't recall that.

Q.   Okay.  So you never received that information that you're aware of?

A.   But I could check if there's an email chain that I simply don't remember.  There could be a situation that there was an email where they have asked if all committee members can meet, and all committee members couldn't meet.  Then subsequently the hearing panel would include the majority of the committee members.  But I just can't recall that.

Q.   Okay.  And I'll share with you -- I'm

sharing with you an exhibit that will be Exhibit 6 to the deposition.

(EXHIBIT 6 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q. And this was actually a hearing exhibit also, so you may have seen it in that context. But it was my request to opposing counsel for a brief extension of the administrative hearing. Do you recognize it now that...

A. Can we read that? Let me just read that, and I'll see if that maybe helps me.

Q. Yes, please.

A. (Reviewing document.) I do recall something along those lines. I'm not sure if this -- this email or the other email. But I do recall conversation regarding the fact that that wasn't the full University P&T Committee composition in the hearing panel.

Q. Understood. And so at the time that the hearing was rescheduled in February, do you recall being informed that one of the reasons was so there could be an effort to have more -- or a complete P&T Committee panel?

A. I just simply don't remember, but in both cases when we were -- when there was an attempt to

47

schedule the meeting, the effort was made to get most university committee members as possible, but simply there was no dates where all could meet for this extended period of time.

Q. Okay. So the hearing was next scheduled for June 3rd, 2025. Is that accurate?

A. That's correct. It was June 3rd, June 4th, and June 5th.

Q. And that was a Tuesday through Thursday? Hang on. That may not be right. Let me check. Yes. So that was Tuesday June 3rd through Thursday June the 5th? Is that --

A. If you say so.

Q. -- accurate? If I say so.

A. I can quickly...

Q. That's okay. The hearing was in early June 2025.

A. That would be Tuesday, Wednesday, and Thursday of June 2025.

Q. Okay. Thank you. When did you learn that the hearing was going to take place beginning on June 3rd, 2025?

A. We probably were notified a week before or so. I would need to look into my emails just to give you the exact number of days, if that's what

48

you need.

Q. Okay. So the first time you were notified about the notice of intent and the potential schedule was in December of 2024, ahead of the February scheduled hearing date, correct?

A. Could you repeat that question?

Q. So the first time it was scheduled, there was an email from Dr. Shaw in December of 2024 that we've looked at, alerting you guys to the fact that there was going to be a hearing potentially in February. Is that accurate?

A. Yes. If that's the -- that was the date of Dr. Shaw's letter, that would be the first time that I would learn about that. About the appeal.

Q. When you received notification, in this instance in the spring roughly a week before the hearing, was that a bit of a concern from a scheduling standpoint, that it was so close in time to the hearing?

A. Yes, that was a short period of time, but the information was provided to that, and we had time to evaluate that information afterwards and also during the hearings.

Q. Okay. So do you know how that date was selected, June 3rd, 2025?

49

A.    For...

Q.    For the administrative hearing.

A.    You mean the June 3rd, 4th, and 5th for the in-person hearing, right?

Q.    Right, yeah, yeah.  Do you know how the June 3rd was --

A.    That was -- no.  So the general counsel's office coordinated that meeting.  They have sent the emails to the committee members and -- to check when they were available.  And they selected the days based on when most committee members -- P&T Committee members could meet and participate in the hearing.

Q.    As chair of the P&T Committee, were you consulted on members' availability before the date was selected?

A.    I probably was sent several dates that were possible, but I would have to check on that.

Q.    Okay.  Let's look at... All right.  Let's look at this document that we'll make Exhibit 7.

     (EXHIBIT 7 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q.    And I'll let you -- I'm on the first page, and I'll let you read what you want, and then I'll go to the next, if you'd like a chance to review it.

50

A.   (Reviewing document.)  I don't recall this email.  I may have it, but I remember you mentioning that to me during the in-person hearing.

Q.   So this was a made an exhibit, I think, at the hearing, correct?

A.   Yeah.

Q.   Okay.  And so it looks like it was dated April 22nd, 2025.  You see that?

A.   Yes, I do.

Q.   Okay.  And it was addressed -- you know, because I'm an attorney, there's some ethical --

A.   Yes.

Q.   -- restrictions who I can contact.  It was addressed to the P&T Committee but care of the general counsel for Mississippi State, correct?

A.   Yes, I see that.

Q.   And so is it your testimony that you never received this letter until we got to the hearing and it was made an exhibit?

A.   I don't recall that.  I would have to check.  I might be wrong.  I may have received that email, but at this point I just simply don't remember.

Q.   Okay.  So you don't have a recollection of receiving this document?

51

A.   Yes.  I don't.

Q.   Okay.  Thank you.  And if you'll see there, it says that the hearing was scheduled for June 3rd, 2025 through June 5th, 2025, correct?

A.   Yes, I can see that.

Q.   And so we're talking about well more than a month before the hearing, there has already been agreement of when the hearing was going to take place, correct?

A.   Yes.

Q.   But the P&T Committee did not find about the hearing -- when the hearing was going to take place until a week before the hearing, correct?

A.   Let me double-check that.

Q.   May be able to help you.  I'll pull up a document that we'll make Exhibit 7.

A.   I'm just looking for an email from Ms. Joan Lucas to see if she indeed sent an email to me regarding the hearing.  Just to make sure that I provide you with the correct information.

Q.   Okay.

A.   You said that email was dated on April 22nd?

Q.   Yeah.  And I'm sorry, that would be -- that is going to be Exhibit 7, the letter dated

52

April 22nd.

COURT REPORTER: I'm sorry. I thought you already marked an Exhibit 7. Did you not?

MR. BRAGG: I did, I did. I'm going back to that Exhibit 7.

THE WITNESS: (Reviewing documents.) I see the email here from general counsel, January 28, asking us to move the hearing from our calendars. Then the next communication that I have from general counsel is on May 29.

MR. BRAGG: Okay. Thank you. So now I'll be pulling up Exhibit 20 -- I mean Exhibit 8. Document will be Exhibit 8.

(EXHIBIT 8 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q. And I believe this is an email from Dr. Zhang to the people who either were or had been at some point on the P&T Committee, with Joan copied, Ms. Lucas copied?

A. Yes, I do see that email.

Q. Do you recall receiving this email?

A. (Reviewing document.) Would you scroll down?

Q. Okay.

53

A.    I do recall receiving an email from Dr. Zhang.  This or a similar email regarding the meeting.  And also several other emails where he would contact me or the committee members, indicating that he did that despite your legal advice.

Q.    I understand that.  But this was -- so he had contacted you here on May 28th, 2025, correct?

A.    Yes, I see the date here, May 28, 2025.

Q.    Okay.  And then the hearing having been set for over a month by then, you -- it looks like you sent an email to Ms. Lucas and copied the other members of the P&T Committee and requested confirmation about whether the hearing would take place on the 3rd through the 5th.  Is that accurate?

A.    Yes, that's correct.

Q.    Okay.  So we're less than a week out from the hearing, and there still had not been a confirmation at the time that you sent that email. Is that correct?

A.    That's correct.

Q.    Show you a document that will be marked Exhibit 9.

(EXHIBIT 9 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

54

Q.   And I'll go down to the very bottom of it. And if you'll see, this begins with an email sent from Tina Gilliland with Dr. Shaw's office on behalf of Dr. Shaw to the P&T Committee, including you.  Is that correct?

A.   Yes.  I can see that email and... Could you enlarge the emails?  Yes.  And my email address is on the list of recipients.

Q.   Okay.  I'm going to make it smaller again just to...

A.   Sure.

Q.   So it looks like Dr. Shaw at that point, either directly or someone on his behalf, communicated that the faculty termination hearing was scheduled for June 3rd to 5th.  Is that correct?

A.   Yes.

Q.   And was this the first time that the P&T Committee received confirmation that's when the hearing was going to go forward?

A.   At this point I'm not sure.  There might be some other communication before that, and this was one of several emails just to confirm how many faculty members will be able to participate in that meeting.  It looks like this is a re-confirmation

just to make sure that perhaps people who indicated that they are available before, that they are still available for the meeting.

Q. Okay. But the email we just looked at where there had not been any confirmation was on --

A. Yes.

Q. -- May 28th, the day before this email, correct?

A. Yeah.

Q. So when it says -- when the email says, "I would like to confirm once more which members... are currently available to participate," it insinuates that there had been an earlier confirmation. But that would have been no earlier than May 28th, 2025, correct?

A. It's difficult for me to speculate on that. I would have to go back to my emails and just see if there was anything sent to me before the 28th regarding that case, but...

Q. But as we sit here today, you're not aware of anything?

A. Right now I'm not.

Q. Okay. That will be Exhibit 9. All right. Let me share another document with you. I try not to be so document-intensive in depositions, but I

56

think this case is -- there's a lot of documents, so... All right.  This will be Exhibit 10 to the deposition.

(EXHIBIT 10 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q.    And I think it's very possible you haven't seen these emails because you weren't on them, and it was just emails between counsel.  But let me know if you are aware of this.

A.    And that email was sent on May 28?

Q.    That's right, at 9:03 p.m.

A.    I would have to check my mailbox just so to see if there was any communication regarding that.

Q.    Okay.  But you're not aware of any as you sit here --

A.    I'm not -- many of those emails would include repetitive communication when you have a chain, so at this point I am not able to verify whether I have seen that email before or not.

Q.    Okay.  And it looks like at that time there were four people who were identified as part of the P&T Committee who would be able to hear the appeal, correct?

A.    Yeah.  Robert Grala, myself, Dr. Melody

57

Dale, Dr. Dipangkar Dutta, and Dr. Santanu Kundo, they are and they were members of the University P&T Committee. I'm no longer on the committee because my term has expired.

Q. Your term has now expired?

A. Yes. Has expired in August of last year. You can serve only two consecutive terms on the University P&T Committee.

Q. Okay. It looks like Charlie, Mr. Winfield, was looking for clarification about whether Robert Moore was still on the P&T Committee, depending on when his term ended?

A. Yes.

Q. Do you know whether at the time of the hearing of Dr. Zhang, whether Dr. Moore was on the P&T Committee?

A. At the time Dr. Robert Moore was on the committee, the University P&T Committee, and he did participate in the hearing panel deliberations. And he did sign the recommendation letter.

Q. Was anyone who participated in the hearing panel not actually part of the P&T Committee that had been appointed?

A. I am not aware of that. I think I verified that before we moved to hear that case.

58

Q.   That'll be Exhibit 10.  I'm pulling up Exhibit 11.

(EXHIBIT 11 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q.   And I will represent to you that this is an email from Joan to you and others, the P&T Committee, that includes a Dropbox link to the party's materials.  Do you recognize that as such?

A.   Yes, I do.

Q.   And it looks like if we scroll down here, it's 31 pages that includes position statements of Dr. Zhang and then of Mississippi State.

A.   Yeah.

Q.   And I'll let you actually -- I'll go quickly, but I'll let you confirm that that is the case.  Is that an accurate representation of what this --

A.   Yes.  This document seems familiar.

Q.   So that will be Exhibit 11.  And it looks like this email was sent near the close of business on May 29th, 2025, correct?

A.   That's correct.

Q.   And was this the first time that you received the position statement of Dr. Zhang?

A.   That probably was the first time, but

59

again I would have to check my records.

Q. Okay. You don't recall receiving it before this time?

A. I don't, not at this point.

Q. And if we look here, the actual date on the position statement was May 22nd, 2025, correct?

A. Correct.

Q. And then actually the committee and then each member or potential member of the committee was listed as a recipient of this letter, care of general counsel for Mississippi State. Is that correct?

A. That's correct.

Q. Let me ask you about Todd Archer, because I haven't seen him. He was on the website, but he wasn't on some of the communications. Was he a member of the committee at this time?

A. He was a member of the committee, but his term ended, so he did not participate in the deliberations of Dr. Zhang's case.

Q. Do you know when his term ended?

A. I would have to check my records.

Q. All right. And then we'll go down a little further. On page -- on the PDF page 22 of this exhibit, which is Bates number MSU 258034, the

Mississippi State's position paper, which is titled Supplement to Notice of Intent to Terminate, you see that it was dated January 22nd, 2025?

A.   Yes.

Q.   And it was also addressed to the Promotion and Tenure Committee.  You see that?

A.   It was addressed to the Promotion and Tenure Committee, Dr. Li Zhang.

Q.   And Dr. Zhang.

A.   It doesn't say "and."

Q.   It does not.  It doesn't have a comma.  I assume that the first line is the committee, and the second would be Dr. Zhang.  But let me just ask you.  Did you receive this document before May 29th of 2025?

A.   I can check that in my books right now, if you -- if you want me to.

Q.   Sure.

A.   And the title of that would be Promotion and Tenure Committee, Dr. Li Zhang?

COURT REPORTER:  I'm sorry.  I didn't understand what you said.  Could you repeat what you said, sir?

THE WITNESS:  Oh.  I just said that the title of the email was Promotion and Tenure

61

Committee, Dr. Li Zhang, so that's how I'm going to search to see if I have received that email.

MR. BRAGG CONTINUED:

Q. Yeah, I'm not sure what the title would have been. It looks like it was a Supplement to Notice of Intent to Terminate.

A. So I have an email from January 21st, saying that Dr. Zhang and the university would be represented by attorneys, and because of that, I don't need to notify Dr. Jia about...

Q. Dr. Zhang.

A. Dr. -- I'm sorry. That's a different email, and that was from...

Q. That may be the email, Dr. Grala, where they're saying it won't be like Dr. Jia's matter where you have to notify the parties.

A. Could you repeat that question?

Q. I think -- we're getting far afield, but just for clarification, I think you were -- that email you were looking at references the fact that unlike with the hearing with Dr. Jia, you won't have to notify the parties directly.

A. Yes, yes. Because of attorneys being involved who will sort everything out, and then we'll receive the needed information. The email on

62

January 28 instructs us to remove Dr. Zhang's hearing from our calendar.

Q. Okay. And you didn't receive the notice of intent that you're aware of?

A. I don't see it right now. Unless it was sent by someone else than Ms. Lucas, I don't see it.

Q. Okay.

MR. BRAGG: Can we go off the record for just a second?

(OFF THE RECORD.)

MS. MATTHEWS: Hey, Grafton.

MR. BRAGG: Yeah.

MS. MATTHEWS: Dr. Grala, I think, has a correction he wants to make about his service on the committee, if now would be a good time for him to just...

MR. BRAGG: That's fine.

MS. MATTHEWS: Okay.

THE WITNESS: So, Mr. Bragg, you had asked me about whether I have served as a member in awaiting appeals under University P&T Committee. I was a member before, and there was a case referred to us, and I was a member, but eventually that case was withdrawn by the faculty member who appealed.

But I did serve as a chair and also a

63

member of the departmental Promotion and Tenure Committee that involved decisions related to promotion and tenure. I serve currently as the chair and as a member of the college level P&T Committee. And I also served on the committee established by a former dean regarding the unsatisfactory performance of a full professor in my department.

MR. BRAGG CONTINUED:

Q. Okay. Thank you. I understand. But the only cases you've heard, actually heard on the university P&T level, are the three that you identified beforehand?

A. Yes, that's correct.

Q. Okay. Earlier you talked about -- and I just want you to help me understand. You talked about the requirement that someone who participates in deliberations on a particular matter be of equal rank. Tell me a little bit about that.

A. So, for example, if you have promotion from associate to full professor, in a hypothetical scenario, let's say this promotion was denied. If you are an associate professor, you cannot vote on that because you don't have the experience, so you don't necessarily know what it takes to get from a

64

associate professor to a full professor.

So you have to be already at that level of a full professor to be able to review that case and provide your opinion on that. And that's stipulated in the faculty handbook.

Q. Okay. And that's true of promotion decisions and also termination decisions?

A. I'm not sure about that.

Q. Okay. Why is that an important requirement?

A. It is -- at least for a promotion and tenure, it is an important requirement because you have to know what are the criteria that you need to meet in order to be promoted from associate to a full professor, for example, in this hypothetical scenario. So if you don't have that experience, that would be really unfair and not a decision --

Q. Would that not equally apply to the loss of tenure. If you don't have tenure, you really shouldn't be in a position of judging whether someone should lose their tenure?

A. Yeah, so -- well, so in this case, if you're referring to Dr. Zhang, that wasn't a loss of tenure. That was a termination. So there was no discussion of a tenure or a promotion. And in

65

this case, we have faculty around -- in the Rank 2 and 3. Those are the only faculty who can serve on the University P&T Committee.

Q. Say that again.

A. So the University P&T Committee composition includes faculty Rank 2 and 3, and those are only who can serve. And depending whether that's a tenure or a nontenure decision. If that's a tenure decision, only faculty who already have tenure would be able to deliberate on that case. If that was a Rank 3 decision, only faculty who are in the Rank 3 would be able participate and deliberate on that case.

Q. Okay. I'm not sure what faculty Rank 2 and Rank 3 means. Can you explain that to me?

A. So associate professor would be Rank 2. Full professor would be Rank 3. Instructor 2 would be ranked 2. Instruction 3 would be ranked 3. And then you have -- you may have assistant professor, which would be Rank 1. And you have assistant teaching professor, and you have associate teaching professor, which would be Rank 2. And you may have a teaching professor which would be Rank 3.

Q. Okay. So rank doesn't necessarily correlate with whether they're tenure or not

66

because --

A. Doesn't necessarily indicate that. You might be in the Rank 2, and you may have tenure, or you may not have, depending whether you are tenure-track faculty or professional-track faculty.

Q. Okay. I think you said earlier that this is not a case about tenure, but isn't it true that the standards for terminating someone who has tenure are very different from the standards for terminating someone who does not have tenure?

A. So those are the contractual obligations, and basically if the faculty has tenure, they are entitled to have a hearing before the hearing panel regarding the termination.

Q. So there would not even be a hearing in the event that there were no tenure?

A. I would have to check on that. It just -- a lot depends on what the contract might be and how they -- how those faculty are (indiscernible).

Q. Okay. And so the faculty panel here with Dr. Zhang was asked to determine whether the standards for terminating a tenured professor had been met. Is that accurate?

A. The charge here was to determine if the university had a cause to terminate Dr. Zhang.

67

Q.   Okay.  And cause is something that the university must have to terminate a tenured professor, right?

A.   That's correct.

Q.   Okay.  At one point I think you had made a request to Joan for the faculty panel to have an adviser similar to how the parties both had?

A.   Yes.

Q.   And what was -- do you recall Joan's response to that?

MS. MATTHEWS:  I'm going to object to talking about anything that's privileged communication.  If you have it, Grafton, that's -- you know.

MR. BRAGG:  I do have it, yeah.  I was curious where you guys were going on privilege because there's -- quite a few of her communications were produced.

MS. MATTHEWS:  Sure.

MR. BRAGG:  Yeah, I was just trying to short-circuit and not having to make everything an exhibit.  But I can bring it -- I can bring it up so that you'll feel comfortable that I have it.

MR. BRAGG CONTINUED:

Q.   Okay.  We'll go back down to the bottom of

68

this email chain here.  You see this email that you sent to Joan Lucas and copying the committee on May 29th --

A.   Yes.

Q.   -- at 2:29 p.m.?

A.   Yes, that's correct.

Q.   Okay.  And it looks like you were requesting an adviser under Policy HRM --

A.   Yes.

Q.   -- 60.113?

A.   Yes, you are correct.

Q.   Okay.  And we will make this exhibit -- this will be Exhibit 12 to the deposition, before I forget.

(EXHIBIT 12 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q.   And there are some back and forth and some other things, but at the end of that email chain, on May 30th at 10:56 a.m., Joan says, "Yes, my apologies for not being clear.  I plan to serve in that role" -- being the adviser role -- "until I am out of town, and Brandon Jolly will fill in when I'm gone."  Do you see that?

A.   Yes, that's correct, I see it.

Q.   Okay.  And Brandon Jolly is also a member

69

of the office of general counsel like Joan.  Is that correct?

A.   That's correct.

Q.   So tell me about Joan's role in advising the panel.

MS. MATTHEWS:  I'm going to object to anything that would be speculative on his part. I'm not sure he can speak to the role of general counsel in general, you know.

MR. BRAGG:  Yeah.  I guess what I want to know -- and I'm not asking you this right now, Dr. Grala.  I'm just talking with Ashlyn on the record.  What I'd like to get into is sort of what she communicated to them and what they -- like what advice was given.

I don't know if you guys are asserting the privilege over that.  It seems like there has been -- my impression in reviewing the documents was that there was not a privilege being asserted on communications between the panel and general counsel.

MS. MATTHEWS:  There is a privilege being asserted there when it's in that advisory role.  We tried to be -- I guess I don't know if "generous" is the right word, but not hold back

things that are simply scheduling related, right, or that were not clearly related to providing advice.

That email you just pulled up I think establishes the advisory role, and so everything that fits into that box, we're asserting privilege on. And more, but in relation to this question.

MR. BRAGG: Okay. I'm going to ask a few questions, and then you can assert the privilege and instruct him not to answer if that's your choice. Is that fair?

MS. MATTHEWS: Sure.

MR. BRAGG CONTINUED:

Q. Okay. Dr. Grala -- and I believe your counsel is going to assert the privilege, so I would expect you to take a minute to give her a chance to do that as I ask because I don't want to unnecessarily invade the privilege.

So I think the email's established that Joan was the adviser to the hearing panel, correct? I think you can answer that one.

MS. MATTHEWS: Yes.

THE WITNESS: That's correct.

MR. BRAGG CONTINUED:

Q. Did Joan give verbal advice to the panel

71

during the course of the proceedings?

A.    We just had questions regarding the procedures.  That was the role of the policy 60.113.  The appealing faculty can have an adviser who may be an attorney.  The university may have an attorney.  And the faculty -- the hearing panel may also have an adviser.  We wanted to make sure that we followed the policy, so that was the request for the adviser.

Q.    Okay.  So when I was meeting with Dr. Zhang one-on-one and advising him during the proceedings, the other side was not allowed to be in those conversations, correct?  You understand that?

A.    You mean when you had those privileged conversations with your client?

Q.    Right, right.

A.    Yeah.

Q.    And so -- and, similarly, Mississippi State would have its own communications with Mr. Mullen, presumably, and Ms. Matthews, Mr. Winfield, to which I would not be a party.

A.    No, we did not have, except communication with Ms. Lucas.

Q.    Say that -- so there were no

72

communications that were just the panel and

Ms. Lucas?

        A.    There were.

        Q.    Oh, there were.  Okay.  And those are

communications we would not have been allowed to be

a part of.  Is that correct?

                MS. MATTHEWS:  I'm not sure he can

speak to the --

                THE WITNESS:  There was really

nothing confidential in those discussions.  It was

just about procedures.

