BEFORE THE MISSISSIPPI STATE UNIVERSITY
PROMOTION AND TENURE COMMITTEE

RE:  LI ZHANG

_____

TRANSCRIPT OF HEARING TESTIMONY OF

JULIA MORRISON

_____

Had on June 4, 2025

at Mississippi State University

Transcribed by:  Cathy White

EXHIBIT

**13**

Cathy M. White, CCR

JULIA MORRISON
JUNE 04, 2025

APPEARANCES


COMMITTEE MEMBERS:

     DR. ROBERT GRALA, CHAIR
     MS. KELLI ANTHONY
     DR. MELODY DALE
     DR. DIPANGKAR DUTTA
     DR. SANTANU KUNDU
     DR. SHIEL LU
     DR. ROBERT MOORE


MISSISSIPPI STATE UNIVERSITY REPRESENTATIVE:

     DR. TABOR MULLEN


LEGAL ADVISORS FOR MISSISSIPPI STATE UNIVERSITY:

     CHARLIE WINFIELD, ESQUIRE
     ASHLYN MATTHEWS, ESQUIRE


LEGAL ADVISOR FOR DR. LI ZHANG:

     GRAFTON BRAGG, ESQUIRE

JULIA MORRISON
JUNE 04, 2025

INDEX

Style . . . . . . . . . . . . . . . . . . . . . .    1

Appearances  . . . . . . . . . . . . . . . . . . .    2

Index  . . . . . . . . . . . . . . . . . . . . . .    3

Julia Morrison

   BY DR. MULLEN . . . . . . . . . . . . . . . . .    4

   BY DR. ZHANG  . . . . . . . . . . . . . . . . .   16

   BY THE COMMITTEE  . . . . . . . . . . . . . . .   37

Certificate of Transcription . . . . . . . . . . .   62

Cathy M. White, CCR

cathywhitecsr@gmail.com                                601.405.3762

JULIA MORRISON
JUNE 04, 2025

JULIA MORRISON

EXAMINATION

BY DR. MULLEN:

Q. Julia -- excuse me. Dr. Morrison, will you introduce yourself?

A. My name is Julia Morrison, and I am the senior HR business partner in human resources that works predominantly with academic affairs, so I serve our academic units. I work predominantly with deans, department heads, faculty members, and then staff in those areas of academics.

Q. Much has been said about the eForm process and, in particular, the eForm process in the fall of '21.

A. Okay.

Q. Did you support Bagley at that time?

A. So I did not support Bagley at that time, but I was in human resources and I'm familiar with the eForm process.

Q. Okay. And the Committee has asked for the eForms.

A. Okay.

Q. And you are getting those for them?

A. Correct. Yes.

Q. Can you talk generally about the way you

JULIA MORRISON
JUNE 04, 2025

understand the eForm could have gone down in this particular --

A. Sure.

Q. To have unfolded this in this particular --

A. Sure. So my understanding is that there was a conversation in advance of the submission of the eForm regarding the need to take leave, which is typical to how you would navigate leave as a faculty member or a staff member. Generally you have that conversation. It's agreed upon that you're going to take leave. The eForm process is an electronic process that the University does that ensures that our records -- that's how we actually deduct your accrued leave balances. So it's more of an administrative process on the back end.

My understanding in this case is that Dr. Zhang submitted his leave through that eForm at some time, I don't know the date specifically, but that it was declined. And when I say "declined," I don't mean that the leave was declined. I mean the request was resub- -- declined because there were inaccuracies associated with that.

I think all of us who have done eForms at some point, you know, if you're clicking on the calendar or you're clicking on the clock, it can get a

little -- you can intend for it to be eight hours, but then it can, you know, 16 hours.  The only way that we have that is to reject it and send it back to the eForm originator, so in this case, the employee.

So my understanding is that there was a lot of back and forth with that.  At some point, Marida Meridu (phonetic), who was our lead specialist at the time, reached out to need the appropriate medical documentation to substantiate that.  By policy, if an individual is out for more than 32 hours, we have to have supporting doctor's notes.  My understanding is we had it, it just wasn't attached to the eForm.  So there was a lot of procedural things, but that the leave itself had been preapproved outside of this eForm process.

Q.  Okay.  Now, you are -- so you started off in research --

A.  Uh-huh.

Q.  -- but then -- I'm not going to use the word ascend, but were promoted to academic affairs?

A.  Correct.  Yes.

Q.  The largest division?

A.  Yes.

Q.  Okay.  So you're aware of the process to terminate an employee?

A.  Correct.  Yes.

JULIA MORRISON
JUNE 04, 2025

Q. And to terminate a tenured employee?

A. Yes.

Q. Okay.

A. There are different stipulations and reasons under which you may do it for a tenured faculty member as well as different remedies associated with that.

Q. Okay. But before we get to that, in the fall of '23, October 8th --

A. Uh-huh.

Q. -- you sat in on an annual review rebuttal.

A. So it was an annual review meeting. It was the meeting, itself. So Dr. Zhang had received electronic copies of the evaluations. The intent of that meeting was for them to have a meeting to discuss that feedback, and so that wasn't the rebuttal meeting, itself. It was the initial annual evaluation.

Q. Okay. Tell me about how that --

A. Sure. So that meeting took place the morning of October 18th in Dr. Howard's office. It was to cover an annual evaluation 2021 and 2022. Dr. Zhang had received copies in advance. He had a variety of questions that he wanted to cover during that time. And so I was there from an HR perspective, not to get in the weeds on the feedback, itself, but to really ensure that the conversation remained constructive between Dr. Zhang and

JULIA MORRISON
JUNE 04, 2025

Dr. Howard, as well as to ensure that Dr. Zhang was aware of what his remedies were should they disagree. There was a strong indication that they were going to disagree with the annual evaluation feedback, and so I was there to ensure that it was clear on what those options are in terms of rebutting and submitting a statement or requesting a third-party evaluation. That was really my role that day.

You know, Dr. Howard communicated the feedback. There were a lot of questions that Dr. Zhang had. I intervened a few times to provide clarification on what I thought that Dr. Howard was trying to convey to Dr. Zhang. At one point, it got a little heated between the two of them, and it did result in a little bit of name-calling at that point.

Q. Okay. What options did Dr. Zhang have at that time?

A. So, like all faculty, if you have -- during the annual evaluation process, the University has an obligation to provide you with the annual evaluation as well as an opportunity to talk about it. Some choose to do that. Others might abstain from that process. But you have the option, if you disagree at the end of that evaluation, there are boxes where you mark where you agree with their review or disagree. In addition to agreeing or

JULIA MORRISON
JUNE 04, 2025

disagreeing, you can include a rebuttal statement and/or request an evaluation from the next higher authority, which is usually the dean.

Q. Okay. One question that's come up. I used to have a supervisor who was very pronounced -- he loved to sign the evaluation in front of you. Do you remember if Dr. Howard signed that evaluation?

A. I don't recall if -- I don't believe the signing took place in front of me.

Q. Okay.

A. But it's not uncommon for us to not have signed evaluations because there is a -- sometimes people want to take it with them to have a -- to look at it. Sometimes there are some language changes that the faculty member's requesting. Sometimes it's a case of I feel like my research was counted in this way and it needs to be counted in this way. So the signing doesn't always happen in that meeting.

