# Videotaped Videoconference Vijaya Gopu

## Li Zhang
## vs.
## Mississippi State University

## January 22, 2026



338 Indian Gate Circle
Ridgeland, MS 39157
601-573-0961

amanda@awreporting.com
www.awreporting.com

1

IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT


LI ZHANG                                         PLAINTIFF


V.                          CASE NO. 25CI1:23-cv-441-AHW


MISSISSIPPI STATE UNIVERSITY and
MISSISSIPPI BOARD OF TRUSTEES OF STATE
INSTITUTIONS OF HIGHER LEARNING          DEFENDANTS




        ************************************************


           VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
                        VIJAYA GOPU


        *************************************************



                  APPEARANCES NOTED WITHIN


             DATE:  THURSDAY, JANUARY 22, 2026
                      PLACE:  VIA ZOOM
                  DEPONENT APPEARING FROM
                   BATON ROUGE, LOUISIANA
                     TIME:  10:03 A.M.






                    BETHANY CAMMACK
                Certified Shorthand Reporter
                 Mississippi CSR No. 1526

APPEARANCES


ASHLYN BROWN MATTHEWS
The Winfield Law Firm
224 East Main Street
Starkville, Mississippi  39759
amatthews@winfieldlawfirm.com
        Counsel for Defendants


GRAFTON E. BRAGG
BraggLaw
965 Madison Avenue, Suite 2C
Madison, Mississippi  39110
grafton@graftonbragglaw.com
        Counsel for Plaintiff


VIDEOGRAPHER:  MATTHEW MAGEE

ALSO PRESENT:  LI ZHANG

3

# TABLE OF CONTENTS

PAGE

Title Page................................... 1

Appearance Page.............................. 2

Table of Contents........................... 3

Exhibit Index............................... 4


EXAMINATION OF VIJAYA GOPU

    By Ms. Matthews............................ 5
    By Mr. Bragg............................... 103
    By Ms. Matthews............................ 131
    By Mr. Bragg............................... 142
    By Ms. Matthews............................ 142


Reporter's Certificate...................... 144

Deponent's Errata Sheet..................... 145

4

EXHIBIT INDEX

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Dr. Gopu's Curriculum Vitae | 23 |
| Exhibit 2 | Dr. Gopu's Testimony, 6/3/25 | 57 |
| Exhibit 3 | Email Exchange, Re: My Email LI001767-LI001769 | 67 |
| Exhibit 4 | Email Exchange, MSU's Possible Withdraw, LI001740-LI001742 | 85 |
| Exhibit 5 | Email Exchange, UTC Letter of Support, LI001753 | 88 |
| Exhibit 6 | Email with Dr. Sherry's Letter MSU219882-MSU219883 | 123 |
| Exhibit 7 | Email Exchange, Green Light MSU243524-MSU243527 | 128 |
| Exhibit 8 | Email Exchange, Bumpy Ride MSU249328-MSU249329 | 143 |

5

THE VIDEOGRAPHER: Good morning. This is the videotape deposition of Dr. Vijaya Gopu, taken by counsel in the matter of Li Zhang versus Mississippi State University.

Today's date is January the 22nd, 2026. The time is now 10:03 a.m. Counsel may introduce themselves on record, and afterwards the court reporter will swear in the witness.

MS. MATTHEWS: This is Ashlyn Matthews, attorney for MSU and IHL and Mark Keenum and Alfred Rankins.

MR. BRAGG: Grafton Bragg, attorney for the plaintiff, Dr. Li Zhang.

VIJAYA GOPU,

having been remotely sworn,

was examined and testified as follows:

EXAMINATION

BY MS. MATTHEWS:

Q. Dr. Gopu, will you state your full name for the record, please?

A. My full name including the middle name?

Q. Yes.

A. That's VJ Krishna Arya Gopu. And we normally don't use the middle name too often. That's why I say VJ Gopu.

Q. Okay. I'm glad to hear you say your first name because I was not sure how to pronounce it. So thank you. VJ --

A. Yeah, VJ just like PJ.

Q. Okay.

A. VJ is -- actually stands for Victor. The Christian name is Victor.

Q. Okay. So Dr. Gopu, I guess I already told you who I represent --

A. Yes.

Q. -- but throughout our conversation today, I will probably be referring to MSU. We agree that when I do that, I'm referring to Mississippi State University?

A. Uh-huh, yes, I know that.

Q. Okay. Great. Have you ever given a deposition before?

A. I'm trying to remember, you know, to be honest. I might have done it, but I can't remember. Maybe in a structural engineering case or something, I might have given in the past. But not in the academic world.

Q. Okay. Yeah, I know that sometimes engineers get called in to be expert witnesses --

A. Yeah.

Q.    -- in cases they otherwise have no involvement with.  Maybe you've done something like that before?

A.    Yes, yes.  I think where there was some failure or something like that, that they asked me. I was an expert witness for that.  But I do not precisely remember.  This was quite a while back in my younger days, when I was not this busy, that I did some expert witness work, yes.

Q.    Okay.  Do you remember ever preparing reports for those -- for anything like that?

A.    No, I didn't.  I was not asked to, you know, prepare reports.  I was asked to provide my expert opinion on what happened.

Q.    Okay.

A.    So that's what -- in my area of specialty, so they asked me about it, and I provided the information.  And I think that was for the City of Baton Rouge, if I'm correct.

Q.    Okay.  Did you testify at trial?

A.    No.  There was no -- I tell you, they didn't go to trial.

Q.    They did or they did not?

A.    No, it didn't go -- it didn't go to trial. I don't think it went to trial, because I would

8

have been called again.

Q.   Okay.  Well, I'll tell you some things that you might already know, but in a deposition -- this is just to sort of tell you, I guess, the ground rules, for lack of a better term, for a deposition.

We always try to answer out loud so the court reporter can take down what's being said.  We also -- you know, I'll try not to talk over you, and I'll just ask that you try not to talk over me. Sometimes we do that just in normal life because we anticipate what somebody is going to say, want to go ahead and answer.

But we just try not to do that in a deposition because it makes the court reporter's job really difficult.  I'm sure I will forget, and I invite everyone to remind me when I've forgotten. And so if we have to remind you, just know we're not doing it to be mean or anything like that. Sound good?

A.   Yep.  I understand.  Oh, one question I have before we get started.  I got a call from one of -- somebody wanted to serve me a summons.

MR. BRAGG:  You want to go off the record since he's asking you a question?

AW Reporting
601-573-0961

MS. MATTHEWS: Yes.

MR. BRAGG: I'm fine with him asking. We'll go off the record for this.

THE VIDEOGRAPHER: One second. Off the record. The time is 10:07.

(OFF THE RECORD.)

THE VIDEOGRAPHER: Back on record. The time is 10:11.

MR. BRAGG: All right. So this is Grafton Bragg on behalf of Dr. Zhang. So we have designated Gopu as a hybrid fact/expert to give testimony that's consistent with that he gave at the administrative hearing in this matter.

And, you know, there's always a difficult line to draw between what really qualifies as expert opinion versus what's fact opinion. And so the designation was made out of caution for that reason.

I do think that Dr. Gopu can certainly testify about things that he has personal knowledge of, things that are rationally derived from his personal knowledge. And also he can give expert opinions, it's our position, on things that grow out of, you know, matters that he was involved in.

Dr. Gopu was not involved in some of the

things that he may get questions about. For example, the traffic counts project is one thing that springs to mind. And so it's our position that that would not be appropriate testimony for a hybrid fact/expert who has been designated in that way.

And so we're going to object for any of that sort of testimony about things he wasn't involved in to be used at trial. And then it's my understanding that Ms. Matthews will allow that to be a standing objection so that I don't have to continue to make it here today.

MS. MATTHEWS: Yes. And I'll confirm that.

MR. BRAGG: Okay. Thank you. All right. I'll stop talking.

MS. MATTHEWS: Okay.

MS. MATTHEWS CONTINUED:

Q. Dr. Gopu, so I guess you -- you understand that you've been designated as sort of a -- what was described as a hybrid expert/fact witness. Is that correct?

A. Yes, correct.

Q. So you are not being paid to give this testimony. Is that right?

A.   Oh, no, no.  Not at all.

Q.   Okay.  And you've not prepared any sort of report for this case?

A.   No, no, nothing.

Q.   Okay.  What did you do prepare for this deposition?

A.   What did I do?  I'm trying to think.  I read my testimony that I gave in the previous hearing, administrative hearing.  That's the only thing that I -- because I wanted to recollect what was said, and that's exactly what I would say today.

Q.   Okay.

A.   So nothing -- nothing -- when you tell the truth, you don't have any versions.  So it's really simple to remember.

Q.   Did you meet with Dr. Zhang in advance of the deposition?

A.   No, not at all.

Q.   Did you talk with him on the phone?

A.   He said that his attorneys would contact me.  That's the only message that I got from him.

Q.   Okay.

A.   I didn't talk to him at any length.  He just said, "My attorney is going to be in touch

12

with you."  Perhaps that was regarding this deposition.  But I was in Washington, DC, in the Transportation Research Board meeting, so I couldn't really have a conversation.

Q.   Okay.  Did you meet with Dr. Zhang's attorney ahead of the deposition?

A.   I mean, I had this telephone conversation.

Q.   Okay.

A.   That's it.  And that's only -- I've known about him only two days back.  I didn't know the attorney before then.

Q.   Okay.  About how long was your conversation, would you say?

A.   With whom?

Q.   With Grafton, Dr. Zhang's attorney.

A.   Oh, yeah.  A few minutes.  Maybe 10, 12 minutes.

Q.   Okay.  Did you review any of MSU's employment policies?

A.   No, I didn't.

Q.   Okay.  What about IHL's policies, did you review any of those?

A.   What is IHL actually?

Q.   Oh, I'm sorry.  That's the Institutions of Higher Learning for -- our State Institutions of

13

Higher Learning.

A.   No, I didn't review any of the policies. I didn't review anything from Mississippi State University policies.  I was just -- you know, I reviewed my testimony.  That's about all I did.

Q.   Okay.  Fair enough.  So where do you live currently?

A.   I'm in Baton Rough.

Q.   You live in Baton Rough?

A.   Yes.  I've lived in Baton Rouge for the past 48 years.

Q.   Okay.  So do you work for the University of Louisiana at Lafayette?

A.   Yes.  I'm an endowed professor, but I have a joint appointment that's also associate director for the Louisiana Transportation Research Center. That's a joint appointment.  Joint appointment in the sense that the Transportation Research Center buys my time out from the university.

Q.   Okay.

A.   So -- they have to because the university won't let me have an office here if somebody's not paying them.  So I'm a source of money for the university.  Let me put it that way.  That's our joint appointment.

14

That's a very unique appointment, as a matter of fact. There's only one such appointment I know of this nature at any center, at any state-funded center. The Transportation Research Center is completely a research arm for the Louisiana Department of Transportation.

Q. Okay.

A. So I deal with the external programs, funding from the federal agencies, National Science Foundation, national academies. So I'm the one who is the contact person for the DOT.

Q. Okay. So you still -- you have a title of professor, but you're not -- with the University of Louisiana at Lafayette, but you're not --

A. No, no. I'm with the university. I'm a tenured professor, so I'm with the university, but I do not teach. Because --

Q. Right. You do not teach. Okay.

A. Yeah, because I'm a hundred percent in administration and research. So I do not teach. That's why my physical presence on the campus is not required. I go there whenever -- you know, on certain things, certain meetings, administrative meetings and all that, I go there. But I'm a fully tenured professor there. If I leave the

15

Transportation Research Center, I'll be a hundred percent on the campus.

Q. Understood. So did you -- were you involved in submitting -- well, I assume that for this center that you run now, that there is a proposal submitted at some point to have it funded. Is that right?

A. Okay. The center does not participate in the UTC program. Only the university. So when I submit a proposal for the University Transportation Center, it has to go through University of Louisiana at Lafayette.

Because the center doesn't participate in the UTC program. They cannot participate. It's only for institutions of higher learning. So Mississippi State, University of Louisiana, Tulane. Any major university can participate. But state centers are not eligible.

Q. Okay. So what kind of work does the center do?

A. We do -- the center, we have different programs. We have people who do research on asphalt, concrete, intelligent transportation systems, safety, geotechnical, a whole array of things. So we have what's -- and then also we are

16

involved with technology transfer for the DOT people.  There are 4,500 employees, so the center is involved in training for all these people.

And so we have about 35 research type of people.  And some of them are embedded in universities, and some of them are civil service employees.  So the center does a lot of different things.  And then we -- the center also contracts with universities.  We offer research contracts to faculty at all state universities.

Q.    Okay.

A.    At any given time we might have 50 or 60 research projects that have been undertaken, half of which are universities.

Q.    Okay.  Has Dr. Zhang ever had a contract with --

A.    No, no.

Q.    Okay.  Has one ever been offered to him?

A.    No.  Because most of our contracts go to state institutions, faculty at state institutions. And sometimes we go out of state when the expertise is not there.  Sometimes if we do not have a faculty member who has the necessary expertise, then we go out of state.

But anybody can respond to the RFP that

17

are put out by the center.  But we try to find faculty members within the state to do the work. And if we can't, you know, we absolutely have to farm out.

Q.   Okay.  So the Louisiana Transportation Research Center that you work at will put out its own RFP for a project that's available for people --

A.   Correct.  That's right.  But I'm not involved with that, because I'm not involved with anything internal.  Because I'm only involved with external.  That's why I'm an associate director of external program.  That means -- suppose a faculty member wants to go on something and proposes it. We assist in that particular effort.

Because the Transportation Research Center is also an eligible entity for National Science Foundation funding.  Certain things we can do -- the center can do, certain things they cannot do. When it is the university only, then I have to go through the University of Louisiana.

Q.   Okay.  Thank you for explaining all of this to me.  The research world is vast --

A.   Oh, yes.

Q.   -- and I am trying to understand it, but I

18

might have some other questions that may not make sense to you because I don't have a good understanding, so...

A. That's fine.

Q. I appreciate you helping me out on that.

A. No problem.

Q. So I'm going to -- I kind of got ahead of myself. So I'm going to back up real quick, and just ask you a question. And it might seem like a weird question, but I have to ask it because of some of the issues that are in this case, but --

A. Yes.

Q. -- what do you consider your race to be?

A. Asian. South Asian. Southeast Asian. So Asian means all the way from China to Iran. So I'm a Southeast Asian.

Q. Okay. So where are you from originally?

A. Originally from India. I came here 55 years back.

Q. Okay. What brought you here?

A. I went to graduate school at Colorado State. I did my master's and Ph.D. there. And then went to do consulting. Did that for three years, four years. And then came to LSU as a young assistant professor.

19

And that's -- and then I continued. Basically that's how I got -- I came to Louisiana. I was a consultant in Denver, and then I came to Louisiana in 1978. Never thought I would be here for 50 years. So I got kind of stuck.

Q. Yeah. So I'm going to share my screen with you really quick.

A. Okay.

Q. Tell me if you can -- can you see my screen?

A. Okay.

Q. It's a document --

A. Yeah. Can you enlarge it by any chance?

Q. Yes.

A. Oh, that's my bio.

Q. Yes. Oops, that's a little bit too big.

A. That's good. I think even -- I mean, I know my bio. Go ahead.

Q. Okay. Well, I was going to ask you about this one. So I got this from a -- it was an email that was sent in 2022 that had your CV attached.

A. Okay.

Q. And so I just wanted to see -- I think this is the most recent CV I have for you, so I wanted to see if there's anything different on

20

here, if it would need to be updated.

A.    Oh, it definitely has to be updated.
Quite a bit.

Q.    Okay.

A.    Because my CV from 2022 and 2026 are not
-- I mean, as far as appointments are concerned,
it's correct, but a lot of other activities are
excluded in this CV.  So if you want I can send you
the latest one.

Q.    Okay.  Yeah, that would be great, if you
don't mind.  I guess you could send it to Grafton,
and he could route to it me.

A.    Yeah.

MS. MATTHEWS:  Does that work,
Grafton?

THE WITNESS:  Yeah, I'll send it to
him.

MR. BRAGG:  It may be nice to take --
would it be good just to take a three-minute break
so he can do that?  It may save us some time on the
back end.

MS. MATTHEWS:  Actually, yeah, let's
do that if y'all don't mind.

THE VIDEOGRAPHER:  Off the record.
The time is 10:23.

21

(OFF THE RECORD.)

THE VIDEOGRAPHER: Back on the record. The time is 10:38.

MS. MATTHEWS CONTINUED:

Q. Okay. Dr. Gopu, I've got your updated resume, so now I'm going to share my screen again with this document.

A. Okay.

Q. Can you tell me when you're able to see it?

A. Yeah, I can see it.

Q. Okay. So this looks like the one that has been updated. Is that right?

A. I think so. Well, let me take a look what I sent you. So I have it here, so let me open it. Yeah, that's what it is. I think you have it.

Q. Okay. Great.

A. Slightly reformatted in a sense. That's what it is.

Q. Understand. So your education here, it looks like you got your bachelor's degree in India and then came over to Colorado in the U.S. to get your master's and your Ph.D.?

A. Yes.

Q. Okay. And it looks like your work history from when I was looking at your old one -- I assume

AW Reporting
601-573-0961

22

the long, long time ago stuff is probably still the same. But I looked like you had started out for working for the company before you went into academia.

A. Correct, yes. I worked -- in between my master's and Ph.D. I worked for one year, and then after my Ph.D. I worked for three years.

Q. Okay. When you first made the switch, you went to LSU?

A. Yes.

Q. Okay. And it looks like you kind of -- you know, you did LSU, maybe Tulane --

A. No, LSU at Huntsville.

Q. LSU and then Huntsville, and then back to Louisiana?

A. Yeah, correct. That's -- Tulane offered me, so I was -- I didn't even move to Huntsville. I was commuting every week. That became a pain. And when Tulane offered, I immediately switched to Tulane.

Q. Okay.

A. And that's when -- I was a department chair at Huntsville, and then I was a department chair at Tulane.

Q. Okay.

23

MS. MATTHEWS: Let me go ahead before I forget. We'll mark this as Exhibit 1 to Dr. Gopu's deposition.

(EXHIBIT 1 WAS MARKED FOR THE RECORD.)

MS. MATTHEWS CONTINUED:

Q. Okay. So do you have any certifications aside -- you know, you got your bachelor's, master's, and Ph.D. I think I saw that you had a PE certification?

A. Yes. I'm a licensed professional engineer. And I'm also a member of the state licensing board for professional engineers and land surveyors, which is an appointment made by the governor. So that's a six-year appointment, from 2022 to 2028, I'll be on the board. And next year I'll be the chairman of the board.

Q. Okay. All of your experience at universities, have you always been in the civil engineering department?

A. Yes, always.

Q. And I see that you have some endowed appointments.

A. Yes.

Q. Can you explain what that means?

A. Okay. Endowed appointments are something

24

that the university makes a selection based on the faculty member's record, and it is an endowment that supports the faculty member's travel, and, let's say, provides a supplement and things like that. And so that's basically an endowment to retain the faculty member.

Q. Okay.

A. So that -- you know, so it gives you a title, and then it gives you discretionary support.

And then at the University of New Orleans I had a $2 million endowment. So that supports a lot more than just, you know, a portion of your salary and, you know, everything. So it depends upon the type of the endowment you have. And they give you a title.

So I had that from LSU. At Tulane I didn't have that endowment because I went as a department chair, and I didn't ask for an endowed position.

COURT REPORTER: And you did what? I'm sorry.

THE WITNESS: I didn't request an endowed chair position. I went as a department chair. So that was adequate.

MS. MATTHEWS CONTINUED:

25

Q.   Does it come with any additional job responsibilities?

A.   No.  A normal endowed professorship doesn't come with additional responsibilities.  But a department chair is completely different.  That's an administrative position that comes with a lot of responsibilities.

Q.   Right, right.  So the endowment -- I just want to focus back in on the endowment chair.  It sounds like it's a pretty big honor to be given something like that.  Is that --

A.   Yes.

Q.   -- fair to say?

A.   Yes.  Generally.  An endowed chair is a very big honor.  An endowed professorship is a good honor.

Q.   Oh, okay.  So there's different levels of --

A.   Oh, different levels.  An endowed chair is the -- you know, is the top -- what do you call -- recognition for a professor.  And an endowed professorship is a little different.  It's a smaller amount.

Q.   Okay.  So the difference is the title and then the amount of --

26

A.   Correct.

Q.   -- money that goes into the discretionary fund?

A.   Exactly.  Endowed chair, they're usually in the millions.  An endowed professorship is usually in hundreds of thousands.

Q.   Okay.

A.   So there's a big difference.

Q.   Still not bad, but not as good as millions, right?

A.   Yeah, yeah.

MR. BRAGG:  It's a zero.

THE WITNESS:  Yeah, just a zero.

MS. MATTHEWS CONTINUED:

Q.   Okay.  So not every faculty will receive an endowed position --

A.   No.

Q.   -- of anything, right?

A.   No.  The university has to have the endowment in order to support the professorships, so they have only a limited number of professorships.  And they try to award all the senior professors with an endowed professorship, but that's not always possible.  All the universities don't have the large endowments.

27

Q.   Okay.  Do you know about endowments that MSU has?

A.   I have no idea.  I have no idea of how many endowed professors they have or how many endowed chairs they have.  I've never really inquired into that at all.

Q.   Okay.  In your experience, how is it chosen who is given an endowed professorship or an endowed chair?

A.   What happens is, they -- every year -- I mean, depending upon the availability, the university would tell that we have an endowed professorship in engineering.  So people can nominate you.  Can nominate you for the -- for the endowed professorship or endowed chair.

And there's a selection committee that would review your nomination and your résumé and then decide whether you are the top candidate for that professorship.  That's how it is done.

Q.   Okay.  Has that been at every university?

A.   Almost every university there's a nomination, and there is a selection.  Nomination doesn't mean you're going to get it.  I mean, you know, you're one of the candidates for the professorship.  And there's a committee, a

28

selection committee, that the -- depends upon the college. The dean of the College of Engineering would appoint the selection committee. And then they would recommend who gets that.

And it could be from all disciplines. It could be the civil engineering, mechanical, electrical. You're competing with the colleagues from the entire college. And that's the same thing that happens in all colleges. Each college has its own professorships. So I cannot get a professorship in sciences.

Q. Is it usually a professor who has -- I guess you were able to -- is it a negotiation that's made when you go to a new you've sometimes or --

A. No. It's not a negotiation. You could say that I have a professorship, or I have an endowed chair at the university -- let's say I'm going from LSU to Tulane. I can say, "Wait a minute, I have a professorship at LSU. Do you have a professorship to offer me at Tulane?" You can use that as a -- you know, as a bargaining thing.

And you can then -- sometimes they hire you with an endowed chair. They'll say, "We want you, and we want you to come and join the

university.  We have an endowed chair that we can offer."  So it's a discretion of the university and administration whether you can get it.

Q.  Okay.  So at some point it looks like you went to work at the UTC for Alabama at Huntsville?

A.  Yes.

Q.  Okay.  Was that your first --

A.  But -- okay, that was a part of my activity.  I was an assigned director for the U.S. Transportation Center in Alabama.  Because in Alabama our UTC had University of Alabama at Tuscaloosa, University of Alabama at Birmingham, and the University of Alabama at Huntsville.

So these three universities were a team. Just like the proposal we submitted with Li. Except the universities were all from different states.

But in Alabama it was one UT -- the UTC was only within the state.  That was very peculiar, because normally UTCs are not like that.  UTCs are with campuses across the country.  But in Alabama it is called UTCA, University Transportation Center for Alabama.  So they were somehow able to wing it and get a UTC for the state.

Q.  Okay.  Were you involved in doing that

30

proposal for that one?

A. Yes. We got a renewal, yes. I worked with the other UTC side directors from Birmingham and from Tuscaloosa.

Q. Were you the PI?

A. No. We have co-PIs. Because there can be only one PI, and that's a school usually. A school was the lead institution, and we were the site. So I was a co-PI.

Q. Understood. Do you know if any sort of congressional support was requested for that proposal?

A. I cannot recall. There must have -- Tuscaloosa must have done something. And I do not know what the lead institution did. But we at Huntsville and Birmingham, I don't think we sought congressional support. Tuscaloosa might have done it, and I can't remember.

I remember the director and the lead PI was Dan Turner, but -- he might have used his connections, you know, in the Alabama congressional delegation. But I never asked him that question.

Q. Okay. That would've probably gone through the Tuscaloosa part because they were leading?

A. Correct. I said that it might have gone

31

through the Tuscaloosa University administration. The chancellors and so on might have done it. Because the -- I'm trying to remember where the -- what do you call -- the university regents -- oh, that was located -- the university regents is located in Montgomery.

So I think that the university administration might have worked it out. I do not -- I don't remember. We did not. I did not get involved with the legislation or anything like that at Huntsville. And I know Birmingham did not get involved.

Q. Okay. Understood. It looks like you were there until -- oh, let's see. What was it? 2003 or so?

A. Yeah. 2003 I moved to Tulane.

Q. To Tulane. Okay. And that's when you became department chair, right?

A. Yeah. I was a department chair at Huntsville, so --

Q. Oh, okay.

A. So I was just a -- it's a parallel move. I mean in the sense -- appointment-wise it was the chair -- department chair to department chair.

Q. Got it. Okay. When did -- how long has

32

it been since you've had to teach any courses?

A. The last time I taught a class was in 2014. 2014, I think. '13 or '14. I taught at University of New Orleans. I would teach -- at the University of New Orleans, I used to teach one class a year. And I think that was the last time I taught.

When I moved to Lafayette, you know, I negotiated that this is going to be too much, too taxing. Because I live in Baton Rouge, it's too taxing for me to come to the center and then go and teach a class -- you know, two classes every week. So the president exempted me from the teaching responsibility.

Q. That was nice.

A. Yeah.

Q. Okay. So I guess let's just narrow down so I can get an idea of what your experience in university administration is. We've got department head -- or department chair, I guess, at University of Alabama at Huntsville. Then the same thing at Tulane.

A. Correct.

Q. And that's a collective eight years, right?

33

A.   Yes.

Q.   Okay.  Let's see.  What am I missing?  Has there been anything else where you've served in an administrative role for a university?

A.   Yeah.  Because the center directors are also administrators.  Because we have to manage the center funding and having the faculty to work on projects.  So it is kind of a department chair.  It comes with a department chair, plus you have to manage the center, your site.  So it's kind of the department administration and the center administration.

Q.   Okay.

A.   So the two are embedded.  It's not discretely different, but it's embedded in your duties, so...

Q.   Okay.

A.   And that's -- at Tulane we didn't have a transportation center, but I had programmatic centers.  I had water resources research and management center -- I mean, program.  So there it was more programmatic administration, introducing new programs.

I introduced a master's in environmental engineering.  You know, a doctoral program in water

34

resources engineering. So it was more programmatic administration. Besides just faculty administration, but you had to do also program administration.

Q. Okay. Have you ever served as a dean?

A. No. I'm glad. I'm sorry. No, I never served as a dean. I was asked to serve as a dean. I was asked to, you know, take the position, but I said no.

Q. No, thank you, right?

A. No, thank you.

Q. Okay. Have you ever served in a vice president role?

A. Oh, at the university?

Q. Yes.

A. No. Not the vice president. I interact with the vice presidents, you know, quite a bit. Because my research activity and everything, I interact a lot with the VPs. So I know what to do. I'm quite aware.

Q. Okay. So I guess this probably goes without saying, but you've served as a provost or president of a university, right?

A. No, no. I never served. Beyond department chair and the center administration, I

35

didn't serve anything higher than that.

Q. Okay.

A. But though I have a lot of interaction with the deans and the VPs in particular. Not the presidents. Presidents is a different level. VP for research and the deans of the colleges, I interact quite a bit.

Q. Okay. I'm going to stop sharing my screen. I think we can move on from the --

A. Okay.

Q. -- CV part. Thank you for working through that with me.

A. No problem.

Q. How long have you known Dr. Zhang?

A. Dr. Zhang, the first time I interacted with him was when we had joint UTC with -- when I was at the center with LSU and Mississippi State. And that's when Dr. Burak Eksioglu was the lead from -- at the Mississippi State end.

Q. Okay. Can you spell his name really quick?

A. B-u-r-a-k, Burak. Eksioglu, E-s-k-i-o-g-l-u. Eksioglu. I can send it to you.

Q. Okay. That sounds like a name that would be very impressive to know how to spell off the top

36

of your head, so...

A.   Yeah.

Q.   Okay.  So around what year would that have been where y'all were working on that?

A.   I think that's about 2011 and '12.  I can't precisely state the date.  Two thousand -- I would say 2011, '12.  That's when I first met Li.  Because we got that funded.

That center we worked -- similar team worked -- we had Old Dominion University, the University of Denver, Mississippi State, Ole Miss, which is the University of Mississippi, and then LSU, that I was participating in that role.  And I'm trying to think.  And I think Hampton University.  Hampton University.

I think we had five or six institutions participated.  We had wrote a strong proposal, and that is -- that we won that with the first attempt.

Q.   Okay.  And you worked together on that proposal?

A.   Yeah, we worked together on the proposal.  And we made it, you know, a winning proposal.  So we all worked together.  And I did, you know, editorial work to make sure that we offered the input for the right sections and all that.  We did

37

that.  It was a winning proposal.

And then we worked on that for a few years.  And then we submitted again in the 2016 cycle.  But we -- 2016 cycle, I think.  And we did not win that one.

Q.  Who was going to be the lead institution on that one?

A.  That was -- oh.  Let me tell you this. What happened, I think it might have been Clemson. Because Burak Eksioglu moved to Clemson.  I'm trying to remember whether he moved after 2016 or before 2016.  I can't remember that.  But he was still the lead.

So if he was at Mississippi State, then obviously we submitted through Mississippi State. We didn't change the lead PI.  We kept them the same.  The same universities, but Burak might have moved to Mississippi State -- Clemson by that time. I'm not sure.  I have to verify.  I have not looked at -- you know.

Man, I wish I remembered it, but anyhow. Mississippi State may not have been involved.  I do not know if -- Li might be able to tell you whether he submitted.  I have to go back and look at my records.

38

Q.   That's fine if you don't remember.  It's okay.

A.   Yeah.  Well, 2016 we submitted again.  We didn't win.  And then in 2022 there was a notice of funding opportunity.  That's when Li said, "Let us lead the UTC proposal for Tier One."

Q.   Yes.  Okay.

A.   So we worked with the Mississippi State people, you know, from 2012 all the way to '22.

Q.   How often -- when you were working on that in -- or I guess since the 2011 UTC was funded --

A.   Yes.

Q.   -- and then you said you and Dr. Zhang would -- y'all both worked for the center.  Is that right?

A.   Yes.  We worked for the center.  Meaning he was the co-PI, I think, at Mississippi's -- at the lead, and I was managing as a site at BRC LSU.

Q.   Okay.  So was he kind of a supervisor over you at that point?

A.   No.  No, there's no supervisor.

Q.   Okay.

A.   Each state is separate.  So there's no -- it is a collaborative effort.  There's a lead institution which is responsible for submitting the

39

reports.  Not the sites.  The lead institutions has to get the information from the sites and submit the report.  So that's an extra duty for the lead institution.  But the PI, the principal investigator, of the lead institutions has more responsibilities than the PIs at the sites.

Q.  Okay.  So when y'all were working at that center together, how often would you guys communicate or work directly together, if you had say?  Daily, weekly, monthly?

A.  Maybe -- I communicated only with Burak because he was the lead PI.  I didn't communicate at all -- I don't recall communicating with Li unless there was an email or something requesting something.

Otherwise, our communication was strictly with Burak Eksioglu.  And that one, we would perhaps have communication every week or biweekly or something.  And then we would have meetings.  So we'd get together and then have -- all the site directors, we would get together and have meetings.

And there was an annual meeting at Mississippi State University.  Because all of our researchers who worked on the projects, they would come in and make presentations and all that.  So

40

that was an annual meeting of the center.

Q.   Okay.  So have you and Dr. Zhang ever hung out socially?

A.   No.

Q.   Okay.

A.   Not -- not really.  Because we had the other site directors, right, so I was hanging with other site directors, because we were discussing, you know, how things were going and all that.  So I don't recall hanging with him socially at all.

Q.   Did you ever discuss any issues he was having at work?

A.   No.  Because he didn't have any issues when we were working.  I mean, to my knowledge, in 2011 and '12, there were no issues.  I didn't know anything -- any issues existed until -- until the '22 thing came up, I didn't know anything happened -- anything was happening.  So '22 was when things surfaced, let me tell you that.

Q.   Okay.

A.   Okay?  Until that we had no knowledge at all about anything about Mississippi State.

Q.   Okay.  So would he tell you about issues he was having while you were working on the proposal?  Did he talk about issues at work then?

41

And not for 2011.  For the 2022.

A.   2022, he didn't talk -- I think the thing came up when this congressional -- I mean, when Patrick Sherry of University of Denver ran into Mississippi lobbyists or something.  That's when the things hit the fan.

So that's when we found out there was a problem.  That's the first time, I think, we discerned there was some conflict or some -- the university was upset with Li.  That's when we found out there was something going on.

