# Dr. Santanu Kundu

## Li Zhang
## vs.
## Mississippi State University

## January 16, 2026



338 Indian Gate Circle
Ridgeland, MS 39157
601-573-0961

amanda@awreporting.com
www.awreporting.com

1

IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

LI ZHANG                                        PLAINTIFF

v.                                      CAUSE NO. 23-441

MISSISSIPPI STATE UNIVERSITY and
MISSISSIPPI BOARD OF TRUSTEES OF
STATE INSTITUTIONS OF HIGHER LEARNING   DEFENDANTS

VIDEOCONFERENCE DEPOSITION OF DR. SANTANU KUNDU

Taken at the instance of the Defendants via Zoom
Videoconference on Friday, January 16, 2026,
beginning at 9:02 a.m.

* * * * * * * * * * * * *
REPORTED STENOGRAPHICALLY BY:
LORI W. BUSICK, CVR-S #7510, CCR #1677

APPEARANCES:

GRAFTON E. BRAGG, ESQ. (VIA ZOOM)
BraggLaw, PLLC
965 Madison Avenue
Madison, Mississippi 39110
(601) 624-1153
grafton@graftonbragglaw.com

          COUNSEL FOR PLAINTIFF


ASHLYN B. MATTHEWS, ESQ. (VIA ZOOM)
The Winfield Law Firm, P.A.
224 East Main Street
Post Office Box 80281
Starkville, Mississippi 39759
Telephone: (662) 323-3984
Facsimile: (662) 323-3920
amatthews@winfieldlawfirm.com

          COUNSEL FOR DEFENDANT

INDEX

Style and Appearances...........................1

Certificate of Deponent........................49

Certificate of Court Reporter..................50


EXAMINATIONS

Examination by Mr. Bragg.......................4

4

Dr. Santanu Kundu,

having been first duly sworn, was examined and

testified as follows:


EXAMINATION BY MR. BRAGG:

Q.   Please state your full name for the

record.

A.   My full name Santanu Kundu.

Q.   Santanu Kundu?

A.   Santanu, S-A-N-T-A-N-U, Kundu.

Q.   Santanu Kundu.  Did I say that correctly?

A.   Yes.

Q.   I'll call you Dr. Kundu?  It's Kundu?

A.   Yes, K-U-N-D-U.  Yes.

Q.   Okay.  I want to make sure I get the

pronunciation correct.  Feel free to correct me as

we go if I mess that up.

A.   Understood.

Q.   Have you ever given a deposition testimony

before?

A.   No.

Q.   I'm sure you know a little -- you've been

told a little bit about the process.  I'm just going

to go over a few of the things that I like to cover

with everybody to make sure we're on the same page.

5

A.    Okay.

Q.    One of the things is, when I ask you a question, it's typically best if you can respond with a yes or a no and not just a nod or a shake.

A.    Sure.

Q.    For purposes of the transcript, that's better.  Does that work?

A.    Yes.  And if I nod my head, if I'm missing something, please let me know, I'll correct myself.

Q.    Okay.  I will try to.  I'm better about catching that than I used to be.  I've got better with time.  Looking at your transcripts -- reviewing your transcripts and seeing that parenthesis that says nod or shake or indicates affirmative, it's like, oh, man, we didn't do that.  So I've learned from my mistakes a little bit.

The other thing is, a lot of times in conversation we will tend to jump in when we understand what the other person is conveying before they've finished their complete thought, which is very normal.  For purposes of the deposition, it's best if you can allow me to finish my question before you finish -- before you jump in with your answer and I'll do my best to try to return the favor, let you finish your answer before I jump in

6

with my question.  Does that work?

A.   It will work fine for me.

Q.   Good job.  Just like that.  That's especially true when we're on zoom, because the zoom can only record one person speaking at a time.

A.   Okay.

Q.   If you need a break, let me know.  I don't think you'll need a break.  I don't think we'll be here very long, but I'm happy to accommodate if you do.

A.   Sure.  Thank you.  I appreciate that.

Q.   Okay.  If there's a question that you don't understand, I would ask that you let me know you don't understand, ask me to clarify so that we can make sure that you do understand.  Is that fair?

A.   That's very fair.  Sure, I'll do so.

Q.   And the reason for that is because if you don't ask me to clarify then anyone who reads the transcript later will assume you did understand the question.  Is that fair?

A.   Perfectly makes sense.

Q.   Some of those things, it's just good to get those on the record.  Because I've had a situation before where somebody said they didn't understand, but they didn't ask to clarify and we

were able to go back and say, no, no, we had this agreement. So that's why we get that on the record.

A. Sure. I appreciate it.

Q. What did you do to prepare for the deposition here today?

A. Not -- specifically nothing.

Q. Okay. Did you review any materials before this deposition today?

A. I just checking the letter that was sent -- Dr. Grala prepared.

Q. That's the recommendation from the promotion and tenure committee?

A. Yes.

Q. Okay. And so I know that there are department level promotion and tenure committees, but the one that we'll be talking about today is the University Promotion and Tenure Committee; is that right?

A. Yes.

Q. So we may talk about a specific department. But if we don't specify, can we agree that when we say promotion and tenure committee or when we say P&T committee, we're talking about the University P&T Promotion and Tenure Committee that heard Dr. Zhang's hearing in June of 2025?

8

A.   For this meeting purpose, yes.

Q.   Okay.  Thank you.

You may have spoken with Ashlyn before the deposition, I don't need to know what you talked about.  But did you meet with Ashlyn in preparation for the deposition?

A.   I met with her just to know how this process works.

Q.   Did you review any documents during that meeting?

A.   I have not.

Q.   So the only thing you've looked at is you briefly looked at the P&T recommendation letter?

A.   Just before this meeting I did that.

Q.   Okay.  Thank you.

I want to get just a little bit about your background.  I don't have to know every single thing about you.

A.   Yes, sir.

Q.   Maybe if we had more time in a different setting.  So what -- I guess where did you grow up; where were you born?

A.   I was born in India.  I grew up in India. And then I came to the United States for my graduate study to do PhD here.

I did my PhD from Clemson University, that's in South Carolina. After that I did two postdoctoral research, one is at University of Massachusetts-Amherst. That is in Massachusetts Amherst. And after that I also did a postdoc in National Institute for Standards and Technology, NIST at Gaithersburg, Maryland. That's a federal lab.

I fished the postdoc at 2011, December. I started my 10-year track positions in the chemical engineering department at Mississippi State University, starting January 2012. Since then I'm here. Initially I started as an assistant professor then I received my tenure and promotion to associate and then also recently promoted to full professor.

So presently I'm a full professor in the chemical department at Mississippi State University.

Q. That was very thorough and chronological. I appreciate that.

A. Thank you.

Q. So I do have a few follow-ups. India is a big place. Can you give me a general sense of the region where you lived when you were in India?

A. I'm from Kolkata.

Q. Can you spell that, please? Is there an

English spelling for that?

A. Yes. K-O-L-K-A-T-A.

Q. I think there was another member of the P&T committee who I spoke with who had lived in that area; is that right? Do you know about --

A. I don't know.

Q. His name is alluding me. We were talking the other day.

Okay. So what year did you start at Clemson?

A. I started in Clemson 2001.

Q. Okay. And you had the two -- when did -- when did you finish at Clemson?

A. 2006.

Q. And then your two postdoctoral studies were between 2006 and 2011?

A. 2006, December I graduate. So 2007 to 2011.

Q. 2007 to 2011. Okay.

And then the first job you had after postdoctorate studies was at Mississippi State University?

A. After my postdocs, yes.

Q. Just occurred to me, do you know chemical engineers Jeremy Grafton or Ginger Grafton?

11

A.   I -- at this point I don't recall.

Q.   Okay.  They -- I know they come and do some recruiting at Mississippi State.  That's my aunt and uncle.  But they graduated from the chemical engineering department.

A.   I may have seen them, but I -- at this point, I cannot just directly.

Q.   Understand.

I'm going to pull up a document and I'll share my screen so that you can see it.  This has been marked as Exhibit 1 to the depositions that I've taken.

A.   Yes.

Q.   I do not think you've seen this document.

A.   Not seeing anything yet.  Okay.  Yeah.

Q.   You see it?

A.   I can see it now.  Yes.

Q.   This is a -- these are -- I'll represent to you that these are responses to questions that we've asked, interrogatories that were filled out by Mississippi State University.

A.   Okay.

Q.   And I'm going to take you down to page 7.

A.   Yeah.

Q.   And I just want you to review that and

12

make sure that that information is all accurate.  If it's not accurate -- all the information under your name there.

A.   Yeah.

Q.   If anything's not accurate just let me know.  You can just review it silently.  You don't have to read it all out loud.

A.   Yes, that looks correct.

Q.   Okay.  Thank you.

And this is -- I'm not asking this question unnecessarily, I assure you there's a purpose for it.  But what is your -- what would you consider your race to be?  Like if you were filling out a questionnaire --

A.   Can you -- can you please repeat the question?  Yes, please.  And then give the options I have also.

Q.   Yeah, I guess that's the question.

So I know that the ideas of race and ethnicity are actually really complicated questions, in my view raises sort of a construct that we have, that society has created.  But it is a thing and you see these on questionnaires.

So if there was a questionnaire that said what is your race, what would you mark on that

13

questionnaire?

A.    I'd put, like if there's Asian, I put Asian.

Q.    Asian?

A.    Yes.

Q.    What about your -- your country of origin is India?

A.    Yes.

Q.    Okay.  Is there -- what about your ethnicity?  How would you describe your ethnicity?

A.    I mean --

Q.    Indian American at this point?

A.    Yeah.  Yeah.  I'm a U.S. citizen, yes.

Q.    Okay.  I know that's actually not nearly as simple of a question as the questionnaires make it seem, so I appreciate that.

        Okay.  When did you -- I need to back up just a little bit.

A.    Okay.

Q.    I wanted to follow-up on the timeline of your tenure track.  So you started in 2012 as an assistant professor?

A.    Uh-huh (affirmative response).

Q.    What was the next step after that and when?

14

A. So when you get an appointment here, if you're in a tenure track position, so the next step in engineering track position is getting -- like if you start as an assistant professor, getting tenure and a promotion to become associate professor. I applied that together and I become associate professor with tenure.

Q. Okay. And when did you become an associate professor with tenure?

A. I think, I don't have my CV in front of me, but I believe that's 2018.

Q. 2018?

A. Yeah. If you want me to check, I can go and open my CV.

Q. That's fine. And you were promoted to full professor in August of 2022?

A. If my memory is right, yes.

Q. And it's true that the provost of the university, at that time Dr. Shaw, would have had to approve your promotion to full professor?

A. Yes.

Q. How did you get appointed to the P&T committee?

A. It was an election.

Q. When was your appointment?

15

A. See I don't exactly recall all the timelines. But if you ask me I can go back and I can respond to you. But if I remember it, some part of time -- so this is my second year. I started maybe two years back. But exactly I don't recall this one. I remember there is an election and I was elected to be chair of the committee for the college of engineering.

Q. There was a matter that the P&T committee considered where a professor had some Visa issues and ultimately was terminated as a result of not being qualified to work. Were you on that --

A. I was in that committee, but I'm not hundred percent sure at this time what is happened in the end.

Q. Okay.

A. Whether they -- she was -- whether the faculty was terminated or not. That part I'm not sure. But I was part of the committee where the committee looked at the process.

Q. And the P&T committee at least recommended the termination of the faculty member?

A. Yes.

Q. Okay. And then before that there was an appeal by an instructor, Breckan Rush, were you

16

involved in that matter?

A.   No, sir.

Q.   So were the only two matters where you actually participated the matter with the Visa, the professor with the Visa and then Dr. Zhang's administrative hearing?

A.   Yes, sir.

Q.   Did you serve -- so I think I know the answer to this, but did you ever serve alongside Dr. Zhang while he was on the P&T committee?

A.   I have not -- I don't remember that.  No, I don't think so.

Q.   Did you know who Dr. Zhang was before --

A.   He's a colleague, yes.

Q.   Because you're in the same -- both in the college of engineering?

A.   Uh-huh (affirmative response).

Q.   Okay.  Tell me about your -- just in general, like describe your relationship with Dr. Zhang before the administrative hearing.

A.   So he's a colleague.  Okay.  So I know him, he's in here.  So yeah, so that's the way I know him.

Q.   Did you ever have any negative interactions with Dr. Zhang?

17

A.   Negative interaction?  No.

Q.   Did you ever have any positive interactions with Dr. Zhang?

A.   No.

Q.   Did you ever work with Dr. Zhang on a research project or any other collaborative effort?

A.   No.

Q.   Okay.  You have very different fields of specialty within engineering, correct?

A.   Yes.

Q.   And so you knew who he was -- it sounds like you kind of knew who he was, he knew who you were, but it did not go a lot further than that?

A.   It's not -- no, it did not.  Yeah.

Q.   Did you ever hear other people within the college of engineering talking about Dr. Zhang when Dr. Zhang was not present?

A.   No, I have not had heard anything.  It's a big college, I don't think that -- it's a different department, yes.

Q.   Did you ever hear any students talking about Dr. Zhang?

A.   No.

Q.   When did you first learn about the notice of termination for Dr. Zhang?

A.   When I was part of this committee.

Q.   There was -- I think there was an email from Dr. Grala forwarding the recommendation from Provost Shaw.  Is that the time at when you first learned about it?

A.   That's when he wants to meet as a committee, yes.

Q.   The hearing was first scheduled for February of 2025; is that correct?

A.   If I recall, yes.  And then it was postponed.  For some reason it was -- it did not happen.

Q.   Do you know why it was postponed?

A.   No.

Q.   Were you going to be available for the February hearing had it gone forward?

A.   I have to check the timeline that day, like when the committee wants to meet.  But overall, if I'm traveling I was available most likely.

Q.   Okay.  The hearing was next scheduled to begin on June 3, 2025?

A.   There was email communications in between, so I don't remember how this thing happened.  If asked if I can be present in June and I said yes.  I was -- I had travel after that, so I told them I

19

would be available during that time.

Q. Okay. Let me pull this document up.

This has been made Exhibit 8 to the depositions.

Okay. Do you recognize this? Take a minute and I'm happy to scroll down or enlarge or whatever. But let me know if you recognize this email chain.

A. Okay.

Q. And I'll scroll down here.

A. I think yes. Yes, I'm on the email list. Yes.

Q. Okay. So this is an email -- the first one on the list, which is the bottom email of Exhibit 8, was from Dr. Zhang to several members of the P&T committee and Joanne Lucas also on May 28, 2025. Is that accurate?

A. Can you repeat the question again. I'm reading.

Q. Yeah.

So this was a -- the first email was from Dr. Zhang to members of the P&T committee and Joanne Lucas on May 28, 2025.

A. Yeah.

Q. And this was a -- he was discussing and

20

mentioned -- do you see where he mentioned that the hearing was scheduled for June 3rd to June 5th of 2025?

A. Uh-huh (affirmative response).

Q. Okay. And then do you see the next email where Dr. Grala forwarded this email to Joanne Lucas, did not included Dr. Zhang on the next email, but it looks like included everyone else?

A. Okay. Yes.

Q. And it looks like she was asking for -- excuse me -- he was asking for confirmation about when the hearing would take place and when the panel would receive access to all pertinent materials and names of witnesses?

A. Yes.

Q. Okay. So to me it looks like Dr. Grala had not, before May 29th, 2025, received confirmation that the hearing would actually happen on June 3rd. Is that consistent with your recollection?

A. I mean, this is what I remember. This is the email. I've seen it, yes.

Q. Okay. Do you remember learning -- excuse me -- let me ask that in a better way.

Do you remember getting confirmation that

the hearing was going to happen on June 3rd at any time before Dr. Grala sent this email?

A. I don't recall like anything before that. But I can go back to my emails. But I don't remember anything specific for that.

Q. As we sit here today, you don't --

A. Yeah.

Q. -- you don't have a recollection of anything before that?

A. Yeah.

Q. Did you know Dean Jason Keith before the hearing?

A. Yes.

Q. He was your Dean?

A. He was my Dean, yes.

Q. Not at the time of the hearing however?

A. He left I think before that, yes. Something around that time. I don't exactly remember the date, yes.

Q. Do you know why he left?

A. I don't know -- privy of all information, but I know that he's been -- he's become a provost in one of the schools in Iowa.

