IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

LI ZHANG                                                        PLAINTIFF

v.                                                  CASE NO. 1:23-cv-71-GHD-DAS

MISSISSIPPI STATE UNIVERSITY, et al.                          DEFENDANTS

MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

As the parties' voluminous submissions make clear, this is a case for trial, not for summary judgment. The fact-intensive record supports numerous inferences—which the jury is free to draw—that the Mississippi State University ("University"), for itself and on behalf of the Mississippi Board of Trustees of the Institutions of Higher Learning ("IHL"), carried out a coordinated plan.

A jury could find that the University built a file so it could have "cause" to terminate Dr. Zhang. Evidence shows administrators planning to "let him fail," instructing students to "keep a record" against him, and directing efforts to "aggressively do everything we can" to "rectify this situation." Along the way, the University took numerous adverse employment actions against Dr. Zhang and disregarded numerous guarantees secured by federal law. Summary judgment should be denied.

**FACTS**

### *Dr. Zhang's Background*

Dr. Zhang is a Chinese-American professor of transportation engineering. (Exhibit 1, Deposition of Li Zhang, "Zhang Depo.," at 38). Dr. Zhang started working at the University as an assistant professor in January 2005. (Zhang Depo, at 28, 36). He received a tenure promotion in 2011. (Zhang Depo, at 39). And he was promoted to full professor in Spring 2021. (Zhang Depo, at 45-46).

During his time at the University, Dr. Zhang made significant research contributions within the field of civil engineering. Dr. Zhang brought various honors to the University, including an international best paper award and around $14 million in research funding. (Exhibit 2, Declaration of Li Zhang, "Zhang Dec." ¶1); (Exhibit 56, Excerpts from 2019 Dossier). In 2020 and 2021, Dr. Zhang's research workload and contributions to the school were approximately 4.9 times that of an average tenure-track and tenured faculty member within the School, and 2 times that of the other two full professors within the School. (Exhibit 3, 5.10.21 Email from D. Traux); (Exhibit 4, 5.1.22 Faculty Email from I. Howard).

Dr. Zhang's direct supervisor for 15 years, former department head Dennis Truax, had very positive things to say about Dr. Zhang. Dr. Zhang demonstrated a high level of professionalism. (Exhibit 5, Truax Tr., at 6). Dr. Zhang was well regarded by the Mississippi Department of Transportation ("MDOT"), which continually renewed projects with Dr. Zhang. (Truax Tr., at 10-11). Though Dr. Truax and Dr. Zhang would sometimes have disagreements, Dr. Zhang never acted from a spirit of

manipulation. (Truax Tr., at 7-8). Dr. Zhang always prioritized the success of his students and program, and he never once breached collegiality. (Truax Tr., at 7-8). Critically, Dr. Truax never had any student express a complaint about Dr. Zhang during his 15 years as department head. (Truax Tr., at 29-30).

### *Dr. Zhang's Personal Challenges*

In more recent years, Dr. Zhang has faced a series of personal challenges. One of his children, C.Z., has been diagnosed with a rare genetic mutation (SCN2A) that causes autism and severe developmental delays. (Zhang Depo, at 143). C.Z. requires 40 hours of ABA therapy per week. (Zhang Depo, at 8, 145-146). The practical challenges with C.Z.'s condition and his care are well-described by Ying Zhang, Dr. Zhang's wife. (Exhibit 6, Y. Zhang Depo, at 40-46). To protect the sensitive nature of this information, Dr. Zhang incorporates by reference that deposition (which will be filed under confidentiality protection). The University's daycare did not admit C.Z. (Zhang Depo, at 8). With Dr. Truax's permission, Dr. Zhang moved to Brandon, Mississippi, and C.Z. was able to enroll in Canopy Children's Solutions, an ABA therapy program. (Zhang Depo, at 8, 145); (Truax Tr., at 6). Several different times, Dr. Zhang sought leave to care for C.Z. but was denied or delayed by University administrators. (Exhibit 67, Zhang Response to Interrogatory No. 1); (Exhibit 68, Leave Request Docs).

Dr. Zhang also had several medical challenges, including debilitating back pain. (Zhang Depo, at 155, 156). The pain radiated to Dr. Zhang's leg, and he could

not walk even one hundred feet without breaks. *Id.* Dr. Zhang would have to take several breaks from the engineering building to the dean's office. *Id.* Dr. Zhang would eventually require spinal surgery to alleviate his pain. (Exhibit 7, 11.23.21 Email from Zhang with Post-Op Instructions); (Exhibit 57, Medical Records). Before that surgery, Dr. Zhang dealt with this debilitating pain for years. (Zhang Dec., ¶11).

### *Summer 2021: Isaac Howard Becomes Department Head*

Dr. Truax retired from the department head position in the summer of 2021, and Dr. Howard became interim director for the school of civil and environmental engineering. (Truax Tr. 14); (Exhibit 8, Howard Tr., at 4). In 2022, the college's Dean Jason Keith removed Dr. Howard's interim tag, and he became the permanent director. (Howard Tr., at 4).

Dr. Howard was deeply unpopular among the faculty. (Truax Tr., at 40-41); (Zhang Depo, at 65, 72-73). As the outgoing director, Dr. Truax put it:

> [T]here was not one faculty member in the department that wanted to work with Dr. Howard to the point that, after I left, in short order, four faculty resigned when the dean appointed him over their objection to be the department head or director . . . . [F]aculty actually wrote letters and said we don't want Dr. Howard to be the department head.

(Truax Tr., at 40-41).

### *Dr. Howard and Dr. Keith Poison the Well Against Dr. Zhang*

During Dr. Howard's first semester as interim director, Dr. Zhang's dean, Jason Keith, met Provost David Shaw, once a month. (Exhibit 9, Shaw Tr., at 30-31).

4

As provost, David Shaw is over all faculty at the University, including Dr. Zhang. (Exhibit 10, Grala Depo, at 21, 110-112); (Exhibit 11, Gammill Depo, at 22).

In these meetings, Dr. Keith was reporting on the "ongoing conflict" between Dr. Howard and Dr. Zhang. (Shaw Tr., at 62). Dr. Shaw conceded that Dean Keith's information about the conflict may have come from Dr. Howard. (Shaw Tr., at 31). During the semester, Dr. Zhang repeatedly asked to meet with Dr. Shaw. (Zhang Dec., ¶2). But Dr. Shaw did not communicate with Dr. Zhang at all; he was relying solely on Dean Keith as his "eyes and ears." (Shaw Tr., at 70-71). In his testimony, Dr. Shaw admitted it would have "more balanced" had he spoken with Dr. Zhang instead of relying solely on Dean Keith's reports. (Shaw Tr., at 43).