MR. BRAGG CONTINUED:

        Q.    Will you describe the content of those

discussions?

                MS. MATTHEWS:  And, Dr. Grala, I'm

going to instruct you not to answer about private

conversations that were held between you or other

members of the committee and Joan Lucas or Brandon

Jolly.

                THE WITNESS:  I'm going to follow

your advice.

MR. BRAGG CONTINUED:

        Q.    Good man.  There was a call before the

hearing, I believe, with the panel and Joan.  Is

that who all was on that call?

73

A.   The call regarding what?

Q.   I can pull that up.  So we'll make this Exhibit 13 to the deposition.  Let's see.  It's a longer email chain.  Let me get to the right spot.

(EXHIBIT 13 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q.   Okay.  It looks like on May 30th, the Friday before the hearing, you emailed and asked for a short WebEx call on Monday?

A.   Yes.

Q.   Okay.  And do you recall having that call?

A.   Vaguely.  We had an online meeting with the hearing panel and Ms. Lucas regarding procedures.

Q.   Okay.  Was there anyone in that call outside of the panel members and Ms. Lucas?

A.   No.  I don't think so.

Q.   And I will make that Exhibit 13.  If I didn't say it already.  I usually say that twice just to be sure.

Talk to me about the executive sessions that the panel would have sometimes.  So if I recall correctly, there would be testimony given.  There would be -- the witness would be questioned by both sides and then also by the panel,

74

oftentimes the panel doing the best job of questioning of anyone. And then there would be a time when the panel would confer just among the panel members. Is that correct?

A. That's correct.

Q. Was Ms. Lucas ever in any of those deliberations?

A. No.

Q. Were any other counsel or general counsel from Mississippi State ever in any --

A. No.

Q. -- of those meetings?

A. I'm sorry for interrupting. No. Only hearing panel members.

Q. Okay. Do you have -- is there anything from those executive session deliberations that sticks out in your mind as a particularly significant conversation?

A. Could you specify?

Q. I know very little about what was discussed, so I don't have a lot of specifics. I just -- you know, were there -- were the conversations heated at times during those deliberations?

A. No. During those conversations we

would've just summarized what was said or reported by witnesses or by Dr. Zhang or, you know, university officials, just to make sure that we have the same understanding of what was said and if anything was missed. So basically we were establishing the common timeline of events and what was said.

Q. So was that a helpful way to summarize as you go and so you could use that later on when making the decision?

A. Yes.

Q. And at any time before the hearing on June 3rd, 2025, did you have a conversation with David Shaw about Dr. Li Zhang?

A. No. The only communication I received from Dr. Shaw was the letter and the charge sent to the committee to initiate the hearing.

Q. What about with Dean Jason Keith?

A. No.

Q. What about with any of the witnesses that testified at the hearing?

A. No.

Q. I'm going to share what's already been marked as Exhibit 7. We've looked at this before, but this was the April 22nd, 2025 letter from me to

the P&T Committee care of general counsel.  Do you recall looking at this earlier today?

A.   Could you scroll -- I think I have said that I don't recall that email.

Q.   Okay.  And I think this was a -- this wasn't, I guess, a hearing exhibit.  I think that's right.  You said you didn't recall receiving it necessarily.

Well, let me ask you this.  So the first request on here, No. 1 -- there were three different requests.  The first request was that the full P&T Committee attend and participate at the hearing.

And I understand your testimony about that, but please just confirm that the full P&T Committee did not participate in the hearing.

A.   The full committee did not participate and could not participate because of conflicting schedules.

Q.   Okay.  And let's look at No. 3.  No. 3 is a request by Dr. Zhang through counsel to have access to his Banner, OneDrive, and MSU email account, specifically within 21 days before the scheduled hearing.  Do you see that?

A.   Yes, I do.

Q.   Do you recall that request being made?  Do you recall reviewing and learning that Dr. Zhang had made that request?

A.   There perhaps was another communication from Dr. Zhang indicating that he did not have access to those tools.

Q.   Okay.  And do you know if he ever got access to those things?

A.   I'm not aware of that.

Q.   Okay.  And did the P&T Committee ever take steps to try to give him access?

A.   No, we did not.  And we don't have authority to do that.

Q.   Was there ever a recommendation or a discussion about a recommendation that he be allowed access to those things?

A.   No.

Q.   Let's talk a little bit about the hearing itself, although I don't have a whole lot of questions about that.  So there were times throughout the hearing where the panel would request documents that the parties had not provided, correct?

A.   Correct.

Q.   All right.  And at some point there was a

78

request for the signed annual reviews for 2021 and 2022 for Dr. Zhang?

A.   That's correct.

Q.   And do you recall if the panel ever received reviews that had been fully signed for 2021 and 2022?

A.   We have not.

Q.   Okay.  I'm going to pull up what will be marked as Exhibit 14.

(EXHIBIT 14 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q.   And it looks like -- you recognize this as an email exchange between you and Dr. Mullen on --

A.   That's correct.

Q.   -- June 9th and 10th of 2025?

A.   That's correct.

Q.   Okay.  And here looks like Dr. Mullen said that signed copies -- the request, I guess, was for copies of the 2021 and 2022 annual evaluation, signed by him, the department head, and the dean.

And then Dr. Mullen represented that signed copies were delivered to the committee with Dr. Howard's signature and HR email.  You see that?

A.   Yeah, I see that.

Q.   Do you recall if the panel received what

79

he is representing was presented?

A.    So we did request annual reviews for five years.  We have received those, but not all of them were signed by the dean.

Q.    Okay.  I want make this Exhibit 15 to the deposition.

(EXHIBIT 15 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q.    And do you recognize this email that was provided as an attachment to one of Dr. Mullen's emails?

A.    Could you stop on the first page?

Q.    Yeah.  Start right here.

A.    Perhaps not in this form, but we have received a compilation from Dr. Mullen regarding how many annual reviews were completed, how many of them were signed or not.

Q.    Okay.  So if we go down, there's an email from June 4th, 2025 from Robert Green to Dr. Mullen.  Do you see that?

A.    I can see that email.

Q.    You do see it?

A.    Yes.

Q.    Okay.  Did you see this email as part of your review and deliberations in the case?

80

A.   I think I have seen it, but I would have to confirm.

Q.   Okay.  And it looks like Robert Green is saying we can argue that Dr. Ford was objective for him to potentially sign these annual reviews?

A.   I cannot say beyond what that email says.

Q.   You're not aware of any situation where Dr. Ford actually came back as dean and later signed annual reviews?

A.   I'm not aware of that.

Q.   I'm going to make this Exhibit 16 to the deposition and share it.

(EXHIBIT 16 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q.   And tell me where to start for you to be able to identify the email chain.  You want to look at this first page?

A.   Yes, sir.  (Reviewing document.)  Yes, that's my email to Dr. Zhang.

Q.   Okay.  And so --

A.   Response to Dr. Zhang's email.

Q.   Your response.  And the response was in response to Dr. Zhang's request to submit his own version of the timeline, correct?

A.   Correct.

81

Q. Okay. And here you -- it looks like you said the panel should technically review only testimonies and documents provided during the hearing, plus any documentation requested by the hearing panel. Is that accurate?

A. Correct.

Q. And then you mentioned that the university provided the timeline to us, to the hearing panel and to Dr. Zhang and to his lawyer, which was me, and that Dr. Zhang did not object to the timeline presented by the university, correct?

A. Correct.

Q. But then you did go ahead and say that given the situation, that you would request that the hearing panel would request Dr. Zhang's timeline, correct?

A. Correct.

Q. Okay. If I recall correctly, the panel actually requested the timeline first from Dr. Howard. Is that right?

A. I think we had requested a timeline from Dr. Mullen, to get the full account of when the communication took place regarding the UTC proposal.

COURT REPORTER: I'm sorry.

82

Regarding what?

THE WITNESS: A UTC proposal.

MR. BRAGG: That's UTC.

THE WITNESS: Yeah.

MR. BRAGG: All capital letters.

MR. BRAGG CONTINUED:

Q. So Dr. Mullen is the one who provided the timeline?

A. No, I think that would be Dr. Mullen who provided the timeline.

Q. Who did?

A. I think that was Dr. Mullen who provided the timeline, but I'm just not sure.

Q. Okay.

A. Any communication regarding additional documentation was between me and Dr. Mullen, if we needed additional documentation from the university.

Q. Okay. If I recall correctly, Dr. Howard was asked during the panel Q&A if he could provide a timeline, and he had some questions clarifying what exactly he needed to do as far as providing that timeline. Do you recall that?

A. I don't really recall that.

Q. Okay. And then I think the -- and do you

83

recall sort of Dr. Mullen taking over the responsibility for Dr. Howard?

A.   We would specifically ask Dr. Mullen to provide that timeline.

Q.   Okay.  Dr. Zhang was not requested to provide a timeline, correct?

A.   Correct.

Q.   Okay.  I want to make this Exhibit 17.

(EXHIBIT 17 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q.   I'll start at -- what I really want to ask about is right here, on this one from -- this one to you on June 11th.  Just let me know if you recognize the email.

A.   Yeah, I see this email.  It was sent to me and the panel members.

Q.   Who sent it to you?

A.   Dr. Dutta, Dipangkar.  Dipangkar Dutta.

Q.   Okay.  Dipangkar.  And he was in favor of -- it looks like he was in favor of requesting the timeline from Dr. Zhang, correct?

A.   Correct.

Q.   He mentioned "it probably has no bearing on our discussion."  Do you know what he meant by that?

84

MS. MATTHEWS: Objection. That's speculation. To the extent he told you what he meant.

MR. BRAGG CONTINUED:

Q. Yeah, that's -- I guess that's kind of what I'm getting at. So it looks like later you mentioned that there would be discussion about it the next day?

A. Can you actually scroll down to show me the entire chain of that communication?

Q. Sure. It looks like it starts with this discussion about a meeting.

A. Okay. Let's go to the next page. Okay. Let's go to the next one. Yeah, I have read the entire chain.

Q. Okay. So is it accurate to say that you were conveying that you could discuss the following day, which would be June 12th, the suggestion to allow Dr. Zhang to present his timeline on that day, on the 12th?

A. So was that -- if you could remind the dates. Was that after Dr. Zhang sent me an email preferring to provide his own timeline?

Q. Yes, it was.

A. So I wouldn't make that decision by

myself.  I consulted that with the hearing panel,

whether that would be acceptable.

Q.  Okay.  And do you recall how that

discussion went?

A.  I think what we have discussed that, yes,

we would look at the timeline to establish, you

know, the complete timeline of the events.

Q.  Okay.  And there was this comment about

"it probably has no bearing on our discussion."

Was there any followup discussion about the

relevance or lack of relevance in the committee's

mind of Dr. Zhang's timeline?

A.  No.  I think we didn't determine that

there were any significant differences in the

timeline provided by both parties.

Q.  Okay.  I'm going to go ahead and make this

Exhibit 18 to the deposition.

(EXHIBIT 18 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q.  And do you recognize this document?  I'll

scroll down, let you confirm the signatures.

A.  Yes.  This is an email on my behalf to

Dr. Shaw with the signatures from every hearing

panel member.

Q.  Okay.  So you said email, but it's a

letter, correct?

A. It's a letter sent via email (indiscernible).

Q. That's right. Understand. Okay. So I've got a few questions about this letter, but one of the questions -- or one thing I want to look at is down here on page 2, the sentence that -- I'm going to highlight it. It starts "Subsequently."

A. Yes.

Q. And it looks like the panel had -- it says the panel had meetings on June 5th, 8th, 12th, and 16th of 2025 to discuss the evidence.

A. That's correct.

Q. Okay. And so I want to know a little bit about -- with that in mind, I want to know a little bit about the process in how this final product came together.

A. By --

Q. Yeah --

A. -- "the final product," you mean...

Q. This recommendation.

A. Okay.

Q. This page that I'm looking at that's Exhibit -- going to be Exhibit 18, this is the final recommendation signed by every member of the

87

P&T Committee, correct?

A.   That's correct.

Q.   Okay.  So from the day that the hearing ended on June 5th, which one of the online meeting days, until the 19th of June when this was issued, I just want to know a general timeline of how this document came to be.

A.   Okay.  So typically when the hearing is held, the hearing panel is required to provide a recommendation to the provost and vice president within five business days.

During the hearing, the hearing panel requested additional documents from the university, and those documents came at different times.  So we met several times to discuss those, and whether they had relevance to our discussion, and how they would impact the vote, and whether we had enough information to make a recommendation.

And the final letter to Dr. Shaw was provided within the five business days after we received the last piece of requested documentation.

I started writing the draft letter.  The draft letter was uploaded in Teams, where we -- where I outlined the major points discussed by the hearing panel and what should be included in the

letter.  And then every panel member had an opportunity to provide comments, edits, amend the letter, and discuss it in any other way.  Also, via emails.  Those emails were sent to me, and I responded.

And eventually when we felt that we had enough -- or that we had all the information that we needed to make an informed decision, we took a vote and provided our recommendation to the provost.

Q.   Okay.  And so I'll pull up Exhibit -- what will be Exhibit 19.

(EXHIBIT 19 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q.   And this is a very long document, and so I just want to look at the first page right now.  I'll ask you to go through all of it later.  But this is -- looks like this was on Saturday, June 7th, 2025.

A.   Yes.

Q.   Is that when you uploaded the document, the first draft in the Teams, and solicited comment?

A.   It might be, or it might be sooner than that.

Q.   Okay.

89

A.   I sent an email to all hearing -- could you go back to that?

Q.   Yep.

A.   Yes, that would be correct.

Q.   So the draft -- so if we go back to Exhibit 16, the first online meeting was on June 5th?

A.   Yes.

Q.   Which was Thursday of the hearing, correct?

A.   Yes.

Q.   Okay.  And then from that you generated -- from everything, including that meeting, you generated a first draft that you uploaded on June 7th?

A.   That's correct.

Q.   Okay.  And what was your --

A.   We thought we had enough information to write the draft.

Q.   So when I'm reading through the emails, it really looks like what you were trying to do is sort of capture what everyone -- what the consensus of the group was.  Is that fair?

A.   That's correct.

Q.   Okay.  And so you weren't necessarily putting in your personal beliefs in the draft?

90

A. No. It was basically the consensus of the group, and also every hearing panel member had the ability to disagree or amend or change the letter, that they thought would be appropriate or represent their views. So my goal here was just to take charge in writing the draft. By no means it were -- those were my personal views.

Q. Right. And that was my takeaway from that. But somebody's got -- somebody's got to put the draft together. You can't have -- you can't have six people writing a first draft.

Okay. So it looks like the next meeting was on June 8th, which would have been -- would that have been a Sunday? Would have been a Sunday. Do you recall how that meeting went?

A. No, I don't recall. It was -- typically those meetings would be related to the additional information provided to us, or discussed the revised version of the letter and see if additional changes were needed.

Q. Okay. Do you remember anything specific about the meeting on June 12th?

A. No. We had -- well, we had a discussion regarding how to view some items and inappropriate behavior, but whether that was on June 5th, 8th, or

91

12th, I don't remember that.

Q. Okay. And it looks like the last one was June 16th?

A. That's correct.

Q. Is that when the vote would have happened?

A. That would be the meeting where the vote would happen.

Q. Okay. And tell me how the vote went.

A. So the vote went online. And each faculty member, when we had a description that there was a cause -- that we agreed that there was a cause for termination due to conduct, each member voted yes or no.

Q. So there were different instances of alleged misconduct?

A. That's correct.

Q. And did you take them up one by one?

A. We did, yes. We looked at that. The different panel members had differing views on that, whether any individual event would constitute contumacious conduct that would arise to termination versus looking at all events together.

Q. Did the panel have a definition of contumacious conduct that applied?

A. We did look at the dictionary to determine

92

what that implied.

Q. Do you remember which dictionary?

A. I don't remember. That would be Webster or Oxford Dictionary. But at the end we didn't use their word, "contumacious." We used due to the conduct.

COURT REPORTER: You used what? I'm sorry.

THE WITNESS: We used the word "conduct." That there was a cause to terminate Dr. Zhang due to conduct.

MR. BRAGG CONTINUED:

Q. Okay. And I think you did -- the word "contumacious" does show up a couple times in the -- in Exhibit 18 here.

So we've got -- well, the first one is describing the notice, which was not the committee's findings. So I'm with you on that.

The second one is on page 3, and it's discussing the traffic count assignment?

A. That's correct.

Q. And the final sentence under the traffic count assignment bullet point is, "This willful disregard of instructions from supervisors was a clear case of contumacious conduct."

93

A.    That's correct.

Q.    Was that an error, or should that have just been misconduct?

A.    No.  In this case we said contumacious conduct.

Q.    Okay.  So that was an intentional choice in that one instance?

A.    Yes.

Q.    Did the -- so since the word was used, what was the definition that the panel landed on?

A.    That Dr. Zhang would be insubordinate that he would willfully disregard instructions and otherwise would engage in inappropriate behavior. Which included also communications with students.

Q.    Okay.  Is that a definition -- that's not -- is that a definition of contumacious conduct, or more just a description of Dr. Zhang's behavior as viewed by you or the panel?

A.    Could you describe the difference --

Q.    What I want to know is -- you know, because you said you consulted -- the panel consulted the dictionaries.

A.    Yes.

Q.    Was there a uniform definition of contumacious conduct set apart from what any one

person did or didn't do that the panel applied?

A. So the definition, for example, stated two types of behavior that would be defined as a contumacious misconduct. That would be the willful disregard instructions from supervisors and disobedience.

Q. And did everyone agree on that definition?

A. That's what we have found in the dictionary, and that's how we interpreted that.

Q. Okay. So the dictionary definition was used.

A. Yes.

Q. Okay. I want to -- let me ask you in general. There are -- well, let's do this.

MR. BRAGG: Ashlyn, I think -- I feel like I've got -- we can go off the record for just a second.

(OFF THE RECORD.)

MR. BRAGG CONTINUED:

Q. All right. Dr. Grala, on page 2 there is a bold statement that says, "While the committee has not reached an agreement on each of the particular reasons for termination, it finds, by a majority vote, that the university had cause to terminate Dr. Zhang due to conduct."

95

A.   That's correct.

Q.   And it looks like four of the panel members voted for the recommendation, three voted against it, and none abstained.  Is that accurate?

A.   That's correct.

Q.   And then we come down here and there is a statement that says, "The committee has reached agreement on the following points of note."

A.   That's correct.

Q.   Okay.  What I want to know is, is the agreement on these bullet points, the following points of note, was that a unanimous agreement, or was that a majority agreement?

A.   We haven't voted on those individually. We just recognized that there were common points that kind of occurred during that discussion in the hearing.  We voted only on the -- whether the university had a cause to terminate Dr. Zhang based on conduct.

Q.   Okay.  And was the vote that was had -- did the panel vote that the university had cause to terminate Dr. Zhang due to contumacious conduct, or just due to conduct?

A.   Due to conduct.

Q.   Did the panel vote that the university had

96

cause to terminate Dr. Zhang for any other reason other than conduct?

A.    We had not.

Q.    So there was not a majority vote that Dr. Zhang had engaged in contumacious conduct, correct?

A.    No.

Q.    Let me ask that -- sometimes --

A.    Correct.

Q.    Yeah.  So is it true that the panel never had a majority vote finding that Dr. Zhang had engaged in contumacious conduct?

A.    Yeah.  We voted only on the conduct.

Q.    Thank you.  It looks like the panel also recommended establishing another faculty panel to determine if Dr. Zhang's 2021 and 2022 teaching and research rankings were consistent with his performance during those years?

A.    That's correct.

Q.    Was that something that was voted on by the entire panel?

A.    No, we haven't voted on that specifically.

Q.    Okay.  Are you personally in favor of that recommendation?

A.    I did suggest that recommendation.

97

Q.   Okay.  And why did you suggest that recommendation?

A.   One of the termination reasons were unsatisfactory productivity in terms of teaching and research.  And we believed that those should be evaluated by a panel of experts that would be close to Dr. Zhang's field of expertise.

Q.   Okay.  Why is important for those annual evaluations to be evaluated by people within his expertise?

A.   So those annual evaluations are typically evaluated by a department head who ranks you, and then they are evaluated by the dean.  But they are similar in extent to a promotion and tenure, and basically expectations for teaching or specifically in research may vary from discipline to discipline. So what might be acceptable as an activity in one discipline, there might be a different expectation in a different discipline.

Q.   Okay.  And maybe -- I think my emphasis on -- you answered the question, but a different emphasis than I was really getting at, which is my fault.  Why is it important -- I mean, he's got the incomplete annual reviews, because they weren't signed in accordance with university policy,

98

correct?

A.   I wouldn't say they're incomplete because they were reviewed by a department head.  We just don't know whether they were reviewed by a dean.  There was no signature.  Some of them.

Q.   Okay.  So this recommendation was for additional review by those who, you know, were in the field and able to do that review.  And so why was additional review an important recommendation?

A.   Because we did not evaluate Dr. Zhang's performance in teaching or research, according to his departmental or school guidance.

Q.   Okay.  And so if the recommendation is to terminate Dr. Zhang's employment, and assuming that recommendation is followed since it was -- you know, it would be followed by the administrators who had recommended it to you guys in the first place, then why would there need to be any further review of Dr. Zhang's employment if he's not going to be employed there anymore?

A.   Yeah, so when that letter of the intent of termination came in, it was for several reasons, but technically only one of those reasons would be required, you know, for that to take effect.

We just -- because teaching and research

were listed as one of the two reasons, and we didn't evaluate those, we wanted to communicate that we really haven't looked at that. To the extent to determine whether the rankings assigned to Dr. Zhang for teaching and research were correct.

Q. Okay. I want to give you a second -- and you're very familiar with these. I know it's been a while, but you did draft them. Is there anything in any of these bullet points, these additional items of note, that you personally disagree with?

A. No, I don't.

Q. Okay. Is there anything in any of the letter that you personally disagree with?

A. No. We just had different opinions within the hearing panel whether we should look at individual cases and whether any of those would raise to the contumacious conduct versus whether we should look at those collectively.

Q. Is it your understanding that that was really the only source of disagreement on the for-cause or not for-cause vote?

A. Yes. I mean, some hearing panel members had questions whether those individual events raised to the contumacious conduct, and they voted

100

accordingly.

Q. Okay. So as far as -- I mean, obviously, right here where it says four of the panel members voted in favor of this recommendation, three voted against, and none abstained, that sentence reveals that there was a disagreement, but you agree that the sentence itself is accurate, right?