Q. Okay.

A. But it doesn't negate the feedback that was provided.

Q. Yes. And to your knowledge, Dr. Zhang did have an appeal meeting. I called it a rebuttal.

A. Sure.

Q. Meeting with Dr. Keith?

JULIA MORRISON
JUNE 04, 2025

A.   Yes.

Q.   Okay.  So he's apprised of his options.  He took them both.

A.   Yes.

Q.   Just --

A.   Yeah.  My understanding is that Dr. Zhang did both.  Right?  He submitted a rebuttal of his own accord and then also had the third-party evaluation from the dean.

Q.   Okay.  This name-calling, this is the Nazi comment?

A.   Yeah.

Q.   Okay.  All right.  Let's go to -- at some point, you know, we've done the annual review, we've done the rebuttal, the independent -- in that time -- third party, and that kind of closes down around November 15th.  And on February 14th -- and I think this is Exhibit Number 4 in my book.

A.   Okay.

Q.   All right.  This is an intent to terminate.

A.   Correct.

Q.   Okay.  Now, words mean something.  "Intent" means we intend to terminate you.  So Dr. Zhang said yesterday several times that he is a former professor.  In the eyes of the University, he is on paid administrative leave?

Cathy M. White, CCR

cathywhitecsr@gmail.com                                              601.405.3762

JULIA MORRISON
JUNE 04, 2025

A.   Yes.   He is on paid -- so the process of how this works is, when the University has made the determination that we are going to seek termination, we provide a individual with this notice of intent to terminate.   They have the ability to request a termination hearing, which is these proceedings, and that effectively halts.   They remain on -- employed by the University on paid administrative leave.   They have the same benefits, the same pay, and then we conduct the hearing.   And then based on the outcome of that, we would -- you know, if upheld, we would proceed with official termination.   So there have been no changes to his pay, there have been no changes to his benefits status, none of that.

Q.   And we found out yesterday that, collectively, the two sides had agreed to hold this hearing in the future, which is where we are now.

A.   Sure.   Yeah.   That happens occasionally outside of the HR process.   Perhaps someone will have an attorney and those attorneys will discuss and, for whatever reason, the timeline can be slightly different from that reflected in policy, but that is a mutually agreed upon situation.

Q.   That's fine.   So he was relieved of all work duties?

A.   Correct.

Q.   But put on administrative leave?

JULIA MORRISON
JUNE 04, 2025

A. Correct.

Q. Never missed a paycheck?

A. Correct.

Q. Never missed a benefit?

A. Correct.

Q. And today -- or excuse me. Yesterday is the hearing to provide procedural due process?

A. Correct. Yes.

Q. Okay.

A. This is the due process that is allowed to all faculty members after the University determines that we are moving forward with intent to terminate.

Q. Now, I feel like I'm in the know of the University, but this doesn't happen a lot.

A. Correct.

Q. Okay. So can you talk to me collectively -- and you can speak to this particular incident, but also just in generalities, of how the University determines that a tenured faculty member should be removed from employment?

A. Sure.

Q. Or terminated.

A. Sure. You are correct that it is a rare circumstance that the University would seek to terminate a faculty member. There are kind of two ways in this which one would do that. The first would be if we were having

JULIA MORRISON
JUNE 04, 2025

substantial performance concerns.  In that case that -- we would likely, with poor performance, seek a post-tenure review process that would come through with a plan for improvement and then a period of time to take corrective actions.  A second, though, is conduct.

Q.  Okay.

A.  And so when we have members of the University community, regardless of their tenure status, that the University feels are not following instructions or putting the University at substantial risk, are not receptive to feedback from their supervisors, that would be a conduct situation in which post-tenure review would not be appropriate.  And in those cases, we would move for termination.

Q.  For conduct, the OP for post-tenure actually says you can't use.

A.  Correct.  Yeah.  So post-tenure review is not a process for disciplinary action.  So when a faculty member has done something that would warrant disciplinary action and displayed that conduct, we actually cannot use post-tenure review by the policy.  Instead, we have to handle that from a disciplinary perspective, and sometimes that's written reprimands, but when that hasn't been effective, it would be intent to terminate.

Q.  Will you go through for the Committee the

Cathy M. White, CCR
cathywhitecsr@gmail.com                                    601.405.3762

JULIA MORRISON
JUNE 04, 2025

collective decision-making that has to be put in place for Dr. Shaw to inform a faculty member that they're being terminated for cause?

A. Sure. So whenever we're looking at something, we do something that is called a permission for discharge, and so we have a meeting to discuss that. It typically starts from the closest line supervisors. So it would be the department head, dean. Sometimes an associate dean may have a role to play in that. We involve human resources, we involve general counsel, and then we involve the provost. And so those are sort of the individual players that have a piece of the puzzle that talk through. And it becomes a matter of what have we done, you know, what corrective action have we taken, how many conversations have we had, what have we tried to remediate, or is this situation so severe and so pervasive that we're at a place that this is conduct and we need to move forward with intent to terminate. So those are the individuals that would participate in that discussion.

Q. And that happened in this case?

A. Yes, that did happen in this case.

Q. General counsel signs off on it.

A. Correct.

Q. And then the provost writes the letter in accordance with the policy?

JULIA MORRISON
JUNE 04, 2025

A.   And then typically, once the provost writes the letter that -- Dr. Shaw does not deliver the letter.  It is the dean, sometimes department head, with HR that actually participates and has that meeting with the individual to inform them.  And that is what happened on that February 14th date.

Q.   Everything that happened in this particular case is standard of the way we handle terminations.

A.   Yes.  This is how we do it.  Once we have this letter, we meet with them, we deliver the letter and the reasons.  We don't provide a lot of detail because, at that point, you have the letter.  It speaks for itself. Then we transition to talking about should you choose not to signal your right to an appeal, we talk about continuity of benefits, we talk about all of those kind of procedural things about ending your business at the University.  That all happens in that case.

Q.   Did I miss anything?

A.   I think -- I think that was the bulk of my --

Q.   Interaction?

A.   -- involvement, interaction with this, which was really about leave, annual evaluations, as well as the termination proceedings.  I have participated in several, I think four, faculty termination proceedings over the last year, and they have all unfolded just like this in

JULIA MORRISON
JUNE 04, 2025

terms of the notification -- the meeting, the notification, apprising them of their rights to a hearing.

DR. MULLEN:  Thank you for your time.

DR. GRALA:  Dr. Zhang, it is your turn to ask questions.

EXAMINATION

BY DR. ZHANG:

Q.  Thank you, Julia.  So my first question is, you just say it.  I have maybe half hour or so to explain everything.  I appreciate your help on that.

So my first question is that, can you confirm again what you have talk about my proposed termination as far as based on my research or teaching performance, it's based on allegations about my conduct.

A.  So it's based on both.  So if you look at the specific cause, it lists failure to teach in accordance with University standards.  It also lists unsatisfactory performance in research.  But then it's this conduct piece and malfeasance including those things.  So what I was saying is -- I think the question was why wasn't -- you know, how do we handle that, what prong would that fall under.  And there is not a provision in post-tenure review that addresses the conduct piece.  So that's what I was trying to communicate.

Q.  Thank you for clarification, so one thing that I

JULIA MORRISON
JUNE 04, 2025

(indiscernible) here is that I can still call myself a professor at Mississippi State University.  Can you confirm I can still do that?