Q.   Okay.

A.   Until then we were just working as if -- we present, you know, the proposal.  We have all team up and work on a proposal.  We had a meeting in Jackson, Mississippi.  All the site people came from different places.  We sat together and worked out the proposal.  We put the proposal together.

I think when the proposal was completed, that's when we found out there was some issues. With the university being upset about what happened in DC when Patrick Sherry went to meet his lobbyist or his congressional delegation.  That's when we found out that he'd interacted with the Mississippi people, and the university was upset.  Until then

42

we didn't have any feel that there was a conflict.

Q. Okay. Did he ever mention anything to you about other issues, other than the congressional support issue or just the UTC in general? Did he --

A. No. I don't recall him talking about any specific issues related to the UTC proposal. He did mention one thing. We had -- when we were in Jackson, he did mention that his -- you know, he talked about his child having some needs or something like that.

That's the only think I recall. And I said, "I'm sorry to hear that." That's all. So he was mentioning that -- I think his child is special needs or something. I don't know. I can't remember.

Q. Okay. Did he ever complain to you about his department head?

A. No. We never talked about administration at all. About his chair or dean or anything. The first time all this surfaced was when the UTC proposal was written and we were going to the submission stage.

That's when we realized there was some friction. Friction or some element of concern at the university administration level. I didn't

43

really know that at all.  Nobody knew about -- I don't think any of our site directors knew about this problem.

Q.  Okay.  You've never served in any kind of supervisor role over Dr. Zhang.  Is that right?

A.  Oh, no, never.  I had no supervisory -- I had no role in Mississippi State.

Q.  Right, right.  Okay.  But the whole time you've known him, it's been -- essentially you're equal collaborators on things or --

A.  Correct, yes.  Equal.  Especially on the '22 proposal.  On the 20- -- on the '11 and '12 -- 2011, '12 proposal, it was still with his colleague.  He was -- our primary contact was another person and not Li.  So we knew Li was working with -- you know, in the team, but our primary interaction was with Burak.

Q.  Okay.  You've never had to evaluate his work performance?

A.  Oh, no.  They wouldn't allow me to evaluate, being from another university, I don't think.  That's the last thing the university would do.

Q.  Okay.  And you've never participated in any sort of employment decision regarding

44

Dr. Zhang. Is that right?

A. No. Yes, absolutely. Never participated.

Q. Have you ever exchanged text messages with him?

A. Oh, when we were writing the proposal, yes. And after that, there was very little interaction. But I can go through and send you whatever messages I got from him. I can go through.

Q. Okay.

A. I have it on the phone because I don't think they're deleted.

Q. Okay. How often -- since this UTC proposal finished and that was all done with, how often do you guys email each other, would you say?

A. We never email. We don't have any communication. After the UTC proposal got declined or -- I don't -- we don't even know whether it was submitted, first of all. Because we never saw the reviews. I think things got pretty tough after the proposal was written up, and we didn't -- the team didn't know whether it was submitted, and the team had never seen the reviews from the UTC program.

Then we knew about all this -- that there was some concern. So we didn't pursue anything.

45

But we knew we didn't get the award.  Because the announcement did not list Mississippi State as a recipient of the Tier 1 UTC.

Q.   Okay.

A.   Till today, I do not even know whether the university submitted the proposal.  I have no idea.

Q.   You recall appearing at an administrative hearing for Dr. Zhang in June 2025?

A.   Yes.  I remember very well.

Q.   You were invited by Dr. Zhang to testify at that, right?

A.   Correct.

Q.   And you appeared via Zoom like this, right?

A.   Yes, via Zoom, yes.

Q.   Or whatever -- I don't know if it was Zoom or a different platform.

A.   No, it was Zoom, but there were so many people, I think this is a much better setup than that Zoom.

Q.   Right.  It was all -- it was everybody in a room, and then you had to be on the screen for everything.  Is that --

A.   Oh, yeah, that's right.  Yeah.  You can't tell whom you're talking to.

46

Q. Right. I think you may have already talked about this, but you communicated with Dr. Zhang ahead of that, right, to set that up?

A. That one, I can't recall. It's been last year, so -- he might have talked to me or emailed me or something, and then I said -- to testify, and I said, "Yeah, I would be glad to do that." Because he was asking me to report what I know. That's it.

Q. So it sounds like any communications that you would've had with Dr. Zhang after this UTC proposal fell through and that was over, it sounds like any communications y'all had would've been related either to that administrative hearing or with this litigation that you're --

A. Yeah.

Q. -- here for today?

A. Yeah. After the UTC got declined, the proposal got declined, there was really nothing to communicate. Because we didn't see Mississippi State as a winner, so I think people just ignore it. You know, okay, we submitted a proposal, it didn't get funded, and then we move on, right? I think -- there was no followup.

And the thing that concerned me is, we

didn't see the review.  So now I'm saying, wait a minute, did Li submit the proposal?  Because we can't submit a proposal.  Mississippi State had to submit because it's the lead institutions.

So the question becomes:  We didn't get the reviews.  Did the university not submit it, or what happened to the reviews?  So we have still not seen the reviews.

Q.   Okay.  So when you appeared for the administrative hearing, when you went to, I guess, give testimony there --

A.   Yes.

Q.   You understood at that time that Dr. Zhang was facing a possible termination?

A.   Yes, I know that.  I knew that.  And I also understood that one of the concerns was -- his termination was triggered by this -- approaching the congressional delegation.  That's what I thought.  Because his -- he was told not to approach the congressional delegation.  But they thought he disobeyed and approached it, which he did not.

That contact was done -- was made by Patrick Sherry.  I know that very well.  So that's the one thing I know.  That maybe he triggered the

48

anger of the administration because of what happened in Washington, DC. That's all I know.

Q. Okay. So when you appeared at the hearing, you were appearing as an advocate for Dr. Zhang?

A. Yeah.

MR. BRAGG: Object to the form.

THE WITNESS: My advocacy was very simple. That he had nothing to do with what happened in DC. That's what I was saying. Please don't blame him. That's all I was saying.

I mean, there's nothing wrong in saying your colleague -- you know, if he gets blamed for something which he did not do. I'm just telling the committee that you can find fault with other things but not this thing. Don't hang this thing on his neck when he had nothing to do with meeting anybody in Washington, DC.

It was all done by -- I had nothing to do with it either. They could've easily said, hey, you're responsible. I didn't go to DC. You know, Patrick Sherry went to DC, and you're the home lender. You know, I did it, and I didn't know that I was violating anything. But, you know, anything -- anyhow, this happened.

49

My testimony was to basically say he had nothing to do with what got Mississippi State University angry. Because they felt that he was disobeying the directive, I think. I said he did not participate. Somebody else interacted.

That's all I was -- my testimony was focused on that one. I knew that that got him into trouble, and that's why I was willing to testify. Because I was involved in the proposal, and I knew what happened.

MS. MATTHEWS CONTINUED:

Q. Have you ever participated in a similar proceeding in any of the universities you've worked for?

A. No. In sense of dismissal, yes. Because when I was a department chair at Tulane, we had to terminate a professor for due cause. And that has nothing to do with this. That had everything to do with his work at the university. It has nothing to do with a proposal or disobeying or something. He just did not do the work.

And when your professor doesn't do his work, you know, we have a choice. You know, we had to terminate him or do something. So I was involved with that. And the faculty committee

50

supported the decision of the department.

Unfortunately, I was the department chair, and I had to do that. But it was so egregious that we had no choice but to, you know, tell him that -- you know, to terminate. So I was involved.

Q. Can you explain how that professor was not doing his work? Without giving me names. You don't have to tell me --

A. Yeah, yeah, I can't give you names because -- he was -- see, at every university they go through an ABET evaluation. Every division goes for engineering and technology. Every six years. And we have to provide the continuous improvement.

We have to provide -- the professor has to maintain a dossier kind of thing of all the work that was being done by the students, with grading and -- so many metrics have to be -- had to be kept track of, right? He didn't do any of that stuff.

And that jeopardizes the reputation of the department, of the program. So we couldn't allow that. And he didn't have office hours. You know, he would come whenever he pleased, and so that didn't work out. And this is a private institution, where students are paying 50 to $60,000 tuition. And you can't see the professor.

So that didn't go very well.

I think there were a lot of things. I mean, just not one. I think there was a litany of issues that undermined the program. So we couldn't allow that.

Q. Okay. So you said there was an issue with the students not being able to see the professor?

A. Yeah. The student -- because he -- we have specific office hours. You know, he wasn't there for the office hours. And he did not prepare the package for the ABET accreditation. So all those have to be done. And if you don't prepare the package, then it hurts the ABET review. And we can't afford to lose state accreditation, being such a premium school.

Q. Right. It's pretty serious in my understanding when the ABET evaluator visits, right?

A. This is very serious. Because we have to prepare a lot of stuff and a lot of material. And the department -- as a department chair, I can't do that. The professors have to participate in that and then do it.

And that is mandatory for us. It's not an optional thing, well, like, you know, I'll do it

52

next semester.  No.  Every semester you had to do it.  So you had to keep track of the progress.  So that's required.  So when the professor doesn't do it you know, that's -- we have issues.

I participated in one more.  Let me put -- never at LSU.  Never at Huntsville.  One at Tulane.  That's it.  In my entire 48 years as a professor.

Q.  Okay.  I just want to -- one thing about the ABET visits, I just want to ask you a little bit more about that.  Because it seems like -- from my understanding, there's also -- you have an evaluator come visit and actually talk with people, have meetings, in addition to all the paperwork that has to be submitted, all of that.

A.  Yes.

Q.  How long does the visit usually last?

A.  The ABET visit usually is no more than two days.

Q.  Okay.  And it's pretty structured and rigid as far as what --

A.  Yes.  Very structured.  It's structured because they have to do certain things.

Q.  Right.

A.  The evaluator has to do certain things.  And then there is a team.  Because the evaluator

53

for each program is different.  Mechanical engineering evaluator is different from civil engineering and electrical engineering and all that.

So if you have seven programs, there will be seven evaluators coming and examining the seven programs.  For each degree program, undergraduate degree program, there is one evaluator.  So you come and evaluate that.

That visit usually takes two days for the department and maybe another day for collective meeting, because they have to decide whether they're going to give them full accreditation or a short accreditation or whatever they decide.

Q.    And you pretty much -- you're kind of just doing whatever schedule the evaluator wants to do. Is that fair to say?

A.    Yeah.  I mean, the -- it's already been announced.  The evaluator is coming on this particular day, and they'll leave on this particular day.  That's all set up by the ABET organization.

Q.    And they tell you how it's going to go, and you just kind of have to do what they say, right?

54

A.   Yes.  Yeah.  But they give you guidelines to prepare for the ABET visit.  So would be standard documents.  I've been involved with half a dozen ABET visits.  So I know.  I've prepared documents for ABET visit.  So I know what is involved.  It's a lot of work.  And it cannot be completed without the faculty participation.

Q.   Okay.  And then the other issue with that professor was the student experience, right?  For the students --

A.   Student experience in the sense that he didn't maintain any specific -- what you call -- hours and -- he was not committed.  I mean, you can tell whether a faculty member is treating this as a part-time job.  So that didn't work out.

Q.   Did he have any, you know, special reasons for not doing what he needed to do?  Do you remember?

A.   No.  I think he -- I do not know, but I'm just guessing.  He had other activities on the side that took up all his time, and he had no time for the university.  I'm sorry.  You're getting a full-time job at the university, at Tulane, and you cannot have this as a part-time job.

Q.   Right.

55

A.   So that's what -- that's what -- I mean, I'm suspecting that's what happened.  I'm suspecting.  I do not know the facts because I do not know what his part-time job was.

Q.   Understand.

A.   Other job was.  Other job was.  I have no idea.

Q.   I understand.  So at some point you kind of have to put the students above what the professor wants, right?

A.   No.  The program.  The program.  If there's no program, there's no students either.  So the program is the priority.  So you need to maintain -- sustain the program.  That means you sustain your students and everything else that goes with it.

Q.   Okay.  So in your experience in doing these kind of proceedings, I guess you understood that they don't have to follow the same kind of rules as you would have to follow if you're in a court, right?  Like procedural rules.  Like that.  You don't have to follow the Louisiana rules of court or -- I'm not sure what they might have that there, but...

A.   For what?  To follow the rules for what?

56

Q.   Just for how the hearing might go.  Is it governed by internal documents and policies, or do you follow --

A.   Oh, I mean, the faculty member, you mean?

Q.   Well, just for -- yeah, for the hearings, like the --

A.   Oh, internal.  That's a university policy. That's a university hearing.  So the university establishes the procedure, and then you follow the university procedure for determining the action. So that's strictly -- each university has its own procedure.  So it's not one standard procedure within the state or within -- you know, for all the universities.

Q.   Okay.  I'm going to share my screen with you again.  Okay.  Tell me when you can...

A.   Yeah, I can see it.

Q.   Okay.  Do you recognize this as the transcript of your --

A.   Yeah.

Q.   -- testimony?

A.   Yes, I do.

MS. MATTHEWS:  Okay.  I'm going to mark this one as Exhibit 2 to Dr. Gopu's deposition.

AW Reporting
601-573-0961

57

(EXHIBIT 2 WAS MARKED FOR THE RECORD.)

MS. MATTHEWS CONTINUED:

Q. And it sounded like earlier when we referenced this that you had already kind of read through it?

A. Yeah. I glanced -- I mean, I took a brief look at everything.

Q. Okay. And I know you had said earlier you still agree with everything that you said in here. Is that right?

A. Yes, absolutely.

Q. Okay. So I'm not going to make you sit here and read it and tell me what you agree or don't agree with. Is that fair?

A. Yeah, no problem.

Q. Okay. So when you were giving these opinions in this -- at the hearing, were you applying any kind of written standard for academia or for professors or for administration? Is there any kind of written standard that you're relying on when you're giving these opinions?

A. No. I'm just giving my opinion. But there's no standard for administrators. I think it's -- or professors. I think it's -- you know, professors have to conduct themselves. They have

58

to be an example, so that's all you can say.  But they don't come with a set of instructions, you know.

They know that they have to do research, they have to teach, and then they have to, you know, write proposals.  And so that's -- the job is pretty well understood.  When you go through graduate school, you know.  And when you go to undergraduate school, you know what a professor does.  So that's basically it.  So there's no training program for professors.

Q.   Okay.  And it looks like in your testimony -- and I guess I was probably there, so -- but you were giving some opinions on, you know, what you thought about how MSU reacted to certain things, the actions that they took.  Is that fair to say?

A.   Yeah.  I said -- this was -- basically my comment was focused on this DC issue.  But I didn't comment on anything beyond that, I don't recall.  Did I say anything else beyond that?  I don't know.

Q.   I guess we can go through a couple of points in just a second.  But I guess I just want to confirm whether when you were giving these opinions -- and it sounds like, you know, you're pulling on your experience and things like that.

59

But did you do any sort of comparative analysis of MSU's actions versus actions that had been taken by peer institutions in similar situations?

A. Because I wouldn't be -- I wouldn't have knowledge of --

MR. BRAGG: Objection for the record. You can answer, Dr. Gopu. I just wanted to make sure I had my objection on the record. Go ahead.

THE WITNESS: What I'm saying is, I wouldn't know what other institutions have dealt with. It's impossible for me to know. And what I was saying was strictly related to Li being found -- the university finding fault with Li. That's what I was commenting on. That's the only thing that I was really talking about, is that he was not at fault.

In my opinion, he was not at fault at all. And this fault might lie with what happened with Patrick Sherry. And he didn't know that he was doing anything wrong either. Otherwise he wouldn't jeopardize the proposal. So that's what I was talking about.

I don't have any experience of how other universities or other people handle any specific issue. But sometimes, you know, actions are taken

60

by universities based on their own criteria, yes?
That's all I can say.  But in this particular case
I was commenting that it's not fair to blame Li for
somebody else's action.  That's all I was saying.

MS. MATTHEWS CONTINUED:

Q.   So what did -- do you remember what you
did to prepare for the administrative hearing?

A.   I didn't prepare at all.  I just spoke,
you know.

Q.   You spoke with Dr. Zhang?

A.   Spoke to -- no.  Zhang told me that there
will be a hearing, and he didn't tell me what the
questions will be.  He didn't say anything.  He
said, "Can you participate in the hearing?"  I
said, "I'll be glad to."

Because what I understood was that he was
getting into trouble on this particular issue.
That's what I was -- said, "I can definitely say
that you were not at fault."  That's the only thing
I said.  "And I'll be glad to testify."  That's all
I said.  And beyond that, I didn't say -- promise
him anything or discuss much further.

Q.   Okay.  I'm going to share my screen with
you again.

A.   Okay.

61

Q.   Let me know when you can see an email.

A.   Yes.

Q.   Okay.  Does this look like an email exchange that you had with Dr. Zhang?

A.   I can't -- let me get it closer because --

Q.   I can try to zoom a little bit.

A.   Yeah.  Can you zoom it?

Q.   My zoom is not very skilled today.

A.   "Let's talk on Wednesday at 9:00 a.m." --

MR. BRAGG:  Ashlyn, I think when maximized the PDF, that's allowed it to look bigger on y'all's end when I've been sharing it.  It may already be --

MS. MATTHEWS:  Well --

THE WITNESS:  Oh, yeah.  That's good. If you can scroll it, I can --

MS. MATTHEWS CONTINUED:

Q.   Okay.  Well, let me scroll to the bottom of it real quick.  You can see where it started here.

A.   You see, on my screen, I have a small laptop, and I can see -- is there any way to expand it?  Increase the -- is there anything -- oh, it's at 125.  Can you make it 150?

Q.   Let's see.

AW Reporting
601-573-0961

62

A.   Yeah.  Can you change that?  Yeah.  Okay.
Now scroll down.

Q.   So this is the bottom of the email.

A.   Yeah.  Go to the top.

Q.   Okay.

A.   Okay.  "Let's talk on Wednesday at 9:00
a.m. so we can figure out how to handle the Zoom
meeting.  Since we will be hiking in Whistler, it
will be difficult for me to tell where we would be
during our travel days."  Oh, that was last year,
right?

Q.   It was.  And you don't have to read this
whole thing.  I mean, I want you read it if you
want to refresh your memory, but you can just read
it to yourself if you want to take a moment.

A.   Yeah.  I can.  How do you scroll it?  "Try
to figure something out if you let me know which
day you have in mind."  Okay.  That's all.  I'm
asking him which day the Zoom meeting for the
hearing.

Q.   Okay.  And it looks like this was --

A.   May 5th.

Q.   -- May 5th, that was about a month before
the hearing, right?

A.   Yeah.

63

Q. Okay. So I'm going to scroll down to the email that looks like you got from Dr. Zhang that you were responding to. Is that a fair depiction of what this is?

A. "Looks like it will be good for us to have an initial meeting on May 7, this Wednesday from your calendar." Okay. "Would 9:00 a.m. in the morning be good or 1:30... I think we should end in around two hours." Oh, this is for the setting of the meeting? For the hearing?

Q. Well, I was going to ask you what it was about.

A. I can't...

Q. The hearing was on June 3. It started on June 3rd.

A. June. So what is this?

Q. It looks like you guys were setting up a time to talk ahead of the hearing.

A. You know, I can't remember. Let me -- can you scroll down further? And let us see for June. "Looks like your will -- you will... be able to join us..." So he's asking for a meeting.

"We will try to control MSU's questions within half an hour. Please let me know."

Q. So it -- and you can please correct me if

64

I'm wrong, but it looks to me like this is the same email. It's cut up between two pages.

A. Oh, okay. What did I say? "I have attached my May and June calendars so that you can decide on the day that I can testify." Oh, that's what I was talking about. I gave him the calendar, telling him this is the days that I'm open to testify. "Via Zoom or in person in Jackson or Starkville." That's what I said.

Q. Okay. And so the way I read Dr. Zhang's response is that, you know, he wants to set up an initial meeting.

A. Before the hearing.

Q. Right. That's what I -- that's what it looks like to me, but I wanted to ask you --

A. He might have to -- to me, there's no definite schedule for another conversation. If he had called me before the testimony, I wouldn't have heard anything more than what I already know.

And that was that the university was upset with him about the DC meeting. That's all he was able to tell me. Beyond that, I couldn't gather anything. And I do not know anything else beyond that anyhow.

Q. Okay. So you did have a conversation

65

beforehand. You don't -- do you remember if it happened on this May 7th date?

A. To be honest, I do not -- I don't remember we had -- it must have happened -- because of the way this email reads, it must have happened, but I can't remember when we had a conversation.

Q. That is fine. And it looks like he thought you would need to meet for around two hours. Do you remember if it ended up taking that long?

A. The two hours was for the hearing. Not for the meeting with him.

Q. Okay.

A. Just gave -- "I think we should end in" -- I thought that was for -- the two hours for the administrative hearing. Why would I talk to him for two hours? There's nothing for me to talk to him about.

Q. I know. That was going to be my question. The way I read the email it made it sound like possibly --

A. Yeah, no.

Q. -- to meet for two hours, and I was just curious if you ended up talking --

A. No, no, not -- I can't talk to Li for two

hours.  There's nothing --

Q.  Okay.

A.  -- nothing to talk about this hearing.  I think he was -- I understood that he wanted me to be ready for two hours for the hearing.  That's all.

Q.  Okay.  Understood.  That's fair enough. Okay.  I got myself off track here.

A.  That's okay.

Q.  Has Dr. Zhang ever told you about the claims that he's making in these lawsuits?

A.  Nothing.  I didn't know that he was actually filing a lawsuit, no, so -- let alone the claim.  I didn't know he was filing a lawsuit.  I know that we did administrative hearing.  After that there was no contact.  Absolutely nothing.

Until he said that you will have to -- my attorney will be getting in touch with you or something like that.  That's it.  So I didn't know there was a lawsuit that was going on, because we never talked about it.  After the administrative hearing, nothing has happened.

Q.  Okay.

A.  And did the university terminate him after the 2022 proposal, or when did they terminate?  I don't even know when they terminated him.

MS. MATTHEWS:  Bethany, I think I forgot to mark that email as an exhibit.  Can we mark that as Exhibit 3?

COURT REPORTER:  Okay.

(EXHIBIT 3 WAS MARKED FOR THE RECORD.).

MR. BRAGG:  Did you mark his CV, and if so, what was that exhibit?

MS. MATTHEWS:  That was 1.  Or it should have been, I think.

COURT REPORTER:  So let's go off the record for just a sec.

THE VIDEOGRAPHER:  Off the record. The time is 11:24.

(OFF THE RECORD.)

THE VIDEOGRAPHER:  Back on record. The time is 11:25.

MS. MATTHEWS CONTINUED:

Q.   Okay.  Dr. Gopu, we can talk a little bit about the UTC proposal issues.  I know we've talked about it already, but just to kind of hit on some of the specific things.  You know, at the hearing -- and you might remember this from your transcript -- but you mentioned that when you're collaborating on a UTC proposal everyone is very cautious about who the team leader is.  Do you remember saying

68

that?

A.   Yeah.   We want to -- we're careful in having a leader that we can trust and, you know, we can rely on.   So when Li proposed that we submit a proposal, I mean, I felt comfortable because we worked with Mississippi State already, and we didn't have any inhibition.

Because that first UTC went very well.   We had no complications with Mississippi State managing.   Sometimes the institution itself could be an issue.   They may not be able to manage a UTC properly, and then we'll have all kind of hassles with that.   So we felt comfortable with Mississippi State.

We said, okay, you know, we dealt with them for four years or whatever earlier, so -- everything went smooth.   So we know Li.   We worked with that previously, so let's go with that.   And all the partners, all the nine universities that we worked with, I think they were all comfortable. Nobody had any questions.

I think if they'd had questions, they wouldn't work.   People who are hesitant, they will not partner.   They will say, okay, this has not gone very well last time, and we don't want to do

69

this again.  So we had had a -- we had a good experience with Mississippi State.

Q.  Okay.  So you're saying that maybe they were hesitant because a UTC proposal is such a big thing, and it didn't work before and why bother?  Is that what...

A.  Yeah.  I mean, if it didn't work before, or if they didn't -- if Mississippi State did not administer that -- because, see, the money comes to the lead institution, and then they spread it out to the other sites.

And if they don't handle that very well, it leaves, you know, a bad taste in your mouth.  And then they'll say, okay, this is not an institution you want to work with on a UTC proposal.

So they go with trust.  I think all these universities -- I've led one proposal with 12 universities.  They wouldn't work with me if they didn't trust me.  They'll say, okay, you know, I'll work with VJ because I know -- this is -- he'll manage this properly.

So there's a question of the institutional management and also the lead PI management.  I think they have to trust both.  You have to trust the institution, and you have to trust the lead PI,

so --

Q.   Have you -- sorry, I didn't want to cut you off.  Go ahead.

A.   No, that's it.  That's all I wanted to say.

Q.   Okay.  Have you ever been in a position where you had to approve somebody as a PI on a proposal?  Not necessarily a UTC but any proposal.

A.   Me approving?

Q.   Or, you know, give somebody the green light to go ahead and be the PI on something.  That sort of thing.

A.   Oh, yeah, because, you know, in the center we award projects to faculty members, and then they're the PIs.  And then I support -- I've supported at least 90 young professors and gave them grants through a fund that I get from the state.

And every year I support four or five faculty members, young faculty members.  They're the PIs for the project.  I designate them as the PIs.  They have to submit a proposal, and then I -- you know, I pick four or 12 or 15 and then provide them money and funding.  So that'll be collaboration research initiation funding.  So I do

that.  I mean, I've definitely designated PIs.

Q.  Okay.  Whenever you designate or give somebody, you know, the go-ahead to be a PI on something, are you always a hundred percent sure that they're the best choice for the project, or do you ever have doubts about the person?

A.  No, we try to do our best picking the right PIs.  So we solicit proposals, and then when they come, we screen them, and we select the best ones out of the lot.  And then we fund four or five young professors.

This is -- I mean, my program only targets young professors or assistant professors.  So -- for them to be successful.  So this is an investment.  We don't get anything out of a it. And those PIs, we do the best.  So far maybe -- out of 90, maybe one or two might have disappointed me, but 99 percent do very well.

Q.  That's a pretty good record.

A.  Yeah, a very good record.  And then they're all appreciative because that's a lot of professors that you're supporting.  So at least, you know, you get your name out.  Oh, this guy is giving us money, so...

So I've done that, and then you can --

72

with a UTC, that money is also used to support some young -- some senior professors, some midlevel professors.  So we supported with the 2011/2012 at least about 15 to 16 professors on research grants.  That money came from -- directly from the UTC program.

Q.   Okay.  So I guess what I'm asking is, you know, you do a lot of like giving people opportunities --

A.   Yes.

Q.   -- to be a PI.  And I'm sure at some point you had someone that you're like, I'm not sure if -- you know, if this person can do this.  I think they might be our best option now.  Let's give them a chance.  Has that ever been...

A.   No, no --

MR. BRAGG:  Objection.  You can answer.

THE WITNESS:  We are very careful in the PIs we select.  And, I mean, we do not want to have any failure.  Sometimes the PIs we fund, they do the work, and they leave the university.  Then we lose.  I think we invest in the PI, and then the PI does the work and submits his final report, and the next thing you know is, he has left our

university and gone to Florida, for example, or something like that.

Okay. We had created a person who was successful, and he's able to market himself into another institution. So it's a loss that we're more worried about than nonperformance. So most of these people perform.

We very seldom have faculty members who do not deliver. Very seldom. I've not seen very many. And when they don't deliver, that's because they're leaving the university. Because if they want to stay at the university, it's going to be a real problem for them not to deliver.

MS. MATTHEWS CONTINUED:

Q. Okay. So tell me -- I know you've kind of explained, you know, here and there what your opinion is on the UTC congressional support --

A. Yes.

Q. -- issue. But I'd kind of like to just hear an overview of what your understanding is of what happened with the UTC proposal after it was submitted.

A. I do not know it was even submitted, but this was presubmission.

Q. So I believe the congressional support

74

issue happened after submission, right?

A.    No.

Q.    Okay.

A.    No.   The issue was before.   Otherwise, why would we write all these letters?   Why would Patrick Sherry write the letters and all that: Please submit and don't hold it up.   So there was a threat that the proposal will not be submitted.

And that scared us.   We put so much effort, please don't kill the proposal at the university level.   Because, otherwise, one of our other partners will take it over and submit that as the lead institution.   So, you know, that's what we were really concerned about Mississippi State saying, okay, we are angry with what has happened, so we're going to kill this proposal.

Wait a minute.   We invested so much time in this proposal, so don't kill it.   It's not -- it's not just one university's effort.   Multiple universities have participated in this, so, you know, you can't kill it just like that.

See, that's the thing that came up.   You know, our interest was to make sure the proposal is submitted.   And all of these issues that you're talking about with the university getting upset

75

about the contact at the congressional level, that happened before the submission deadline. So that's when we found out there's a problem. See, otherwise, you know, there wouldn't have been a big issue.

Q. Okay. No point in seeking support after submission?

A. No. Normally you don't do that too much after submission. You know, maybe some universities do it. I do not know. But normally you try to alert your congressmen or senators or whoever, hey, we're submitting, please write a letter of support. And a senator might write a letter of support, you know, that sort -- we didn't -- I didn't get letters of support for my UTC proposal.

Q. Okay. Was it still successful?

A. Pardon? No, we were highly recommended, but another state had more clout than we did. So we lost it. I'm on the advisory board for that particular center. That's amazing, right? I get kicked, and then I serve on the advisory board. But, anyhow, that's -- that happens with all the universities.

Q. Okay. So with this 2022 UTC proposal, you

76

did not personally meet with any Mississippi congressional staff or --

A.   Right.  I wouldn't even know where they are.  Let alone meeting with them.  I wouldn't know where they're located.  Because a congressional staff, I don't -- I never met with any congressional staff ever in my life.

Q.   It's not something faculty typically does?

A.   No, no.  No, they can't do it.  Because -- they can't do it because that has to be done by the administration.  So you cannot meet -- go and meet -- I cannot go to DC and meet my lobbyist.

The university -- every university has a lobbyist in DC.  I cannot go and meet my lobbyist in DC without the administration telling me that you can do that.  I mean, you know, faculty members don't go and meet lobbyists.  I'm sorry.  That's not one of their normal activities.  That's -- I never heard of that.

So when you meet a lobbyist, that is because your administration is telling you to go and meet the lobbyist.  Explain to them what you need and all that because they are not able to communicate the message properly.  So that time you can go and meet your lobbyist.

But very, very seldom that happens. I do not even know who the lobbyist is for the University of Louisiana or for LSU.

Q. So I understand your take on the whole situation was that Patrick Sherry, who worked -- I believe for the University of Denver? Is that right?

A. Yeah, University of Denver.

Q. Okay. He ended up communicating with somebody in the Mississippi congressional --

A. No, he didn't communicate. He met his Colorado delegation or Colorado lobbyist or delegation or whatever. And when they were talking, they asked him, "What are the UTCs you're participating in?"

And then this Mississippi State University UTC proposal came into light. And when that came up, there was somebody from the Mississippi congressional office who was there. That's how this came up.

And he was saying, "Oh, Mississippi is submitting a UTC proposal." So the word got out from the Colorado congressional office or lobbyist office to the Mississippi people. That's it. That's all.

78

And that word came from that particular person, whoever overheard Patrick Sherry talking. That went to the university. The university understood that Li was the one who was contacting his people in DC. That's a problem.

That's what I understood. And maybe I understood it wrong, but that's what I understood. That caused them to get angry. That's what I heard.

Q. Okay. So you were not in the room with Patrick Sherry when --

A. No, no.

Q. -- Patrick --

A. I was not --

COURT REPORTER: Okay, okay, okay. Y'all are talking on top of each other really bad. All right?

MS. MATTHEWS: Sorry.

COURT REPORTER: So please let her finish her whole question. All righty?

THE WITNESS: Okay.

COURT REPORTER: Thank you.

MS. MATTHEWS CONTINUED:

Q. You were not in the room with Patrick Sherry when the communication happened with him and

79

the congressional delegation, right?

A.   No, I wasn't there.  I wasn't there.  I didn't know when he met until he wrote that email.

Q.   So your understanding of what happened comes from Patrick or who?

A.   Patrick.

Q.   Okay.

A.   He's the only one involved.

Q.   And he told you about what happened after it came to light that somebody may be in trouble for this.  Is that fair to say?

A.   Exactly.  Exactly.

Q.   Okay.  He didn't write that letter under oath.  Is that right?

A.   He wrote -- he wrote like I would write. He just wrote the facts.  "Hey, this is not Li who has done this.  And I didn't know even I was doing anything wrong," or something like that.  He wrote, you know, a fairly long letter.

That's -- yeah, exact -- he didn't write that -- he wrote that only when he found out that it was causing a problem for Li.

Q.   Okay.  So you were not present for the communications that MSU had with the person who reported it to them.  Is that right?

80

A.   Okay.  I did not have -- repeat the question.

Q.   Well, somebody eventually reported the communication -- they reported what happened with Patrick Sherry.  They reported that to MSU.  Is that your understanding?