Q. He got a promotion.

A. Okay.

Q.   Provost.

Did you have any personal interactions with Dean Keith like other than through email?

A.   Like just like a general communication?

Q.   Yeah.  Did you have like meetings and in-person interactions with Dean Keith or was your interaction with him limited to like written communications?

A.   No, I did have meeting with Dean Keith. He was department head in the school of chemical engineering and then he became a Dean.  So occasionally we have meetings, yes.

Q.   So he was your department head before he was the Dean?

A.   Yes, sir.

Q.   Did you have -- were you involved at all -- and maybe the professors aren't involved in this.  But were you involved in his appointment from department head to the Dean?

A.   No.

Q.   Is that something that a professor would ever be involved in?

A.   No.  So there is a committee and then -- so generally when there is a -- like any promotion happen -- so initially he was like been selected as

23

the interim Dean.  And after that, there was a charge happened.  And when there is a search committee, generally it constitute the faculty member from the department.  But I was not the faculty member on that committee, on that search committee.

Q.    And that's what I was thinking about, more of a search committee.

Were you a part of the search committee when he was made department head?

A.    No, it was before me.

Q.    He was department head before you were in the department?

A.    Yeah.  He start -- he started before me. So I started 2012, he started I believe some point in time 2011, like fall semester or something like that.

Q.    I think you describe your relationship with Dr. Zhang as a colleague.  Is that similar to how you would describe your relationship with Dr. Keith?

A.    See Dr. Keith was my supervisor as a Dean, so definitely it is little different because he's more supervisor.  So I'll say that it is different.

Q.    Okay.  Did you have a -- would you

24

describe it as a positive relationship?  And I'm --
let me, before I get into these questions.  I know
this is a little bit -- this is a little more
sensitive because you have some direct interactions
with Dean Keith than I would normally ask just
because of your involvement P&T committee, and so I
appreciate that.

But did you have a positive relationship
with Dean Keith?

A.   That's a very subjective word.  I
probably -- I'm probably not going to answer like a
yes or no.  We have professional working
relationship with Dean Keith.

Q.   Okay.  Did you ever have any disagreements
with Dean Keith?

A.   Personally?

Q.   Yes.

A.   Personally, no.  But the thing is that --
you probably heard that we had some policy
disagreements.  So that I was part of a faculty
senate.  So those things.  We went to the faculty
senate on all these things, some policy changes.  So
this kind of thing happened.  But not in a
personal -- personal level, no.

Q.   Okay.  So you had professional

disagreements?

A.   Yes.

Q.   Tell me about the faculty senate policy disagreement.  I may have heard about this, but it's been a while.

A.   So basically there's a policy change happened.  There is a -- and the policy change, when policy change happen about how -- like research grants will be written and then how funding would work out.  So he gave us -- there was a policy came out of the college of engineering and we disagreed.  So that basically then it's basically went through the process and that end up being in a faculty senate.  So that's what -- but that is -- I'm not doing as myself.  This is not between me and Dr. Keith.  This is nothing to do with that.  This is I'm representing college of engineering.  And as and a college of engineering representative senators, so we basically represent the faculty.  And we went to the faculty senate and asked for resolve on that issue.

Q.   Okay.  And I understand that this was not like a personal -- there's no personal animosity.  Ashlyn and I are on different sides of this case and we represent different parties, but we get along

26

personally, but we have different professional -- so I understand that.

A.   Yes.

Q.   But what was the specific policy change that was at issue?  You said it had to do with research grants?

A.   Yeah, research grants.  So basically it was the question like if there's any kind of like a federal funding we request, so we have to provide some part of that grant to the department.  So it is about how to distribute the money and everything like that.

Q.   So can you describe how Dean Keith wanted it distributed?  What his position was versus what the department of chemical engineering's position was?

A.   No, he's not in department of chemical engineering.  Department of chemical engineering is like represent -- like they are -- this is the faculty.

Q.   Oh, the faculty senate?

A.   These are faculty.  It's nothing to do -- it's basically all the faculty in the college of -- most of the faculty in college of engineering that thought that the policy is not helping them.  So

27

that's the reason we want to revive, so that's what happened.

Q. So I'm just trying to understand. So it had to do with how the money would be distributed from a federal project --

A. No, it's not distributed. So let me give you a little bit more details.

So basically let's say that you ask hundred dollars for a grant, for national science foundation or anything like that. So if any case like if you request some money it comes to your summer salary. Then previously it was like if you requested the summer salary, it is fine.

The new policy was that if you requested a summer salary you have to provide -- like Dean college of engineering was asking that -- I'm not saying the Dean specifically, because it is college of engineering. College of engineering and the department, they're requesting that some part of summer salary would also come to the department.

Q. And that would be less money for the professor to get as part of their summer salary?

A. If you put it that way, yes.

Q. What was the resolution of that policy disagreement? How was it resolved?

28

A.   So it was like -- so we went to the faculty senate and then we explain our case and then ultimately the policy was revoked.

Q.   So it stayed as it was before?

A.   It stayed as before.

Q.   So you were successful in this professional disagreement?

A.   Yeah.  It is not a personal.  It is not a -- it is not a successful or unsuccessful.  It is basically we went to the forces, we made our case and then everybody agreed.

Q.   Understood.  And I'm not says that it was personal.  I am completely -- I'm with you on that. I understand what you're saying.

A.   Okay.  Thank you.

Q.   Did you know Isaac Howard before this administrative hearing?

A.   Isaac Howard, yes, I know him.  He's also a colleague.  I may have met him couple of times, something like that, similar like that.

Q.   So your relationship with Isaac Howard was more like your relationship with Dr. Zhang?

A.   Yes.

Q.   Have you had any conversations with David Shaw?

A.   About what?

Q.   Outside of the hearing?

A.   About this?  No.

Q.   No, no.  So I've talked to several folks and they have never even spoken with David Shaw.  Have you spoken with him at all other than during the administrative hearing?

A.   So he's a Provost.  So yeah, I have like -- nothing about this thing.  Okay.  We never talked about anything on this.  But I also serve on faculty senate, so I probably met him couple of times, hi and hello.

And also he was -- so before he became a provost he was like our PI for research.  So he was the PI for a big grant I was part of.  Okay.  So in that respect, so he was the PI, so I had -- I had communications with him at that time.

Q.   What was that project?

A.   That was called -- from the National Science Foundation project.  You can look at that as like a center for -- I can tell you all details if you want.  I can go back and look at the website.  So this is a five-years, multi-million, multi-University project.  Okay.  About setting up a center on optoelectronics materials.  So the

universities involved are Mississippi State, University of Southern Mississippi, University of Mississippi, University of Jackson. So all the state universities together, so this is a big competitive grant we wrote. So we -- he was the PI, but he was the main guide for this. Because this happen because it's applied by the university, so the university research head will be the VP research will be the PI. So that's what -- that's what he was. And then yeah, this is the project we worked on Natural Science Foundation, a computer project and we won that.

Q. You did win the project?

A. Yes.

Q. Was that federal funded?

A. It's federal funded.

Q. During that project, was there any requests for congressional support?

A. No.

Q. You looked like you had to think for a minute. Are you sure about that or --

A. No, that's what I'm thinking. Basically at that time we had a 20 percent, like -- 20 percent cost that came from the college department. But I'm trying to think, there is no -- because this is --

31

the way it works, there's no congressional request because it's a Natural Science Foundation project. No.

I was thinking because I told you about cost shared because now it is coming from somewhere, so then I yeah...

Q. Have you ever been part of -- when I say congressional support, I don't just mean congressional funding, like congressional support in like a funding matter. But was there a request for like a letter of support from any congressional person?

A. I don't recall.

Q. So that could be a yes or a no, you don't know about that?

A. I don't know about that.

Q. I understand the word support to mean different things.

Okay. So do you remember the discussion in this matter about the UTC proposal that Dr. Zhang was leading on behalf of Mississippi State?

A. As a part of the committee as far as I can remember.

Q. Right. And that's what I'm asking, you remember hearing about that as part of the

32

committee?

A. Yes, sir.

Q. Okay. And so, Dr. Zhang --

A. (Coughing). Sorry about that. Yeah, go ahead.

Q. Okay. So it sounds like in the proposal you worked on there was actually the head of -- it was a very significant proposal for a lot of federal funding. And so Dr. Shaw as the head of research was actually the lead PI; is that right?

A. That's a -- you're talking about the grant we won?

Q. Yes, the one that you won.

A. Yes. That's the one that he was the main part, he was the PI. He was -- he was leading, but it doesn't mean that he wrote parts -- all of it. Because it's a lot of people work on that. The co-team was there, I was part of the co-team. He was giving us direction, but that's it. I think that everybody together we wrote a big proposal, yes.

Q. So is that typical for really large proposals like that, for the PI to be someone within the research department and not -- I mean within the -- to be the head of research at the University

33

rather than --

A.   Yeah.

Q.   Yeah, go ahead.

A.   No, go ahead, end your question. I'm sorry.

Q.   Yeah.  I guess what I'm trying to figure out, so Dr. Zhang's proposal for the UTC funding was also a large scale proposal with a bunch of collaborating universities for a significant amount of federal funding.  You agree with that?

A.   Yes.

Q.   And, but Dr. Zhang as the, sort of, subject matter expert at the department level was the lead PI for that, which is not the case on the proposal that you won with Dr. Shaw, correct?

A.   So every proposal is different.  Because it depends on the funding, it work differently.  So the thing on this one, I do not know about the UTC, how it works.  Every funding agencies work in a different way.  I can only speak about the one that I'm part of.  In that particular proposal this is a multi-university, all are state universities.  And the way it works is that there is Mississippi Research Council there.  They are also getting involved.  So all of this together, it's a

34

20-million-dollar proposal, it's a big proposal.  So a lot of people involved, lot of folks are involved and Dr. Shaw was the PI.

But we -- my part was in that team was like there was a co-research team, I was part of that to help write the proposal.  But I don't know about UTC how that projected worked, what kind of involvement they asked for the individual PI or something like that, but, yeah.

Q.   Okay.  I understand.  All right.  Did you -- I'll move on from that.  I was trying to see kind of what you knew about it.

A.   Okay.

Q.   So you knew Dr. Howard.  Did you know any of the other witnesses that testified during the administrative hearing?

A.   Like in a personal sense?

Q.   Outside of -- outside of just the hearing, did you know them personally or professionally?

A.   Professionally I know department head, like Dennis Truax.  So again, I have seen him.  I have even less interaction with him than like with Dr. Zhang or Dr. Howard.  So I know that he's there and I have seen him.  So that person and then was Dr. Green, Robert Green from college of engineering.

35

He's now Assistant Associate Dean.  Yeah, so he was there.  So I don't know him personally but we email communicate, we met professionally here and there. So that's what it is.

Q.   What about Dr. Julie Jordan?

A.   Yeah, Dr. Julie Jordan.  Yeah, sorry about that.  Yeah.  So basically when Dr. Shaw become provost, so Dr. Julie Jordan become VP for research. So she became the PI for the grant that I was talking about.

Q.   Okay.  So she actually took over as the --

A.   She took over that job and at a part of the research team.  So we had interactions with her. And beyond that she's a VP, so I have -- I don't think that I have a personal, like a one-to-one meeting with her in that sense.  But hi and hello, we've met, like we talk and all those things.  Yeah, I -- yeah.

Q.   Okay.  Sounds good.

What about Teresa Gamble, she didn't testify, but she was on some emails that were presented at the hearing.  Do you know Teresa?

A.   Teresa Gamble, yes -- (coughing) sorry about that.  Teresa Gamble, yes.  So Teresa Gamble was also associated with the office of research.  So

36

when I started here, so she was like part of the official research.  So that's the way I know her.  I have been in communications with her at that time.

Q.   Okay.  Would you -- with regard to, I guess, Dr. Jordon and Dr. Gamble, did you have any negative interactions with either of them stick out, positive interactions with either of them that stick out or was it a relatively neutral working relationship with both of them?

A.   It's a professional relationship.  I don't think anything I can say positive or negative, yes.

Q.   Okay.  Great.

I want to talk -- you have known -- you had some more knowledge of the people involved in the hearing than a lot of the other people that sat on the panel.  So that took a little bit longer than it did with them, so I appreciate you bearing with me.

I want to talk a little bit about -- we're not going to go into the deep ins and outs of the hearing itself.  But I want to ask you kind of about your process in deliberating.

Did you take notes during the hearing? Did you just listen or kind of how did you sort of intake information and go about thinking through how

37

you were going to vote?

A.   So my -- the way I work is that I am a very good listener, in my opinion.  And then I used, I took some notes.  So basically -- and then also the way I ask -- I think that, if you recall, the way it happened like Dr. Grala asked all the questions.  But before that, like at a committee that I had co-chair that asked Dr. Grala then we discussed and those questions have been asked.

So I was like asking lot of questions.

Q.   You were an active -- so a lot of the questions that Dr. Grala asked were because you were a fairly active participant in coming up with those questions?

A.   No, me -- not my -- all questions are not mine.  But I was not silent, like a listener.  I may have -- all these questions came from the committee.  Because there are some cases we have ten questions, maybe some cases I have one, some cases two.  There are many cases that questions are everyone asking the same questions.  Yeah, but I'm not -- I was not like a passive listener.

Q.   I did not -- I perceived that you were listening very well and other members were listening really well, too.  It was a group of people that

38

very attentive and we appreciated that.

Okay.  So you did take some notes.  Do you remember the extent of the notes that you took?

A.   No, not too much.

Q.   Okay.

A.   Not too much.

Q.   As we sit here today, can you remember anything you wrote down?

A.   Not -- nothing that like stand out, no.

Q.   And so, did you -- did you write those notes on separate pages or did you write them on the binder materials that had been provided by Mississippi State?

A.   I think that I wrote on like a -- on a piece of paper and also on the -- I don't think I wrote anything on binder.  I may have highlighted. I do not -- I'm not exactly sure.  But I know that I wrote something on some piece of papers, yes.

Q.   And did you deliver those notes and your -- all of your binder materials back to the office or general counsel?

A.   Yes, it was instructed.

Q.   And you're aware -- have you been made aware that the notes were shredded?

A.   I heard that when I met with Ms. Matthews

39

two days ago.

Q. I want to pull up the P&T's recommendation. I think you recently looked at this.

A. Yeah.

Q. Okay. I'm trying to make it a little bit bigger for you. All right. Can you see it?

A. Yes.

Q. This has been marked as Exhibit 18. I'll go down and let you confirm that this is the final version that you signed and approved?

A. Yes.

Q. Okay. All right. So let's go up here. So I want to look at this bold statement first, the first bold statement.

A. Uh-huh (affirmative response).

Q. The first, I guess, dependent clause, grammatically: While the committee has not reached an agreement on each of the particular reasons for termination.

A. Uh-huh (affirmative response).

Q. You agree that there was a professional disagreement between the committee members about the different findings that are in the letter?

A. Yes.

40

Q.   And then are those findings the things that are these bullet points here?

A.   Yes.

Q.   And so, this is sort of what the committee found, but it's not necessarily -- everything in there isn't -- you didn't agree with it exactly; is that accurate?

A.   I mean, when we signed the letter we put it together like a yes.  So these are what we all agreed on to write.

Q.   So you all agreed that it would be written as part of the --

A.   Yes.

Q.   -- committee's decision, but that doesn't mean that you personally agreed with everything in the bullet points; is that accurate?

A.   So it is a letter that's coming from the committee, so we signed that.  I am -- and if you look at this one, the way it is written that many cases like the committee did not say that whether it a fault or it is not fault.

So yeah, so basically some we had a disagreement, like which one can be contumacious cause and which is not.  But yeah, that was I can say.

41

Q.    And you said a word and I was about to ask you about it.  You knew what I was going to ask about.  It's this word contumacious conduct.

A.    Uh-huh (affirmative response).

Q.    Was that a significant point of discussion at the hearing -- during the deliberations?

A.    Yes.

Q.    And so I want to pull up Exhibit 20 to the depositions.

Do you recognize this HRM policy regarding termination of employment?

A.    Yes.

Q.    And that's something that the committee also looked at --

A.    Yes.

Q.    -- during deliberations?

A.    Yes.

Q.    And if we go down here to roman numeral two it says, employees with a contract and there are four different things that are listed out there.  Is that a list that the committee considered?