Dr. Shaw was so heavily influenced by these meetings that, at the end of the semester, Dr. Shaw wrote that there was "a long history of issues" and that Dr. Zhang had "been repeatedly working the system to his advantage." (Exhibit 58, November 2021 Emails, at 1). During his testimony, Dr. Shaw conceded this "long history" was "not like years" but arose solely from information he learned from Dr. Keith during the Fall 2021 semester. (Shaw Tr., at 61-62).

### ***The University Intentionally Prevents Dr. Zhang from Taking Leave for his Back Surgery***

Dr. Zhang's radiating back pain was so bad that he underwent spine surgery at the end of the Fall 2021 semester. Leading up to this, Dr. Zhang had informed Dr. Howard and Dr. Keith about his back issues and difficulty walking. (Zhang Dec., ¶3). On the morning of November 19, 2021, Dr. Zhang told Dr. Howard and Dr. Keith that he was scheduled for a surgical consult on November 22, 2021. (Zhang Dec., ¶4).

Neither Dr. Howard nor Dr. Keith objected. (Zhang Dec., ¶4); (Exhibit 59, Nov. 19, 2021 Emails).

At the consult, Dr. Zhang's physician recommended that Dr. Zhang undergo a surgery that was scheduled for the following week on December 1, 2021. (Med. Rec., at 8, 9, 11, 12); (Zhang Dec., ¶5). The day after the consult, Dr. Zhang let Dr. Howard and Dr. Keith know about his surgery and provided his doctor's restrictions, including no work for 2 weeks following the surgery. (11.23.21 Email from Zhang with Post-Op Instructions). Dr. Zhang also asked for additional resources and time to administer and submit the final exam for two undergraduate courses, including transportation engineering. *Id.* In the early morning before the surgery, Dr. Zhang submitted a formal request through the University's eForm process, which Dr. Howard disapproved for purported paperwork reasons (Exhibit 12, 12.1.21 eForm Request). At a post-operative exam on December 3, 2021, Dr. Zhang's surgeon extended this no-work restriction until January 17, 2022. (Med. Rec., at 36). On the same day, Dr. Zhang submitted the revised leave request. (Exhibit 55 - December 3, 2021 Leave Form and Email).

The University took no action on Dr. Zhang's updated leave request until January 27, 2022—more than 50 days after he submitted the revised request and 10 days after his work restrictions expired. (Med Rec., at 36). After the fact, University witnesses have claimed that Dr. Zhang's leave was somehow "pre-approved" outside of its formal eForm process. (Exhibit 13, Admin. Hearing Transcript of Julia

Morrison, "Morrison Tr.," at 6); (Howard Tr., at 18-20). According to Dr. Howard, "[n]o one was trying to actually deny medical leave." (Howard Tr., at 91).

The record contradicts Dr Howard. At no point until after he recovered did anyone inform Dr. Zhang that his leave request was approved. (Zhang Dec., ¶6). And in the background, the University administrators were actively opposing his leave request. Just before the surgery, Dr. Keith wrote in an underlined email excerpt to several administrators, including Dr. Howard and Dr. Shaw: "I would like to see if we can deny his request for surgery and ask him to administer the final and submit the grades." (November 2021 Emails, at 3) (emphasis in original). The HR director responded that "Unfortunately, we cannot deny medical leave for an employee." (November 2021 Emails, at 2). Dr. Keith replied that "defer might be a better word to use . . . ." *Id.* And Dr. Shaw emailed:

> There's a long history of issues here, and we need to aggressively do everything we can to rectify this situation. He's been repeatedly working the system to his advantage. Leslie [the HR director], I'd like for you to work with Jason and Isaac to develop an action plan to stop this behavior.

(November 2021 Emails, at 2).

As a result, Dr. Zhang had no support to help him grade papers, and he was forced to work during his recovery from surgery. (Zhang Dec., ¶7).

### *After Dr. Zhang Grades Exams, the Administrators Change Grades without Telling Dr. Zhang*

Without the meaningful support of his administrators, Dr. Zhang had to effectively go it alone. Dr. Zhang submitted the final exam to the administration, took steps to ensure that a proctor would be available to administer the exams, and then—

7

right after his surgery—graded the exams and calculated the final grade. (Zhang Dec., ¶7).

Meanwhile, without alerting Dr. Zhang, University administrators were making a behind-the-scenes "contingency" plan that involved assigning students different grades than they earned. (Exhibit 14, Emails Regarding Grade Change Plan, at 13-14). Although they allowed Dr. Zhang to assign grades, associate dean Dr. Robert Green candidly admitted they "had decided to make changes before" Dr. Zhang posted final grades. (Exhibit 15, Admin. Hearing Transcript of Robert Green, "Green Tr.," at 27).

Then, after Dr. Zhang submitted grades and was making some adjustments, he realized that "most" of the students' grades "had been changed, totally different" from what he had submitted. (Exhibit 16, Emails Confirming Grade Changes). Dr. Zhang immediately reported this incident, which he felt was a security threat, to his administrators. *Id.* Dr. Keith responded and informed Dr. Zhang that, without telling him, they had overridden the grades he had assigned. *Id.*

As a result, students who had performed very poorly were given a free pass by the administrators who handed out the grades (and who were not qualified to do so). (Exhibit 17, Grade Changes); (Exhibit 18, Babski-Reeves Tr., at 51-52). Other than students who legitimately earned "A's" and 1 other student, everyone received a bump of at least a full letter grade. (Grade Changes). Many received a 2-letter grade increase. And three students were moved up 3 letter grades, from either "D" to "A" or "F" to "B." (Grade Changes).

During Dr. Truax's time, changes to grades at the administrative level were "[a]bsolutely never allowed by anybody except with the approval and foreknowledge of the instructor, ever." (Truax Tr., at 35). In carrying out this significant grade increase, University administrators not only lacked Dr. Zhang's approval—they didn't even give him a heads up.

### *Administrators Send Ethnically-Charged Emails*

In the midst of the December 2021 events, University administrators sent two emails using their work emails that reflect a culture of ethnic-bias. On December 8, 2021, Dr. Keith wrote "Maybe 'Zi' is the one who can't speak English" when commenting on a purchase order submitted by Dr. Zhang. (Exhibit 60, "Zi" Email). The next day, Dr. Green wrote that a student with a failing grade "would argue that since 'Dr. Zhang spoke no English' there was no use in going to class." (Emails Regarding Grade Changes, at 4).

### *Dr. Zhang Seeks Federal Employment Protections*

In early February 2022, Dr. Zhang's then-attorney sent an email to the University's general counsel, expressing violations of (among other things) the FMLA, Title VII, ADA, and the ADEA. (Exhibit 61, 2.7.22 Email from W. Moller to J. Lucas). On March 1, 2023, Dr. Zhang filed his first EEOC charge. As later amended, that charge expressed claims of race, age, disability, and caregiver discrimination. (Exhibit 65 - First EEOC Charge and Amendment Charge). Dr. Howard, Dr. Keith,

9

and Dr. Shaw learned about Dr. Zhang's EEOC charge in or around April 2022. (Exhibit 19, University's Responses to Second Set of Interrogatories, #15).