A. Yes.

Q. But in other places, for example, under the points of note, there are actual findings of the panel. And --

A. Yeah --

Q. Go ahead.

A. No, go ahead. I'm sorry.

Q. And so it's my understanding that for those, any time there's finding about what happened, you are in full agreement with that finding?

A. Yes.

Q. Kelli Anthony, who we're going to talk to in a little bit, did not personally sign this document, correct?

A. Yes.

Q. You signed it on her behalf?

A. Yes. And she authorized me to sign on her

101

behalf.

Q.    How did she authorize you to sign it?

A.    I think that was via email when I have requested that specifically.  And Ms. Kelli Anthony participated in reviewing the letter, adding her comment, and then she indicated that she was fine with the letter.

And she was able to sign, but she didn't have the means to sign that.  I think she didn't have a computer with the ability to sign.  She authorized me to sign on her behalf.  And I also checked with Ms. Lucas, whether that would be appropriate for me to sign on her behalf.

Q.    And I'm not doubting that she authorized you to sign.  I'm curious.  I didn't see the email where she -- I saw the email where you requested it, an email from her, but I didn't see an email where she responded.  Is it possible that she told you verbally?

A.    At this case I don't remember.  There could be also a note in the online document, the draft letter itself, where she would add that as a comment over there.

Q.    Okay.  And I will say, there have been a lot of emails produced, so it's very possible that

I missed one and it's in there.  I was just curious if you knew.

A.   I was very particular about having proof that Ms. Kelli Anthony actually authorized me to sign on her behalf.

Q.   Understood.  Understood.  Okay.  So after -- hang on.  After the hearing, there were these hearing -- I guess did you have a binder that was collected by general counsel?

A.   Yes.

Q.   And that was the binder that was distributed to you at the beginning of the hearing that had position statements and exhibits?

A.   That's correct.

Q.   Did you have anything else in that binder?

A.   I was making notes during the hearing, just to make sure that we have all the points or the questions that we needed to ask the witnesses.

Q.   Okay.  Were those notes like in the margin of the binders?

A.   No.  Those would be on separate pages.

Q.   Okay.  And were the notes included -- when you returned it to the general counsel, were they --

A.   I have returned everything.

103

Q.    Okay.  And it was included within the --
like what part of the binder would it have been
included in?

A.    That would be within the binder itself.

Q.    Did you put them like into the rings of
the binder, or did you put them into a separate
pocket?

A.    That would be in a separate pocket.  Those
pages were not punch-holed.

Q.    Okay.  So those pages would not have been
pages -- they would have been -- well, let me back
up.  All the pages that you were provided by
general counsel with the position statements and
the exhibits, those were all punch-holed, correct?

A.    Yes, correct.  There were some documents
distributed during the hearing to both parties that
they may or may not been punch-holed.

Q.    What about the notes?  Do you recall
anything you wrote down?

A.    Those were just standard notes, just
noting different answers that were provided, and
consulting those with other panel members, just to
make sure that we have the same understanding and
nothing was misunderstood.

        And those also included questions for the

104

next witness that would be called.  And those questions were asked, along with some additional questions that were followed up by individual hearing panel members.

Q.   So the panel did not have an opportunity to review the video?

A.   We did not go over the video.

Q.   Okay.  So if there were answers written down and deliberated over, those notes sort of would've been the controlling piece of evidence as to what was said, in your mind.  Is that accurate?

A.   No.  Could you rephrase that?

Q.   Yeah, I said that wrong.  So I guess if you had made notes about what witnesses testified to, in the notes -- you with me?

A.   So our findings were based on what we have heard during the hearing panel testimonies and based on our individual notes.

Q.   Okay.  Do you know if that's true for every one of the panel members, or is that just your case?

A.   That was my case.  I cannot speak for other members, but I know several of them referred to their own notes.

Q.   Okay.  All right.  I'm going to pull up a

105

document.  I think this might be easier for me to send it to you.

MR. BRAGG:  Ashlyn, do you mind if I send it to Dr. Grala -- I still have his email -- and copy you?

MS. MATTHEWS:  That's fine.

MR. BRAGG CONTINUED:

Q.  This has already been marked as Exhibit 19, but I haven't authenticated the entire thing yet.  And we can take -- we can go off the record when we do this, but I'm just going to have you -- it's like 58 pages.

I want you to look at the document and confirm that everything within that document is draft or comments about the draft and sort of the deliberation process that you guys had around the draft after the hearing had concluded.

A.  (Nods head affirmatively.)  I haven't received anything yet.

Q.  Okay.

A.  I'm going to check if that went perhaps to -- no, I do have it now.

COURT REPORTER:  Okay.  Are we on the record or off the record?

MR. BRAGG:  We can go off the record

while he takes just a second to do that.

(OFF THE RECORD.)

MR. BRAGG CONTINUED:

Q.   All right.  So what is this document a compilation of?

A.   So as you said, that's more than 50 pages. I haven't read every word, but that's includes two types of communications.  One is between -- direct emails to me from other hearing panel members regarding the document, or from me to them.  And the other was notifications from Teams that there was a change made in the online document.

After I received such notification, I would go to the document, see what was done, what was changed, what comments were left, and if there was any action on my part that was needed.  Looks like most of those were notifications from Teams regarding the changes implemented by other hearing panel members.

Q.   Okay.  And I wanted to -- let's look at this -- we're looking at Exhibit 19, which is what you're testifying about.  Let's see.  Let's go on page 3 right here.

So help me just understand sort of the formatting on page 3.  So it says from Robert Grala

to Kelli Anthony, and it says that you replied to a comment. You see that?

A. Yes, I see that.

Q. And so here it says, "You left a comment," and then --

A. Yes.

Q. -- it has you replied?

A. Yes.

Q. Do you know if there -- does that mean that this would have been -- looks like that would have been Kelli's comment. You agree with me on that?

A. Yes. That's likely it was the case.

Q. Okay. And because it says "You," does that mean that it was not from your inbox?

A. No. So as you can see, it's Grala, Robert, says Exchange Administrative Group. So it says from me because I have created the Teams group on Microsoft Teams to be able to edit that document. So whenever, you know, a change is made, there is some notification from that.

Q. Okay.

A. But that wouldn't be email -- it wouldn't be an email that I would compose and send to Ms. Kelli. It's automatically generated which says

108

those were a comment by her, and then later I replied to that comment.

Q. Okay. So do you know why it says, "You left a comment," and it seems to be talking about Kelli's comment? And has "Robert Grala replied"?

A. I don't know. It looks to me -- my assumption would be that was Kelli who left the comment. That would say, you know, Kelli Anthony left a comment.

It might be that I have left a comment asking about the 2021, 2022 evaluations; Ms. Kelli Anthony replied to that; and then I replied to this -- to her again. But I'm not sure why it is done that way.

Q. Okay.

A. So you can see here, Ms. Kelli Anthony added a comment.

Q. Yeah, it's --

A. And that's her -- yeah. And that's what she added here.

Q. Do you know if this document still exists, the Teams document exists in a way where you could go in and see whenever everybody left comment and what the replies were, sort of the entire comment history?

109

A.   No.   The only document that is in that folder is the final draft.  So basically when comments were uploaded and provided, we would address those comments.  And then when the comments were addressed to the satisfaction of the hearing panel, that comment would be removed.  And any edits associated to that, except the final version.

Q.   Was ever proposed comment discussed in one of these meetings?  One of these remote meetings?

A.   Every hearing panel member had an opportunity to discuss those or express their opinion on that.

Q.   Okay.  Whether through editing or commenting on the Teams meeting -- on the Teams document or in an actual meeting.  Is that accurate?

A.   Yes.  So we both discussed the draft letter via Teams, and also we had online meetings when we have discussed some aspects of that letter too.

Q.   Okay.  Sounds good.

MR. BRAGG:  Give me -- I think we're going to be very close to finished.  Give me like four or four minutes just to consult with my notes, and I'll be back on.

(OFF THE RECORD.)

MR. BRAGG CONTINUED:

Q. Okay. I want to ask you just a couple more questions. The first one deals with the role of the Promotion and Tenure Committee as it relates to tenure promotions. And so if someone is up for a tenure promotion, would the P&T Committee have any role in that, if that person were actually promoted?

A. No. So there was two aspects. There's a tenure and there's a promotion, so those are the two separate processes.

Q. Okay.

A. And you have a promotion without the tenure. The committee -- the University Committee on Promotion and Tenure would be involved only if the faculty was denied promotion or a tenure and if they have appealed that decision.

Q. Okay. So a -- so someone who is not tenure-track could still be promoted --

A. Yes.

Q. -- or denied that promotion, and have the right to appeal to the P&T Committee?

A. That's correct. That's correct.

Q. And ultimately the provost is the ultimate

authority on who gets promoted and who gets tenure. Is that right?

A. The provost approves that and then sends their recommendation to the president, Dr. Keenum, who makes the final decision regarding the promotion and tenure.

Q. Okay. And so it goes -- let's talk about promotions for non-tenure-track faculty.

A. Yes.

Q. That goes -- like who makes the first decision? What is sort of the decisional hierarchy on that?

A. So the faculty applies for a promotion or tenure. That packet is submitted to a department head. The department head sends the packet or application to the departmental promotion and tenure committee who reviews a copy and makes recommendation to the department head.

Department head looks at the recommendation and makes his or her own opinion on whether that promotion or tenure should be granted, which may or may not coincide with the committee recommendation.

That -- on that level the packet goes forward to the next level, which would be a dean.

Dean sends the packet to the college promotion and tenure committee, who reviews that and provides recommendation to a dean.  And dean makes a decision based on that, which may or may not coincide with the committee's recommendation.

And at that point, the packet goes to the provost's office.  Depending whether the faculty has an extension appointment, it may go to extension director.  Subsequently.

Q.   Okay.  And so all of them go through the provost's office?

A.   Yes.

Q.   And you know that from your time serving on various committees because --

A.   That's correct.  And that's -- I apologize for interrupting.  That's correct, and that's also in the university faculty handbook.

Q.   Okay.  I want to talk about the criteria for termination of a tenured faculty member.  So that criteria is found in, I think, the Mississippi State Handbook, but also in IHL board policies, correct?

A.   I haven't reviewed the IHL board policies, but the ultimate decision, if that was appealed, would be made by IHL.

Q. Do you know the policy off the top of your head for -- the Mississippi State relevant policy?

A. So the Mississippi relevant policy has a policy that states the termination -- recruitment and termination of faculty, and there's a distinction there between tenure and non-tenure faculty and faculty or employees employed at will.

The University P&T Committee only has a role when there are decisions related to the faculty at Mississippi State University. So wouldn't be involved in any decision related to other personnel.

Q. Okay. And so is that policy 60.113 HRM?

A. That's correct.

Q. Okay. And so under that policy, one of the reasons you can be terminated is for malfeasance, inefficiency, or contumacious conduct, correct?

A. Yes.

Q. And another reason you can be terminated is for cause.

A. Yes.

Q. And there are a couple of other ones also, but those are the two I want to talk about. So it sounds like the panel did not recommend that

114

Dr. Zhang be terminated for malfeasance, inefficiency, or contumacious conduct, but only recommended that he be terminated for cause based on his conduct. Is that accurate?

A. That's accurate.

Q. Okay. And so it seems to me that in evaluating Dr. Zhang's conduct, the appropriate criteria to apply would be the one that specifically addresses conduct, and not the more general for-cause standard. Do you agree with that, and if not, why?

A. Can you bring up the --

Q. Yeah.

A. -- policy that lists those cases where the faculty can be terminated?

Q. Yes. That is a fair question. And the reason I didn't bring it up is because I didn't have it handy.

MR. BRAGG: Ashlyn, I'm sure this has been produced at some point within something, but I'm just pulling it up on the website, if that's okay.

MS. MATTHEWS: Okay. It's 60.113?

MR. BRAGG: Yeah.

MS. MATTHEWS: And I don't know -- I

can't remember if this is one that's been superceded at any point.

MR. BRAGG: It looks like it's got November 14th, 2014.

MS. MATTHEWS: Okay.

MR. BRAGG: And I'll just represent to you that -- let me see. I just pulled this directly from policies.msstate.edu right now.

MS. MATTHEWS: Grafton --

MR. BRAGG: Yes, Ashlyn?

MS. MATTHEWS: I found it in the production if you want the Bates number.

MR. BRAGG: Yeah. Let's do that.

MS. MATTHEWS: It starts at 255901.

MR. BRAGG: 25 what now?

MS. MATTHEWS: 255901.

MR. BRAGG: Okay. Would that have been -- do you know which date of production? I've got them organized by date. I can find it, but...

MS. MATTHEWS: 10/24/24.

(OFF THE RECORD.)

MR. BRAGG CONTINUED:

Q. Okay. Can you see this now, Dr. Grala?

A. Yes. I can see at-will employees, which wouldn't be the case here.

116

Q.   Right.  So this is -- so I'll scroll down. I believe it's a six-page policy that governs the termination of employees in general.  Does that look accurate to you?

A.   Yes.  So that's the university policy regarding the termination of employment for individuals employed at Mississippi State University.

Q.   Okay.  And so for a tenured faculty member, we come down to -- all right.  So it's not really tenured.  It looks like the policy's written a little differently than maybe the IHL, but you have at-will employees and then employees with a contract.  Tenured professors would be among those who are employees with a contract, correct?

A.   Correct.

Q.   Okay.  And then if you look at that paragraph there, you've got four different numbers that are bases for termination of an employee with a contract, correct?

A.   Could you highlight those sections?  I think your document is not moving here on the screen.

Q.   Oh.  Let me just try to start over.  All right.  Is that highlighted there?

117

A.    Yes.

Q.    All right.

A.    (Reviewing document.)  I have read the entire paragraph.

Q.    Okay.  And so my question is -- all right. So this was not a situation where there were financial exigencies -- exigencies is how you say that -- as declared by the IHL, correct?

A.    Correct.

Q.    Dr. Zhang was not terminated because of a reduction in programs or units approved by the IHL board, correct?

A.    Correct.

Q.    He was not terminated because of malfeasance, inefficiency, or contumacious conduct, correct?

A.    So this one there was a disagreement between the individual hearing panel members whether the individual acts raised to the -- to the activity that would be defined as contumacious, with some hearing panel members believing that they did not, and some others believing that they did.

Q.    Right.

A.    So the compromise was to include the statement that the committee found that the

118

university had a cause to terminate Dr. Zhang due to conduct.

Q. Okay. And --

A. For example, some -- yeah.

Q. And so still only three committee members voted in favor of the for-cause finding, correct?

A. There were four committee members who voted for cause, and three voted against.

Q. Okay. And so among those four that voted for cause, was there a disagreement about whether this conduct had risen to the level of contumacious conduct?

A. I don't think so, but that would be a question to those individuals.

Q. I can ask. Do you recall the individuals who voted in favor of Dr. Zhang's termination?

A. Yes, I do.

Q. Can you tell me?

A. That was myself, Dr. Kelli Anthony, Dr. Robert Moore, and Dr. Melody Dale.

Q. So in your mind Dr. Zhang's conduct did rise to the level of contumacious conduct?

A. I would say so.

Q. So here's my question. Back to my question that set us on this. If the basis for the

119

termination or the basis for rejecting the termination recommendation is about the conduct of the professor, then wouldn't you look to prong 3 that specifically deals with conduct, and not the more general for-cause language in prong 4?

A. So, basically, in my opinion, what we felt, that the cause for termination was basically misconduct or contumacious conduct. So that was our interpretation of those two points.

Q. But there was not a finding of contumacious conduct, correct?

A. Could you repeat that? I couldn't hear it.

Q. But there was not a finding of contumacious conduct.

A. Not by all members of the hearing panel.

Q. Okay. And there was not a vote -- I think you testified earlier there was not a vote that Dr. Zhang had engaged in contumacious conduct.

A. No. There was a vote whether Dr. Zhang -- whether there was a cause to terminate Dr. Zhang based on conduct.

MR. BRAGG: All right. I think that's all I have.

MS. MATTHEWS: I don't have anything.

MR. BRAGG: Okay.

AW Reporting
601-573-0961

(EXHIBIT 20 WAS MARKED FOR THE RECORD.)

(DEPOSITION CONCLUDED APPROXIMATELY 12:43 P.M.)

(READING AND SIGNING WAS NOT WAIVED.)

CERTIFICATE OF REPORTER

I, BETHANY CAMMACK, Certified Shorthand Reporter and Notary Public for the State of Mississippi, do hereby certify that the above and foregoing pages contain a full, true and correct transcript of the proceedings, as taken by me at the time and place indicated, and later reduced to typewritten form under my supervision and to the best of my skill and ability.

I further certify that I placed the witness under oath to tell the truth and that all answers were given under that oath. I further certify that the witness has chosen the right to read and sign the deposition.

I further certify that I am not in the employ of or related to any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of this case.

Witness my signature and seal this the 19th day of January, 2026.

BETHANY CAMMACK, CSR
CSR NO. 1526
My Commission Expires May 5, 2027

122

ERRATA SHEET

I, ROBERT GRALA, do solemnly swear that I have read the foregoing _____ pages and that the same is a true and correct transcript of the testimony given by me at the time and place hereinbefore set forth, with the following corrections:

Page:  Line:  Correction:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____
ROBERT GRALA

NOTARIZATION

I, _____, notary public for the

State of Mississippi, _____ County, do

hereby certify that Robert Grala personally

appeared before me this _____ day of _____,

2026, at _____, Mississippi.

My Commission Expires:_____

_____
(NOTARY PUBLIC)

**10th** 78:15

**11th** 83:13

**12th** 84:18,20 86:11 90:22 91:1 (5)

**14th** 115:4

**16th** 86:12 91:3

**19th** 87:5 121:20

**21st** 61:7

**22nd** 50:8 51:23 52:1 59:6 60:3 75:25 (6)

**25ci123cv441ahw** 5

**28th** 53:8 55:7,15,19 (4)

**29th** 58:21 60:14 68:3

**2c** 2:4

**30th** 68:19 73:7

**31st** 20:7

**3rd** 47:6,7,11,22 48:25 49:3,6 51:4 53:15 54:15 75:13 (11)

**4th** 47:8 49:3 79:19

**5th** 47:8,12 49:3 51:4 53:15 54:15 86:11 87:4 89:7 90:25 (10)

**7th** 36:23 88:19 89:14

**8th** 86:11 90:13,25

**9th** 34:9 78:15

**aarhus** 37:21

**ability** 31:4 90:3 101:10 121:9 (4)

**able** 9:4 12:20 25:18 26:2,18 30:10 32:4,4 38:22 39:10,12,13 40:5 43:22 51:15

54:24 56:19,23 64:3 65:10,12 80:16 98:8 101:8 107:19 (25)

**about** 8:19 10:14 11:3,16 12:1 16:10,13 19:1 21:16 22:18,20 23:13 24:20,24 25:17 26:1 29:15,16,24 31:19,25 32:24 33:21 34:20 35:10 37:6 39:3,19 40:10 43:1,20 48:3,14,14 51:6,11 53:14 57:10 59:14 61:10 62:14,20 63:15,17,19 64:8 66:7 67:12 69:4 72:11,16 73:21 74:20 75:14,18,20 76:14 77:15,18,20 83:12 84:7,12 85:8,10 86:5,15,16 90:22 100:16 102:3 103:18 104:14 105:15 106:22 108:4,11 111:7 112:18 113:24 118:10 119:2 (82)

**above** 14:15 121:4

**abstained** 95:4 100:5

**academic** 19:7 23:14

**acceptable** 85:2 97:17

**access** 9:20 76:22 77:6,8,11,16 (6)

**accordance** 97:25

**according** 98:11

**accordingly** 100:1

**account** 76:23 81:22

**accurate** 12:4 21:9 33:24 37:4 47:6,14 48:11 53:15 58:16 66:23 81:5 84:16 95:4 100:7 104:11 109:16 114:4,5 116:4 (19)

**acting** 21:24

**action** 106:16

**activity** 97:17 117:20

**acts** 117:19

**actual** 30:23,23 59:5 100:10 109:15 (5)

**actually** 31:6 46:5 57:22 58:14 59:8 63:11 80:8 81:19 84:9 102:4 110:8 (11)

**add** 101:22

**added** 108:17,20

**adding** 101:5

**additional** 82:15,17 87:13 90:17,19 98:7,9 99:10 104:2 (9)

**address** 54:7 109:4

**addressed** 50:10,14 60:5,7 109:5 (5)

**addresses** 114:9

**administrative** 32:12,21 34:13 35:3,9 46:8 49:2 107:17 (8)

**administrators** 98:16

**admirable** 13:7

**advice** 53:6 69:15 70:3,25 72:21 (5)

**adviser** 67:7 68:8,21 70:20 71:4,7,9 (7)

**advising** 69:4 71:11

**advisor** 4:12,22

**advisors** 42:11

**advisory** 69:23 70:5

**affirmatively** 105:18

**afield** 61:18

**after** 7:6 10:16,21 11:8,13 17:3 19:6 29:25 38:14 84:22 87:20 102:7,7 105:17 106:13

(15)

**afterwards** 48:22

**again** 14:8 54:9 59:1 65:4 108:13 (5)

**against** 6:13 17:7,9 18:18 26:25 27:2,6,9 95:4 100:5 118:8 (11)

**ago** 9:3 19:2,11 20:9 23:13 44:23 (6)

**agree** 16:9 94:7 100:6 107:11 114:10 (5)

**agreed** 42:8 91:11

**agreement** 51:8 94:22 95:8,11,12,13 100:17 (7)

**agrees** 31:21

**ahead** 7:24 17:19 19:19 34:18 48:4 81:13 85:16 100:13,14 (9)

**alerting** 48:9

**allegations** 13:12

**alleged** 91:15

**allow** 40:22 84:19

**allowed** 26:7 71:12 72:5 77:16 (4)

**alluded** 22:2

**along** 42:23 46:14 104:2

**already** 51:7 52:3 64:2 65:10 73:19 75:23 105:8 (7)

**also** 9:2,11,22 16:2 27:17 30:3 35:18 36:7 37:12 38:3 42:14 43:9 46:6 48:23 53:3 60:5 62:25 63:5 64:7 68:25 71:7 73:25 88:3 90:2 93:14 96:14 101:11,21 103:25 109:18 112:16,21 113:23 (33)