A.  So your title has not changed.  You are not assigned --

Q.  (Indiscernible.)

A.  You are not assigned classes at this moment, but your title has not changed.  You are on administrative leave in that title, in that position.

Q.  Okay.  Thank you.  So my next question is that, at a termination hearing, when you and Dr. Jason Keith, we met in his office, and in that meeting -- and we are talking about, you know, how we cover -- because you understand I have a disabled son, so I worry about the healthcare is discontinued.  Then you told me your health care is going to be ended by February 29th, and my last payday is February 29.

A.  So I do recall what you're talking about.

Q.  Yeah.

A.  We met on February --

Q.  Can you confirm is that what we talk about?

A.  We did talk about that, but there are inaccuracies, I think, in there or misunderstandings.  So we did meet on February 14th in Jason Keith's office.  You did confirm that you needed continued healthcare coverage.

Cathy M. White, CCR
cathywhitecsr@gmail.com                                    601.405.3762

JULIA MORRISON
JUNE 04, 2025

What I talked to you about is that, yes, your employment and your last paycheck would end on February 29th along with your healthcare coverage if you did not signal a hearing. So there are email exchanges between the two of us that indicate that you would retain your benefits and retain payment until after the hearing process had concluded, because you signaled, I think, the very next day, I think it was February 15th, you signaled a desire to have this hearing. And so you have remained in pay status and you have remained in benefits. You should not have received any COBRA information, which would have gone to your home address.

Q. Okay. So when you said -- so that was the -- so our email communication still going on, and I think I submitted, like you mentioned, that's something that I expressed the intention to have my, you know, hearing to you take place, and you have also mentioned that you have agreed with that. So we continued to have conversation.

A. You and I or --

Q. Yeah.

A. Okay.

Q. Yeah, email communication about the health insurance, the continue of that. I think you -- look at Z-3.

A. All right.

JULIA MORRISON
JUNE 04, 2025

Q.   Z-3.  And if you look at that email --

A.   Yeah.

Q.   -- then the last email that I was confirmed I can get the benefits and everything is February 21st.  So --

A.   So I say to you, I can confirm you will --

Q.   Uh-huh.

A.   -- continue to be paid and will --

Q.   Right.

A.   -- continue to receive benefits as long as you are on administrative leave.

Q.   Right.  Yes.

DR. MULLEN:  Have you not been getting paid?

DR. GRALA:  Let's just carry on.

DR. MULLEN:  Sorry.  Sorry.

A.   So, yes, that is true that I did confirm, and you are still on administrative leave, so you are still continuing to be paid and to receive benefits.  So I guess I'm not clear on what the question is.

BY DR. ZHANG:

Q.   Yeah.  My question is that, there is a (indiscernible) 21st and I submit my intention to get a hearing the next day.  (Indiscernible) here my general counsel and the time he get evolved, then, you know, I got a chance to get paid.  If they are not involved, and then I will -- I won't have to say I will not get paid

Cathy M. White, CCR
cathywhitecsr@gmail.com                                              601.405.3762

JULIA MORRISON
JUNE 04, 2025

benefits.

A. Well, so any time an individual, whether you have general counsel or not, any time that you have signaled a request for hearing, you remain on paid administrative leave until the hearing has concluded and the decision has been rendered. So whether you had counsel or not did not dictate whether or not you were paid. What continued your pay beyond that February 29th date was that you signaled to Dr. Shaw an intent to have a hearing.

DR. MULLEN: Would you look at --

DR. ZHANG: Yeah, okay.

BY DR. ZHANG:

Q. Come to page 3.

A. Your page 3?

Q. Uh-huh. It's the same.

A. Yep, same one. Okay.

Q. And if you look at other email, and I did inform you and your -- you did acknowledge that I needed to have a hearing --

A. Uh-huh.

Q. -- on the next day, which I have the conversation or which I got a letter. (Indiscernible) the next day, you confirm that I did request the hearing.

A. Uh-huh.

Q. Right? That (indiscernible) before you goes off

JULIA MORRISON
JUNE 04, 2025

on the biggest page, page 2.

A. Where I say, thanks for reaching out. I'm very sensitive to your situation. I recommend you refer to the benefits guide I gave you during the --

Q. Right.

A. Yep.

Q. So you know I request the hearing and (indiscernible) you talk about, no, not health benefits.

A. So I guess I don't understand. You emailed on the 15th and you asked me where to submit to request a hearing. You do that, and I tell you, you need to speak to the provost. And then you talk about how -- then you switch gears and talk about how your special needs child cannot lose --

Q. Uh-huh.

A. -- coverage. At that point, I don't know if you have notified Dr. Shaw or not. You have indicated that you want to, but that is not the same thing as actually doing that. So at the point at which I respond to you and answer your questions, I'm doing my best to answer the questions that you're asking. But I don't have knowledge of what happened between you and Dr. Shaw at that point.

Q. Okay. But you didn't inform me that, once you submitted the letter to Dr. Shaw, then you are going to (indiscernible) for the benefit, (indiscernible).

JULIA MORRISON
JUNE 04, 2025

A.   So we had that conversation when we met to discuss this letter of termination, that your termination date would be this unless you signaled the need for a hearing.

Q.   And so apologies if I didn't make that abundantly clear.  You know, in the same date, on the 15th or whenever that is, we say -- I respond to you -- you tell me about Blue Cross/Blue Shield, and I respond to you that you will retain your Mississippi State benefits beyond the 29th termination date.

Q.   On 15th?

A.   On the 21st.

Q.   Yeah, the 21st.  Not until the 21st that even (indiscernible) I want to communicate without (indiscernible), I don't have what, you know -- I need to ask that another question, so --

A.   Okay.

Q.   So I officially step down between me and Dr. Howard this (indiscernible) some of the issues.  So in that meeting, when we first met, that you gave me a bunch of documents.

A.   Sure.

Q.   One of them is termination.

A.   No.

Q.   Can you give -- how many (indiscernible).  How

JULIA MORRISON
JUNE 04, 2025

many --

A.   So I have notes, and I don't have them with me.

Q.   Okay.

A.   But I do recall, at the end of that, I gave you a variety of policies at the end of that, which are common. I think it was the annual evaluation policy that talks about what your options are associated with that.  We had employee guidelines for conduct --

Q.   Okay.

A.   -- because that was referenced in one of your annual evaluations.  We also had the University's policy on discrimination, harassment, and retaliation because that was referenced in one of those reviews.  So I had the relevant policies that were referenced in your annual evaluations so that you would have them and not have to dig through them.  But there was nothing to do with termination in that annual evaluation meeting.

Q.   Yeah.  Can you explain, that's just standard practice, in the annual evaluation, when you present that, you just give everybody the same document included termination, but I could have done.  That's my memory.  I wasn't --

A.   There wouldn't be any reason to include any termination.  I did provide you with those policies.

Q.   Yeah, termination policy.

Cathy M. White, CCR

cathywhitecsr@gmail.com                                601.405.3762

## JULIA MORRISON
JUNE 04, 2025

A.   So, no, not the termination policy.  It was the annual evaluation policy, it was the employee guidelines for conduct policy, and it was discrimination, harassment, and retaliation.  Those are the policies that were referenced in your evaluations and that is why they were provided as addendums to that, so that --

Q.   Okay.

A.   -- when Dr. Howard would say they were, you know, pulled from the policy, I could pull the actual policy and say, you know, there is no changes based on the language he provides aligned with the actual University policy.  So that was the reason for having them present.