A.   Yes.

MR. BRAGG:  Objection.  You can go ahead.

THE WITNESS:  Yes.  I do not know who reported what to MSU.  I have no idea.

MS. MATTHEWS CONTINUED:

Q.   You didn't hear that conversation, right?

A.   Oh, no, not at all.  Actually zero.  I didn't know anything happened until Li got into trouble.  I didn't know there was anything happening.

Q.   Did you do anything to independently confirm what Patrick had told you about what happened?

A.   No.  How could I confirm that?  There was nothing to confirm.  I am taking his word for granted.  That's all.

Q.   Okay.

A.   Because I know something happened.  And --

81

that put Li in trouble, for which he did not do anything. I mean, he was not responsible for anything. That's all I know. But beyond that, I have no knowledge, except whatever Patrick was telling me. That's what I accepted.

Q. You were not privy to any internal discussions among MSU's administrators regarding the UTC proposal --

MR. BRAGG: Objection.

MS. MATTHEWS CONTINUED:

Q. -- is that right?

A. No, no. That's all pretty much internal.

Q. Okay. So you weren't there for their discussions about issues that were going on with the proposal, correct?

A. No. I was not party to that at all.

Q. You weren't made aware of issues they were having with budgeting?

A. Huh-uh (negative response). I don't -- I don't recall at all. Actually, nothing surfaced until this issue of communicating with the lobbyist or congressional delegation came up. There was no issue that we --

(INTERFERENCE.)

COURT REPORTER: I'm sorry? There

AW Reporting
601-573-0961

82

was no -- hello?

MS. MATTHEWS: Something definitely happened with the audio there.

COURT REPORTER: Yeah, we seem to be getting a lot of back... the last thing I have is, "There was no issue that we..."

MS. MATTHEWS CONTINUED:

Q. I'll just ask again or confirm. You were not involved in the internal discussions with MSU on budgeting issues, right?

A. Yes. I was not involved.

Q. Okay. Thank you. You weren't copied on every email Dr. Zhang had with his administration regarding the UTC. Is that right?

A. Yeah. I don't think he shared those emails with me.

Q. And you were not on every phone call he may have had related to the UTC proposal, correct?

A. Yes. I was not involved with it. Anything that's happening between Li and Mississippi State University administrators, I was not involved.

Q. Okay. So anything you know about what happened between Dr. Zhang and MSU is just based on what Dr. Zhang has told you. Is that right?

83

MR. BRAGG: Objection.

THE WITNESS: We heard from -- obviously from Dr. Zhang that MSU had serious concerns about what happened in Washington, D.C. And that was creating an issue for the proposal.

MS. MATTHEWS CONTINUED:

Q. Okay. So your understanding of the whole situation came from Dr. Zhang, correct?

MR. BRAGG: Objection, asked and answered.

MS. MATTHEWS: I'm not sure he did answer it, because he talked about something other than --

MR. BRAGG: Well, earlier -- earlier he did. And I think he said -- he confirmed that wasn't the case, his entire understanding.

COURT REPORTER: I'm sorry. Say that again. You think what?

MR. BRAGG: I just think he gave an answer earlier that addressed this question. That's my objection.

MS. MATTHEWS CONTINUED:

Q. That your knowledge of the situation is based on communications with Dr. Zhang and Dr. Sherry. Is that correct?

84

A.   Right.

Q.   Okay.

          MR. BRAGG:  Thanks.

MS. MATTHEWS CONTINUED:

Q.   I'm going to share my screen with you again.  Just a moment.  Bear with me.  Okay.  Do you see the email on your screen?

A.   Oh, yes, I see that.  Can you again increase the font size to 150?

Q.   Well, I'm going to ask you to just read it to yourself quietly.

A.   Okay.  Yeah.

Q.   I'll see if I can get it all on one screen.

A.   Well, I can expand myself.  Don't worry.  Don't worry.  I can do that on my screen.  Because it's a touch screen so I can do that.  (Reviewing document.)  I read the first page.

Q.   Okay.  I'll scroll down for you, but that's pretty much...

A.   Oh, that's it?  Okay.

Q.   There's at the bottom here...

A.   Okay.  I see that what is -- I think this letter is a few years old.  I think I've seen this one because he sent it to all of us.

AW Reporting
601-573-0961

85

Q.   Yes.  So I was going to ask, that you recognize this as a --

A.   Yeah.  Now when I read it, I recognize it, but he did say -- this is how we found out actually something is happening.  I think through messages or whatever, we found out that he's in trouble and the proposal is in trouble.

Q.   Okay.

MS. MATTHEWS:  So we'll mark this as Exhibit 4.

(EXHIBIT 4 WAS MARKED FOR THE RECORD.)

MS. MATTHEWS CONTINUED:

Q.   So this was an email that Dr. Zhang sent.  Was this the team, the UTC --

A.   That's the team.  That's the team.  You have Patrick Sherry at the University of Denver.  Yunlong at Texas A&M.  Myself and all these partners.  I think all the partners who were involved.  He sent it to everybody who was involved.

I think what happened is, none of the universities really went and -- what you call -- tried to solicit support for the Mississippi State University proposal.  What happened with Patrick Sherry was -- it's unfortunate that somehow it got

86

into the Mississippi delegation or lobbyist's ears.

And I don't think anybody intentionally violated MSU -- what you call -- demands not to lobby for the proposal. I don't think any other institution lobbied. Even Patrick did not lobby. I think he was just mentioning that I have -- I'm participating in this UTC proposal. So that was my take from what Patrick had to tell us.

Q. All right.

A. But I can understand Mississippi misunderstood that one of the team members was violating the rules. But I didn't think that he was violating the rules. That's an unfortunate coincidence.

Q. Okay. So I highlighted a part of this email right here. And it kind of looks like Dr. Zhang's asking for people to write letters explaining maybe the situation. Is that a fair...

A. (Reading to himself.) Yes. He's asking to write a letter to convince the administration that he's not responsible.

Q. Okay. And then underneath that, there's, I guess, four points. And it looks like what he says are points that he would like to make. Is that right?

87

A.   So he was afraid, I think -- this thing came up -- is that if MSU doesn't want to submit it and doesn't want to lead it, let's transfer this to some other institution.  Yes.  That was -- I remember that thought came... (reviewing document.)

Q.   Okay.  That's fine.  So after this, some letters were written for Dr. Zhang.  Is that right?

A.   Correct.  To the administration, I think. I think I might have written one.  I can't remember.

Q.   I was going to ask you that.  So we know about Patrick Sherry's letter, right?

A.   Yeah.  I think I may not have written one. I think the group had a letter.  I think.  I do not know if I -- if I'm recollecting it properly.  I thought the group sent a letter to the administration, saying that Li was not responsible, please don't kill the proposal, or something like that.  I'm not sure.

You might have that letter.  If we had sent it to the administration, you must have that.

Q.   I do.  I'm going to -- well, I don't -- I've got this email.  I'm going to show it to you.

MS. MATTHEWS:  Bethany, we'll make this Exhibit 5.

88

(EXHIBIT 5 WAS MARKED FOR THE RECORD.)

MS. MATTHEWS CONTINUED:

Q.   Wrong one.  Sorry.  Okay.  Can you see this email on your screen?

A.   Okay.  (Reviewing document.)

Q.   It looks like it's an email dated October 29th.  Is that right?

A.   Yeah.

Q.   Is it an email that you sent?

A.   Yes, that's -- I sent that email because, remember, I said, "I am drafting a letter on behalf of all the site directors and need this information."  Yes.

Q.   So that's the one you're talking about?

A.   Yeah, that's the one I'm talking about.

Q.   Okay.

A.   Because we were concerned about the proposal being killed, and then we were pleading, don't do it.  And I do not have -- do you have that letter which I sent to the administration?

Q.   Probably.  I don't have it in front of me, though, so that's fine.  Do you know of any other letters?

A.   No.  I think that's the only letter I recall.  But definitely in that email I was saying

89

that I will draft a letter on behalf of all the site directors, right? So I must have done it, then. But I don't have -- you don't have the letter that went to the administration? I might never find it.

Q. Okay. So I've got one more email to show you.

A. Okay.

Q. Let me know when you can see this email that looks like it was written by Robert Whalin.

A. (Reviewing document.)

Q. Are you able to see the email?

A. Yeah. I'm trying to read the last paragraph.

Q. Okay.

A. I think -- I remember -- I remember seeing this email. I think this is what alarmed us that Mississippi State might withdraw the proposal.

Q. Well, the one I want you to look at is at the very top. You see kind of the red bar, and then there's some text underneath the red bar?

A. Yeah. "Is not from the ODU account. Do not click links..."

Q. Underneath that part.

A. Oh, underneath that part. Okay.

90

(Reviewing document.) Yeah, I read that. Robert Whalin said -- he said he received some emails from the -- yeah.

Q. Okay. So --

A. I read that. I read that.

Q. Okay. So who is Robert Whalin? Is he a collaborator?

A. Yeah. He's -- Robert Whalin is from Jackson State University, I think.

Q. Okay. In Jackson, Mississippi, right? That's the only one I know of.

A. Yeah. Because it said Jackson State University Mississippi.edu. It looks like he's a Mississippi faculty member.

Q. And it looks like he references receiving several emails from an individual urging congressional contact regarding the MSU led proposal. Do you know who he's talking about there?

A. I have no idea.

Q. Okay. Looks like he says he thought the emails were inappropriate. Do you remember having any sort of similar feeling around the situation?

A. No, I don't recall. Who would write to all these people telling them to contact? I do not

91

know who did that.

Q. Okay.

A. I wrote all the emails...

Q. Okay.

A. With no response. I think -- I don't know who he's talking about. I have no idea.

Q. Okay. All right. So just real quick, at the administrative hearing, you might -- I think you remember giving some testimony about a project that Dr. Zhang assigned to his students?

A. Uh-huh, yes.

Q. It involved some traffic counts?

A. Yes.

Q. Is it fair to say your knowledge of that project is based on what Dr. Zhang has told you about it?

A. No. Actually, I didn't know until the hearing about that project.

Q. Okay.

A. The first time I heard about it was at the hearing. He didn't mention anything about that to me in a private conversation. And I don't remember him ever mentioning in an email that he was -- that there was an issue with -- I think the first time I heard that was when I was questioned about the

92

traffic count.

That's a classroom project, right? Some assignment. That's an assignment. That was a classroom assignment, if I can remember. And the -- in that last year's testimony, they were asking is that the right thing for a professor to do or something like that. I can't remember exactly the details.

But I don't remember Li talking to me about it. The first time I heard about that was in the hearing.

Q. Okay. So has your knowledge about that changed since the hearing, or have you learned more about it?

A. No, I didn't learn more about it. Whatever testimony I gave, you know, is the testimony I would give now. Because nothing has changed in my opinion. And I think they were asking me if it's a proper thing for the professor to do.

You know, we leave instruction to the professor. And we don't micromanage the professor. That's what, you know, my feeling is. And if there is a concern on the part of the students, then the department chair needs to step in and say, hey,

93

let's do this a different way or something.  It's up to the faculty member and the department chair to sort some of these issues out.

And it really should not involve an upper administration.  This is pretty local for the department.  And if there's an issue, the chair can step in and say, hey, look, chief, I mean, there's some concern.  Can we do it a different way?  Or can we -- can we make sure that the students know what to do to protect themselves, or something like that.

But this is not something that can be escalated to a higher level beyond the department chair, in my opinion.

Q.  I understand from your -- sorry.  Did you have more?

A.  No.

Q.  I understand from your hearing testimony that if you were to hear of students feeling unsafe in carrying out an assignment, that you believe it would be appropriate to cancel the assignment.  Is that right?

A.  I don't -- no, I didn't say cancel the assignment.  I think they have to look at the -- I don't remember what I said, but I think if it's

94

unsafe, it's something that has to be addressed with the professor.

Because I cannot as a department chair -- you know, I don't run the class. So I tell him, hey, look, the students are feeling unsafe. How do we mitigate this situation? That's what I would do. And find a solution for that issue.

Maybe they should -- you know, they should find a different location for doing the traffic count. Or maybe a safe radio or something. Or do -- you know, have an alternative assignment or something like that. If the students feel threatened, yes, I would definitely meet with the faculty.

But I do not know why the administration is involved. That I'm not able to figure out. Why is it not in the department? Why is the issue not being addressed by the department chair? The students normally go to the department chair, if they have a concern. They don't go to the dean.

They go to the department chair and say, look, you know, VJ Gopu is assigning me a project which -- or a task which is not really safe or something like that.

Then I would call the faculty member in

95

and say, hey, look, something needs to change in the assignment or the way the assignment is carried out.  That's what I would say.  And I think that's exactly what I said even the last time.

Q.   I think it sounds like you were not involved, though, in communications that Zhang -- that Dr. Zhang may have had with his department chair about the project.  Is that right?

A.   No, I am not -- I'm not privy to that. Yes.  I didn't see any communication.  But this question came up in the hearing, but I wasn't aware of this prior to the hearing.  That there was an issue with the classroom.  I didn't know about that at all.  Zhang never mentioned that there's a classroom issue.

Q.   Okay.  And you're not familiar with MSU policies about -- concerning course structure, things like that?

A.   No.  No.  No, each university has -- you have to have a -- what you call -- course outline that has to be handed over to the students at the beginning of the semester.

This is how I conduct the class.  This is the course outline.  And this is how I'm going to hold the exams.  And some schedule for the exams.

96

Everything has to be provided.  That's mandatory for almost every, you know, class that you teach.

Q.  You're not familiar with how administration at MSU would typically handle a situation where they're concerned about student safety?

A.  I do not know.  You know.  Well, to my knowledge, I think if it's my department, I would consider the department chair to be able to resolve that.  But I do not know what Mississippi State requires.  If there's a safety issue at Tulane or Huntsville or wherever I'm the department chair, they would bring it to me and say, we got an issue here.

Okay.  Let's figure out how to resolve this to keep the students safe and the department out of trouble.  If something happens to a student, we're in deep trouble.  So I would have that resolved within the department.  I do not know what MSU's standing policies are on safety.  I do not know.

Q.  If a student ever expressed to you that they felt threatened by a professor, how do you think you would handle that?

A.  Threatened?  Threatened by a professor?

97

Q. Yes.

A. Oh, that's a different ballgame. Because that gets into a domain which is a little bit more complicated. But threatened in the sense by bad grades? Or is it physical threatening? So it all depends upon what type of threat the student is experiencing. You know what I'm saying.

I think it's -- that's -- the threat could be different dimensions, so I need to know what precise threat is the professor imposing on the student. And then we have to take an action based on the type of threat.

Q. Okay. So --

A. It cannot be just one solution for all the threats. You know, it depends upon what type of threat. And some threats are very, very serious. Particularly when it comes to student's harassment and all. Those are really serious. Okay? That goes to human resources almost. It depends upon what type of threat.

Q. Okay.

MR. BRAGG: I'm going to just object to this line of questioning as not only beyond the scope of what Dr. Gopu has had, you know, personal involvement in, but beyond the scope of anything

98

that was at the administrative hearing or referenced in the designation or anything like that as well. But you can -- I'm not going to stop you from asking the questions.

MS. MATTHEWS CONTINUED:

Q. So it's your opinion, though, that a professor can threaten a student and it's okay at a certain threshold?

A. No --

Q. I'm sorry. I should rephrase that. Maybe not directly threaten or -- I should say make a student feel threatened. And that's okay at a certain threshold?

A. No, it's not okay. But, I mean, it's the student's responsibility to go and talk to the department chair and say, this is what is happening. And then the department chair has to look at what it is, and then he can talk to the professor and -- it depends upon what the threat is.

So without -- otherwise, it becomes abstract. "You said 'I feel threatened.' How are you being threatened? What has the professor done to you for you to feel threatened?" So it has to be a case-by-case evaluation.

99

But there's -- no threat should be taken lightly. Don't get me wrong. So every threat is a threat. But, you know, what is the action that has to be taken by the department chair depends upon the type of threat.

Q. Okay. So what if a professor found out that students were complaining about him or his class --

A. Yes.

Q. And then the professor went to the class after that and acted in a way that the students described as hostile or made them feel threatened by the interaction?

MR. BRAGG: Same objection. Can we have an agreement on a standing objection for this?

MS. MATTHEWS: That's fine. That's fine.

MR. BRAGG: Okay.

THE WITNESS: Well, I think then definitely the professor can be dragged to the department chair's office, and then they have to have a talk. "What the heck is going on in your classroom?"

I think sometimes the professor -- the students go in and complain this professor gave

100

really difficult exams. Okay. That's not a threat. But the students are genuinely feeling that the exams were not -- you know, were not proper. Were extremely difficult or something like that. This happens all the time.

And, you know, the chair -- it's the chair's responsibility to resolve these type of issues. Unless they are HR, human resources related, sexual harassment and things like that. Then you go to escalate it to a different level.

Now, but most of these things what the students perceive as threat, the department chair has to look at it and resolve it with the faculty member. Warn him or do something. You know, I do not know what, depending upon the threat.

MS. MATTHEWS CONTINUED:

Q. Right.

A. That's how I would handle it, you know, to be honest. And sometimes if it goes straight to the dean, the dean will say, well, go and talk to the department chair. You know, you don't come to me. First of all, let him fail to resolve the issue, then I will take it. Then I will handle it. If the department chair doesn't get the problem solved, then obviously the next step is the dean.

101

Q. Okay. Every university probably handles it differently, right?

A. Yeah. Every university handles it different. And every chair handles it differently, you know. So it is not the same culture at every university. What I'm saying is what I would do.

And if the students come to me and talk to me and complain, then I will -- what happens if the students go straight to the dean? And if it's a very sensible dean, the dean will say, go and talk to your chair first. Let them resolve this thing. And if he doesn't, then come to me.

So normally there is a -- what you call -- chain of command, right? So you have to go through the chain. You just don't go straight to the vice president or the president and complain. That's silly. So you need to have it done locally, and if it fails, go to the college level.

Q. Okay.

A. That's my opinion. I mean, I'm not saying that every university has to do it that way, but that's what I would do, how I would handle it.

Q. Okay. And you don't have any knowledge of how MSU would typically handle situations like that, right?

A. No, I wouldn't have any knowledge. I do not know how MSU handles anything, you know.

Q. Okay. Have you ever tried to recruit Dr. Zhang to work at the University of Louisiana at Lafayette?

A. No, never.

Q. Okay. What about Tulane?

A. No. I think he wasn't -- I didn't even know him at Tulane.

Q. Okay. So at any university you've worked with, you've never tried to recruit him to come work with you?

A. Oh, no, never. I never recruit. I never thought about it. But, actually, when we hire, we hire young professors, not senior. You know, assistant professors, research professors and all that. Research assistant professors. So I wouldn't be recruiting anybody at the very senior level. Very few positions are open at the full professor level.

Q. Okay.

MS. MATTHEWS: I don't think I have any more questions. Grafton?

MR. BRAGG: Yes. I have some questions.

EXAMINATION

BY MR. BRAGG:

Q. Dr. Gopu, to be cognizant of your time, I'm happy to give you a break if you need it, but I'm also happy to just plow along --

A. I've got another meeting at 1:30.

Q. What time is your next meeting?

A. 1:30.

Q. Okay. I will not be nearly that long, and so if we -- but I think we can just go ahead and say that we can --

A. Yeah, why don't we go ahead.

Q. Okay. Sounds good.

MR. BRAGG: And, Ashlyn, before I begin with questions, just thinking about how this would play at trial, there are -- for example, you've gone into some things that, you know, may cover some ground that I would want to cover and -- like background, for example, and maybe some other opinions as well.

I'm going to have to duplicate a little bit, but it would help me avoid duplication if we could just -- if we could agree that just because he testified to something in your examination, doesn't mean that it couldn't be admissible as part

of his expert opinion and my examination, if he is indeed accepted as an expert on those topics at trial. Does that make sense?

MS. MATTHEWS: Would you like to go off record for a second and talk about it?

MR. BRAGG: Yeah, if we just want to -- that's fine.

MS. MATTHEWS: Okay.

THE VIDEOGRAPHER: Okay. Off the record. The time is 12:15.

(OFF THE RECORD.)

THE VIDEOGRAPHER: Back on record. The time is 12:20.

MR. BRAGG: Okay. So I just want to put an agreement on the record that I think counsel have reached during the break. And that is, just that -- so Dr. Gopu, this video may be used at trial, and the transcript may be used at trial.

And it's my understanding that the defendants won't object to any testimony that he may have given earlier on the mere fact that it was given earlier. So just based on the sequence of when the testimony was given. Is that accurate, Ashlyn?

MS. MATTHEWS: Yes.

MR. BRAGG: Okay. Thank you.

MR. BRAGG CONTINUED:

Q. Okay, Dr. Gopu. That will help us avoid some duplication, but I do want to go through your general background. So just before we begin, please state your name again for the record.

A. My first name is VJ, middle name Krishna Arya, last name, Gopu.

Q. Okay. And give me the high level summary of your background and education, and specifically in administration.

A. Well, as I mentioned earlier, I've been a professor, a faculty member, at a university for 48 years. This is my 48th year. I will be completing 48 years. I'll be getting into my 49th year. And I've been also a university -- I have been a department chair at two major universities for eight years.

And also been involved with the University Transportation Center program for well over 20 years. And currently I'm an associate director for the Louisiana Transportation Research Center, and I facilitate all interactions with all the universities within the state and also of the federal agencies, like the University

Transportation Center program, National Science Foundation, other agencies.

So I've been, you know, kind of involved with administration at different levels for the past quarter of a century.

Q. Thank you. I believe I've heard before that you have a -- sort of a rare distinction about being the only professor in Louisiana to do something?

A. Oh, yeah. I'm the only professor in Louisiana history to be a tenured full professor at four major universities. Three of them are Carnegie 1 institutions. That is LSU, Tulane, and University of Louisiana.

I do not think -- I don't think anybody is going to be breaking that record fairly soon. First of all, they have to live as long as I have lived. And then they have to be a professor for a very long time, and also four universities would like to have you.

Q. Yeah. That's quite a distinguishing honor.

So today I'm going to ask you some facts, some questions about things that you have personal knowledge of. I'm going to ask you some things

that may be fact opinions.  So they may not be things you have personal knowledge of, but they're things that you have an opinion about because of your personal knowledge.

And then I may also ask you some questions about matters that would be considered expert opinion, things that you're able to testify about based on your background, experience, and qualifications.

And so I want to ask you this:  When I ask you an expert opinion, will you agree to give that opinion to a reasonable degree of probability within your field?

A.  Yes, I will.

Q.  Okay.  Thank you.

MR. BRAGG:  And at this time I'd like to tender Dr. Gopu as an expert in higher education administration, including research administration.

And, Ashlyn, I'll allow your cross-examination earlier to stand as your voir dire examination, any arguments for those purposes at trial, but certainly if you want to have any additional questions right now, you can.

MS. MATTHEWS:  Go ahead.

MR. BRAGG:  Okay.  Thank you.

108

MR. BRAGG CONTINUED:

Q.   All right.  I would like to share my screen.  And can you please confirm that this is a -- this is your current CV?

A.   Oh, I don't see a CV.

MS. MATTHEWS:  Grafton --

MR. BRAGG:  I haven't started the screen share.

MS. MATTHEWS:  I think you're sharing the wrong thing, Grafton.

MR. BRAGG:  Oh, no.  Thanks for letting me know.  I know what I was sharing.  You didn't take a screenshot, did you, Ashlyn?

MS. MATTHEWS:  I did not, I promise.

MR. BRAGG:  Okay.

MR. BRAGG CONTINUED:

Q.   All right.  Can you see the CV now?  Is that what's being shared?

A.   Yeah.  The same thing that I sent you this morning.

Q.   Correct.  Okay.  So please confirm that that is your current CV.

A.   Yes, that is.

Q.   Okay.  And is the information and all of your experience and publications that is listed in

109

this CV accurate?

A. Yes.

Q. Okay.

MR. BRAGG: I would like to introduce into evidence the CV of Dr. Gopu. All right. And that is Exhibit No. 1 for purposes of the deposition.

COURT REPORTER: I'm sorry. We already have Exhibits 1 through 5.

MR. BRAGG: Yes. That had already been marked as No. 1. Is that right, Ashlyn? It was the first one?

MS. MATTHEWS: Yes. The CV.

MR. BRAGG: Okay. It's already been marked as Exhibit No. 1 to the deposition. I'm just making a proffer to make it an exhibit, for there to be a time in the record for when we get to trial.

MR. BRAGG CONTINUED:

Q. All right. One quick question: Have you ever taught a traffic engineering course?

A. No. I don't teach traffic engineering, but I have projects in that area.

Q. Okay. And so you have overseen people who teach traffic engineering --

110

A.    Yes.

Q.    -- but you haven't actually taught it?

A.    Correct.  Because I have research assistant professors.  I have two research assistant professors who are funded with my grants, and they teach and conduct research in that area.

Q.    Okay.  I think you testified that you had worked on a UTC proposal with Mississippi State somewhere shortly after 2010.  Is that accurate?

A.    Yes.  2011, '12, I think that's when we got the first.

Q.    And what was the name of the PI?

A.    The PI for that -- the lead PI was from Mississippi State University, Burak Eksioglu.

Q.    Okay.  And you knew that Dr. Zhang was working on Burak's team?

A.    Yes.  When we wrote the proposal I knew he was working.  But our interactions were between the PIs at the sites and the lead PI.  So my most -- 99 percent of my interaction was with Burak Eksioglu.

Q.    Did you ever get a chance to meet Dr. Zhang during that process?

A.    Oh, yes, absolutely.  When we wrote the proposal, I think -- I can't remember exactly, but I met Zhang at Mississippi State University itself.

111

Q.    What was your impression of Dr. Zhang during that time?

A.    Well, that was the first project, so I had limited interaction and knowledge of either Burak or Li Zhang.  So, you know, we came to know about them as we started working on the -- on the projects related to the grant.

Q.    Okay.  And did you develop an impression of Dr. Zhang as you were working during the project?

A.    Yes.  Because, you know, he was doing his own projects, and everything was timely.  Because I was responsible for my site at LSU, but, you know, I did not deal with the Mississippi State University projects.  They were separate.  They were being managed by Burak and Li.

So, you know, they were all separate, different projects.  So they were not all the same project.  And we are not collaborating on these projects.  We were doing our projects independent of MSU and the other sites.

Q.    Understood.  Over time did you have occasion to learn about the reputation of Dr. Zhang within your field?

A.    Yes.  Because of the UTC.  You know, he

112

did a good job.  You know, we worked very well.  We didn't have any issues.  And Zhang appeared to be pretty much tied to MSU, you know.  I didn't think that he was going to be leaving or anything like that.

And so we felt comfortable when the opportunity came up in 2016.  I think we resubmitted -- we submitted another UTC proposal that was not funded.  And then we had to wait for six years for the opportunity to surface in 2022.

Q.   Okay.  I want to pause here.  Earlier you were asked about whether you and I had spoken before, and I think you mentioned you didn't know me until a couple of days ago?

A.   Yes.  That's true.

Q.   So I know you from a conversation that we had, I think, before the administrative hearing.  Is it possible that you spoke with Dr. Zhang and me on a call before the administrative hearing?

A.   I can't remember, to be honest.  I'm not going to avoid the question, but I don't -- I don't remember.

Q.   Okay.

A.   Because this was -- that was an administrative hearing, and then I -- you know, I

113

thought just -- I might have talked to Zhang and you at the time, but I can't recall talking to both of you in a telephone call.  I can't remember that.

Q.   Okay.  Has your testimony that you've given so far today been based on your recollections?

A.   Yes, absolutely.

Q.   All right.  Let's talk about the 2022 UTC. Just before we get to the point where congressional delegation became an issue, tell me about your experience generally working on that project.

A.   I think I was very happy because we had the -- to some degree, our old team back participating in this new proposal.  And then we had some additional partners, new partners.  The University of South Alabama, Jackson State University.  All these were not in the original UTC proposal.

So we had new partners.  We had -- I think there were three new partners, which was really good.  And I thought -- and then it was easy to work with, and then Li was really cooperative.  And I think we did a good job putting the proposal together.

We didn't have any conflict or any concern

114

about Li being the lead PI for Mississippi State. If we'd had any reservation, we would have stated that. And Patrick Sherry, who was from University of Denver, and I are fairly senior people. So we would have sensed a discomfort and said, hey, I'm not going to work on this proposal.

So we didn't have any problem. We worked very well, and we put the proposal together. So none of the site PIs had any issue with Li at the time when we wrote the proposal.

Q. And how do you know that?

A. Because I interacted with all of them, right? So we met. We had a group meeting in Jackson to discuss the tasks and what to prioritize and what are the limits we want to put in the proposal, so... I know how the discussions went very well.

Q. How much work would you say went into the proposal process?

A. That's a good question. As professors we don't clock hours. You know that. And we might have spent maybe an equivalent of two to three weeks on getting this. I think we have our own tasks, and then we have to also pull together the résumés of all the people who are going to be

115

working at our institution.

And then we had to review the proposal after it is written, sections of the proposal. And so we had to also do the final review of the proposal. Make sure, you know, we had checked all the boxes and -- you know, cross the T's and dot the I's. We had to do that. So we did that.

I think it -- it takes quite a bit of an effort. So I would say, you know, easily three to four weeks of effort.

Q. And is there one individual per institution who is actively working on the proposal?

A. Yes. Usually there's a lead. I mean, he might get some help from his faculty members, but that's not an issue. We normally communicate with the lead from the partner institution.

Q. Okay.

A. Because there may be a lot of faculty members at the institution. We don't want to deal with all of them. It's impossible.

Q. So I think you were asked earlier if you knew whether the proposal had been submitted. Do you know for certain whether it was submitted?

A. No, I don't.

116

Q. Okay.

A. Till today, I don't.

Q. Okay. Is it -- and I know the issue with the congressional support was brought to your attention. Do you know for sure whether that was before or after the submission?

A. No, that was before.

Q. Okay.

A. Otherwise why would we write letters to the administration saying, please submit the proposal. Don't kill it. Or transfer it to some other institution who would lead. So we wouldn't have written that. All this issue came up before the submission because of the threat of this proposal being nixed at Mississippi State.

That's when -- all these issues came up only before the submission. That Li was in trouble and all this. We didn't know about all this. How would I know what Patrick did in DC? You know, he might have done something which annoyed Mississippi State. You know, we didn't know all this was going on until we heard from Li that the proposal might be -- might not be submitted.

Q. So -- and I understand that there was -- it was your testimony there was some threat that

the proposal might not be the submitted because of the congressional delegation issue?

A. Yes.

Q. Okay. And I'll represent to you, there has been evidence in this case that the proposal was submitted in around August before the congressional delegation issue arose. So is it possible that your timeline is off, and the request for congressional support --

A. Well, I think --

Q. Go ahead.

A. I might say this. If they had already submitted, then the concern might have been that they would withdraw it. If they'd already submitted, the fear was it would be withdrawn.

But I cannot tell whether it was -- the threat came after the submission or before the submission, because I was not at Mississippi State, so I do not know the timeline of everything.

Q. Okay.

A. So if it was submitted, then our concern was, oh, let's not withdraw it.

Q. Okay.

A. That's different from not submitting it, right? I think if you withdraw it, that kills the

proposal.  So our focus was to make sure that the proposal is submitted for review.

Q.  Okay.

A.  And whether they -- I think the fear was, if it was submitted, then they were saying that we would withdraw the proposal.  So I do not know what actually happened at the university.  I have no idea.

Q.  Okay.  If the proposal had been submitted and the concern was a threat to withdraw the proposal, would that change your opinions in any way that you've given?

A.  No, nothing changes.  I think withdrawal is as good as not submitting it.  So our concern was not nonsubmission.

Q.  In some ways is it worse because it's already been submitted and --

MS. MATTHEWS:  Object.

THE WITNESS:  No, no --

MS. MATTHEWS:  Object to leading.

THE WITNESS:  Pardon?

MR. BRAGG CONTINUED:

Q.  You can answer.

A.  No, they're both the same.  UTC program doesn't care whether you're withdrawing or not

119

submitting.  It's the same to them.  So for us it's a question of nonsubmission.  That was our fear.

Q.  Okay.

A.  Withdrawing is like nonsubmission.

Q.  Okay.  Tell me about the -- just tell me in your words what happened with the congressional delegation issue.

A.  What we learned was that Li was in trouble because the university administration was very upset with him for this contact with the Mississippi delegation.  But what I hear from Patrick is that he went to DC to talk to his lobbyist or delegation or whatever to campaign for the proposal that he was involved with in Denver.

And then they asked him the question, "What are the other UTC proposals you're involved with?"  And he mentioned the proposal he was collaborating with with Mississippi State.

And somebody at that particular instant was in their office, and that he was from Mississippi -- or, I mean, not Mississippi State.  A congressional delegation or lobbyist.  And so -- and then he communicated -- or somebody communicated from the Mississippi lobbyist group to the administration at Mississippi State.  That's

120

what I understand. And that's what angered the administration, so...