A.    Yes.

Q.    Okay.  And I think the committee focused on -- it didn't -- the financial exigencies as declared by the IHL and then termination or

42

reduction of programs, or academic administrative units as approved by the IHL, those were not relevant to the committee's deliberations here. Would you agree with that?

A. Yes.

Q. So the committee really focused on number three, which was malfeasance and efficiency or contumacious conduct, and them number four, for cause. Do you agree with that?

A. Yes.

Q. And so the word contumacious conduct, what is your understanding of what that means?

A. So that is like a -- I was not very sure. It's much more legal terminology. Right? So my understanding was that like not following the like a order by the superior, not following the procedure, like a standard procedure. And those, in my opinion, can be considered as this cause.

Q. Okay. So I'll go back to Exhibit 18. It says that four panel members voted in favor of the -- well, let's look at the recommendation. The recommendation was that the University had cause to terminate Dr. Zhang due to conduct?

A. Uh-huh (affirmative response).

Q. And you agree that that was the -- that

43

was the majority vote?

A. That was the majority vote, yes.

Q. Okay. And four voted for it, three voted against it, none abstained.

A. Uh-huh (affirmative response).

Q. That's accurate?

A. That's accurate.

Q. And it's my understanding you were one of the three that voted against the recommendation?

A. Do I need to disclose that?

Q. Yeah.

MR. BRAGG: I think -- Ashlyn, he can disclose that, right?

MS. MATTHEWS: Yes, you can disclose it.

A. Yes, my vote was like -- yes -- no -- I'm one of the three votes.

Q. (By Mr. Bragg) One of the three against the recommendation to terminate Dr. Zhang?

A. Yes.

Q. So was there an actual vote on what counts as -- well, let me ask that differently.

Was there an actual vote about whether Dr. Zhang had committed contumacious conduct?

A. If I recall it, I don't think so. I don't recall it clearly.

44

Q.    So the vote was more generally whether the University had cause to terminate Dr. Zhang due to conduct?

A.    Yes.

Q.    And so you would agree that contumacious conduct is a basis for termination under the HRM policy?

A.    Uh-huh (affirmative response).  Yes.

Q.    And so it's my understanding that by voting against the recommendation to terminate Dr. Zhang it would have been your conclusion that he did not commit conduct that rose to the level of contumacious conduct.  Is that accurate?

A.    That's accurate.

Q.    So under bullet point two there's a discussion here about the traffic counts assignment.

A.    Yeah.

Q.    And the very final sentence says, this willful disregard of instructions from supervisors was a clear case of contumacious conduct.  Do you see that?

A.    Uh-huh (affirmative response).

Q.    And so based on what you just explained, it's my understanding you don't agree with that particular sentence?

45

A.   See the thing is that I don't recall exactly the way it happened.  Because I had -- my understanding was that, like a -- yeah, let me don't add anything here.  Yes.  So basically yes, I agree with you.

Q.   So you don't -- you agree with me that you don't agree with that one sentence?

A.   I would say that I was -- like my point was like we should -- there are -- it can be handled, before it goes to that level, it could be handled in a different way than reach to this level.  So my standing was that.

Q.   Okay.

A.   Not like a -- yeah.

Q.   I think you just -- I think you testified that in your opinion, Dr. Zhang did not engage in conduct that rose to the level of contumacious conduct; is that right?

A.   I mean, some cases I say that this is very unprofessional.

Q.   And I understand that.

A.   Yes.

Q.   I feel like this is fairly mathematical.  I think we looked at the policy and you said that it was your conclusion and your vote that he hadn't

46

engaged in conduct that would lead to the level of contumacious conduct. You testified to that, right?

A. Yes.

Q. And so then this sentence says that he did something that was a clear case of contumacious conduct. And so my question is just, you don't agree with the sentence in bullet point two that says he did do something that was a clear case of contumacious conduct because you didn't believe that he engaged in conduct that rose to the level of contumacious conduct; is that right?

A. Okay, let me put it this way. So my idea is that it's unprofessional. Again, the contumacious conduct is a very legally word. So what is contumacious conduct, what is not? That maybe -- that's the law of court can decide.

My argument was that like I think that's very unprofessional. Some say it's like it could be considered contumacious, it cannot be considered not contumacious. So my idea was that it is not. Okay.

Q. Right.

A. Yeah. So my opinion is it's very unprofessional.

Q. Okay. So you personally didn't believe that the traffic counts assignment issue was a clear

47

case of contumacious conduct?

A. It's borderline, in my opinion.

Q. It's borderline, but you did -- after your deliberations and as you were voting, that was not your conclusion?

A. That was -- that was not my conclusion.

Q. Okay.

A. And I -- again, I don't recall every details of that meeting. That was long ago.

Q. It was a long time ago.

A. Yeah.

Q. I had never heard the word contumacious until --

A. Yes.

MR. BRAGG: Let me -- let me just take a second here and just doublecheck my notes.

Okay. I have no further questions.

MS. MATTHEWS: I don't have any questions.

MR. BRAGG: Thank you, Dr. Kundu.

THE WITNESS: Thank you.

THE REPORTER: Do you need a copy, Ashlyn?

MS. MATTHEWS: Yes.

THE REPORTER: Read and sign?

MS. MATTHEWS: Yes.

48

(End of Deposition.)

SIGNATURE/NOT WAIVED

(Whereupon, the above-entitled deposition was concluded at 9:55 a.m.)

49

CERTIFICATE OF DEPONENT

DEPONENT:  Dr. Santanu Kundu
DATE:  January 16, 2026
CASE STYLE:  Zhang vs. MSU
ORIGINAL TO:  Ashlyn Matthews, Esq.

I, the above-named deponent in the deposition taken in the herein styled and numbered cause, certify that I have examined the deposition taken on the date above as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me.

Subject to those corrections listed below, if any, I find the transcript to be the correct testimony I gave at the aforestated time and place.

Page        Line                        Comments
_____      _____      _____
_____      _____      _____
_____      _____      _____
_____      _____      _____
_____      _____      _____
_____      _____      _____
_____      _____      _____
_____      _____      _____
_____      _____      _____
_____      _____      _____
_____      _____      _____
_____      _____      _____

This the _____ day of _____, 2026

_____
Dr. Santanu Kundu

State of Mississippi
County of _____

Subscribed and sworn to before me, this the _____ day of _____, 2026.


My Commission Expires:

_____            _____
                                    Notary Public

50

CERTIFICATE OF COURT REPORTER

I, Lori W. Busick, Court Reporter and Notary Public, in and for the State of Mississippi, hereby certify that the foregoing contains a true and correct transcript of the testimony of Dr. Santanu Kundu, as taken by me in the aforementioned matter at the time and place heretofore stated, as taken by stenotype and later reduced to typewritten form under my supervision by means of computer-aided transcription.

I further certify that under the authority vested in me by the State of Mississippi that the witness was placed under oath by me to truthfully answer all questions in the matter.

I further certify that, to the best of my knowledge, I am not in the employ of or related to any party in this matter and have no interest, monetary or otherwise, in the final outcome of this matter.

Witness my signature and seal this the 26th day of January, 2026.

Lori W. Busick, CVR-S #7510, CCR #1677
My Commission Expires:
August 22, 2026

# Dr. Santanu Kundu

# Li Zhang
## vs.
# Mississippi State University

# January 16, 2026



338 Indian Gate Circle
Ridgeland, MS 39157
601-573-0961

amanda@awreporting.com
www.awreporting.com

IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

LI ZHANG                                    PLAINTIFF

v.                          CAUSE NO. 23-441

MISSISSIPPI STATE UNIVERSITY and
MISSISSIPPI BOARD OF TRUSTEES OF
STATE INSTITUTIONS OF HIGHER LEARNING   DEFENDANTS

VIDEOCONFERENCE DEPOSITION OF DR. SANTANU KUNDU

Taken at the instance of the Defendants via Zoom
Videoconference on Friday, January 16, 2026,
beginning at 9:02 a.m.

* * * * * * * * * * * * *
REPORTED STENOGRAPHICALLY BY:
LORI W. BUSICK, CVR-S #7510, CCR #1677

---

INDEX

Style and Appearances............................1

Certificate of Deponent.........................49

Certificate of Court Reporter...................50

EXAMINATIONS

Examination by Mr. Bragg........................4

---

APPEARANCES:

GRAFTON E. BRAGG, ESQ. (VIA ZOOM)
BraggLaw, PLLC
965 Madison Avenue
Madison, Mississippi 39110
(601) 624-1153
grafton@graftonbragglaw.com

COUNSEL FOR PLAINTIFF

ASHLYN B. MATTHEWS, ESQ. (VIA ZOOM)
The Winfield Law Firm, P.A.
224 East Main Street
Post Office Box 80281
Starkville, Mississippi 39759
Telephone: (662) 323-3984
Facsimile: (662) 323-3920
amatthews@winfieldlawfirm.com

COUNSEL FOR DEFENDANT

---

Dr. Santanu Kundu, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. BRAGG:

Q. Please state your full name for the record.

A. My full name Santanu Kundu.

Q. Santanu Kundu?

A. Santanu, S-A-N-T-A-N-U, Kundu.

Q. Santanu Kundu. Did I say that correctly?

A. Yes.

Q. I'll call you Dr. Kundu? It's Kundu?

A. Yes, K-U-N-D-U. Yes.

Q. Okay. I want to make sure I get the pronunciation correct. Feel free to correct me as we go if I mess that up.

A. Understood.

Q. Have you ever given a deposition testimony before?

A. No.

Q. I'm sure you know a little -- you've been told a little bit about the process. I'm just going to go over a few of the things that I like to cover with everybody to make sure we're on the same page.

5

A. Okay.

Q. One of the things is, when I ask you a question, it's typically best if you can respond with a yes or a no and not just a nod or a shake.

A. Sure.

Q. For purposes of the transcript, that's better. Does that work?

A. Yes. And if I nod my head, if I'm missing something, please let me know, I'll correct myself.

Q. Okay. I will try to. I'm better about catching that than I used to be. I've got better with time. Looking at your transcripts -- reviewing your transcripts and seeing that parenthesis that says nod or shake or indicates affirmative, it's like, oh, man, we didn't do that. So I've learned from my mistakes a little bit.

The other thing is, a lot of times in conversation we will tend to jump in when we understand what the other person is conveying before they've finished their complete thought, which is very normal. For purposes of the deposition, it's best if you can allow me to finish my question before you finish -- before you jump in with your answer and I'll do my best to try to return the favor, let you finish your answer before I jump in

6

with my question. Does that work?

A. It will work fine for me.

Q. Good job. Just like that. That's especially true when we're on zoom, because the zoom can only record one person speaking at a time.

A. Okay.

Q. If you need a break, let me know. I don't think you'll need a break. I don't think we'll be here very long, but I'm happy to accommodate if you do.

A. Sure. Thank you. I appreciate that.

Q. Okay. If there's a question that you don't understand, I would ask that you let me know you don't understand, ask me to clarify so that we can make sure that you do understand. Is that fair?

A. That's very fair. Sure, I'll do so.

Q. And the reason for that is because if you don't ask me to clarify then anyone who reads the transcript later will assume you did understand the question. Is that fair?

A. Perfectly makes sense.

Q. Some of those things, it's just good to get those on the record. Because I've had a situation before where somebody said they didn't understand, but they didn't ask to clarify and we

7

were able to go back and say, no, no, we had this agreement. So that's why we get that on the record.

A. Sure. I appreciate it.

Q. What did you do to prepare for the deposition here today?

A. Not -- specifically nothing.

Q. Okay. Did you review any materials before this deposition today?

A. I just checking the letter that was sent -- Dr. Grala prepared.

Q. That's the recommendation from the promotion and tenure committee?

A. Yes.

Q. Okay. And so I know that there are department level promotion and tenure committees, but the one that we'll be talking about today is the University Promotion and Tenure Committee; is that right?

A. Yes.

Q. So we may talk about a specific department. But if we don't specify, can we agree that when we say promotion and tenure committee or when we say P&T committee, we're talking about the University P&T Promotion and Tenure Committee that heard Dr. Zhang's hearing in June of 2025?

8

A. For this meeting purpose, yes.

Q. Okay. Thank you.

You may have spoken with Ashlyn before the deposition, I don't need to know what you talked about. But did you meet with Ashlyn in preparation for the deposition?

A. I met with her just to know how this process works.

Q. Did you review any documents during that meeting?

A. I have not.

Q. So the only thing you've looked at is you briefly looked at the P&T recommendation letter?

A. Just before this meeting I did that.

Q. Okay. Thank you.

I want to get just a little bit about your background. I don't have to know every single thing about you.

A. Yes, sir.

Q. Maybe if we had more time in a different setting. So what -- I guess where did you grow up; where were you born?

A. I was born in India. I grew up in India. And then I came to the United States for my graduate study to do PhD here.

9

I did my PhD from Clemson University, that's in South Carolina. After that I did two postdoctoral research, one is at University of Massachusetts-Amherst. That is in Massachusetts Amherst. And after that I also did a postdoc in National Institute for Standards and Technology, NIST at Gaithersburg, Maryland. That's a federal lab.

I fished the postdoc at 2011, December. I started my 10-year track positions in the chemical engineering department at Mississippi State University, starting January 2012. Since then I'm here. Initially I started as an assistant professor then I received my tenure and promotion to associate and then also recently promoted to full professor.

So presently I'm a full professor in the chemical department at Mississippi State University.

Q. That was very thorough and chronological. I appreciate that.

A. Thank you.

Q. So I do have a few follow-ups. India is a big place. Can you give me a general sense of the region where you lived when you were in India?

A. I'm from Kolkata.

Q. Can you spell that, please? Is there an

10

English spelling for that?

A. Yes. K-O-L-K-A-T-A.

Q. I think there was another member of the P&T committee who I spoke with who had lived in that area; is that right? Do you know about --

A. I don't know.

Q. His name is alluding me. We were talking the other day.

Okay. So what year did you start at Clemson?

A. I started in Clemson 2001.

Q. Okay. And you had the two -- when did -- when did you finish at Clemson?

A. 2006.

Q. And then your two postdoctoral studies were between 2006 and 2011?

A. 2006, December I graduate. So 2007 to 2011.

Q. 2007 to 2011. Okay.

And then the first job you had after postdoctorate studies was at Mississippi State University?

A. After my postdocs, yes.

Q. Just occurred to me, do you know chemical engineers Jeremy Grafton or Ginger Grafton?

11

A. I -- at this point I don't recall.

Q. Okay. They -- I know they come and do some recruiting at Mississippi State. That's my aunt and uncle. But they graduated from the chemical engineering department.

A. I may have seen them, but I -- at this point, I cannot just directly.

Q. Understand.

I'm going to pull up a document and I'll share my screen so that you can see it. This has been marked as Exhibit 1 to the depositions that I've taken.

A. Yes.

Q. I do not think you've seen this document.

A. Not seeing anything yet. Okay. Yeah.

Q. You see it?

A. I can see it now. Yes.

Q. This is a -- these are -- I'll represent to you that these are responses to questions that we've asked, interrogatories that were filled out by Mississippi State University.

A. Okay.

Q. And I'm going to take you down to page 7.

A. Yeah.

Q. And I just want you to review that and

12

make sure that that information is all accurate. If it's not accurate -- all the information under your name there.

A. Yeah.

Q. If anything's not accurate just let me know. You can just review it silently. You don't have to read it all out loud.

A. Yes, that looks correct.

Q. Okay. Thank you.

And this is -- I'm not asking this question unnecessarily, I assure you there's a purpose for it. But what is your -- what would you consider your race to be? Like if you were filling out a questionnaire --

A. Can you -- can you please repeat the question? Yes, please. And then give the options I have also.

Q. Yeah, I guess that's the question.

So I know that the ideas of race and ethnicity are actually really complicated questions, in my view raises sort of a construct that we have, that society has created. But it is a thing and you see these on questionnaires.

So if there was a questionnaire that said what is your race, what would you mark on that

questionnaire?

A. I'd put, like if there's Asian, I put Asian.

Q. Asian?

A. Yes.

Q. What about your -- your country of origin is India?

A. Yes.

Q. Okay. Is there -- what about your ethnicity? How would you describe your ethnicity?

A. I mean --

Q. Indian American at this point?

A. Yeah. Yeah. I'm a U.S. citizen, yes.

Q. Okay. I know that's actually not nearly as simple of a question as the questionnaires make it seem, so I appreciate that.

Okay. When did you -- I need to back up just a little bit.