### *Administrators Actively "Build their File" to Terminate Dr. Zhang*

From the Spring 2022 semester on, there is evidence of extensive file-building against Dr. Zhang at the highest levels within the University.

A. *Spring 2022 Traffic Engineering Class*

In the past (before the grade change incident), Dr. Zhang had not been a subject of student complaints more than other professors. (Exhibit 20, Swort Depo, at 12). Just weeks into the semester, a student in Dr. Zhang's traffic engineering class, B.T., sent an email to Dr. Howard to make several complaints about "Dr. Zhang's teaching methods." (Exhibit 21, Email Exchange Regarding Student Complaints). In Dr. Zhang's transportation engineering class the semester before, B.T. was set to receive a "C," but administrators had changed her grade to an "A." (Grade Changes). Also, the day before B.T. sent the email, she signed a confession admitting to collaborating with another student on homework, affirming this was "against the syllabus" and would "not happen again." (Zhang Dec., ¶8 & Exhibit A to Affidavit, B.T. Admission).

B.T.'s email the next day listed the names of 23 students who supposedly signed off. But B.T. was fuzzy about the details on how these names were collected. (Exhibit 22, Deposition of B.T., at 21-25). Ten of these students had been in the class where grades had been changed. *Compare* (Email Regarding Student Complaints),

10

*with* (Grade Changes). And B.T. admitted there would be no "written confirmation that each one of these people had given their stamp of approval and authority for their name to be on this email . . . ." (B.T. Tr., at 25).

Dr. Howard and assistant dean Robert Green met with four students on February 25, 2022, three of whom had benefited from grade increases the previous semester. (Email Exchange Regarding Student Complaints); (Email Regarding Student Complaints) (Grade Changes); (Green Tr., at 16). Dr. Howard told the students to "Keep a record. The department is going to handle it." (B.R. Tr., at 32-33). Dr. Howard communicated with Dr. Keith and associate dean Kari Babsk-Reeves about the student emails and meeting. (Email Exchange Regarding Student Complaints). But again, no one informed Dr. Zhang about the situation. (Howard Tr., at 49); (Green Tr., at 47-48); (Zhang Dec., ¶9).

Following that meeting, administrators contrived certain "safety" concerns about a standard traffic counting assignment. The assignment involves "collecting if cars are turning left, right, or through and then keeping track of that either with an instrument or . . . a notepad." (Swort Depo, at 10). This assignment was on the syllabus that had been approved by the University Curriculum Committee. (Shaw Tr., at 64). It was prescribed by the textbook that was assigned for the course. (Zhang Dec., ¶10 & Exhibit B to Dec, Textbook Excerpt). And it had "always been a component" of the class. (Truax Tr., at 64). Tellingly, the students did not express any safety concerns, (Howard Tr., at 27), and for good reason. The assignment "was just like walking. Like to get there was literally essentially walking around campus, and

11

then we just parked on the corner of the intersection to do the counts." (Swort Depo, at 11).

Nonetheless, on March 10, 2022, Dr. Keith informed Dr. Zhang that he could "not do the project as is" because of "safety and liability" issues. (Exhibit 23, Emails Regarding Traffic Counts). Dr. Zhang responded that it was his "duty and professional responsibility" to ensure the students could "reach the objectives of the course." *Id.*

On April 28, 2022, Dr. Keith emailed the whole class to schedule a meeting for the following week after classes would be over but before the final exam. (Exhibit 24, 4.28.22 Email from Keith to Entire Class). Dr. Keith noted that he was "aware of some of the concerns and would like to document them." *Id.* Although he requested "positive or negative experiences," the stated purposes was to allow the administration "to take further action." *Id.*

After receiving several responses that he had invited, Dr. Keith informed Dr. Zhang that he was "removed as instructor of record" from the traffic engineering course. (Exhibit 25, 5.3.22 Email from Keith to Zhang). Among the reasons cited were the student complaints and the allegedly "unsafe" traffic counting project. *Id.* As a result, the administration "boost[ed]" the students' grades by eliminating the traffic counts project and outright cancelling the final exam. (B.T. Depo, at 35-36).

### B. *UTC Proposal*

Alongside these actions against Dr. Zhang as an instructor, the University was also acting against him as a researcher. In January 2022, Dr. Zhang was selected to

be the PI (principal investigator) on a roughly $20 Million University Transportation Centers ("UTC") proposal through the United States Department of Transportation. (Exhibit 26, Emails Regarding UTC PI Selection). This major proposal involved collaboration with 9 other universities. (Exhibit 62, Admin. Hearing Tr. of Julie Jordan, "Jordan Tr.," at 44).

The team was strong, and Dr. Zhang was a highly regarded leader of the team. As one well-respected collaborator, Dr. V.J. Gopu, put it:

> [I]t was easy to work with, and then Li [Zhang] was really cooperative. And I think we did a good job putting the proposal together. We didn't have any conflict or concern about Li being the PI for Mississippi State. If we'd had any reservation, we would have stated that . . . . We worked very well, and we put the proposal together. So none of the site PIs had any issue with Li at the time when we wrote the proposal.

(Exhibit 27, Gopu Depo, at 113-114).

Another collaborator, Dr. Patrick Sherry, said:

> Dr. Zhang has been with us for 15—you know, many years. He was one of the members of the original UTC. He had successfully submitted proposals and delivered work products. He's considered to be very knowledgeable in the area that he conducts research in. I mean, two different UTC directors had included him as part of the team. There was no doubt in our mind that he was a qualified professional researcher who would represent Mississippi well and add to the overall consortium.

(Exhibit 28, Sherry Tr., at 7-8).

Unfortunately, Dr. Zhang and the team did not know that the University had ulterior motives. According to associate VP of research Teresa Gammill, Dr. Keith (the Dean) and Dr. Babski-Reeves (associate Dean) gave Dr. Zhang "the green light to let him fail and then they'll be done having to deal with his tirades every year when

13

this RFP drops." (Exhibit 29, "Let Him Fail" Email Exchange); (Gammill Depo, at 47-48).

In general, University research personnel had a bad attitude about Dr. Zhang during the process. VP of Research Dr. Julie Jordan claimed that Dr. Zhang was not appropriately communicating with his other collaborators, (Jordan Tr., at 45)—in stark contrast to what the actual collaborators thought. (Gopu Depo, at 113-114); (Sherry Tr., at 7-8). Dr. Gammill claimed that Dr. Zhang was "self centered and not a team player" even though she did not recall ever actually meeting Dr. Zhang. (Gammill Depo, at 24, 73). She had received negative information from Dr. Shaw, which he had in turn received in his monthly meetings with Dr. Keith. (Gammill Depo, at 82-84).