**although** 77:19

**altomonte** 39:3,5

**always** 21:23 25:6

**am** 20 10:6 24:8 56:19 57:24 68:19,21 121:15 (8)

**amatthews@winfieldlawfirm com** 2:9

**amend** 88:2 90:3

**among** 74:3 116:14 118:9

**analysis** 21:20

**angi** 24:4

**announced** 17:2,5

**annual** 15:1,6,10 78:1,19 79:2,16 80:5,9 97:8,11,24 (12)

**another** 11:13 28:21 31:13 33:2,18 40:19 43:25 55:24 77:4 96:15 113:20 (11)

**answer** 7:10,11,24 21:8 24:9 27:5 70:10,21 72:16 (9)

**answered** 97:21

**answering** 21:19

**answers** 4:4 7:2 11:21 103:21 104:8 121:12 (6)

**anthony** 100:20 101:4 102:4 107:1 108:8,12,16 118:19 (8)

**anymore** 98:20

**anyone** 32:24 44:17,18 57:21 73:15 74:2 (6)

**anything** 12:3 40:20 55:18,21 67:12 69:7 74:15 75:5 90:21 99:9,13 102:15 103:19 105:19 119:24 (15)

**apart** 93:25

**apologies** 68:20

**apologize** 112:15

**appeal** 4:6,257955 5:9 20:3,22 21:17 27:13,21,24 38:6 41:10 48:14 56:24 110:23 (14)

**appealed** 15:4 35:16 62:24 110:18 112:24 (5)

**appealing** 15:5 71:4

**appeals** 62:21

**appearances** 16 2:1

**appeared** 122:21

**appearing** 19

**application** 111:16

**applied** 91:24 94:1

**applies** 111:13

**apply** 12:20 64:18 114:8

**appointed** 12:11 18:22 57:23

**appointment** 18:13 19:4 112:8

**approach** 25:13

**appropriate** 23:9 31:11 90:4 101:13 114:7 (5)

**approved** 117:11

**approves** 111:3

**approximately** 120:2

**april** 50:8 51:22 52:1 75:25 (4)

**arbitrary** 41:25

**archer** 59:14

**architecture** 24:5

**are** 8:13 11:11 13:11,20 14:1 15:24 16:14 17:2 21:10 24:20 36:16 42:1,14,25 55:2,2,12 56:9 57:2 63:12,23 64:13 65:2,7,12 66:4,9,11,12,19 68:11,17 69:16 70:1 72:4 94:14 96:23 97:11,13,13 100:10,17 105:23 110:11 113:9,23,24 116:15,19 (49)

**argue** 80:4

**arise** 21:13 25:21 91:21

**arose** 18:21

**around** 12:18 65:1 105:16

**art** 24:5

**ashlyn** 2:7 8:16,25 24:6 69:12 94:15 105:3 114:19 115:10 (9)

**ask** 7:22,24,25 8:4,19 10:8 13:8,13 20:12 34:20 59:14 60:13 70:8,17 76:9 83:3,11 88:17 94:13 96:8 102:18 110:3 118:15 (23)

**asked** 7:23 28:12 45:21 62:20 66:21 73:8 82:20 104:2 (8)

**asking** 52:9 69:11 108:11

**aspects** 109:19 110:10

**assert** 70:9,15

**asserted** 69:19,23

**asserting** 69:16 70:6

**assigned** 99:4

**assignment** 92:20,23

**assignments** 42:19

**assistant** 65:19,20

**associate** 11:8,11 17:23,24

63:21,23 64:1,14 65:16,21 (10)

**associated** 109:7

**assume** 8:7 60:12

**assuming** 33:25 98:14

**assumption** 108:7

**athena** 39:19,21,22

**attachment** 79:10

**attempt** 46:25

**attend** 39:25 40:6 42:19 76:12 (4)

**attendance** 25:5 26:7,8,10 (4)

**attending** 44:9,10

**attorney** 50:11 71:5,6

**attorneys** 8:6 61:9,23

**atwill** 115:24 116:13

**august** 19:9 23:14 57:6

**authenticated** 105:9

**authority** 77:13 111:1

**authorization** 23:2

**authorize** 101:2

**authorized** 22:22,25 23:8 31:5 100:25 101:11,14 102:4 (8)

**automatically** 107:25

**availability** 42:16 43:20 49:15

**available** 43:10,25 49:10 55:2,3,12 (6)

**avenue** 2:4

**awaiting** 62:21

**aware** 43:1,15 45:11,12,17 55:20 56:9,15 57:24 62:4 77:9 80:7,10 (13)

**back** 27:20 33:13 34:5 41:7 44:9 52:6 55:17 67:25 68:17 69:25 80:8 89:2,5 103:11 109:25 118:24 (16)

**background** 10:2

**banner** 76:22

**based** 49:11 95:18 104:16,18 112:4 114:3 119:21 (7)

**bases** 116:19

**basically** 18:4,10 41:22 42:21 66:12 75:5 90:1 97:15 109:2 119:6,7 (11)

**basics** 6:20

**basis** 118:25 119:1

**bates** 29:10 59:25 115:12

**bear** 11:17 33:11 40:24

**bearing** 83:23 85:9

**became** 20:12 32:11

**because** 7:18 8:4 18:21 19:6 31:6,11 34:11 35:3 39:18,25 40:6 41:14 42:17 43:4 50:11 56:7 57:4 59:14 61:9,23 63:24 64:12 66:1 67:17 70:17 76:18 93:21 97:24 98:2,10,25 107:14,18 112:14 114:17 117:10,14 (37)

**before** 6:11,16,17 7:9,11,25 11:20 20:11 27:7 35:19 43:2,19 47:23 48:16 49:15 51:7,13 54:22 55:2,7,18 56:20 57:25 59:3 60:14 62:22 66:13 68:13 72:23 73:8 75:12,24 76:23 122:21 (34)

**beforehand** 63:13

**began** 10:25

**beginning** 23:14 47:21 102:12

**begins** 54:2

**behalf** 54:4,13 85:22 100:24 101:1,11,13 102:5 (8)

**behavior** 90:25 93:13,17 94:3 (4)

**being** 12:15 21:11 38:22 41:16 46:21 61:23 68:20,21 69:19,23 77:1 (11)

**beliefs** 89:25

**believe** 31:10 52:17 70:14 72:24 116:2 (5)

**believed** 97:5

**believing** 117:21,22

**benefit** 10:2

**best** 7:12,13 13:9 30:16 74:1 121:9 (6)

**bethany** 24 7:15 33:9 121:2,24 (5)

**between** 42:10 56:8 69:20 72:17 78:13 82:16 106:8 113:6 117:18 (9)

**beyond** 28:4 80:6

**binder** 102:8,11,15 103:2,4,6 (6)

**binders** 102:20

**bit** 8:13 9:25 22:18 24:7 48:17 63:19 77:18 86:14,16 100:21 (10)

**board** 7 112:21,23 117:12 (4)

**bold** 94:21

**booker** 14:20

**books** 60:16

**born** 10:3,10,11

**both** 17:24 29:6 41:21 42:23 46:24 67:7 73:25 85:15 103:16 109:17 (10)

**bottom** 28:23 29:10 36:22 54:1 67:25 (5)

**bourgeois** 24:4

**box** 70:6

**bragg** 2:3 3:9 4:13 6:5,12 12:23 13:1,5 19:23 24:6,12 28:11 29:1 33:8,11,17 36:5 41:2 44:4,7 46:4 49:22 52:5,12,16 53:25 56:5 58:4 61:3 62:8,12,17,19 63:9 67:15,20,24 68:16 69:10 70:8,13,24 72:12,22 73:6 78:11 79:8 80:14 82:3,5,6 83:10 84:4 85:19 88:14 92:12 94:15,19 105:3,7,25 106:3 109:22 110:2 114:19,24 115:3,6,10,13,15,17,22 119:22,25 (75)

**bragglaw** 2:3

**brandon** 68:22,25 72:18

**break** 7:19,25

**brecken** 4:6 19:15 20:2,22 22:10 25:17 27:10,13,21,22 (10)

**brief** 46:7

**bring** 67:22,22 114:12,17 (4)

**brown** 2:7

**bullet** 92:23 95:11 99:10

**burger** 14:19,19,21,21,21,22 (6)

**business** 58:20 87:11,20

**calendar** 62:2

**calendars** 52:10

**call** 6:9 15:25 16:20,24 72:23,25 73:1,9,11,15 (10)

**called** 30:12 104:1

**came** 80:8 86:17 87:7,14 98:22 (5)

**cammack** 24 121:2,24

**can** 6:9 8:17,18 11:18 12:13 14:8 15:7,22 16:9 17:1,3,25 18:3 19:13,19 25:24 26:16,17 27:17,19,22 30:6,23 42:3,19 43:25 44:4 45:21 46:10 47:15 50:13 51:5 54:6 57:7 60:16 62:8 65:2,7,15 67:22,22 69:8 70:9,21 71:4 72:7 73:2 79:21 80:4 84:9 94:16 105:10,10,25 107:16 108:16 113:16,20 114:12,15 115:19,23,24 118:15,18 (65)

**can't** 45:24 90:10,10 115:1 (4)

**cannot** 39:14 63:23 80:6 104:22 (4)

**capacities** 6:15

**capital** 82:5

**capture** 89:21

**care** 50:14 59:10 76:1

**case** 5 9:2,13 13:11 15:9,10 18:4,5,6,16 19:10,12,17,19 20:20 21:12,14,16 22:21 23:20,23 24:25 25:2,17,23 26:16,17,17,19 27:10,15 28:17 29:17,25 30:21 31:19 35:17 39:15 41:13 42:5 55:19 56:1 57:25 58:16 59:20 62:22,23 64:3,22 65:1,11,13 66:7 79:25 92:25 93:4 101:20 104:21,22

107:13 115:25 121:18 (62)

**cases** 17:21 20:17 22:1,4 24:23 25:20 46:25 63:11 99:17 114:14 (10)

**caucasian** 13:18

**cause** 66:25 67:1 91:11,11 92:10 94:24 95:18,21 96:1 113:21 114:3 118:1,8,10 119:7,20 (16)

**certainly** 8:18

**certificate** 3:121 121:1

**certifications** 13:20

**certified** 24 121:2

**certify** 121:4,10,13,15 122:20 (5)

**chain** 15:2,3 28:22 29:2 33:18 34:7 36:7,17 45:19 56:19 68:1,18 73:4 80:16 84:10,15 (16)

**chains** 29:6

**chair** 16:14 18:17,20,23 19:3,5,7 20:12,18 25:1 41:19 42:1 43:23,24,25 44:1,1 49:14 62:25 63:4 (20)

**chairperson** 18:14

**chance** 28:3 49:25 70:17

**change** 34:22 38:10 90:3 106:12 107:20 (5)

**changed** 106:15

**changes** 90:20 106:18

**charge** 66:24 75:16 90:6

**charged** 35:15,16

**charlie** 57:9

**charter** 17:14

**check** 20:14 38:9 45:18 47:10 49:9,18 50:21 56:12 59:1,22 60:16 66:17 105:21 (13)

**checked** 101:12

**choice** 70:11 93:6

**chosen** 121:13

**chronologically** 36:11

**circuit** 1

**claimed** 31:7

**clarification** 17:20 57:10 61:19

**clarifying** 82:21

**clarity** 21:6

**class** 40:3,3

**clear** 68:20 92:25

**clearly** 70:2

**client** 71:16

**close** 48:18 58:20 97:6 109:23 (4)

**coincide** 111:22 112:5

**collected** 102:9

**collectively** 99:19

**college** 10:5 14:18 15:20 16:7,18,23 17:3,10 24:5 63:4 112:1 (11)

**come** 22:19 95:6 116:10

**comes** 16:20,20

**comfortable** 67:23

**coming** 43:17

**comma** 60:11

**command** 15:2,3

**comment** 85:8 88:22 101:6,23 107:2,4,11 108:1,2,4,5,8,9,10,17,23,24 109:6,8 (19)

**commenting** 109:14

**comments** 9:20 28:16 88:2 105:15 106:15 109:3,4,4 (8)

**commission** 121:25 122:23

**committee** 4:2,16 5:18 15:16,18,20,23 16:1,3,10,11,13,19 17:12,15,15,21 18:9,11,16,19,20,22 20:11,13,15,18,21,24 21:8,10,13,16,19,23,23 22:1 23:19 25:4,8,10,16,18 26:4 27:12,14 28:2,5,5,8,14 29:20 33:4,21 34:8,22 35:1,13,19,21,24 36:21 37:2,15 38:1,3,5,8,10,12,24 39:19,23 41:14 42:6,15,18,23 43:1,23 44:16 45:13,21,22,24 46:17,23 47:2 49:9,11,12,14 50:14 51:11 52:19 53:4,13 54:4,19 56:23 57:3,3,8,12,16,18,18,22 58:7 59:8,9,17,18 60:6,8,12,20 61:1 62:15,21 63:2,5,5 65:3,5 68:2 72:18 75:17 76:1,12,16,17 77:10 78:22 87:1 94:21 95:7 110:5,7,15,15,23 111:17,22 112:2 113:8 117:25 118:5,7 (149)

**committee's** 20:2 35:15,16 85:11 92:18 112:5 (6)

**committees** 16:5 112:14

**common** 75:6 95:15

**communicate** 99:2

**communicated** 54:14 69:14

**communication** 43:14 52:10 54:22 56:13,18 67:13 71:23 75:15 77:4 81:23 82:15 84:10 (12)

**communications** 59:16 67:18 69:20 71:20 72:1,5 93:14 106:8 (8)

**compilation** 79:15 106:5

**complete** 46:22 85:7

**completed** 17:4 79:16

**compose** 107:24

**composition** 34:22 46:17 65:6

**compromise** 117:24

**computer** 101:10

**concern** 48:17

**concluded** 105:17 120:2

**conditional** 31:3

**conduct** 41:23 91:12,21,24 92:6,10,11,25 93:5,16,25 94:25 95:19,22,23,24 96:2,5,12,13 99:18,25 113:17 114:2,4,7,9 117:15 118:2,11,12,21,22 119:2,4,8,11,14,18,21 (40)

**confer** 74:3

**conferences** 42:20

**confidential** 35:3 72:10

**confirm** 19:25 36:16 54:23 55:11 58:15 76:15 80:2 85:21 105:14 (9)

**confirmation** 19:21 53:14,19 54:19 55:5,14 (6)

**conflict** 38:21 40:1,16,19,21 44:18 (6)

**conflicting** 76:18

**consecutive** 57:7

**consensus** 89:21 90:1

**considered** 18:9

**consistent** 96:17

**constitute** 91:20

**consult** 109:24

**consultation** 41:21 42:3

**consulted** 43:1 49:15 85:1 93:21,22 (5)

**consulting** 42:13,15 103:22

**contact** 30:16 31:20 43:9 50:13 53:4 (5)

**contacted** 8:25 30:15 43:20,22 53:8 (5)

**contain** 121:5

**content** 72:13

**contents** 3:1,3

**contest** 15:7

**context** 46:6

**continued** 5:1 13:5 19:3,5,8,23 24:12 28:11 29:1 33:17 36:5 41:2 44:7 46:4 49:22 52:16 53:25 56:5 58:4 61:3 63:9 67:24 68:16 70:13,24 72:12,22 73:6 78:11 79:8 80:14 82:6 83:10 84:4 85:19 88:14 92:12 94:19 105:7 106:3 110:2 115:22 (42)

**contract** 66:18 116:14,15,20 (4)

**contractual** 66:11

**contribute** 30:6

**controlling** 104:10

**contumacious** 91:21,24 92:5,14,25 93:4,16,25 94:4 95:22 96:5,12 99:18,25 113:17 114:2 117:15,20 118:11,22 119:8,11,14,18 (24)

**convened** 45:14

**conversation** 7:5 9:6 32:24 46:16 74:18 75:13 (6)

**conversations** 44:22 71:13,16 72:17 74:23,25 (6)

**conveying** 30:25 31:1 84:17

**coordinate** 42:22

**coordinated** 49:8

**coordinating** 43:5,7

**copied** 32:10 52:20,20 53:12 (4)

**copies** 78:18,19,22

**copy** 105:5 111:17

**copying** 68:2

**correct** 6:9 11:2 12:10 15:5 20:4,6,8 21:21 22:10,11 24:15,19 29:14 32:12,23 33:9 34:3,13,19 37:16,22 39:4 41:9 42:9 47:7 48:5 50:5,15 51:4,9,13,20 53:8,16,20,21 54:5,16 55:8,15 56:24 58:21,22 59:6,7,12,13 63:14 67:4 68:6,11,24 69:2,3 70:20,23 71:13 72:6 74:4,5 77:23,24 78:3,14,16 80:24,25 81:6,11,12,16,17 83:6,7,21,22 86:1,13 87:1,2 89:4,9,15,23 91:4,16 92:21 93:1 95:1,5,9 96:6,9,19 98:1 99:6 100:22 102:14 103:14,15 110:24,24 112:15,16,22 113:14,18 116:15,16,20 117:8,9,12,13,16 118:6 119:11 121:5 122:2 (119)

**correction** 62:14 122:4

**corrections** 122:3

**correctly** 14:2 27:16 73:23 81:18 82:19 (5)

**correlate** 65:25

**correspond** 32:9

**could** 21:1 31:8 32:23 42:8,23 44:14 45:13,18,19 46:22 47:3 48:6 49:12 54:6 60:22 61:17 74:19 75:9 76:3,18 79:12 82:20 84:17,21 89:1 93:19 101:21 104:12 108:22 110:20 116:21 119:12 (32)

**couldn't** 42:18 45:22 119:12

**counsel** 2:5,9 6:19 40:13 45:12 46:7 50:15 52:8,11 56:8 59:11 69:1,9,21 70:15 74:9,9 76:1,21 102:9,23 103:13 121:16 (23)

**counsel's** 43:6,17 49:7

**count** 92:20,23

**county** 1 122:19

**couple** 6:14 20:15 22:2 29:5 92:14 110:3 113:23 (7)

**course** 71:1

**court** 1 12:8 28:9 33:10 52:2 60:21 81:25 92:7 105:23 (9)

**cover** 6:22 9:4

**craig** 37:21

**created** 9:12 107:18

**criteria** 17:11 64:13 112:18,20 114:8 (5)

**critical** 24:10

**csr** 25 121:24

**curious** 67:16 101:15 102:1

**current** 31:9 37:15

**currently** 9:21 55:12 63:3

**cv** 13:21

**dale** 57:1 118:20

**date** 18 5:16 20:5 32:6 41:3,20,20,22,25 42:2,18 43:2,5,7 45:6 48:5,12,24 49:15 53:9 59:5 115:18,19 (23)

**dated** 50:7 51:22,25 60:3 (4)

**dates** 41:16 43:8,19 47:3 49:17 84:22 (6)

**david** 75:13

**day** 37:12 55:7 84:8,18,20 87:3 121:20 122:21 (8)

**days** 40:23 41:12 42:5,9 47:25 49:11 76:23 87:5,11,20 (10)

**deal** 17:21

**deals** 110:4 119:4

**dean** 14:18 15:8,9,12 16:17 24:4 63:6 75:18 78:20 79:4 80:8 97:13 98:4 111:25 112:1,3,3 (17)

**december** 36:23 48:4,8

**decided** 41:17 42:10

**decision** 11:10 15:9 17:23 18:1 24:14 27:21 35:16 41:11 42:4 64:17 65:8,9,11 75:10 84:25 88:8 110:18 111:5,11 112:4,24 113:11 (22)

**decisional** 111:11

**decisions** 29:22 63:2 64:7,7 113:9 (5)

**declared** 117:8

**defendants** 7 2:9

**defined** 94:3 117:20

**definition** 91:23 93:10,15,16,24 94:2,7,10 (8)

**definitively** 44:18

**degrees** 13:20

**delayed** 41:17

**deliberate** 39:15 65:10,13

**deliberated** 104:9

**deliberation** 105:16

**deliberations** 57:19 59:20 63:18 74:7,16,24 79:25 (7)

**deliver** 32:5

**delivered** 78:22

**denial** 22:6,9

**denied** 63:22 110:17,22

**department** 10:4 14:1,5,6,9,14 16:12,18,23 17:10 63:8 78:20 97:12 98:3 111:14,15,18,19 (18)

**departmental** 16:6 63:1 98:12 111:16 (4)

**depending** 57:12 65:7 66:4 112:7 (4)

**depends** 66:18

**deponent** 19

**deposition** 12 6:16,17,23 7:8 8:21,24 9:1 13:3 19:20 28:24 36:3 46:2 56:3 68:13 73:3 79:6 80:12 85:17 120:2 121:14 (21)

**depositions** 55:25

**describe** 13:14,15,17 72:13 93:19 (5)

**describing** 92:17

**description** 4:2 5:2 91:10 93:17 (4)

**design** 24:5

**designated** 44:1

**despite** 53:5

**details** 31:15

**determine** 66:21,24 85:13 91:25 96:16 99:4 (6)

**develop** 30:1

**developed** 29:20

**dialogue** 34:5

**dictionaries** 93:22

**dictionary** 91:25 92:2,4 94:9,10 (5)

**didn't** 23:9 28:5 31:6,10 35:2,23 60:21 62:3 73:19 76:7 85:13 92:4 94:1 99:2 101:8,9,15,17 114:17,17 (20)

**difference** 93:19

**differences** 85:14

**different** 17:9,21 24:20 42:19 44:16 61:12 66:9 76:11 87:14 91:14,19 97:18,19,21 99:15 103:21 116:18 (17)

**differently** 116:12

**differing** 91:19

**difficult** 55:16

**difficulty** 29:13

**dipangkar** 57:1 83:18,18,19 (4)

**direct** 106:8

**directly** 54:13 61:22 115:8

**director** 112:9

**disagree** 90:3 99:11,14

**disagreement** 99:21 100:6 117:17 118:10 (4)

**discipline** 97:16,16,18,19 (4)

**disclose** 35:2

**discuss** 26:16 84:17 86:12 87:15 88:3 109:11 (6)

**discussed** 6:20 74:21 85:5 87:24 90:18 109:8,17,19 (8)

**discussing** 18:4 92:20

**discussion** 17:25 30:2 64:25 77:15 83:24 84:7,12 85:4,9,10 87:16 90:23 95:16 (13)

**discussions** 28:16 43:13 72:10,14 (4)

**disobedience** 94:6

**disregard** 92:24 93:12 94:5

**distinction** 113:6

**distributed** 102:12 103:16

**district** 1

**document** 5:10 8:20 9:19,22 11:19 20:1 24:8 28:22 32:18 33:8,14 34:19 36:2,13 46:13 49:20 50:1,25 51:16 52:14,23 53:22 55:24 58:18 60:14 80:18 85:20 87:7 88:15,21 100:22 101:21 105:1,13,14 106:4,10,12,14 107:20 108:21,22 109:1,15 116:22 117:3 (46)