Q.   Okay.  So when MSU decided I will be terminated or to get the termination letter, which they -- it was that they decided either to terminate me or to term- -- to give me the termination letter.

A.   So we provided you with a termination letter on February 14th.

Q.   Right.

A.   Is that what you're asking?

Q.   Yes.

A.   Okay.

Q.   (Indiscernible.)

DR. GRALA:  Clarification?

DR. MORRISON:  Sure.

JULIA MORRISON
JUNE 04, 2025

DR. GRALA:  Was that the termination letter or was the notice of intent?

DR. MORRISON:  It's the notice of intent to terminate.

DR. GRALA:  Okay.

BY DR. ZHANG:

Q.  So on which day University decided I should receive the notice of termination?

A.  So I don't know what specific date.  There was a meeting in advance with the decision-makers to have that.

Q.  Yeah.

A.  And I don't know specifically that date in my mind.

Q.  Okay.  Do you have any case in January, February before the (indiscernible)?

A.  No.  The time in January was during a snow day.  I remember that because I was remote.  But I don't remember specifically what date.

Q.  Okay.  Thank you.  Do you remember the details about that meeting when, you know, when you say that I call Isaac Howard and that he -- (indiscernible) of what Dr. Howard say.

A.  I don't recall verbatim what Dr. Howard said.  I know that the context of that was that you were upset with some of the guidance he was giving you that you felt to be

JULIA MORRISON
JUNE 04, 2025

micromanaging and that was, you know...

Q. That was when he was call me an engineer and --

A. I do recall this. Okay.

Q. And (indiscernible).

A. So when he called, I think he said something like you were a good engineer or wonderful engineer.

Q. Right.

A. From Dr. Howard's perspective, and this is where I interjected in the meeting, he was trying to convey to you, he was trying to give you a compliment that you are a good engineer. You interpreted that to mean that you were no longer a professor.

Q. Right.

A. You understood that to mean that he had taken your title away.

Q. That's right.

A. He meant it as a compliment that you have a good engineer skill. And so that is when that meeting sort of devolved.

Q. Right. And also in the same time when he a little bit upset and do you still remember he's laughing? He's trying to say this guy is a joke. I call him engineer, he is just (indiscernible). So he is laughing, just like I am the engineer, he's (indiscernible) too far, and this is an indication to me -- he was laughing.

Cathy M. White, CCR

cathywhitecsr@gmail.com                                  601.405.3762

JULIA MORRISON
JUNE 04, 2025

A. So I guess I don't -- I didn't make note of that. I can't confirm or deny if he was laughing. That didn't register with me.

Q. Okay. All right. Yeah, that's fine. I understand. After many years, I might be able to find out the notes, the meeting notes.

My mind just (indiscernible) when I think about question that had previous --

A. Take your time.

But I am concerned, I guess. I don't know. I don't think I have the right to ask question, but you are being paid in benefits. Right?

Q. Yeah.

A. You've not had -- you're covered. Correct?

Q. Yes, until today.

A. You're still covered.

Q. Yeah, until today.

A. You're still covered.

Q. Until today.

A. No. Beyond today.

Q. Okay.

A. You will be covered until you receive an outcome of all of this.

Q. Okay. Okay.

(Indiscernible).

## JULIA MORRISON
JUNE 04, 2025

BY DR. ZHANG:

Q. Okay. In exhibits.

A. Our book or your book?

Q. Your book.

A. What number?

Q. Thirty-three.

A. Okay.

Q. It (indiscernible) --

A. Okay.

Q. -- tell you the reference.

A. Okay.

DR. MULLEN: So it will be the 11th page, which is marked MSU 238174, and that's (indiscernible).

DR. MORRISON: Okay.

DR. LU: Say it again. What's the number?

DR. MULLEN: 238174.

DR. MORRISON: Okay. Yep. I'm there. This is following your email --

MR. BRAGG: It's an app report.

(Indiscernible, multiple speakers).

DR. MULLEN: If you look for the large blacked-out piece. It is in our book, 33.

DR. MORRISON: 33. Okay.

DR. KUNDU: It's not (indiscernible.)

DR. MORRISON: 174 is the last -- it looks like

this with a big old chunk at the bottom?

DR. MULLEN:  Doctor, I believe you're in the (indiscernible).

BY DR. ZHANG:

Q.  Would you mind read the fourth line?  That might refresh you some memory.

A.  Where?  Right -- what I say?

Q.  No.

A.  Where am I reading?  Oh, okay.  Yeah.  So it doesn't tell me who this is from, so I don't know who the writer is here.

Q.  You go to the --

A.  It says -- oh, okay, yes.  Dr. Howard says, Dr. Zhang is a good --

(Indiscernible, multiple speakers.)

DR. MORRISON:  Oh, sorry.

(Indiscernible, multiple speakers.)

DR. GRALA:  All right, everyone.  Are we ready?

DR. MULLEN:  My focus, mark Z, it has everything.

MS. ANTHONY:  Mine has it, too.

DR. MULLEN:  Some are not.

MS. ANTHONY:  That's the problem.

DR. MORRISON:  Okay.  Ready?

BY DR. ZHANG:

Q.  Yes.  Would you mind to you read that line for

JULIA MORRISON
JUNE 04, 2025

me?

A. Okay. So this is an email from Dr. Howard and he says, the only thing that surprised me was him taking the phrase "Dr. Zhang is a good engineer" and finding multiple ways to criticize me for saying it. That is the point where I laughed in the meeting. He found a way to surprise me.

Q. Yeah.

A. Okay.

Q. He did laugh at me. Right?

A. So he says --

Q. I personally feel insult and agonizing that I -- my title of professor was depressed and he convert me to an engineer, and I felt, you know, just so unprepared in the annual meeting.

A. So if you'll remember, you and I had that conversation in the annual evaluation, and I affirmed that that's not what's happening. He wasn't changing your title, and he didn't have the authority to do that unilaterally. My understanding is that he was -- based on what he said here, he's laughing -- based on what he says here is I think he -- I think he was laughing at the fact that he was trying to give you a compliment and that somehow --

Q. Okay.

Cathy M. White, CCR

cathywhitecsr@gmail.com                                601.405.3762

JULIA MORRISON
JUNE 04, 2025

A.   -- got misconstrued.  So I think he was laughing at the situation, not at you, based on how this is written, but I can't speak to his intent.

Q.   Okay.  Thank you.  So follow-up on that.

A.   Sure.

Q.   So he is my school director.

A.   Sure.

Q.   He's still because I can still call my professor.  So if he think I give something, you know, improper either to him or other faculty, should have had a meeting to resolve that?  If he think I called nothing is not appropriate or is insulting between somehow he does not feel comfortable, should we have the conversation?  Should he have that?

A.   So, in general, yes, situations should be solved at the lowest level possible.  There are cases, though, where a relationship between a faculty member and their supervisor is so contentious that having a direct conversation between the two people is not effective.  And that is typically why -- when HR gets involved and why I was present at the --

Q.   Right.

A.   -- annual evaluation.

Q.   Yeah.  So my point, if he think I brought him (indiscernible) should have a meeting to resolve that if

JULIA MORRISON
JUNE 04, 2025

he care about it, and then he said sometimes have very intensive meet, you know, funk, and usually we just have the office staff to be present or was (indiscernible.) My point is that we should resolve that thing. Why it don't happen in that meeting? Because he's department head, think -- first of all, he -- he's the person that, if he don't feel comfortable, he's the person tell not to feel comfortable. Secondly, he's a department head. We should get it resolved between me and him. Do you think that should be the case?