But nobody set this up. I think -- Patrick Sherry didn't set it up. He didn't go to the Mississippi congressional group or the lobbyists and ask for help. Because it just snowballed into something which he didn't realize was happening.

Q. Okay. I want to -- let me ask you this. You said you learned about that from Patrick. Did you have a conversation with Patrick, or was it --

A. No. No, I learned that from Li, that the administration was unhappy about this contact. And then Patrick was the one who said that he was the one who made the contact.

Q. Did Patrick verbally tell you that, or was it just via email?

A. I don't -- it might've been verbal, or it might have been email. I might have talked to Patrick. I don't remember.

But the end result was, we know that Patrick met with his delegation, and then he inadvertently communicated that to the Mississippi delegation or whatever, and they communicated that to the university. That much I know.

Q.   Okay.

A.   Either Patrick might have sent us in a email, or he might've just told us verbally. Because we needed to find out who was responsible for getting the Mississippi delegation involved. That was Patrick.

Q.   Okay.  And I'm going to pull up an email chain that it looks like you're on.  And I'm just going to scroll down.  I'll start at the first email and scroll down.

Do you recognize this as an email chain that started with a letter from Patrick Sherry?

A.   Yeah.

Q.   Okay.

A.   Yeah, I think he shared this with -- or we read it.  Somehow I remember this email or this letter from Patrick.

Q.   Okay.

A.   Did he send it to all the site people?

Q.   So it looks like, based on this document here, that Patrick sent it to Li -- do you see it -- October 28th -- October 28th at 11:03 a.m.?

A.   Yeah.  And Li might it have shared it with us?  Did Li forward to --

Q.   Yeah.  The email from Dr. Zhang a little

122

bit later on October 28th to several Mississippi State administrators and copying --

A.    Then I got it.  That's how I remember that Patrick admitted that he -- you know, that this happened.

Q.    Is this an email that informed your understanding of the underlying facts?

A.    Yes.  But we might have known the facts even before, but Patrick put it on paper.

Q.    Okay.  As an administrator who's trying to sort of understand facts about what happened, is this email something that you would consider?

A.    Yes.  Because Patrick is telling the story, what happened.  I mean, Li is telling us, this is Patrick's letter, what he did.

Q.    Okay.  And would it be reasonable to rely on Patrick's explanation?

A.    Oh, yes, absolutely.

Q.    Okay.  And what about if you had a conversation with Patrick?  Would that be something that would be relevant to your understanding?

A.    Yes.  I mean, if Patrick had talked to me -- he might have talked to me and then explained to me that this is what happened.  I did it.  You know, I didn't do it -- I didn't do it

AW Reporting
601-573-0961

123

intentionally, but it snowballed into Mississippi State delegation getting involved. But I would have accepted it because, you know, he was speaking the truth.

Q. Do you know how Mississippi State responded when it found out that -- oh, I'm sorry.

MR. BRAGG: I'm going to make that -- I would like to introduce the email exchange starting with the letter from Patrick Sherry into evidence. And for the purposes of the deposition, that will be Exhibit 6 to the deposition.

(EXHIBIT 6 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

Q. Dr. Gopu, when Mississippi State found out that someone had contacted the Mississippi congressional delegation, do you know how they responded?

A. I think that we -- we know that from Li. That that triggered them to say that you're insubordination, and then we will withdraw the proposal and all that. That came up after that.

Q. Okay.

A. I think that was the -- that's what I understand was the response of Mississippi State.

Q. Okay.

124

A.    Was they were -- or the administration was very unhappy that this happened.  But they tied this to Li doing it, but which he did not do.  It was unfortunate it happened, but linking it with Li was the problem.  I think Li became the fall guy.

Q.    And is that something -- learning that from Li, is that a reasonable way to learn about how MSU responded, in your opinion?

MS. MATTHEWS:  Object to leading.

MR. BRAGG CONTINUED:

Q.    Yeah, let me ask it -- let me ask it a different way.  As someone who's been tendered as an expert in administration, do you feel one way or the other whether you have enough to know -- to give an opinion about how Mississippi State responded?

A.    I think what I found was, it was -- the response of trying to punish Li was a little bit hard -- was harsh, because Li was not responsible.  In my opinion, that has to be taken into consideration in any action they take.  Because Li did not do it.  That's all I'm saying.

I think my whole testimony hinges on the fact that Li did not -- what you call -- disobey the directions that were given to him by

125

Mississippi State: Don't communicate with the lobbyist and don't do this. And then he did exactly that. And it is totally unfortunate that Patrick ran into the Mississippi delegation. It was very unfortunate.

Q. Okay.

A. And I feel that it should not cost -- it should not be -- Li should not penalized for what Patrick did.

Q. Okay. And you haven't read the Mississippi State or IHL policies, correct?

A. No, I've not read.

Q. So you're not relying on those policies as a basis for your opinion --

A. No. It's strictly my opinion.

Q. Okay. But what is that opinion based on?

A. Based on the fact that the person is not responsible, so don't make him responsible for something he's not. That's all. That's my -- that's my administrative acumen.

Q. Okay. Administrative -- your experience as an administrator?

A. Yes. You know.

Q. And maybe common sense as an individual?

A. Yeah.

126

MS. MATTHEWS: Object to leading.

MR. BRAGG CONTINUED:

Q. Okay. I'm going to show you two more emails. And I know that you weren't a party to these emails, but I specifically want to draw your attention to this June 6, 2022 email from Teresa Gammill to Julie Jordan. Is this an email that you have seen before?

A. Yeah, I think I've seen this.

Q. Have I provided it to you?

A. Yeah. Yeah. I think somehow I recall. I think I may remember seeing it recently or...

Q. Okay. And I think the statement here that I want to draw your attention to from Teresa is, do you see where it says, "That's the reason they gave him the green light, to let him fail, and then they'll be done with having to deal with his tirades every year when this RFP drops"?

A. See, I don't know what the tirades are. I have no idea what --

Q. Okay. But do you see the statement in the document?

A. Yes.

Q. Okay.

A. But Kari and Jason -- Kari and Jason, I'm

127

trying to remember.

Q. Okay. Let me ask you just more generally, because I know you may not know every single player in the email chain. But do you have an opinion about this phrase right here, "they gave him the green light to let him fail"?

A. Yeah. I think I talked about this in my last testimony, in the administrative testimony. This is very unfortunate, that whoever is in the research office saying, let's let this guy submit the proposal so that he can fail.

I think, you know, university administrators normally tend to support the faculty member, not want a faculty member to fail. So I do not know what caused or what made the administrators want him to fail. And if they wanted him to fail, why did they even allow him to submit the proposal?

They should've told the partner universities that we're not going to be leading this -- this -- what do you call -- this UTC. So one of you take over the leadership because we're not really interested. That shows lack of interest in the UTC.

And the admission for the -- for the

128

proposal to fail?  That means they're asking eight

other universities also to fail, which is not fair.

So I don't understand at all the logic behind that

statement.  I mean, it's not -- it's not a very

good statement for the partners.

                    MR. BRAGG:  I would to introduce that

email into evidence.  For deposition purposes, that

will be Exhibit 7.

        (EXHIBIT 7 WAS MARKED FOR THE RECORD.)

MR. BRAGG CONTINUED:

    Q.    All right.  I'm now going to show you --

I'm going to share my screen one more time.  And

I'm going to show you two emails here.

            There's email from Teresa Gammill to Kari

Reeves that says that a letter went to Dr. Zhang

this morning.  "Hold on for a bumpy ride, I'm

afraid.  His proposal will be pulled today from DOT

as well."  Do you see that?

    A.    Yeah.

    Q.    Okay.  And then there's this email down

here where Teresa says to Kari, "I agree with all

of the above.  Zhang will be furious that we pulled

it, but even worse that we have made him look bad

with partnering IHLs."  Do you see that?

    A.    Yeah.

129

Q. And have you reviewed these emails before?

A. Yeah, I might have reviewed it, but I can't recall everything.

Q. Okay.

A. But this is kind of a followup of them wanting the proposal to fail.

Q. Are your opinions about these emails the same as the one you looked at before?

A. Yeah. Absolutely. I think -- this was dated October 25th. When was the other mail about we want him to fail? When was that? The earlier email.

Q. I'll pull it up. You see it was in June of 2022?

A. Yeah. June 2022. And then they gave the green light in October to pull this out. To pull the proposal. Is that --

Q. What's your opinion --

A. -- correct?

Q. -- about that?

COURT REPORTER: I'm sorry. What did you say, Mr. Bragg?

MR. BRAGG CONTINUED:

Q. What is your opinion about that?

A. Yeah, this doesn't make any sense. In

130

June they said let him submit the proposal and then let him fail. And then in October they say, let's pull the proposal.

So, you know, the partners feel bad, right, when we know this. And for four months we worked on the proposal or whatever, and submitted the proposal. And then now they're pulling it. Nothing makes sense to me at all. You know, I'm not able to comment even, because I don't know what their game plan is.

Q. I think you testified earlier that you had not done some sort of comparative analysis between Mississippi State's procedures and other universities' procedures?

A. No, I've not made any analysis, no.

Q. Have you in your decades of time spent in administration, research as a professor, ever seen anything like this before?

A. No, I never heard of that.

MS. MATTHEWS: Object to leading.

MR. BRAGG CONTINUED:

Q. Was that a no?

A. No, I've never seen this. Normally when we submit proposals, we do it with the backing of the university. They want us to have a winning

131

proposal.  So this is a little bit strange to me.

Q.   Okay.  Bear with me for just one moment, please.

A.   Okay.

MR. BRAGG:  I tender the witness.

THE WITNESS:  Pardon?

MR. BRAGG:  We need to go back on the record, Matt.

MS. MATTHEWS:  I'm not sure --

THE VIDEOGRAPHER:  We didn't go off the record.

MR. BRAGG:  Okay.  Yeah.  I tender the witness.

FURTHER EXAMINATION

BY MS. MATTHEWS:

Q.   Dr. Gopu, I just have a couple of followup questions.

A.   Yes.

MS. MATTHEWS:  And if we could pull up again the Exhibit 6.  Do you mind pulling that up, Grafton?

MR. BRAGG:  Oh, I'm sorry.

MS. MATTHEWS:  That's okay.

MR. BRAGG:  This was the résumé?

MS. MATTHEWS:  6 was Patrick's

132

letter.

MR. BRAGG: Okay. Can you see it?

THE WITNESS: Yes, I can.

MS. MATTHEWS CONTINUED:

Q. So this was about Patrick Sherry sending the letter about what happened in DC. Is that right?

A. Yes. I think that's the item 1, yes.

Q. Okay. And you don't know if MSU considered this in making its decision about the proposal. Is that right?

A. That was my assumption, that they used this as a reason for being really upset with Li. That's what -- I mean, I'm conjecturing, but I -- I do not know what other factors MSU used. I have no idea.

But this is what we -- the whole team, all the entire consortium, felt that the decision of MSU to withdraw or not submit the proposal, that's what we based it on. Based on Patrick's action reflected -- hello? Who is that?

MR. BRAGG: Dr. Zhang, you mind turning off your camera and audio?

(OFF THE RECORD.)

MS. MATTHEWS CONTINUED:

133

Q. Dr. Gopu, I understood when you were talking with Grafton that you were saying MSU should've considered this letter from Dr. Sherry. Was that -- did I understand that correctly?

A. Yes. Should have considered that. That this letter kind of tells us that Li did not create this situation. It was Patrick Sherry creating the situation inadvertently. So that's all I'm saying.

Q. Okay. And you don't know what MSU considered when it was making its decisions about Dr. Zhang or the UTC proposal. Is that right?

A. No. I think we felt that -- not with Zhang, but regarding the UTC proposal, I thought this was the response. This action was responsible for MSU to either withdraw or not submit the proposal. We all felt that was the cause. I mean, if there were other causes, we do not know.

Q. Nobody from MSU told you exactly what the cause was?

A. No.

Q. Or what they considered? Did they tell you what they considered?

A. I think from the email that was sent to Li, saying that you disobeyed or whatever, and then we're going to withdraw the proposal, that

convinced us that this was the -- this was the activity that created the problem for the whole proposal.

Q. Sure.

A. If there were other factors we do not know, because this is the only factor that was obvious to us.

Q. Okay. You don't know what kind of mitigating factors they may have considered, right?

A. I do not know.

Q. Okay.

A. I have no -- this is the one which they explicitly state in the communication with Li that we are really -- that you're being insubordinate and you -- all that. So that was tied to this congressional delegation issue.

So we -- everybody concluded that Mississippi State was really unhappy with this, and that caused them to either not submit or withdraw the proposal.

MS. MATTHEWS: Okay. Grafton, we're done with the document. You can stop sharing your screen, if you'd like.

MS. MATTHEWS CONTINUED:

Q. You were shown some other communications

135

involving someone named Teresa Gammill.  You don't know Teresa Gammill, do you?

A.  I don't.  I don't know Teresa.  I don't know anybody in those emails except the people we were working with.  I have no idea who that is. And I'm assuming they're administrators, because they appear to be having a lot of clout.  So I think it's coming from some senior administration. That's what I concluded.

Q.  Okay.

A.  I never investigated who these -- the various individuals are.

Q.  You never investigated what was shown to you -- I mean, what was said in those emails, if it was true?

MR. BRAGG:  Objection.

THE WITNESS:  I didn't follow that.

MS. MATTHEWS CONTINUED:

Q.  I guess I'll ask it a different way.  You were shown a statement that said -- and we can pull it up for you.  I'm trying to avoid the hassle of putting up the document.

But there was a statement made that a green light was given, and he would fail.  Or that would allow him to fail or something like that.  Is

136

that --

A.   Yeah, that's right.

Q.   All right.  You don't know if they wanted him to fail.

A.   No.  They were -- no, not wanted him to fail.  It shows -- the expression was -- I mean, the email that was sent by one administrator to another administrator was saying, we're going to let him submit it and -- so that he can fail or something.  I can't remember the wording.  So that he can fail.

I said why -- failure coming in the picture when you're approving it for submission, I don't understand.  So that he can fail and he will not be successful or something like that.  It just didn't sound right in my opinion.  You know, not coming from a colleague or from an administrator, saying, let this professor submit a proposal so that he can fail.  Just -- it's a conflict.

You know, as a statement it's -- you know.  You want him to be successful.  You want him to -- that it be a winning proposal.  And so saying "so that he can fail," just carries the wrong message.  That's all.

And normally you don't see something like

137

that.  That's all I'm saying.  I don't see an administrator wishing a proposal developed by a professor -- hoping it will fail, that's just not -- that's not professional.  Let me put it that way.

Q.  Right.  And the email was -- it was a person saying what she thought someone else wanted.  Do you remember that about the email?

A.  Yes.  I'd have to look at it again.  But I can't -- I don't remember the words.  But the words that stood out was saying hoping it will fail or something like that.

MS. MATTHEWS:  Grafton, do you mind pulling it up?

MR. BRAGG:  I do not.  I'm pulling it up right now.

MS. MATTHEWS:  Thank you.

MS. MATTHEWS CONTINUED:

Q.  Can you see it, Dr. Gopu?

A.  Yeah.

Q.  Okay.  And the sentence we're talking about is that last one, right before the letter T.

A.  Yeah.  This -- above the T.  See, they're saying... the two things I didn't understand in this is, "At the rate they're going, they're not

138

going to submit a proposal."

Q.   And you don't know -- you don't know everything that MSU administrators did to help Dr. Zhang with the proposal?

A.   I don't know anything about what they did.

Q.   Okay.

A.   From this --

Q.   And this -- this statement -- sorry, go ahead.

MR. BRAGG:  I was just objecting.  I think he had more to say.

THE WITNESS:  That's the reason they gave him the green light, to let him fail.  And then they'll be done with having to deal with his tirades every year when this opportunity, the RFP drops.  This whole -- the tone of this whole message doesn't sit very well.

MS. MATTHEWS CONTINUED:

Q.   Okay.

A.   I mean, I don't understand why they're saying they're not going to -- they are not going to submit a proposal.  I don't know where that comes from.

Q.   Okay.  This is -- it reads to me, and I think you would agree, that she's talking about the

139

reason that Kari and Jason gave him the green light, correct?

A. Correct. They gave him the green light --

Q. Per --

A. So they're afraid that -- "It will be a major undertaking to tell him he can't be the PI, if funded."

Q. Yes. And so she is giving her opinion on why two other people did something. Is that fair to say?

MR. BRAGG: Objection.

THE WITNESS: Yeah. She's saying give a green light. So I think she's conjecturing why they gave the green light.

MS. MATTHEWS CONTINUED:

Q. Right. And you don't know who Teresa Gammill is?

A. No. I think she's from the Office of Research, because it says research.mississippistate. I'm thinking she's a VP for research or somebody in the research office.

Q. And you don't know her role, though?

A. No, I do not know the role. I have no idea. I do not know who is Julie Jordan. I don't know who that is. And it's sent to Julie -- it

looks like somebody in the research office is sending it to another person in the research office. That's what I'm seeing.

And also opinion, that's the reason they gave, she's having an opinion why Kari and Jason gave the green light. She's conjecturing the reason they gave the green light is to let him fail.

Q. And if I submit to you that Kari, the person she's talking about, has since testified under oath that they did not want him to fail, would that change anything for you?

MR. BRAGG: Objection. You can answer.

THE WITNESS: Yeah. No, Kari and Jason can say that I didn't -- we didn't say that we wanted him to fail. Somebody else is saying that we wanted him to fail. That's true. Because it's not Kari and Jason who were writing an email that we want him to fail, right? So obviously it's Teresa's assuming that Kari and Jason want him to fail.

MS. MATTHEWS CONTINUED:

Q. Right.

A. I agree. In that sense. That she's

141

making an assumption that Kari and Jason want him to fail.  But it sounds like -- reads like all these people are having the same opinion.  That's -- you know, unfortunately, that's the message that this conveys.

Q.  That's your assumption?

A.  No.  No, I am not saying that Kari and Jason are making the -- but it looks bad.  Let me put it that way.  I'm not saying anything else, but I'm saying it looks bad.

Q.  Okay.  You were not involved in these discussions between Teresa Gammill, Kari, and Jason about this project, correct?

A.  Oh, no, not at all.  Nobody ever contacted me or any of the other site PIs.  Nobody.  I don't think so.  I don't think the UTC partners were engaged in any of this communication between Teresa, Julie Jordan, or Kari, or Jason.  I don't think we were involved.

Q.  Okay.

MS. MATTHEWS:  I don't have any other questions.

MR. BRAGG:  Okay.  I've got one followup.

FURTHER EXAMINATION

BY MR. BRAGG:

Q. If Teresa Gammill testified that she got the understanding about why Kari and Jason gave Li the green light from Kari and Jason, then would that be significant to your opinion?

MS. MATTHEWS: Objection.

THE WITNESS: Yes.

MR. BRAGG CONTINUED:

Q. You can answer.

A. Yeah. Because you had to get -- you had to get Teresa, Kari, and Jason all testifying what the heck is this email. Who is wanting him to fail? Is Teresa wanting him to fail? Or is it Kari and Jason wanting him to fail? It's unclear. Because from this email it looks like that Teresa's assuming that Kari and Jason want him to fail.

Q. Okay. Thank you.

MS. MATTHEWS: May I ask one followup?

THE WITNESS: Yes.

MR. BRAGG: Re-re-re-direct?

MS. MATTHEWS: Yeah.

FURTHER EXAMINATION

BY MS. MATTHEWS:

Q. We can agree this email does not say, we

143

want him to fail, right?

A.   No, they don't want him to fail.  They'll let him fail.  That's what it says.

Q.   Okay.  Thank you.

MS. MATTHEWS:  No further questions.

MR. BRAGG:  Okay, thanks.  Thank you, Dr. Gopu.  I think you're going to be able to make your meeting.

THE WITNESS:  Yeah, I think so.

THE VIDEOGRAPHER:  This concludes the deposition.  The time is 1:10.

(EXHIBIT 8 WAS MARKED FOR THE RECORD.)

(DEPOSITION CONCLUDED.)

(READING AND SIGNING WAS NOT WAIVED.)

CERTIFICATE OF REPORTER

I, BETHANY CAMMACK, Certified Shorthand Reporter and Notary Public for the State of Mississippi, do hereby certify that the above and foregoing pages contain a full, true and correct transcript of the proceedings, as taken by me at the time and place indicated, and later reduced to typewritten form under my supervision and to the best of my skill and ability.

I further certify that I placed the witness under oath to tell the truth and that all answers were given under that oath. I further certify that the witness has chosen the right to read and sign the deposition.

I further certify that I am not in the employ of or related to any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of this case.

Witness my signature and seal this the 6th day of February, 2026.

BETHANY CAMMACK, CSR
CSR NO. 1526
My Commission Expires May 5, 2027

145

ERRATA SHEET

I, VIJAYA GOPU, do solemnly swear that I have read the foregoing _____ pages and that the same is a true and correct transcript of the testimony given by me at the time and place hereinbefore set forth, with the following corrections:

Page:  Line:  Correction:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

VIJAYA GOPU

NOTARIZATION

I, _____, notary public for the

State of Mississippi, _____ County, do

hereby certify that Vijaya Gopu personally appeared

before me this \_\_\_\_\_ day of _____, 2026, at

_____, Mississippi.

My Commission Expires:_____

_____

(NOTARY PUBLIC)

AW Reporting
601-573-0961

**$2** 24:11

**$60000** 50:25

**'11** 43:12

**'12** 36:5,7 40:15 43:12,13 110:10 (6)

**'13** 32:3

**'14** 32:3

**'22** 38:9 40:17,18 43:12 (4)

**'i** 98:22

**22nd** 5:5

**25ci123cv441ahw** 5

**25th** 129:10

**28th** 121:22,22 122:1

**29th** 88:7

**2c** 2:8

**3rd** 63:15

**48th** 105:14

**49th** 105:15

**5th** 62:22,23

**6th** 144:20

**7th** 65:2

**a&m** 85:17

**abet** 50:11 51:11,13,17 52:9,17 53:21 54:2,4,5 (10)

**ability** 144:9

**able** 21:9 28:13 29:23 37:23 51:7 63:21 64:22 68:11 73:4 76:23 89:12 94:16 96:9 107:7 130:9 143:7 (16)

**about** 7:17 9:20 10:1,8 12:10,12,21 13:5 16:4 19:19 27:1 36:5 40:22,22,23,25 41:21 42:3,5,9,16,18,19 43:1,2 44:24 46:2 52:8,10 58:15 59:15,22 62:23 63:12 64:6,21 65:18 66:3,9,20 67:19,20,24 71:6 72:4 73:6 74:14,25 75:1 79:9 80:19 81:14 82:23 83:4,12 87:12 88:14,15,17 90:18 91:6,9,16,18,20,21,25 92:10,10,12,14,15 95:8,13,17 96:5 99:7 102:7,14 103:15 104:5 106:7,24 107:3,6,7 111:5,23 112:12 113:8,10 114:1 116:18 119:5 120:10,13 122:11,19 124:7,15 127:5,7 129:7,10,20,24 132:5,6,10 133:10 137:8,22 138:5,25 140:10 141:13 142:3 (117)

**above** 55:9 128:22 137:23 144:4 (4)

**absolutely** 17:3 44:2 57:11 66:15 110:23 113:7 122:18 129:9 (8)

**abstract** 98:22

**academia** 22:4 57:18

**academic** 6:22

**academies** 14:10

**accepted** 81:5 104:2 123:3

**account** 89:22

**accreditation** 51:11,14 53:13,14 (4)

**accurate** 104:23 109:1 110:9

**across** 29:21

**acted** 99:11

**action** 56:10 60:4 97:11 99:3 124:21 132:20 133:14 (7)

**actions** 58:16 59:2,2,25 (4)

**actively** 115:12

**activities** 20:7 54:20 76:18

**activity** 29:9 34:18 134:2

**actually** 6:6 12:23 20:22 52:12 66:12 80:14 81:20 85:4 91:17 102:14 110:2 118:7 (12)

**acumen** 125:20

**addition** 52:13

**additional** 25:1,4 107:23 113:15 (4)

**addressed** 83:20 94:1,18

**adequate** 24:24

**administer** 69:9

**administration** 14:20 29:3 31:1,8 32:19 33:11,12,22 34:2,3,4,25 42:18,25 48:1 57:19 76:11,15,21 82:13 86:20 87:8,17,21 88:20 89:4 93:5 94:15 96:4 105:11 106:4 107:18,18 116:10 119:9,25 120:2,13 124:1,13 130:17 135:8 (42)

**administrative** 9:13 11:9 14:23 25:6 33:4 45:7 46:14 47:10 60:7 65:16 66:14,20 91:8 98:1 112:17,19,25 125:20,21 127:8 (20)

**administrator** 122:10 125:22 136:7,8,17 137:2 (6)

**administrators** 33:6 57:23 81:7 82:21 122:2 127:13,16 135:6 138:3 (9)

**admissible** 103:25

**admission** 127:25

**admitted** 122:4

**advance** 11:17

**advisory** 75:20,22

**advocacy** 48:8

**advocate** 48:4

**afford** 51:14

**afraid** 87:1 128:17 139:5

**after** 22:7 37:11 44:6,17,20 46:11,18 66:14,20,23 73:21 74:1 75:6,9 79:9 87:6 99:11 110:9 115:3 116:6 117:17 123:21 (22)

**afterwards** 5:7

**again** 8:1 21:6 37:3 38:3 56:16 60:24 69:1 82:8 83:18 84:6,8 105:6 131:20 137:9 (14)

**agencies** 14:9 105:25 106:2

**ago** 22:1 112:14

**agree** 6:12 57:9,13,14 103:23 107:11 128:21 138:25 140:25 142:25 (10)

**agreement** 99:15 104:15

**ahead** 8:13 12:6 18:7 19:18 23:1 46:3 59:8 63:18 70:3,11 80:9 103:10,12 107:24 117:11 138:9 (16)

**alabama** 29:5,10,11,11,12,13,18,21,23 30:21 32:21 113:16 (12)

**alarmed** 89:17

**alert** 75:11

**alfred** 5:11

**allow** 10:10 43:20 50:20 51:5 107:19 127:17 135:25 (7)

**allowed** 61:11

**almost** 27:21 96:2 97:19

**alone** 66:12 76:4

**along** 103:5

**already** 6:8 8:3 46:1 53:18 57:4 61:13 64:19 67:20 68:6 109:9,10,14 117:12,14 118:17 (15)

**also** 2:12 8:9 9:22 13:15 15:25 16:8 17:17 23:11 33:6 34:3 47:16 52:11 69:23 72:1 103:5 105:16,19,24 106:19 107:5 114:24 115:4 128:2 140:4 (24)

**alternative** 94:11

**always** 8:7 9:14 23:18,20 26:24 71:4 (6)

**am** 20 5:6 17:25 33:2 61:9 62:7 63:7 80:22 88:11 95:9 121:22 141:7 144:15 (13)

**amatthews@winfieldlawfirm com** 2:5

**amazing** 75:21

**among** 81:7

**amount** 25:23,25

**analysis** 59:1 130:12,15

**anger** 48:1

**angered** 120:1

**angry** 49:3 74:15 78:8

**announced** 53:19

**announcement** 45:2

**annoyed** 116:20

**annual** 39:22 40:1

**another** 43:15,21 53:11 64:17 73:5 75:19 103:6 112:8 136:8 140:2 (10)

**answer** 8:7,13 59:7 72:18 83:12,20 118:23 140:14 142:9 (9)

**answered** 83:10

**answers** 144:12

**anticipate** 8:12

**anybody** 16:25 48:18 86:2 102:18 106:15 135:4 (6)

**anyhow** 37:21 48:25 64:24 75:23 (4)

**anything** 7:11 8:19 13:3 17:11 19:25 26:18 31:10 33:3 35:1 40:16,17,18,22 42:2,19 44:25 48:24,24 58:19,20 59:20 60:13,22 61:23 64:19,23,23 71:15 79:18 80:15,16,18 81:2,3 82:20,23 91:21 97:25 98:2 102:2 112:4 130:18 138:5 140:12 141:9 (45)

**appear** 135:7

**appearances** 16 2:1

**appeared** 45:13 47:9 48:3 112:2 145:20 (5)

**appearing** 19 45:7 48:4

**applying** 57:18

**appoint** 28:3

**appointment** 13:15,17,17,25 14:1,2 23:13,14 (8)

**appointments** 20:6 23:22,25

**appointmentwise** 31:23

**appreciate** 18:5

**appreciative** 71:21

**approach** 47:20

**approached** 47:21

**approaching** 47:17

**appropriate** 10:4 93:21

**approve** 70:7

**approving** 70:9 136:13

**are** 9:21 10:24 15:18,25 16:2,5,6,14 17:1 18:11,17 20:5,6,7 23:25 27:18 29:20,20 33:5,14 50:24 59:25 68:23 71:4 72:19 74:15 76:4,23 77:14 78:16 86:24 89:12 94:5 96:20 97:16,18 98:22 100:2,8 102:19 103:16 106:12 110:5 111:19 114:4,15,25 119:16 126:19 129:7 134:14 135:12 138:21 141:3,8 (55)

**area** 7:16 109:23 110:6

**arguments** 107:21

**arm** 14:5

**arose** 117:7

**around** 36:3 63:9 65:8 90:23 117:6 (5)

**array** 15:24

**arya** 5:23 105:8

**ashlyn** 2:3 5:9 61:10 103:14 104:24 107:19 108:13 109:11 (8)

**asian** 18:14,14,14,15,16 (5)

**aside** 23:7

**ask** 8:10 18:9,10 19:19 24:18 52:9 63:11 64:15 82:8 84:10 85:1 87:11 106:23,25 107:5,10,10 120:6,9 124:11,11 127:2 135:19 142:18 (24)

**asked** 7:5,12,13,17 30:22 34:7,8 77:14 83:9 112:12 115:22 119:15 (12)

**asking** 8:25 9:2 46:8 62:19 63:22 72:7 86:17,19 92:5,19 98:4 128:1 (12)

**asphalt** 15:23

**assigned** 29:9 91:10

**assigning** 94:22

**assignment** 92:3,3,4 93:20,21,24 94:11 95:2,2 (9)

**assist** 17:15

**assistant** 18:25 71:13 102:16,17 110:4,5 (6)

**associate** 13:15 17:12 105:21

**assume** 15:4 21:25

**assuming** 135:6 140:21 142:16

**assumption** 132:12 141:1,6

**attached** 19:21 64:4

**attempt** 36:18

**attention** 116:5 126:6,14

**attorney** 5:10,12 11:25 12:6,11,15 66:17 (7)

**attorneys** 11:21

**audio** 82:3 132:23

**august** 117:6

**availability** 27:11

**available** 17:7

**avenue** 2:8

**avoid** 103:22 105:3 112:21 135:21 (4)

**award** 26:22 45:1 70:14

**aware** 34:20 81:17 95:11

**bachelor's** 21:20 23:7

**back** 7:7 9:7 12:10 18:8,19 20:21 21:2 22:14 25:9 37:24 67:15 82:5 104:12 113:13 131:7 (15)

**background** 103:19 105:5,10 107:8 (4)

**backing** 130:24

**bad** 26:9 69:13 78:16 97:4 128:23 130:4 141:8,10 (8)

**ballgame** 97:2

**bar** 89:20,21

**bargaining** 28:22

**based** 24:1 60:1 82:24 83:24 91:15 97:11 104:22 107:8 113:5 121:20 125:16,17 132:20,20 (14)

**basically** 19:2 24:5 49:1 58:10,17 (5)

**basis** 125:14

**baton** 19 7:19 13:8,9,10 32:10 (6)

**bear** 84:6 131:2

**became** 22:18 31:18 113:10 124:5 (4)

**because** 6:2 7:25 8:11,15 11:10 13:21 14:17,19 15:13 16:19 17:10,11,16 18:2,10 20:5 24:17 29:10,20 30:6,24 31:3 32:10 33:5,6 34:18 36:8 37:10 39:12,23 40:6,8,13 44:11,19 45:1 46:8,20 47:2,4,19 48:1 49:3,9,15 50:9 51:8,19 52:10,22,25 53:12 55:3 59:4 60:16 61:5 65:4 66:19 68:5,8 69:4,9,20 70:13 71:21 73:10,11 74:11

76:5,9,10,21,23 80:25 83:12 84:16,25 88:10,17 90:12 92:17 94:3 97:2 103:23 107:3 110:3 111:11,12,25 112:24 113:12 114:12 115:19 116:14 117:1,18 118:16 119:9 120:6 121:4 122:13 123:3 124:19,21 127:3,22 130:9 134:6 135:6 139:19 140:18 142:10,15 (113)

**becomes** 47:5 98:21

**before** 6:17 7:3 8:22 12:11 22:3 23:1 37:12 62:23 64:13,18 69:5,7 74:4 75:2 103:14 105:5 106:6 112:13,17,19 113:9 116:6,7,13,17 117:6,17 122:9 126:8 129:1,8 130:18 137:22 145:21 (34)