A. Okay.

Q. I wanted to follow-up on the timeline of your tenure track. So you started in 2012 as an assistant professor?

A. Uh-huh (affirmative response).

Q. What was the next step after that and when?

A. So when you get an appointment here, if you're in a tenure track position, so the next step in engineering track position is getting -- like if you start as an assistant professor, getting tenure and a promotion to become associate professor. I applied that together and I become associate professor with tenure.

Q. Okay. And when did you become an associate professor with tenure?

A. I think, I don't have my CV in front of me, but I believe that's 2018.

Q. 2018?

A. Yeah. If you want me to check, I can go and open my CV.

Q. That's fine. And you were promoted to full professor in August of 2022?

A. If my memory is right, yes.

Q. And it's true that the provost of the university, at that time Dr. Shaw, would have had to approve your promotion to full professor?

A. Yes.

Q. How did you get appointed to the P&T committee?

A. It was an election.

Q. When was your appointment?

A. See I don't exactly recall all the timelines. But if you ask me I can go back and I can respond to you. But if I remember it, some part of time -- so this is my second year. I started maybe two years back. But exactly I don't recall this one. I remember there is an election and I was elected to be chair of the committee for the college of engineering.

Q. There was a matter that the P&T committee considered where a professor had some Visa issues and ultimately was terminated as a result of not being qualified to work. Were you on that --

A. I was in that committee, but I'm not hundred percent sure at this time what is happened in the end.

Q. Okay.

A. Whether they -- she was -- whether the faculty was terminated or not. That part I'm not sure. But I was part of the committee where the committee looked at the process.

Q. And the P&T committee at least recommended the termination of the faculty member?

A. Yes.

Q. Okay. And then before that there was an appeal by an instructor, Breckan Rush, were you involved in that matter?

A. No, sir.

Q. So were the only two matters where you actually participated the matter with the Visa, the professor with the Visa and then Dr. Zhang's administrative hearing?

A. Yes, sir.

Q. Did you serve -- so I think I know the answer to this, but did you ever serve alongside Dr. Zhang while he was on the P&T committee?

A. I have not -- I don't remember that. No, I don't think so.

Q. Did you know who Dr. Zhang was before --

A. He's a colleague, yes.

Q. Because you're in the same -- both in the college of engineering?

A. Uh-huh (affirmative response).

Q. Okay. Tell me about your -- just in general, like describe your relationship with Dr. Zhang before the administrative hearing.

A. So he's a colleague. Okay. So I know him, he's in here. So yeah, so that's the way I know him.

Q. Did you ever have any negative interactions with Dr. Zhang?

17

A. Negative interaction? No.

Q. Did you ever have any positive interactions with Dr. Zhang?

A. No.

Q. Did you ever work with Dr. Zhang on a research project or any other collaborative effort?

A. No.

Q. Okay. You have very different fields of specialty within engineering, correct?

A. Yes.

Q. And so you knew who he was -- it sounds like you kind of knew who he was, he knew who you were, but it did not go a lot further than that?

A. It's not -- no, it did not. Yeah.

Q. Did you ever hear other people within the college of engineering talking about Dr. Zhang when Dr. Zhang was not present?

A. No, I have not had heard anything. It's a big college, I don't think that -- it's a different department, yes.

Q. Did you ever hear any students talking about Dr. Zhang?

A. No.

Q. When did you first learn about the notice of termination for Dr. Zhang?

18

A. When I was part of this committee.

Q. There was -- I think there was an email from Dr. Grala forwarding the recommendation from Provost Shaw. Is that the time at when you first learned about it?

A. That's when he wants to meet as a committee, yes.

Q. The hearing was first scheduled for February of 2025; is that correct?

A. If I recall, yes. And then it was postponed. For some reason it was -- it did not happen.

Q. Do you know why it was postponed?

A. No.

Q. Were you going to be available for the February hearing had it gone forward?

A. I have to check the timeline that day, like when the committee wants to meet. But overall, if I'm traveling I was available most likely.

Q. Okay. The hearing was next scheduled to begin on June 3, 2025?

A. There was email communications in between, so I don't remember how this thing happened. If asked if I can be present in June and I said yes. I was -- I had travel after that, so I told them I

19

would be available during that time.

Q. Okay. Let me pull this document up. This has been made Exhibit 8 to the depositions. Okay. Do you recognize this? Take a minute and I'm happy to scroll down or enlarge or whatever. But let me know if you recognize this email chain.

A. Okay.

Q. And I'll scroll down here.

A. I think yes. Yes, I'm on the email list. Yes.

Q. Okay. So this is an email -- the first one on the list, which is the bottom email of Exhibit 8, was from Dr. Zhang to several members of the P&T committee and Joanne Lucas also on May 28, 2025. Is that accurate?

A. Can you repeat the question again. I'm reading.

Q. Yeah. So this was a -- the first email was from Dr. Zhang to members of the P&T committee and Joanne Lucas on May 28, 2025.

A. Yeah.

Q. And this was a -- he was discussing and

20

mentioned -- do you see where he mentioned that the hearing was scheduled for June 3rd to June 5th of 2025?

A. Uh-huh (affirmative response).

Q. Okay. And then do you see the next email where Dr. Grala forwarded this email to Joanne Lucas, did not included Dr. Zhang on the next email, but it looks like included everyone else?

A. Okay. Yes.

Q. And it looks like she was asking for -- excuse me -- he was asking for confirmation about when the hearing would take place and when the panel would receive access to all pertinent materials and names of witnesses?

A. Yes.

Q. Okay. So to me it looks like Dr. Grala had not, before May 29th, 2025, received confirmation that the hearing would actually happen on June 3rd. Is that consistent with your recollection?

A. I mean, this is what I remember. This is the email. I've seen it, yes.

Q. Okay. Do you remember learning -- excuse me -- let me ask that in a better way. Do you remember getting confirmation that

21

the hearing was going to happen on June 3rd at any time before Dr. Grala sent this email?

A. I don't recall like anything before that. But I can go back to my emails. But I don't remember anything specific for that.

Q. As we sit here today, you don't --

A. Yeah.

Q. -- you don't have a recollection of anything before that?

A. Yeah.

Q. Did you know Dean Jason Keith before the hearing?

A. Yes.

Q. He was your Dean?

A. He was my Dean, yes.

Q. Not at the time of the hearing however?

A. He left I think before that, yes. Something around that time. I don't exactly remember the date, yes.

Q. Do you know why he left?

A. I don't know -- privy of all information, but I know that he's been -- he's become a provost in one of the schools in Iowa.

Q. He got a promotion.

A. Okay.

22

Q. Provost.

Did you have any personal interactions with Dean Keith like other than through email?

A. Like just like a general communication?

Q. Yeah. Did you have like meetings and in-person interactions with Dean Keith or was your interaction with him limited to like written communications?

A. No, I did have meeting with Dean Keith. He was department head in the school of chemical engineering and then he became a Dean. So occasionally we have meetings, yes.

Q. So he was your department head before he was the Dean?

A. Yes, sir.

Q. Did you have -- were you involved at all -- and maybe the professors aren't involved in this. But were you involved in his appointment from department head to the Dean?

A. No.

Q. Is that something that a professor would ever be involved in?

A. No. So there is a committee and then -- so generally when there is a -- like any promotion happen -- so initially he was like been selected as

23

the interim Dean. And after that, there was a charge happened. And when there is a search committee, generally it constitute the faculty member from the department. But I was not the faculty member on that committee, on that search committee.

Q. And that's what I was thinking about, more of a search committee.

Were you a part of the search committee when he was made department head?

A. No, it was before me.

Q. He was department head before you were in the department?

A. Yeah. He start -- he started before me. So I started 2012, he started I believe some point in time 2011, like fall semester or something like that.

Q. I think you describe your relationship with Dr. Zhang as a colleague. Is that similar to how you would describe your relationship with Dr. Keith?

A. See Dr. Keith was my supervisor as a Dean, so definitely it is little different because he's more supervisor. So I'll say that it is different.

Q. Okay. Did you have a -- would you

24

describe it as a positive relationship? And I'm -- let me, before I get into these questions. I know this is a little bit -- this is a little more sensitive because you have some direct interactions with Dean Keith than I would normally ask just because of your involvement P&T committee, and so I appreciate that.

But did you have a positive relationship with Dean Keith?

A. That's a very subjective word. I probably -- I'm probably not going to answer like a yes or no. We have professional working relationship with Dean Keith.

Q. Okay. Did you ever have any disagreements with Dean Keith?

A. Personally?

Q. Yes.

A. Personally, no. But the thing is that -- you probably heard that we had some policy disagreements. So that I was part of a faculty senate. So those things. We went to the faculty senate on all these things, some policy changes. So this kind of thing happened. But not in a personal -- personal level, no.

Q. Okay. So you had professional

25

disagreements?

A. Yes.

Q. Tell me about the faculty senate policy disagreement. I may have heard about this, but it's been a while.

A. So basically there's a policy change happened. There is a -- and the policy change, when policy change happen about how -- like research grants will be written and then how funding would work out. So he gave us -- there was a policy came out of the college of engineering and we disagreed. So that basically then it's basically went through the process and that end up being in a faculty senate. So that's what -- but that is -- I'm not doing as myself. This is not between me and Dr. Keith. This is nothing to do with that. This is I'm representing college of engineering. And as and a college of engineering representative senators, so we basically represent the faculty. And we went to the faculty senate and asked for resolve on that issue.

Q. Okay. And I understand that this was not like a personal -- there's no personal animosity. Ashlyn and I are on different sides of this case and we represent different parties, but we get along

26

personally, but we have different professional -- so I understand that.

A. Yes.

Q. But what was the specific policy change that was at issue? You said it had to do with research grants?

A. Yeah, research grants. So basically it was the question like if there's any kind of like a federal funding we request, so we have to provide some part of that grant to the department. So it is about how to distribute the money and everything like that.

Q. So can you describe how Dean Keith wanted it distributed? What his position was versus what the department of chemical engineering's position was?

A. No, he's not in department of chemical engineering. Department of chemical engineering is like represent -- like they are -- this is the faculty.

Q. Oh, the faculty senate?

A. These are faculty. It's nothing to do -- it's basically all the faculty in the college of -- most of the faculty in college of engineering that thought that the policy is not helping them. So

27

that's the reason we want to revive, so that's what happened.

Q. So I'm just trying to understand. So it had to do with how the money would be distributed from a federal project --

A. No, it's not distributed. So let me give you a little bit more details.

So basically let's say that you ask hundred dollars for a grant, for national science foundation or anything like that. So if any case like if you request some money it comes to your summer salary. Then previously it was like if you requested the summer salary, it is fine.

The new policy was that if you requested a summer salary you have to provide -- like Dean college of engineering was asking that -- I'm not saying the Dean specifically, because it is college of engineering. College of engineering and the department, they're requesting that some part of summer salary would also come to the department.

Q. And that would be less money for the professor to get as part of their summer salary?

A. If you put it that way, yes.

Q. What was the resolution of that policy disagreement? How was it resolved?

28

A. So it was like -- so we went to the faculty senate and then we explain our case and then ultimately the policy was revoked.

Q. So it stayed as it was before?

A. It stayed as before.

Q. So you were successful in this professional disagreement?

A. Yeah. It is not a personal. It is not a -- it is not a successful or unsuccessful. It is basically we went to the forces, we made our case and then everybody agreed.

Q. Understood. And I'm not says that it was personal. I am completely -- I'm with you on that. I understand what you're saying.

A. Okay. Thank you.

Q. Did you know Isaac Howard before this administrative hearing?

A. Isaac Howard, yes, I know him. He's also a colleague. I may have met him couple of times, something like that, similar like that.

Q. So your relationship with Isaac Howard was more like your relationship with Dr. Zhang?

A. Yes.

Q. Have you had any conversations with David Shaw?

29

A. About what?

Q. Outside of the hearing?

A. About this? No.

Q. No, no. So I've talked to several folks and they have never even spoken with David Shaw. Have you spoken with him at all other than during the administrative hearing?

A. So he's a Provost. So yeah, I have like -- nothing about this thing. Okay. We never talked about anything on this. But I also serve on faculty senate, so I probably met him couple of times, hi and hello.

And also he was -- so before he became a provost he was like our PI for research. So he was the PI for a big grant I was part of. Okay. So in that respect, so he was the PI, so I had -- I had communications with him at that time.

Q. What was that project?

A. That was called -- from the National Science Foundation project. You can look at that as like a center for -- I can tell you all details if you want. I can go back and look at the website. So this is a five-years, multi-million, multi-University project. Okay. About setting up a center on optoelectronics materials. So the

30

universities involved are Mississippi State, University of Southern Mississippi, University of Mississippi, University of Jackson. So all the state universities together, so this is a big competitive grant we wrote. So we -- he was the PI, but he was the main guide for this. Because this happen because it's applied by the university, so the university research head will be the VP research will be the PI. So that's what -- that's what he was. And then yeah, this is the project we worked on Natural Science Foundation, a computer project and we won that.

Q. You did win the project?

A. Yes.

Q. Was that federal funded?

A. It's federal funded.

Q. During that project, was there any requests for congressional support?

A. No.

Q. You looked like you had to think for a minute. Are you sure about that or --

A. No, that's what I'm thinking. Basically at that time we had a 20 percent, like -- 20 percent cost that came from the college department. But I'm trying to think, there is no -- because this is --

31

the way it works, there's no congressional request because it's a Natural Science Foundation project. No.

I was thinking because I told you about cost shared because now it is coming from somewhere, so then I yeah...

Q. Have you ever been part of -- when I say congressional support, I don't just mean congressional funding, like congressional support in like a funding matter. But was there a request for like a letter of support from any congressional person?

A. I don't recall.

Q. So that could be a yes or a no, you don't know about that?

A. I don't know about that.

Q. I understand the word support to mean different things.

Okay. So do you remember the discussion in this matter about the UTC proposal that Dr. Zhang was leading on behalf of Mississippi State?

A. As a part of the committee as far as I can remember.

Q. Right. And that's what I'm asking, you remember hearing about that as part of the

32

committee?

A. Yes, sir.

Q. Okay. And so, Dr. Zhang --

A. (Coughing). Sorry about that. Yeah, go ahead.

Q. Okay. So it sounds like in the proposal you worked on there was actually the head of -- it was a very significant proposal for a lot of federal funding. And so Dr. Shaw as the head of research was actually the lead PI; is that right?

A. That's a -- you're talking about the grant we won?

Q. Yes, the one that you won.

A. Yes. That's the one that he was the main part, he was the PI. He was -- he was leading, but it doesn't mean that he wrote parts -- all of it. Because it's a lot of people work on that. The co-team was there, I was part of the co-team. He was giving us direction, but that's it. I think that everybody together we wrote a big proposal, yes.

Q. So is that typical for really large proposals like that, for the PI to be someone within the research department and not -- I mean within the -- to be the head of research at the University

33

rather than --

A. Yeah.

Q. Yeah, go ahead.

A. No, go ahead, end your question. I'm sorry.

Q. Yeah. I guess what I'm trying to figure out, so Dr. Zhang's proposal for the UTC funding was also a large scale proposal with a bunch of collaborating universities for a significant amount of federal funding. You agree with that?

A. Yes.

Q. And, but Dr. Zhang as the, sort of, subject matter expert at the department level was the lead PI for that, which is not the case on the proposal that you won with Dr. Shaw, correct?

A. So every proposal is different. Because it depends on the funding, it work differently. So the thing on this one, I do not know about the UTC, how it works. Every funding agencies work in a different way. I can only speak about the one that I'm part of. In that particular proposal this is a multi-university, all are state universities. And the way it works is that there is Mississippi Research Council there. They are also getting involved. So all of this together, it's a

34

20-million-dollar proposal, it's a big proposal. So a lot of people involved, lot of folks are involved and Dr. Shaw was the PI.

But we -- my part was in that team was like there was a co-research team, I was part of that to help write the proposal. But I don't know about UTC how that projected worked, what kind of involvement they asked for the individual PI or something like that, but, yeah.

Q. Okay. I understand. All right. Did you -- I'll move on from that. I was trying to see kind of what you knew about it.

A. Okay.

Q. So you knew Dr. Howard. Did you know any of the other witnesses that testified during the administrative hearing?

A. Like in a personal sense?

Q. Outside of -- outside of just the hearing, did you know them personally or professionally?

A. Professionally I know department head, like Dennis Truax. So again, I have seen him. I have even less interaction with him than like with Dr. Zhang or Dr. Howard. So I know that he's there and I have seen him. So that person and then was Dr. Green, Robert Green from college of engineering.