Given their feelings about Dr. Zhang, the University refused to lend the proposal the support it needed to be funded. UTC proposals "have to have a letter of support from some congressional member" to "make it . . . through the different levels of review." (Sherry Tr., at 7). A Mississippi congressional staffer reached out to the University's research department, clearly demonstrating congressional interest in the project. (Gammill Depo, at 46); ("Let Him Fail" Email Exchange). But the University refused to ask for congressional support, with Dr. Gammill claiming this was because "the UTC is a funded program." (Exhibit 30, Emails Regarding Congressional Support). In her deposition, however, Dr. Gammill admitted there was no hard and fast rule that would have prevented the University from seeking

14

congressional support. (Gammill Depo, at 49). And with a PI other than Dr. Zhang, the University might have sought congressional support. *Id.*

Given this, Dr. Zhang scheduled a meeting with his collaborators to ask if one of them may be able to seek the needed congressional support through their institutions. When University administrators saw this email come across, Dr. Jordan instructed Dr. Zhang to "stand down." (Exhibit 31, "Stand Down" Email). Dr. Zhang emailed his team back, cancelled the meeting, and told them there would be no phone call regarding the topic of congressional support. (Exhibit 32, Zhang's Email Cancelling Call).

The team timely submitted the proposal. (Gammill Depo, at 68) The team worked hard (spending 3-4 weeks of man hours per collaborating institution), did a good job putting it together, and submitted a competitive proposal. (Gopu Depo., at 80, 115). Even Dr. Gammill had to concede that it was a good proposal with a reasonable chance of being funded. (Gammill Depo, at 68, 80).

After the proposal was submitted, one of the collaborators Dr. Sherry went to Washington D.C. to meet with congressional delegation from his state of Colorado. (Exhibit 63, Congressional Support Clarification); (Sherry Tr. at 4-7). While there, his delegation introduced him to Mississippi delegation. (Congressional Support Clarification); (Sherry Tr., at 4-7). Dr. Zhang was not there, and he did not tell Dr. Sherry to do this. (Congressional Support Clarification); (Sherry Tr., at 4-7). But when University administrators found out, they punished Dr. Zhang for Dr. Sherry's actions, even after Dr. Sherry explained the entire situation. (Jordan Tr., at 36). Dr.

15

Jordan issued a formal reprimand to Dr. Zhang and—for no good reason—ordered that the proposal be withdrawn. (Exhibit 64, Formal Reprimand). Even though Dr. Gammill conceded that the University should have contacted the other collaborating institutions, Dr. Jordan admitted that she did not consult with them before withdrawing the proposal. (Jordan Tr., at 39). Dr. Jordan admitted that she punished Dr. Zhang for someone else's conduct—that is, because she asked Dr. Zhang to stand down, he passed that information along to his collaborators, and one of them did not follow her order. (Jordan Tr., at 36).

Dr. Gammill practically gloated about the reprimand to Dr. Zhang. Right after the letter went out, she wrote to Dr. Babski-Reeves:

> Good morning. Letter went via email to Zhang this morning. Hold on for a bumpy ride I'm afraid. His proposal will be pulled today from DOT as well.
>
> . . . . Zhang will be furious that we pulled it but even worse that we have made him look bad with the partnering IHLs.

(Exhibit 33, Post-Reprimand Emails from Gammill to Babski-Reeves).

### C. *MDOT Project*

Dr. Zhang went on sabbatical starting in the Fall 2022 semester. At that time, he had been working for several years on a project for MDOT. Dr. Zhang spoke with Cindy Smith at MDOT, who agreed to extend the project for another year since Dr. Zhang was on sabbatical. (Exhibit 34, Emails Regarding MDOT Extension, at 4). Dr. Julie Jordan then called Cindy Smith and overrode the agreed-upon extension. From that conversation, Cindy Smith got the impression that Dr. Zhang had "no intention of producing a final deliverable." (Emails Regarding MDOT Extension, at 2). But this

16

was not so. Rather, Dr. Jordan unilaterally overrode the extension request because she did not "think [Dr. Zhang] needed an extension . . . ." (Emails Regarding MDOT Extension, at 3); (Jordan Tr., at 29-30).

### *The University Violates Procedures and Issues Pre-determined Annual Reviews to Dr. Zhang*

After waging its file-building campaign against Dr. Zhang, the University finally had enough to issue annual reviews for the 2021 and 2022 school years.

Before issuing the reviews, Dr. Howard drafted a year-over-year comparison for Dr. Zhang's annual reviews, something he did not do for other faculty. (Exhibit 45, Annual Review Consultation Emails); (Howard Tr., at 99). He also consulted with Dr. Keith, Dr. Shaw, and general counsel Joan Lucas about how to evaluate Dr. Zhang's performance. (Annual Review Consultation Emails). During that email consultation, Dr. Howard admitted he was giving Dr. Zhang "about as much of a drop from 2020 as [he] thought [he] could justify . . . ." (Annual Review Consultation Emails, at 1). Dr. Howard testified that he did not collaborate with Dr. Shaw or Ms. Lucas about any other professors' ratings, just Dr. Zhang's. (Howard Tr., at 82-83). A faculty hearing panel would later find that this unique pre-discussion "appear[ed] to undermine the independence of the annual review and the subsequent dean's review when the annual review was challenged by Dr. Zhang." (Exhibit 35, Hearing Panel Recommendation, at 5).

The annual reviews violated not only fundamental fairness, but also clearly specified University policies. For example, the 2021 and 2022 annual reviews were conducted on the same day in October 2023. (Exhibit 36, 2021 and 2022 Annual

17

Reviews). This violated a University policy that requires the reviews to be completed by March 15 each year. (Exhibit 37, AOP 13.24, at 4).

The reviews were supposed to be signed by Dr. Zhang, Dr. Howard, and (because Dr. Zhang appealed) Dr. Keith. (AOP 13.24, at 2). Yet the copies provided to Dr. Zhang (and produced in discovery) were not signed by Dr. Howard or Dr. Keith. (2021 and 2022 Annual Reviews). Dr. Howard testified that he had signed copies somewhere, (Howard Tr., at 46), but the only copies that have been produced were not signed by Dr. Howard. (Annual Reviews). During an administrative hearing, University administrators tried to devise a scheme to cure this glaring procedural error by having a new dean complete the annual review. Although they didn't go through with it, Dr. Green wrote: "since he was not at MSU during the time frame, we can argue he is objective." (Exhibit 38, Emails Regarding Annual Review Signatures).

### *The University Decides to Terminate Dr. Zhang*

On February 14, 2024, Dr. Shaw signed a termination letter. (Exhibit 39, Termination Letter). Although the letter was styled as a "Notice of Intent" and referenced hearing rights, the import of the University's decision was clear. Among other things, the letter said:

> "[Y]our employment with Mississippi State University will be terminated for cause on February 29, 2024.

> "As of today, you are relieved of all work duties."

> "Since you will have no further business to conduct with MSU, your electronic door access will be shut off immediately. You should not be on campus during this time."