**documentation** 8:14 22:14 23:25 81:4 82:16,17 87:21 (7)

**documentintensive** 55:25

**documents** 4:24 24:2 32:7 52:7 56:1 69:18 77:22 81:3 87:13,14 103:15 (11)

**does** 7:3,13 14:13 17:15 20:24 21:8 22:1 60:11 66:10 92:14 107:9,14 116:3 (13)

**doesn't** 31:15 43:23 60:10,11 65:24 66:2 (6)

**doing** 13:8 74:1

**donald** 14:6,9

**donald's** 14:11

**done** 31:5 32:25 33:1,1 42:3 106:14 108:14 (7)

**doublecheck** 19:13 26:13 38:19 39:1 51:14 (5)

**doubting** 101:14

**down** 11:25 19:24 29:9 52:24 54:1 58:10 59:23 67:25 79:18 84:9 85:21 86:7 95:6 103:19 104:9 116:1,10 (17)

**dr** 5:9 6:9,12 9:2,13 10:3 11:20,21 13:6 14:6,9,14,19,22 15:5 19:9 21:13 23:24 24:4,13,15,19,21,21 25:1 26:1,2 27:12,14,15,23 28:3,6,7,13 29:3,7,13,17,18 30:3,11,15,16 31:19,21 32:3,8,20 33:3,6,21 34:11,25 35:6,11,12,13,15,18,18 36:21 37:1 38:6 41:6,7,8,10 48:8,13 52:18 53:2 54:3,4,12 56:25 57:1,1,15,15,17 58:12,24 59:20 60:8,9,13,20 61:1,8,10,11,12,14,15,21 62:1,13 64:23 66:21,25 69:12 70:14 71:11 72:15 75:2,14,16 76:21 77:2,5 78:2,13,17,21,23 79:10,15,20 80:4,8,19,21,23 81:9,10,15,20,22 82:7,9,12,16,19 83:1,2,3,5,18,21 84:19,22 85:12,23 87:19 92:11 93:11,17 94:20,25 95:18,22 96:1,5,11,16

97:7 98:10,14,19 99:5 105:4 111:4 114:1,7 115:23 117:10 118:1,16,19,20,20,21 119:18,19,20 (176)

**draft** 9:12 30:4 87:22,23 88:22 89:5,13,18,25 90:6,10,11 99:9 101:22 105:15,15,17 109:2,17 (19)

**dropbox** 58:7

**due** 32:6 91:12 92:5,11 94:25 95:22,23,24 118:1 (9)

**during** 21:22 28:1,8,13 32:11 40:6 48:23 50:3 71:1,11 74:23,25 81:3 82:20 87:12 95:16 96:18 102:16 103:16 104:17 (20)

**dutta** 57:1 83:18,18

**e** 2:3

**each** 9:23 16:22,23 37:18 38:13 59:9 91:9,12 94:22 (9)

**earlier** 22:2 55:13,14 63:15 66:6 76:2 119:17 (7)

**early** 23:13 47:16

**easier** 20:12 105:1

**east** 2:8

**economics** 10:7 13:23

**edit** 107:19

**editing** 109:13

**edits** 88:2 109:7

**educational** 40:5

**effect** 98:24

**efficient** 7:19

**effort** 46:22 47:1

**either** 52:18 54:13

**elaborate** 44:14

**elect** 19:7

**elected** 15:19 18:19 21:11 33:3 (4)

**elections** 38:16

**else** 62:6 102:15

**email** 4:7,4,10,6,8,16,10,19,12,22,14 5:4,16,7 28:22 29:2,6,9,19 30:10 31:15 32:25 33:2,18 34:6,7,11,17 35:6 36:6,14,17,22,25 37:7,14 38:15 39:9 40:13 45:18,20 46:15,15 48:8 50:2,22 51:17,18,22 52:8,17,21,22 53:1,2,12,19 54:2,6,7 55:4,7,10 56:10,20 58:6,20 60:25 61:2,7,13,14,20,25 68:1,1,18 70:4 73:4 76:4,22 78:13,23 79:9,18,21,24 80:6,16,19,21 83:14,15 84:22 85:22,25 86:2 89:1 101:3,15,16,17,17 105:4 107:23,24 (106)

**email's** 70:19

**emailed** 33:25 73:8

**emailing** 33:20

**emails** 9:4,7,10 36:19 44:21,25 47:24 49:9 53:3 54:7,23 55:17 56:7,8,17 79:11 88:4,4 89:19 101:25 106:9 (21)

**emphasis** 97:20,22

**employ** 121:16

**employed** 98:20 113:7 116:7

**employee** 116:19

**employees** 113:7 115:24 116:3,13,13,15 (6)

**employment** 5:12 22:5 24:19 25:2 35:14 98:14,19 116:6 (8)

**end** 15:4 33:13 68:18 92:4 (4)

**ended** 57:12 59:19,21 87:4 (4)

**engage** 93:13

**engaged** 96:5,12 119:18

**enlarge** 54:7

**enough** 21:3,6 87:17 88:7 89:17 (5)

**ensure** 25:14

**entire** 25:4,18 26:16 34:16 36:14 84:10,15 96:21 105:9 108:24 117:4 (11)

**entitled** 66:13

**environmental** 13:25

**equal** 63:18

**equally** 64:18

**errata** 3:122 122:1

**error** 93:2

**establish** 85:6

**established** 63:6 70:19

**establishes** 70:5

**establishing** 75:6 96:15

**ethical** 50:11

**ethnicity** 13:12,15,18

**evaluate** 48:22 98:10 99:2

**evaluated** 11:10 15:8 97:6,9,12,13 (6)

**evaluates** 21:14

**evaluating** 114:7

**evaluation** 9:21 15:6,7,10 78:19 (5)

**evaluations** 97:9,11 108:11

**even** 44:23 66:15

**event** 66:16 91:20

**events** 75:6 85:7 91:22 99:24 (4)

**eventually** 39:12,15 62:23 88:6 (4)

**ever** 6:15 11:20 26:24 45:12 74:6,10 77:7,10,14 78:4 109:8 (11)

**every** 6:23 9:19 13:14 18:8 19:7 26:2 28:15 30:20 85:23 86:25 88:1 90:2 104:20 106:7 109:10 (15)

**everybody** 39:18 108:23

**everyone** 8:5 89:21 94:7

**everything** 12:10 13:21 61:24 67:21 70:5 89:12 102:25 105:14 (8)

**evidence** 86:12 104:10

**exact** 47:25

**exactly** 19:17 82:22

**examination** 3:8 6:4

**examined** 6:3

**example** 18:3 63:20 64:15 94:2 100:9 118:4 (6)

**except** 12:10 37:9 71:23 109:7 (4)

**exception** 16:4

**exchange**

4:7,4,10,8,16,10,12,22,14 5:4,16,7 78:13 107:17 (14)

**executive** 73:21 74:16

**exhausted** 15:1

**exhibit**
4:1,4,7,10,12,13,16,19,22 5:1,4,7,10 8:20 13:2,4 19:20,22 20:1,10 27:20 28:24,25 33:9,15,16 36:3,4,23 40:24 44:15 46:1,1,3,5 49:20,21 50:4,19 51:16,25 52:3,6,13,13,14,15 53:23,24 55:23 56:2,4 58:1,2,3,19 59:25 67:22 68:12,13,15 73:3,5,18 75:24 76:6 78:9,10 79:5,7 80:11,13 83:8,9 85:17,18 86:24,24 88:11,12,13 89:6 92:15 105:9 106:21 120:1 (86)

**exhibits** 8:11,16 102:13 103:14 (4)

**exigencies** 117:7,7

**exists** 108:21,22

**expect** 6:25 70:16

**expectation** 97:18

**expectations** 97:15

**expected** 5:16 11:24

**experience** 28:7,12 63:24 64:16 (4)

**experiments** 42:21

**expertise** 97:7,10

**experts** 97:6

**expired** 57:4,5,6

**expires** 121:25 122:23

**explain** 65:15

**express** 109:11

**extended** 47:4

**extension** 4:6 45:13 46:8 112:8,9 (5)

**extent** 28:17 84:2 97:14 99:4 (4)

**extra** 15:19

**fact** 46:16 48:9 61:20

**faculty** 15:7,19 16:17,21,24,25,25 17:2 18:11 21:11 22:22,24 23:9 25:20,21,25 26:2,15 29:21 30:5,9 31:2,2,5,7 33:2 35:20 40:14,14 54:14,24 62:24 64:5 65:1,2,6,9,12,14 66:5,5,12,19,20 67:6 71:4,6 91:9 96:15 110:17 111:8,13 112:7,17,19 113:5,7,7,10 114:15 116:9 (61)

**faculty's** 31:4

**fair** 8:1,8 70:11 89:22 114:16 (5)

**fall** 19:8

**familiar** 32:11 58:18 99:8

**far** 61:18 82:22 100:2

**fault** 97:23

**favor** 83:19,20 96:23 100:4 118:6,16 (6)

**february** 39:11 41:4,9,15,18,18 43:2,19 44:11,19 46:20 48:5,11 (13)

**feedback** 30:3

**feel** 67:23 94:15

**feels** 21:16

**felt** 21:23 88:6 119:7

**female** 23:5,6

**few** 67:17 70:9 86:5

**field** 25:22 42:21 97:7 98:8 (4)

**figure** 42:22

**filed** 6:13

**fill** 68:22

**final** 9:14,18,21,22 15:9 24:17 31:21 34:6 86:16,20,25 87:19 92:22 109:2,7 111:5 121:18 (17)

**financial** 117:7

**find** 8:17 35:10 40:10 41:22 51:11 115:19 (6)

**finding** 23:4,7 96:11 100:16,18 118:6 119:10,13 (8)

**findings** 92:18 100:10 104:16

**finds** 94:23

**fine** 6:10 62:17 101:6 105:6 (4)

**finish** 7:9,10,24

**finished** 12:9 109:23

**firm** 2:7

**first** 1 6:18,25 10:9 13:16 19:4 20:20 22:9 25:3 27:10 29:9 35:10 36:8,11,20 37:6,21 41:4,8 48:2,7,13 49:23 54:18 58:23,25 60:12 76:9,11 79:12 80:17 81:19 88:16,22 89:6,13 90:11 92:16 98:17 110:4 111:10 (41)

**fit** 20:24

**fits** 70:6

**five** 11:8,13 12:19,20 79:2 87:11,20 (7)

**folder** 109:2

**folks** 39:18 44:16

**follow** 72:20

**followed** 23:19 35:21 71:8 98:15,16 104:3 (6)

**following** 34:8 84:17 95:8,11 122:3 (5)

**follows** 6:3

**followup** 4:14 32:24 85:10

**forcause** 99:22,22 114:10 118:6 119:5 (5)

**ford** 80:4,8

**foregoing** 121:5 122:2

**forest** 10:5,6 13:22,23,24 (5)

**forestry** 10:4 12:6 14:2

**forget** 68:14

**form** 13:17 79:14 121:8

**formatting** 106:25

**former** 63:6

**forth** 34:5 68:17 122:3

**forward** 39:11 54:20 111:25

**forwarded** 37:14

**found** 36:21 37:6 94:8 112:20 115:11 117:25 (6)

**four** 56:22 95:2 100:3 109:24,24 116:18 118:7,9 (8)

**friday** 73:8

**full** 6:6 11:6,14,15 12:11,15,21 17:24 18:3,4 22:3 45:13 46:17 63:7,21 64:1,3,15 65:17 76:12,15,17 81:22

100:17 121:5 (25)

**fully** 78:5

**further** 59:24 98:18 121:10,12,15 (5)

**general** 40:13 43:6,17 49:7 50:15 52:8,11 59:11 69:1,8,9,20 74:9 76:1 87:6 94:14 102:9,23 103:13 114:10 116:3 119:5 (22)

**generated** 9:15 89:11,13 107:25 (4)

**generous** 69:25

**george** 12:5

**get** 15:15 19:20,25 22:3 28:2 30:7 32:3 34:6 47:1 63:25 69:13 73:4 81:22 (13)

**gets** 16:23 111:1,1

**getting** 29:13 37:9 61:18 84:6 97:22 (5)

**gilliland** 54:3

**give** 9:1 10:1 30:23 47:25 70:16,25 77:11 99:7 109:22,23 (10)

**given** 6:15,17 69:15 73:23 81:14 121:12 122:3 (7)

**go** 6:21 7:24 8:11 9:2 17:19 19:19 25:24 31:15 34:18 36:10,10 37:18 38:19 39:1,6,17 44:4,21 49:25 54:1,20 55:17 58:14 59:23 62:8 67:25 75:9 79:18 81:13 84:13,14 85:16 88:17 89:2,5 94:16 100:13,14 104:7 105:10,25 106:14,22 108:23 112:8,10 (46)

**goal** 21:12 90:5

**goes** 111:7,10,24 112:6 (4)

**going** 7:7,17 8:11 10:1,8 11:18,25 13:9,13 15:8 28:21 39:17 42:1 45:9,10 47:21 48:10 51:8,12,25 52:5 54:9,20 61:1 67:11,16 69:6 70:8,15 72:16,20 75:23 78:8 80:11 85:16 86:7,24 98:19 100:20 104:25 105:11,21 109:23 (43)

**gone** 39:10 68:23

**good** 7:1,5 8:21 62:15 72:23 109:21 (6)

**google** 21:3,4

**got** 8:10 27:20 29:5 36:22 50:18 77:7 86:5 90:9,9 92:16 94:16 97:23 115:3,19 116:18 (15)

**governs** 116:2

**graduate** 10:20

**grafton** 2:3 4:13 6:12 24:1 62:11 67:13 115:9 (7)

**grafton@graftonbragglawco m** 2:5

**grala** 12 3:8 6:1,8,9 10:3 11:20 12:5 13:6 56:25 61:14 62:13 69:12 70:14 72:15 94:20 105:4 106:25 107:16 108:5 115:23 122:1,16,20 (24)

**granted** 111:21

**great** 12:22 16:16

**grebner** 14:7,10,12,12,14 (5)

**green** 79:19 80:3

**group** 5:10 33:20 89:22 90:2 107:17,18 (6)

**guess** 9:8 24:14 42:12 69:10,24 76:6 78:18 84:5 102:8 104:13 (10)

**guidance** 98:12

**guys** 28:1 48:9 67:16 69:16 98:17 105:16 (6)

**h1b** 31:4

**half** 9:3 19:1,6,11 20:9 44:23 (6)

**handbook** 64:5 112:17,21

**handy** 114:18

**hang** 47:10 102:7

**happen** 91:7

**happened** 91:5 100:17

**happy** 15:2

**has** 6:13,20 11:10 26:6,7,24 29:20 30:19 33:14 42:4,4,5 51:7 57:4,5,6 62:14 66:8,12 69:17 83:23 85:9 94:22 95:7 105:8 107:7 108:5 112:8 113:3,8 114:19 121:13 (32)

**haven't** 30:11,12 56:6 59:15 95:14 96:22 99:3 105:9,18 106:7 112:23 (11)

**having** 6:2 29:13 53:10 67:21 73:11 102:3 (6)

**he** 14:18 27:17,24 30:13 31:21 35:2,8 37:25 38:3,5,7,7,20,21,24,25 53:3,5,7 57:18,20 59:15,15,16,18,19 62:14 69:8 72:7 77:5,7,15 79:1 82:20,21,22 83:19,20,23,24 84:2,2 93:12 106:1 114:3 117:14 (46)

**he's** 31:22 34:12 97:23 98:19 (4)

**head** 14:6,9,14 16:18 78:20 97:12 98:3 105:18 111:15,15,18,19 113:2 (13)

**hear** 22:2 56:23 57:25 119:12 (4)

**heard** 30:20 63:11,11 104:17 (4)

**hearing** 9:2,9,19,23 13:7 22:24 23:12 25:8,9 26:5,5,12,15 28:15 30:5,18,20 32:11,12 36:1 38:5,7,20,23 39:10,16,19 40:15,23 41:4,8,24 42:4,8 43:7,8,9,24 44:2,10,22 45:4,23 46:5,8,18,20 47:5,16,21 48:5,10,17,19 49:2,4,13 50:3,5,18 51:3,7,8,12,12,13,19 52:9 53:10,14,18 54:14,20 57:15,19,21 61:21 62:2 66:13,13,15 70:20 71:6 72:24 73:8,13 74:14 75:12,17,21 76:6,13,16,24 77:18,21 81:4,5,8,15 85:1,23 87:3,8,9,12,12,25 89:1,9 90:2 95:17 99:16,23 102:7,8,12,16 103:16 104:4,17 105:17 106:9,18 109:5,10 117:18,21 119:15 (129)

**hearings** 48:23

**heated** 74:23

**held** 72:17 87:9

**help** 51:15 63:16 106:24

**helpful** 25:25 75:8

**helps** 46:11

**her** 67:17 70:16 100:24,25 101:5,11,13,17 102:5 108:1,13,19 111:20 (13)

**here** 7:17 10:22 24:20 29:9 34:4,21 36:11,22 37:19,21 38:17 44:8 52:8 53:8,9 55:20 56:16 58:10 59:5 66:20,24 68:1 76:10 78:17 79:13 81:1 83:12 86:7 90:5 92:15 95:6 100:3 106:23 107:4 108:16,20 115:25 116:22 (38)

**here's** 118:24

**hereby** 121:4 122:20

**hereinbefore** 122:3

**hey** 41:17 62:11

**hierarchy** 111:11

**higher** 7 18:2

**highlight** 86:8 116:21

**highlighted** 116:25

**him** 14:15 28:19 38:22 59:15 62:16 70:10 71:11 77:11 78:20 80:5 (10)

**hinds** 1

**his** 30:3,17 37:9,23 54:13 57:12 59:18,21 62:14 69:7 76:22 80:23 81:9 84:19,23 96:17 97:9 98:12 105:4 111:20 114:4 (21)

**history** 108:25

**hold** 69:25

**hope** 21:3

**hoping** 21:2,5

**host** 32:10

**how** 9:1 10:12 13:14,15 14:11 15:15,24 18:13 20:11 21:15 22:16,19 25:13,24 35:10 37:23 40:10 41:3,15 43:16 48:24 49:5 54:23 61:1 66:18,19 67:7 79:16,16 85:3 86:16 87:6,16 90:15,24 91:8 94:9 101:2 117:7 (39)

**howard** 29:3,4,7 30:15 31:19 32:8 81:20 82:19 83:2 (9)

**howard's** 78:23

**however** 18:2

**hr** 78:23

**hrm** 5:20 26:22,23 68:8

113:13 (5)

**hypothetical** 63:21 64:15

**i'd** 69:13

**i'll** 6:21 7:12 8:16,18,19 19:19,24 28:23 29:4 34:4 36:2,10,11 45:25 46:11 49:23,24,24 51:15 52:13 54:1 58:14,14,15 83:11 85:20 88:11,17 109:25 115:6 116:1 (31)

**i'm** 6:19 7:15 9:4 10:1 11:18,25 13:9,13,13 20:16,16 23:5 24:22 28:9,21 33:12,13,25 36:15 39:1,17 45:25 46:14 49:23 50:11 51:17,24 52:2,5 54:9,21 55:22 56:17 57:3 58:1 60:21 61:1,4,12 64:8 65:14 67:11 68:23 69:6,8,11,12 70:8 72:7,15,20 74:13 75:23 77:9 78:8 80:10,11 81:25 82:13 84:6 85:16 86:7,23 89:19 92:7,18 100:14 101:14,15 104:25 105:11,21 108:13 114:19,21 (75)

**i've** 7:22 8:10 22:13 27:20 30:22 86:4 94:16 115:18 (8)

**idea** 9:1 21:18 25:9

**identified** 56:22 63:13

**identify** 8:16 80:16

**ihl** 6:14 112:21,23,25 116:12 117:8,11 (7)

**impact** 87:17

**implemented** 106:18

**implied** 92:1

**important** 7:1,8 64:9,12 97:8,23 98:9 (7)

**impression** 69:18

**inappropriate** 90:24 93:13

**inbox** 107:15

**include** 45:23 56:18 117:24

**included** 87:25 93:14 102:22 103:1,3,25 (6)

**includes** 58:7,11 65:6 106:7 (4)

**including** 33:21 54:4 89:12

**incomplete** 97:24 98:2

**incorrect** 20:10

**indeed** 51:18

**independent** 21:20,24 45:2

**index** 3:4 4:1 5:1

**indicate** 66:2

**indicated** 30:9 35:18,22 39:9 55:1 101:6 121:7 (7)

**indicating** 35:13 53:5 77:5

**indiscernible** 31:17 66:19 86:3

**individual** 17:9 18:18 43:9,25 91:20 99:17,24 104:3,18 117:18,19 (11)

**individually** 95:14

**individuals** 6:14 24:21 116:7 118:14,15 (5)

**inefficiency** 113:17 114:2 117:15

**inform** 40:11

**information** 12:1,3 21:14 24:7 31:20 35:4 37:8 45:17 48:21,22 51:20 61:25 87:18 88:7 89:17 90:18 (16)

**informed** 35:8 46:21 88:8

**initiate** 75:17

**inperson** 26:7 49:4 50:3

**insinuates** 55:13

**instance** 48:16 93:7

**instances** 91:14

**institution** 31:13

**institutions** 7

**instruct** 70:10 72:16

**instruction** 65:18

**instructions** 92:24 93:12 94:5

**instructor** 65:17

**instructs** 62:1

**insubordinate** 93:11

**intend** 8:15

**intent** 22:5,12,19 23:22 24:18 25:2 35:7 41:11 48:3 60:2 61:6 62:4 98:21 (13)

**intentional** 93:6

**interaction** 28:18

**interactions** 28:6

**interest** 121:17

**interested** 15:17 24:9

**international** 40:3

**interpretation** 119:9

**interpreted** 94:9

**interrogatories** 4:13 11:22

**interrogatory** 13:2

**interrupting** 74:13 112:16

**into** 31:15 47:24 69:13 70:6 103:5,6 (6)

**invade** 70:18

**invariably** 13:13

**involve** 22:5

**involved** 16:18 20:17 22:4,6 24:14,18 41:23 43:5 61:24 63:2 110:16 113:11 (12)

**involving** 13:12 29:7

**iowa** 10:21

**is** 4:7 6:8,11,18 7:1,7,20,22,23,25 8:8,15,21 9:21 12:1,3,4,5,10,18 13:19 14:17 15:5,6,10,22,25 16:17,22 17:4,4,11,12,14,14,23 18:8,9 20:1,13 21:8,12,18,19 23:4 24:15,18,19 25:9,12 26:14,20 27:22 28:22 29:10,24 33:5,9,12 34:11 36:17 37:4,6,15,21,23 39:3,19 41:6,12 42:16 43:25 44:12 47:6,12 48:11 50:17 51:25 52:11,17 53:15,20 54:5,8,15,25 56:1 58:5,15,16 59:11,25 60:1,12 64:9,11,12 66:7,23 67:1 68:25 69:1,13,22,25 70:11,15 72:6,24 74:4,15 76:20 79:1 80:3 81:5,20 82:7 83:12 84:16 85:22 86:6,24 87:8,9 88:15,18,21 89:20,22 91:5 92:16,19,23 93:15,16,20 94:20 95:4,6,10,10 96:10 97:8,22,23 98:13,15 99:9,13,20 100:7 101:18 104:11,20 105:14 106:4,8,21 107:20,21 108:13 109:1,2,15 110:6,19,25 111:2,11,14 112:20 113:13,16,21 114:4,16,17 115:1 116:1,22,25 117:5,7 119:2 122:2 (185)