A. So in this case, my understanding is that it was over and done with. The conversation you all had wasn't particularly productive, so there was no reason to think that a follow-up conversation between the two of you would be productive. So I think you kind of each went to your separate corners and went about your business.

Q. Yes. So whatever happened in that meeting should be resolved at this point?

A. I mean, I think --

Q. He called me something. I called him something. Is that -- even now, do you think in your mind?

A. Oh, no, that's not what I'm saying at all. But there are situations in which an individual agrees to just move forward. They might have been wronged. They might have had a situation where the conduct wasn't appropriate,

JULIA MORRISON
JUNE 04, 2025

but they decide to move forward. And that's what I understand to have happened here --

Q. Okay.

A. -- is that it was an unproductive exchange between the two of y'all in the annual evaluation process. He understood that you were going to seek your appeal rights through the annual evaluation process, and he was letting that be.

Q. Is it true that if he think I insult him or whatever or improper, he should have filed a complaint against me, or should report HR, or should be -- do something instead of, well, now, many years, that's become the issue, fire me, upon --

A. So I guess I'm not clear on what you're asking. I don't believe that this incident is what was referred to in the termination decision.

Q. Okay. Thank you. I remember when you -- when I first met you and Dr. Howard at his office, and you introduced yourself, and you said you are there to make sure that policy is followed. I didn't recall you said anything else. You talk about that. Do you think it was -- you are there to make sure the policies are followed?

A. So I recall what you were saying at the beginning of the meeting. I introduced myself and --

JULIA MORRISON
JUNE 04, 2025

Q.   Okay.

A.   -- again said that we want to be sure that the meeting was civil and that you were aware of what your --

Q.   Uh-huh.

A.   -- you know, remedies were.  I did talk to you at the beginning about the University's policy that the individual can't record a meeting unless all parties agree, and so that was the reason why we didn't record the meeting.  Is that what you were asking?

Q.   No.  My point is that you are there because you wanted to make sure all the policies are followed.

A.   So I was there to ensure that you had an appropriate conversation with your supervisor, that if you had questions that, you know, to the best of our ability, the University tried to answer them, and mostly that you were aware of what the remedies associated with the annual evaluation process were.  So I was there to ensure that you were aware and had been properly informed of what your options were.

Q.   Okay.  So you are not there to make sure that the policies are followed?

A.   Well, so I was there to ensure the annual evaluation policy was --

Q.   That's (indiscernible).

A.   -- followed.  And should there be other policies

JULIA MORRISON
JUNE 04, 2025

that are under the unit, like, HR's purview, I was there to, like, speak on those things, but...

Q. Okay. Good. Thank you. And why not say violation policy is a timeline, so from HR's point of view, when Dr. Howard and I have say interview or to have the annual review, that is way, way past in timeline. So you are there to make sure that policies are followed. The timeline of the review is very important policy. So why don't you make sure that policy is followed?

A. So I think in this case, my understanding is that the annual evaluations for everyone in civil engineering were delayed in part because of the move to the new building and also because of the interim director status. And so from our perspective, when we're looking, we're looking to see was one individual adversely impacted or was this something that everybody experienced equally. And in the case of annual evaluations, my understanding is that they were delayed for everyone, and that everyone met those years to do those two together.

Q. Okay. If that is the case, if my memory is right, that there are some paperwork need to be done before you delay, for example, for more than one year. The intent of that is the policy?

A. So I'm not familiar with that, but that would have happened in the dean's office and would be --

Cathy M. White, CCR
cathywhitecsr@gmail.com                                    601.405.3762

JULIA MORRISON
JUNE 04, 2025

Q. Dr. Howard annual (indiscernible.)

A. So the dean's office would grant you an extension if you were not able to do your annual evaluation.

Q. Right. So there is some paperwork that never done, wenever showed that paperwork is done.

A. So I'm not familiar with any paperwork, but you would need approval from your dean's office to not do evaluations --

Q. Right.

A. -- for a particular department.

Q. Right. So if the timelines are not followed, we needed to fire the -- okay. I'm sorry. All right.

On the second one, you said you wanted to ensure the policies are followed. Are you aware that everyone in civil engineering, all the faculty, are evaluated?

A. Am I aware of --

Q. Is that true, all the faculty in the civil engineering department are evaluated in their 2021 year?

A. So my understanding is that evaluations were delayed in civil engineering --

Q. Right.

A. -- for 2021.

Q. Yes. But everyone got evaluated.

A. I couldn't speak to that. I'm not involved in all annual evaluations for faculty. I'm involved in

## JULIA MORRISON
### JUNE 04, 2025

potentially contentious evaluations.

Q. Okay. Is that possible for, you know, HR (indiscernible) to show the Committee members that everyone's valuation in 2021 existed? They don't have to read it, but they needed to see the signature at the year to make sure that year all the faculty. You can print out all the faculty's name and so the Committee can check all the faculty.

A. So I think that's a determination for the Committee.

Q. And the second is that 2021, 2022 (indiscernible).

A. I can't speak to that. That would be something this Committee would have to determine.

DR. ZHANG: Okay. I think that last one. Thank you.

DR. GRALA: Thank you very much, Dr. Zhang.

What we'd like to do now, take a 10-minute recess (indiscernible) --

DR. MORRISON: Okay.

DR. GRALA: -- and the panel will have questions.

DR. MORRISON: Okay.

(Recess.)

DR. GRALA: I think we are ready to start.

EXAMINATION

BY DR. GRALA:

Q. Dr. Morrison, we have several questions for you.

A. Yes.

Q. And that's basically we would like to clarify some items to better understand what procedures would be applicable in this situation.

A. Okay.

Q. You have mentioned handling several cases related to the faculty termination.

A. Uh-huh.

Q. How many of those have you handled for misconduct last year and every year within the last five years or so? We'd like to know how common it is.

A. I think two, three, that have been misconduct, three.

Q. Total or per year?

A. Out of the last two years.

Q. Okay.

A. Uh-huh.

Q. In a case where there is intention to terminate a faculty --

A. Sure.

Q. -- who initiates that decision to start the process of developing the notice of intent to terminate employment?

JULIA MORRISON
JUNE 04, 2025

A. So, it depends. Typically what happens is a department head would have a conversation with their dean regarding, you know, the situation that led to that. If the dean feels as though that may be a possibility, he would loop in HR, civil -- excuse me -- HR, general counsel, and the provost's office to have that conversation. So, typically, it is initiated or at least a conversation originates when the dean escalates it to the provost's office.

Q. Okay. And who approves the notice to terminate employment? Who makes that decision to send that notice to the employee?

A. So, typically, once, you know, those individuals have made the decision and everybody is on board, what ends up happening is Dr. Shaw's office, with assistance from general counsel, drafts the official notice and informs Dr. Keenum that the decision is taking place, and then HR and the dean's office coordinates the meeting with the impacted employee.

Q. Okay.

A. Does that --

Q. Yes, yes, yes.

You remember a meeting you had with Dr. Howard and Dr. Zhang that was related to annual evaluation. And was the annual evaluation for two years?