**beforehand** 65:1

**begin** 103:15 105:5

**beginning** 95:22

**behalf** 9:10 88:11 89:1

**behind** 128:3

**being** 8:8 10:24 41:21 43:21 50:16 51:7,14 59:12 88:18 94:18 98:23 106:8 108:18 111:16 114:1 116:15 132:13 134:14 (18)

**believe** 73:25 77:6 93:20 106:6 (4)

**besides** 34:2

**best** 71:5,7,9,16 72:14 144:9 (6)

**bethany** 24 67:1 87:24 144:2,24 (5)

**better** 8:5 45:19

**between** 9:15 22:5 64:2 82:20,24 110:18 130:12 141:12,17 (9)

**beyond** 34:24 58:19,20 60:21 64:22,23 81:3 93:13 97:23,25 (10)

**big** 19:16 25:10,15 26:8 69:4 75:4 (6)

**bigger** 61:11

**bio** 19:15,18

**birmingham** 29:12 30:3,16 31:11 (4)

**bit** 19:16 20:3 34:17 35:7 52:10 61:6 67:18 97:3 103:22 115:8 122:1 124:18 131:1 (13)

**biweekly** 39:18

**blame** 48:11 60:3

**blamed** 48:13

**board** 7 12:3 23:12,15,16 75:20,22 (7)

**both** 38:14 69:24 113:2 118:24 (4)

**bother** 69:5

**bottom** 61:18 62:3 84:22

**boxes** 115:6

**bragg** 2:7 3:103,142 5:12,12 8:24 9:2,9,10 10:15 20:18 26:12 48:7 59:6 61:10 67:6 72:17 80:8 81:9 83:1,9,14,19 84:3 97:22 99:14,18 102:24 103:2,14 104:6,14 105:1,2 107:16,25 108:1,7,11,15,16 109:4,10,14,19 118:22 123:7,13 124:10 126:2 128:6,10 129:22,23 130:21 131:5,7,12,22,24 132:2,22 135:16 137:15 138:10 139:11 140:13 141:23 142:1,8,21 143:6 (72)

**bragglaw** 2:7

**brc** 38:18

**break** 20:19 103:4 104:16

**breaking** 106:16

**brief** 57:6

**bring** 96:13

**brought** 18:20 116:4

**brown** 2:3

**budgeting** 81:18 82:10

**bumpy** 4:8 128:16

**burak** 35:18,22,22 37:10,17 39:11,17 43:17 110:14,20 111:4,16 (12)

**burak's** 110:16

**busy** 7:8

**buys** 13:19

**calendar** 63:7 64:6

**calendars** 64:4

**call** 8:22 25:20 31:4 54:12 82:17 85:22 86:3 94:25 95:20 101:13 112:19 113:3 124:24 127:21 (14)

**called** 6:24 8:1 29:22 64:18 (4)

**came** 18:18,24 19:2,3 21:21 40:17 41:3,16 72:5 74:22 77:17,17,20 78:1 79:10 81:22 83:8 87:2,5 95:11 111:5 112:7 116:13,16 117:17 123:21 (26)

**camera** 132:23

**cammack** 24 144:2,24

**campaign** 119:13

**campus** 14:21 15:2

**campuses** 29:21

**can** 8:8 9:19,22 15:17 16:25 17:18,19 19:9,9,13 20:8,20 21:9,10 23:24 27:13,14 28:19,21,23 29:1,3 30:6 32:18 35:9,20,23 44:7,8 48:15 50:6 54:13 56:16,17 58:1,21 59:7 60:2,14,18 61:1,6,7,16,16,19,22,24 62:1,7,14,16 63:19,25 64:4,5 67:2,18 68:3,4 71:25 72:13,17 76:16,25 80:8 84:8,13,15,16,17 86:10 88:3 89:9 92:4 93:6,8,9,9,12 98:3,7,18 99:14,20 103:10,11 107:23 108:3,17 118:23 127:11 132:2,3 134:22 135:20 136:9,11,14,19,23 137:19 140:13,16 142:9,25 (106)

**can't** 6:19 17:3 30:18 36:6 37:12 42:14 45:24 46:4 47:3 50:9,25 51:14,21 61:5 63:13,19 65:6,25 74:21 76:9,10 87:9 92:7 110:24 112:20 113:2,3 129:3 136:10 137:10 139:6 (31)

**cancel** 93:21,23

**candidate** 27:18

**candidates** 27:24

**cannot** 15:14 17:19 28:10 30:13 54:6,24 76:11,12,14 94:3 97:14 117:16 (12)

**care** 118:25

**careful** 68:2 72:19

**carnegie** 106:13

**carried** 95:2

**carries** 136:23

**carrying** 93:20

**case** 5 6:20 11:3 18:11 60:2 83:16 117:5 144:18 (8)

**casebycase** 98:25

**cases** 7:1

**cause** 49:17 133:16,19

**caused** 78:8 127:15 134:19

**causes** 133:17

**causing** 79:22

**caution** 9:17

**cautious** 67:24

**center** 13:16,18 14:3,4,5 15:1,5,8,11,13,20,21 16:2,7,8 17:1,6,16,19 29:10,22 32:11 33:5,7,10,11,19,21 34:25 35:17 36:9 38:14,16 39:8 40:1 70:13 75:21 105:20,22 106:1 (40)

**centers** 15:18 33:20

**century** 106:5

**certain** 14:23,23 17:18,19 52:22,24 58:15 98:8,13 115:24 (10)

**certainly** 9:19 107:22

**certificate** 3:144 144:1

**certification** 23:9

**certifications** 23:6

**certified** 24 144:2

**certify** 144:4,10,13,15 145:20 (5)

**chain** 101:14,15 121:8,11 127:4 (5)

**chair** 22:23,24 24:18,23,24 25:5,9,14,19 26:4 27:9,15 28:18,24 29:1 31:18,19,24,24,24 32:20 33:8,9 34:25 42:19 49:16 50:2 51:21 92:25 93:2,6,14 94:3,18,19,21

95:8 96:9,12 98:16,17 99:4 100:6,12,21,24 101:4,11 105:17 (49)

**chair's** 99:21 100:7

**chairman** 23:16

**chairs** 27:5

**chance** 19:13 72:15 110:21

**chancellors** 31:2

**change** 37:16 62:1 95:1 118:11 140:12 (5)

**changed** 92:13,18

**changes** 118:13

**checked** 115:5

**chief** 93:7

**child** 42:9,13

**china** 18:15

**choice** 49:23 50:4 71:5

**chosen** 27:8 144:13

**christian** 6:7

**circuit** 1

**city** 7:18

**civil** 16:6 23:18 28:6 53:2 (4)

**claim** 66:13

**claims** 66:10

**class** 32:2,6,12 94:4 95:23 96:2 99:8,10 (8)

**classes** 32:12

**classroom** 92:2,4 95:13,15 99:23 (5)

**clemson** 37:9,10,18

**click** 89:23

**clock** 114:21

**closer** 61:5

**clout** 75:19 135:7

**cognizant** 103:3

**coincidence** 86:14

**collaborating** 67:23 111:19 119:18

**collaboration** 70:25

**collaborative** 38:24

**collaborator** 90:7

**collaborators** 43:10

**colleague** 43:14 48:13 136:17

**colleagues** 28:7

**collective** 32:24 53:11

**college** 28:2,2,8,9 101:18 (5)

**colleges** 28:9 35:6

**colorado** 18:21 21:21 77:12,12,23 (5)

**come** 25:1,4 28:25 32:11 39:25 50:22 52:12 53:9 58:2 71:9 100:21 101:7,12 102:11 (14)

**comes** 25:6 33:9 69:9 79:5 97:17 138:23 (6)

**comfortable** 68:5,13,20 112:6 (4)

**coming** 53:6,19 135:8 136:12,17 (5)

**command** 101:14

**comment** 58:18,19 130:9

**commenting** 59:14 60:3

**commission** 144:25 145:23

**committed** 54:13

**committee** 27:16,25 28:1,3 48:15 49:25 (6)

**common** 125:24

**communicate** 39:9,12 46:20 76:24 77:11 115:16 125:1 (7)

**communicated** 39:11 46:2 119:23,24 120:23,24 (6)

**communicating** 39:13 77:9 81:21

**communication** 39:16,18 44:17 78:25 80:4 95:10 134:13 141:17 (8)

**communications** 46:10,13 79:24 83:24 95:6 134:25 (6)

**commuting** 22:18

**company** 22:3

**comparative** 59:1 130:12

**competing** 28:7

**complain** 42:16 99:25 101:8,16 (4)

**complaining** 99:7

**completed** 41:19 54:7

**completely** 14:5 25:5

**completing** 105:14

**complicated** 97:4

**complications** 68:9

**concern** 42:24 44:25 92:24

93:8 94:20 113:25 117:13,21 118:10,14 (10)

**concerned** 20:6 46:25 74:14 88:17 96:5 (5)

**concerning** 95:17

**concerns** 47:16 83:4

**concluded** 134:17 135:9 143:13

**concludes** 143:10

**concrete** 15:23

**conduct** 57:25 95:23 110:6

**confirm** 10:13 58:23 80:19,21,22 82:8 108:3,21 (8)

**confirmed** 83:15

**conflict** 41:9 42:1 113:25 136:19 (4)

**congressional** 30:11,17,21 41:3,23 42:3 47:18,20 73:17,25 75:1 76:2,5,7 77:10,19,23 79:1 81:22 90:17 113:9 116:4 117:2,7,9 119:6,22 120:5 123:16 134:16 (30)

**congressmen** 75:11

**conjecturing** 132:14 139:13 140:6

**connections** 30:21

**consider** 18:13 96:9 122:12

**consideration** 124:21

**considered** 107:6 132:10 133:3,5,10,21,22 134:9 (8)

**consistent** 9:12

**consortium** 132:18

**consultant** 19:3

**consulting** 18:23

**contact** 11:21 14:11 43:14 47:23 66:15 75:1 90:17,25 119:10 120:13,15 (11)

**contacted** 123:15 141:14

**contacting** 78:4

**contain** 144:5

**contents** 3:1,3

**continue** 10:12

**continued** 10:18 19:1 21:4 23:5 24:25 26:14 49:11 57:2 60:5 61:17 67:17 73:14 78:23 80:12 81:10 82:7 83:6,22 84:4 85:12 88:2 98:5 100:16 105:2 108:1,16 109:19 118:22 123:13 124:10 126:2 128:10 129:23 130:21 132:4,25 134:24 135:18 137:18 138:18 139:15 140:23 142:8 (43)

**continuous** 50:13

**contract** 16:15

**contracts** 16:8,9,19

**control** 63:23

**conversation** 6:11 12:4,7,13 64:17,25 65:6 80:13 91:22 112:16 120:11 122:20 (12)

**conveys** 141:5

**convince** 86:20

**convinced** 134:1

**cooperative** 113:22

**copi** 30:9 38:17

**copied** 82:12

**copis** 30:6

**copying** 122:2

**correct** 7:19 10:22,23 17:9 20:7 22:5,16 26:1 30:25 32:23 43:11 45:12 63:25 81:15 82:18 83:8,25 87:8 108:21 110:3 125:11 129:19 139:2,3 141:13 144:5 145:2 (27)

**correction** 145:4

**corrections** 145:3

**correctly** 133:4

**cost** 125:7

**could** 20:11,12 28:5,6,16 68:10 80:21 97:8 103:23,23 131:19 (11)

**could've** 48:20

**couldn't** 12:4 50:20 51:4 64:22 103:25 (5)

**counsel** 2:5,9 5:3,6 104:15 144:16 (6)

**count** 92:1 94:10

**country** 29:21

**counts** 10:2 91:12

**county** 1 145:19

**couple** 58:21 112:14 131:16

**course** 95:17,20,24 109:21 (4)

**courses** 32:1

**court** 1 5:7 8:8,15 24:20 55:21,23 67:4,10 78:15,19,22 81:25 82:4 83:17 109:8 129:21 (17)

**cover** 103:18,18

**create** 133:6

**created** 73:3 134:2

**creating** 83:5 133:7

**criteria** 60:1

**cross** 107:19 115:6

**csr** 25 144:24

**culture** 101:5

**curious** 65:24

**current** 108:4,22

**currently** 13:7 105:21

**curriculum** 4:4

**cut** 64:2 70:2

**cv** 19:21,24 20:5,8 35:11 67:6 108:4,5,17,22 109:1,5,13 (13)

**cycle** 37:4,4

**daily** 39:10

**dan** 30:20

**date** 18 5:5 36:6 65:2 (4)

**dated** 88:6 129:10

**day** 53:11,20,21 62:18,19 64:5 144:20 145:21 (8)

**days** 7:8 12:10 52:18 53:10 62:10 64:7 112:14 (7)

**dc** 12:2 41:22 48:2,10,18,21,22 58:18 64:21 76:12,14,15 78:5 83:4 116:19 119:12 132:6 (17)

**deadline** 75:2

**deal** 14:8 111:14 115:20 126:17 138:14 (5)

**dealt** 59:10 68:15

**dean** 28:2 34:5,7,7 42:19 94:20 100:20,20,25 101:9,10,10 (12)

**deans** 35:4,6

**decades** 130:16

**decide** 27:18 53:12,14 64:5 (4)

**decision** 43:25 50:1 132:10,18 (4)

**decisions** 133:10

**declined** 44:17 46:18,19

**deep** 96:18

**defendants** 7 2:5 104:20

**definite** 64:17

**definitely** 20:2 60:18 71:1 82:2 88:25 94:13 99:20 (7)

**degree** 21:20 53:7,8 107:12 113:13 (5)

**delegation** 30:22 41:23 47:18,20 77:12,13 79:1 81:22 86:1 113:10 117:2,7 119:7,11,13,22 120:22,24 121:5 123:2,16 125:4 134:16 (23)

**deleted** 44:12

**deliver** 73:9,10,13

**demands** 86:3

**denver** 19:3 36:11 41:4 77:6,8 85:16 114:4 119:14 (8)

**department** 14:6 22:22,23 23:19 24:18,23 25:5 31:18,19,24,24 32:19,20 33:8,9,11 34:25 42:17 49:16 50:1,2,20 51:21,21 53:11 92:25 93:2,6,13 94:3,17,18,19,21 95:7

96:8,9,12,16,19 98:16,17 99:4,21 100:12,21,24 105:17 (48)

**depending** 27:11 100:15

**depends** 24:13 28:1 97:6,15,19 98:19 99:4 (7)

**depiction** 63:3

**deponent** 19

**deposition** 12 5:2 6:17 8:3,6,15 11:6,18 12:2,6 23:3 56:25 109:7,15 123:10,11 128:7 143:11,13 144:14 (20)

**derived** 9:21

**described** 10:21 99:12

**description** 4:2

**designate** 70:21 71:2

**designated** 9:11 10:5,20 71:1 (4)

**designation** 9:17 98:2

**details** 92:8

**determining** 56:10

**develop** 111:8

**developed** 137:2

**didn't** 7:12,22,24,24 11:24 12:10,20 13:2,3 22:17 24:17,18,22 33:18 35:1 37:16 38:4 39:12 40:13,15,17 41:2 42:1,25 44:21,22,25 45:1 46:20,23 47:1,5 48:21,23 50:18,21,23 51:1 54:12,15 58:18 59:19 60:8,12,13,21 66:11,13,18 68:7 69:5,7,8,19 70:2 75:14,15 77:11 79:3,13,17,20 80:13,15,16 86:12 91:17,21 92:15 93:23 95:10,13 102:8 108:13 112:2,3,13 113:25 114:7

116:18,21 120:4,4,7 122:25,25 131:10 135:17 136:16 137:24 140:16,16 (92)

**difference** 25:24 26:8

**different** 15:21 16:7 19:25 25:5,17,19,22 29:16 33:15 35:5 41:17 45:17 53:1,2 93:1,8 94:9 97:2,9 100:10 101:4 106:4 111:18 117:24 124:12 135:19 (26)

**differently** 101:2,4

**difficult** 8:16 9:14 62:9 100:1,4 (5)

**dimensions** 97:9

**dire** 107:20

**directions** 124:25

**directive** 49:4

**directly** 39:9 72:5 98:11

**director** 13:15 17:12 29:9 30:19 105:21 (5)

**directors** 30:3 33:5 39:21 40:7,8 43:2 88:12 89:2 (8)

**disappointed** 71:17

**discerned** 41:9

**disciplines** 28:5

**discomfort** 114:5

**discretely** 33:15

**discretion** 29:2

**discretionary** 24:9 26:2

**discuss** 40:11 60:22 114:14

**discussing** 40:8

**discussions** 81:7,14 82:9

114:16 141:12 (5)

**dismissal** 49:15

**disobey** 124:24

**disobeyed** 47:21 133:24

**disobeying** 49:4,20

**distinction** 106:7

**distinguishing** 106:21

**district** 1

**division** 50:11

**doctoral** 33:25

**document** 19:12 21:7 84:18 87:5 88:5 89:11 90:1 121:20 126:22 134:22 135:22 (11)

**documents** 54:3,5 56:2

**does** 15:8,19 16:7 20:14 25:1 52:16 58:10 61:3 72:24 76:8 104:3 142:25 (12)

**doesn't** 15:13 25:4 27:23 49:22 52:3 87:2,3 100:24 101:12 103:25 118:25 129:25 138:17 (13)

**doing** 8:19 29:25 50:7 53:16 54:17 55:17 59:20 79:17 94:9 111:11,20 124:3 (12)

**domain** 97:3

**dominion** 36:10

**done** 6:19 7:2 27:19 30:14,17 31:2 44:14 47:23 48:19 50:16 51:12 71:25 76:10 79:17 89:2 98:23 101:17 116:20 126:17 130:12 134:22 138:14 (22)

**dossier** 50:15

**dot** 14:11 16:1 115:6 128:17 (4)

**doubts** 71:6

**down** 8:8 32:17 62:2 63:1,20 84:19 121:9,10 128:20 (9)

**dozen** 54:4

**dr** 4:4,5,6 5:2,13,19 6:8 9:10,19,25 10:19 11:17 12:5,15 16:15 21:5 23:3 35:14,15,18 38:13 40:2 43:5 44:1 45:8,10 46:3,11 47:13 48:5 56:24 59:7 60:10 61:4 63:2 64:10 66:9 67:18 82:13,24,25 83:3,8,24,25 85:13 86:17 87:7 91:10,15 95:7 97:24 102:4 103:3 104:17 105:3 107:17 109:5 110:15,22 111:1,9,23 112:18 121:25 123:14 128:15 131:16 132:22 133:1,3,11 137:19 138:4 143:7 (75)

**draft** 89:1

**drafting** 88:11

**dragged** 99:20

**draw** 9:15 126:5,14

**drops** 126:18 138:16

**due** 49:17

**duplicate** 103:21

**duplication** 103:22 105:4

**during** 62:10 104:16 110:22 111:2,9 (5)

**duties** 33:16

**duty** 39:3

**e** 2:7

**each** 28:9 38:23 44:15 53:1,7 56:11 78:16 95:19 (8)

**earlier** 57:3,8 68:16 83:14,14,20 104:21,22 105:12

107:20 112:11 115:22 129:11 130:11 (14)

**ears** 86:1

**easily** 48:20 115:9

**east** 2:4

**easy** 113:21

**editorial** 36:24

**education** 21:19 105:10 107:17

**effort** 17:15 38:24 74:10,19 115:9,10 (6)

**egregious** 50:3

**eight** 32:24 105:18 128:1

**either** 46:14 48:20 55:12 59:20 111:4 121:2 133:15 134:19 (8)

**eksioglu** 35:18,22,23 37:10 39:17 110:14,20 (7)

**electrical** 28:7 53:3

**element** 42:24

**eligible** 15:18 17:17

**else** 33:3 49:5 55:15 58:20 64:23 137:7 140:17 141:9 (8)

**else's** 60:4

**email** 4:6,6,4,9,6,12,8 19:20 39:14 44:15,16 61:1,3 62:3 63:2 64:2 65:5,20 67:2 79:3 82:13 84:7 85:13 86:16 87:23 88:4,6,9,10,25 89:6,9,12,17 91:23 120:17,19 121:3,7,10,11,16,25 122:6,12 123:8 126:6,7 127:4 128:7,14,20 129:12 133:23 136:7 137:6,8 140:19 142:12,15,25 (61)

**emailed** 46:5

**emails** 82:16 90:2,16,22 91:3 126:4,5 128:13 129:1,7 135:4,14 (12)

**embedded** 16:5 33:14,15

**employ** 144:16

**employees** 16:2,7

**employment** 12:19 43:25

**end** 20:21 35:19 61:12 63:8 65:14 120:21 (6)

**ended** 65:9,24 77:9

**endowed** 13:14 23:21,25 24:18,23 25:3,14,15,19,21 26:4,5,16,23 27:4,5,8,9,12,15,15 28:18,24 29:1 (24)

**endowment** 24:2,5,11,14,17 25:8,9 26:20 (8)

**endowments** 26:25 27:1

**engaged** 141:17

**engineer** 23:11

**engineering** 6:20 23:19 27:13 28:2,6 33:25 34:1 50:12 53:2,3,3 109:21,22,25 (14)

**engineers** 6:24 23:12

**enlarge** 19:13

**enough** 13:6 66:6 124:14

**entire** 28:8 52:7 83:16 132:18 (4)

**entity** 17:17

**environmental** 33:24

**equal** 43:10,11

**equivalent** 114:22

**errata** 3:145 145:1

**escalate** 100:10

**escalated** 93:13

**eskioglu** 35:23

**especially** 43:11

**essentially** 43:9

**establishes** 56:9

**evaluate** 43:18,21 53:9

**evaluation** 50:11 98:25

**evaluator** 51:17 52:12,24,25 53:2,8,16,19 (8)

**evaluators** 53:6

**even** 19:17 22:17 44:18 45:5 66:25 73:23 76:3 77:2 79:17 86:5 95:4 102:8 122:9 127:17 128:23 130:9 (16)

**eventually** 80:3

**ever** 6:16 7:10 16:15,18 34:5,12 40:2,11 42:2,16 44:3 49:12 66:9 70:6 71:6 72:15 76:7 91:23 96:22 102:3 109:21 110:21 130:17 141:14 (24)

**every** 22:18 26:15 27:10,20,21 32:12 39:18 50:10,11,12 52:1 70:19 76:13 82:13,17 96:2 99:2 101:1,3,4,5,21 126:18 127:3 138:15 (25)

**everybody** 45:21 85:19 134:17

**everyone** 8:17 67:24

**everything** 24:13 34:18 45:23 49:18 55:15 57:7,9 68:17 96:1 111:12 117:19 129:3 138:3

(13)

**evidence** 109:5 117:5 123:10 128:7 (4)

**exact** 79:20

**exactly** 11:11 26:4 79:12,12 92:7 95:4 110:24 125:3 133:18 (9)

**examination** 3:8 5:17 103:1,24 104:1 107:20,21 131:14 141:25 142:23 (10)

**examined** 5:16

**examining** 53:6

**example** 10:2 58:1 73:1 103:16,19 (5)

**exams** 95:25,25 100:1,3 (4)

**except** 29:16 81:4 135:4

**exchange** 4:6,4,9,12,8 61:4 123:8 (7)

**exchanged** 44:3

**excluded** 20:8

**exempted** 32:13

**exhibit** 4:1,4,5,6,9,12 23:2,4 56:24 57:1 67:2,3,5,7 85:10,11 87:25 88:1 109:6,15,16 123:11,12 128:8,9 131:20 143:12 (27)

**exhibits** 109:9

**existed** 40:16

**expand** 61:22 84:15

**experience** 23:17 27:7 32:18 54:9,11 55:17 58:25 59:23 69:2 107:8 108:25 113:11 125:21 (13)

**experiencing** 97:7

**expert** 6:24 7:6,9,14 9:16,22 104:1,2 107:6,11,17 124:13 (12)

**expertfact** 10:21

**expertise** 16:21,23

**expires** 144:25 145:23

**explain** 23:24 50:6 76:22

**explained** 73:16 122:23

**explaining** 17:22 86:18

**explanation** 122:17

**explicitly** 134:13

**expressed** 96:22

**expression** 136:6

**external** 14:8 17:12,13

**extra** 39:3

**extremely** 100:4

**facilitate** 105:23

**facing** 47:14

**fact** 9:16 14:2 104:21 107:1 124:24 125:17 (6)

**factexpert** 9:11 10:5

**factor** 134:6

**factors** 132:15 134:5,9

**facts** 55:3 79:16 106:23 122:7,8,11 (6)

**faculty** 16:10,20,23 17:2,13 24:2,3,6 26:15 33:7 34:2 49:25 54:7,14 56:4 70:14,20,20 73:8 76:8,16 90:14 93:2 94:14,25 100:13 105:13 115:15,19 127:13,14 (31)

**fail** 100:22 126:16 127:6,11,14,16,17 128:1,2 129:6,11 130:2 135:24,25 136:4,6,9,11,14,19,23 137:3,11 138:13 140:8,11,17,18,20,22 141:2 142:13,13,14,16 143:1,2,3 (38)

**fails** 101:18

**failure** 7:5 72:21 136:12

**fair** 13:6 25:13 53:17 57:14 58:16 60:3 63:3 66:6 79:11 86:18 91:14 128:2 139:9 (13)

**fairly** 79:19 106:16 114:4

**fall** 124:5

**familiar** 95:16 96:3

**fan** 41:6

**far** 20:6 52:20 71:16 113:5 (4)

**farm** 17:4

**fault** 48:15 59:13,16,17,18 60:19 (6)

**fear** 117:15 118:4 119:2

**february** 144:20

**federal** 14:9 105:25

**feel** 42:1 94:12 98:12,22,24 99:12 124:13 125:7 130:4 (9)

**feeling** 90:23 92:23 93:19 94:5 100:2 (5)

**fell** 46:12

**felt** 49:3 68:5,13 96:23 112:6 132:18 133:12,16 (8)

**few** 12:16 37:2 84:24 102:19 (4)

**field** 107:13 111:24

**figure** 62:7,17 94:16 96:15 (4)

**filing** 66:12,13

**final** 72:24 115:4 144:18

**find** 17:1 48:15 89:5 94:7,9 121:4 (6)

**finding** 59:13

**fine** 9:2 18:4 38:1 65:7 87:6 88:22 99:16,17 104:7 (9)

**finish** 78:20

**finished** 44:14

**firm** 2:3

**first** 1 6:1 22:8 29:7 35:15 36:7,18 41:8 42:20 44:19 68:8 84:18 91:20,24 92:10 100:22 101:11 105:7 106:17 109:12 110:11 111:3 121:9 (23)

**five** 36:16 70:19 71:10

**florida** 73:1

**focus** 25:9 118:1

**focused** 49:7 58:18

**follow** 55:19,20,22,25 56:3,9 135:17 (7)

**following** 145:3

**follows** 5:16

**followup** 46:24 129:5 131:16 141:24 142:19 (5)

**font** 84:9

**foregoing** 144:5 145:2

**forget** 8:16 23:2

**forgot** 67:2

**forgotten** 8:17

**form** 48:7 144:8

**forth** 145:3

**forward** 121:24

**found** 41:7,10,20,24 59:12 75:3 79:21 85:4,6 99:6 123:6,14 124:17 (13)

**foundation** 14:10 17:18 106:2

**four** 18:24 68:16 70:19,23 71:10 86:23 106:12,19 115:10 130:5 (10)

**friction** 42:24,24

**front** 88:21

**full** 5:19,21 53:13 102:19 106:11 144:5 (6)

**fulltime** 54:23

**fully** 14:24

**fund** 26:3 70:17 71:10 72:21 (4)

**funded** 15:6 36:8 38:11 46:23 110:5 112:9 139:7 (7)

**funding** 14:9 17:18 33:7 38:5 70:24,25 (6)

**furious** 128:22

**further** 60:22 63:20 131:14 141:25 142:23 143:5 144:10,12,15 (9)

**game** 130:10

**gammill** 126:7 128:14 135:1,2 139:17 141:12 142:2 (7)

**gather** 64:22

**gave** 9:12 11:8 64:6 65:14 70:16 83:19 92:16 99:25 126:15 127:5 129:15 138:13 139:1,3,14 140:5,6,7 142:3

(19)

**general** 42:4 105:5

**generally** 25:14 113:11 127:2

**genuinely** 100:2

**geotechnical** 15:24

**get** 6:24 8:22 10:1 21:21 27:23 28:10 29:3,24 31:9,11 32:18 39:2,20,21 45:1 46:23 47:5 61:5 70:17 71:15,23 75:15,21 78:8 84:13 99:2 100:24 109:17 110:21 113:9 115:15 142:10,11 (33)

**gets** 28:4 48:13 97:3

**getting** 54:22 60:17 66:17 74:25 82:5 105:15 114:23 121:5 123:2 (9)

**give** 9:11,22 10:24 24:15 47:11 50:9 53:13 54:1 70:10 71:2 72:14 92:17 103:4 105:9 107:11 124:15 139:13 (17)

**given** 6:16,21 16:12 25:10 27:8 104:21,22,23 113:5 118:12 124:25 135:24 144:12 145:3 (14)

**gives** 24:8,9

**giving** 50:7 57:16,21,22 58:14,23 71:24 72:8 91:9 139:8 (10)

**glad** 6:1 34:6 46:7 60:15,20 (5)

**glanced** 57:6

**go** 7:22,24,24 8:13,24 9:3 14:22,24 15:11 16:19,21,24 17:14,20 19:18 23:1 28:14 32:11 37:24 44:7,8 48:21 50:10 51:1 53:23 56:1 58:7,8,21 59:8 62:4 67:10 68:18 69:16 70:3,11 76:11,12,14,17,21,25 80:8

94:19,20,21 98:15 99:25 100:10,20 101:9,10,14,15,18 103:10,12 104:4 105:4 107:24 117:11 120:4 131:7,10 138:8 (65)

**goahead** 71:3

**goes** 26:2 34:21 50:11 55:15 97:19 100:19 (6)

**going** 8:12 10:7 11:25 18:7,8 19:6,19 21:6 27:23 28:19 32:9 35:8 37:6 40:9 41:11 42:21 53:13,23 56:15,23 57:12 60:23 63:1,11 65:19 66:19 73:12 74:16 81:14 84:5,10 85:1 87:11,22,23 95:24 97:22 98:3 99:22 103:21 106:16,23,25 112:4,21 114:6,25 116:21 121:7,9 123:7 126:3 127:20 128:11,12,13 133:25 136:8 137:25 138:1,21,21 143:7 (63)

**gone** 30:23,25 68:25 73:1 103:17 (5)

**good** 5:1 8:20 18:2 19:17 20:19 25:15 26:9 61:15 63:5,8 69:1 71:19,20 103:13 112:1 113:21,23 114:20 118:14 128:5 (20)

**gopu** 12 3:8 5:3,14,19,23,25 6:8 9:11,19,25 10:19 21:5 59:7 67:18 94:22 97:24 103:3 104:17 105:3,8 107:17 109:5 123:14 131:16 133:1 137:19 143:7 145:1,16,20 (31)

**gopu's** 4:4,5 23:3 56:24 (4)

**got** 8:22 11:22 18:7 19:2,5,20 21:5,20 23:7 30:2 31:25 32:19 36:8 44:8,17,20 46:18,19 49:2,7 63:2 66:7 77:22 80:15 85:25 87:23 89:6 96:13 103:6 110:11 122:3 141:23 142:2 (33)

**governed** 56:2

**governor** 23:14

**grades** 97:5

**grading** 50:16

**graduate** 18:21 58:8

**grafton** 2:7 5:12 9:10 12:15 20:11,15 102:23 108:6,10 131:21 133:2 134:21 137:13 (13)

**grafton@graftonbragglawco m** 2:9

**grant** 111:7

**granted** 80:23

**grants** 70:17 72:4 110:5

**great** 6:16 20:10 21:16

**green** 4:12 70:10 126:16 127:6 129:16 135:24 138:13 139:1,3,13,14 140:6,7 142:4 (14)

**ground** 8:5 103:18

**group** 87:14,16 114:13 119:24 120:5 (5)

**grow** 9:23

**guess** 6:8 8:4 10:19 20:11 28:13 32:17,20 34:21 38:11 47:10 55:18 58:13,21,22 72:7 86:23 135:19 (17)

**guessing** 54:20

**guidelines** 54:1

**guy** 71:23 124:5 127:10

**guys** 39:8 44:15 63:17

**half** 16:13 54:3 63:24

**hampton** 36:14,15

**handed** 95:21

**handle** 59:24 62:7 69:12 96:4,24 100:18,23 101:22,24 (9)

**handles** 101:1,3,4 102:2 (4)

**hang** 48:16

**hanging** 40:7,10

**happened** 7:14 37:9 40:17 41:21 47:7 48:2,10,25 49:10 55:2 59:18 65:2,4,5 66:21 73:21 74:1,15 75:2 78:25 79:4,9 80:4,15,20,25 82:3,24 83:4 85:21,24 118:7 119:6 122:5,11,14,24 124:2,4 132:6 (40)