35

He's now Assistant Associate Dean. Yeah, so he was there. So I don't know him personally but we email communicate, we met professionally here and there. So that's what it is.

Q. What about Dr. Julie Jordan?

A. Yeah, Dr. Julie Jordan. Yeah, sorry about that. Yeah. So basically when Dr. Shaw become provost, so Dr. Julie Jordan become VP for research. So she became the PI for the grant that I was talking about.

Q. Okay. So she actually took over as the --

A. She took over that job and at a part of the research team. So we had interactions with her. And beyond that she's a VP, so I have -- I don't think that I have a personal, like a one-to-one meeting with her in that sense. But hi and hello, we've met, like we talk and all those things. Yeah, I -- yeah.

Q. Okay. Sounds good.

What about Teresa Gamble, she didn't testify, but she was on some emails that were presented at the hearing. Do you know Teresa?

A. Teresa Gamble, yes -- (coughing) sorry about that. Teresa Gamble, yes. So Teresa Gamble was also associated with the office of research. So

36

when I started here, so she was like part of the official research. So that's the way I know her. I have been in communications with her at that time.

Q. Okay. Would you -- with regard to, I guess, Dr. Jordon and Dr. Gamble, did you have any negative interactions with either of them stick out, positive interactions with either of them that stick out or was it a relatively neutral working relationship with both of them?

A. It's a professional relationship. I don't think anything I can say positive or negative, yes.

Q. Okay. Great.

I want to talk -- you have known -- you had some more knowledge of the people involved in the hearing than a lot of the other people that sat on the panel. So that took a little bit longer than it did with them, so I appreciate you bearing with me.

I want to talk a little bit about -- we're not going to go into the deep ins and outs of the hearing itself. But I want to ask you kind of about your process in deliberating.

Did you take notes during the hearing? Did you just listen or kind of how did you sort of intake information and go about thinking through how

37

you were going to vote?

A. So my -- the way I work is that I am a very good listener, in my opinion. And then I used, I took some notes. So basically -- and then also the way I ask -- I think that, if you recall, the way it happened like Dr. Grala asked all the questions. But before that, like at a committee that I had co-chair that asked Dr. Grala then we discussed and those questions have been asked.

So I was like asking lot of questions.

Q. You were an active -- so a lot of the questions that Dr. Grala asked were because you were a fairly active participant in coming up with those questions?

A. No, me -- not my -- all questions are not mine. But I was not silent, like a listener. I may have -- all these questions came from the committee. Because there are some cases we have ten questions, maybe some cases I have one, some cases two. There are many cases that questions are everyone asking the same questions. Yeah, but I'm not -- I was not like a passive listener.

Q. I did not -- I perceived that you were listening very well and other members were listening really well, too. It was a group of people that

38

very attentive and we appreciated that.

Okay. So you did take some notes. Do you remember the extent of the notes that you took?

A. No, not too much.

Q. Okay.

A. Not too much.

Q. As we sit here today, can you remember anything you wrote down?

A. Not -- nothing that like stand out, no.

Q. And so, did you -- did you write those notes on separate pages or did you write them on the binder materials that had been provided by Mississippi State?

A. I think that I wrote on like a -- on a piece of paper and also on the -- I don't think I wrote anything on binder. I may have highlighted. I do not -- I'm not exactly sure. But I know that I wrote something on some piece of papers, yes.

Q. And did you deliver those notes and your -- all of your binder materials back to the office or general counsel?

A. Yes, it was instructed.

Q. And you're aware -- have you been made aware that the notes were shredded?

A. I heard that when I met with Ms. Matthews

39

two days ago.

Q. I want to pull up the P&T's recommendation. I think you recently looked at this.

A. Yeah.

Q. Okay. I'm trying to make it a little bit bigger for you. All right. Can you see it?

A. Yes.

Q. This has been marked as Exhibit 18. I'll go down and let you confirm that this is the final version that you signed and approved?

A. Yes.

Q. Okay. All right. So let's go up here. So I want to look at this bold statement first, the first bold statement.

A. Uh-huh (affirmative response).

Q. The first, I guess, dependent clause, grammatically: While the committee has not reached an agreement on each of the particular reasons for termination.

A. Uh-huh (affirmative response).

Q. You agree that there was a professional disagreement between the committee members about the different findings that are in the letter?

A. Yes.

40

Q. And then are those findings the things that are these bullet points here?

A. Yes.

Q. And so, this is sort of what the committee found, but it's not necessarily -- everything in there isn't -- you didn't agree with it exactly; is that accurate?

A. I mean, when we signed the letter we put it together like a yes. So these are what we all agreed on to write.

Q. So you all agreed that it would be written as part of the --

A. Yes.

Q. -- committee's decision, but that doesn't mean that you personally agreed with everything in the bullet points; is that accurate?

A. So it is a letter that's coming from the committee, so we signed that. I am -- and if you look at this one, the way it is written that many cases like the committee did not say that whether it a fault or it is not fault.

So yeah, so basically some we had a disagreement, like which one can be contumacious cause and which is not. But yeah, that was I can say.

41

Q. And you said a word and I was about to ask you about it. You knew what I was going to ask about. It's this word contumacious conduct.

A. Uh-huh (affirmative response).

Q. Was that a significant point of discussion at the hearing -- during the deliberations?

A. Yes.

Q. And so I want to pull up Exhibit 20 to the depositions.

Do you recognize this HRM policy regarding termination of employment?

A. Yes.

Q. And that's something that the committee also looked at --

A. Yes.

Q. -- during deliberations?

A. Yes.

Q. And if we go down here to roman numeral two it says, employees with a contract and there are four different things that are listed out there. Is that a list that the committee considered?

A. Yes.

Q. Okay. And I think the committee focused on -- it didn't -- the financial exigencies as declared by the IHL and then termination or

42

reduction of programs, or academic administrative units as approved by the IHL, those were not relevant to the committee's deliberations here. Would you agree with that?

A. Yes.

Q. So the committee really focused on number three, which was malfeasance and efficiency or contumacious conduct, and them number four, for cause. Do you agree with that?

A. Yes.

Q. And so the word contumacious conduct, what is your understanding of what that means?

A. So that is like a -- I was not very sure. It's much more legal terminology. Right? So my understanding was that like not following the like a order by the superior, not following the procedure, like a standard procedure. And those, in my opinion, can be considered as this cause.

Q. Okay. So I'll go back to Exhibit 18. It says that four panel members voted in favor of the -- well, let's look at the recommendation. The recommendation was that the University had cause to terminate Dr. Zhang due to conduct?

A. Uh-huh (affirmative response).

Q. And you agree that that was the -- that

43

was the majority vote?

A. That was the majority vote, yes.

Q. Okay. And four voted for it, three voted against it, none abstained.

A. Uh-huh (affirmative response).

Q. That's accurate?

A. That's accurate.

Q. And it's my understanding you were one of the three that voted against the recommendation?

A. Do I need to disclose that?

Q. Yeah.

MR. BRAGG: I think -- Ashlyn, he can disclose that, right?

MS. MATTHEWS: Yes, you can disclose it.

A. Yes, my vote was like -- yes -- no -- I'm one of the three votes.

Q. (By Mr. Bragg) One of the three against the recommendation to terminate Dr. Zhang?

A. Yes.

Q. So was there an actual vote on what counts as -- well, let me ask that differently.

Was there an actual vote about whether Dr. Zhang had committed contumacious conduct?

A. If I recall it, I don't think so. I don't recall it clearly.

44

Q. So the vote was more generally whether the University had cause to terminate Dr. Zhang due to conduct?

A. Yes.

Q. And so you would agree that contumacious conduct is a basis for termination under the HRM policy?

A. Uh-huh (affirmative response). Yes.

Q. And so it's my understanding that by voting against the recommendation to terminate Dr. Zhang it would have been your conclusion that he did not commit conduct that rose to the level of contumacious conduct. Is that accurate?

A. That's accurate.

Q. So under bullet point two there's a discussion here about the traffic counts assignment.

A. Yeah.

Q. And the very final sentence says, this willful disregard of instructions from supervisors was a clear case of contumacious conduct. Do you see that?

A. Uh-huh (affirmative response).

Q. And so based on what you just explained, it's my understanding you don't agree with that particular sentence?

45

A. See the thing is that I don't recall exactly the way it happened. Because I had -- my understanding was that, like a -- yeah, let me don't add anything here. Yes. So basically yes, I agree with you.

Q. So you don't -- you agree with me that you don't agree with that one sentence?

A. I would say that I was -- like my point was like we should -- there are -- it can be handled, before it goes to that level, it could be handled in a different way than reach to this level. So my standing was that.

Q. Okay.

A. Not like a -- yeah.

Q. I think you just -- I think you testified that in your opinion, Dr. Zhang did not engage in conduct that rose to the level of contumacious conduct; is that right?

A. I mean, some cases I say that this is very unprofessional.

Q. And I understand that.

A. Yes.

Q. I feel like this is fairly mathematical. I think we looked at the policy and you said that it was your conclusion and your vote that he hadn't

46

engaged in conduct that would lead to the level of contumacious conduct. You testified to that, right?

A. Yes.

Q. And so then this sentence says that he did something that was a clear case of contumacious conduct. And so my question is just, you don't agree with the sentence in bullet point two that says he did do something that was a clear case of contumacious conduct because you didn't believe that he engaged in conduct that rose to the level of contumacious conduct; is that right?

A. Okay, let me put it this way. So my idea is that it's unprofessional. Again, the contumacious conduct is a very legally word. So what is contumacious conduct, what is not? That maybe -- that's the law of court can decide.

My argument was that like I think that's very unprofessional. Some say it's like it could be considered contumacious, it cannot be considered not contumacious. So my idea was that it is not. Okay.

Q. Right.

A. Yeah. So my opinion is it's very unprofessional.

Q. Okay. So you personally didn't believe that the traffic counts assignment issue was a clear

47

case of contumacious conduct?

A. It's borderline, in my opinion.

Q. It's borderline, but you did -- after your deliberations and as you were voting, that was not your conclusion?

A. That was -- that was not my conclusion.

Q. Okay.

A. And I -- again, I don't recall every details of that meeting. That was long ago.

Q. It was a long time ago.

A. Yeah.

Q. I had never heard the word contumacious until --

A. Yes.

MR. BRAGG: Let me -- let me just take a second here and just doublecheck my notes.

Okay. I have no further questions.

MS. MATTHEWS: I don't have any questions.

MR. BRAGG: Thank you, Dr. Kundu.

THE WITNESS: Thank you.

THE REPORTER: Do you need a copy, Ashlyn?

MS. MATTHEWS: Yes.

THE REPORTER: Read and sign?

MS. MATTHEWS: Yes.

48

(End of Deposition.)

SIGNATURE/NOT WAIVED

(Whereupon, the above-entitled deposition was concluded at 9:55 a.m.)

49

CERTIFICATE OF DEPONENT

DEPONENT: Dr. Santanu Kundu
DATE: January 16, 2026
CASE STYLE: Zhang vs. MSU
ORIGINAL TO: Ashlyn Matthews, Esq.

I, the above-named deponent in the deposition taken in the herein styled and numbered cause, certify that I have examined the deposition taken on the date above as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me.

Subject to those corrections listed below, if any, I find the transcript to be the correct testimony I gave at the aforestated time and place.

Page      Line                Comments
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____

This the _____ day of _____, 2026

_____
Dr. Santanu Kundu

State of Mississippi
County of _____

Subscribed and sworn to before me, this the _____ day of _____, 2026.

My Commission Expires:

_____          _____
                                Notary Public

50

CERTIFICATE OF COURT REPORTER

I, Lori W. Busick, Court Reporter and Notary Public, in and for the State of Mississippi, hereby certify that the foregoing contains a true and correct transcript of the testimony of Dr. Santanu Kundu, as taken by me in the aforementioned matter at the time and place heretofore stated, as taken by stenotype and later reduced to typewritten form under my supervision by means of computer-aided transcription.

I further certify that under the authority vested in me by the State of Mississippi that the witness was placed under oath by me to truthfully answer all questions in the matter.

I further certify that, to the best of my knowledge, I am not in the employ of or related to any party in this matter and have no interest, monetary or otherwise, in the final outcome of this matter.

Witness my signature and seal this the 26th day of January, 2026.

Lori W. Busick, CVR-S #7510, CCR #1677
My Commission Expires:
August 22, 2026

**#1677** 23 50:24

**#7510** 23 50:24

**10year** 9:10

**20milliondollar** 34:1

**26th** 50:21

**29th** 20:17

**3rd** 20:2,19 21:1

**5th** 20:2

**able** 7:1

**about** 4:23 5:10 7:16,20,23 8:5,16,18 10:5 13:6,9 16:18 17:16,22,24 18:5 20:11 23:7 25:3,4,8 26:11 29:1,3,9,10,24 30:21 31:4,15,16,20,25 32:4,11 33:18,20 34:7,12 35:5,6,10,20,24 36:19,21,25 39:23 41:1,2,3 43:22 44:16 (53)

**above** 49:5

**aboveentitled** 48:4

**abovenamed** 49:4

**abstained** 43:4

**academic** 42:1

**access** 20:13

**accommodate** 6:9

**accurate** 12:1,2,5 19:17 40:7,16 43:6,7 44:13,14 (10)

**active** 37:11,13

**actual** 43:20,22

**actually** 12:20 13:14 16:4 20:18 32:7,10 35:11 (7)

**add** 45:4

**administrative** 16:6,20 28:17 29:7 34:16 42:1 (6)

**affirmative** 5:14 13:23 16:17 20:4 39:16,21 41:4 42:24 43:5 44:8,22 (11)

**aforementioned** 50:7

**aforestated** 49:8

**after** 9:2,5 10:20,23 13:24 18:25 23:1 47:3 49:6 (9)

**again** 19:18 34:21 46:13 47:8 (4)

**against** 43:4,9,17 44:10 (4)

**agencies** 33:19

**ago** 39:1 47:9,10

**agree** 7:21 33:10 39:22 40:6 42:4,9,25 44:5,24 45:4,6,7 46:7 (13)

**agreed** 28:11 40:10,11,15 (4)

**agreement** 7:2 39:19

**ahead** 32:5 33:3,4

**allow** 5:22

**alluding** 10:7

**along** 25:25

**alongside** 16:9

**also** 9:5,15 12:17 19:16 27:20 28:18 29:10,13 33:8,24 35:25 37:4 38:15 41:14 (14)

**am** 18 28:13 37:2 40:18 48:5 50:16 (6)

**amatthews@winfieldlawfirm com** 2:10

**american** 13:12

**amherst** 9:5

**amount** 33:9

**animosity** 25:23

**another** 10:3

**answer** 5:24,25 16:9 24:11 50:14 (5)

**anyone** 6:18

**anything** 11:15 17:18 21:3,5,9 27:10 29:10 36:11 38:8,16 45:4 (11)

**anything's** 12:5

**appeal** 15:25

**appearances** 2:1

**appearances1** 3:2

**applied** 14:6 30:7

**appointed** 14:22

**appointment** 14:1,25 22:18

**appreciate** 6:11 7:3 9:19 13:16 24:7 36:17 (6)

**appreciated** 38:1

**approve** 14:20

**approved** 39:11 42:2

**are** 7:14 11:18,19 12:20 25:24 26:19,22 30:1,21 33:22,24 34:2 37:15,18,20,20 39:24 40:1,2,9 41:19,20 45:9 (23)

**area** 10:5

**aren't** 22:17

**argument** 46:17

**around** 21:18

**ashlyn** 2:7 8:3,5 25:24 43:12 47:21 49:3 (7)

**asian** 13:2,3,4

**ask** 5:2 6:13,14,18,25 15:2 20:24 24:5 27:8 36:21 37:5 41:1,2 43:21 (14)

**asked** 11:20 18:24 25:20 34:8 37:6,8,9,12 (8)

**asking** 12:10 20:10,11 27:16 31:24 37:10,20 (7)

**assignment** 44:16 46:25

**assistant** 9:13 13:22 14:4 35:1 (4)

**associate** 9:14 14:5,6,9 35:1 (5)

**associated** 35:25

**assume** 6:19

**assure** 12:11

**attentive** 38:1

**august** 14:16 50:25

**aunt** 11:4

**authority** 50:11

**available** 18:15,19 19:1

**avenue** 2:3

**aware** 38:23,24

**b** 2:7

**back** 7:1 13:17 15:2,5 21:4 29:22 38:20 42:19 (8)

**background** 8:17

**based** 44:23

**basically** 25:6,12,12,19

26:7,23 27:8 28:10 30:22 35:7 37:4 40:22 45:4 (13)