(Termination Letter). In her testimony before the administrative panel, HR representative Julia Morrison admitted (before being spared by the panel chair) that "we provided you with a termination letter on February 14." (Morrison Tr., 24).

In his letter, Dr. Shaw cited justifications of the University's own making. Relying on the pre-engineered annual reviews, Dr. Shaw claimed that Dr. Zhang received an "unsatisfactory rating in teaching since 2021" and "[u]satisfactory performance in research." (Termination Letter). In fact, even in the 2021 and 2022 annual reviews by Dr. Howard, Dr. Zhang received "satisfactory" ratings for graduate-level teaching in 2021 and in 2022. (Annual Review Consultation Emails); (2021 and 2022 Annual Reviews).

After receiving his notice of termination, Dr. Zhang timely requested a hearing. (Grala Depo, at 41). Dr. Zhang's classes (traffic engineering (CE 4143) and travel behavior modeling and forecasting (CE 4173)) were reassigned to Case Fulcher, who is Caucasian and who does not have a Ph.D. (Stipulation of Record, ECF [138]).

### ***The Parties Participate in an Administrative Hearing, with Dr. Zhang at a Disadvantage***

The hearing was originally set to begin in February 2025 before the Promotion and Tenure Committee ("P&T Committee"). (Grala Depo, at 41). The P&T Committee reports directly to the Provost, Dr. Shaw. (Grala Depo, at 21).  Dr. Zhang was provided little information about how the committee would be convened, but he eventually learned (through counsel) that the full P&T Committee would not be there. Dr. Zhang's attorney requested a brief extension, writing in part:

> Based on the information we have received, we are not confident that the full Promotions and Tenure Committee is being convened for this hearing, which would be the normal and proper process under the University's policy. My client is naturally concerned about whether a partial committee would be a truly neutral one, especially since the administration that desires to terminate Dr. Zhang has (as far as we know) control over who does and who does not sit on the committee. **In our view, the only way to ensure there is no selection bias is to ensure that the full committee convenes for this important hearing. If the University needs a bit more time to ensure this happens, that will be time well spent.**

(Exhibit 40, Counsel Email Requesting Extension) (emphasis added).

By April, the administrative hearing was rescheduled to begin on June 3, 2025. (Exhibit 41, Counsel Ltr Regarding Hearing Procedures). On April 22, 2025, Dr. Zhang's counsel sent a letter to the P&T Committee "c/o" opposing counsel. In it, counsel reiterated the request for the full P&T Committee to convene to eliminate selection bias. *Id.* Counsel also requested that Dr. Zhang be given access to Banner, OneDrive, and his University email account, *Id.*, all things that the University had access to and that a professor would normally have as well. (Morrison Tr., at 46-47).

Despite Dr. Zhang's efforts to ensure a neutral process, it was not neutral for at least three reasons. First, the P&T Committee did not receive confirmation of the June 3 hearing date until May 29, 2025—only *after* Dr. Zhang sent an email to all published committee members that triggered an internal inquiry. (Exhibit 42, Hearing Date Email Exchange); (Exhibit 43, Anthony Depo, at at 22); (Exhibit 44, Lu Depo, at 21-22); (Grala Depo, 48-53); (Exhibit 46, Dutta Depo, at 17-18); (Exhibit 47, Kundu Depo, at 20-21). By this time, the hearing had been scheduled for over a

month. Unsurprisingly, the full P&T Committee did not attend the hearing. (Grala Depo, at 76).

Second, the University never gave Dr. Zhang access to Banner, OneDrive, and his email account that he had requested. (Grala Depo, at 77). When asked about this, Kelli Anthony, one of the committee members who voted against Dr. Zhang, admitted: "Broadly speaking, I would say from the outside looking in, it would seem that maybe that was unfair." (Anthony Depo, at 29).

And third, the University's general counsel served as the P&T Committee's advisor on "procedural issues." (Grala 68, 69, 71). General counsel was also included in emails where Dr. Shaw, Dr. Keith, and Dr. Howard pre-determined Dr. Zhang's annual reviews. (Annual Review Consultation Emails). And general counsel had specifically been consulted about and signed off on the decision to terminate Dr. Zhang in the first place. (Shaw Depo, at 23-24). When Dr. Zhang's attorney inquired about conversations between the P&T Committee and the University's general counsel, Defendants expressly invoked the attorney-client privilege and instructed the witness not to answer. (Grala Depo, 69, 70, 72). In other words, the P&T Committee had, as a confidential advisor, counsel who was very much in favor of Dr. Zhang's termination.

### *The Panel Recommends Dr. Zhang's Termination by a Narrow Vote Along Racial Lines*

After a three-day administrative hearing, the panel voted 4-3 in favor of Dr. Zhang's termination. As a professor with a tenure contract, Dr. Zhang could only be terminated for specified reasons. (Exhibit 48, HRM 60.113). Those include conduct-

based reasons like "malfeasance, inefficiency, or contumacious conduct." *Id.* at 1. They also include a more general "for cause." *Id.* The Committee did not vote that Dr. Zhang had engaged in any of the specific conduct-based reasons for termination. (Grala Depo, at 113-114). It only voted that he be "terminated for cause based on his conduct." *Id.*

The 4 panel members who voted in favor of Dr. Zhang's termination are Caucasian. (Grala Depo, at 13, 118); (Anthony Depo, at 11); (Dale Depo, at 15-16, 32); (Stipulation of Record, ECF [138]). The 3 panel members that voted against his termination are Asian, either from India or China. (Grala Depo, at 118); (Dutta Depo, at 7, 22); (Kundu Depo, at 12-13); (Lu Depo, at 11, 23-24). After the panel's decision, the Provost, University president Dr. Mark Keenum, and IHL director Alfred Rankins, Jr. all approved the decision to terminate Dr. Zhang.

### *The University Destroys Evidence*

After the hearing, the University's general counsel's office collected hearing binders and their contents (including any notes) from each panel member. (Exhibit 49, University's Response to Interrogatory No. 16). The general counsel's office then proceeded to shred the contents of the binders. *Id.*

The University recognized the possibility "that some of the binders may have contained a limited number of notes taken by the individual panel members . . . ." *Id.* They contained more than just a "limited amount." The panel chair, Dr. Grala, "was making notes during the hearing, just to make sure that [the panel had] all the points or the questions that [it] needed to ask the witnesses." (Grala Depo, at 102). The

panel's findings "were based on" the hearing testimony and the members' "own individual notes." (Grala Depo, at 104). Dr. Grala knew that "several" of the other panel members "referred to their own notes." *Id.* Other panel members indicated they did (or may have) taken notes. (Kundu Depo, at 38) (recalls writing notes and potentially highlighting); (Dale Depo, at 37-38) (may have taken notes but could not remember); (Dutta Depo, at 18) (probably took some notes).