**isaac** 29:3

**isn't** 66:7

**issued** 87:5

**issues** 13:11

**items** 90:24 99:11

**its** 71:20

**itself** 77:19 100:7 101:22 103:4 (4)

**january** 18 52:8 60:3 61:7 62:1 121:20 (6)

**jason** 75:18

**jenna** 39:3,5

**jia** 22:15,17 24:15,21 26:1,2 27:15 29:17,18 61:10,21 (11)

**jia's** 61:15

**joan** 51:18 52:19 58:6 67:6 68:2,19 69:1 70:20,25 72:18,24 (11)

**joan's** 67:9 69:4

**job** 7:5 13:7 74:1

**join** 20:13

**joint** 28:13

**jolly** 68:22,25 72:19

**judge** 8:7

**judging** 64:20

**judicial** 1

**julia** 32:14

**july** 20:7

**jump** 7:6,9,11

**june** 38:4 47:6,7,7,8,11,12,17,19,22 48:25 49:3,6 51:4,4 54:15 75:12 78:15 79:19 83:13 84:18

86:11 87:4,5 88:18 89:6,13 90:13,22,25 91:3 (31)

**jury** 8:7

**just** 6:22,23 7:20 8:4,19,25 9:5 12:2,7,8 13:13 19:20,25 20:16 23:24 24:8 25:20 29:4,11 30:23 31:20 32:2,20 34:1,16,16,25 35:8 36:8,15,16 37:18 40:21 41:17 43:4,12,15,22 44:5,24 45:24 46:10,24 47:24 50:22 51:17,19 54:10,23 55:1,4,18 56:8,12 60:13,24 61:19 62:9,16 63:16 66:17 67:20 69:12 70:4 71:2 72:1,11 73:20 74:3,22 75:1,3 76:15 82:13 83:13 87:6 88:16 90:5 93:3,17 94:16 95:15,23 98:3,25 99:15 102:1,17 103:20,20,22 104:20 105:11 106:1,24 109:24 110:3 114:21 115:6,7 116:24 (101)

**k** 6:8

**keenum** 111:4

**keith** 75:18

**kelli** 100:20 101:4 102:4 107:1,25 108:7,8,11,16 118:19 (10)

**kelli's** 107:11 108:5

**kind** 21:5 29:4 84:5 95:16 (4)

**knew** 38:15 102:2

**know** 6:11 7:15,16,20 8:4,5,13 12:9 13:21 16:22 25:20 28:3 30:17 32:6 38:12,17,21 39:7,8 41:3,15 42:1 43:14 44:8,10 45:4 48:24 49:5 50:10 56:9 57:14 59:21 63:25 64:13 67:14 69:9,11,16,24 74:20,22 75:2 77:7 83:13,24 85:7 86:14,15 87:6 93:20,20 95:10 98:4,7,16,24 99:8 104:19,23 107:9,20 108:3,6,8,21 112:13 113:1 114:25 115:18 (69)

**knowledge** 43:11

**kundo** 57:1

**kundu** 33:6

**l** 12:5

**lack** 85:11

**landed** 93:10

**language** 119:5

**large** 38:8

**last** 14:11 19:9 24:25 57:6 87:21 91:2 (6)

**late** 12:13

**later** 45:6,10,10 75:9 80:8 84:6 88:17 108:1 121:7 (9)

**law** 2:7

**lawyer** 81:9

**lawyers** 42:10

**learn** 47:20 48:14

**learned** 14:25 34:12

**learning** 7 77:2

**least** 64:11

**leave** 32:21 34:13 35:3,9 (4)

**led** 7:18

**left** 106:15 107:4 108:4,7,9,10,23 (7)

**legal** 23:2 42:10 53:5

**less** 53:17

**let** 7:9,10,15,20 8:4,5 12:8 19:14,24 23:24 34:1,16,16 36:8 41:7 46:10 47:10 49:23,24 51:14 55:24 56:8

58:14,15 59:14 60:13 73:4 76:9 83:13 85:21 94:13 96:8 103:11 115:7 116:24 (35)

**let's** 16:9 22:2,8 49:19,19 63:22 73:3 76:20 77:18 84:13,14 94:14 106:20,22,22 111:7 115:13 (17)

**letter** 4:13 9:12,24 12:14 25:25 29:20 30:1,5,9,17,19,23,24 31:1,20,22,23,25 32:2,4,5 35:12 37:10 48:13 50:18 51:25 57:20 59:10 75:16,25 86:1,2,5 87:19,22,23 88:1,3 90:3,19 98:21 99:14 101:5,7,22 109:18,19 (47)

**letters** 82:5

**level** 15:12 16:6,7,8,12 18:2,5,6 22:6,7 63:4,12 64:2 111:24,25 118:11,22 (17)

**levels** 16:5

**li** 3 6:12 24:21 27:23 60:8,20 61:1 75:14 (8)

**like** 6:22 19:18 20:5 21:12,13,23 22:19 23:3,4 28:15 29:11,12 32:8,14 36:18,25 37:11 38:9 49:25 50:7 53:11 54:12,25 55:11 56:21 57:9 58:10,20 61:5,15 68:7 69:1,13,14,17 73:7 78:12,17 80:3 81:1 83:20 84:6,11 86:10 88:18 89:20 90:12 91:2 94:16 95:2 96:14 102:19 103:2,5 105:12 106:17 107:10 109:23 111:10 113:25 115:3 116:11 (62)

**likely** 107:13

**line** 37:19 60:12 122:4

**lines** 46:14

**link** 58:7

**list** 17:11 22:3 38:14 54:8 (4)

**listed** 12:1 59:10 99:1

**lists** 114:14

**litigation** 41:14 45:9

**little** 7:17 9:25 22:18 24:7 59:24 63:19 74:20 77:18 86:14,15 100:21 116:12 (12)

**live** 9:19 10:12

**lived** 10:14

**long** 9:3 10:1,12 20:11 88:15 (5)

**longer** 35:1 44:23 57:3 73:4 (4)

**look** 19:24 27:18,19,23 36:18 47:24 49:19,20 59:5 76:20 80:16 85:6 86:6 88:16 91:25 99:16,19 105:13 106:20 116:4,17 119:3 (22)

**looked** 9:7 44:15 48:9 55:4 75:24 91:18 99:3 (7)

**looking** 51:17 57:10 61:20 76:2 86:23 91:22 106:21 (7)

**looks** 19:18 20:5 29:11,12 32:8,14 36:18,25 37:11 50:7 53:11 54:12,25 56:21 57:9 58:10,19 61:5 68:7 73:7 78:12,17 80:3 81:1 83:20 84:6,11 86:10 88:18 89:20 90:12 91:2 95:2 96:14 106:16 107:10 108:6 111:19 115:3 116:11 (40)

**lose** 64:21

**loss** 64:18,23

**lot** 7:5 39:18 56:1 66:18 74:21 77:19 101:25 (7)

**loud** 12:8

**lucas** 51:18 52:20 53:12 62:6 68:2 71:24 72:2,18 73:13,16

74:6 101:12 (12)

**made** 11:10 32:9 45:12 47:1 50:4,19 67:5 77:1,3 104:14 106:12 107:20 112:25 (13)

**madison** 2:4

**mailbox** 56:12

**main** 2:8

**major** 87:24

**majority** 25:10,12,23 26:4 45:23 94:24 95:13 96:4,11 (9)

**make** 6:23 8:20 13:1 19:19 28:23 49:20 51:16,19 54:9 55:1 62:14 67:21 68:12 71:7 73:2,18 75:3 79:5 80:11 83:8 84:25 85:16 87:18 88:8 102:17 103:23 (26)

**makes** 13:21 15:9 31:24 111:5,10,17,20 112:3 (8)

**making** 33:12 75:10 102:16

**male** 23:5

**malfeasance** 113:17 114:1 117:15

**man** 72:23

**manner** 21:24

**many** 25:25 54:23 56:17 79:16,16 (5)

**margin** 102:19

**mark** 36:3

**marked** 8:12 13:4 19:22 20:1 28:25 33:15,16 36:4 46:3 49:21 52:3,15 53:22,24 56:4 58:3 68:15 73:5 75:24 78:9,10 79:7 80:13 83:9 85:18 88:13 105:8 120:1 (28)

**master's** 13:24,24

**material** 4:15

**materials** 58:8

**math** 20:8

**matter** 6:13 18:8 19:16 24:17 27:3 29:16,18 61:15 63:18 121:17 (10)

**matters** 25:3 26:6 27:8

**matthews** 2:7 8:25 24:1 62:11,13,18 67:11,19 69:6,22 70:12,22 71:21 72:7,15 84:1 105:6 114:23,25 115:5,9,11,14,16,20 119:24 (26)

**may** 16:4 17:21 25:21,22 38:14 39:10 46:6 47:10 50:2,21 51:15 52:11 53:8,9 55:7,15 56:10 58:21 59:6 60:14 61:14 65:19,22 66:3,4 68:2,19 71:5,5,6 73:7 97:16 103:17,17 111:22,22 112:4,4,8 121:25 (40)

**maybe** 16:9 20:12 25:19 46:11 97:20 116:12 (6)

**me** 7:9,10,20 8:4,5,23 9:1,25 10:2 11:17 12:9 18:18,19 19:14 22:14,18 23:24 29:24 30:23 33:11 34:1,16,16 36:8,10,12,12,19,19 40:11,25 41:7 44:12 46:10,11 47:10 50:3 51:14,19 53:4 55:16,18,24 56:8 59:14 60:13,17 62:20 63:16,19 65:15 69:4 73:4,21 75:25 76:9 80:15 81:9 82:16 83:13,15 84:9,22 88:4 91:8 94:13 96:8 100:25 101:11,13 102:4 103:11 104:15 105:1 106:9,10,24 107:11,18 108:6 109:22,23 114:6 115:7 116:24 118:18 121:6 122:3,21 (89)

**mean** 23:3 27:2 34:24,25 43:13 49:3 52:13 71:15 86:20 97:23 99:23 100:2 107:9,15 (14)

**means** 65:15 90:6 101:9

**meant** 21:4 83:24 84:3

**meet** 42:2,23 45:21,22 47:3 49:12 64:14 (7)

**meeting** 5:7 26:18 33:22 43:7,8,18 47:1 49:8 53:3 54:25 55:3 71:10 73:12 84:12 87:4 89:6,12 90:12,15,22 91:6 109:14,15 (23)

**meetings** 39:13,14 74:12 86:11 90:17 109:9,9,18 (8)

**melody** 56:25 118:20

**member** 9:19,23 17:12 20:17 26:11,12 28:15 30:20 33:2 37:25 38:3 42:18 59:9,9,17,18 62:20,22,23,24 63:1,4 68:25 85:24 86:25 88:1 90:2 91:10,12 109:10 112:19 116:10 (32)

**members** 18:18 21:10 26:15 30:5,9 35:22 37:15 38:10,12 42:15,23 43:1,9 45:21,22,24 47:2 49:9,11,12 53:4,13 54:24 55:11 57:2 72:18 73:16 74:4,14 83:16 91:19 95:3 99:23 100:3 103:22 104:4,20,23 106:9,19 117:18,21 118:5,7 119:15 (45)

**members'** 49:15

**mention** 45:8

**mentioned** 32:20 36:20 81:7 83:23 84:7 (5)

**mentioning** 50:3

**merit** 21:17

**message** 43:16

**met** 6:11 66:23 87:15

**microsoft** 107:19

**mid** 19:18

**middle** 19:12

**might** 8:12 35:19,20 38:11 50:21 54:21 66:3,18 88:23,23 97:17,18 105:1 108:10 (14)

**mind** 74:17 85:12 86:15 104:11 105:3 118:21 (6)

**mine** 20:9

**minimum** 12:20

**minute** 8:17 10:9 11:17 12:2 33:11 44:5 70:16 (7)

**minutes** 109:24

**misconduct** 91:15 93:3 94:4 119:8 (4)

**miss** 26:18

**missed** 75:5 102:1

**missing** 25:19

**mississippi** 1,6,7,19,25 2:39110,39759 4:4 6:13,20 10:5,22,24 11:1,3 22:22,25 23:8,10 31:3,8,12 50:15 58:12 59:11 60:1 71:19 74:10 112:20 113:2,3,10 116:7 121:4 122:19,22 (36)

**misunderstood** 103:24

**monday** 73:9

**monetary** 121:17

**month** 51:7 53:11

**moore** 57:11,15,17 118:20 (4)

**more** 24:8 46:22 51:6 55:11 70:7 93:17 106:6 110:4 114:9 119:5 (10)

**morrison** 32:14

**most** 18:12 26:9 42:22 47:2 49:11 106:17 (6)

**move** 10:15,18 36:12 52:9 (4)

**moved** 10:19 57:25

**moving** 24:22 116:22

**ms** 8:25 24:1 27:10 51:18 52:20 53:12 62:6,11,13,18 67:11,19 69:6,22 70:12,22 71:21,24 72:2,7,15 73:13,16 74:6 84:1 101:4,12 102:4 105:6 107:25 108:11,16 114:23,25 115:5,9,11,14,16,20 119:24 (41)

**msu** 4:256858,9,257955,15,25 8013,21,24 5:258552,6,258655,258504 29:11 59:25 76:22 (14)

**much** 6:22

**mullen** 71:21 78:13,17,21 79:15,20 81:22 82:7,9,12,16 83:1,3 (13)

**mullen's** 79:10

**must** 67:2

**my** 6:8,11 7:9,11,12 8:15 9:3 10:20 11:18 13:9 14:6,9 15:10,19 17:10 21:7 31:18 42:12 44:21 46:7 47:24 54:7 55:17 56:12 57:4 59:1,22 60:16 63:8 68:19 69:18 80:19 85:22 90:5,7,8 97:20,22 100:15 104:22 106:16 108:6 109:24 117:5 118:24,24 119:6 121:8,9,19,25 122:23 (52)

**myself** 9:5 13:17 56:25 85:1 118:19 (5)

**nagel** 39:20,21,22,22 (4)

**name** 6:6,8,11 14:11 15:25 22:13 37:23 (7)

**names** 17:3

**near** 58:20

**necessarily** 35:2 63:25 65:24 66:2 76:8 89:24 (6)

**necessary** 43:23

**need** 7:19 12:8 29:25 47:24 48:1 61:10 64:13 98:18 (8)

**needed** 4:53 31:20 32:3 61:25 82:17,22 88:8 90:20 102:18 106:16 (10)

**needs** 8:17

**never** 6:17 45:16 50:17 96:10 (4)

**next** 7:11 22:7 36:12 37:12 42:12 47:5 49:25 52:10 84:8,13,14 90:12 104:1 111:25 (14)

**no** 5,25 6:17 7:2 16:20 18:17 20:19 28:4 31:16,18 32:2,2 35:8 42:18 44:20 45:3 47:3 49:7 55:14 57:3 64:25 66:16 71:23,25 73:17 74:8,11,13,25 75:15,19,22 76:10,20,20 77:12,17 82:9 83:23 85:9,13 90:1,6,16,23 91:13 93:4 96:7,22 98:5 99:12,15 100:14 102:21 104:12 105:22 107:16 109:1 110:10 119:19 121:17,1526 (62)

**nods** 7:2 105:18

**nominate** 16:25

**nominations** 16:24 17:2

**none** 35:22 95:4 100:5

**nontenure** 65:8 113:6

**nontenuretrack** 111:8

**normal** 7:5

**notarization** 122:17

**notary** 121:3 122:18,25

**note** 95:8,12 99:11 100:10 101:21 (5)

**noted** 16

**notes** 102:16,19,22 103:18,20 104:9,14,15,18,24 109:24 (11)

**nothing** 72:10 103:24

**notice** 22:19,21 23:22 24:3,18 35:7,11,14 37:1,7,9 48:3 60:2 61:6 62:3 92:17 (16)

**notification** 12:14 16:21 48:15 106:13 107:21 (5)

**notifications** 106:11,17

**notified** 36:21 47:23 48:2

**notify** 31:19 61:10,16,22 (4)

**noting** 103:21

**november** 115:4

**now** 8:11 11:4,16 17:18 33:13 46:9 52:12 55:22 57:5 60:16 62:5,15 69:12 88:16 105:22 115:8,15,23 (18)

**number** 4:2 5:2 26:20 47:25 59:25 115:12 (6)

**numbered** 29:10

**numbering** 33:12

**numbers** 116:18

**oath** 121:11,12

**object** 67:11 69:6 81:10

**objection** 84:1

**objective** 80:4

**obligations** 66:11

**obtain** 30:17

**obvious** 7:8

**obviously** 100:2

**occurred** 95:16

**off** 12:23,25 41:1 44:4,6 62:8,10 94:16,18 105:10,24,25 106:2 110:1 113:1 115:21 (16)

**offered** 10:22 31:2

**office** 43:6,17 49:8 54:3 69:1 112:7,11 (7)

**official** 6:15 13:20 15:25

**officials** 75:3

**oftentimes** 74:1

**oh** 36:10 60:24 72:4 116:24 (4)

**old** 31:9

**once** 38:15 55:11

**one** 11:17 12:23 16:5,6,7,23 17:8,20 19:6 21:13 22:6,6,8,9,12 26:11 34:21 36:8 38:10,18 39:9 41:18 46:21 54:23 67:5 70:21 79:10 82:7 83:12,12 84:14 86:5,6 87:4 91:2,17,17 92:16,19 93:7,25 97:3,17 98:23 99:1 102:1 104:20 106:8 109:8,9 110:4 113:15 114:8 115:1 117:17 (55)

**onedrive** 76:22

**oneonone** 71:11

**ones** 113:23

**ongoing** 41:14 45:9

**online** 73:12 87:4 89:6 91:9 101:21 106:12 109:18 (7)

**only** 7:22 18:3 26:14 57:7 63:11 65:2,7,9,11 74:13 75:15 81:2 95:17 96:13 98:23 99:21 109:1 110:16 113:8 114:2 118:5 (21)

**opinion** 25:14 28:20 64:4 109:12 111:20 119:6 (6)

**opinions** 99:15

**opportunity** 88:2 104:5 109:11

**opposing** 46:7

**order** 32:3 41:23 64:14

**organizational** 20:25

**organized** 115:19

**other** 16:25 25:22 28:6 30:5 37:8 38:18 46:15 53:3,12 54:22 68:18 71:12 72:17 74:9 88:3 96:1,2 100:9 103:22 104:23 106:9,11,18 113:12,23 (25)

**others** 29:5 32:10 58:6 117:22 (4)

**otherwise** 93:13 121:18

**our** 33:12 52:9 62:2 83:24 85:9 87:16 88:9 104:16,18 119:9 (10)

**out** 12:8 35:10 36:21 37:6 40:10 42:22 53:17 61:24 68:22 74:17 (10)

**outcome** 121:18

**outlined** 87:24

**outside** 42:9 44:25 73:16

**over** 6:21 9:3 11:9 25:1,24 40:4 53:11 69:17 83:1 101:23 104:7,9 116:24 (13)

**overall** 9:1

**own** 71:20 80:23 84:23 104:24 111:20 (5)

**oxford** 92:4

**p&t** 16:3,5,10,13,19 17:12 18:9,10 20:2,13,24 21:7,10,18,22 23:19 25:4,7,8,10,15 33:3 34:8 36:21 37:15,25 38:3,8 39:23 45:13 46:17,23 49:11,14 50:14 51:11 52:19 53:13 54:4,18 56:23 57:3,8,11,16,18,22 58:6 62:21 63:4,12 65:3,5 76:1,12,15 77:10 87:1 110:7,23 113:8 (61)

**packet** 111:14,15,24 112:1,6 (5)

**page** 3:2,1,2 4:2 5:2 6:24 29:10 32:17 34:7 36:9 49:23 59:24,24 79:12 80:17 84:13 86:7,23 88:16 92:19 94:20 106:23,25 122:4 (24)

**pages** 58:11 102:21 103:9,10,11,12 105:12 106:6 121:5 122:2 (10)

**panel** 9:19,23 22:24 25:8,9 26:5,6,12,15 28:15 30:5,18,20 36:1 38:7,20,23 39:16 40:15 43:9,24 44:2 45:23 46:18,23 57:19,22 66:13,20 67:6 69:5,20 70:20,25 71:6 72:1,24 73:13,16,22,25 74:1,3,4,14 77:21 78:4,25 81:2,5,8,15,18 82:20 83:16 85:1,24 86:10,11 87:9,12,25 88:1 90:2 91:19,23 93:10,18,21 94:1 95:2,21,25 96:10,14,15,21 97:6 99:16,23 100:3,11 103:22 104:4,5,17,20 106:9,19 109:6,10 113:25 117:18,21 119:15 (95)