JULIA MORRISON
JUNE 04, 2025

A.    It was.

Q.    Okay.

A.    So in the case where we might have missed an annual evaluation for a variety of factors -- it's happened in other units across the University, too -- we sometimes will have to do a catch-up where we get -- we then get back on track.  Otherwise, you're just going to be behind perpetually.

Q.    And that, on a routine basis, HR is not involved in the annual evaluation.  Right?  It's only when you have --

A.    Yes.  That is typically the case unless there is a reason to believe that it would be contentious between the two.  And based on the past conversations between the two of them, it was recommended.

Q.    You had mentioned that names had been called, were called during that meeting.

A.    Sure.

Q.    Could you tell what the names?

A.    So I think that specific reference was when Dr. Zhang called Dr. Howard a Nazi.

Q.    Okay.  Were there any other names used during that discussion?

A.    That was the name, yeah.

Q.    Okay.

JULIA MORRISON
JUNE 04, 2025

A. Uh-huh.

Q. Would it be possible to get for us a list of all employees in the school and whether their evaluation for those two years was completed, and whether it was signed by the department head, dean, the dean, and the faculty member who questioned?

A. So I don't know that I would personally be the one that would gather that information, but if the Committee -- if that's a request of the Committee through the proper procedures, I can do what's needed.

Q. Okay. Now, so your meeting with Dr. Howard and Dr. Zhang in October of 2023?

A. Uh-huh.

Q. When you were trying to make a -- possibly have a discussion that would result in positive outcomes?

A. Uh-huh.

Q. But about four months later, in February, Dr. Zhang received a notice of intent to terminate employment. Are you aware of any events that took place between during this time that actually led to that escalation to actual intent to terminate?

A. So are you asking am I aware of specific --

Q. Yes.

A. -- instances? So I think between the eval- -- my understanding is, between the evaluation, there was a

JULIA MORRISON
JUNE 04, 2025

continued pattern of failure to follow instructions and what they determined to be insubordination. And so I know, like, in the annual evaluation meeting between Dr. Zhang and Dr. Howard, there was a lot of friction, particularly when they were talking about his ratings in research, and so I think failure to accept that, there was a lot of back and forth.

You know, the annual evaluation process has to come to an end at some point, and so I think there was a lot of friction between the department. Dr. Zhang kind of, when he ran out of remedies associated with the annual evaluation process, wanted to continue to escalate that issue, and so I think it was a feeling as though he was not receptive to corrective action or to accepting decisions made on behalf of the department.

Q. So there's an annual evaluation policy, AOP --

A. Uh-huh.

Q. -- 1324. And that policy states that annual review eventually has to be signed by all parties, so the faculty, department head, and dean, and a copy of that has to be returned and provided to the faculty member. Right? Is that correct?

A. So typically, yes.

Q. Are there any exceptions to that?

A. Well, I mean, there are lots of times in which

JULIA MORRISON
JUNE 04, 2025

the back and forth of the documents may or may not be signed. That's sort of a technicality that doesn't negate the feedback that is provided in the evaluation.

Q. You've perhaps answered that question, but if it is not signed or if it is not returned to faculty, is the annual evaluation still valid?

A. Yes. I mean, there's plenty of times in which I will have given you an annual evaluation. Let's say it's electronically. We meet. You haven't decided what -- if you want to approve, agree with it or decline. You may have a copy that is not signed. It is not uncommon, too, for an individual faculty sometimes to refuse to sign and, so that -- you know, there's nothing that forces us, so then we just keep that copy along with any rebuttal, and that's what gets stored.

Q. So if that happens, is there any other documentation made stating faculty refused to sign the annual review?

A. So the best practice would be to note that, but if the dean -- it's managed at the dean's office. The dean's office is the repository for all annual evaluations. And so, frequently, based on the volume of that, if we have a copy of it, it's been sent in, the individual has received a copy of that, we're not scrutinizing who signed what when. It is still -- the

JULIA MORRISON
JUNE 04, 2025

feedback is still valid.  The rating still exists.

Q.  And I might not be remembering that correctly, but why would the faculty refuse to sign?  Even if they disagree with the annual evaluation, they could still check the box I don't -- I don't agree and sign that we have the dean.

A.  Yeah.  So there are plenty of times in which -- and by policy, it says that your 10-day rebuttal period exists at the time of signing.  And so it is not uncommon for faculty to not want to start that 10-day window and, as a result, not sign.  So they say at the annual -- at the end of the meeting, I'm not comfortable signing, they don't sign, they don't start that 10-day window, and it ends up being a case where they can buy themselves more time.  That's not our preference from an HR perspective, but it is a loophole that sometimes is used.

Q.  So in that case, when a -- if someone doesn't sign, they could come a year after and say, you know, I want to sign now and have --

A.  So (audio distortion) HR's recommendation to a department head is to send it to them electronically, say this meeting occurred on this date, here is your annual evaluation, this starts that 10-day period, please inform me if you would -- you know, if you're declining to sign. So it puts it back on the faculty member, starts that

JULIA MORRISON
JUNE 04, 2025

window, and then we have documentation of when that 10-day window ends.

Q.   And that perhaps doesn't apply to you, but we would like to see the Dr. Zhang's annual evaluations for those two contentious years signed by department head and the dean, if that was actually the case.  Because what we have here, there's no annual evaluations that have been signed by Dr. Zhang, but Dr. Howard indicated that he has his own copy that was signed by him.

DR. MULLEN:  In 2022.

BY DR. GRALA:

Q.   Okay.  Now, if you could refer to the MSU handbook.

A.   Okay.

Q.   I'm sorry.  The white one.

A.   This one?  Okay.

Q.   Exhibit Z-3, page 1.

A.   Z-3?

Q.   Page 1.

A.   Okay.

Q.   There's an email from you.

A.   Yep.

Q.   And that said -- that informs Dr. Zhang that he's being -- his access to email is going to be restricted (indiscernible) because of an email exchange be forward.

JULIA MORRISON
JUNE 04, 2025

A. In the third paragraph, fourth paragraph, it says, additionally, I've been asked to inform you that your MSU email access has been turned off in response to an email exchange that occurred yesterday afternoon.

Q. And do you know what that email exchange was about?

A. I can't recall off the top of my head what that was. It's not uncommon, if an individual who is in this kind of limbo status, where they've received intent to termination, if they send an email to the entire faculty or something like that, that we would take that action. I don't remember the specifics of this case.

Q. What is your -- what is the standard practice if a faculty express unhappiness (indiscernible) because there's intention to terminate upon them? You mentioned, for Dr. Zhang, he gets the pay, he gets the benefit. What about other aspects such as access to the email, access to OneDrive and --

A. So, generally speaking, what would happen would be that, at the point of termination, they get a separate document that kind of explains here are the terms of this in-between period, which I think you might have a copy of somewhere. And that explains to people you're not to be on campus, you're not required to clean out of your office or do those kind of things until we actually have -- if

JULIA MORRISON
JUNE 04, 2025

you trigger a hearing and the outcome of the hearing. Generally, you would retain access to University email, Banner, those systems. However, if we have a reason to believe, based on, like, an email exchange or if something happens after the notice of intent to terminate, the University can always -- what they do is scramble your password to prevent you from accessing those things. That can be reinstated. If there's a time at which you need to come to campus to get your documents, you just have to communicate through that process.