**happening** 40:18 80:17 82:20 85:5 98:17 120:8 (6)

**happens** 27:10 28:9 75:23 77:1 96:17 100:5 101:8 (7)

**happy** 103:4,5 113:12

**harassment** 97:17 100:9

**hard** 124:19

**harsh** 124:19

**has** 9:20 10:5 15:11 16:15,18,23 20:2 21:11 26:19 27:2,20 28:9,12 31:25 33:2 39:1,5 49:17,19 50:14 52:14,24 56:11 66:9,21 68:24 72:15,25 74:15 76:10,13 79:17 82:25 91:15 92:12,17 94:1 95:19,21 96:1 97:24 98:17,23,24 99:3 100:13 101:21 113:4 117:5 124:20 140:10 144:13 (52)

**hassle** 135:21

**hassles** 68:12

**haven't** 108:7 110:2 125:10

**having** 5:15 33:7 40:12,24 42:9 68:3 81:18 90:22 126:17

135:7 138:14 140:5 141:3 (13)

**he** 9:12,20,22,24 10:1,8 11:21,24 20:12,20 30:20 37:11,12,14,24 38:17,19 39:12 40:11,13,23,24,25 41:2 42:2,4,6,8,8,12,16 43:14 46:5,8 47:19,21,21,25 48:9,13,14,17 49:1,3,4,20 50:10,18,21,22,22 51:8,9,10 54:11,13,16,17,19,20,21 59:15,17,19,19,20 60:12,13,13,16 64:11,16,17,21 65:7 66:4,4,11,13,16 72:25 77:9,11,11,21 79:3,3,9,13,15,15,16,18,20,21,21 81:1,2 82:15,17 83:11,12,15,15,15,19 84:25 85:4,19 86:6,12,23,24 87:1 90:2,2,6,15,21,21 91:21,23 98:18 101:12 102:8 103:24 104:1,20 110:17 111:11,25 112:4 115:14 116:19 119:12,14,17,17,20,23 120:4,7,14,22 121:3,15,19 122:4,15,23 123:3 124:3 125:2 127:11 135:24 136:9,11,14,14,19,23 138:11 139:6 (163)

**he'd** 41:24

**he'll** 69:20

**he's** 8:25 63:22 66:10 73:4 79:8 85:6 86:19,21 90:8,13,18 91:6 125:19 (13)

**head** 32:20 36:1 42:17

**hear** 6:1 42:12 73:20 80:13 93:19 119:11 (6)

**heard** 64:19 76:19 78:9 83:2 91:20,25 92:10 106:6 116:22 130:19 (10)

**hearing** 9:13 11:9,9 45:8 46:14 47:10 48:4 56:1,8 57:17 60:7,12,14 62:20,24 63:10,14,18 64:13 65:11,16 66:3,5,14,21 67:21 91:8,18,21 92:11,13 93:18 95:11,12 98:1 112:17,19,25 (38)

**hearings** 56:5

**heck** 99:22 142:12

**hello** 82:1 132:21

**help** 103:22 105:3 115:15 120:6 138:3 (5)

**helping** 18:5

**her** 78:19,20 139:8,22 (4)

**here** 10:12 13:22 18:18,20 19:4 20:1 21:14,19 46:17 57:9,13 61:20 66:7 73:16 84:22 86:16 96:14 112:11 121:21 126:13 127:5 128:13,21 (23)

**hereby** 144:4 145:20

**hereinbefore** 145:3

**hesitant** 68:23 69:4

**hey** 48:20 75:12 79:16 92:25 93:7 94:5 95:1 114:5 (8)

**high** 105:9

**higher** 7 12:25 13:1 15:15 35:1 93:13 107:17 (7)

**highlighted** 86:15

**highly** 75:18

**hiking** 62:8

**him** 9:2 11:20,22,24 12:10 16:18 20:17 30:22 35:16 40:10 42:5 43:9 44:4,8 48:11 49:7,24 50:4 60:22 62:19 64:6,7,21 65:12,16,18 66:23,25 77:14 78:25 91:23 94:4 99:7 100:14,22 102:9,11 119:10,15 124:25 125:18 126:16,16 127:5,6,16,17,17 128:23 129:11 130:1,2 135:25 136:4,5,9,21,21 138:13,13 139:1,3,6 140:7,11,17,18,20,21 141:1 142:12,13,14,16

143:1,2,3 (77)

**himself** 73:4 86:19

**hinds** 1

**hinges** 124:23

**hire** 28:23 102:14,15

**his** 9:21 11:21 30:20 35:20 41:22,23 42:8,9,13,17,19 43:13,18 47:16,19 48:17 49:19,22 50:7 54:21 55:4 67:6 72:24 77:11 78:5 80:22 82:13 83:16 91:10 95:7 99:7 104:1 111:11 115:15 119:12 120:22 126:17 128:17 138:14 (39)

**history** 21:24 106:11

**hit** 41:6 67:20

**hold** 74:7 95:25 128:16

**home** 48:22

**honest** 6:19 65:3 100:19 112:20 (4)

**honor** 25:10,15,16 106:22 (4)

**hoping** 137:3,11

**hostile** 99:12

**hour** 63:24

**hours** 50:21 51:9,10 54:13 63:9 65:9,11,15,17,23 66:1,5 114:21 (13)

**how** 6:2 12:12 19:2 27:3,4,7,19 31:25 35:14,25 38:10 39:8 40:9 44:13,14 50:6 52:16 53:23 56:1 58:15 59:23 62:7,16 77:19 80:21 85:4 94:5 95:23,24 96:3,15,23 98:22 100:18 101:22,24 102:2 103:15 114:11,16,18 116:18 122:3 123:5,16 124:8,15 (47)

**hr** 100:8

**huhuh** 81:19

**human** 97:19 100:8

**hundred** 14:19 15:1 71:4

**hundreds** 26:6

**hung** 40:2

**huntsville** 22:13,14,17,23 29:5,13 30:16 31:11,20 32:21 52:6 96:12 (12)

**hurts** 51:13

**hybrid** 9:11 10:5,21

**i'd** 73:19 107:16 137:9

**i'll** 8:2,9,10 10:13,16 15:1 20:16 23:15,16 51:25 60:15,20 69:19 82:8 84:13,19 105:15 107:19 117:4 121:9 129:13 135:19 (22)

**i'm** 6:1,13,18 7:19 8:16 9:2 11:7 12:24 13:8,14,23 14:10,15,15,16,19,24 17:9,10,11,12 18:7,8,15 19:6 21:6 23:10,11 24:21 28:18 31:3 34:6,6,20 35:8 36:14 37:10,19 42:12 47:1 48:14 54:19,22 55:2,2,23 56:15,23 57:12,22 59:9 60:23 62:18 63:1 64:1,7 72:7,11,12 75:20 76:17 81:25 83:11,17 84:5,10 86:6 87:15,19,22,23 88:15 89:13 94:16 95:9,24 96:12 97:7,22 98:3,10 101:6,20 103:4,5,21 105:21 106:10,23,25 109:8,15 112:20 114:5 121:7,8 123:6,7 124:22 126:3,25 128:11,12,13,16 129:21 130:8 131:9,22 132:14 133:8 135:6,21 137:1,15 139:20 140:3 141:9,10 (119)

**i's** 115:7

**i've** 8:17 12:9 13:10 21:5 27:5 54:3,4 61:12 69:17 70:15 71:1,25 73:9 84:24 87:23 89:6

103:6 105:12,16 106:3,6 125:12 126:9 130:15,23 141:23 (26)

**idea** 27:3,3 32:18 45:6 55:7 80:11 90:20 91:6 118:8 126:20 132:16 135:5 139:24 (13)

**ignore** 46:21

**ihl** 5:10 12:23 125:11

**ihl's** 12:21

**ihls** 128:24

**immediately** 22:19

**imposing** 97:10

**impossible** 59:11 115:21

**impression** 111:1,8

**impressive** 35:25

**improvement** 50:13

**inadvertently** 120:23 133:8

**inappropriate** 90:22

**including** 5:21 107:18

**increase** 61:23 84:9

**indeed** 104:2

**independent** 111:20

**independently** 80:18

**index** 3:4 4:1

**india** 18:18 21:20

**indicated** 144:7

**individual** 90:16 115:11 125:24

**individuals** 135:12

**information** 7:18 39:2 88:13 108:24 (4)

**informed** 122:6

**inhibition** 68:7

**initial** 63:6 64:12

**initiation** 70:25

**input** 36:25

**inquired** 27:6

**instant** 119:19

**institution** 30:8,15 37:6 38:25 39:4 50:24 68:10 69:10,15,25 73:5 74:13 86:5 87:4 115:1,12,17,20 116:12 (19)

**institutional** 69:22

**institutions** 7 12:24,25 15:15 16:20,20 36:16 39:1,5 47:4 59:3,10 106:13 (13)

**instruction** 92:21

**instructions** 58:2

**insubordinate** 134:14

**insubordination** 123:20

**intelligent** 15:23

**intentionally** 86:2 123:1

**interact** 34:16,19 35:7

**interacted** 35:15 41:24 49:5 114:12 (4)

**interaction** 35:3 43:17 44:7 99:13 110:20 111:4 (6)

**interactions** 105:23 110:18

**interest** 74:23 127:23 144:17

**interested** 127:23

**interference** 81:24

**internal** 17:11 56:2,7 81:6,12 82:9 (6)

**into** 22:3 26:2 27:6 41:4 49:7 60:17 73:4 77:17 80:15 86:1 97:3 103:17 105:15 109:5 114:18 120:7 123:1,9 124:20 125:4 128:7 (21)

**introduce** 5:6 109:4 123:8 128:6 (4)

**introduced** 33:24

**introducing** 33:22

**invest** 72:23

**invested** 74:17

**investigated** 135:11,13

**investigator** 39:5

**investment** 71:15

**invite** 8:17

**invited** 45:10

**involve** 93:4

**involved** 9:24,25 10:9 15:4 16:1,3 17:10,10,11 29:25 31:10,12 37:22 49:9,25 50:5 54:3,6 79:8 82:9,11,19,22 85:19,20 91:12 94:16 95:6 105:19 106:3 119:14,16 121:5 123:2 141:11,19 (36)

**involvement** 7:2 97:25

**involving** 135:1

**iran** 18:15

**is** 5:2,5,6,9 6:6,7 8:4,12 9:5,8,9 10:2,21,25 11:25 12:23 14:5,11,21 15:5,7 16:3,22 17:17,20,23 19:24 20:25 21:3,12,15,18 22:1 23:13 24:2

25:5,11,14,15,19,20,22,24 26:5 27:7,8,10,19,22 28:12,13 29:22 31:5 32:9,19 33:8 35:5 36:12,18 38:14,23,24,25 42:13 43:5 44:1 45:19,23 46:25 50:23 51:19,24 52:17,25 53:1,2,8,17,19 54:5,14 55:13 56:1 57:10,14,19 58:6,16 59:9,15 61:8,22,23 62:3 63:3,4,9,16 64:1,7,11 65:7 67:13,16,24,25 69:4,6,14,20 71:12,14,23 72:1,7,25 73:17,20 74:23 76:20,21 77:2,6,21 79:11,14,16,25 80:5 81:11 82:5,14,24,25 83:23,25 84:23,24 85:4,5,7,21 86:18,24 87:2,7 88:7,9 89:17,19,22 90:6,6,8 91:14,15 92:6,16,23,24 93:5,12,21 94:16,17,17,22,23 95:2,8,23,23,24 97:3,5,6,10 98:16,16,18,20 99:2,3,22 100:25 101:5,6,13 103:7 104:1,10,13,16,23 105:7,14 106:13,15 108:3,4,17,22,23,24,25 109:6,11 110:9 112:18 115:3,11,12 116:3 117:7,8 118:2,14,16 119:4,12 122:6,11,13,14,15,24 124:6,7 125:3,16,17 126:7,14 127:9,9 128:2 129:5,17,24 130:10 131:1 132:6,11,17,21 133:11 134:6,12 135:5,25 137:22,25 138:24 139:8,9,17,24,25 140:1,7,17 142:12,12,13,13 143:11 145:2 (267)

**issue** 42:4 51:6 54:8 58:18 59:25 60:17 68:11 73:19 74:1,4 75:5 81:21,23 82:6 83:5 91:24 93:6 94:7,17 95:13,15 96:11,13 100:23 113:10 114:9 115:16 116:3,13 117:2,7 119:7 134:16 (33)

**issues** 18:11 40:11,13,15,16,23,25 41:20 42:3,6 51:4 52:4 67:19 74:24 81:14,17 82:10 93:3 100:8 112:2 116:16 (21)

**item** 132:8

**its** 17:6 28:9 56:11 132:10 133:10 (5)

**itself** 68:10 110:25

**jackson** 41:16 42:8 64:8 90:9,10,12 113:16 114:14 (8)

**january** 18 5:5

**jason** 126:25,25 139:1 140:5,16,19,21 141:1,8,12,18 142:3,4,11,14,16 (16)

**jeopardize** 59:21

**jeopardizes** 50:19

**job** 8:16 25:1 54:15,23,24 55:4,6,6 58:6 112:1 113:23 (11)

**join** 28:25 63:22

**joint** 13:15,17,17,25 35:16 (5)

**jordan** 126:7 139:24 141:18

**judicial** 1

**julie** 126:7 139:24,25 141:18 (4)

**june** 45:8 63:14,15,16,20 64:4 126:6 129:13,15 130:1 (10)

**just** 6:4 8:4,10,11,14,18 11:25 13:4 18:9 19:23 20:19 24:12 25:8 26:13 29:15 31:22 32:17 34:2 41:13 42:4 46:21 48:14 49:21 51:3 52:8,9 53:15,24 54:20 56:1,5 57:22 58:22,22 59:7 60:8 62:14 65:14,23 67:11,20 73:19 74:19,21 79:16 82:8,24 83:19 84:6,10 86:6 91:7 97:14,22 101:15 103:5,10,15,23,23 104:6,14,16,22 105:5 109:16 113:1,9 119:5 120:6,17 121:3,8 127:2 131:2,16 136:15,19,23 137:3 138:10 (81)

**kari** 126:25,25 128:14,21 139:1 140:5,9,15,19,21 141:1,7,12,18 142:3,4,11,14,16 (19)

**keenum** 5:10

**keep** 52:2 96:16

**kept** 37:16 50:17

**kicked** 75:22

**kill** 74:10,16,18,21 87:18 116:11 (6)

**killed** 88:18

**kills** 117:25

**kind** 15:19 18:7 19:5 22:11 33:8,10 38:19 43:4 50:15 53:15,24 55:8,18,19 57:4,18,20 67:20 68:12 73:15,19 86:16 89:20 106:3 129:5 133:6 134:8 (27)

**knew** 43:1,2,15 44:24 45:1 47:15 49:7,9 110:15,17 115:23 (11)

**know** 6:15,18,23 7:13 8:3,9,18 9:14,24 12:10 13:4 14:3,22 17:3 19:18 22:12 23:7 24:8,12,13 25:20 27:1,24 28:22 30:10,15,21 31:11 32:8,12 33:25 34:8,17,19 35:25 36:22,23 37:20,23 38:9 40:9,15,17 41:14 42:8,14 43:1,16 44:18,22 45:5,16 46:8,22 47:15,24,25 48:2,13,21,23,23,24 49:23,23 50:4,5,21 51:9,25 52:4 54:4,5,16,19 55:3,4 56:13 57:8,24 58:3,4,6,8,9,14,20,24 59:10,11,19,25 60:9 61:1 62:17 63:19,24 64:11,19,23 65:19 66:11,13,14,18,25 67:19,21 68:3,15,17 69:13,19,20 70:10,13,23 71:3,23 72:8,13,25 73:15,16,23 74:13,21,23 75:4,9,10,14 76:3,4,16 77:2 79:3,17,19

80:10,15,16,25 81:3 82:23 87:11,15 88:22 89:9 90:11,18 91:1,5,17 92:16,21,23 93:9 94:4,8,11,15,22 95:13 96:2,7,7,10,19,21 97:7,9,15,24 99:3 100:3,6,14,15,18,21 101:5 102:2,2,9,15 103:17 106:3 108:12,12 111:5,5,11,13,17,25 112:1,3,13,16,25 114:11,16,21 115:5,6,9,24 116:3,5,18,19,19,21,21 117:19 118:6 120:21,25 122:4,25 123:3,5,16,18 124:14 125:23 126:4,19 127:3,3,12,15 130:4,5,8,9 132:9,15 133:9,17 134:6,8,10 135:2,3,4 136:3,16,20,20 138:2,2,5,22 139:16,22,23,24,25 141:4 (261)

**knowledge** 9:20,22 40:14,21 59:5 81:4 83:23 91:14 92:12 96:8 101:23 102:1 106:25 107:2,4 111:4 (16)

**known** 12:9 35:14 43:9 122:8 (4)

**krishna** 5:23 105:7

**lack** 8:5 127:23

**lafayette** 13:13 14:14 15:12 32:8 102:5 (5)

**land** 23:12

**laptop** 61:22

**large** 26:25

**last** 32:2,6 43:22 46:4 52:16 62:10 68:25 82:5 89:13 92:5 95:4 105:8 127:8 137:22 (14)

**later** 122:1 144:7

**latest** 20:9

**law** 2:3

**lawsuit** 66:12,13,19

**lawsuits** 66:10

**lead** 30:8,15,19 35:18 37:6,13,16 38:6,18,24 39:1,3,5,12 47:4 69:10,23,25 74:13 87:3 110:13,19 114:1 115:14,17 116:12 (26)

**leader** 67:25 68:3

**leadership** 127:22

**leading** 30:24 118:20 124:9 126:1 127:20 130:20 (6)

**learn** 92:15 111:23 124:7

**learned** 92:13 119:8 120:10,12 (4)

**learning** 7 12:25 13:1 15:15 124:6 (5)

**least** 70:16 71:22 72:4

**leave** 14:25 53:20 72:22 92:21 (4)

**leaves** 69:13

**leaving** 73:11 112:4

**led** 69:17 90:17

**left** 72:25

**legislation** 31:10

**lender** 48:23

**length** 11:24

**let** 13:22,24 21:13,14 23:1 37:8 38:5 40:19 52:5 61:1,5,18 62:17 63:19,20,24 66:12 76:4 78:19 89:9 100:22 101:11 120:9 124:11,11 126:16 127:2,6,10 130:1,2 136:9,18 137:4 138:13 140:7 141:8 143:3 (38)

**let's** 20:22 24:4 28:18 31:14 32:17 33:2 61:9,25 62:6 67:10

68:18 72:14 87:3 93:1 96:15 113:8 117:22 127:10 130:2 (19)

**letter** 4:9,6 75:13,14 79:13,19 84:24 86:20 87:12,14,16,20 88:11,20,24 89:1,4 121:12,17 122:15 123:9 128:15 132:1,6 133:3,6 137:22 (27)

**letters** 74:5,6 75:15 86:17 87:7 88:23 116:9 (7)

**letting** 108:12

**level** 35:5 42:25 74:11 75:1 93:13 100:10 101:18 102:19,20 105:9 (10)

**levels** 25:17,19 106:4

**li** 3 2:12 5:3,13 29:15 36:7 37:23 38:5 39:13 41:10 43:15,15 47:2 59:12,13 60:3 65:25 68:4,17 78:4 79:16,22 80:15 81:1 82:20 87:17 92:9 111:5,16 113:22 114:1,9 116:17,22 119:8 120:12 121:21,23,24 122:14 123:18 124:3,4,5,7,18,19,21,24 125:8 132:13 133:6,24 134:13 142:3 (55)

**li001740li001742** 4:8

**li001753** 4:001753

**licensed** 23:10

**licensing** 23:12

**lie** 59:18

**life** 8:11 76:7

**light** 4:12 70:11 77:17 79:10 126:16 127:6 129:16 135:24 138:13 139:2,3,13,14 140:6,7 142:4 (16)

**lightly** 99:2

**like** 6:4 7:2,5,11 8:19 18:9

21:11,20,24 22:2,11 24:4 25:10,11 29:4,15,20 31:10,13 35:24 42:10 45:13 46:10,13 51:25 52:10 55:21,21 56:6 57:3 58:12,24,25 61:3 62:21 63:2,5,17,21 64:1,15 65:7,20 66:18 72:8,12 73:2,19 74:21 79:15,18 86:16,23,24 87:18 88:6 89:10 90:13,15,21 92:7 93:10 94:12,24 95:5,18 98:2 100:4,9 101:24 103:19 104:4 105:25 106:20 107:16 108:2 109:4 112:4 119:4 121:8,20 123:8 130:18 134:23 135:25 136:15,25 137:12 140:1 141:2,2 142:15 (92)

**limited** 26:21 111:4

**limits** 114:15

**line** 9:15 97:23 145:4

**linking** 124:4

**links** 89:23

**list** 45:2

**listed** 108:25

**litany** 51:3

**litigation** 46:15

**little** 19:16 25:22 44:6 52:9 61:6 67:18 97:3 103:21 121:25 124:18 131:1 (11)

**live** 13:6,9 32:10 106:17 (4)

**lived** 13:10 106:18

**lobbied** 86:5

**lobby** 86:4,5

**lobbyist** 41:22 76:12,14,14,20,22,25 77:2,12,23 81:21 119:13,22,24 125:2 (15)

**lobbyist's** 86:1

**lobbyists** 41:5 76:17 120:6

**local** 93:5

**locally** 101:17

**located** 31:5,6 76:5

**location** 94:9

**logic** 128:3

**long** 12:12 22:1,1 31:25 35:14 52:16 65:10 79:19 103:9 106:17,19 (11)

**look** 21:13 37:24 57:7 61:3,11 89:19 93:7,24 94:5,22 95:1 98:18 100:13 128:23 137:9 (15)

**looked** 22:2 37:19 129:8

**looking** 21:25

**looks** 21:11,20,24 22:11 29:4 31:13 58:12 62:21 63:2,5,17,21 64:1,15 65:7 86:16,23 88:6 89:10 90:13,15,21 121:8,20 140:1 141:8,10 142:15 (28)

**lose** 51:14 72:23

**loss** 73:5

**lost** 75:20

**lot** 16:7 20:7 24:12 25:6 34:19 35:3 51:2,20,20 54:6 71:10,21 72:8 82:5 115:19 135:7 (16)

**loud** 8:7

**louisiana** 19 13:13,16 14:6,14 15:12,16 17:5,21 19:2,4 22:15 55:22 77:3 102:4 105:22 106:8,11,14 (19)

**lsu** 18:24 22:9,12,13,14 24:16 28:19,20 35:17 36:13 38:18 52:6 77:3 106:13 111:13 (15)

**made** 9:17 22:8 23:13 28:14 36:22 47:23 65:20 81:17 99:12 120:15 127:15 128:23 130:15 135:23 (14)

**madison** 2:8

**magee** 2:11

**mail** 129:10

**main** 2:4

**maintain** 50:15 54:12 55:14

**major** 15:17 105:17 106:12 139:6 (4)

**make** 10:12 18:1 36:24 39:25 57:12 59:7 61:24 74:23 86:24 87:24 93:9 98:11 104:3 109:16 115:5 118:1 123:7 125:18 129:25 143:7 (20)

**makes** 8:15 24:1 130:8

**making** 66:10 109:16 132:10 133:10 141:1,8 (6)

**man** 37:21

**manage** 33:6,10 68:11 69:21 (4)

**managed** 111:16

**management** 33:21 69:23,23

**managing** 38:18 68:10

**mandatory** 51:24 96:1

**many** 27:4,4 45:18 50:17 73:10 (5)

**mark** 5:10 23:2 56:24 67:2,3,6 85:9 (7)

**marked** 23:4 57:1 67:5 85:11 88:1 109:11,15 123:12 128:9 143:12 (10)

**market** 73:4

**master's** 18:22 21:22 22:6 23:8 33:24 (5)

**material** 51:20

**matt** 131:8

**matter** 5:3 9:13 14:2 144:17 (4)

**matters** 9:24 107:6

**matthew** 2:11

**matthews** 2:3 3:9,10,11 5:9,10,18 9:1 10:10,13,17,18 20:14,22 21:4 23:1,5 24:25 26:14 49:11 56:23 57:2 60:5 61:14,17 67:1,8,17 73:14 78:18,23 80:12 81:10 82:2,7 83:6,11,22 84:4 85:9,12 87:24 88:2 98:5 99:16 100:16 102:22 104:4,8,25 107:24 108:6,9,14 109:13 118:18,20 124:9 126:1 130:20 131:9,15,19,23,25 132:4,25 134:21,24 135:18 137:13,17,18 138:18 139:15 140:23 141:21 142:6,18,22,24 143:5 (82)

**maximized** 61:11

**may** 5:6 10:1 18:1 20:18,20 37:22 46:1 61:12 62:22,23 63:6 64:4 65:2 68:11 79:10 82:18 87:13 95:7 103:17 104:17,18,21 107:1,1,5 115:19 126:12 127:3 134:9 142:18 144:25 (31)

**maybe** 6:20 7:2 12:16 22:12 39:11 47:25 53:11 69:3 71:16,17 75:9 78:6 86:18 94:8,10 98:10 103:19 114:22 125:24 (19)

**me** 7:5,17 8:10,17,23 11:22 13:22,24 17:23 18:5 19:9 20:12 21:9,13,14 22:17 23:1 28:21 32:11,13 35:12 37:8 40:19 43:20 46:5,6,8,25 50:7,8 52:5 56:16 57:13 59:11 60:11,12 61:1,5,18 62:9,17

63:19,24,25 64:1,15,16,18,22 65:17 66:4 69:18,19 70:9 71:17 73:15 76:15 81:5 82:16 84:6 88:21 89:9 91:22 92:9,19 94:22 96:13 99:2 100:22 101:7,8,12 103:22 105:9 108:12 112:14,18 113:10 119:5,5 120:9 122:22,23,24 124:11,11 127:2 130:8 131:1,2 137:4 138:24 141:8,15 144:6 145:3,21 (97)

**mean** 8:19 12:7 19:17 20:6 27:11,23,23 31:23 33:21 40:14 41:3 48:12 51:3 53:18 54:13 55:1 56:4,4 57:6 62:13 68:5 69:7 71:1,12 72:20 76:16 81:2 93:7 98:14 101:20 103:25 115:14 119:21 122:14,22 128:4 132:14 133:16 135:14 136:6 138:20 (41)

**meaning** 38:16

**means** 17:13 18:15 23:24 55:14 128:1 (5)

**mechanical** 28:6 53:1

**meet** 11:17 12:5 41:22 65:8,23 76:1,11,11,12,14,17,20,22,25 94:13 110:21 (16)

**meeting** 12:3 39:22 40:1 41:15 48:17 53:12 62:8,19 63:6,10,22 64:12,21 65:12 76:4 103:6,7 114:13 143:8 (19)

**meetings** 14:23,24 39:19,21 52:13 (5)

**member** 16:23 17:14 23:11 24:6 54:14 56:4 90:14 93:2 94:25 100:14 105:13 127:14,14 (13)

**member's** 24:2,3

**members** 17:2 70:14,20,20 73:8 76:16 86:11 115:15,20 (9)

**memory** 62:14

**mention** 42:2,7,8 91:21 (4)

**mentioned** 67:23 95:14 105:12 112:13 119:17 (5)

**mentioning** 42:13 86:6 91:23

**mere** 104:21

**message** 11:22 76:24 136:23 138:17 141:4 (5)

**messages** 44:3,8 85:5

**met** 36:7 76:6 77:11 79:3 110:25 114:13 120:22 (7)

**metrics** 50:17

**micromanage** 92:22

**middle** 5:21,24 105:7

**midlevel** 72:2

**might** 6:19,21 8:3 16:12 18:1,9 30:17,20,25 31:2,8 37:9,17,23 46:5 55:23 56:1 59:18 64:16 67:22 71:17 72:14 75:13 87:9,20 89:4,18 91:8 113:1 114:21 115:15 116:20,22,23 117:1,12,13 120:19,19 121:2,23 122:8,23 129:2 (44)

**might've** 120:18 121:3

**million** 24:11

**millions** 26:5,10

**mind** 10:3 20:11,23 62:18 131:20 132:22 137:13 (7)

**minute** 28:20 47:2 74:17

**minutes** 12:16,17

**miss** 36:11

**missing** 33:2

**mississippi** 1,6,7,25

2:39759,39110 5:4 6:13 13:3 15:16 35:17,19 36:11,12 37:14,15,18,22 38:8 39:23 40:22 41:5,16,24 43:7 45:2 46:20 47:3 49:2 68:6,9,13 69:2,8 74:14 76:1 77:10,16,18,21,24 82:21 85:23 86:1,10 89:18 90:10,14 96:10 110:8,14,25 111:14 114:1 116:15,20 117:18 119:11,18,21,21,24,25 120:5,23 121:5 122:1 123:1,5,14,15,24 124:15 125:1,4,11 130:13 134:18 144:4 145:19,22 (81)

**mississippi's** 38:17

**mississippiedu** 90:13

**misunderstood** 86:11

**mitigate** 94:6

**mitigating** 134:9

**moment** 62:15 84:6 131:2

**monetary** 144:17

**money** 13:23 26:2 69:9 70:24 71:24 72:1,5 (7)

**montgomery** 31:6

**month** 62:23

**monthly** 39:10

**months** 130:5

**more** 24:12 33:22 34:1 39:5 52:5,10,17 64:19 73:6 75:19 89:6 92:13,15 93:16 97:3 102:23 126:3 127:2 128:12 138:11 (20)

**morning** 5:1 63:8 108:20 128:16 (4)

**most** 16:19 19:24 73:6 100:11 110:19 (5)

**mouth** 69:13

**move** 22:17 31:22 35:9 46:23 (4)

**moved** 31:16 32:8 37:10,11,18 (5)

**ms** 3:9,10,11 5:9,18 9:1 10:10,13,17,18 20:14,22 21:4 23:1,5 24:25 26:14 49:11 56:23 57:2 60:5 61:14,17 67:1,8,17 73:14 78:18,23 80:12 81:10 82:2,7 83:6,11,22 84:4 85:9,12 87:24 88:2 98:5 99:16 100:16 102:22 104:4,8,25 107:24 108:6,9,14 109:13 118:18,20 124:9 126:1 130:20 131:9,15,19,23,25 132:4,25 134:21,24 135:18 137:13,17,18 138:18 139:15 140:23 141:21 142:6,18,22,24 143:5 (80)

**msu** 5:10 6:12 27:2 58:15 79:24 80:5,11 82:9,24 83:3 86:3 87:2 90:17 95:16 96:4 101:24 102:2 111:21 112:3 124:8 132:9,15,19 133:2,9,15,18 138:3 (28)

**msu's** 4:4 12:18 59:2 63:23 81:7 96:20 (6)

**msu219882msu219883** 4:11

**msu249328msu249329** 4:14

**much** 32:9 45:19 53:15 60:22 74:9,17 75:8 81:12 84:20 112:3 114:18 120:25 (12)

**multiple** 74:19

**must** 30:13,14 65:4,5 87:21 89:2 (6)

**my** 4:6 5:21 7:8,13,16 10:9 11:8,25 13:5,19 14:21 18:22 19:6,9,15,18 20:5 21:6 22:5,7 29:8 34:18 35:8 37:24 40:14 48:8 49:1,6 51:16 52:7,11 56:15 57:22 58:17 59:8,17

60:23 61:8,21 64:4 65:19 66:16 71:12 75:15 76:7,12,14 83:21 84:5,16 86:7 92:18,23 93:14 96:7,8 101:20 104:1,19 105:7,14,15 108:2 110:5,19,20 111:13 124:20,23 125:15,19,20 127:7 128:12 132:12 136:16 144:8,9,19,25 145:23 (81)

**myself** 18:8 66:7 84:15 85:17 (4)

**name** 5:19,21,21,24 6:2,7 35:20,24 71:23 105:6,7,7,8 110:12 (14)

**named** 135:1

**names** 50:7,9

**narrow** 32:17

**national** 14:9,10 17:17 106:1 (4)

**nature** 14:3

**nearly** 103:9

**necessarily** 70:8

**necessary** 16:23

**neck** 48:17

**need** 20:1 55:13 65:8 76:23 88:12 97:9 101:17 103:4 131:7 (9)

**needed** 54:17 121:4

**needs** 42:9,14 92:25 95:1 (4)

**negative** 81:19

**negotiated** 32:9

**negotiation** 28:13,16

**never** 19:4 27:5 30:22 34:6,24 42:18 43:4,6,18,24 44:2,16,19,23 52:6,6 66:20 76:6,19 89:5 95:14

102:6,11,13,13,13 130:19,23 135:11,13 (30)