**basis** 44:6

**bearing** 36:17

**became** 22:11 29:13 35:9

**because** 6:4,17,23 16:15 23:23 24:4,6 27:17 30:6,7,25 31:2,4,5 32:17 33:16 37:12,18 45:2 46:9 (20)

**become** 14:5,6,8 21:22 35:7,8 (6)

**before** 4:20 5:19,23,23,25 6:24 7:7 8:3,14 15:24 16:13,20 20:17 21:2,3,9,11,17 22:13 23:11,12,14 24:2 28:4,5,16 29:13 37:7 45:10 49:21 (30)

**begin** 18:21

**beginning** 18

**behalf** 31:21

**being** 15:12 25:13

**believe** 14:11 23:15 46:9,24 (4)

**below** 49:7

**best** 5:3,22,24 50:15 (4)

**better** 5:7,10,11 20:24 (4)

**between** 10:16 18:22 25:15 39:23 (4)

**beyond** 35:14

**big** 9:22 17:19 29:15 30:4 32:20 34:1 (6)

**bigger** 39:7

**binder** 38:12,16,20

**bit** 4:23 5:16 8:16 13:18 24:3

27:7 36:16,19 39:6 (9)

**board** 8

**bold** 39:14,15

**borderline** 47:2,3

**born** 8:22,23

**both** 16:15 36:9

**bottom** 19:14

**box** 2:80281

**bragg** 2:2 4:5 43:12,17 47:15,19 (6)

**bragg4** 3:7

**bragglaw** 2:2

**break** 6:7,8

**breckan** 15:25

**briefly** 8:13

**bullet** 40:2,16 44:15 46:7 (4)

**bunch** 33:8

**busick** 23 50:2,24

**call** 4:13

**called** 29:19

**came** 8:24 25:10 30:24 37:17 (4)

**can** 5:3,22 6:5,15 7:21 9:22,25 11:10,17 12:6,15,15 14:13 15:2,3 18:24 19:18 21:4 26:13 29:20,21,22 31:22 33:20 36:11 38:7 39:7 40:23,24 42:18 43:12,14 45:9 46:16 (34)

**cannot** 11:7 46:19

**carolina** 9:2

**case** 25:24 27:10 28:2,10 33:14 44:20 46:5,8 47:1 49:3 (10)

**cases** 37:18,19,19,20 40:20 45:19 (6)

**catching** 5:11

**cause** 6 40:24 42:9,18,22 44:2 49:5 (7)

**ccr** 23 50:24

**center** 29:21,25

**certificate** 3:3,4 49:1 50:1 (4)

**certify** 49:5 50:4,11,15 (4)

**chain** 19:8

**chair** 15:7

**change** 25:6,7,8 26:4 (4)

**changes** 24:22

**charge** 23:2

**check** 14:13 18:17

**checking** 7:9

**chemical** 9:10,17 10:24 11:5 22:10 26:15,17,18 (8)

**chronological** 9:18

**circuit** 1

**citizen** 13:13

**clarify** 6:14,18,25

**clause** 39:17

**clear** 44:20 46:5,8,25 (4)

**clearly** 43:25

**clemson** 9:1 10:10,11,13 (4)

**cochair** 37:8

**collaborating** 33:9

**collaborative** 17:6

**colleague** 16:14,21 23:19 28:19 (4)

**college** 15:7 16:16 17:16,19 25:11,17,18 26:23,24 27:16,17,18 30:24 34:25 (14)

**come** 11:2 27:20

**comes** 27:11

**coming** 31:5 37:13 40:17

**comments** 49:9

**commission** 49:23 50:24

**commit** 44:12

**committed** 43:23

**committee** 7:12,17,22,23,24 10:4 14:23 15:7,9,13,19,20,21 16:10 18:1,7,18 19:16,22 22:23 23:3,5,6,8,9 24:6 31:22 32:1 37:7,17 39:18,23 40:4,18,20 41:13,21,23 42:6 (39)

**committee's** 40:14 42:3

**committees** 7:15

**communicate** 35:3

**communication** 22:4

**communications** 18:22 22:8 29:17 36:3 (4)

**competitive** 30:5

**complete** 5:20

**completely** 28:13

**complicated** 12:20

**computer** 30:11

**computeraided** 50:10

**concluded** 48:5

**conclusion** 44:11 45:25 47:5,6 (4)

**conduct** 41:3 42:8,11,23 43:23 44:3,6,12,13,20 45:17,18 46:1,2,6,9,10,11,14,15 47:1 (21)

**confirm** 39:10

**confirmation** 20:11,18,25

**congressional** 30:18 31:1,8,9,9,11 (6)

**consider** 12:13

**considered** 15:10 41:21 42:18 46:19,19 (5)

**consistent** 20:19

**constitute** 23:3

**construct** 12:21

**contain** 49:6

**contains** 50:4

**contract** 41:19

**contumacious** 40:23 41:3 42:8,11 43:23 44:5,13,20 45:17 46:2,5,9,11,14,15,19,20 47:1,12 (19)

**conversation** 5:18

**conversations** 28:24

**conveying** 5:19

**copy** 47:21

**coresearch** 34:5

**correct** 4:16,16 5:9 12:8 17:9 18:9 33:15 49:8 50:5 (9)

**corrections** 49:7

**correctly** 4:11

**correctness** 49:5

**cost** 30:24 31:5

**coteam** 32:18,18

**coughing** 32:4 35:23

**could** 31:14 45:10 46:18

**council** 33:24

**counsel** 2:5,11 38:21

**country** 13:6

**counts** 43:20 44:16 46:25

**county** 1 49:20

**couple** 28:19 29:11

**court** 1 3:4 46:16 50:1,2 (5)

**cover** 4:24

**created** 12:22

**cv** 14:10,14

**cvrs** 23 50:24

**date** 21:19 49:5

**david** 28:24 29:5

**day** 10:8 18:17 49:17,2026 50:21 (5)

**days** 39:1

**dean** 21:11,14,15 22:3,6,9,11,14,19 23:1,22 24:5,9,13,15 26:13 27:15,17 35:1 (19)

**december** 9:9 10:17

**decide** 46:16

**decision** 40:14

**declared** 41:25

**deep** 36:20

**defendant** 2:11

**defendants** 9,17

**definitely** 23:23

**deliberating** 36:22

**deliberations** 41:6,16 42:3 47:4 (4)

**deliver** 38:19

**dennis** 34:21

**department** 7:15,21 9:11,17 11:5 17:20 22:10,13,19 23:4,10,12,13 26:10,15,17,18 27:19,20 30:24 32:24 33:13 34:20 (23)

**dependent** 39:17

**depends** 33:17

**deponent** 49:1,2,4

**deponent49** 3:3

**deposition** 13 4:19 5:21 7:5,8 8:4,6 48:1,4 49:4,5 (11)

**depositions** 11:11 19:4 41:9

**describe** 13:10 16:19 23:18,20 24:1 26:13 (6)

**details** 27:7 29:21 47:9

**didn't** 5:15 6:24,25 35:20 40:6 41:24 46:9,24 (8)

**different** 8:20 17:8,19

23:23,24 25:24,25 26:1 31:18 33:16,20 39:24 41:20 45:11 (14)

**differently** 33:17 43:21

**direct** 24:4

**direction** 32:19

**directly** 11:7

**disagreed** 25:11

**disagreement** 25:4 27:25 28:7 39:23 40:23 (5)

**disagreements** 24:14,20 25:1

**disclose** 43:10,13,14

**discussed** 37:9

**discussing** 19:25

**discussion** 31:19 41:5 44:16

**disregard** 44:19

**distribute** 26:11

**distributed** 26:14 27:4,6

**district** 1

**document** 11:9,14 19:2

**documents** 8:9

**does** 5:7 6:1

**doesn't** 32:16 40:14

**doing** 25:15

**dollars** 27:9

**doublecheck** 47:16

**down** 11:23 19:6,10 38:8 39:10 41:18 (6)

**dr** 13 4:1,13 7:10,25 14:19

5

16:5,10,13,20,25
17:3,5,16,17,22,25 18:3
19:15,22 20:6,7,16 21:2
23:19,21,22 25:16 28:22 31:20
32:3,9 33:7,12,15
34:3,14,23,23,25 35:5,6,7,8
36:5,5 37:6,8,12 42:23
43:18,23 44:2,11 45:16 47:19
49:2,18 50:6 (59)

**due** 42:23 44:2

**duly** 4:2

**during** 8:9 19:1 29:6 30:17
34:15 36:23 41:6,16 (8)

**e** 2:2

**each** 39:19

**east** 2:8

**efficiency** 42:7

**effort** 17:6

**either** 36:6,7

**elected** 15:7

**election** 14:24 15:6

**else** 20:8

**email** 18:2,22
19:8,11,13,14,21 20:5,6,7,22
21:2 22:3 35:2 (14)

**emails** 21:4 35:21

**employ** 50:16

**employees** 41:19

**employment** 41:11

**end** 15:15 25:13 33:4 48:1 (4)

**engage** 45:16

**engaged** 46:1,10

**engineering** 9:11 11:5 14:3
15:8 16:16 17:9,16 22:11
25:11,17,18 26:18,18,24
27:16,18,18 34:25 (18)

**engineering's** 26:15

**engineers** 10:25

**english** 10:1

**enlarge** 19:6

**especially** 6:4

**esq** 2:2,7 49:3

**ethnicity** 12:20 13:10,10

**even** 29:5 34:22

**ever** 4:19 16:9,24
17:2,5,15,21 22:22 24:14 31:7
(10)

**every** 8:17 33:16,19 47:8 (4)

**everybody** 4:25 28:11 32:20

**everyone** 20:8 37:20

**everything** 26:11 40:5,15

**exactly** 15:1,5 21:18 38:17
40:6 45:2 (6)

**examination** 3:7 4:5

**examinations** 3:6

**examined** 4:2 49:5

**excuse** 20:11,23

**exhibit** 11:11 19:3,15 39:9
41:8 42:19 (6)

**exigencies** 41:24

**expert** 33:13

**expires** 49:23 50:24

**explain** 28:2

**explained** 44:23

**extent** 38:3

**facsimile** 2:10

**faculty** 15:18,22 23:3,5
24:20,21 25:3,13,19,20
26:20,21,22,23,24 28:2 29:10
(17)

**fair** 6:15,16,20

**fairly** 37:13 45:23

**fall** 23:16

**far** 31:22

**fault** 40:21,21

**favor** 5:25 42:20

**february** 18:9,16

**federal** 9:7 26:9 27:5
30:15,16 32:8 33:10 (7)

**feel** 4:16 45:23

**few** 4:24 9:21

**fields** 17:8

**figure** 33:6

**filled** 11:20

**filling** 12:13

**final** 39:10 44:18 50:18

**financial** 41:24

**find** 49:6,8

**findings** 39:24 40:1

**fine** 6:2 14:15 27:13

**finish** 5:22,23,25 10:13 (4)

**finished** 5:20

**firm** 2:7

**first** 1 4:2 10:20 17:24 18:4,8 19:13,21 39:14,15,17 (11)

**fished** 9:9

**fiveyears** 29:23

**focused** 41:23 42:6

**folks** 29:4 34:2

**following** 42:15,16

**follows** 4:3

**followup** 13:20

**followups** 9:21

**forces** 28:10

**foregoing** 50:4

**form** 50:9

**forward** 18:16

**forwarded** 20:6

**forwarding** 18:3

**found** 40:5

**foundation** 27:10 29:20 30:11 31:2 (4)

**four** 41:20 42:8,20 43:3 (4)

**free** 4:16

**friday** 16

**front** 14:10

**full** 4:6,8 9:15,16 14:16,20 49:6 (7)

**funded** 30:15,16

**funding** 25:9 26:9 31:9,10 32:9 33:7,10,17,19 (9)

**further** 17:13 47:17 50:11,15 (4)

**gaithersburg** 9:7

**gamble** 35:20,23,24,24 36:5 (5)

**gave** 25:10 49:8

**general** 9:22 16:19 22:4 38:21 (4)

**generally** 22:24 23:3 44:1

**get** 4:15 6:23 7:2 8:16 14:1,22 24:2 25:25 27:22 (9)

**getting** 14:3,4 20:25 33:24 (4)

**ginger** 10:25

**give** 9:22 12:16 27:6

**given** 4:19 49:7

**giving** 32:19

**go** 4:17,24 7:1 14:13 15:2 17:13 21:4 29:22 32:4 33:3,4 36:20,25 39:10,13 41:18 42:19 (17)

**goes** 45:10

**going** 4:23 11:9,23 18:15 21:1 24:11 36:20 37:1 41:2 (9)

**gone** 18:16

**good** 6:3,22 35:19 37:3 (4)

**got** 5:11 21:24

**graduate** 8:24 10:17

**graduated** 11:4

**grafton** 2:2 10:25,25

**grafton@graftonbragglawco m** 2:4

**grala** 7:10 18:3 20:6,16 21:2 37:6,8,12 (8)

**grammatically** 39:18

**grant** 26:10 27:9 29:15 30:5 32:11 35:9 (6)

**grants** 25:9 26:6,7

**great** 36:12

**green** 34:25,25

**grew** 8:23

**group** 37:25

**grow** 8:21

**guess** 8:21 12:18 33:6 36:5 39:17 (5)

**guide** 30:6

**hadn't** 45:25

**handled** 45:10,11

**happen** 18:12 20:18 21:1 22:25 25:8 30:7 (6)

**happened** 15:14 18:23 23:2 24:23 25:7 27:2 37:6 45:2 (8)

**happy** 6:9 19:6

**has** 11:10 12:22 19:3 39:9,18 (5)

**having** 4:2

**he** 16:10 17:11,12,12 18:6 19:25 20:1,11 21:14,15,17,20,24 22:10,11,13,13,25 23:10,12,14,14,15 25:10 29:13,13,14,14,16 30:5,6,9 32:14,15,15,15,16,18 35:1 43:12 44:11 45:25 46:4,8,10

(45)

**he's** 16:14,21,22 21:22,22 23:23 26:17 28:18 29:8 34:23 35:1 (11)

**head** 5:8 22:10,13,19 23:10,12 30:8 32:7,9,25 34:20 (11)

**hear** 17:15,21

**heard** 7:25 17:18 24:19 25:4 38:25 47:12 (6)

**hearing** 7:25 16:6,20 18:8,16,20 20:2,12,18 21:1,12,16 28:17 29:2,7 31:25 34:16,18 35:22 36:15,21,23 41:6 (23)

**hello** 29:12 35:16

**help** 34:6

**helping** 26:25

**her** 8:7 35:13,16 36:2,3 (5)

**here** 6:9 7:5 8:25 9:13 14:1 16:22 19:10 21:6 35:3 36:1 38:7 39:13 40:2 41:18 42:3 44:16 45:4 47:16 (18)

**hereby** 50:4

**herein** 49:4

**heretofore** 50:8

**hi** 29:11 35:16

**higher** 9

**highlighted** 38:16

**him** 16:22,23 22:7 28:18,19 29:6,11,17 34:21,22,24 35:2 (12)

**hinds** 1

**his** 10:7 22:18 26:14

**how** 8:7 13:10 14:22 18:23 23:20 25:8,9 26:11,13 27:4,25 33:19 34:7 36:24,25 (15)

**howard** 28:16,18,21 34:14,23 (5)

**however** 21:16

**hrm** 41:10 44:6

**hundred** 15:14 27:9

**i'd** 13:2

**i'll** 4:13 5:9,24 6:16 11:9,18 19:10 23:24 34:11 39:9 42:19 (11)

**i'm** 4:22,23 5:8,10 6:9 9:12,16,24 11:9,23 12:10 13:13 15:13,18 18:19 19:6,11,18 24:1,11 25:14,17 27:3,16 28:12,13 30:22,24 31:24 33:4,6,21 37:21 38:17 39:6 43:15 (36)