## STANDARD

The Court should not grant summary judgment unless there "is no genuine dispute as to any material fact . . . ." FED. R. CIV. P. 56(a). In evaluating the Defendants' summary-judgment motion, the Court must review the record "in the light most favorable" to Dr. Zhang, the non-moving party. *Harstad v. City of Columbus, Miss.*, No. 1:13-CV-004-DMB-DAS, 2014 WL 4913966, at \*2 (N.D. Miss. Sept. 30, 2014) (citing *Pratt v. City of Houston*, 247 F.3d 601, 606 (5th Cir. 2001)).

## ARGUMENT

### (1) *There is Evidence to Support Dr. Zhang's FMLA Interference Claims.*

Dr. Zhang pursues direct claims under the FMLA's self-care provisions. (ECF [92], Count 1). Dr. Zhang has presented evidence that the University denied or effectively denied several leave requests in violation of the FMLA's family-care provisions. To establish an FMLA interference claim, Dr. Zhang must show (1) his employer was subject to the FMLA's requirements, (2) he was entitled to FMLA benefits, (3) the employer denied those benefits, (4) he gave notice of his intention to take leave, (5) his employer denied him the benefits to which he was entitled under

the FMLA, and (6) he was prejudiced. *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 526 (5th Cir. 2021). Defendants do not contest that they were subject to the FMLA or that Dr. Zhang was entitled to FMLA benefits. They argue only that Dr. Zhang was not denied properly requested leave and cannot show prejudice. But on these questions, the record demonstrates genuine issues of material fact.

In 2021, Dr. Zhang was required to take leave for C.Z.'s medical appointments (including a dental appointment). Dr. Howard would not arrange for Dr. Zhang's classes to be covered, so Dr. Zhang had to make up the classes later. (Exhibit 67, Zhang's Interrog. Resp. No. 1); (Leave Req. Docs, at 1-10).

In September 2021, C.Z. had been exposed to COVID-19, and Dr. Zhang requested leave from Dr. Howard. Dr. Howard delayed approval of this request for leave, which effectively forced Dr. Zhang to teach the class anyway. (Zhang's Interrog. Resp. No. 1); (Leave Request Docs., at 11-18, 21-24).

In October 2023, Dr. Howard and Dr. Morrison delayed in approving Dr. Zhang's request for leave to care for C.Z. Because leave was delayed, Dr. Zhang drove from Brandon to Starkville with C.Z. and brought him to the office. The leave was only approved after Dr. Zhang drove C.Z. to Starkville and his office, so Dr. Zhang was effectively denied a portion of that leave request. (Zhang's Interrog. Resp. No. 1); (Leave Request Docs., at 38-43).

Dr. Zhang requested leave to care for C.Z. from January 2, 2024 through January 5, 2024. Dr. Morrison asked Dr. Zhang to withdraw this request because classes were not in session so no leave would be granted. (Zhang's Interrog. Resp. No.

24

1); (Leave Request Docs., at 44-47). These days were scheduled faculty work days, so it was necessary for Dr. Zhang to have this leave to be able to take off work. (Zhang Dec., ¶12).

Given this record evidence, the jury could infer interference with Dr. Zhang's family-care rights under the FMLA, and that Dr. Zhang suffered prejudice from that interference. Summary judgment should be denied.

### (2) *There is Evidence to Support Dr. Zhang's Rehabilitation Act and ADA Claims.*

Dr. Zhang pursues direct and *ex parte Young* claims under the Rehabilitation Act and *ex parte Young* claims under the ADA. (ECF [92], Counts 2 & 5). To prove disability discrimination under the Rehabilitation Act, Dr. Zhang needs to first make a prima facie case by showing that (1) he was an individual with a disability, (2) he was otherwise qualified, (3) he worked for a program receiving federal assistance, and (4) he was discriminated against "solely by reason" of his disability. *Houston v. Texas Dep't of Agric.*, 17 F.4th 576, 586 (5th Cir. 2021). The prima facie case under the ADA is slightly different, requiring Dr. Zhang to prove that (1) that he had a disability or was regarded as disabled, (2) that he was qualified for his job, and (3) that he "was subject to an adverse employment decision" because of his disability. *Strife v. Aldine Indep. Sch. Dist.*, 138 F.4th 237, 248 (5th Cir. 2025). Whereas the Rehabilitation Act requires that disability be the sole reason for Dr. Zhang's adverse actions, the ADA requires only motivating-factor causation. *Harmon v. Collier*, 158 F.4th 595, 608 (5th Cir. 2025).

Defendants do not meaningfully dispute that Dr. Zhang had a disability (his debilitating back pain that prevented him from walking to his office), that he was qualified for his job, or that the University received federal assistance. Defendants' only argument about Dr. Zhang's *prima facie* case is that he "cannot show a causal connection" (ECF [148], at 27)]). Narrowly framing the issue, Defendants contend that Dr. Zhang's termination is the only possible adverse employment action that could be actionable under the Rehabilitation Act. But under a 2024 Supreme Court decision, the Fifth Circuit's historical standard for adverse employment action has been significantly relaxed. *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 359 (2024). Post-*Muldrow*, an employment action is adverse so long as Dr. Zhang experienced "some injury respecting h[is] employment terms or conditions." *Id.* Under this standard, the evidence shows numerous adverse employment actions by the Defendants along the way to termination, including (1) changing the grades assigned by Dr. Zhang in Fall 2021, (2) stripping Dr. Zhang of his teaching responsibilities in Spring 2022 (and never allow him to teach again), (3) sabotaging the UTC proposal led by Dr. Zhang, (4) cancelling the extension for Dr. Zhang's MDOT project, (5) issuing pre-determined and poor annual reviews for 2021 and 2022, and (6) terminating Dr. Zhang.

The jury could easily infer that each of these events was solely caused by Dr. Zhang's debilitating back pain. It was when Dr. Zhang needed leave for his back surgery that the Provost—who sits above all faculty and other academic administrators at the institution—wrote:

> There's a long history of issues here, and we need to aggressively do everything we can to rectify this situation. He's been repeatedly working the system to his advantage. Leslie [the HR director], I'd like for you to work with Jason and Isaac to develop an action plan to stop this behavior.

(November 2021 Emails, at 2).

A jury could find that, from this point on, the University administrators' hostile attitude toward Dr. Zhang, including their instructions for students to "keep a record" on Dr. Zhang and their desire to "let him fail" directly flowed from Dr. Shaw's top-down directive that was directly connected to Dr. Zhang's disability.

Because Dr. Zhang has satisfied his prima facie case, he can defeat summary judgment by showing that Defendants' proffered "legitimate" reason for terminating him is pretext. *Cromwell v. Boa Vida Hosp. of Aberdeen, MS, L.L.C.*, No. 22-60109, 2023 WL 2535739 (5th Cir. Mar. 16, 2023). Pretext means the explanation is "false or unworthy of credence," that is, "if it is not the real reason for the adverse employment action." *Id.*

Defendants have not clearly articulated the non-discriminatory reason for each adverse employment action. But whatever the precise reasons are, there is evidence of pretext. Among other things:

- Dr. Zhang's dean, Jason Keith, who was close to (and in fact appointed) the deeply unpopular Isaac Howard poisoned the well against Dr. Zhang in private conversations with the provost, Dr. Shaw.