**paper** 60:1

**paragraph** 11:25 116:18 117:4

**part** 31:18 36:7,17 38:8 56:22 57:22 69:7 72:6 79:24 103:2 106:16 (11)

**participate** 9:20 17:25 26:3 39:13,14,16 40:22 43:22 49:12 54:24 55:12 57:19 59:19 65:13 76:12,16,17,18 (18)

**participated** 20:21 25:4 26:12,15 57:21 101:5 (6)

**participates** 63:17

**participation** 4:8 28:4,8,13 29:21 (5)

**particular** 63:18 94:23 102:3

**particularly** 74:17

**parties** 41:21,23 42:8,14,24 61:16,22 67:7 77:22 85:15 103:16 (11)

**party** 29:3 71:22 121:16

**party's** 58:8

**past** 26:6

**pdf** 59:24

**pdfs** 9:23

**pendency** 9:8

**people** 15:25 32:10 37:19 52:18 55:1 56:22 90:11 97:9 (8)

**perceive** 28:19

**performance** 63:7 96:18 98:11

**perhaps** 30:13 55:1 77:4 79:14 105:21 (5)

**period** 11:9 41:12 47:4 48:20 (4)

**person** 7:7 22:13 37:21 94:1 110:8 (5)

**personal** 26:10 43:11 89:25 90:7 (4)

**personally** 26:25 96:23 99:11,14 100:21 122:20 (6)

**personnel** 113:12

**phd** 10:20 13:22

**phrased** 43:16

**piece** 87:21 104:10

**place** 18 23:12 42:4,8 45:10 47:21 51:9,13 53:15 81:23 98:18 121:7 122:3 (13)

**placed** 121:10

**places** 100:9

**plaintiff** 3 2:5

**plan** 68:20

**planning** 44:9,10,19

**please** 6:6 8:4 12:24 46:12 76:15 (5)

**plus** 81:4

**pm** 56:11 68:5 120:2

**pocket** 103:7,8

**point** 20:16 30:8 34:12 38:25 45:8 50:22 52:19 54:12,21 56:19 59:4 67:5 77:25 92:23 112:6 114:20 115:2 (17)

**points** 87:24 95:8,11,12,15 99:10 100:10 102:17 119:9 (9)

**poland** 10:11,12,13,14 (4)

**policies** 26:22 112:21,23

**policiesmsstateedu** 115:8

**policy** 5:20 13:25 25:7,11 26:14,20,21,23 68:8 71:3,8 97:25 113:1,2,3,4,13,15 114:14 116:2,5 (21)

**policy's** 116:11

**portal** 9:12,17

**position** 4:19 10:22 11:16 12:21 16:22 17:7 31:2 58:11,24 59:6 60:1 64:20 102:13 103:13 (14)

**positions** 17:1

**possible** 7:19 25:6 47:2 49:18 56:6 101:18,25 (7)

**potential** 48:3 59:9

**potentially** 48:10 80:5

**practical** 25:13

**preferring** 84:23

**preliminary** 6:21

**prepare** 8:23

**preschedules** 25:21

**present** 84:19

**presentation** 26:16

**presented** 79:1 81:11

**presided** 25:1

**president** 87:10 111:4

**presumably** 71:21

**pretty** 6:22

**prevented** 38:22

**private** 72:16

**privilege** 67:16 69:17,19,22 70:6,10,15,18 (8)

**privileged** 67:12 71:15

**probably** 20:15 24:16 25:19 38:25 44:21 47:23 49:17 58:25

83:23 85:9 (10)

**procedures** 71:3 72:11 73:14

**proceed** 32:4

**proceedings** 7:18 71:1,12 121:6 (4)

**process** 86:16 105:16

**processes** 32:1 110:12

**produce** 12:14

**produced** 67:18 101:25 114:20

**product** 86:16,20

**production** 115:12,18

**productivity** 97:4

**professional** 28:19

**professionaltrack** 29:21 66:5

**professor** 10:6 11:6,8,11,14,16 12:6,11,15,21 17:24 18:3 63:7,21,23 64:1,1,3,15 65:16,17,19,21,22,23 66:22 67:3 119:3 (28)

**professors** 17:24,25 18:4 116:14 (4)

**program** 40:2

**programs** 117:11

**promoted** 11:6,8,11,14,15 12:15 64:14 110:9,20 111:1 (10)

**promotion** 15:15,21,23 16:1,11 17:22 22:6,9 29:22 60:5,7,19,25 63:1,3,20,22 64:6,11,25 97:14 110:5,7,11,14,16,17,22 111:6,13,16,21 112:1 (33)

**promotions** 110:6 111:8

**prong** 119:3,5

**pronounce** 37:23

**pronunciation** 39:4

**proof** 102:3

**proposal** 81:24 82:2

**proposed** 109:8

**provide** 9:20 12:13 15:7,18 21:6,15 28:16 30:1 51:20 64:4 82:20 83:4,6 84:23 87:9 88:2 (16)

**provided** 21:14 22:23 30:3 32:7 45:1 48:21 77:23 79:10 81:3,8 82:7,10,12 85:15 87:20 88:9 90:18 103:12,21 109:3 (20)

**provides** 30:18 112:2

**providing** 21:20 70:2 82:22

**provost** 14:23 21:8,12,15,19 30:2,19 32:5 87:10 88:10 110:25 111:3 (12)

**provost's** 112:7,11

**public** 121:3 122:18,25

**pull** 8:17 51:15 73:2 78:8 88:11 104:25 (6)

**pulled** 27:20 70:4 115:7

**pulling** 52:13 58:1 114:21

**punchholed** 103:9,14,17

**put** 90:9 103:5,6

**putting** 89:25

**q&a** 82:20

**question** 7:9,11,23,23,25

8:3,8 10:9 13:10,16 21:5 24:9 28:10 44:12 48:6 61:17 70:7 97:21 114:16 117:5 118:14,24,25 (23)

**question's** 44:13

**questioned** 73:24

**questioning** 74:2

**questions** 8:19 13:8 70:9 71:2 77:20 82:21 86:5,6 99:24 102:18 103:25 104:2,3 110:4 (14)

**quickly** 19:13 25:24 27:19 34:1 47:15 58:15 (6)

**quite** 8:13,13 67:17

**race** 13:12,14

**raise** 99:18

**raised** 99:25 117:19

**rank** 18:5,11,11 63:19 65:1,6, 11,12,14,15,16,17,20,22,23,24 66:3 (17)

**ranked** 65:18,18

**rankings** 96:17 99:4

**ranks** 97:12

**rather** 7:2

**reached** 94:22 95:7

**read** 12:2 29:12 34:1,16 36:8,13 46:10,10 49:24 84:14 106:7 117:3 121:14 122:2 (14)

**reading** 89:19 120:3

**reads** 8:5 31:15

**ready** 30:8 36:12

**really** 24:8 28:20 64:17,19 72:9 82:24 83:11 89:20 97:22

99:3,21 116:11 (12)

**reason** 7:20 31:18 40:7 96:1 113:20 114:17 (6)

**reasons** 46:21 94:23 97:3 98:22,23 99:1 113:16 (7)

**recall** 11:23 17:8 33:1 37:8 39:11 43:4,21 45:15,24 46:13,15,20 50:1,20 52:22 53:1 59:2 67:9 73:11,23 76:2,4,7 77:1,2 78:4,25 81:18 82:19,23,24 83:1 85:3 90:15,16 103:18 118:15 (37)

**receive** 11:12 15:1 18:13 60:14 61:25 62:3 (6)

**received** 9:11 10:22 11:5 12:14 18:15,16 19:4 30:11,12 35:7,14 45:16 48:15 50:18,21 54:19 58:24 61:2 75:15 78:5,25 79:3,15 87:21 105:19 106:13 (26)

**receiving** 37:9 50:25 52:22 53:1 59:2 76:7 (6)

**recipient** 59:10

**recipients** 54:8

**recognize** 29:2 36:6 46:9 58:8 78:12 79:9 83:14 85:20 (8)

**recognized** 95:15

**recollection** 12:18 44:17 45:2 50:24 (4)

**recommend** 113:25

**recommendation** 4:2 5:18 9:15 21:15 22:23 23:18 26:25 27:7,9 30:1,19 32:9 57:20 77:14,15 86:21,25 87:10,18 88:9 95:3 96:24,25 97:2 98:6,9,13,15 100:4 111:4,18,20,23 112:3,5 119:2 (36)

**recommendations** 20:2

**recommended** 96:15 98:17 114:3

**reconfirmation** 54:25

**record** 6:7 12:23,25 13:4 19:22 28:25 33:16 36:4 41:1 44:4,6,9 46:3 49:21 52:15 53:24 56:4 58:3 62:8,10 68:15 69:13 73:5 78:10 79:7 80:13 83:9 85:18 88:13 94:16,18 105:11,24,24,25 106:2 110:1 115:21 120:1 (39)

**records** 59:1,22

**recruitment** 113:4

**reduced** 121:7

**reduction** 117:11

**reelected** 19:6

**references** 61:20

**referred** 16:2 41:13 42:5 62:22 104:23 (5)

**referring** 37:1 64:23

**refused** 40:21

**regarding** 4:10 9:13 29:20 30:15 43:10,17 44:22 46:16 51:19 53:2 55:19 56:13 63:6 66:14 71:2 73:1,13 79:15 81:23 82:1,15 90:24 106:10,18 111:5 116:6 (26)

**rejecting** 119:1

**related** 17:23 22:21 63:2 70:1,2 90:17 113:9,11 121:16 (9)

**relates** 110:5

**relation** 70:7

**relevance** 85:11,11 87:16

**relevant** 113:2,3

**remember** 27:16 43:16 44:24 45:19 46:24 50:2,23 90:21 91:1 92:2,3 101:20 115:1 (13)

**remind** 9:5 84:21

**remote** 26:7,11 109:9

**remotely** 6:2 26:12

**remove** 62:1

**removed** 109:6

**repeat** 28:9 48:6 60:22 61:17 119:12 (5)

**repetitive** 56:18

**rephrase** 104:12

**replace** 33:3

**replied** 107:1,7 108:2,5,12,12 (6)

**replies** 108:24

**report** 14:4,6,9,14 21:11 (5)

**reported** 75:1

**reporter** 24 12:8 28:9 33:10 52:2 60:21 81:25 92:7 105:23 121:1,3 (11)

**reporting** 13:18

**reports** 14:18,22 17:16

**represent** 6:12 58:5 90:4 115:6 (4)

**representation** 33:24 58:16

**representative** 25:14,15

**represented** 61:9 78:21

**representing** 79:1

**request** 4:6,18 5:4 46:7 67:6 71:8 76:10,11,21 77:1,3,22

78:1,18 79:2 80:23 81:14,15 (18)

**requested** 45:12 53:13 81:4,19,21 83:5 87:13,21 101:4,16 (10)

**requesting** 68:8 83:20

**requests** 76:11

**required** 12:16,20 26:8 41:12 87:9 98:24 (6)

**requirement** 63:17 64:10,12

**requires** 13:18

**rescheduled** 45:5 46:20

**research** 96:17 97:5,16 98:11,25 99:5 (6)

**resource** 10:7

**resources** 10:5 13:22,24 14:19 (4)

**respectful** 13:9

**respond** 7:1

**responded** 32:15 88:5 101:18

**response** 30:11,13 67:10 80:21,22,22,23 (7)

**responses** 13:2

**responsibility** 83:2

**restrictions** 50:13

**results** 38:15

**returned** 102:23,25

**reveals** 100:5

**review** 15:1 18:7,16 30:6,6 35:21 49:25 64:3 79:25 81:2 98:7,8,9,19 104:6 (15)

**reviewed** 29:25 98:3,4 112:23 (4)

**reviewing** 34:19 35:17 36:13 46:13 50:1 52:7,23 69:18 77:2 80:18 101:5 117:3 (12)

**reviews** 78:1,5 79:2,16 80:5,9 97:24 111:17 112:2 (9)

**revised** 90:19

**right** 8:11 24:13,22,22 26:6 28:21 33:12 42:12 47:10 49:4,5,19 55:22,23 56:2,11 59:23 60:16 62:5 67:3 69:11,25 70:1 71:17,17 73:4 76:7 77:25 79:13 81:20 83:12 86:4 88:16 90:8 94:20 100:3,7 104:25 106:4,23 110:23 111:2 115:8 116:1,10,25 117:2,5,23 119:22 121:13 (51)

**rings** 103:5

**rise** 118:22

**risen** 118:11

**robert** 12 3:8 6:1,8 12:5 56:25 57:11,17 79:19 80:3 106:25 107:17 108:5 118:20 122:1,16,20 (17)

**role** 68:21,21 69:4,8,24 70:5 71:3 110:4,8 113:9 (10)

**rotate** 38:12

**rotations** 38:11

**roughly** 20:9 48:16

**rule** 7:16

**running** 17:7,9 18:18

**ruo** 22:15,17 24:21 27:15 29:17 (5)

**rush** 4:6 19:15 20:2,22 22:10 25:18 27:11,13,21,22 (10)

**sabbatical** 26:3 30:13 38:25 39:5,7 40:17 (6)

**sabbaticals** 25:22

**said** 16:16 24:23 34:21,21 42:13 51:22 60:22,23,24 66:6 75:1,4,7 76:3,7 78:17 81:2 85:25 93:4,21 104:11,13 106:6 (23)

**same** 6:24 28:2 75:4 103:23 122:2 (5)

**santanu** 33:6 57:1

**satisfaction** 109:5

**saturday** 36:23 88:18

**save** 12:7,7 33:13

**saw** 101:16

**say** 7:7 14:8 15:22 17:23 47:13,14 60:10 63:22 65:4 71:25 73:19,19 80:6 81:13 84:16 98:2 101:24 108:8 117:7 118:23 (20)

**saying** 61:8,15 80:4

**says** 25:12 29:19 51:3 55:10,10 68:19 80:6 86:10 94:21 95:7 100:3 106:25 107:1,4,14,17,18,25 108:3 (19)

**scenario** 63:22 64:16

**schedule** 47:1 48:4

**scheduled** 41:5,8 44:11 47:5 48:5,7 51:3 54:15 76:24 (9)

**schedules** 43:2 76:19

**scheduling** 33:22 43:18 48:18 70:1 (4)

**school** 98:12

**science** 13:25

**screen** 8:16 11:18 116:23

**scroll** 11:25 19:24 29:4 34:4 52:23 58:10 76:3 84:9 85:21 116:1 (10)

**scrolling** 36:15

**seal** 121:19

**search** 61:2

**seat** 16:23

**second** 12:24 19:25 22:7,12 27:15 29:12,15,19 60:13 62:9 92:19 94:17 99:7 106:1 (14)

**sections** 116:21

**secure** 31:4

**see** 11:18 12:3 23:24 29:7 33:22 34:9 42:15 44:21 46:11 50:8,16 51:2,5,18 52:8,21 53:9 54:2,6 55:18 56:13 60:3,6 61:2 62:5,6 68:1,23,24 73:3 76:24 78:23,24 79:20,21,22,24 83:15 90:19 101:15,17 106:14,22 107:2,3,16 108:16,23 115:7,23,24 (51)

**seems** 12:13 20:4 58:18 69:17 108:4 114:6 (6)

**seen** 11:19,20 22:13 30:22 46:6 56:7,20 59:15 80:1 (9)

**select** 25:8,9 41:20 42:1,18 (5)

**selected** 16:17 41:3,16,21 43:3,19 48:25 49:10,16 (9)

**selecting** 16:19

**selfnominations** 17:1

**semester** 19:8 23:14

**senate** 16:21

**send** 9:8 40:13 105:2,4 107:24 (5)

**sending** 38:15

**sends** 111:3,15 112:1

**sense** 31:24

**sensitive** 4:18 13:8

**sent** 9:10 30:10 35:12 36:19 49:8,17 51:18 53:12,19 54:2 55:18 56:10 58:20 62:6 68:2 75:16 83:15,17 84:22 86:2 88:4 89:1 (22)

**sentence** 29:19 86:7 92:22 100:5,7 (5)

**separate** 102:21 103:6,8 110:12 (4)

**september** 23:15 34:8

**serve** 15:20 18:17 35:23 38:20,22 40:14 44:1 57:7 62:25 63:3 65:2,7 68:20 (13)

**served** 35:19 62:20 63:5

**service** 15:19 62:14

**serving** 15:18 26:4 35:20,24 112:13 (5)

**session** 74:16

**sessions** 73:21

**set** 11:21 53:11 93:25 118:25 122:3 (5)

**several** 8:10 15:24 16:5 30:12 38:12 49:17 53:3 54:23 87:15 98:22 104:23 (11)

**shakes** 7:2

**share** 8:15 11:18 28:21 45:25 55:24 75:23 80:12 (7)

**sharing** 33:14 46:1

**shaw** 15:5 23:24 24:13 35:12,18 36:21 37:1 48:8

54:4,12 75:14,16 85:23 87:19 (14)

**shaw's** 48:13 54:3

**she** 8:17,18 23:7 32:20 39:6,6,9,10,12,15,22,25 40:2,4,5,11 51:18 69:14 100:25 101:2,6,6,8,8,9,10,14,16,18,18,22 108:20 (32)

**sheet** 3:122 122:1

**short** 48:20 73:9

**shortcircuit** 67:21

**shorthand** 24 121:2

**should** 41:17 64:21 81:2 87:25 93:2 97:5 99:16,19 111:21 (9)

**shouldn't** 64:20

**show** 36:2 53:22 84:9 92:14 (4)

**side** 71:12

**sides** 73:25

**sign** 30:8,10 31:22 32:23 57:20 80:5 100:21,25 101:2,8,9,10,11,13,15 102:5 121:14 (17)

**signature** 4:7 30:17 78:23 98:5 121:19,23 (6)

**signatures** 85:21,23

**signed** 9:23 23:22 24:4 25:25 30:20 78:1,5,18,20,22 79:4,17 80:9 86:25 97:25 100:24 (16)

**significant** 74:18 85:14

**signing** 120:3

**similar** 30:14 53:2 67:7 97:14 (4)

**similarly** 71:19

**simply** 45:19 46:24 47:3 50:22 70:1 (5)

**since** 10:24 28:1 42:5 93:9 98:15 (5)

**sir** 60:23 80:18

**sit** 38:17 39:10 44:8 55:20 56:16 (5)

**situation** 42:7,14,25 45:20 80:7 81:14 117:6 (7)

**situations** 30:4

**six** 90:11

**sixpage** 116:2

**skill** 121:9

**smaller** 54:9

**so** 6:19,25 8:15 9:3,7,10,18,21 10:8 11:2,9,14,15,23,25 12:5,13 13:9,12,15,22 14:1 15:6,12,22,24 16:5,9,16,20 17:6 18:4,10,15,21 19:11,14 20:8,20,24 21:10 22:4,8 23:14 24:9,13,20,23,25 25:6,6,11,23 26:3,9,17 27:17,20,22,24 28:1,15,22 29:9,18,25 30:2,22 31:5,14,24 32:8 33:8,10 34:20 35:23 36:20 37:21,25 38:5,7,10,14,17 39:15 40:5,9,20 41:7,7,10,15,19,21,25 42:12,12,13,21 43:6,8,24 44:15,23,25 45:13,16 46:6,19,21 47:5,11,13,14,24 48:2,7,18,24 49:7 50:4,7,17,24 51:6 52:12 53:7,17 54:12 55:10,25 56:2,12,19 58:19 59:19 61:1,7 62:19 63:20,24 64:2,16,22,22,24 65:5,16,24 66:11,15,20 67:23 69:4 70:5,15,19 71:8,10,19,25 73:2,17,22 74:21 75:5,8,9 76:9 77:20 79:2,18 80:20 82:7 84:6,16,21,25 85:25 86:4,14

87:3,8,14 88:11,15 89:5,5,19,24 90:5,12 91:9,14 92:16,18 93:6,9 94:2,10 96:4,10 97:11,17 98:6,8,13,21 100:2,15 101:25 102:6 103:10 104:5,8,13,16 106:4,6,24,25 107:4,16,17,20 108:3,16 109:2,17 110:6,10,11,19,19 111:7,13 112:10,19 113:3,10,13,15,24 114:6 116:1,1,5,9,10 117:5,6,17,24 118:5,9,13,21,23,24 119:6,8 (261)

**solemnly** 122:1

**solicited** 88:22

**some** 6:21 8:19 12:1 13:11,11 15:18 21:6 26:10 30:7 31:20 34:5 35:20 40:5,15 43:13 45:8 50:11 52:19 54:22 59:16 68:17,17 77:25 82:21 90:24 98:5 99:23 103:15 104:2 107:21 109:19 114:20 117:21,22 118:4 (35)

**somebody's** 90:9,9

**someone** 14:14 15:22 17:7 26:17 54:13 62:6 63:17 64:21 66:8,10 110:6,19 (12)

**something** 21:3 30:14 46:14 67:1 96:20 114:20 (6)

**sometimes** 7:12 21:2 73:22 96:8 (4)

**sooner** 11:7 88:23

**sorry** 23:5 24:22 28:9 51:24 52:2 60:21 61:12 74:13 81:25 92:8 100:14 (11)

**sort** 6:20 7:6 13:21 15:1 21:20 31:25 34:4 36:15 61:24 69:13 83:1 89:21 104:9 105:15 106:24 108:24 111:11 (17)

**sounds** 109:21 113:25

**source** 99:21

**speak** 69:8 72:8 104:22

**specialization** 13:23

**specific** 17:3 18:23 32:6,6 42:2 43:5 90:21 (7)

**specifically** 25:12 43:15 76:23 83:3 96:22 97:15 101:4 114:9 119:4 (9)

**specifics** 74:21

**specify** 16:12 21:1 74:19

**speculate** 55:16

**speculation** 84:2

**speculative** 69:7

**spell** 14:11 21:3 22:16

**spend** 10:1

**sponsored** 31:11,12

**spot** 73:4

**spring** 48:16

**standard** 11:9 103:20 114:10

**standards** 66:8,9,22

**standpoint** 48:18

**starkville** 19

**start** 28:23 30:4 36:11 79:13 80:15 83:11 116:24 (7)

**started** 10:20 87:22

**starts** 19:7 33:20 84:11 86:8 115:14 (5)

**state** 6,7 6:6,14,20 10:6,21,23,24 11:1,3 22:23,25 23:8,10 31:3,8,12 50:15 58:12 59:11 71:20 74:10 112:21 113:2,10 116:7 121:3 122:19 (29)

**state's** 4:4 60:1

**stated** 94:2

**statement** 58:24 59:6 94:21 95:7 117:25 (5)

**statements** 58:11 102:13 103:13

**states** 10:15,19 113:4

**status** 4:4

**steps** 77:11

**sticks** 74:17

**still** 26:4 38:8,24 53:18 55:2 57:11 105:4 108:21 110:20 118:5 (10)

**stipulated** 64:5

**stipulates** 25:7

**stipulation** 26:14

**stop** 79:12

**stops** 15:12

**street** 2:8

**structural** 31:25

**structure** 20:25

**struggle** 7:12

**stuck** 29:6

**students** 40:4 93:14

**studies** 10:20,21

**stuff** 40:5

**submit** 80:23

**submitted** 18:6 111:14

**subsequently** 33:2 45:22 86:8

112:9 (4)

**such** 58:8 106:13

**sufficiently** 7:7

**suggest** 96:25 97:1

**suggestion** 84:18

**suite** 2:4

**summarize** 75:8

**summarized** 75:1

**summer** 40:2

**sunday** 90:14,14

**superceded** 115:2

**supervision** 121:8

**supervisors** 92:24 94:5

**supplement** 60:2 61:5

**supposed** 17:13

**sure** 6:19,23 7:15 9:4 20:16
33:12 38:18 39:1 46:14 51:19
54:11,21 55:1 60:18 61:4 64:8
65:14 67:19 69:8 70:12 71:7
72:7 73:20 75:3 82:13 84:11
102:17 103:23 108:13 114:19
(30)