Q. Could we also refer to Exhibit Z-1 in the same binder?

A. Okay.

Q. And the first page of that, that's a notice of intent --

A. Yes.

Q. -- to terminate. And the second one is an official memoranda.

A. Yeah.

Q. And there's bullet number 5 which says, your access to MSU systems, including departmental shared drive, software, et cetera, will be turned off on the date of your termination. So was the initial intent to turn off those only if Dr. Zhang is terminated. Right?

A. Typically, yes, but it sounds --

JULIA MORRISON
JUNE 04, 2025

Q.   (Indiscernible, two speakers).

A.   -- like, from the previous email exchange, his conduct necessitated us to take away that access sooner than would have otherwise been the case.

I don't know if it's in your documents, but when we were going back and forth with Dr. Zhang to try and schedule a time for him to come to his office, he indicated he needed access to Banner.  I got permission to from Dr. Shaw to do that at the time at which he was scheduling to come to campus.  That never took place because the lawyer sort of handled it outside of --

Q.   Okay.

A.   -- my jurisdiction.

Q.   There's also another question.

A.   Sure.

Q.   So we have been provided with exhibits or information from both sides.

A.   Yeah.

Q.   And there's also each employee, including faculty, has a personnel file --

A.   Uh-huh.

Q.   -- in the department.  Is this information confidential and can this panel have access to that personnel file?

A.   So personnel, I mean, yeah.  So the University

Cathy M. White, CCR
cathywhitecsr@gmail.com                                    601.405.3762

## JULIA MORRISON
### JUNE 04, 2025

does keep a personnel file.  Typically, nothing is in your personnel file other than standard job, employment things. If there also official disciplinary action, that might be in there.  Annual performance evaluation isn't in there. So while, you know, if an individual had a business purpose to need it, HR could, you know, turn that over.  I don't know that --

Q.  So --

A.  I guess I don't see what --

DR. MULLEN:  The personal file.

DR. MORRISON:  -- you would additionally gain here.

DR. GRALA:  Can we get access to that?  We would like to request access, and you can determine if that's going to be possible.

DR. MULLEN:  I will speak to general counsel, yeah.

DR. MORRISON:  Again, just to clarify, an employee can request a copy of their personnel file at any point, and so there's -- it's not like there's some kind of mystery documents or something in them.  You would -- anything that we put in there from an HR perspective, you, as an employee, would have had the opportunity to see.

BY DR. GRALA:

Q.  That's fine and we're not in (indiscernible)

JULIA MORRISON
JUNE 04, 2025

anything.  We would like to have -- we wuld like to just see the file.

A.  Yeah, and I --

Q.  For our better understanding.

A.  Yeah.

DR. GRALA:  The panel members, do you have any other questions?  Is there anything that I've missed?

DR. MOORE:  I have one quick one.

BY DR. MOORE:

Q.  In the University folder, section 33.

A.  (Indiscernible) right by there.  University file?

Q.  Yes.  Section 33.

A.  Okay.

Q.  Page 238174.

A.  Okay.

Q.  This is your conversation with Dr. Howard.

A.  Sure.

Q.  And on the top part, on the last sentence, you say, I'm learning this is not your typical case.

A.  Uh-huh.

Q.  And in the bottom line, he earlier responded, Julia, you're likely to get several first experiences as this process unfolds.  What's being referred to with the case in process there?

A.  So where?  As this process --

JULIA MORRISON
JUNE 04, 2025

Q. Right.

A. So this was my first interaction. This was the first time that I had met Dr. Zhang, so I don't know what he means by that. I think he just means as you have continued interactions with Dr. Zhang. And so then I say, with this case, meaning with my involvement with this annual evaluation process, like this is my first time.

Q. Oh, you're referring, like, in this case, this --

A. Yeah, yeah, yeah, yeah.

Q. Okay. I was wondering how they were interrelated. That's all.

A. I don't think that they are. Right? I think that you're drawing connections between those email exchanges that weren't intended.

Q. Right. And that's why I wanted to clarify it.

A. Yeah.

DR. MOORE: Thank you.

BY DR. KUNDU:

Q. So in that folder, it says that, like, top of (indiscernible) it said IHL.

A. Uh-huh.

Q. So, is that -- like, can you tell us why IHL is there?

A. I did not produce this, so I cannot speak to that.

JULIA MORRISON
JUNE 04, 2025

MR. WINFIELD: I can answer, if you would like. The reason that IHL is there is because most of these documents were assembled as part of ongoing litigation to which IHL is a defendant because -- I don't want to speak for the person who drafted it, but most of these contracts are -- IHL is a part of the contract executed locally, and so you can't really bring the case without bringing everybody in. And so that was just shorthand in my office as to the case. It's the case we're dealing with.

DR. GRALA: Is it also (indiscernible) supervisors or (indiscernible)?

MR. WINFIELD: It is that, but honestly, the reason it's on that particular notebook is because, if you go into my computer system, that's how my file was named, and my assistant looked at it and said MSU and IHL.

DR. GRALA: In this particular case, this hearing, IHL is not involved unless it is escalated once you process through?

MR. WINFIELD: Yeah, that's correct. So this -- Dr. Zhang would ultimately have an appeal right to IHL, but it would only be triggered a few steps down the road.

DR. GRALA: Any other questions?

BY DR. DUTTA:

Q. Yeah. We had a question about the supplemental notice. So why was it -- why was it required and why did

Cathy M. White, CCR

JULIA MORRISON
JUNE 04, 2025

it come a year later after the termination, intent of termination?

DR. GRALA: So Dr. Zhang's --

A. So you're talking about this very -- this confidential piece at the front of the binder? Again, I think that may be a Charlie question. But my understanding -- so there are two separate things. At the point at which he was terminated, he was -- or notified of intent to terminate, he was given a supplement that had instructions on how to conduct himself in that time frame. I think what you're asking is the supplement in January.

DR. DUTTA: That's right.

BY DR. GRALA:

Q. Which was issued one year later after the notice of intent?

A. That was preparation, was it not?

MR. WINFIELD: I can speak on that because my office put that together. Due to conversations that were taking place between Dr. Zhang's attorney and me, this process, for a lot of reasons, didn't happen as soon as it might in other cases. There was nothing untoward or improper by the University or by Dr. Zhang. It had a lot to do with other procedures that had to take place.

And so, typically, I think what happens is, when you get lawyers involved, one of the things that we try to

JULIA MORRISON
JUNE 04, 2025

do is to not turn this process into an ambush.  So in effect, what it was, it was basically for us to be able to say in our paper, all right, here's what we're doing, is all these things here that we're talking about, here's -- and it's not necessarily exclusive, but it is designed to be a fair summary of what our witnesses intend to say.  In return, as part of that process and agreement, Dr. Zhang was able to have it in advance to be able to respond to it.  But, really, I guess the best way I know to say it is, it was designed to be an exchange of information in advance so that it's not a gotcha exercise so that there's a surprise witness that walks in and says something, but more or less to say here's what the case -- here's what we think.

DR. GRALA:  But we are talking about the supplemental information to the doctor's attorney.  Is that right?

MR. WINFIELD:  Exactly.

DR. DUTTA:  The first document in the University binder.

DR. MORRISON:  (Indiscernible).

MR. WINFIELD:  It is the summary for everything that follows.

DR. DALE:  Say that again?