**new**  24:10 28:14 32:4,5 33:23 113:14,15,19,20 (9)

**next**  23:15 52:1 72:25 100:25 103:7 (5)

**nice**  20:18 32:15

**nine**  68:19

**nixed**  116:15

**no** 5,25 7:1,12,21,21,24 11:1,1,4,4,19 12:20 13:2 14:15,15 16:17,17,19 18:6 22:13 25:3 26:17,19 27:3,3 28:16 30:6 34:6,6,9,10,11,16,24,24 35:13 38:21,21,21,23 40:4,13,15,21 42:5,18 43:6,6,7,20 44:2 45:6,18 46:24 49:15 50:4 52:1,17 54:19,21 55:6,11,12,12 57:15,22,23 58:10 60:11 64:16 65:22,25,25 66:12,15 68:9 70:4 71:7 72:16,16 74:2,4 75:6,8,18 76:9,9,9 77:11 78:12,12 79:2 80:11,14,21 81:4,12,12,16,22 82:1,6 88:24 90:20,24 91:5,6,17 92:15 93:17,23 95:9,19,19,19 98:9,14 99:1 102:1,6,8,13 108:11 109:6,11,15,22 115:25 116:7 118:7,13,19,19,24 120:12,12 125:12,15 126:20 130:15,15,19,22,23 132:15 133:12,20 134:12 135:5 136:5,5 139:18,23,23 140:15 141:7,7,14 143:2,5 144:17,1526 (163)

**nobody**  43:1 68:21 120:3 133:18 141:14,15 (6)

**nominate**  27:14,14

**nomination**  27:17,22,22

**none**  85:21 114:9

**nonperformance**  73:6

**nonsubmission**  118:15 119:2,4

**normal**  8:11 25:3 76:18

**normally**  5:24 29:20 75:8,10 94:19 101:13 115:16 127:13 130:23 136:25 (10)

**notarization**  145:17

**notary**  144:3 145:18,25

**noted**  16

**nothing**  11:4,14,14 46:19 48:9,12,17,19 49:2,18,19 65:17 66:1,3,11,15,21 80:22 81:20 92:17 118:13 130:8 (22)

**notice**  38:4

**now**  5:6 15:5 21:6 47:1 62:2 72:14 85:3 92:17 100:11 107:23 108:17 128:11 130:7 137:16 (14)

**number**  4:2 26:21

**oath**  79:14 140:11 144:11,12 (4)

**object**  10:7 48:7 97:22 104:20 118:18,20 124:9 126:1 130:20 (9)

**objecting**  138:10

**objection**  10:11 59:6,8 72:17 80:8 81:9 83:1,9,21 99:14,15 135:16 139:11 140:13 142:6 (15)

**obvious**  134:7

**obviously**  37:15 83:3 100:25 140:20 (4)

**occasion**  111:23

**october**  88:6 121:22,22 122:1 129:10,16 130:2 (7)

**odu**  89:22

**off**  8:24 9:3,4,6 20:24 21:1 35:25 66:7 67:10,12,14 70:3 104:5,9,11 117:8 131:10 132:23,24 (19)

**offer**  16:9 28:21 29:2

**offered**  16:18 22:16,19 36:24 (4)

**office**  13:22 50:21 51:9,10 77:19,23,24 99:21 119:20 127:10 139:18,21 140:1,3 (14)

**often**  5:24 38:10 39:8 44:13,15 (5)

**oh**  8:21 11:1 12:16,24 17:24 19:15 20:2 25:17,19 31:4,14,21 34:14 37:8 43:6,20 44:5 45:24 56:4,7 61:15,23 62:10 63:9 64:3,5 70:13 71:23 77:21 80:14 84:8,21 89:25 97:2 102:13 106:10 108:5,11 110:23 117:22 122:18 123:6 131:22 141:14 (44)

**old**  21:25 36:10 84:24 113:13 (4)

**ole**  36:11

**one**  8:21,22 9:4 10:2 14:2,10 16:18 19:20 20:9 21:11,25 22:6 27:24 29:18 30:1,7 32:5 37:5,7 38:6 39:17 42:7 46:4 47:16,25 49:7 51:3 52:5,6,8 53:8 56:12,24 69:17 71:17 74:11,19 76:18 78:4 79:8 84:13,25 86:11 87:9,13 88:3,14,15 89:6,19 90:11 97:14 109:12,20 115:11 120:14,15 124:13 127:22 128:12 129:8 131:2 134:12 136:7 137:22 141:23 142:18 (67)

**ones**  71:10

**only**  11:9,22 12:9,10 14:2 15:9,15 17:11,20 26:21 29:19

30:7 39:11 42:11 59:14 60:19 71:12 79:8,21 88:24 90:11 97:23 106:8,10 116:17 134:6 (26)

**oops** 19:16

**open** 21:14 64:7 102:19

**opinion** 7:14 9:16,16 57:22 59:17 73:17 92:18 93:14 98:6 101:20 104:1 107:3,7,11,12 124:8,15,20 125:14,15,16 127:4 129:18,24 136:16 139:8 140:4,5 141:3 142:5 (30)

**opinions** 9:23 57:17,21 58:14,24 103:20 107:1 118:11 129:7 (9)

**opportunities** 72:9

**opportunity** 38:5 112:7,10 138:15 (4)

**option** 72:14

**optional** 51:25

**order** 26:20

**organization** 53:22

**original** 113:17

**originally** 18:17,18

**orleans** 24:10 32:4,5

**other** 18:1 20:7 30:3 40:7,8 42:3,3 44:15 48:15 54:8,20 55:6,6 59:10,23,24 69:11 74:12 78:16 83:12 86:4 87:4 88:22 103:19 106:2 111:21 116:12 119:16 124:14 128:2 129:10 130:13 132:15 133:17 134:5,25 139:9 141:15,21 (39)

**otherwise** 7:1 39:16 59:20 74:4,11 75:4 98:21 116:9 144:18 (9)

**our** 6:11 9:23 10:3 12:25

13:24 16:19 29:11 39:16,23 43:2,14,16 62:10 71:7 72:14,25 74:11,23 110:18 111:20 113:13 114:23 115:1 117:21 118:1,14 119:2 (27)

**out** 8:7 9:17,24 13:19 16:21,24 17:1,4,6 18:5 22:2 31:8 40:3 41:7,11,18,20,24 50:23 54:15 62:7,17 69:10 71:10,15,16,23 75:3 77:22 79:21 85:4,6 93:3,20 94:16 95:3 96:15,17 99:6 121:4 123:6,14 129:16 137:11 (44)

**outcome** 144:18

**outline** 95:20,24

**over** 8:9,10 21:21 38:19 43:5 46:12 74:12 95:21 105:20 111:22 127:22 (11)

**overheard** 78:2

**overseen** 109:24

**overview** 73:20

**own** 17:7 28:10 56:11 60:1 111:12 114:23 (6)

**package** 51:11,13

**page** 3:2,1,2 4:2 84:18 145:4 (6)

**pages** 64:2 144:5 145:2

**paid** 10:24

**pain** 22:18

**paper** 122:9

**paperwork** 52:13

**paragraph** 89:14

**parallel** 31:22

**pardon** 75:18 118:21 131:6

**part** 29:8 30:24 35:11 86:15 89:24,25 92:24 103:25 (8)

**participate** 15:8,13,14,17 49:5 51:22 60:14 (7)

**participated** 36:17 43:24 44:2 49:12 52:5 74:20 (6)

**participating** 36:13 77:15 86:7 113:14 (4)

**participation** 54:7

**particular** 17:15 35:4 53:20,21 60:2,17 75:21 78:1 119:19 (9)

**particularly** 97:17

**partner** 68:24 115:17 127:19

**partnering** 128:24

**partners** 68:19 74:12 85:18,18 113:15,15,19,20 128:5 130:4 141:16 (11)

**parttime** 54:15,24 55:4

**party** 81:16 126:4 144:16

**past** 6:21 13:11 106:5

**patrick** 41:4,22 47:24 48:22 59:19 74:6 77:5 78:2,11,13,24 79:5,6 80:5,19 81:4 85:16,24 86:5,8 87:12 114:3 116:19 119:12 120:4,10,11,14,16,20,22 121:2,6,12,17,21 122:4,9,13,20,22 123:9 125:4,9 132:5 133:7 (46)

**patrick's** 122:15,17 131:25 132:20 (4)

**pause** 112:11

**paying** 13:23 50:24

**pdf** 61:11

**pe** 23:9

**peculiar** 29:19

**peer** 59:3

**penalized** 125:8

**people** 15:22 16:2,3,5 17:8 27:13 38:9 41:16,25 45:19 46:21 52:12 59:24 68:23 72:8 73:7 77:24 78:5 86:17 90:25 109:24 114:4,25 121:19 135:4 139:9 141:3 (27)

**per** 115:11 139:4

**perceive** 100:12

**percent** 14:19 15:2 71:4,18 110:20 (5)

**perform** 73:7

**performance** 43:19

**perhaps** 12:1 39:18

**person** 14:11 43:15 64:8 71:6 72:13 73:3 78:2 79:24 125:17 137:7 140:2,10 (12)

**personal** 9:20,22 97:24 106:24 107:2,4 (6)

**personally** 76:1 145:20

**phd** 18:22 21:22 22:6,7 23:8 (5)

**phone** 11:20 44:11 82:17

**phrase** 127:5

**physical** 14:21 97:5

**pi** 30:5,7,19 37:16 39:4,12 69:23,25 70:7,11 71:3 72:11,23,24 110:12,13,13,19 114:1 139:6 (20)

**pick** 70:23

**picking** 71:7

**picture** 136:13

**pis** 39:6 70:15,21,22 71:1,8,16 72:20,21 110:19 114:9 141:15 (12)

**pj** 6:4

**place** 18 144:7 145:3

**placed** 144:10

**places** 41:17

**plaintiff** 3 2:9 5:13

**plan** 130:10

**platform** 45:17

**play** 103:16

**player** 127:3

**pleading** 88:18

**please** 5:20 48:10 63:24,25 74:7,10 75:12 78:19 87:18 105:6 108:3,21 116:10 131:3 (14)

**pleased** 50:22

**plow** 103:5

**plus** 33:9

**point** 15:6 29:4 38:20 55:8 72:11 75:6 113:9 (7)

**points** 58:22 86:23,24

**policies** 12:19,21 13:2,4 56:2 95:17 96:20 125:11,13 (9)

**policy** 56:7

**portion** 24:12

**position** 9:23 10:3 24:19,23 25:6 26:16 34:8 70:6 (8)

**positions** 102:19

**possible** 4:4 26:24 47:14 112:18 117:8 (5)

**possibly** 65:21

**precise** 97:10

**precisely** 7:7 36:6

**premium** 51:15

**prepare** 7:13 11:5 51:10,12,20 54:2 60:7,8 (8)

**prepared** 11:2 54:4

**preparing** 7:10

**presence** 14:21

**present** 2:12 41:14 79:23

**presentations** 39:25

**president** 32:13 34:13,16,23 101:16,16 (6)

**presidents** 34:17 35:5,5

**presubmission** 73:24

**pretty** 25:10 44:20 51:16 52:19 53:15 58:7 71:19 81:12 84:20 93:5 112:3 (11)

**previous** 11:8

**previously** 68:18

**primary** 43:14,17

**principal** 39:4

**prior** 95:12

**prioritize** 114:14

**priority** 55:13

**private** 50:23 91:22

**privy** 81:6 95:9

**probability** 107:12

**probably** 6:12 22:1 30:23 34:21 58:13 88:21 101:1 (7)

**problem** 18:6 35:13 41:8 43:3 57:15 73:13 75:3 78:5 79:22 100:24 114:7 124:5 134:2 (13)

**procedural** 55:21

**procedure** 56:9,10,12,12 (4)

**procedures** 130:13,14

**proceeding** 49:13

**proceedings** 55:18 144:6

**process** 110:22 114:19

**professional** 23:10,12 137:4

**professor** 13:14 14:13,16,25 18:25 25:21 28:12 49:17,22 50:6,14,25 51:7 52:3,7 54:9 55:10 58:9 92:6,19,22,22 94:2 96:23,25 97:10 98:7,19,23 99:6,10,20,24,25 102:20 105:13 106:8,10,11,18 130:17 136:18 137:3 (43)

**professors** 26:23 27:4 51:22 57:19,24,25 58:11 70:16 71:11,13,13,22 72:2,3,4 102:15,16,16,17 110:4,5 114:20 (22)

**professorship** 25:3,15,22 26:5,23 27:8,13,15,19,25 28:11,17,20,21 (14)

**professorships** 26:20,22 28:10

**proffer** 109:16

**program** 15:9,14 17:13 33:21,25 34:3 44:23 50:20 51:4 53:1,7,8 55:11,11,12,13,14 58:11 71:12

72:6 105:20 106:1 118:24 (23)

**programmatic** 33:19,22 34:1

**programs** 14:8 15:22 33:23 53:5,7 (5)

**progress** 52:2

**project** 10:2 17:7 70:21 71:5 91:9,15,18 92:2 94:22 95:8 111:3,10,19 113:11 141:13 (15)

**projects** 16:13 33:8 39:24 70:14 109:23 111:7,12,15,18,20,20 (11)

**promise** 60:21 108:14

**pronounce** 6:2

**proper** 92:19 100:4

**properly** 68:12 69:21 76:24 87:15 (4)

**proposal** 15:6,10 29:15 30:1,12 36:17,20,21,22 37:1 38:6 40:25 41:14,15,18,18,19 42:6,21 43:12,13 44:5,14,17,21 45:6 46:12,19,22 47:2,3 49:9,20 59:21 66:24 67:19,24 68:5 69:4,15,17 70:8,8,22 73:21 74:8,10,16,18,23 75:16,25 77:17,22 81:8,15 82:18 83:5 85:7,24 86:4,7 87:18 88:18 89:18 90:18 110:8,17,24 112:8 113:14,18,23 114:6,8,10,16,19 115:2,3,5,13,23 116:11,15,22 117:1,5 118:1,2,6,9,11 119:14,17 123:21 127:11,18 128:1,17 129:6,17 130:1,3,6,7 131:1 132:11,19 133:11,13,16,25 134:3,20 136:18,22 137:2 138:1,4,22 (121)

**proposals** 58:6 71:8 119:16 130:24 (4)

**proposed** 68:4

**proposes** 17:14

**protect** 93:10

**provide** 7:13 50:13,14 70:23 (4)

**provided** 7:17 96:1 126:10

**provides** 24:4

**provost** 34:22

**public** 144:3 145:18,25

**publications** 108:25

**pull** 114:24 121:7 129:13,16,16 130:3 131:19 135:20 (8)

**pulled** 128:17,22

**pulling** 58:25 130:7 131:20 137:14,15 (5)

**punish** 124:18

**purposes** 107:21 109:6 123:10 128:7 (4)

**pursue** 44:25

**put** 13:24 17:1,6 41:18 52:5 55:9 74:9 81:1 104:15 114:8,15 122:9 137:4 141:9 (14)

**putting** 113:23 135:22

**qualifications** 107:9

**qualifies** 9:15

**quarter** 106:5

**question** 8:21,25 18:9,10 30:22 47:5 65:19 69:22 78:20 80:2 83:20 95:11 109:20 112:21 114:20 119:2,15 (17)

**questioned** 91:25

**questioning** 97:23

**questions** 10:1 18:1 60:13 63:23 68:21,22 98:4 102:23,25 103:15 106:24 107:5,23 131:17 141:22 143:5 (16)

**quick** 18:8 19:7 35:21 61:19 91:7 109:20 (6)

**quietly** 84:11

**quite** 7:7 20:3 34:17,20 35:7 106:21 115:8 (7)

**race** 18:13

**radio** 94:10

**ran** 41:4 125:4

**rankins** 5:11

**rare** 106:7

**rate** 137:25

**rationally** 9:21

**re** 4:6

**reached** 104:16

**reacted** 58:15

**read** 11:8 57:4,13 62:12,13,14 64:10 65:20 84:10,18 85:3 89:13 90:1,5,5 121:16 125:10,12 144:14 145:2 (20)

**reading** 86:19 143:14

**reads** 65:5 138:24 141:2

**ready** 66:5

**real** 18:8 61:19 73:13 91:7 (4)

**realize** 120:7

**realized** 42:23

**really** 8:16 9:15 11:15 12:4

19:7 27:5 35:20 40:6 43:1 46:19 59:15 74:14 78:16 85:22 93:4 94:23 97:18 100:1 113:20,22 127:23 132:13 134:14,18 (24)

**reason** 9:18 126:15 132:13 138:12 139:1 140:4,7 (7)

**reasonable** 107:12 122:16 124:7

**reasons** 54:16

**recall** 30:13 39:13 40:10 42:5,11 45:7 46:4 58:19 81:20 88:25 90:24 113:2 126:11 129:3 (14)

**receive** 26:15

**received** 90:2

**receiving** 90:15

**recent** 19:24

**recently** 126:12

**recipient** 45:3

**recognition** 25:21

**recognize** 56:18 85:2,3 121:11 (4)

**recollect** 11:10

**recollecting** 87:15

**recollections** 113:6

**recommend** 28:4

**recommended** 75:18

**record** 5:7,20 8:25 9:3,5,6,7 20:24 21:1,3 23:4 24:2 57:1 59:6,8 67:5,11,12,14,15 71:19,20 85:11 88:1 104:5,10,11,12,15 105:6 106:16 109:17 123:12 128:9 131:8,11 132:24 143:12 (38)

**records** 37:25

**recruit** 102:3,11,13

**recruiting** 102:18

**red** 89:20,21

**reduced** 144:7

**reeves** 128:15

**referenced** 57:4 98:2

**references** 90:15

**referring** 6:12,13

**reflected** 132:21

**reformatted** 21:17

**refresh** 62:14

**regarding** 12:1 43:25 81:7 82:14 90:17 133:13 (6)

**regents** 31:4,5

**related** 42:6 46:14 59:12 82:18 100:9 111:7 144:16 (7)

**relevant** 122:21

**rely** 68:4 122:16

**relying** 57:20 125:13

**remember** 6:18,20 7:7,10 11:16 30:18,19 31:3,9 37:11,12 38:1 42:15 45:9 54:18 60:6 63:19 65:1,3,6,9 67:22,25 87:5,10 88:11 89:16,16 90:22 91:9,22 92:4,7,9 93:25 110:24 112:20,22 113:3 120:20 121:16 122:3 126:12 127:1 136:10 137:8,10 (47)

**remembered** 37:21

**remind** 8:17,18

**remotely** 5:15

**renewal** 30:2

**repeat** 80:1

**rephrase** 98:10

**report** 11:3 39:3 46:8 72:24 (4)

**reported** 79:25 80:3,4,5,11 (5)

**reporter** 24 5:8 8:8 24:20 67:4,10 78:15,19,22 81:25 82:4 83:17 109:8 129:21 144:1,3 (16)

**reporter's** 8:15

**reports** 7:11,13 39:1

**represent** 6:9 117:4

**reputation** 50:19 111:23

**request** 24:22 117:8

**requested** 30:11

**requesting** 39:14

**required** 14:22 52:3

**requires** 96:11

**rereredirect** 142:21

**research** 12:3 13:16,18 14:4,5,20 15:1,22 16:4,9,13 17:6,16,23 33:20 34:18 35:6 58:4 70:25 72:4 102:16,17 105:22 107:18 110:3,4,6 127:10 130:17 139:19,20,21 140:1,2 (34)

**researchers** 39:24

**researchmississippistate** 139:19

**reservation** 114:2

**resolve** 96:9,15 100:7,13,22 101:11 (6)

**resolved** 96:19

**resources** 33:20 34:1 97:19 100:8 (4)

**respond** 16:25

**responded** 123:6,17 124:8,16 (4)

**responding** 63:3

**response** 64:11 81:19 91:5 123:24 124:18 133:14 (6)

**responsibilities** 25:2,4,7 39:6 (4)

**responsibility** 32:14 98:15 100:7

**responsible** 38:25 48:21 81:2 86:21 87:17 111:13 121:4 124:19 125:18,18 133:14 (11)

**resubmitted** 112:8

**result** 120:21

**resume** 21:6

**retain** 24:6

**review** 12:18,22 13:2,3 27:17 47:1 51:13 115:2,4 118:2 (10)

**reviewed** 13:5 129:1,2

**reviewing** 84:17 87:5 88:5 89:11 90:1 (5)

**reviews** 44:20,23 47:6,7,8 (5)

**rfp** 16:25 17:7 126:18 138:15 (4)

**ride** 4:8 128:16

**right** 9:9 10:16,25 14:18 15:7 17:9 21:12 25:8,8 26:10,18

31:18 32:25 34:10,23 36:25 38:15 40:7 43:5,8,8 44:1 45:11,14,21,24 46:1,3,23 50:18 51:16,18 52:23 53:25 54:9,25 55:10,21 57:10 62:11,24 64:14 71:8 74:1 75:21 76:3 77:7 78:17 79:1,14,25 80:13 81:11 82:10,14,25 84:1 86:9,16,25 87:7,12 88:7 89:2 90:10 91:7 92:2,6 93:22 95:8 100:17 101:2,14,25 107:23 108:2,17 109:5,11,20 113:8 114:13 117:25 127:5 128:11 130:5 132:7,11 133:11 134:9 136:2,3,16 137:6,16,22 139:16 140:20,24 143:1 144:13 (101)

**righty** 78:20

**rigid** 52:20

**robert** 89:10 90:1,6,8 (4)

**role** 33:4 34:13 36:13 43:5,7 139:22,23 (7)

**room** 45:22 78:10,24

**rouge** 19 7:19 13:10 32:10 (4)

**rough** 13:8,9

**route** 20:12

**rules** 8:5 55:20,21,22,25 86:12,13 (7)

**run** 15:5 94:4

**résumé** 27:17 131:24

**résumés** 114:25

**safe** 94:10,23 96:16

**safety** 15:24 96:6,11,20 (4)

**said** 8:8 11:11,21,25 30:25 34:9 38:5,13 42:12 46:6,7 48:20 49:4 51:6 57:8,9 58:17 60:14,15,18,20,21 64:9 66:16 68:15 83:15 88:11 90:2,2,12 93:25 95:4 98:22 114:5

120:10,14 130:1 135:14,20 136:12 (40)

**salary**  24:13

**same**  22:2 28:8 32:21 37:17,17 55:19 64:1 99:14 101:5 108:19 111:18 118:24 119:1 129:8 141:3 145:2 (16)

**sat**  41:17

**save**  20:20

**saw**  23:8 44:19

**say**  5:25 6:1 8:12 11:11 12:13 24:4 25:13 28:17,18,19,24 36:7 39:10 44:15 49:1 53:17,24 58:1,16,20 60:2,13,18,21 64:3 68:24 69:14,19 70:5 79:11 83:17 85:4 91:14 92:25 93:7,23 94:21 95:1,3 96:13 98:11,16 100:20 101:10 103:11 114:18 115:9 117:12 123:19 129:22 130:2 138:11 139:10 140:16,16 142:25 (56)

**saying**  34:22 47:1 48:10,11,12 59:9,12 60:4 67:25 69:3 74:15 77:21 87:17 88:25 97:7 101:6,20 116:10 118:5 124:22 127:10 133:2,8,24 136:8,18,22 137:1,7,11,24 138:21 139:12 140:17 141:7,9,10 (37)

**says**  86:24 90:21 126:15 128:15,21 139:19 143:3 (7)

**scared**  74:9

**schedule**  53:16 64:17 95:25

**school**  18:21 30:7,7 51:15 58:8,9 (6)

**science**  14:9 17:17 106:1

**sciences**  28:11

**scope**  97:24,25

**screen**  19:6,10 21:6 35:9 45:22 56:15 60:23 61:21 71:9 84:5,7,14,16,17 88:4 108:3,8 128:12 134:23 (19)

**screenshot**  108:13

**scroll**  61:16,18 62:2,16 63:1,20 84:19 121:9,10 (9)

**seal**  144:19

**sec**  67:11

**second**  9:4 58:22 104:5

**sections**  36:25 115:3

**see**  19:9,23,25 21:9,10 23:21 31:14 33:2 46:20 47:1 50:10,25 51:7 56:17 61:1,19,21,22,25 63:20 69:9 74:22 75:3 84:7,8,13,23 88:3 89:9,12,20 95:10 108:5,17 121:21 126:15,19,21 128:18,24 129:13 132:2 136:25 137:1,19,23 (46)

**seeing**  89:16 126:12 140:3

**seeking**  75:6

**seem**  18:9 82:4

**seems**  52:10

**seen**  44:23 47:8 73:9 84:24 126:8,9 130:17,23 (8)

**seldom**  73:8,9 77:1

**select**  71:9 72:20

**selection**  24:1 27:16,22 28:1,3 (5)

**semester**  52:1,1 95:22

**senator**  75:13

**senators**  75:11

**send**  20:8,11,16 35:23 44:7

**121:19** (6)

**sending**  132:5 140:2

**senior**  26:23 72:2 102:15,18 114:4 135:8 (6)

**sense**  13:18 18:2 21:17 31:23 49:15 54:11 97:4 104:3 125:24 129:25 130:8 140:25 (12)

**sensed**  114:5

**sensible**  101:10

**sent**  19:21 21:14 84:25 85:13,19 87:16,21 88:9,10,20 108:19 121:2,21 133:23 136:7 139:25 (16)

**sentence**  137:21

**separate**  38:23 111:15,17

**sequence**  104:22

**serious**  51:16,19 83:3 97:16,18 (5)

**serve**  8:23 34:7 35:1 75:22 (4)

**served**  33:3 34:5,7,12,22,24 43:4 (7)

**service**  16:6

**set**  46:3 53:21 58:2 64:11 120:3,4 145:3 (7)

**setting**  63:9,17

**setup**  45:19

**seven**  53:5,6,6

**several**  90:16 122:1

**sexual**  100:9

**share**  19:6 21:6 56:15 60:23 84:5 108:2,8 128:12 (8)

**shared**  82:15 108:18

**121**:15,23 (4)

**sharing** 35:8 61:12 108:9,12 134:22 (5)

**she** 137:7 139:8 142:2

**she's** 138:25 139:12,13,18,20 140:5,6,10,25 (9)

**sheet** 3:145 145:1

**sherry** 41:4,22 47:24 48:22 59:19 74:6 77:5 78:2,11,25 80:5 83:25 85:16,25 114:3 120:4 121:12 123:9 132:5 133:3,7 (21)

**sherry's** 4:6 87:12

**short** 53:14

**shorthand** 24 144:2

**shortly** 110:9

**should** 63:8 65:14 67:9 93:4 94:8,8 98:10,11 99:1 125:7,8,8 133:5 (13)

**should've** 127:19 133:3

**show** 87:23 89:6 126:3 128:11,13 (5)

**shown** 134:25 135:13,20

**shows** 127:23 136:6

**side** 30:3 54:20

**sign** 144:14

**signature** 144:19

**significant** 142:5

**signing** 143:14

**silly** 101:17

**similar** 36:9 49:12 59:3 90:23 (4)

**simple** 11:16 48:9

**since** 8:25 32:1 38:11 44:13 62:8 92:13 140:10 (7)

**single** 127:3

**sit** 57:12 138:17

**site** 30:8 33:10 38:18 39:20 40:7,8 41:16 43:2 88:12 89:2 111:13 114:9 121:19 141:15 (14)

**sites** 39:1,2,6 69:11 110:19 111:21 (6)

**situation** 77:5 83:8,23 86:18 90:23 94:6 96:5 133:7,8 (9)

**situations** 59:3 101:24

**six** 36:16 50:12 112:10

**sixyear** 23:14

**size** 84:9

**skill** 144:9

**skilled** 61:8

**slightly** 21:17

**small** 61:21

**smaller** 25:23

**smooth** 68:17

**snowballed** 120:7 123:1

**so** 6:3,8 7:16,17 8:7,18 9:9,10,16 10:3,7,11,19,24 11:14,15 12:3 13:6,12,21,23 14:8,10,12,16,20 15:3,9,15,19,25 16:2,4,7 17:5 18:3,7,8,14,15,17 19:5,6,20,23,24 20:8,20 21:6,11,13,14,14,19 22:17 23:6,14 24:5,8,8,11,13,16,24 25:8,17,24 26:8,15,21 27:13 28:10 29:2,4,14,23 30:8

31:2,7,15,20,22 32:13,17,18 33:8,10,14,16,21 34:1,19,21 36:1,3,22 37:14 38:8,19,23 39:3,7,19,25 40:2,7,9,18,23 41:7 42:12 43:15 44:25 45:18 46:5,10,21 47:1,5,7,9,24 48:3 49:24 50:3,5,17,20,22 51:1,4,6,11 52:2,2,3 53:5,8 54:2,4,5,15 55:1,8,12,13,17 56:8,11,12 57:12,16 58:1,6,10,10,13 59:21 60:6 62:3,7 63:1,16,22,25 64:4,10,25 66:12,18 67:7,10 68:4,13,16,17,18 69:1,3,16,22 70:1,24,25 71:8,13,14,16,22,24,25 72:3,7 73:5,6,15,25 74:7,9,13,16,17,18,20 75:2,19,25 76:11,20,24 77:4,22 78:10,19 79:4,23 81:13 82:23 83:7 84:17 85:1,9,13 86:7,15 87:1,6,11 88:14,22 89:2,6 90:4,6 91:7 92:12 94:4 96:18 97:5,9,13 98:6,21,24 99:2,6 101:5,13,14,17 102:10,17 103:10 104:14,17,22 105:5 106:3,23 107:1,10 108:21 109:24 110:19 111:3,5,17,18 112:6,16 113:5,19 114:4,7,8,13,16 115:4,7,9,22 116:12,24 117:7,19,21 118:1,6,14 119:1,22 120:2 121:20 125:13,18 127:11,14,21 128:3 130:4 131:1 132:5 133:8 134:15,17 135:7 136:9,10,14,18,22,22 139:5,8,13 140:20 141:16 143:9 (318)

**socially** 40:3,10

**solemnly** 145:1

**solicit** 71:8 85:23

**solution** 94:7 97:14

**solved** 100:25

**some** 7:4,9 8:2 9:25 15:6 16:5,6 18:1,11 20:20 23:21 29:4 41:9,9,20 42:9,23,24 44:25 55:8 58:14 67:20

AW Reporting
601-573-0961

72:1,2,2,11 75:9 87:4,6 89:21 90:2 91:9,12 92:2 93:3,8 95:25 97:16 102:24 103:17,18,19 105:4 106:23,24,25 107:5 113:13,15 115:15 116:11,25 118:16 130:12 134:25 135:8 (56)

**somebody** 8:12,23 49:5 60:4 70:7,10 71:3 77:10,18 79:10 80:3 119:19,23 139:20 140:1,17 (16)

**somebody's** 13:22

**somehow** 29:23 85:25 121:16 126:11 (4)

**someone** 72:12 123:15 124:12 135:1 137:7 (5)

**something** 6:21 7:2,5 17:14 23:25 25:11 30:14 39:14,15,19 41:5,11 42:10,14 46:6 48:14 49:20,24 62:17 66:18 70:11 71:4 73:2 76:8 79:18 80:25 82:2 83:12 85:5 87:18 92:7 93:1,10,12 94:1,10,12,24 95:1 96:17 100:4,14 103:24 106:9 116:20 120:7 122:12,20 124:6 125:19 135:25 136:10,15,25 137:12 139:9 (56)

**sometimes** 6:23 8:11 16:21,22 28:14,23 59:25 68:10 72:21 99:24 100:19 (11)

**somewhere** 110:9

**soon** 106:16

**sorry** 12:24 24:21 34:6 42:12 54:22 70:2 76:17 78:18 81:25 83:17 88:3 93:15 98:10 109:8 123:6 129:21 131:22 138:8 (18)

**sort** 8:4 10:8,20 11:2 30:10 43:25 59:1 70:12 75:14 90:23 93:3 106:7 122:11 130:12 (14)

**sought** 30:16

**sound** 8:20 65:20 136:16

**sounded** 57:3

**sounds** 25:10 35:24 46:10,12 58:24 95:5 103:13 141:2 (8)

**source** 13:23

**south** 18:14 113:16

**southeast** 18:14,16

**speaking** 123:3

**special** 42:13 54:16

**specialty** 7:16

**specific** 42:6 51:9 54:12 59:24 67:21 (5)

**specifically** 105:10 126:5

**spell** 35:20,25

**spent** 114:22 130:16

**spoke** 60:8,10,11 112:18 (4)

**spoken** 112:12

**spread** 69:10

**springs** 10:3

**staff** 76:2,6,7

**stage** 42:22

**stand** 107:20

**standard** 54:3 56:12 57:18,20,23 (5)

**standing** 10:11 96:20 99:15

**stands** 6:6

**starkville** 64:9

**start** 121:9

**started** 8:22 22:2 61:19 63:14 108:7 111:6 121:12 (7)

**starting** 123:9

**state** 6,7 5:4,19 6:13 12:25 13:3 15:16,17 16:10,20,20,21,24 17:2 18:22 23:11 29:19,24 35:17,19 36:6,11 37:14,15,18,22 38:8,23 39:23 40:22 43:7 45:2 46:21 47:3 49:2 51:14 56:13 68:6,9,14 69:2,8 70:18 74:14 75:19 77:16 82:21 85:23 89:18 90:9,12 96:10 105:6,24 110:8,14,25 111:14 113:16 114:1 116:15,21 117:18 119:18,21,25 122:2 123:2,5,14,24 124:15 125:1,11 134:13,18 144:3 145:19 (79)