**i've** 5:11,15 6:23 11:12 20:22 29:4 (6)

**idea** 46:12,20

**ideas** 12:19

**ihl** 41:25 42:2

**included** 20:7,8

**index** 3:1

**india** 8:23,23 9:21,23 13:7 (5)

**indian** 13:12

**indicates** 5:14

**individual** 34:8

**information** 12:1,2 21:21 36:25 (4)

**initially** 9:13 22:25

**inperson** 22:6

**ins** 36:20

**instance** 17

**institute** 9:6

**institutions** 9

**instructed** 38:22

**instructions** 44:19

**instructor** 15:25

**intake** 36:25

**interaction** 17:1 22:7 34:22

**interactions** 16:25 17:3 22:2,6 24:4 35:13 36:6,7 (8)

**interest** 50:17

**interim** 23:1

**interrogatories** 11:20

**into** 24:2 36:20

**involved** 16:1 22:16,17,18,22 30:1 33:25 34:2,2 36:14 (10)

**involvement** 24:6 34:8

**iowa** 21:23

**is** 5:2,17,19,20 6:15,17,20 7:16,17 8:12 9:3,4,21,25 10:5,7 11:18 12:1,10,12,22,25 13:7,9 14:3,17 15:4,6,14 18:4,9 19:13,14,17 20:19,21,21 22:21,23,24 23:2,19,23,24 24:3,3,18 25:7,14,15,16,17 26:10,18,19,25 27:13,17 28:8,8,9,9 29:23 30:4,10,25,25 31:5 32:10,22 33:14,16,21,23,23 35:4 37:2 39:10 40:4,6,16,17,19,21,24 41:20 42:12,13 44:6,13 45:1,18,19,23 46:6,11,13,14,15,15,20,22

(102)

**isaac** 28:16,18,21

**isn't** 40:6

**issue** 25:21 26:5 46:25

**issues** 15:10

**itself** 36:21

**jackson** 30:3

**january** 16 9:12 49:16 50:21 (4)

**jason** 21:11

**jeremy** 10:25

**joanne** 19:16,22 20:6

**job** 6:3 10:20 35:12

**jordan** 35:5,6,8

**jordon** 36:5

**judicial** 1

**julie** 35:5,6,8

**jump** 5:18,23,25

**june** 7:25 18:21,24 20:2,2,19 21:1 (7)

**just** 4:23 5:4 6:3,22 7:9 8:7,14,16 10:24 11:7,25 12:5,6 13:18 16:18 22:4 24:5 27:3 31:8 34:18 36:24 44:23 45:15 46:6 47:15,16 (26)

**keith** 21:11 22:3,6,9 23:21,22 24:5,9,13,15 25:16 26:13 (12)

**kind** 17:12 24:23 26:8 34:7,12 36:21,24 (7)

**knew** 17:11,12,12 34:12,14 41:2 (6)

**know** 4:22 5:9 6:7,13 7:14 8:4,7,17 10:5,6,24 11:2 12:6,19 13:14 16:8,13,21,23 18:13 19:7 21:11,20,21,22 24:2 28:16,18 31:15,16 33:18 34:6,14,19,20,23 35:2,22 36:2 38:17 (40)

**knowledge** 36:14 50:16

**known** 36:13

**kolkata** 9:24 10:2

**kundu** 13 4:1,8,9,10,11,13,13,14 47:19 49:2,18 50:6 (13)

**lab** 9:8

**large** 32:22 33:8

**later** 6:19 50:8

**law** 2:7 46:16

**lead** 32:10 33:14 46:1

**leading** 31:21 32:15

**learn** 17:24

**learned** 5:15 18:5

**learning** 9 20:23

**least** 15:21

**left** 21:17,20

**legal** 42:14

**legally** 46:14

**less** 27:21 34:22

**let** 5:9,25 6:7,13 12:5 19:2,7 20:24 24:2 27:6 39:10 43:21 45:3 46:12 47:15,15 (16)

**let's** 27:8 39:13 42:21

**letter** 7:9 8:13 31:11 39:24

40:8,17 (6)

**level** 7:15 24:24 33:13 44:12 45:10,11,17 46:1,10 (9)

**li** 4

**like** 4:24 5:15 6:3 12:13 13:2 14:3 16:19 17:12 18:18 20:8,10,16 21:3 22:3,4,4,5,7,24,25 23:16,16 24:11 25:8,23 26:8,8,12,19,19 27:10,11,12,15 28:1,20,20,22 29:8,14,21 30:20,23 31:9,10,11 32:6,23 34:5,9,17,21,22 35:15,17 36:1 37:6,7,10,16,22 38:9,14 40:9,20,23 42:13,15,15,17 43:15 45:3,8,9,14,23 46:17,18 (78)

**likely** 18:19

**limited** 22:7

**line** 49:9

**list** 19:11,14 41:21

**listed** 41:20 49:7

**listen** 36:24

**listener** 37:3,16,22

**listening** 37:24,24

**little** 4:22,23 5:16 8:16 13:18 23:23 24:3,3 27:7 36:16,19 39:6 (12)

**lived** 9:23 10:4

**long** 6:9 47:9,10

**longer** 36:16

**look** 29:20,22 39:14 40:19 42:21 (5)

**looked** 8:12,13 15:20 30:20 39:3 41:14 45:24 (7)

**looking** 5:12

**looks** 12:8 20:8,10,16 (4)

**lori** 23 50:2,24

**lot** 5:17 17:13 32:8,17 34:2,2 36:15 37:10,11 (9)

**loud** 12:7

**lucas** 19:16,23 20:7

**made** 19:3 23:10 28:10 38:23 (4)

**madison** 2:3

**main** 2:8 30:6 32:14

**majority** 43:1,2

**make** 4:15,25 6:15 12:1 13:15 39:6 (6)

**makes** 6:21

**malfeasance** 42:7

**man** 5:15

**many** 37:20 40:19

**mark** 12:25

**marked** 11:11 39:9

**maryland** 9:7

**massachusetts** 9:4

**massachusettsamherst** 9:4

**materials** 7:7 20:13 29:25 38:12,20 (5)

**mathematical** 45:23

**matter** 15:9 16:1,4 31:10,20 33:13 50:7,14,17,19 (10)

**matters** 16:3

**matthews** 2:7 38:25 43:14 47:18,22,24 49:3 (7)

**may** 7:20 8:3 11:6 19:16,23 20:17 25:4 28:19 37:16 38:16 (10)

**maybe** 8:20 15:5 22:17 37:19 46:16 (5)

**me** 4:16 5:9,22 6:2,7,13,14,18 9:22 10:7,24 12:5 14:11,13 15:2 16:18 19:2,7 20:11,16,24,24 23:11,14 24:2 25:3,15 27:6 36:18 37:15 43:21 45:3,6 46:12 47:15,15 49:7,21 50:6,12,13 (41)

**mean** 13:11 20:21 31:8,17 32:16,24 40:8,15 45:19 (9)

**means** 42:12 50:10

**meet** 8:5 18:6,18

**meeting** 8:1,10,14 22:9 35:16 47:9 (6)

**meetings** 22:5,12

**member** 10:3 15:22 23:4,5 (4)

**members** 19:15,22 37:24 39:23 42:20 (5)

**memory** 14:17

**mentioned** 20:1,1

**mess** 4:17

**met** 8:7 28:19 29:11 35:3,17 38:25 (6)

**mine** 37:16

**minute** 19:6 30:21

**missing** 5:8

**mississippi** 1,8,8 2:39110,9 9:11,17 10:21 11:3,21 30:1,2,3 31:21 33:23 38:13 49:19 50:3,12 (19)

**mistakes** 5:16

**monetary** 50:18

**money** 26:11 27:4,11,21 (4)

**more** 8:20 23:7,24 24:3 27:7 28:22 36:14 42:14 44:1 (9)

**most** 18:19 26:24

**move** 34:11

**ms** 38:25 43:14 47:18,22,24 (5)

**msu** 49:3

**much** 38:4,6 42:14

**multimillion** 29:23

**multiuniversity** 29:24 33:22

**my** 4:8 5:8,16,22,24 6:1 8:24 9:1,10,14 10:23 11:3,10 12:21 14:10,14,17 15:4 21:4,15 23:22 34:4 37:2,3,15 42:14,17 43:8,15 44:9,24 45:2,8,12 46:6,12,17,20,22 47:2,6,16 49:23 50:9,15,20,24 (47)

**myself** 5:9 25:15

**name** 4:6,8 10:7 12:3 (4)

**names** 20:14

**national** 9:6 27:9 29:19

**natural** 30:11 31:2

**nearly** 13:14

**necessarily** 40:5

**need** 6:7,8 8:4 13:17 43:10 47:21 (6)

**negative** 16:24 17:1 36:6,11 (4)

**neutral** 36:8

**never** 29:5,9 47:12

**new** 27:14

**next** 13:24 14:2 18:20 20:5,7 (5)

**nist** 9:7

**no** 6 4:21 5:4 7:1,1 16:2,11 17:1,4,7,14,18,23 18:14 22:9,20,23 23:11 24:12,18,24 25:23 26:17 27:6 29:3,4,4 30:19,22,25 31:1,3,14 33:4 37:15 38:4,9 43:15 47:17 50:17 (40)

**nod** 5:4,8,14

**none** 43:4

**normal** 5:21

**normally** 24:5

**notary** 49:24 50:3

**notes** 36:23 37:4 38:2,3,11,19,24 47:16 (8)

**nothing** 7:6 25:16 26:22 29:9 38:9 (5)

**notice** 17:24

**now** 11:17 31:5 35:1

**number** 42:6,8

**numbered** 49:4

**numeral** 41:18

**oath** 50:13

**occasionally** 22:12

**occurred** 10:24

**office** 2:80281 35:25 38:21

**official** 36:2

**oh** 5:15 26:21

**one** 5:2 6:5 7:16 9:3 15:6 19:14 21:23 32:13,14 33:18,20 37:19 40:19,23 43:8,16,17 45:7 (18)

**onetoone** 35:15

**only** 6:5 8:12 16:3 33:20 (4)

**open** 14:14

**opinion** 37:3 42:18 45:16 46:22 47:2 (5)

**options** 12:16

**optoelectronics** 29:25

**order** 42:16

**origin** 13:6

**original** 49:3

**other** 5:17,19 10:8 17:6,15 22:3 29:6 34:15 36:15 37:24 (10)

**otherwise** 50:18

**our** 28:2,10 29:14

**out** 11:20 12:7,14 25:10,11 33:7 36:6,8 38:9 41:20 (10)

**outcome** 50:18

**outs** 36:20

**outside** 29:2 34:18,18

**over** 4:24 35:11,12

**overall** 18:18

**p&t** 7:23,24 8:13 10:4 14:22 15:9,21 16:10 19:16,22 24:6 (11)

**p&t's** 39:2

**pa** 2:7

**page** 4:25 11:23 49:9

**pages** 38:11 49:6

**panel** 20:12 36:16 42:20

**paper** 38:15

**papers** 38:18

**parenthesis** 5:13

**part** 15:3,18,19 18:1 23:9 24:20 26:10 27:19,22 29:15 31:7,22,25 32:15,18 33:21 34:4,5 35:12 36:1 40:12 (21)

**participant** 37:13

**participated** 16:4

**particular** 33:21 39:19 44:25

**parties** 25:25

**parts** 32:16

**party** 50:17

**passive** 37:22

**people** 17:15 32:17 34:2 36:14,15 37:25 (6)

**perceived** 37:23

**percent** 15:14 30:23,23

**perfectly** 6:21

**person** 5:19 6:5 31:12 34:24 (4)

**personal** 22:2 24:24,24 25:23,23 28:8,13 34:17 35:15 (9)

**personally** 24:16,18 26:1 34:19 35:2 40:15 46:24 (7)

**pertinent** 20:13

**phd** 8:25 9:1

**pi** 29:14,15,16 30:5,9 32:10,15,23 33:14 34:3,8 35:9 (12)

**piece** 38:15,18

**place** 9:22 20:12 49:8 50:7 (4)

**placed** 50:13

**plaintiff** 4 2:5

**please** 4:6 5:9 9:25 12:15,16 (5)

**pllc** 2:2

**point** 11:1,7 13:12 23:15 41:5 44:15 45:8 46:7 (8)

**points** 40:2,16

**policy** 24:19,22 25:3,6,7,8,10 26:4,25 27:14,24 28:3 41:10 44:7 45:24 (15)

**position** 14:2,3 26:14,15 (4)

**positions** 9:10

**positive** 17:2 24:1,8 36:7,11 (5)

**postdoc** 9:5,9

**postdocs** 10:23

**postdoctoral** 9:3 10:15

**postdoctorate** 10:21

**postponed** 18:11,13

**preparation** 8:5

**prepare** 7:4

**prepared** 7:10

**present** 17:17 18:24

**presented** 35:22

**presently** 9:16

**previously** 27:12

**privy** 21:21

**probably** 24:11,11,19 29:11 (4)

**procedure** 42:16,17

**process** 4:23 8:8 15:20 25:13 36:22 (5)

**professional** 24:12,25 26:1 28:7 36:10 39:22 (6)

**professionally** 34:19,20 35:3

**professor** 9:13,15,16 13:22 14:4,5,7,9,16,20 15:10 16:5 22:21 27:22 (14)

**professors** 22:17

**programs** 42:1

**project** 17:6 27:5 29:18,20,24 30:10,11,13,17 31:2 (10)

**projected** 34:7

**promoted** 9:15 14:15

**promotion** 7:12,15,17,22,24 9:14 14:5,20 21:24 22:24 (10)

**pronunciation** 4:16

**proposal** 31:20 32:6,8,20 33:7,8,15,16,21 34:1,1,6 (12)

**proposals** 32:23

**provide** 26:9 27:15

**provided** 38:12

**provost** 14:18 18:4 21:22 22:1 29:8,14 35:8 (7)

**public** 49:24 50:3

**pull** 11:9 19:2 39:2 41:8 (4)

**purpose** 8:1 12:12

**purposes** 5:6,21

**put** 13:2,2 27:23 40:8 46:12 (5)

**qualified** 15:12

**question** 5:3,22 6:1,12,20 12:11,16,18 13:15 19:18 26:8 33:4 46:6 (13)

**questionnaire** 12:14,24 13:1

**questionnaires** 12:23 13:15

**questions** 11:19 12:20 24:2 37:7,9,10,12,14,15,17,18,20,21 47:17,18 50:14 (16)

**race** 12:13,19,25

**raises** 12:21

**rather** 33:1

**reach** 45:11

**reached** 39:18

**read** 12:7 47:23

**reading** 19:19 49:6

**reads** 6:18

**really** 12:20 32:22 37:25 42:6 (4)

**reason** 6:17 18:11 27:1

**reasons** 39:19

**recall** 11:1 15:1,5 18:10 21:3 31:13 37:5 43:24,25 45:1 47:8 (11)

**receive** 20:13

**received** 9:14 20:17

**recently** 9:15 39:3

**recognize** 19:5,7 41:10

**recollection** 20:20 21:8

**recommendation** 7:11 8:13 18:3 39:3 42:21,22 43:9,18 44:10 (9)

**recommended** 15:21

**record** 4:7 6:5,23 7:2 (4)

**recruiting** 11:3

**reduced** 50:9

**reduction** 42:1

**regard** 36:4

**regarding** 41:10

**region** 9:23

**related** 50:16

**relationship** 16:19 23:18,20 24:1,8,13 28:21,22 36:9,10 (10)

**relatively** 36:8

**relevant** 42:3

**remember** 15:3,6 16:11 18:23 20:21,23,25 21:5,19 31:19,23,25 38:3,7 (14)

**repeat** 12:15 19:18

**reported** 22

**reporter** 47:21,23 50:1,2 (4)

**reporter50** 3:4

**represent** 11:18 25:19,25 26:19 (4)

**representative** 25:18

**representing** 25:17

**request** 26:9 27:11 31:1,10 (4)

**requested** 27:13,14

**requesting** 27:19

**requests** 30:18

**research** 9:3 17:6 25:8 26:6,7 29:14 30:8,8 32:9,24,25 33:24 35:8,13,25 36:2 (16)

**resolution** 27:24

**resolve** 25:21

**resolved** 27:25

**respect** 29:16

**respond** 5:3 15:3

**response** 13:23 16:17 20:4 39:16,21 41:4 42:24 43:5 44:8,22 (10)

**responses** 11:19

**result** 15:11

**return** 5:24

**review** 7:7 8:9 11:25 12:6 (4)

**reviewing** 5:12

**revive** 27:1

**revoked** 28:3

**right** 7:18 10:5 14:17 31:24 32:10 34:10 39:7,13 42:14 43:13 45:18 46:2,11,21 (14)

**robert** 34:25

**roman** 41:18

**rose** 44:12 45:17 46:10

**rush** 15:25

**said** 6:24 12:24 18:24 26:5 41:1 45:24 49:6 (7)

**salary** 27:12,13,15,20,22 (5)

**same** 4:25 16:15 37:21

**santanu** 13 4:1,8,9,10,10,11 49:2,18 50:6 (10)

**sat** 36:15

**say** 4:11 7:1,22,23 23:24 27:8 31:7 36:11 40:20,25 45:8,19 46:18 (13)

**saying** 27:17 28:14

**says** 5:14 28:12 41:19 42:20 44:18 46:4,8 (7)

**scale** 33:8

**scheduled** 18:8,20 20:2

**school** 22:10

**schools** 21:23

**science** 27:9 29:20 30:11 31:2 (4)

**screen** 11:10

**scroll** 19:6,10

**seal** 50:20

**search** 23:2,5,8,9 (4)

**second** 15:4 47:16

**see** 11:10,16,17 12:23 15:1 20:1,5 23:22 34:11 39:7 44:21 45:1 (12)

**seeing** 5:13 11:15

**seem** 13:16

**seen** 11:6,14 20:22 34:21,24

13

(5)