- Based on these limited conversations within just one semester, Dr. Shaw developed a belief that there was a "long history of issues" that by Dr. Shaw's admission, would have been more balanced if he'd talked with Dr. Zhang also, something he did not do.

27

- In direct response to a request for medical leave, Dr. Shaw cited this "long history of issues," expressed a belief that Dr. Zhang had "been repeatedly working the system to his advantage"—i.e., seeking legitimate employment benefits for needed leave, and he directed a team of Dr. Zhang's superiors to "aggressively do everything we can to rectify this situation."

- After Dr. Shaw's directive, Dr. Keith and Dr. Green freely joked in emails about Dr. Zhang's English skills.

- After Dr. Shaw's directive, administrators intervened by changing grades, giving students a free pass by significantly raising grades, including from "D" to "A" and from "F" to "B."

- The semester after Dr. Shaw's directive, Dr. Howard instructed complaining students to "keep a record" against Dr. Zhang and did not inform Dr. Zhang about the complaints or give him an opportunity to address them.

- Dr. Green, Dr. Howard, and Dr. Keith drummed up purported "safety concerns" about a traffic counting project that had always been a component of the course, had been approved by the University Curriculum Committee, and was no more dangerous than "walking around campus"—something students do every day.

- Administrators used these baseless safety concerns and the "record" of student complaints that they had compiled to remove Dr. Zhang from his Spring 2022 class, something that was wholly unjustified. The University then cited this self-generated reason as a basis for Dr. Zhang's termination. (Exhibit 53, Supplemental Notice of Intent).

- The University's administrators sabotaged Dr. Zhang's major UTC proposal. They did not support Dr. Zhang's efforts as they should have, but rather allowed him to lead the proposal to "let him fail." When Dr. Zhang did not fail, but submitted (along with his team) a successful proposal with a reasonable opportunity for funding, Dr. Julie Jordan (who was in frequent contact with Dr. Shaw) literally made Dr. Zhang fail by punishing him for someone else's conduct and withdrawing the proposal without even communicating with the collaborating Universities. The University then cited this self-generated reason as a basis for Dr. Zhang's termination. (Supplemental Notice of Intent).

- After Dr. Zhang secured an extension for another project through MDOT, Dr. Jordan called MDOT and cancelled the extension, leading MDOT to incorrectly assume that Dr. Zhang did not intend to present a final report. The University then cited this self-generated reason as a basis for Dr. Zhang's termination. (Supplemental Notice of Intent).

- Dr. Howard, Dr. Keith, Dr. Shaw, and general counsel collaborated on the annual reviews that Dr. Zhang would receive for 2021 and 2022. These reviews were improperly pre-determined, not even remotely timely, and were not signed by the correct parties. The University cited these pre-determined reviews as a basis for Dr. Zhang's termination. (Termination Letter); (Supplemental Notice of Intent).

- The University failed to afford Dr. Zhang a fair and neutral hearing by failing to alert the full P&T Committee to the hearing date (despite counsel's continual insistence on full panel attendance), by refusing to grant Dr. Zhang access to his University-stored materials, and by having its own general counsel who favored Dr. Zhang's termination serve as a confidential advisor to the faculty panel.

- The University's general counsel's office destroyed critical evidence that served as the basis for the panel members' votes.

Based on this evidence, the jury could find that Defendants manufactured reasons for Dr. Zhang's termination that were not the real reasons that they wanted him fired. The jury may infer disability discrimination under the Rehabilitation Act.

### (3) *There is Evidence to Support Dr. Zhang's Title VII and ADEA Claims.*

Dr. Zhang pursues direct *ex parte Young* claims under Title VII and *ex parte Young* claims under the ADEA. (ECF [92], Counts 3 & 5). To prove discrimination under Title VII based on race and national origin and under the ADEA based on age, Dr. Zhang needs to first make a prima facie case by showing that he (1) is a member of a protected class, (2) was qualified for his position, and (3) suffered an adverse employment action. *Porter v. Siemens Indus., Inc.,* No. 3:19CV109TSL-RHW, 2020

29

WL 13682783, at *2 (S.D. Miss. June 30, 2020). Although Defendants take too narrow a view of "adverse employment action" (as discussed above), they do not dispute any of these elements for Dr. Zhang's Title VII claims.

Dr. Zhang must also satisfy the factually-tailored fourth element of the *prima facie* case. Defendants advocate for a strict version of this element for Dr. Zhang's Title VII claims, asserting that Dr. Zhang must identify a replacement outside his class or strict comparators who received dissimilar treatment. (ECF [148], at 26). But "the precise requirements of the prima facie case can vary with context and were 'never intended to be rigid, mechanized, or ritualistic." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 507, 122 S. Ct. 992, 995, 152 L. Ed. 2d 1 (2002). For the ADEA claims, Defendants concede that it's enough to show that Dr. Zhang was "otherwise discharged because of [his] age." (ECF 148, at 26). And in work-rule cases arising under both Title VII and the ADEA, plaintiffs may satisfy this context-specific fourth element by showing that the plaintiff "did not violate the work-rule for which he was disciplined." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) (quoting *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980)); *Porter*, 2020 WL 13682783, at *2; *Harkness v. Bauhaus U.S.A., Inc.*, 86 F. Supp. 3d 544, 556 (N.D. Miss. 2015) (applying work-rule doctrine to age discrimination case).

Here, Dr. Zhang was terminated for several conduct-related work "rules" that he did not violate. For example, he timely submitted grades in December 2021, even though he should have been on leave. He did not conduct an "unsafe" traffic counting assignment. He did not contact congressional delegation or ask others to do so, though

he was punished for it. This, when combined with the ethically-charged comments about Dr. Zhang's ability to speak English, the fact that every supervisor and faculty panel member taking action or voting against him is Caucasian, plus the facts that several of his classes were assigned to a white/Caucasian professor without a Ph.D, satisfy Dr. Zhang's prima facie case of discrimination.

Because Dr. Zhang has satisfied his prima facie case, he can defeat summary judgment by showing that Defendants' proffered "legitimate" reason for termination is "merely pretext for discrimination."); *Porter*, 2020 WL 13682783, at \*2. For the reasons explained above (fully incorporated here), the jury could find that the Defendants' manufactured reasons for Dr. Zhang's termination were not the real reasons that they wanted him fired and are thus pretextual.