**suspect** 37:24

**swear** 122:1

**switzer** 12:5

**sworn** 6:2

**t** 8:12

**table** 3:1 7:23

**take** 12:2 22:8 23:12 29:12
34:18 42:4,8 45:10 47:21
51:8,12 53:14 70:16 77:10

90:5 91:17 98:24 105:10 (18)

**takeaway** 90:8

**taken** 121:6

**takes** 63:25 106:1

**taking** 83:1

**talk** 16:10 22:18 73:21 77:18
100:20 111:7 112:18 113:24
(8)

**talked** 24:24 63:15,16

**talking** 16:13 24:20 51:6
67:12 69:12 108:4 (6)

**teach** 42:20

**teaching** 65:21,21,23 96:16
97:4,15 98:11,25 99:5 (9)

**teams** 5:10 9:11 87:23 88:22
106:11,17 107:18,19 108:22
109:14,14,18 (12)

**tech** 42:21

**technically** 81:2 98:23

**tell** 8:23 9:25 25:24 29:24
36:11 63:19 69:4 80:15 91:8
118:18 121:11 (11)

**ten** 11:16 41:12

**tenure** 11:12 15:16,21,23
16:1,11 17:22 60:6,8,20,25
63:1,3 64:12,19,19,21,24,25
65:8,9,10,25 66:3,7,9,10,12,16
97:14 110:5,6,7,11,15,16,17
111:1,6,14,17,21 112:2 113:6
(44)

**tenured** 66:22 67:2 112:19
116:9,11,14 (6)

**tenuretrack** 66:5 110:20

**term** 57:4,5,12 59:19,21 (5)

**terminate** 22:5,12 23:23
24:19 25:2 35:7 41:11 60:2
61:6 66:25 67:2 92:11 94:25
95:18,22 96:1 98:14 118:1
119:20 (19)

**terminated** 113:16,20
114:1,3,15 117:10,14 (7)

**terminating** 66:8,10,22

**termination** 5:12 24:4,14
35:11,14 37:2,7,9 41:11 54:14
64:7,24 66:14 91:12,22 94:23
97:3 98:22 112:19 113:4,5
116:3,6,19 118:16 119:1,2,7
(28)

**terms** 41:16 57:7 97:4

**testified** 6:3 29:16 75:21
104:14 119:17 (5)

**testifying** 106:22

**testimonies** 81:3 104:17

**testimony** 6:16 50:17 73:23
76:14 122:2 (5)

**than** 7:2 11:7 44:24 51:6
53:17 55:15 62:6 88:23 96:2
97:22 106:6 116:12 (12)

**thank** 8:10 9:25 13:19 14:13
24:11 47:20 51:2 52:12 63:10
96:14 (10)

**that'll** 58:1

**that's** 6:10 11:2,9 12:15 13:16
15:8 18:2 19:17 20:9 21:21
22:11,17 25:6,9,13,25 26:21
29:14 33:24 34:3,19 36:25
43:12 47:7,16,25 48:12
53:16,21 54:19 56:11 58:22
59:13 61:1,12 62:17 63:14
64:4,6 65:8,9 67:4,12,13
68:6,24 69:3 70:10,23 74:5
76:6 78:3,14,16 80:19 82:3
84:1,5,5 86:4,13,23 87:2
89:15,23 91:4,16 92:21
93:1,15 94:8,9 95:1,5,9 96:19

102:14 104:19 105:6 106:6,7 107:13 108:19,19 110:24,24 112:15,15,16,16 113:14 114:5,21 115:1 116:5 119:23 (96)

**their** 6:15 13:14,15 21:15 30:18 31:9,9 42:16 43:2 64:21 90:5 92:5 104:24 109:11 111:4 (15)

**them** 8:13,17 9:5 22:8 35:22 40:22 56:7 69:14 79:3,17 91:17 98:5 99:9 103:5,6 104:23 106:10 112:10 115:19 (19)

**there's** 16:5,6,7,21,24 17:20,22 29:5 34:5 45:18 50:11 56:1 67:17 79:18 100:16 110:10,11 113:5 (18)

**these** 11:20 24:2 30:4 36:16 39:18 41:18,18 56:7 80:5 95:11 99:8,10,10 102:8 109:9,9 (16)

**they're** 8:12 29:6 41:16 61:15 65:25 98:2 (6)

**thing** 6:25 7:22 34:21 86:6 105:10 (5)

**things** 6:22 68:18 70:1 77:8,16 (5)

**think** 7:16 11:19,23 12:17 14:25 16:2 17:8 20:8 24:10 25:11,19 26:1,11 27:17 29:5 30:7,22 33:10 38:24 39:6,9 40:2 42:7 44:25 50:4 56:1,6 57:24 61:18,19 62:13 66:6 67:5 70:4,19,21 73:17 76:3,5,6 80:1 81:21 82:9,12,25 85:5,13 92:13 94:15 97:20 101:3,9 105:1 109:22 112:20 116:22 118:13 119:16,22 (59)

**third** 11:21

**those** 13:1 16:25 17:1 22:5 25:20 36:18,18 46:14 56:17 65:2,7 66:11,19 71:13,15

72:4,10,13 74:6,12,16,23,25 77:6,8,16 79:3 87:14,15 88:4 90:7,17 95:14 96:18 97:5,8,11 98:7,23 99:2,17,19,24 100:16 102:19,21 103:8,10,14,20,22,25 104:1,9 106:17 108:1 109:4,11 110:11 113:24 114:14 116:14,21 118:9,14 119:9 (66)

**thought** 13:6 30:13 52:3 89:17 90:4 (5)

**three** 22:4 24:23 25:20 63:12 76:10 95:3 100:4 118:5,8 (9)

**through** 8:11,12 9:11,17 15:3 19:9 37:18 39:17 44:21 47:9,11 51:4 53:15 76:21 88:17 89:19 109:13 112:10 (18)

**throughout** 9:8 77:21

**thursday** 47:9,11,19 89:9 (4)

**time** 20 4:10 6:18 9:3 10:24 18:23,24 19:4 21:22 22:8 26:9,24 28:1 30:7 33:13 34:18 35:5 38:10 40:6 41:12 44:17 46:19 47:4 48:2,7,13,18,20,22 53:19 54:18 56:21 57:14,17 58:23,25 59:3,17 62:15 74:3 75:12 100:16 112:13 121:7 122:3 (45)

**timeline** 75:6 80:24 81:8,10,16,19,21 82:8,10,13,21,23 83:4,6,21 84:19,23 85:6,7,12,15 87:6 (22)

**times** 7:6 30:12 74:23 77:20 87:14,15 92:14 (7)

**tina** 54:3

**title** 60:19,25 61:4

**titled** 60:1

**today** 7:17 8:10,24 16:11 38:18 44:8 55:20 76:2 (8)

**todd** 59:14

**together** 28:2 29:6 86:17 90:10 91:22 (5)

**told** 84:2 101:18

**too** 8:17 10:1 12:13 25:24 109:20 (5)

**took** 30:7 81:23 88:8

**tools** 77:6

**top** 34:6 36:8 113:1

**touch** 29:13 32:3

**town** 68:22

**traffic** 92:20,22

**transcript** 8:6 121:6 122:2

**travel** 42:20

**tried** 69:24

**trip** 40:4

**trips** 25:22

**trouble** 35:24

**true** 18:8 64:6 66:7 96:10 104:19 121:5 122:2 (7)

**trustees** 7

**truth** 121:11

**try** 7:18 13:9 55:24 77:11 116:24 (5)

**trying** 67:20 89:20

**tuesday** 18 47:9,11,18 (4)

**twice** 73:19

**two** 19:1,11 20:9 22:4 24:20 25:3,19 57:7 94:2 99:1 106:7 110:10,12 113:24 119:9 (15)

**type** 40:15

**types** 22:1 94:3 106:8

**typewritten** 121:8

**typical** 28:4 42:14

**typically** 15:13 30:4 38:11 41:19 42:13 87:8 90:16 97:11 (8)

**ultimate** 110:25 112:24

**ultimately** 15:4 110:25

**unable** 39:25

**unanimous** 95:12

**uncomfortable** 35:20

**under** 31:5,8 62:21 68:8 92:22 100:9 113:15 121:8,11,12 (10)

**understand** 7:6,14 8:3,8,9 14:2 16:15 21:4,5 35:6 53:7 60:22 63:10,16 71:13 76:14 86:4 106:24 (18)

**understanding** 15:11 21:7 30:24 43:12 75:4 99:20 100:15 103:23 (8)

**understood** 17:6 23:11 46:19 102:6,6 (5)

**unfair** 64:17

**unfortunately** 44:20

**uniform** 93:24

**united** 10:15,19

**units** 117:11

**university** 6 10:6,21,23 11:3 15:18,20,23,25 16:7,13 17:21 18:10 20:25 22:23 23:1,10,19 25:7,10,15 27:1,6,9 31:3,8,10,12 33:3 42:11 43:23

46:17 47:2 57:2,8,18 61:8 62:21 63:12 65:3,5 66:25 67:2 71:5 75:3 81:7,11 82:18 87:13 94:24 95:18,21,25 97:25 110:15 112:17 113:8,10 116:5,8 118:1 (61)

**unless** 62:5

**unlike** 61:21

**unnecessarily** 70:18

**unsatisfactory** 63:7 97:4

**until** 50:18 51:13 68:21 87:5 (4)

**up** 8:18 13:21 15:3,4 27:20 29:4 34:4,8 35:21 36:16 41:7 51:15 52:13 58:1 67:23 70:4 73:2 78:8 88:11 91:17 92:14 103:12 104:3,25 110:6 114:12,17,21 (28)

**update** 4:4

**updated** 38:14

**uploaded** 87:23 88:21 89:13 109:3 (4)

**us** 7:15 33:13 52:9 62:1,23 81:8 90:18 118:25 (8)

**use** 75:9 92:4

**used** 92:5,7,9 93:9 94:11 (5)

**usually** 73:19

**utc** 81:23 82:2,3

**v** 5

**vacant** 16:22

**vaguely** 73:12

**values** 17:12

**variations** 15:24

**various** 112:14

**vary** 97:16

**verbal** 70:25

**verbally** 7:1 101:19

**verified** 57:25

**verify** 56:19

**version** 9:22 31:21 80:24 90:19 109:7 (5)

**versus** 91:22 99:18

**very** 13:9 29:10 34:6 37:11 54:1 56:6 66:9 74:20 88:15 99:8 101:25 102:3 109:23 (13)

**via** 18 26:11 32:25 33:1 86:2 88:3 101:3 109:18 (8)

**vice** 87:10

**video** 26:11 104:6,7

**videoconference** 12

**view** 90:24

**viewed** 93:18

**views** 90:5,7 91:19

**violating** 7:16

**visa** 23:10 31:4,6,9,9,10 (6)

**visits** 25:23

**volunteered** 15:17 18:17

**vote** 17:3,4 26:17,19 27:8 39:14 63:23 87:17 88:9 91:5,6,8,9 94:24 95:20,21,25 96:4,11 99:22 119:16,17,19 (23)

**voted** 18:19 22:24 26:25 27:6 91:12 95:3,3,14,17 96:13,20,22 99:25 100:4,4 118:6,8,8,9,16

(20)

**waived** 120:3

**want** 12:2 29:11 35:2 36:10,16 37:18 49:24 60:17 63:16 69:11 70:17 79:5 80:16 83:8,11 86:6,14,15 87:6 88:16 93:20 94:13 95:10 99:7 105:13 110:3 112:18 113:24 115:12 (29)

**wanted** 34:20 71:7 99:2 106:20 (4)

**wants** 62:14

**wasn't** 22:24 31:4,5,11 39:12 40:5 41:13 43:5 46:16 59:16 64:23 76:6 (12)

**way** 13:8 20:12 30:16 31:14 38:18 75:8 88:3 108:14,22 (9)

**we'll** 8:20 13:1 28:23 36:2 49:20 51:16 59:23 61:25 67:25 73:2 (10)

**we're** 6:23 7:16,17 8:11 16:13 51:6 53:17 61:18 70:6 100:20 106:21 109:22 (12)

**we've** 6:11 24:23 36:22 48:9 75:24 92:16 (6)

**webex** 73:9

**website** 59:15 114:21

**webster** 92:3

**wednesday** 47:18

**week** 47:23 48:16 51:13 53:17 (4)

**weekend** 37:12

**weeks** 41:18

**well** 11:7 16:22 21:3,6 51:6 64:22 76:9 90:23 92:16 94:14 103:11 (11)

**went** 9:3,11 15:3 85:4 90:15 91:8,9 105:21 (8)

**weren't** 15:2 56:7 89:24 97:24 (4)

**wes** 14:19,19,20

**what's** 75:23

**when** 10:18 12:9,10 15:22 20:13 21:2 23:11 25:9 30:10,18 36:12,21 39:6 41:4 42:13 43:10 44:11,15 46:25,25 47:20 48:15 49:10,11 51:8,12 54:19 55:10,10 56:18 57:12 59:21 68:22 69:23 71:10,15 74:3 75:9 81:22 87:5,8 88:6,21 89:19 91:5,10 98:21 101:3 102:22 105:11 109:2,4,19 113:9 (54)

**whenever** 13:7 107:20 108:23

**where** 8:16 9:19,23 10:2,9,18 12:14 20:24 25:21 26:24 30:1,8 40:3 42:3,18,22 45:20 47:3 53:3 55:5 61:14,16 67:16 77:21 80:7,15 87:23,24 91:6 100:3 101:16,16,18,22 108:22 114:14 117:6 (37)

**whether** 8:6 11:11 17:22 22:21 31:21,22 40:17 53:14 56:20 57:11,14,15 62:20 64:20 65:8,25 66:4,21 85:2 87:15,17 90:25 91:20 95:17 98:4 99:4,16,17,18,24 101:12 109:13 111:21 112:7 117:19 118:10 119:19,20 (38)

**which** 11:9 16:14 18:6 19:7,9 27:8 29:3,10 30:5 31:4,9 32:6 41:12 44:25 55:11 59:25 60:1 65:20,22,23 71:22 81:9 84:18 87:4 89:9 90:13 92:2,17 93:14 97:22 106:21 107:25 111:22,25 112:4 115:18,24 (37)

**while** 7:17 20:21 21:19 26:3 94:21 99:9 106:1 (7)

**who** 8:5 14:4,17 17:9 23:22 26:12,15 33:5 35:20 41:17,19 44:8,10,17,18 50:13 52:18 55:1 56:22,23 57:21 61:24 62:24 63:17 65:2,7,9,12 66:8,10 71:5 72:25 82:7,9,11,12 83:17 97:12 98:7,17 100:20 108:7 110:19 111:1,1,5,10,17 112:2 116:15 118:7,16 (52)

**whole** 32:10 77:19

**whom** 17:15

**why** 23:4 45:4 64:9 97:1,8,23 98:8,18 108:3,13 114:11 (11)

**will** 7:15,18 8:7,15 9:1 12:17 19:14 20:1,10 21:4 33:8,12,14 40:24 46:1 52:14 53:22 54:24 55:23 56:2 58:5,19 61:24 68:12,13,22 72:13 73:18 78:8 88:12 101:24 113:7 (32)

**willful** 92:23 94:4

**willfully** 93:12

**willing** 31:22 35:23

**window** 17:4

**winfield** 2:7 57:10 71:22

**winner** 17:4

**withdrawn** 62:24

**within** 16 14:1,4 20:24 26:22 41:11 42:5 76:23 87:11,20 97:9 99:15 103:1,4 105:14 114:20 (16)

**without** 110:14

**witness** 13:14 24:3 52:7 60:24 62:19 70:23 72:9,20 73:24 82:2,4 92:9 104:1 121:11,13,19 (16)

**witnesses** 26:10 75:2,20 102:18 104:14 (5)

**won't** 34:25 35:1 61:15,21 (4)

**word** 9:22 69:25 92:5,9,13 93:9 106:7 (7)

**work** 7:3,13 10:4 22:22,25 23:8,10 31:5,8 (9)

**worked** 28:2

**working** 10:23 11:1,2

**works** 41:22

**would** 7:22,24 11:7,13,14,19,24 13:14,15,17 15:4 19:1,12,15 20:14 21:5 23:13,17,24 24:13 25:8,15 26:13 27:15,24 28:16,16 30:16 32:17 33:6 34:22 38:9,12,19 39:1 40:4,11,15,21 41:19,20,20 42:1,2,17 43:8,21 44:20,23 45:23 47:18,24 48:13,14 49:18 50:20 51:24 52:23 53:4,14 55:11,14,17 56:12,17,23 59:1,22 60:13,19 61:4,8 62:15 64:17,18 65:10,12,16,17,17,18,20,22,23 66:15,17 69:7 70:16 71:20,22 72:5 73:22,23,24,24 74:2,3 77:21 80:1 81:14,15 82:9 83:3 84:7,18 85:2,6 87:17 89:4 90:4,13,13,14,17 91:5,6,7,20,21 92:3 93:11,12,13 94:3,4 97:6 98:16,18,23 99:17 101:12,22 102:21 103:2,4,8,10,11 104:1 106:14 107:10,10,24 108:7,8 109:3,6 110:7,16 111:25 112:25 114:8 115:17 116:14 117:20 118:13,23 (157)

**would've** 75:1 104:10

**wouldn't** 26:18 40:20,22 41:25 45:1 84:25 98:2 107:23,23 113:11 115:25 119:3 (12)

**write** 89:18

**writing** 87:22 90:6,11

**written** 104:8 116:11

**wrong** 50:21 104:13

**wrote** 35:5 103:19

**yeah** 9:10,18 12:19 17:19 19:13,17 24:25,25 25:13 27:3,19 28:12 29:18 31:18 32:19 36:10 37:13,20 38:19 40:18,20,20 43:13 44:15 49:5,5 50:6 51:24 55:9 56:25 58:13 61:4 62:12 64:22 67:15,20 69:10 71:18 78:24 79:13 82:4 83:15 84:5,14 86:19 96:10,13 98:21 100:12 104:13 108:18,19 114:13,24 115:13 118:4 (56)

**year** 9:3 18:25 19:6,7,9 23:13 38:13 44:23 57:6 (9)

**years** 10:14 11:3,9,13,16 12:20 19:1,11 20:9,15 79:3 96:18 (12)

**yep** 89:3

**yes** 7:2,4,14,21 8:2,9,22 9:16 10:17 14:3,16,24 15:14,24 16:4 18:10,24 20:4,23 21:10,25 23:21 26:23 27:4,5,6,23,25 29:8,23 32:13,16,22 33:19,23 34:3,10,14,18,19,23 36:13,18,24 37:3,5,17,17 38:2 39:5,12,24 40:2 41:7,10 42:17 45:7 46:12 47:11 48:12,20 50:9,12,16 51:1,5,10 52:21 53:9,16 54:6,7,17 55:6 57:6,13 58:9,18 60:4 61:23,23 63:14 67:8 68:4,6,9,11,19,24 70:22 73:10 75:11 76:25 79:23 80:18,18 84:24 85:5,22 86:9 88:20 89:4,8,10 91:12,18 93:8,23 94:12 99:23 100:8,19,23,25 102:10 103:15 107:3,6,8,13 109:17 110:21 111:9 112:12 113:19,22 114:16 115:10,24 116:5 117:1 118:17 (132)

**yet** 105:10,19

**you'd** 49:25

**you'll** 6:25 7:13 51:2 54:2 67:23 (5)

**you're** 12:9 13:15 24:2 29:12 34:7 36:12 38:18 42:13 45:17 55:20 56:15 62:4 64:23 80:7 99:8 106:22 (16)

**you've** 24:17 34:12 63:11 116:18 (4)

**your** 6:6 7:10,10,13 9:7 10:2 12:17 13:19,20,21 14:13 18:7 20:8 21:22 25:12 27:5 28:1,7,12,13 29:19 30:24 34:18 43:12,20 50:17 53:5 57:5 64:4 70:11,14 71:16 72:21 74:17 76:14 79:25 80:22 89:16,25 99:20 104:11,21 107:15 112:13 113:1 116:22 118:21 (47)

**yourself** 42:11

**z4** 4:12

**z5** 4:5

**zhang** 3 6:12 24:21 27:12,14,23 28:3,6,7,13 29:13 30:3,11,16 31:21 32:3,20 33:3,21 34:11,25 35:6,13,15,18 41:7,10 52:18 53:2 57:15 58:12,24 60:8,9,13,20 61:1,8,11 64:23 66:21,25 71:11 75:2,14 76:21 77:2,5 78:2 80:19 81:9,10 83:5,21 84:19,22 92:11 93:11 94:25 95:18,22 96:1,5,11 99:5 114:1 117:10 118:1 119:18,19,20 (71)

**zhang's** 5:9 9:2,13 11:21 19:9 21:13 24:19 25:1 35:11 38:6 41:6,8 59:20 62:1 80:21,23 81:15 85:12 93:17 96:16 97:7 98:10,14,19 114:7 118:16,21 (27)

**zoom** 18

| | |
|---|---|
| **224** 2:8 | **255901** 115:14,16 |
| **229** 68:5 | **256861** 29:11 |
| **903** 56:11 | **258034** 59:25 |
| **931** 20 | **258504** 5:258504 |
| **965** 2:4 | **256858861** 4:256858 |
| **1056** 68:19 | **257940945** 4:9 |
| **1243** 120:2 | **257955957** 4:257955 |
| **1526** 25 121:1526 | **257998999** 4:15 |
| **2004** 10:25 | **258013043** 4:258013 |
| **2014** 115:4 | **258053055** 4:21 |
| **2015** 11:15 12:18,19 | **258065084** 4:258065 |
| **2016** 11:15 12:19 | **258552554** 5:258552 |
| **2021** 11:6 12:11 78:1,6,19 96:16 108:11 (7) | **258578579** 4:24 |
| **2022** 78:2,6,19 96:16 108:11 (5) | **258655657** 5:258655 |
| **2023** 19:18 20:6,7 | **258674677** 5:6 |
| **2024** 19:12 23:16,17 34:9 38:1 48:4,8 (7) | |
| **2025** 38:4 39:23 41:4,9 44:19 47:6,17,19,22 48:25 50:8 51:4,4 53:8,9 55:15 58:21 59:6 60:3,15 75:13,25 78:15 79:19 86:12 88:19 (26) | |
| **2026** 18 121:20 122:22 | |
| **2027** 121:25 | |
| **39110** 2:39110 | |
| **39759** 2:39759 | |
| **60113** 5:20 26:21 68:10 71:4 113:13 114:23 (6) | |
| **102424** 115:20 | |