MR. WINFIELD:  This is a summary in everything

Cathy M. White, CCR
cathywhitecsr@gmail.com                                    601.405.3762

JULIA MORRISON
JUNE 04, 2025

that follows.  It's to help you and to not ambush Dr. Zhang.

DR. MOORE:  So if he had done the initial 10-day hearing, that would have been prepared at that time?

MR. WINFIELD:  Correct.

DR. MOORE:  Okay.  So we just --

MR. WINFIELD:  Because we, by agreement, we extended that deadline as we worked through, like I said, a number of issues that I won't bore you with.

DR. MOORE:  Right.

MR. WINFIELD:  But all in good faith by both sides.  So it would have been done then, but it was just, I guess as much as anything, a position statement and I'll put it out there.

MR. BRAGG:  And if I may speak, also, I agree with that and also would add that our response to the notices of intent was kind of intended to mirror that, provided exhibits in a similar fashion to provide everybody with information.  And Dr. Zhang wanted to sign that document, actually, put his signature on that document.  So it was definitely a work of his in this statement.

BY DR. GRALA:

Q.  Dr. Morrison, when you have cases that deal to misconduct, what is the process?  Who decides that the

JULIA MORRISON
JUNE 04, 2025

misconduct reached a level where we need (indiscernible,) that accommodations should be made to terminate?

A.   So again, it would be that collective group that we discussed earlier, department head, deans, human resources, general counsel, and typically the provost's office, that discusses that with reference to the policy, with reference to what the past corrective actions are, and we talk through this -- the particulars of that, and determine whether or not we're at that level.

BY DR. MOORE:

Q.   When would this case be in the continuum of the ones that you've looked at?  Would it be meeting the bare threshold, did it (indiscernible) the grounds for intent to terminate or --

A.   So I think every case is different, so it's really hard to --

Q.   Right.  I know.

A.   -- to make that determination.  I think it is uncommon to see this level of difficulty across the University.  Right?  It's not uncommon for an individual to have a situation where they have a contentious relationship perhaps with their direct supervisor, but it is unusual to have a situation where an individual has such disdain for deans, department heads, VPs of research, human resources, and all of the parties.  Typically, in

Cathy M. White, CCR

cathywhitecsr@gmail.com                                601.405.3762

JULIA MORRISON
JUNE 04, 2025

cases that we're able to remediate, there is a situation where the individual has someone that they are able to take corrective feedback from, and so this one was unique in that case.

DR. MOORE:  Okay.

DR. GRALA:  Any other questions?

DR. KUNDU:  I have one.

DR. GRALA:  Sure.

BY DR. KUNDU:

Q.  I apologize.  (Indiscernible) with AOP, so apparently when it (indiscernible,) it looks like it, that's not sometimes become an option?

A.  What are --

Q.  The AOP regarding the annual evaluation.

A.  Regarding the signature, is that what you're asking?

Q.  Regarding the signature and the timelines. Sometimes it looks like it -- in this (indiscernible), people don't sign something, so -- but the University frowns on those AOP and OP and everything.  So it seems like there are many exceptions done in this particular AOP.

A.  So I guess in the case where an individual -- there are situations, like, in order for flexibility, maybe the department head is on maternity leave, maybe

Cathy M. White, CCR

cathywhitecsr@gmail.com                                      601.405.3762

JULIA MORRISON
JUNE 04, 2025

there is -- a variety of reasons where perhaps the timeline isn't exact.  Typically what happens is an individual seeks permission from their dean and their provost to delay an annual evaluation.  And so, while this is not a case, I don't think, of acting outside of policy, it is a case that sometimes there are copies of annual evaluations that aren't been signed based on the how they exchange.  That's because the value of the annual evaluation process is the narrative, the conversation between the two of those parties.

BY DR. GRALA:

Q.  But if there is an AOP, why is it (indiscernible,) that it's actually not followed, where any AOPs are very clear what needs to be done?

A.  In terms of submitting?

Q.  In terms of the signing, to sign the annual evaluation to the faculty member who's being evaluated.

A.  So that would be a question for your deans who maintain the signing of that.  Right?  So it goes to the dean's office.  The dean's office is -- again, intent is supposed to ensure that those things are taking place. Again, there are times where a faculty member refuses to sign.  And then you're in a catch 22 of, okay, I have this document that has all of this annual evaluation. Regardless of the signature, it does not negate the

JULIA MORRISON
JUNE 04, 2025

feedback and the writings that were provided.

BY DR. LU:

Q.   One comment.

A.   Sure.

Q.   College of agriculture and life science, we hatch on to vicinity (indiscernible) and from (indiscernible) to Hill, Hill building, and the department head change regularly and (indiscernible) but, based on my experience, my observation, in our department, our college never delayed like that.  One year, two year signature on the evaluation, that is not common, in my mind.  I wonder if any SOP from human resources language at some point and cut language and document the procedure.  If something happen, if sanction is needed, what kind of a procedure or paperwork need to do?

A.   So that doesn't exist in terms of a clear SOP about how that needs to be handled.  Typically, because it's an AOP, it's an academic operating policy or procedure, and so that typically flows through the provost's office, through the deans, and with proper approval, then there are situations where there could be an delay in an annual evaluation.  Each department -- like, I know everybody wants me to be able to say that, with 100 percent certainty, all departments do X, Y, and Z, but the truth of the matter is, there are so many

JULIA MORRISON
JUNE 04, 2025

different departments all across campus and they all are operating under different leadership, so it is not possible for me to say with 100 certainty that every department is doing the --

Q. Which that's why there is an AOP or SOP there.

A. So the AOP is under the deans. Yes, your annual evaluations are signed, then go to your dean's office, and that becomes the repository. Again, HR is only involved in faculty annual evaluations when there is some kind of issue.

DR. LU: Thank you.

BY DR. GRALA:

Q. So Dr. Kundu asked if a faculty wanted to delay his evaluation, they could submit a request to a department head or a dean. But if you have a department-wide delay in evaluating all faculty members in that unit, let's say for a year, who would approve that? Or is that annual (indiscernible) for that year?

A. So I think it -- ideally, it would be your dean's office because they would need to know that they wouldn't be collecting it from your department. And I am aware of cases where an individual might have requested delays because of their travel, because of a health condition, you know. We're not, you know --

Q. I can (indiscernible) higher department like it

Cathy M. White, CCR

## JULIA MORRISON
JUNE 04, 2025

took place in this case that there were two evaluations done for two different years at the same time.

A. Yeah.

Q. Is that the case?

A. Yeah.

Q. Okay.

A. And that does happen sometimes with interims if they don't have all the information or in the case where a faculty member maybe doesn't submit their annual evaluation materials in accordance with the guidelines and then, later on, comes back, we would give them the benefit and do those two.

DR. GRALA: Any other questions for Dr. Morrison? If not, thank you very much for your --

DR. MORRISON: Yeah, sure.

JULIA MORRISON
JUNE 04, 2025

CERTIFICATE OF TRANSCRIPTION

I, Catherine M. White, hereby certify that the foregoing pages contain a transcript of the testimony of said witness transcribed from Microsoft Meetings recordings TO THE BEST OF MY ABILITY.

I further certify that I am not in the employ of or related to any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature this the 12th day of August, 2025.

_____
CATHERINE M. WHITE

Cathy M. White, CCR

cathywhitecsr@gmail.com                                    601.405.3762