**state's** 130:13

**stated** 114:2

**statefunded** 14:4

**statement** 126:13,21 128:4,5 135:20,23 136:20 138:8 (8)

**states** 29:17

**stay** 73:12

**step** 92:25 93:7 100:25

**still** 14:12 22:1 26:9 37:13 43:13 47:7 57:9 75:17 (8)

**stood** 137:11

**stop** 10:16 35:8 98:3 134:22 (4)

**story** 122:14

**straight** 100:19 101:9,15

**strange** 131:1

**street** 2:4

**strictly** 39:16 56:11 59:12

AW Reporting
601-573-0961

125:15 (4)

**strong** 36:17

**structural** 6:20

**structure** 95:17

**structured** 52:19,21,21

**stuck** 19:5

**student** 51:8 54:9,11 96:5,17,22 97:6,11 98:7,12 (10)

**student's** 97:17 98:15

**students** 50:16,24 51:7 54:10 55:9,12,15 91:10 92:24 93:9,19 94:5,12,19 95:21 96:16 99:7,11,25 100:2,12 101:7,9 (23)

**stuff** 22:1 50:18 51:20

**submission** 42:22 74:1 75:2,7,9 116:6,14,17 117:17,18 136:13 (11)

**submit** 15:10 39:2 47:2,3,4,6 68:4 70:22 74:7,12 87:2 116:10 127:10,18 130:1,24 132:19 133:15 134:19 136:9,18 138:1,22 140:9 (24)

**submits** 72:24

**submitted** 15:6 29:15 37:3,15,24 38:3 44:19,22 45:6 46:22 52:14 73:22,23 74:8,24 112:8 115:23,24 116:23 117:1,6,13,15,21 118:2,5,9,17 130:6 (29)

**submitting** 15:4 38:25 75:12 77:22 117:24 118:14 119:1 (7)

**successful** 71:14 73:4 75:17 136:15,21 (5)

**such** 14:2 51:15 69:4

**suite** 2:8

**summary** 105:9

**summons** 8:23

**supervision** 144:8

**supervisor** 38:19,21 43:5

**supervisory** 43:6

**supplement** 24:4

**support** 24:9 26:20 30:11,17 42:4 70:15,19 72:1 73:17,25 75:6,13,14,15 85:23 116:4 117:9 127:13 (18)

**supported** 50:1 70:16 72:3

**supporting** 71:22

**supports** 24:3,11

**suppose** 17:13

**sure** 6:2 8:16 36:24 37:19 55:23 59:8 71:4 72:11,12 74:23 83:11 87:19 93:9 115:5 116:5 118:1 131:9 134:4 (18)

**surface** 112:10

**surfaced** 40:19 42:20 81:20

**surveyors** 23:13

**suspecting** 55:2,3

**sustain** 55:14,15

**swear** 5:8 145:1

**switch** 22:8

**switched** 22:19

**sworn** 5:15

**systems** 15:24

**t** 137:22,23

**t's** 115:6

**table** 3:1

**take** 8:8 20:18,19 21:13 34:8 62:15 74:12 77:4 86:8 97:11 100:23 108:13 124:21 127:22 (14)

**taken** 5:3 59:2,25 99:1,4 124:20 144:6 (7)

**takes** 53:10 115:8

**taking** 65:9 80:22

**talk** 8:9,10 11:20,24 40:25 41:2 52:12 61:9 62:6 63:18 65:16,17,25 66:3 67:18 98:15,18 99:22 100:20 101:7,10 104:5 113:8 119:12 (24)

**talked** 42:9,18 46:2,5 66:20 67:19 83:12 113:1 120:19 122:22,23 127:7 (12)

**talking** 10:16 42:5 45:25 59:15,22 64:6 65:24 74:25 77:14 78:2,16 88:14,15 90:18 91:6 92:9 113:2 133:2 137:21 138:25 140:10 (21)

**targets** 71:12

**task** 94:23

**tasks** 114:14,24

**taste** 69:13

**taught** 32:2,3,7 109:21 110:2 (5)

**taxing** 32:10,11

**teach** 14:17,18,20 32:1,4,5,12 58:5 96:2 109:22,25 110:6 (12)

**teaching** 32:13

**team** 29:14 36:9 41:15 43:16 44:21,22 52:25 67:25

85:14,15,15 86:11 110:16
113:13 132:17 (15)

**technology** 16:1 50:12

**telephone** 12:7 113:3

**tell** 7:21 8:2,4 11:14 19:9 21:9
27:12 37:8,23 40:19,23 45:25
50:4,8 53:23 54:14 56:16
57:13 60:12 62:9 64:22 73:15
86:8 94:4 113:10 117:16
119:5,5 120:16 133:21 139:6
144:11 (32)

**telling** 48:14 64:7 76:15,21
81:5 90:25 122:13,14 (8)

**tells** 133:6

**tend** 127:13

**tender** 107:17 131:5,12

**tendered** 124:12

**tenured** 14:16,25 106:11

**teresa** 126:6,14 128:14,21
135:1,2,3 139:16 141:12,18
142:2,11,13 (13)

**teresa's** 140:21 142:15

**term** 8:5

**terminate** 49:17,24 50:5
66:23,24 (5)

**terminated** 66:25

**termination** 47:14,17

**testified** 5:16 103:24 110:7
130:11 140:10 142:2 (6)

**testify** 7:20 9:20 45:10 46:6
49:8 60:20 64:5,8 107:7 (9)

**testifying** 142:11

**testimony** 4:5 9:12 10:4,8,25
11:8 13:5 47:11 49:1,6 56:21

58:12 64:18 91:9 92:5,16,17
93:18 104:20,23 113:4 116:25
124:23 127:8,8 145:2 (26)

**texas** 85:17

**text** 44:3 89:21

**than** 24:12 35:1 39:6 42:3
45:19 52:17 64:19 73:6 75:19
83:13 (10)

**thank** 6:3 10:15 17:22
34:10,11 35:11 78:22 82:12
105:1 106:6 107:15,25 137:17
142:17 143:4,6 (16)

**thanks** 84:3 108:11 143:6

**that'll** 70:24

**that's** 5:23,25 7:16 9:12
11:9,11,22 12:9,9,24
13:5,15,17,24 14:1,21
17:7,9,12 18:4 19:1,2,15,16,17
21:15,17 22:16,22 23:14 24:5
25:5 26:24 27:19 28:8,14 30:7
31:17 32:24 33:18 35:18
36:5,7 38:1,5 39:3
41:5,7,8,10,20,23 42:11,12,23
43:22 45:24 46:9 47:18,24
48:2,10,11 49:6,8 52:3,4,7
53:21 55:1,1,2 56:7,8,11
58:1,6,10 59:13,14,21
60:2,4,18,19,20 61:11,15 62:18
64:5,9,14,14,21 66:5,6,8,18
70:4,4 71:19,21 73:10
74:13,22 75:2,21,23 76:17,18
77:19,24,25 78:5,6,7,8 79:20
80:23 81:3,5,12 82:20 83:21
84:20,21 85:15,15 86:13 87:6
88:10,14,15,22,24 90:11
92:2,3,23 94:6 95:3,3 96:1
97:2,8 98:12 99:16,16
100:1,18 101:16,20,22 104:7
106:21 110:10 112:15 114:20
115:16 116:16 117:24 119:25
120:1 122:3 123:23 124:22
125:19,19,20 126:15 131:23
132:8,14,19 133:8 135:9
136:2,24 137:1,3,4 138:12
140:3,4,18 141:3,4,6 143:3
(189)

**their** 60:1 76:18 81:13 119:20
130:10 (5)

**them** 13:23 16:5,6 37:16
53:13 68:16 70:17,21,24
71:9,14 72:14 73:13 76:4,22
78:8 79:25 90:25 99:12 101:11
106:12 111:6 114:12 115:21
119:1 123:19 129:5 134:19
(28)

**themselves** 5:7 57:25 93:10

**there's** 9:14 14:2 19:25 25:17
26:8 27:16,21,25 38:21,23,24
48:12 52:11 55:12,12 57:23
58:10 64:16 65:17 66:1 69:22
75:3 84:22 86:22 89:21 93:6,7
95:14 96:11 99:1 115:14
128:14,20 (33)

**these** 16:3 29:14 55:18
57:16,21 58:23 66:10 69:16
73:7 74:5,24 85:17 90:25 93:3
100:7,11 111:19 113:17
116:16 126:5 129:1,7 135:11
141:3,11 (25)

**they'd** 68:22 117:14

**they'll** 28:24 53:20 69:14,19
126:17 138:14 143:2 (7)

**they're** 26:4 44:12 53:13
70:15,20 71:5,21 73:11 76:5
96:5 107:2 118:24 128:1 130:7
135:6 137:23,25,25 138:20,21
139:5 (21)

**thing** 10:2 11:10 28:8,22
32:21 40:17 41:2 42:7 43:22
46:25 47:25 48:16,16 50:15
51:25 52:8 59:14 60:19 62:13
69:5 70:12 72:25 74:22 82:5
87:1 92:6,19 101:11 108:10,19
(30)

**things** 8:2 9:20,21,23 10:1,8
14:23 15:25 16:8 17:18,19
24:4 40:9,18 41:6 43:10 44:20
48:16 51:2 52:22,24 58:15,25
67:21 95:18 100:9,11 103:17
106:24,25 107:2,3,7 137:24

32

(34)

**think** 7:4,18,25 9:19 11:7 19:17,23 21:13,15 23:8 30:16 31:7 32:3,6 35:9 36:5,14,14,16 37:4,9 38:17 41:2,8,19 42:11,13 43:2,22 44:12,20 45:19 46:1,21,24 49:4 51:2,3 54:19 57:23,24 61:10 63:8 65:14 66:4 67:1,9 68:20,22 69:16,24 72:13,23 82:15 83:15,18,19 84:23,24 85:5,18,21 86:2,4,6,12 87:1,8,9,13,14,14 88:24 89:16,17 90:9 91:5,8,24 92:18 93:24,25 95:3,5 96:8,24 97:8 99:19,24 102:8,22 103:10 104:15 106:15,15 108:9 110:7,10,24 112:3,7,13,17 113:12,19,23 114:23 115:8,22 117:10,25 118:4,13 120:3 121:15 123:18,23 124:5,17,23 126:9,11,12,13 127:7,12 129:9 130:11 132:8 133:12,23 135:8 138:11,25 139:13,18 141:16,16,19 143:7,9 (141)

**thinking** 103:15 139:20

**those** 7:11 12:22 51:12 71:16 82:15 97:18 104:2 107:21 125:13 135:4,14 (11)

**though** 35:3 88:22 95:6 98:6 139:22 (5)

**thought** 19:4 47:19,21 58:15 65:8,15 87:5,16 90:21 102:14 113:1,21 133:13 137:7 (14)

**thousand** 36:6

**thousands** 26:6

**threat** 74:8 97:6,8,10,12,16,20 98:19 99:1,2,3,5 100:2,12,15 116:14,25 117:17 118:10 (19)

**threaten** 98:7,11

**threatened** 94:13 96:23,25,25 97:4 98:12,23,24 99:12 (9)

**threatened'** 98:22

**threatening** 97:5

**threats** 97:15,16

**three** 18:23 22:7 29:14 106:12 113:20 114:22 115:9 (7)

**threeminute** 20:19

**threshold** 98:8,13

**through** 15:11 17:21 30:23 31:1 35:11 37:15 44:7,9 46:12 50:11 57:5 58:7,21 70:17 85:5 101:14 105:4 109:9 (18)

**throughout** 6:11

**thursday** 18

**tied** 112:3 124:2 134:15

**tier** 38:6 45:3

**till** 45:5 116:2

**time** 20 5:6 9:5,8 13:19 16:12 20:20,25 21:3 22:1 32:2,6 35:15 37:18 41:8 42:20 43:8 47:13 54:21,21 63:18 67:13,16 68:25 74:17 76:24 91:20,24 92:10 95:4 100:5 103:3,7 104:10,13 106:19 107:16 109:17 111:2,22 113:2 114:10 128:12 130:16 143:11 144:7 145:3 (47)

**timeline** 117:8,19

**timely** 111:12

**tirades** 126:18,19 138:15

**title** 14:12 24:9,15 25:24 (4)

**today** 6:11 10:12 11:12 45:5 46:17 61:8 106:23 113:5 116:2 128:17 (10)

**today's** 5:5

**together** 36:19,21,23 39:8,9,20,21 41:17,18 113:24 114:8,24 (12)

**told** 6:8 47:19 60:11 66:9 79:9 80:19 82:25 91:15 121:3 127:19 133:18 (11)

**tone** 138:16

**too** 5:24 19:16 32:9,9,10 75:8 (6)

**took** 54:21 57:6 58:16

**top** 25:20 27:18 35:25 62:4 78:16 89:20 (6)

**topics** 104:2

**totally** 125:3

**touch** 11:25 66:17 84:17

**tough** 44:20

**track** 50:18 52:2 66:7

**traffic** 10:2 91:12 92:1 94:9 109:21,22,25 (7)

**training** 16:3 58:11

**transcript** 56:19 67:22 104:18 144:6 145:2 (5)

**transfer** 16:1 87:3 116:11

**transportation** 12:3 13:16,18 14:4,6 15:1,10,23 17:5,16 29:10,22 33:19 105:20,22 106:1 (16)

**travel** 24:3 62:10

**treating** 54:14

**trial** 7:20,22,24,25 10:9 103:16 104:3,18,18 107:22 109:18 (11)

**tried** 85:23 102:3,11

**triggered** 47:17,25 123:19

**trouble** 49:8 60:17 79:10 80:16 81:1 85:6,7 96:17,18 116:17 119:8 (11)

**true** 112:15 135:15 140:18 144:5 145:2 (5)

**trust** 68:3 69:16,19,24,24,25 (6)

**trustees** 7

**truth** 11:15 123:4 144:11

**try** 8:7,9,10,14 17:1 26:22 61:6 62:16 63:23 71:7 75:11 (11)

**trying** 6:18 11:7 17:25 31:3 36:14 37:11 89:13 122:10 124:18 127:1 135:21 (11)

**tuition** 50:25

**tulane** 15:16 22:12,16,19,20,24 24:16 28:19,21 31:16,17 32:22 33:18 49:16 52:6 54:23 96:11 102:7,9 106:13 (20)

**turner** 30:20

**turning** 132:23

**tuscaloosa** 29:12 30:4,14,17,24 31:1 (6)

**two** 12:10 32:12 33:14 36:6 52:17 53:10 63:9 64:2 65:8,11,15,17,23,25 66:5 71:17 105:17 110:4 114:22 126:3 128:13 137:24 139:9 (23)

**type** 16:4 24:14 97:6,12,15,20 99:5 100:7 (8)

**typewritten** 144:8

**typically** 76:8 96:4 101:24

**uhhuh** 6:15 91:11

**unclear** 142:14

**under** 79:13 140:11 144:8,11,12 (5)

**undergraduate** 53:7 58:9

**underlying** 122:7

**undermined** 51:4

**underneath** 86:22 89:21,24,25 (4)

**understand** 8:21 10:19 17:25 21:19 55:5,8 77:4 86:10 93:15,18 116:24 120:1 122:11 123:24 128:3 133:4 136:14 137:24 138:20 (19)

**understanding** 10:10 18:3 51:17 52:11 73:20 79:4 80:6 83:7,16 104:19 122:7,21 142:3 (13)

**understood** 15:3 30:10 31:13 47:13,16 55:18 58:7 60:16 66:4,6 78:4,6,7,7 111:22 133:1 (16)

**undertaken** 16:13

**undertaking** 139:6

**unfortunate** 85:25 86:13 124:4 125:3,5 127:9 (6)

**unfortunately** 50:2 141:4

**unhappy** 120:13 124:2 134:18

**unique** 14:1

**universities** 16:6,9,10,14 23:18 26:25 29:14,16 37:17 49:13 56:14 59:24 60:1 68:19 69:17,18 74:20 75:10,24 85:22 105:17,24 106:12,19 127:20 128:2 (26)

**universities'** 130:14

**university** 6 5:4 6:14 13:4,12,19,21,24 14:13,15,16 15:9,10,11,16,17 17:20,21 24:1,10 26:19 27:12,20,21 28:18 29:1,2,11,12,13,22 31:1,4,5,7 32:4,5,19,20 33:4 34:14,23 36:10,11,12,15,15 39:23 41:4,10,21,25 42:25 43:21,22 45:6 47:6 49:3,19 50:10 54:22,23 56:7,8,8,10,11 59:13 64:20 66:23 72:22 73:1,11,12 74:11,25 76:13,13 77:3,6,8,16 78:3,3 82:21 85:16,24 90:9,13 95:19 101:1,3,6,21 102:4,10 105:13,16,19,25 106:14 110:14,25 111:15 113:16,17 114:3 118:7 119:9 120:25 127:12 130:25 (112)

**university's** 74:19

**unless** 39:14 100:8

**unsafe** 93:19 94:1,5

**until** 31:14 40:16,16,21 41:13,25 66:16 79:3 80:15 81:21 91:17 112:14 116:22 (13)

**up** 18:8 40:17 41:3,15 44:21 46:3 53:21 54:21 63:17 64:2,11 65:9,24 74:7,22 77:9,18,20 81:22 87:2 93:2 95:11 112:7 116:13,16 120:3,4 121:7 123:21 129:13 131:20,21 135:21,22 137:14,16 (36)

**updated** 20:1,2 21:5,12 (4)

**upon** 24:14 27:11 28:1 97:6,15,19 98:19 99:4 100:15 (9)

**upper** 93:4

**upset** 41:10,21,25 64:20 74:25 119:10 132:13 (7)

**urging** 90:16

**us** 20:20 21:21 29:9 38:5 51:24 63:5,20,22 71:24 74:9 84:25 86:8 89:17 105:3 119:1 121:2,3,24 122:14 130:25 133:6 134:1,7 (23)

**use** 5:24 28:22

**used** 10:9 30:20 32:5 72:1 104:17,18 132:12,15 (8)

**usually** 26:4,6 28:12 30:7 52:16,17 53:10 115:14 (8)

**ut** 29:18

**utc** 4:9 15:9,14 29:5,11,18,24 30:3 35:16 38:6,11 42:4,6,20 44:13,17,23 45:3 46:11,18 67:19,24 68:8,11 69:4,15 70:8 72:1,5 73:17,21 75:15,25 77:17,22 81:8 82:14,18 85:14 86:7 110:8 111:25 112:8 113:8,17 118:24 119:16 127:21,24 133:11,13 141:16 (52)

**utca** 29:22

**utcs** 29:20,20 77:14

**v** 5

**various** 135:12

**vast** 17:23

**verbal** 120:18

**verbally** 120:16 121:3

**verify** 37:19

**versions** 11:15

**versus** 5:4 9:16 59:2

**very** 14:1 25:15 29:19 35:25 44:6 45:9 47:24 48:8 51:1,19 52:21 61:8 67:24 68:8,25 69:12 71:18,20 72:19 73:8,9,9 77:1,1 89:20 97:16,16 101:10 102:18,19 106:19 112:1

113:12 114:8,17 119:9 124:2 125:5 127:9 128:4 138:17 (41)

**via** 18 45:13,15 64:8 120:17 (5)

**vice** 34:12,16,17 101:15 (4)

**victor** 6:6,7

**video** 104:17

**videoconference** 12

**videographer** 2:11 5:1 9:4,7 20:24 21:2 67:12,15 104:9,12 131:10 143:10 (12)

**videotape** 5:2

**videotaped** 12

**vijaya** 12 3:8 5:2,14 145:1,16,20 (7)

**violated** 86:3

**violating** 48:24 86:12,13

**visit** 52:12,16,17 53:10 54:2,5 (6)

**visits** 51:17 52:9 54:4

**vitae** 4:4

**vj** 5:23,25 6:3,4,6 69:20 94:22 105:7 (8)

**voir** 107:20

**vp** 35:5 139:20

**vps** 34:19 35:4

**wait** 28:19 47:1 74:17 112:9 (4)

**waived** 143:14

**want** 8:12,24 20:8 25:9 28:24,25 52:8,9 58:22 62:13,14,15 68:2,25 69:15

70:2 72:20 73:12 87:2,3 89:19 103:18 104:6,14 105:4 107:10,22 112:11 114:15 115:20 120:9 126:5,14 127:14,16 129:11 130:25 136:21,21 140:11,20,21 141:1 142:16 143:1,2 (46)

**wanted** 8:23 11:10 19:23,25 59:7 64:15 66:4 70:4 127:17 136:3,5 137:7 140:17,18 (14)

**wanting** 129:6 142:12,13,14 (4)

**wants** 17:14 53:16 55:10 64:11 (4)

**warn** 100:14

**washington** 12:2 48:2,18 83:4 (4)

**wasn't** 10:8 51:9 79:2,2 83:16 95:11 102:8 (7)

**water** 33:20,25

**way** 10:6 13:24 18:15 38:9 61:22 64:10 65:5,20 93:1,8 95:2 99:11 101:21 118:12 124:7,12,13 135:19 137:5 141:9 (20)

**ways** 118:16

**we'd** 39:20 114:2

**we'll** 9:3 23:2 68:12 85:9 87:24 (5)

**we're** 8:18 10:7 68:2 73:5 74:16 75:12 96:18 127:20,22 133:25 134:21 136:8 137:21 (13)

**we've** 32:19 67:19

**wednesday** 61:9 62:6 63:6

**week** 22:18 32:12 39:18

**weekly** 39:10

**weeks** 114:23 115:10

**weird** 18:10

**well** 8:2 15:4 19:19 21:13 38:3 45:9 47:24 51:1,25 56:5 58:7 61:14,18 63:11 68:8,25 69:12 71:18 80:3 83:14 84:10,15 87:22 89:19 96:7 98:3 99:19 100:20 103:20 105:12,20 111:3 112:1 114:8,17 117:10 128:18 138:17 (38)

**went** 7:25 18:21,23 22:3,9 24:17,23 29:5 41:22 47:10 48:22 68:8,17 78:3 85:22 89:4 99:10 114:16,18 119:12 128:15 (21)

**weren't** 81:13,17 82:12 126:4 (4)

**whalin** 89:10 90:2,6,8 (4)

**what's** 8:8 9:16 15:25 108:18 129:18 (5)

**whatever** 44:8 45:16 53:14,16 68:16 77:13 81:4 85:6 92:16 119:13 120:24 130:6 133:24 (13)

**when** 6:13 7:8 8:17 11:14 15:9 16:21 17:20 21:9,25 22:8,19,22 28:14 31:17,25 32:8 35:16,16,18 36:7 38:5,10 39:7 40:14,18 41:3,3,5,7,10,19,20,22,23 42:7,20,23 44:5 47:9,10 48:3,17 49:16,22 51:17 52:3 56:16 57:3,16,21 58:7,8,23 61:1,10,12 65:6 66:24,25 67:23 68:4 71:8 73:10 75:3 76:20 77:13,17 78:11,25 79:3,21 85:3 89:9 91:25 97:17 102:14 104:23 107:10 109:17 110:10,17,23 112:6 114:10 116:16 123:6,14 126:18 129:10,11 130:5,23 133:1,10 136:13 138:15 (96)

**whenever** 14:22 50:22 71:2

**where** 7:4 13:6 18:17 31:3 33:3 36:4 50:24 61:19 62:9 70:7 76:3,5 96:5 113:9 126:15 128:21 138:22 (17)

**wherever** 96:12

**whether** 27:18 29:3 37:11,23 44:18,22 45:5 53:12 54:14 58:23 112:12 115:23,24 116:5 117:16 118:4,25 124:14 (18)

**which** 16:14 23:13 36:12 38:25 47:21 48:14 62:17,19 81:1 88:20 94:23,23 97:3 113:20 116:20 120:7 124:3 128:2 134:12 (19)

**while** 7:7 40:24

**whistler** 62:8

**who** 6:9 10:5 14:10 15:22 16:23 27:8 28:4,12 37:6 39:24 67:25 68:23 73:3,8 77:2,5,19 78:4 79:5,16,24 80:10 85:18,19 90:6,18,24 91:1,6 109:24 110:5 114:3,25 115:12 116:12 120:14,15 121:4 132:21 135:5,11 139:16,24,25 140:19 142:12 (46)

**who's** 122:10 124:12

**whoever** 75:12 78:2 127:9

**whole** 15:24 43:8 62:13 77:4 78:20 83:7 124:23 132:17 134:2 138:16,16 (11)

**whom** 12:14 45:25

**why** 5:25 14:21 17:12 49:8 65:16 69:5 74:4,5 94:15,16,17 103:12 116:9 127:17 136:12 138:20 139:9,14 140:5 142:3 (20)

**will** 5:8,19 6:12 8:16 10:10 17:6 26:15 53:5 60:12,13 62:8,9 63:5,21,21,23 66:16,17 68:23,24 74:8,12 89:1 100:20,23,23 101:8,10 103:9

105:3,14 107:11,14 123:11,20 128:8,17,22 136:14 137:3,11 139:5 (42)

**willing** 49:8

**win** 37:5 38:4

**winfield** 2:3

**wing** 29:23

**winner** 46:21

**winning** 36:22 37:1 130:25 136:22 (4)

**wish** 37:21

**wishing** 137:2

**withdraw** 4:8 89:18 117:14,22,25 118:6,10 123:20 132:19 133:15,25 134:19 (12)

**withdrawal** 118:13

**withdrawing** 118:25 119:4

**withdrawn** 117:15

**within** 16 17:2 29:19 56:13,13 63:24 96:19 105:24 107:13 111:24 (10)

**without** 34:22 50:7 54:7 76:15 98:21 (5)

**witness** 5:8 7:6,9 10:21 20:16 24:22 26:13 48:8 59:9 61:15 72:19 78:21 80:10 83:2 99:19 118:19,21 131:5,6,13 132:3 135:17 138:12 139:12 140:15 142:7,20 143:9 144:11,13,19 (31)

**witnesses** 6:24

**won** 36:18

**won't** 13:22 104:20

**word** 77:22 78:1 80:22

**wording** 136:10

**words** 119:6 137:10,10

**work** 7:9 13:12 15:19 17:2,6 20:14 21:24 29:5 33:7 36:24 39:9 40:12,25 41:15 43:19 49:19,21,23 50:7,15,23 54:6,15 68:23 69:5,7,15,18,20 72:22,24 102:4,12 113:22 114:6,18 (36)

**worked** 22:5,6,7 30:2 31:8 36:9,10,19,21,23 37:2 38:8,14,16 39:24 41:17 49:13 68:6,17,20 77:5 102:10 110:8 112:1 114:7 130:6 (26)

**working** 22:3 35:11 36:4 38:10 39:7 40:14,24 41:13 43:16 110:16,18 111:6,9 113:11 115:1,12 135:5 (17)

**world** 6:22 17:23

**worried** 73:6

**worry** 84:15,16

**worse** 118:16 128:23

**would** 7:25 10:4 11:11,21 12:13 19:4 20:1,10,19 27:12,17 28:3,4 32:4 35:24 36:3,7 38:14 39:8,17,19,21,24 40:23 43:22 44:15 46:7 50:22 54:2 55:20 62:9 63:7 65:8,16 74:5,5 79:15 86:24 90:24 92:17 93:21 94:6,13,25 95:3 96:4,8,13,18,24 100:18 101:6,22,22,24 103:16,18,22 104:4 106:19 107:6 108:2 109:4 114:2,5,18 115:9 116:9,12,19 117:14,15 118:6,11 122:12,16,20,21 123:2,8 128:6 135:24,25 138:25 140:12 142:4 (86)

**would've** 30:23 46:11,13

**wouldn't** 43:20 59:4,4,10,20 64:18 68:23 69:18 75:4 76:3,4 102:1,18 116:12 (14)

**write** 58:6 74:5,6 75:12,13 79:13,15,20 86:17,20 90:24 116:9 (12)

**writing** 44:5 140:19

**written** 42:21 44:21 57:18,20 87:7,9,13 89:10 115:3 116:13 (10)

**wrong** 48:12 59:20 64:1 78:7 79:18 88:3 99:2 108:10 136:23 (9)

**wrote** 36:17 79:3,15,15,16,18,21 91:3 110:17,23 114:10 (11)

**y'all** 20:23 36:4 38:14 39:7 46:13 78:16 (6)

**y'all's** 61:12

**yeah** 6:4,23,25 12:16 14:19 19:6,13 20:10,13,16,22 21:10,15 22:16 26:11,11,13 31:16,19 32:16 33:5 36:2,21 38:3 45:24,24 46:7,16,18 48:6 50:9,9 51:8 53:18 54:1 56:5,17,20 57:6,15 58:17 61:7,15 62:1,1,4,16,25 65:22 68:2 69:7 70:13 71:20 77:8 79:20 82:4,15 84:12 85:3 87:13 88:8,15 89:13,22 90:1,3,8,12 101:3 103:12 104:6 106:10,21 108:19 121:13,15,23,25 124:11 125:25 126:9,11,11 127:7 128:19,25 129:2,9,15,25 131:12 136:2 137:20,23 139:12 140:15 142:10,22 143:9 (99)

**year** 22:6 23:15 27:10 32:6 36:3 46:5 62:10 70:19 105:14,15 126:18 138:15 (12)

**year's** 92:5

**years** 13:11 18:19,24,24 19:5 22:7 32:24 37:3 50:12 52:7 68:16 84:24 105:14,15,18,21 112:10 (17)

**yep** 8:21

**yes** 5:22 6:10,15 7:4,4,9 9:1 10:13,23 13:10,14 17:24 18:12 19:14,16 21:23 22:5,10 23:10,20,23 25:12,14 29:6 30:2,2 33:1 34:15 38:7,12,16 43:11 44:2,6 45:9,15,15 47:12,15 49:15 52:15,21 54:1 56:22 57:11 60:1 61:2 72:10 73:18 80:7,10 82:11,19 84:8 85:1 86:19 87:4 88:10,13 91:11,13 94:13 95:10 97:1 99:9 102:24 104:25 107:14 108:23 109:2,10,13 110:1,10,17,23 111:11,25 112:15 113:7 115:14 117:3 122:8,13,18,22 125:23 126:23 131:18 132:3,8,8 133:5 137:9 139:8 142:7,20 (97)

**you'd** 134:23

**you're** 14:13,14 21:9 27:23,24 28:7 43:9 45:25 46:15 48:21,22 53:15 54:22 55:20 57:20,21 58:24 67:23 69:3 71:22 72:12 74:24 77:14 88:14 95:16 96:3 107:7 108:9 118:25 119:16 121:8 123:19 125:13 134:14 136:13 143:7 (36)

**you've** 7:2 10:20 11:2 28:14 32:1 33:3 34:22 43:4,9,18,24 49:13 73:15 102:10,11 103:17 113:4 118:12 (18)

**young** 18:24 70:16,20 71:11,13 72:2 102:15 (7)

**younger** 7:8

**your** 5:19 6:1 12:12 18:13 19:21 21:5,19,20,22,22,24,25 23:7,17 24:12 27:7,17,17 29:7 32:18 33:10,15 36:1 48:13 49:22 55:15,17 56:19 58:12,25 62:14 63:7,21 67:22 69:13 71:23 73:16,20 75:11 76:21,25 77:4 79:4 80:6 83:7,23 84:7 88:4 91:14 92:12 93:15,18 98:6 99:22 101:11 103:3,7,24 105:4,6,10 107:4,8,13,19,20

108:4,22,25 111:1,24 113:4,5,10 116:4,25 117:8 118:11 119:6 122:6,21 124:8 125:14,21 126:5,14 129:7,18,24 130:16 132:23 134:22 141:6 142:5 143:8 (95)

**yourself** 62:15 84:11

**yunlong** 85:17

**zero** 26:12,13 80:14

**zhang** 3 2:12 5:3,13 9:10 11:17 16:15 35:14,15 38:13 40:2 43:5 44:1 45:8,10 46:3,11 47:13 48:5 60:10,11 61:4 63:2 66:9 82:13,24,25 83:3,8,24 85:13 87:7 91:10,15 95:6,7,14 102:4 110:15,22,25 111:1,5,9,23 112:2,18 113:1 121:25 128:15,22 132:22 133:11,13 138:4 (55)

**zhang's** 12:5,15 64:10 86:17 (4)

**zoom** 18 45:13,15,16,18,20 61:6,7,8 62:7,19 64:8 (12)

**224** 2:4

**900** 61:9 62:6 63:7

**965** 2:8

**1003** 20 5:6

**1007** 9:5

**1011** 9:8

**1023** 20:25

**1038** 21:3

**1103** 121:22

**1124** 67:13

**1125** 67:16

**1215** 104:10

**1220** 104:13

**1526** 25 144:1526

**1978** 19:4

**2003** 31:14,16

**2010** 110:9

**2011** 36:5,7 38:11 40:15 41:1 43:13 110:10 (7)

**2012** 38:9

**2014** 32:3,3

**2016** 37:3,4,11,12 38:3 112:7 (6)

**2022** 19:21 20:5 23:15 38:4 41:1,2 66:24 75:25 112:10 113:8 126:6 129:14,15 (13)

**2025** 45:8

**2026** 18 5:5 20:5 144:20 145:21 (5)

**2027** 144:25

**2028** 23:15

**4500** 16:2

**6325** 4:5

**39110** 2:39110

**39759** 2:39759

**20112012** 72:3