**selected** 22:25

**semester** 23:16

**senate** 24:21,22 25:3,14,20 26:21 28:2 29:11 (8)

**senators** 25:19

**sense** 6:21 9:22 34:17 35:16 (4)

**sensitive** 24:4

**sent** 7:10 21:2

**sentence** 44:18,25 45:7 46:4,7 (5)

**separate** 38:11

**serve** 16:8,9 29:10

**setting** 8:21 29:24

**several** 19:15 29:4

**shake** 5:4,14

**share** 11:10

**shared** 31:5

**shaw** 14:19 18:4 28:25 29:5 32:9 33:15 34:3 35:7 (8)

**she** 15:17 20:10 35:9,11,12,20,21 36:1 (8)

**she's** 35:14

**should** 45:9

**shredded** 38:24

**sides** 25:24

**sign** 47:23

**signature** 50:20,23

**signaturenot** 48:2

**signed** 39:11 40:8,18

**significant** 32:8 33:9 41:5

**silent** 37:16

**silently** 12:6

**similar** 23:19 28:20

**simple** 13:15

**since** 9:12

**single** 8:17

**sir** 8:19 16:2,7 22:15 32:2 (5)

**sit** 21:6 38:7

**situation** 6:24

**so** 5:15 6:14,16 7:2,14,20 8:12,21 9:16,21 10:9,17 11:10 12:19,24 13:16,21 14:1,2 15:4 16:3,8,12,21,21,22,22 17:11 18:23,25 19:13,21 20:16 22:11,13,23,24,25 23:15,23,24 24:6,20,21,22,25 25:6,10,12,14,19 26:1,7,9,10,13,25 27:1,3,3,6,8,10 28:1,1,4,6,21 29:4,8,8,11,13,14,15,16,16,23,25 30:3,4,5,7,9 31:6,14,19 32:3,6,9,22 33:7,16,17,25 34:1,14,21,23,24 35:1,2,4,7,8,9,11,13,14,24,25 36:1,2,16,17 37:2,4,10,11 38:2,10 39:13,14 40:4,9,11,17,18,22,22 41:8 42:6,11,13,14,19 43:20,24 44:1,5,9,15,23 45:4,6,12 46:4,6,12,14,20,22,24 (153)

**society** 12:22

**some** 6:22 11:3 15:3,10 18:11 23:15 24:4,19,22 26:10 27:11,19 35:21 36:14 37:4,18,19,19 38:2,18 40:22 45:19 46:18 (23)

**somebody** 6:24

**someone** 32:23

**something** 5:9 21:18 22:21 23:16 28:20 34:9 38:18 41:13 46:5,8 (10)

**somewhere** 31:5

**sorry** 32:4 33:5 35:6,23 (4)

**sort** 12:21 33:12 36:24 40:4 (4)

**sounds** 17:11 32:6 35:19

**south** 9:2

**southern** 30:2

**speak** 33:20

**speaking** 6:5

**specialty** 17:9

**specific** 7:20 21:5 26:4

**specifically** 7:6 27:17

**specify** 7:21

**spell** 9:25

**spelling** 10:1

**spoke** 10:4

**spoken** 8:3 29:5,6

**stand** 38:9

**standard** 42:17

**standards** 9:6

**standing** 45:12

**starkville** 2:9

**start** 10:9 14:4 23:14

**started** 9:10,13 10:11 13:21 15:4 23:14,15,15 36:1 (9)

**starting** 9:12

**state** 8,9 4:6 9:11,17 10:21 11:3,21 30:1,4 31:21 33:22 38:13 49:19 50:3,12 (16)

**stated** 50:8

**statement** 39:14,15

**states** 8:24

**stayed** 28:4,5

**stenographically** 22

**stenotype** 50:8

**step** 13:24 14:2

**stick** 36:6,7

**street** 2:8

**students** 17:21

**studies** 10:15,21

**study** 8:25

**style** 3:2 49:3

**styled** 49:4

**subject** 33:13 49:7

**subjective** 24:10

**subscribed** 49:21

**successful** 28:6,9

**summer** 27:12,13,15,20,22 (5)

**superior** 42:16

**supervision** 50:9

**supervisor** 23:22,24

**supervisors** 44:19

**support** 30:18 31:8,9,11,17 (5)

**sure** 4:15,22,25 5:5 6:11,15,16 7:3 12:1 15:14,19 30:21 38:17 42:13 (14)

**sworn** 4:2 49:21

**take** 11:23 19:5 20:12 36:23 38:2 47:15 (6)

**taken** 17 11:12 49:4,5 50:6,8 (6)

**talk** 7:20 35:17 36:13,19 (4)

**talked** 8:4 29:4,9

**talking** 7:16,23 10:7 17:16,21 32:11 35:10 (7)

**team** 34:4,5 35:13

**technology** 9:6

**tell** 16:18 25:3 29:21

**ten** 37:18

**tend** 5:18

**tenure** 7:12,15,17,22,24 9:14 13:21 14:2,4,7,9 (11)

**teresa** 35:20,22,23,24,24 (5)

**terminate** 42:23 43:18 44:2,10 (4)

**terminated** 15:11,18

**termination** 15:22 17:25 39:20 41:11,25 44:6 (6)

**terminology** 42:14

**testified** 4:3 34:15 45:15 46:2 (4)

**testify** 35:21

**testimony** 4:19 49:7,8 50:5 (4)

**than** 5:11 17:13 22:3 24:5 29:6 33:1 34:22 36:15,16 45:11 (10)

**thank** 6:11 8:2,15 9:20 12:9 28:15 47:19,20 (8)

**that's** 5:6 6:3,16 7:2,11 9:2,7 11:3 12:18 13:14 14:11,15 16:22 18:6 23:7 24:10 25:14 27:1,1 30:9,9,22 31:24 32:11,14,19 35:4 36:2 40:17 41:13 43:6,7 44:14 46:16,17 (35)

**their** 5:20 27:22

**them** 11:6 18:25 26:25 34:19 36:6,7,9,17 38:11 42:8 49:6 (11)

**there's** 6:12 12:11 13:2 25:6,23 26:8 31:1 44:15 (8)

**thereof** 49:6

**these** 11:18,19 12:23 24:2,22 26:22 37:17 40:2,9 (9)

**they're** 27:19

**they've** 5:20

**thing** 5:17 8:12,17 12:22 18:23 24:18,23 29:9 33:18 45:1 (10)

**things** 4:24 5:2 6:22 24:21,22 31:18 35:17 40:1 41:20 (9)

**think** 6:8,8 10:3 11:14 14:10 16:8,12 17:19 18:2 19:11 21:17 23:18 30:20,25 32:19 35:15 36:11 37:5 38:14,15 39:3 41:23 43:12,24 45:15,15,24 46:17 (28)

**thinking** 23:7 30:22 31:4 36:25 (4)

**thorough** 9:18

**those** 6:22,23 24:21 35:17 37:9,13 38:10,19 40:1 42:2,17 49:7 (12)

**thought** 5:20 26:25

**three** 42:7 43:3,9,16,17 (5)

**through** 22:3 25:12 36:25

**time** 5:12 6:5 8:20 14:19 15:4,14 18:4 19:1 21:2,16,18 23:16 29:17 30:23 36:3 47:10 49:8 50:7 (18)

**timeline** 13:20 18:17

**timelines** 15:2

**times** 5:17 28:19 29:11

**today** 7:5,8,16 21:6 38:7 (5)

**together** 14:6 30:4 32:20 33:25 40:9 (5)

**told** 4:23 18:25 31:4

**too** 37:25 38:4,6

**took** 35:11,12 36:16 37:4 38:3 (5)

**track** 9:10 13:21 14:2,3 (4)

**traffic** 44:16 46:25

**transcript** 5:6 6:19 49:6,8 50:5 (5)

**transcription** 50:10

**transcripts** 5:12,13

**travel** 18:25

**traveling** 18:19

**truax** 34:21

**true** 6:4 14:18 49:6 50:4 (4)

**trustees** 8

**truthfully** 50:13

**try** 5:10,24

**trying** 27:3 30:25 33:6 34:11 39:6 (5)

**two** 9:2 10:12,15 15:5 16:3 37:19 39:1 41:19 44:15 46:7 (10)

**typewritten** 50:9

**typical** 32:22

**typically** 5:3

**uhhuh** 13:23 16:17 20:4 39:16,21 41:4 42:24 43:5 44:8,22 (10)

**ultimately** 15:11 28:3

**uncle** 11:4

**under** 12:2 44:6,15 50:9,11,13 (6)

**understand** 5:19 6:13,14,15,19,25 11:8 25:22 26:2 27:3 28:14 31:17 34:10 45:21 (14)

**understanding** 42:12,15 43:8 44:9,24 45:3 (6)

**understood** 4:18 28:12

**united** 8:24

**units** 42:2

**universities** 30:1,4 33:9,22 (4)

**university** 8 7:17,24 9:1,3,12,17 10:22 11:21 14:19 30:2,2,3,7,8 32:25 42:22 44:2 (18)

**unnecessarily** 12:11

**unprofessional** 45:20 46:13,18,23 (4)

**unsuccessful** 28:9

**until** 47:13

**up** 4:17 8:21,23 11:9 13:17 19:2 25:13 29:24 37:13 39:2,13 41:8 (12)

**us** 13:13 25:10 32:19

**used** 5:11 37:3

**utc** 31:20 33:7,18 34:7 (4)

**v** 6

**version** 39:11

**versus** 26:14

**very** 5:21 6:9,16 9:18 17:8 24:10 32:8 37:3,24 38:1 42:13 44:18 45:19 46:14,18,22 (16)

**vested** 50:12

**via** 17 2:2,7

**videoconference** 13

**view** 12:21

**visa** 15:10 16:4,5

**vote** 37:1 43:1,2,15,20,22 44:1 45:25 (8)

**voted** 42:20 43:3,3,9 (4)

**votes** 43:16

**voting** 44:10 47:4

**vp** 30:8 35:8,14

**vs** 49:3

**w** 23 50:2,24

**waived** 48:2

**want** 4:15 8:16 11:25 14:13 27:1 29:22 36:13,19,21 39:2,14 41:8 (12)

**wanted** 13:20 26:13

**wants** 18:6,18

**way** 16:22 20:24 27:23 31:1 33:20,23 36:2 37:2,5,6 40:19 45:2,11 46:12 (14)

**we'll** 6:8 7:16

**we're** 4:25 6:4 7:23 36:19 (4)

**we've** 11:20 35:17

**website** 29:22

**well** 37:24,25 42:21 43:21 (4)

**went** 24:21 25:12,20 28:1,10 (5)

**whatever** 19:7

**when** 5:2,18 6:4 7:22,23 9:23 10:12,13 13:17,25 14:1,8,25 17:16,24 18:1,4,6,18 20:12,12 22:24 23:2,10 25:7 31:7 35:7 36:1 38:25 40:8 (30)

**where** 6:24 8:21,22 9:23 15:10,19 16:3 20:1,6 (9)

**whereupon** 48:4

**whether** 15:17,17 40:20 43:22 44:1 (5)

**which** 5:20 19:14 33:14 40:23,24 42:7 (6)

**while** 16:10 25:5 39:18

**who** 6:18 10:4,4 16:13 17:11,12,12 (7)

**why** 7:2 18:13 21:20

**will** 5:10,18 6:2,19 25:9 30:8,9 (7)

**willful** 44:19

**win** 30:13

**winfield** 2:7

**within** 17:9,15 32:23,24 (4)

**witness** 47:20 50:13,20

**witnesses** 20:14 34:15

**won** 30:12 32:12,13 33:15 (4)

**word** 24:10 31:17 41:1,3 42:11 46:14 47:12 (7)

**work** 5:7 6:1,2 15:12 17:5 25:10 32:17 33:17,19 37:2 (10)

**worked** 30:10 32:7 34:7

**working** 24:12 36:8

**works** 8:8 31:1 33:19,23 (4)

**would** 6:13 12:12,25 13:10 14:19 19:1 20:12,13,18 22:21 23:20,25 24:5 25:9 27:4,20,21 36:4 40:11 42:4 44:5,11 45:8 46:1 (24)

**write** 34:6 38:10,11 40:10 (4)

**written** 22:7 25:9 40:11,19 (4)

**wrote** 30:5 32:16,20 38:8,14,16,18 (7)

**yeah** 11:15,24 12:4,18 13:13,13 14:13 16:22 17:14 19:20,24 21:7,10 22:5 23:14 26:7 28:8 29:8 30:10 31:6 32:4 33:2,3,6 34:9 35:1,6,6,7,17,18 37:21 39:5 40:22,24 43:11 44:17 45:3,14 46:22 47:11 (41)

**year** 10:9 15:4

**years** 15:5

**yes** 4:12,14,14 5:4,8 7:13,19

8:1,19 10:2,23 11:13,17 12:8,16 13:5,8,13 14:17,21 15:23 16:7,14 17:10,20 18:7,10,24 19:11,11,12 20:9,15,22 21:13,15,17,19 22:12,15 24:12,17 25:2 26:3 27:23 28:18,23 30:14 31:14 32:2,13,14,21 33:11 35:23,24 36:11 38:18,22 39:8,12,25 40:3,9,13 41:7,12,15,17,22 42:5,10 43:2,14,15,15,19 44:4,8 45:4,4,22 46:3 47:14,22,24 (86)

**yet** 11:15

**you'll** 6:8

**you're** 14:2 16:15 28:14 32:11 38:23 (5)

**you've** 4:22 8:12 11:14

**your** 4:6 5:12,13,23,25 8:16 10:15 12:2,12,13,25 13:6,6,9,10,21 14:20,25 16:18,19 20:19 21:14 22:6,13 23:18,20 24:6 27:11 28:21,22 33:4 36:22 38:20,20 42:12 44:11 45:16,25,25 47:3,5 (41)

**zhang** 4 16:10,13,20,25 17:3,5,16,17,22,25 19:15,22 20:7 23:19 28:22 31:20 32:3 33:12 34:23 42:23 43:18,23 44:2,11 45:16 49:3 (27)

**zhang's** 7:25 16:5 33:7

**zoom** 17 2:2,7 6:4,4 (5)

**224** 2:8

**601** 2:4

**662** 2:662,10

**902** 18

**955** 48:5

**965** 2:3

17

| | | |
|---|---|---|
| **2001** 10:11 | | |
| **2006** 10:14,16,17 | | |
| **2007** 10:17,19 | | |
| **2011** 9:9 10:16,18,19 23:16 (5) | | |
| **2012** 9:12 13:21 23:15 | | |
| **2018** 14:11,12 | | |
| **2022** 14:16 | | |
| **2025** 7:25 18:9,21 19:17,23 20:3,17 (7) | | |
| **2026** 16 49:16,17,2026 50:21,25 (6) | | |
| **23441** 6 | | |
| **39110** 2:39110 | | |
| **39759** 2:9 | | |
| **80281** 2:80281 | | |
| **3233920** 2:10 | | |
| **3233984** 2:662 | | |
| **6241153** 2:4 | | |