### *(4) There is Evidence to Support Dr. Zhang's Retaliation Claims.*

Dr. Zhang pursues direct and *ex parte Young* retaliation claims under the FMLA's family-care provisions, the Rehabilitation Act, and Title VII. (ECF [92], Counts 4 and 5). Dr. Zhang also pursues *ex parte Young* claims for retaliation under the FMLA self-care provisions, ADA, Rehabilitation Act, ADEA, and Title VII. (ECF [92], Count 5). To prove retaliation, Dr. Zhang needs to first establish a prima facie case by showing that he (1) "engaged in a protected activity," (2) "suffered an adverse employment action," and (3) "a causal connection exists between the protected activity and the adverse employment action." *Jones v. McDonough*, No. 1:21CV68-HSO-BWR, 2022 WL 16840339, at \*1 (S.D. Miss. Nov. 9, 2022) (citing *Cohen*, 557 F.

31

App'x 277-78) & *Saketkoo v. Admins. Of Tulane Educ. Fund*, 31 F.4th 990, 997 (5th Cir. 2022)); *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 390 (5th Cir. 379)).

Dr. Zhang undisputedly engaged in protected activity. On February 7, 2022, his then-attorney sent an email to the University's general counsel expressing violations of several employment statutes, including those prohibiting race discrimination, disability discrimination, and interference with FMLA leave. (2.7.22 Email from W. Moller to J. Lucas). Dr. Zhang filed a charge with the EEOC on March 1, 2023. (First EEOC Charge and Amendment Charge). Dr. Howard, Dr. Keith, and Dr. Shaw learned about this charge around April 2022. (University's Responses to Second Set of Interrogatories, #15).

After taking these protected activities, Dr. Zhang suffered several adverse employment actions—ultimately leading to his termination—that a jury could easily relate back to his discrimination complaints. The same month that Dr. Zhang's superiors found out about the EEOC charge, Dr. Keith emailed the whole class to schedule a meeting to "document" student experiences so the administration could "take further action." (4.28.22 Email from Keith to Entire Class). Dr. Zhang was then unceremoniously removed from teaching, and he would never teach another class at the University. This "temporal proximity" between the protected activity and his removal from class is "sufficiently close" to establish the "'causal connection' element of a prima facie case of retaliation." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020). This, and the other evidence identified above, easily satisfies Dr. Zhang's prima facie case.

Because Dr. Zhang has satisfied his prima facie case, he can defeat summary judgment by showing that Defendants' proffered "legitimate" reason for termination is really "pretextual." *Jones*, 2022 WL 16840339, at \*3 (citing *Saketkoo*, 31 F.4th at 1000 & *Cohen*, 557 F. App'x at 278). For the reasons explained above (fully incorporated here), the jury could find that the Defendants' manufactured reasons for Dr. Zhang's termination were not the real reasons that they wanted him fired and are thus pretextual.

**(5) *There is Evidence to Support Dr. Zhang's Due Process Claims*.**

Dr. Zhang pursues reinstatement claims under *ex parte Young* for violations of the Fourteenth Amendment's due process clause. As a tenured professor, Dr. Zhang was entitled to significant procedural safeguards under the Fourteenth Amendment. He had the right to:

> (1) be advised of the cause for his termination in sufficient detail so as to enable him to show any error that may exist; (2) be advised of the names and the nature of the testimony of the witnesses against him; (3) a meaningful opportunity to be heard in his own defense within a reasonable time; and (4) a hearing before a tribunal that possesses some academic expertise and an apparent impartiality toward the charges.

*Levitt v. Univ. of Texas at El Paso*, 759 F.2d 1224, 1228 (5th Cir. 1985) (citing *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970)).

These requirements were not met. As explained above, there were several irregularities in the administrative procedure that call into question its fundamental fairness. The full P&T Committee didn't learn about the hearing date until right before the hearing, and then the full committee could not attend. Dr. Zhang did not

have access to his OneDrive, Banner, and email accounts. And one of the P&T Committee's confidential advisor was the University's general counsel, who had been consulted about and signed off on Dr. Zhang's termination in the first place.

There is also substantial evidence that, well before the hearing, Defendants (through Dr. Shaw, Dean Keith, and Isaac Howard) had already planned to terminate Dr. Zhang. The February 14, 2024 "Notice of Intent" to Dr. Zhang said that it "will be terminated for cause" in two weeks, that Dr. Zhang was "[a]s of today . . . relieved of all work duties" and that his campus and office access would be immediately terminated. (Termination Letter). Dr. Morrison admitted (before being spared by the panel chair) that "we provided you with a termination letter on February 14." (Morrison Tr., 24).

There is also evidence that the hearing before the P&T Committee was a formality that would have no meaningful impact on the outcome for Dr. Zhang, which had been pre-determined. The P&T Committee and each of its members directly report to Dr. Shaw, the Provost and chief academic officer at the University. (Grala Depo, at 21, 110-112); (Exhibit 11, Gammill Depo, at 22). In other words, the P&T Committee is an extension of the Provost's office, and the Provost has the authority to disagree with the recommendations of the P&T Committee, regardless of their findings. (HRM 60.113).

In November 2021, Dr. Shaw had instructed administrators to "aggressively do everything we can to rectify this situation." (November 2021 Emails, at 2). Dr. Shaw was the person who signed Dr. Zhang's termination letter in February 2024.

(Termination Letter). And after the P&T Committee made its findings, including recommendations to correct problems with Dr. Zhang's annual reviews, Dr. Shaw agreed with the part he liked but not the part that he didn't. (Hearing Panel Recommendation); (Exhibit 66, 6.20.25 Ltr from Shaw to Keenum). He wrote to President Keenum: "While I disagree with some of [the P&T Committee's] factual findings, I concur with their recommendation to terminate Dr. Zhang." (6.20.25 Ltr from Shaw to Keenum). Dr. Keenum accepted this recommendation without comment. (Exhibit 69, Dr. Keenum's Final Termination Letter).

While "bias by an adjudicator is not lightly established," a defect in due process "arises when the decision makers have prejudged the facts to such an extent that their minds are 'irrevocably closed' before actual adjudication." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1052 (5th Cir. 1997). Based on all the evidence, the jury can infer that Provost Dr. Shaw, the most significant decision-maker in this case, had firmly made up his mind when he sent the termination letter in February 2024.

For all these reasons, questions of fact preclude summary judgment on Dr. Zhang's due process claims. *Moon v. Midwestern State Univ.*, No. C.A.7:02-CV-270-R, 2004 WL 575953, at *4 (N.D. Tex. Feb. 18, 2004), *on reconsideration in part*, No. CIV.A. 7:02-CV-270-R, 2004 WL 1454410 (N.D. Tex. June 28, 2004) (denying motion to dismiss on allegations that defendants had personal and financial interests in termination and prejudged the facts).

## CONCLUSION

The Court should deny the Defendants' motion for summary judgment.

Dated: March 5, 2026

                                         _/s/ Grafton E. Bragg_
                                         GRAFTON E. BRAGG (MSB #104821)
                                         Attorney for Plaintiff

BraggLaw, PLLC
965 Madison Avenue
Suite 2C
Madison, MS 39110
601.624.1153
grafton@graftonbragglaw.com

36